# EXHIBIT 14



translations@geotext.com
www.geotext.com

STATE OF CALIFORNIA    )
    )
    )
COUNTY OF SAN FRANCISCO )    ss

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from French into English of the attached Writ of Summons to Appear at

Short Notice Before the Paris Commercial Court.


Jennifer Allen, Project Manager
Geotext Translations, Inc.

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this 9th day of ___July___, 20 15 ,

by ___Jennifer Allen___ ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature: _Kurt adam Shlib_

**KURT ADAM SHULENBERGER**
Commission No. 2039095
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires AUGUST 27, 2017

New York
t: +1.212.631.7432

London
t: +44.20.7553.4100

Washington, D.C.
t: +1.202.828.1267

Paris
t: +33.1.42.68.51.47

Chicago
t: +1.312.242.3756

Stockholm
t: +46.8.463.11.87

Houston
t: +1.713.353.3909

Frankfurt
t: +49.69.7593.8434

San Francisco
t: +1.415.576.9500

Hong Kong
t: +852.2159.9143

**WRIT OF SUMMONS TO APPEAR AT SHORT NOTICE BEFORE THE
PARIS COMMERCIAL COURT**

_____

**IN THE YEAR TWO THOUSAND FIFTEEN AND ON THE**

**AT THE REQUEST OF:**

**XPO Logistics, Inc.**, a company incorporated under the laws of the State of Delaware, United States of America, whose registered office is at Five Greenwich Office Park, Greenwich, Connecticut 06831, United States of America, represented by its Chief Executive Officer, Bradley S. Jacobs, hereinafter referred to as "**XPO**",

**XPO Logistics France**, a limited liability company incorporated under the laws of France in the Paris Trade and Companies Register under number 811 597 335, whose registered office is at 23 rue du Roule, 75001 Paris, France, represented by its Chairman, John Jay Hardig, hereinafter referred to as "**XPO France**",

> *Represented by counsel:*   Emmanuel Brochier and Bertrand Cardi
> Lawyers before the Paris Bar (ID No. R170)
> Darrois Villey Maillot Brochier A.A.R.P.I.
> 69 avenue Victor Hugo, 75116 Paris
> Tel. : 01 45 02 19 19 – Fax : 01 45 02 49 59
>
> And whose address for service is at the said lawyer's office;

**I, THE UNDERSIGNED**

**COURT BAILIFF,**

**Pursuant to an order made on request by the President of the Paris Commercial Court dated July 8, 2015, with a copy of such order and of the request being attached to this instrument,**

**HAVE ISSUED SUMMONS TO:**

Elliott Capital Advisors, L.P., a Delaware limited partnership, whose registered office is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington DE 19801, United States of America,

The Liverpool Limited Partnership, a Bermuda limited partnership, whose registered office is c/o Appleby Corporate Services (Bermuda) Ltd., Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda,

Elliott International, L.P., a Cayman Islands limited partnership, whose registered office is c/o Maples & Calder, P.O. Box 309, Ugland House, South Church Street, George Town, Cayman Islands, British West Indies,

Elliott Associates, L.P., a Delaware limited partnership, whose registered office is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington DE 19801, United States of America,

1

**To appear on** September 29, 2015 **at** 2 pm**, at the hearing before the President and Judges of the 7**[th] **Chamber of the Paris Commercial Court at 1 quai de Corse in Paris (75004).**

And inform them that a lawsuit has been filed against them for the reasons set out below; and that they must appear at the hearing or be assisted or represented thereat by any person of their choice who, if not a lawyer, holds a specific power of attorney.

And inform them that if they do not appear, a judgment may be given against them based solely on the evidence presented by the claimants.

The documents on which the claim is based are listed at the end of this summons.

Article 861-2 of the French Code of Civil Procedure:

*"Without prejudice to the provisions of Article 68, application for the grant of time to pay pursuant to Article 1244-1 of the Civil Code can be made in the form of a declaration made, delivered or addressed to the Office of the Clerk of the Court, where it will be recorded. Persons making such applications must prove before the hearing that their opponent was informed thereof by registered letter with acknowledgement of receipt. Any documents cited by the party in support of its request for time to make payment must be attached to the declaration.*

*Pursuant to the second paragraph of Article 446-1, persons making such an application need not attend the hearing. In that event, the judge will only uphold the claims made against that party if he/she considers them to be proper, admissible and valid."*

Pursuant to Article 56 of the French Code of Civil Procedure, it is stated that, due to the urgency of the matter, no attempt has been made to reach an amicable solution to the dispute.

2

**MAY IT PLEASE THE COURT**

The investment fund Elliott is attempting by hidden and unfair tactics to disturb the normal conduct of the simplified public tender offer filed by XPO for the transportation company Norbert Dentressangle in order to make an illicit profit.

To achieve its ends, Elliott Capital Advisors, L.P. ("**Elliott**") entered into derivative agreements with one or more banks for more than 7% of the share capital of Norbert Dentressangle, which in all likelihood led the banks to acquire the same number of Norbert Dentressangle shares. The purpose of this – which until now was unknown to the market – is to prevent these shares from being included with the public offer, which will block the implementation by XPO of the squeeze out that will enable it to acquire the entire share capital of Norbert Dentressangle. Elliott obviously seeks to obtain an undue advantage in exchange for these shares.

However, these tactics are contrary to several mandatory provisions of regulations governing tender offers, which in particular require all stakeholders to behave fairly, transparently and in a manner respectful of the orderly conduct of the Offer. It is therefore appropriate for this court to order Elliott to end its illicit actions and indemnify XPO for the resulting damage.

3

**Table of Contents**

**1.    THE FACTS** ..................................................................................................................**5**

1.1.   The simplified tender offer by XPO on Norbert Dentressangle ...........................................5

1.2.   The transactions carried out by the Funds on the shares of Norbert Dentressangle since the announcement of the Offer ........................................................................................................5

    *1.2.1.  The usual characteristics of CFDs* ...........................................................................6
    *1.2.2.  The transactions reported by the Funds and Bank of America*...................................6

1.3.   Elliott's goal is to block the announced squeeze-out.............................................................7

1.4.   XPO and XPO France are going to file a complaint with the AMF .......................................7

**2.    ARGUMENT** ...................................................................................................................**8**

2.1.   The Transaction is illegal ......................................................................................................8

    *2.1.1.  The Transaction's purpose is to prevent XPO from implementing the announced squeeze-out in order to obtain an undue advantage*.....................................................................8
    *2.1.2.  The Transaction is an unfair and hidden disruption to the free play of the Offer* ..................10

2.2.   The harmful consequences of the Transaction ...................................................................12

    *2.2.1.  The cessation of the illegal situation* ......................................................................12
    *2.2.2.  The damage suffered by XPO and XPO France* ....................................................12

4

## 1.      THE FACTS OF THE CASE

### 1.1.      The simplified tender offer by XPO for Norbert Dentressangle

Norbert Dentressangle SA ("**Norbert Dentressangle**") is the holding company of an international logistics and transport group whose revenues totaled €5.1 billion in 2014. The shares of Norbert Dentressangle are listed on Euronext Paris.

XPO is a leading actor in logistics in North America. The group made consolidated revenues of $2.3 billion in 2014 and the XPO shares are listed on the New York Stock Exchange.

On April 28, 2015, XPO announced (Exhibit 1: Joint press release, April 28, 2015; Exhibit 2: Opening of the pre-Offer period) that:

–     it had undertaken to acquire 67% of Norbert Dentressangle's outstanding shares, at a price of €217.50 per share;

–     it had filed a simplified public tender offer for the remaining shares of Norbert Dentressangle, in cash and at the same price (the "**Offer**");

–     it intended to implement a squeeze-out upon completion of the Offer, if the conditions provided by the regulations are fulfilled.

A squeeze-out is a procedure that allows the initiator of a public tender offer holding, upon completion of the offer, more than 95% of the shares and voting rights of the targeted company to force the minority shareholders to sell their shares at the price of the offer. The initiator then acquires the entire share capital of the targeted company, which allows it to simplify the governance of the new group, thus ending listing-related constraints and facilitating tax consolidation.

The price offered by XPO to acquire the entire share capital of Norbert Dentressangle – more than two billion euros – represents a premium of 37.8% as compared to the last closing price and of nearly 80% as compared to the 12-month average, which represents a premium higher than the average premium recorded in this type of transaction. The independent expert appointed pursuant to the AMF General Regulations moreover noted that the price of the Offer resulted in a premium irrespective of whichever valuation method was employed and concluded that the price of the Offer was fair for the minority shareholders (Exhibit 7: Reply Note of Norbert Dentressangle).

Sixty-seven percent of the outstanding shares of Norbert Dentressangle were acquired by XPO France, a 100% subsidiary of XPO, on June 8, 2015 (Exhibit 3: joint release, June 8, 2015). XPO then filed the proposed Offer with the AMF. The Offer was cleared by the AMF on June 23, 2015. It was opened on June 26, 2015 and will close on July 17, 2015 (Exhibit 4: filing of the proposed Offer; Exhibit 5: approval of the Offer; Exhibit 8: Offer timetable).

### 1.2.      The transactions carried out by the Funds on the shares of Norbert Dentressangle since the announcement of the Offer

Since the announcement of the Offer, Elliott, on behalf of Elliott Capital Advisors LP, The Liverpool Limited Partnership, Elliott International LP and Elliott Associates LP (the "**Funds**"), has been entering into cash settled contracts for difference ("**CFDs**")[1] relating to the Norbert Dentressangle shares. It is important, prior to presenting the transactions (1.2.2), to summarize the usual characteristics of CFDs (1.2.1).

---

[1] These are financial contracts as provided for by Article L.211-1 of the French Monetary and Financial Code; they are covered by Article D.211-1 A, point 6, of the same code.

1.2.1.    The usual characteristics of CFDs

CFDs are similar to equity swaps and are typically concluded between a bank and an investor, thus allowing the latter, without itself acquiring the shares covered by the CFD (known as "underlying shares") to be placed in the same economic situation as if it had acquired them when entering into the CFD and then resold them on its maturity date:

–    in the event of an increase in the market price of the underlying share during the duration of the CFD, the bank pays the amount of the increase (and, if the contract so provides, the dividends potentially paid out during this period) to the investor;

–    in the event of a decrease in the market price of the underlying share during the duration of the CFD, the investor pays the amount of the decrease to the bank.

In general, CFDs give to the investor a right to settle at any moment, including before their maturity date. CFDs can also not have a stated maturity date.

The bank's remuneration consists of fixed trading commissions and interest calculated according to the amount of the underlying shares and of the duration of the CFD. The cost of the CFD for the investor is thus substantially lower than the acquisition cost of the underlying shares. Moreover, the bank has to adopt measures[2] that protect it against the following risks:

–    The risk of default by the investor when the CFD comes to maturity, in the event of a decrease in the market price of the underlying share: to protect itself against this risk, the bank performs "margin calls" by requesting that the investor deposit with it an amount in cash representing a fraction of the underlying share when entering into the CFD; this amount is regularly adjusted according to changes in the share price.

–    The risk of increase in the market price, which would cause it to incur a debt towards the investor: to protect itself against this risk, **the bank acquires shares on the market that it keeps until the maturity of the CFD**. Accordingly, in the event of an increase in the market price at the maturity date, the resale of the shares would allow it to realize a capital gain that it passes on to the investor. In the case of the CFDs, the "delta" (i.e., the ratio between the number of shares acquired for hedging purposes and the number of CFDs) may be equal to one: for each CFD, the bank would acquire one share. The delta may, however, be adjusted by the banks depending on their hedging strategy and overall exposure to the underlying shares.

The CFDs in question do not confer on the investor the right to acquire from the bank the underlying securities. **However, it is very frequent to settle such instruments in kind by transferring the shares, which on occasion reveals the illegality of the investor's scheme.**[3]

1.2.2.    The transactions reported by the Funds and Bank of America

After the announcement of the Offer, on May 8, 2015, Elliott acquired, on behalf of the Funds, 100 Norbert Dentressangle shares. Since then, Elliott has been entering into CFDs almost on a daily basis, at a reference price close to the Offer price or equal to it, with a maturity date of January 29, 2016. On July 1, 2015, the Funds held 18,276 Norbert Dentressangle shares and 724,099 CFDs, representing an economic exposure of approximately 7.55% of the capital of Norbert Dentressangle (Exhibit 10: Elliott statements published by the AMF).

---

[2] Article L.533-2 of the French Monetary and Financial Code and judgment dated February 20, 2007, Articles 292-1 and 294; G.-A. Frot, *Les opérations de couverture conclues au titre de dérivés actions (Hedging transactions through derivatives)*, RTDF n°4, 2009, p.65.

[3] It is this mechanism that allowed LVMH in October 2010 to acquire within a few days a substantial stake representing about 13% of the share capital of Hermès (AMF Sanctions Committee decision dated June 25, 2013 against LVMH).

On July 1, 2015, BoA held 678,301 Norbert Dentressangle shares and had sold 677,864 cash-settled equity swaps relating to as many Norbert Dentressangle shares, with a maturity date of January 29, 2016 (the "**Equity Swaps**") (Exhibit 11: BoA statements published by the AMF). BoA is in all likelihood the banking counterparty from which Elliott purchased its CFDs. This is evidenced by the similarity between the Equity Swaps sold by BoA since June 17, 2015 and the CFDs purchased by Elliott during the same period: the number of daily transactions is very close and sometimes identical, and their prices of reference are very close and their maturity dates are identical.

On July 2, 2015, Elliott purchased 724,910 Norbert Dentressangle shares and sold all of its CFDs (Exhibit 10: Elliott statements published by the AMF).

All of the transactions described above are summarized in table format (Exhibit 9: summary of the transactions carried out by the Funds and BoA).[4]

### 1.3.    Elliott's goal is to block the announced squeeze-out

At two investors' meetings organized by XPO on June 1, 2015, Elliott representatives asked many questions in relation to the potential inability of XPO to implement the announced squeeze-out at the end of the Offer and the financial consequences resulting therefrom for XPO (Exhibit 12: Affidavit of Scott Malat). Since there was no reason at the time to anticipate a failure of the squeeze-out, it is obvious that Elliott already planned to organize such a failure.

In mid-June 2015, a representative of Elliott contacted XPO's advisory bank. On June 19, 2015, the latter returned Elliott's call in order to set up a meeting. The Elliott representative said, however, that a meeting did not appear to be necessary after all. He added: "*we will decide late but a priori we won't tender (…). We think XPO needs to pay more (…). We'll see whether we discuss after closing*" (Exhibit 13: script of phone call between XPO's advisory bank and Elliott). These statements confirm that Elliott (i) has full control over the shares, (ii) is inclined not to tender the shares and (iii) will thereafter attempt to obtain an undue advantage.

### 1.4.    XPO and XPO France are going to file a complaint with the AMF

XPO and XPO France are going to file a complaint with the AMF under Article L.621-19 of the French Monetary and Financial Code. The purpose of such complaint is for the AMF to be aware of the numerous violations of its General Regulations by the Funds so that it may initiate an investigation on the facts of this case, if it deems appropriate to do so, which could lead to the opening of a sanctions proceeding under Article L.621-15 of the French Monetary and Financial Code.

It should be noted that Article L.621-20 of the French Monetary and Financial Code provides that civil courts may ask the AMF for advice when they have to rule on the application of the laws and regulations on which the AMF has jurisdiction. This may be relevant in the present case.

---

[4] In addition, at least since May 20, 2015, Cheyne Capital Management (UK) LLP ("**Cheyne**") concluded CFDs on the Norbert Dentressangle shares at a reference price that was on several occasions higher than the Offer price, with no maturity date. Cheyne did not reveal the acquisition date of its first CFDs, but they were presumably concluded subsequent to the announcement of the Offer. On June 22, 2015, Cheyne held 143,150 CFDs, representing an economic exposure of approximately 1.46% of the capital of Norbert Dentressangle.

**2.**     <u>ARGUMENT</u>

Elliott has engaged in a transaction (the "**Transaction**") that is illegal (2.1) and prejudicial to XPO and XPO France (2.2).

**2.1.**     **The Transaction is illegal**

The Transaction's purpose is to prevent XPO from implementing the announced squeeze-out in order to obtain an undue advantage (2.1.1) and is illegal because it is an unfair and concealed disruption to the free play of the Offer (2.1.2).

2.1.1.     <u>The Transaction's purpose is to prevent XPO from implementing the announced squeeze-out in order to obtain an undue advantage</u>

On July 6, 2015, Elliott disclosed that it purchased 724,910 Norbert Dentressangle shares and sold all of its CFDs. This transaction, as well as Elliott's statements (see 1.3 above) and the set of evidence listed below, demonstrates that the purpose of the Transaction is to prevent XPO from implementing the announced squeeze-out.

(i)     The timetable and context of the Transaction demonstrate that Elliott does not intend to tender in the Offer:

–    Elliott started its transactions on Norbert Dentressangle after the announcement of the mandatory Offer triggered by the transfer of Norbert Dentressangle's control to XPO, and nothing indicates that Elliott had invested in Norbert Dentressangle beforehand;

–    The quantities in question are such that over 5% of Norbert Dentressangle's capital is tied up during the Offer period, which will prevent XPO from obtaining 95% of Norbert Dentressangle's shares at the close of the Offer;

–    No competing offer can reasonably be expected for Norbert Dentressangle, since XPO now owns two thirds of its capital, which excludes any increase of the Offer price;

–    The average reference price for Norbert Dentressangle's shares in the CFDs is close to the Offer price, and therefore the transactions in question cannot be intended to take advantage of a price difference.

Elliott claimed its initial intention when acquiring CFDs was to "*ask XPO to increase its selling price in exchange for our contribution*", and then only later realized, with some delay, that XPO was unable to increase its Offer (Exhibit 13: script of phone call between XPO's advisory bank and Elliott). Such an explanation does not make sense. Elliott is a professional investor and knows from the very onset that there will not be any competing offer nor any reason for XPO to increase its selling price

(ii)     Elliott and BoA did everything possible to conceal the Transaction:

In their statements of intent, Elliott merely stated that it planned to continue its acquisitions, without specifying its intentions with regard to the Offer (Exhibit 10: Elliott statements published by the AMF). Admittedly, Article 231-47 of the AMF General Regulations only obliges the declarant to reveal its intentions with respect to the offer as from its filing date. However, this solution is justified where there is uncertainty about the filing of the offer or its terms, which is not the case here. Moreover, under normal market practices, the majority of declarations made during the pre-offer period include the intentions of the declarant with regard to the offer.[5] In addition, Elliott never specified its intentions after the Offer was

---

[5] Among the 21 declarations of intent in a pre-offer period from 2011 to 2015, 14 (i.e., 66.7%) included the declaring party's intent to tender or not tender its shares (for examples, see 215C0508, 214C0682, 214C2380, 212C1076, 212C0982, 212C0925).

filed, aggravating this breach while its stake has increased by more than 2% since then.

Article 231-52 of the AMF General Regulations obliges financial services providers to disclose their holding in a company targeted by a tender offer 1 trading day after such holding's increase exceeds 1% of that company's share capital since the opening of the pre-offer period. However, BoA disclosed its transactions on the Norbert Dentressangle share (in securities and in derivatives) only several days after having crossed the 5% threshold (Exhibit 11: BoA statements published by the AMF). Moreover, it did so in an incomplete way: BoA's declaration of intent is elusive and does not make any reference to Elliott; BoA uses the term "Equity Swaps" when Elliott is referring to "CFDs"; the prices of reference of BoA's Equity Swaps do not correspond exactly to those of Elliott's CFDs; BoA indicates that it reserves the opportunity to tender to the Offer while it knows that this decision is in practice difficult as long as the CFDs are not settled since it must maintain its hedge. Finally, BoA was late, on July 2, 2015, in resolving the declaration of it having crossed the 5% threshold (Exhibit 11: BoA statements published by the AMF).

(iii)   Elliott frequently engages in strategies disrupting the merger process between companies in order to obtain more favorable conditions than other shareholders:

During the mandatory tender offer filed in 2006 by Eiffarie for the APRR securities, entities affiliated with Elliott bought APRR securities on the market and crossed the 5% threshold before the end of the offer, thus preventing Eiffarie from crossing the 95% threshold of capital and voting rights. The AMF Sanctions Committee noted in a recent decision that Elliott's directors had become convinced that "*if [the Elliott Fund] managed to gather a sufficient block of shares to obstruct in the immediate term, the proposal by Eiffarie [to conduct a squeeze out], it would be able to earn significant added value in the subsequent sale of its stake in the latter, motivated by the prospect of delisting and the tax integration of APRR, or from the potential sale to a third party*". The AMF Sanctions Committee imposed on the two entities concerned a €16 million fine for breaking insider trading rules, since those entities continued to acquire securities on the market during negotiations of the block purchase with Eiffarie (Exhibit 14: AMF Sanctions Committee decision of April 25, 2014, regarding Elliott Advisors UK Ltd and Elliott Management Corporation).

In the context of the offer by McKesson Corporation on Celesio AG in 2013, Elliott acquired a portion of convertible bonds that granted access to Celesio capital and then refused to include them in the offer, which caused its failure. Elliott then managed to sell these bonds as part of a separate agreement with the initiator, at a price at which the available information established that Elliott made a substantial profit (Exhibit 15: materials relating to the McKesson/Celesio transaction).

During summer 2013, after the announcement by Vodafone of its tender offer on Kabel Deutschland for €84.50 per share, Elliott acquired a 10.9% stake in the target together with another fund, which acquired 3.41%. Vodafone obtained more than 75% of the target's capital as part of the offer (which demonstrates that the price was fair). In this context, Elliott has commenced several litigation proceedings, still pending, to try to impose on Vodafone the payment of a price in excess of €250 per share (i.e., 3 times the offer price) (Exhibit 16: materials relating to the Vodafone/Kabel Deutschland transaction).

Elliott is currently attempting to oppose a merger transaction between Samsung (in which Elliott holds 7.1%) and Cheil Industries by challenging the proposed exchange ratio. According to Samsung, Elliott's position would be based on biased documents. On July 1, 2015, a court dismissed Elliott's claim seeking an order prohibiting the transaction under consideration (Exhibit 17: materials relating to the Samsung/Cheil Industries transaction).

2.1.2.   The Transaction is an unfair and concealed disruption to the free play of the Offer

Article 231-3 of the AMF General Regulations, which sets out the guiding principles governing public tender offers, states that:

> *"To allow an offer to be conducted in an orderly fashion in the best interests of investors and the market, the parties concerned shall respect the principles of free play of offers and counter-offers, equal treatment and information for all holders of the securities of the persons concerned by the offer, market transparency and integrity, and fairness of transactions and competition."*

The Paris Court of Appeal stated that:

–   the offer guidelines **apply to any market player in the relevant security**: the free play of offers and counter-offers, in particular, *"is of general interest and concerns the behaviour of the initiator and the target company as well as of third parties"*;[6]

–   the principles regulating the tender offers are public policy provisions and are mandatory for any operator acting on a French financial market;[7]

–   unfairness takes place whenever there is "***obstruction to the free play of offers** and counteroffers through the use of **manipulative or devious means implemented in an unlawful, secret or fraudulent manner**".* [8]

Article 231-3 of the AMF General Regulations therefore applies not only to the Funds but also to BoA. Since Article 6 of the French Civil Code prohibits any *"exemptions, by private agreement, from public policy laws"*, the conclusion by the Funds of contracts violating the public order provisions governing tender offers in France is tortious under Article 1382 of the French Civil Code. The Transaction is thus clearly contrary to Article 231-3 of the AMF General Regulations as it seeks to disrupt the free play and orderly conduct of the Offer (i) in an unfair (ii) and concealed (ii) manner.

(i)   The Transaction seeks to disrupt the free play and orderly conduct of the Offer

Firstly, the free play of offers implies that XPO should not be deprived of its right to implement a squeeze-out in the event that it reaches the 95% threshold of capital and voting rights of Norbert Dentressangle at the end of the Offer. The deprivation of this right not only harms XPO but also the general interest of investors and the market.

In fact, as admitted by the Court of Cassation,[9] general-interest considerations underlie squeeze-outs: they are designed to avoid the cluttering the market with highly illiquid stocks and to make takeover bids, as a way of consolidating listed companies, a real alternative to mergers. They also ensure, in order to maintain the appeal of takeover bids, that the initiator can acquire 100% of the target company if the terms offered are deemed satisfactory by the vast majority of shareholders. These considerations were deemed sufficiently decisive that the European legislator decided to make squeeze-outs generally available. Paragraph 24 of the preamble to Directive 2004/25/EC thus states: "*Member States should take the necessary measures to enable an initiator who, following a takeover bid, has acquired a certain percentage*

---

[6] CA Paris, Nov. 20, 1991, CSEE v. CBV: Bull. Joly Sociétés Jan. 1. 1992, n° 1, p. 76.

[7] CA Paris, January 13, 1998, TECKNECOMP HOLDING INTERNATIONAL BV, RG n°97/15877.

[8] CA Paris, June 17, 1999, Société générale et Paribas v. CMF, BNP: Bull. Joly Bourse Sept. 1, 1999, p. 485.

[9] Cass. com. July 17, 2001, 98-20188.

*of a company's capital carrying voting rights to require the holders of the remaining securities to sell him/her their securities*".

However, the free play of offers implies that all shareholders of the target company are free to tender their shares to the Offer or not. By entering into the CFDs, the Funds prevent BoA from bringing to the Offer securities acquired for hedging purposes. Some of Norbert Dentressangle securities were, at least momentarily, rendered unavailable for the Offer, so that the contribution rate to the Offer will not reflect its actual attractiveness but rather the manipulated result of the Funds' conduct, which is driven solely by their private desire to obtain an undue advantage.

(ii)     The Transaction is unfair

The obstacle to the free play of the Offer is clearly performed by indirect means: rather than acquiring Norbert Dentressangle securities from the outset, the Funds have entered into CFDs that indirectly produce the same effect. The tactic is all the more unfair in that it represents for the Funds an unfairly advantaged position: the cost of the CFDs is indeed well below the price of the underlying shares since it corresponds to bank charges (commission and interest) and immobilization of the amount of margin calls.

In addition, there is no explanation for the discrepancy between the price disclosed by Elliott for the purchased CFDs – almost always below or at the Offer price – and the price disclosed by BoA for the sale of the same securities to Elliott and the purchase of the hedging shares, above the Offer price. The price disclosed by Elliott for acquiring its CFDs may therefore have been calculated in order to conceal the (higher) price actually paid by BoA and other Elliott intermediaries to purchase the Norbert Dentressangle shares on the market. Elliott would have thus unfairly avoided the speculation – and additional costs – that the disclosure of purchases above the Offer price would have triggered.

Finally, unfairness also results from the fact that the Funds formed their position during the pre-offer period, during which XPO could not transact in Norbert Dentressangle shares (Article 231-38 II of the AMF General Regulations). In this way, the Funds at first deprived the initiator XPO of any opportunity to counter their strategy by itself conducting acquisitions on the market. In addition, those acquisitions would have been made at the Offer price, i.e., above the price at which part of the Funds' purchases were made.

(iii)    The Transaction is concealed

The concealment of their real intentions by the Funds and BoA resulted in multiple breaches of disclosure requirements specifically applicable in the event of a tender offer (see above, 2.1.1(ii)). That concealment is also contrary to several provisions of general application.

Firstly, the concealment is contrary to Article 223-6 of the AMF General Regulations, which requires individuals to disclose any "*financial transactions that may have a significant impact on the price of a financial instrument [Norbert Dentressangle shares] or on the situation and the rights of holders of such financial instruments*". The Paris Court of Appeals stated that the strategy of entering into CFDs in order to occultly take a stake in the share capital of an issuer constitutes a "*financial transaction*" within the meaning of that provision.[10] This also the case for the Transaction, which should have therefore have been brought to the attention of the public by Elliott.

Secondly, BoA probably knew that it participated in the implementation of Elliott's strategy: in addition to applicable law, which makes it mandatory for financial institutions to know their customers (which, given Elliott's past behavior, leaves little doubt as to its real intentions), BoA knew (as opposed to the market) all terms of the transactions entered into by Elliott. If confirmed, Elliott and BoA may thus have entered into an agreement – explicitly or not – to acquire Norbert Dentressangle voting rights, in order to implement a

---

[10] CA Paris, May 31, 2012, RG n°2011/05307.

common policy towards Norbert Dentressangle and, therefore, be acting in concert within the meaning of Article L. 233-10 of the French Commercial Code. By acknowledging that is has full control over the shares, Elliott has admitted to acting in concert with BoA (Exhibit 13: script of phone call between XPO's advisory bank and Elliott). If it is the case, BoA and Elliott should have aggregated their holdings when making the disclosures required by Articles 231-46 and 231-47 of the AMF General Regulations and L.233-7 of the French Commercial Code.

**To conclude, the Transaction violates the guiding principles governing public tender offers since it was conducted in a concealed and unfair manner and obviously seeks to block the squeeze-out and compel XPO to negotiate with the Funds the terms of their exit, to the detriment of XPO and the market (Exhibit 18: Consultation of Pr. Hervé Synvet).**

## 2.2.   The harmful consequences of the Transaction

XPO and XPO France, reserving all their rights towards BoA, ask this Court to put an end to the illegal situation and to order Elliott and the Funds to indemnify them.

### 2.2.1.   The cessation of the illegal situation

XPO would suffer a significant damage if the tactics of the Funds achieved their goal of acquiring Norbert Dentressangle shares in breach of applicable public policy provisions regulating tender offers. The appropriate remedy would entail putting an end to the prejudicial situation).[11]

Therefore, the court will order the Funds to return to BoA (or any other bank counterparty) the Norbert Dentressangle shares they acquired from the latter.

### 2.2.2.   The damage suffered by XPO and XPO France

The restitution of the shares to BoA would not entirely remedy the damage suffered by XPO and XPO France, which is already significant. Elliott and the Funds must indemnify the Claimants for this damage the amount of which will be detailed at a later stage.

---

[11] see: G. Viney – P. Jourdain, Les effets de la responsabilité (The effects of liability), 3e ed., nos 34 ff.

**ON THE ABOVE GROUNDS**

*Having regard to Articles 6 and 1382 of the French Civil Code,*
*Having regard to Article L.433-4 of the French Monetary and Financial Code,*
*Having regard to Book II, Title III, of the AMF General Regulations relating to public tender offers, and in particular Article 231-3,*

It is requested that the Paris Commercial Court:

1. Order Elliott Capital Advisors, LP, The Liverpool Limited Partnership, Elliott International LP and Elliott Associates LP to transfer to Bank of America Corporation all of the Norbert Dentressangle shares that they purchased from the latter within three days of receipt (at the address referred in the header hereof) of a copy of the judgment to be issued, under penalty of €200,000 per day of delay;

2. Prohibit (i) Elliott Capital Advisors LP, The Liverpool Limited Partnership, Elliott International LP and Elliott Associates LP and (ii) any fund or entity managed or controlled by or affiliated to them, from purchasing the Norbert Dentressangle shares transferred to Bank of America Corporation pursuant to paragraph 1. above, or otherwise obtain direct, indirect or beneficial ownership of said shares;

3. Order Elliott Capital Advisors LP, The Liverpool Limited Partnership, Elliott International LP and Elliott Associates LP jointly and severally to pay €1 to XPO and €1 to XPO France in damages, the amounts of which will be further determined;

4. Order Elliott Capital Advisors LP, The Liverpool Limited Partnership, Elliott International LP and Elliott Associates LP, jointly and severally, to pay XPO and XPO France € 100,000 each under Article 700 of the French Code of Civil Procedure, and to pay all court costs;

5. Order provisional enforcement of the judgment.

*Subject to all usual reservations*

13

**Exhibits submitted**

Exhibit 1:    Joint press release, April 28, 2015;

Exhibit 2:    Opening of the pre-Offer period;

Exhibit 3:    Joint release, 8 June 2015;

Exhibit 4:    Filing of the proposed Offer;

Exhibit 5:    Clearance of the Offer;

Exhibit 6:    Information note of XPO;

Exhibit 7:    Reply note of Norbert Dentressangle;

Exhibit 8:    Timetable of the Offer;

Exhibit 9:    Summary of transactions;

Exhibit 10:   Elliott statements published by the AMF;

Exhibit 11:   BoA statements published by the AMF;

Exhibit 12:   Affidavit of Scott Malat;

Exhibit 13:   Script of phone call between XPO's advisory bank and Elliott;

Exhibit 14:   AMF Sanctions Committee decision of April 25, 2014, regarding Elliott Advisors UK Ltd
              and Elliott Management Corporation;

Exhibit 15:   Materials relating to the McKesson/Celesio transaction;

Exhibit 16:    Materials relating to the Vodafone/Kabel Deutschland transaction;

Exhibit 17:   Materials relating to the Samsung/Cheil Industries transaction;

Exhibit 18:   Legal opinion of Pr. Hervé Synvet;

Exhibit 19:   Elliott's disclosure released on July 6, 2015.

**ASSIGNATION A BREF DELAI
DEVANT LE TRIBUNAL DE COMMERCE DE PARIS**

---

**L'AN DEUX MILLE QUINZE ET LE**

**À LA DEMANDE DE :**

**XPO Logistics, Inc.**, société anonyme immatriculée au Delaware, Etats-Unis d'Amérique, dont le siège social est situé Five Greenwich Office Park, Greenwich Connecticut 06831, Etats-Unis d'Amérique, prise en la personne de son Chief Executive Officer Bradley S. Jacobs, ci-après désignée « **XPO** »,

**XPO Logistics France**, société par actions simplifiée immatriculée au registre du commerce et des sociétés de Paris sous le numéro 811 597 335, dont le siège social est situé 23 rue du Roule, 75001 Paris, prise en la personne de son président Hardig John Jay, ci-après désignée « **XPO France** »,

> *Ayant pour avocats :* Emmanuel Brochier et Bertrand Cardi
> Avocats au Barreau de Paris (Vest. R170)
> Darrois Villey Maillot Brochier A.A.R.P.I.
> 69 avenue Victor Hugo, 75116 Paris
> Tél. : 01 45 02 19 19 – Fax : 01 45 02 49 59
>
> Au cabinet desquels elles élisent domicile,

**J'AI,**

**HUISSIER DE JUSTICE SOUSSIGNÉ**

**En vertu d'une ordonnance rendue sur requête par Monsieur le président du tribunal de commerce de Paris en date du 8 juillet 2015, copie de l'ordonnance et de la requête étant jointe au présent acte,**

**DONNÉ ASSIGNATION À :**

Elliott Capital Advisors, L.P., un *limited partnership* du Delaware, dont le siège social est situé c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington DE 19801, Etats-Unis d'Amérique,

The Liverpool Limited Partnership, un *limited partnership* des Bermudes, dont le siège social est situé c/o Appleby Corporate Services (Bermuda) Ltd., Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda,

Elliott International, L.P., un *limited partnership* des Iles Cayman, dont le siège social est situé c/o Maples & Calder, P.O. Box 309, Ugland House, South Church Street, George Town, Cayman Islands, British West Indies,

Elliott Associates, L.P., un *limited partnership* du Delaware, dont le siège social est situé c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington DE 19801, Etats-Unis d'Amérique,

1

**D'avoir à comparaître le 29 septembre 2015 à 14 heures, à l'audience de Messieurs les Président et Juges composant la 7ème Chambre du tribunal de commerce de Paris, sis 1 quai de Corse à Paris (75004).**

Leur indiquant qu'un procès leur est intenté pour les raisons ci-après exposées ; qu'ils sont tenus de comparaître à cette audience ou de s'y faire assister ou représenter par toute personne de leur choix, leur représentant, s'il n'est avocat, devant justifier d'un pouvoir spécial.

Leur précisant qu'à défaut, ils s'exposent à ce qu'un jugement soit rendu à leur encontre, sur les seuls éléments fournis par les demandeurs.

Les pièces sur lesquelles la demande est fondée sont visées en fin d'acte.

Article 861-2 du Code de procédure civile :

« *Sans préjudice des dispositions de l'article 68, la demande incidente tendant à l'octroi d'un délai de paiement en application de l'article 1244-1 du Code civil peut être formée par déclaration faite, remise ou adressée au greffe, où elle est enregistrée. L'auteur de cette demande doit justifier avant l'audience que l'adversaire en a eu connaissance par lettre recommandée avec demande d'avis de réception. Les pièces que la partie invoque à l'appui de sa demande de délai de paiement sont jointes à la déclaration.*

*L'auteur de cette demande incidente peut ne pas se présenter à l'audience, conformément au second alinéa de l'article 446-1. Dans ce cas, le juge ne fait droit aux demandes présentées contre cette partie que s'il les estime régulières, recevables et bien fondées.* »

En application de l'article 56 du Code de procédure civile, il est précisé qu'en raison de l'urgence aucune diligence n'a pu être entreprise en vue de parvenir à une résolution amiable du litige.

2

**PLAISE AU TRIBUNAL**

Le fonds d'investissement Elliott tente, par des manœuvres occultes et déloyales, de perturber le déroulement normal de l'offre publique d'achat déposée par XPO sur la société de transports Norbert Dentressangle, en vue de réaliser un profit illicite.

Pour parvenir à ses fins, Elliott Capital Advisors, L.P. (« **Elliott** ») a conclu avec une ou plusieurs banques des contrats dérivés portant sur plus de 7% du capital de Norbert Dentressangle, qui ont selon toute vraisemblance conduit les banques à acquérir autant d'actions Norbert Dentressangle sur le marché. L'objectif recherché – mais jusqu'à présent dissimulé au marché – est d'empêcher que ces actions soient apportées à l'offre publique, ce qui rendra impossible la mise en œuvre par XPO du retrait obligatoire lui permettant d'acquérir la totalité du capital de Norbert Dentressangle. Elliott cherche évidemment à obtenir en contrepartie de ces actions un avantage indu.

Mais ces manœuvres sont contraires à plusieurs dispositions impératives de la réglementation des offres publiques, qui impose notamment à tous les acteurs un comportement loyal, transparent et respectueux d'un déroulement ordonné de l'offre. Il convient par conséquent que le tribunal de céans enjoigne à Elliott de mettre fin à ses manœuvres illicites et le condamne à indemniser XPO du préjudice en résultant.

**Table des matières**

**1.    FAITS** ........................................................................................................................ **5**

1.1.   L'offre publique de XPO sur Norbert Dentressangle ............................................... 5

1.2.   Les opérations réalisées sur le titre Norbert Dentressangle depuis l'annonce de l'Offre ........................... 5

    *1.2.1.  Les caractéristiques usuelles des CFD* ........................................................ *6*
    *1.2.2.  Les opérations réalisées par Elliott et Bank of America* ............................ *6*

1.3.   L'objectif poursuivi par Elliott est d'empêcher le retrait obligatoire annoncé par XPO ...................... 7

1.4.   XPO et XPO France vont déposer une plainte auprès de l'AMF ............................... 7

**2.    DISCUSSION** ............................................................................................................ **8**

2.1.   L'Opération est illicite ............................................................................................. 8

    *2.1.1.  L'Opération vise, à l'insu du marché, à faire échec au retrait obligatoire annoncé par XPO afin d'en tirer un avantage indu* .......................... *8*
    *2.1.2.  L'Opération constitue une entrave déloyale et occulte au libre jeu de l'Offre* ............................ *10*

2.2.   Les conséquences dommageables de l'Opération ................................................... 12

    *2.2.1.  La cessation de la situation illicite* ............................................................ *12*
    *2.2.2.  Le dommage subi par XPO et XPO France* ................................................ *12*

1.      **FAITS**

1.1.    **L'offre publique de XPO sur Norbert Dentressangle**

Norbert Dentressangle SA (« **Norbert Dentressangle** ») est la holding de tête d'un groupe international de la logistique et du transport dont le chiffre d'affaires s'est élevé à 5,1 Mds€ en 2014. L'action Norbert Dentressangle est cotée sur Euronext Paris.

XPO est un acteur majeur de la logistique en Amérique du Nord. Le groupe a réalisé un chiffre d'affaires consolidé de 2,3 Mds$ en 2014 et l'action XPO est cotée sur le *New York Stock Exchange*. Le 28 avril 2015, XPO a annoncé (pièce n°1 : communiqué conjoint du 28 avril 2015 ; pièce n°2 : ouverture de la période de préoffre) :

–       s'être engagée à acquérir 67% du capital de Norbert Dentressangle, au prix de 217,50€ par action ;

–       le dépôt d'une offre publique d'achat simplifiée sur le solde du capital de Norbert Dentressangle, libellée en numéraire et au même prix (« **l'Offre** ») ;

–       son intention de mettre en œuvre un retrait obligatoire à l'issue de l'Offre, si les conditions prévues par les textes sont satisfaites.

Le retrait obligatoire est une procédure qui permet à l'initiateur d'une offre publique d'acquisition détenant, à l'issue de l'offre, plus de 95% du capital et des droits de vote de la société visée, de contraindre les actionnaires minoritaires à lui céder leurs titres au prix de l'offre. L'initiateur acquiert ainsi la totalité du capital de la société visée, ce qui lui permet de simplifier la gouvernance du nouveau groupe, de mettre fin aux contraintes liées à la cotation et de procéder à l'intégration fiscale.

Le prix proposé par XPO pour acquérir la totalité du capital de Norbert Dentressangle – plus de deux milliards d'euros – représente une prime de 37,8% par rapport au dernier cours de clôture et près de 80% par rapport à la moyenne 12 mois, soit une prime très supérieure à la moyenne des primes constatées dans ce genre d'opérations. L'expert indépendant désigné en application du règlement général de l'AMF a d'ailleurs constaté que le prix de l'Offre faisait ressortir une prime quelle que soit la méthode d'évaluation utilisée, et conclu au caractère équitable du prix de l'Offre pour les minoritaires (pièce n°7 : note en réponse de Norbert Dentressangle).

L'acquisition de 67% des actions en circulation de Norbert Dentressangle a été réalisée le 8 juin 2015 par XPO France, filiale à 100% de XPO (pièce n°3 : communiqué conjoint du 8 juin 2015). XPO France a ensuite déposé le projet d'Offre auprès de l'AMF. Déclarée conforme par l'AMF le 23 juin 2015, l'Offre a été ouverte du 26 juin au 17 juillet 2015 (pièce n°4 : dépôt du projet d'Offre ; pièce n°5 : conformité de l'Offre ; pièce n°8 : calendrier de l'Offre).

1.2.    **Les opérations réalisées sur le titre Norbert Dentressangle depuis l'annonce de l'Offre**

Depuis l'annonce de l'Offre, Elliott conclut pour le compte des fonds The Liverpool Limited Partnership, Elliott International L.P. et Elliott Associates L.P. (les « **Fonds** ») des contrats financiers avec paiement d'un différentiel (en anglais *contracts for difference* ou « **CFD** »)[1] à règlement en espèces, portant sur des actions Norbert Dentressangle . Il convient, avant de présenter les opérations réalisées (1.2.2), de rappeler les caractéristiques usuelles de tels contrats (1.2.1).

---

[1] Il s'agit de contrats financiers au sens de l'article L.211-1 du code monétaire et financier, visés à l'article D.211-1 A, point 6, du même code.

### 1.2.1.   Les caractéristiques usuelles des CFD

Les CFD sont similaires à des *equity swaps*. Ils sont en général conclus entre une banque et un investisseur et permettent à ce dernier, sans acquérir lui-même les actions qui font l'objet du CFD (dites « actions sous-jacentes »), d'être replacé dans la même situation économique que s'il les avait acquises lors de la conclusion du CFD puis revendues à sa date d'échéance :

–   en cas de hausse du cours de l'action sous-jacente pendant la durée du CFD, la banque verse à l'investisseur le montant de cette hausse (et, si le contrat le prévoit, les dividendes éventuellement versés pendant cette période) ;

–   en cas de baisse de l'action sous-jacente pendant la durée du CFD, l'investisseur verse à la banque le montant de cette baisse.

En général, les CFD peuvent être dénoués à tout moment par l'investisseur, y compris avant leur date d'échéance. Les CFD peuvent d'ailleurs ne pas prévoir de date d'échéance.

La banque se rémunère par le biais de commissions forfaitaires et d'un intérêt calculé en fonction du montant des actions sous-jacentes et de la durée du CFD. Le coût du CFD pour l'investisseur est donc très inférieur au coût d'acquisition du sous-jacent. Par ailleurs, la banque est tenue[2] de prendre des mesures qui la protègent contre les risques suivants :

–   Le risque de défaut de l'investisseur lors de l'échéance du CFD, en cas de baisse du cours du sous-jacent : pour se protéger contre ce risque, la banque procède à des « appels de marge » en exigeant le dépôt auprès d'elle, par l'investisseur, d'un montant en numéraire représentant une fraction du cours de l'action sous-jacente lors de la conclusion du CFD ; ce montant est régulièrement ajusté en fonction de l'évolution du cours de l'action.

–   Le risque d'une hausse du cours qui fera naître à sa charge une dette à l'égard de l'investisseur : pour se protéger contre ce risque, **la banque acquiert des actions sur le marché qu'elle conserve jusqu'à l'échéance du CFD**. Ainsi, en cas de hausse du cours à l'échéance, la revente des actions lui permet de réaliser une plus-value qu'elle reverse à l'investisseur. Dans le cas des CFD, le « delta » (c'est-à-dire le rapport entre le nombre d'actions acquises en couverture et le nombre d'actions) pourrait être égal à un : pour chaque CFD, la banque acquerrait une action. Le delta est toutefois ajusté par les banques en fonction de leur stratégie de couverture et de leur exposition globale aux actions sous-jacentes.

Les CFD en cause ne confèrent pas à l'investisseur le droit d'acquérir auprès de la banque les titres sous-jacents. **Toutefois, il est très fréquent que ces instruments se dénouent en nature avec livraison des titres, révélant parfois ainsi l'illicéité du schéma de l'investisseur**[3].

### 1.2.2.   Les opérations réalisées par Elliott et Bank of America

Après l'annonce de l'Offre, le 8 mai 2015, Elliott a acquis 100 actions Norbert Dentressangle pour le compte des Fonds. Depuis cette date, Elliott a conclu presque quotidiennement des CFD à un cours de référence proche du prix de l'Offre ou égal à ce dernier, et arrivant à échéance le 29 janvier 2016. Le 1er juillet 2015, les Fonds détenaient 18.276 actions Norbert Dentressangle et 724.099 CFD, soit une exposition économique portant sur environ 7,55% du capital de Norbert Dentressangle (pièce n°10 : déclarations d'Elliott publiées par l'AMF).

---

[2] Article L.533-2 du Code monétaire et financier et arrêté du 20 février 2007, articles 292-1 et 294 ; G.-A. Frot, Les opérations de couverture conclues au titre de dérivés actions, RTDF n°4, 2009, p.65.

[3] C'est ce mécanisme qui avait permis en octobre 2010 à LVMH d'acquérir en quelques jours une participation substantielle représentant environ 13% du capital d'Hermès (Décision de la Commission des sanctions de l'AMF du 25 juin 2013 à l'égard de la société LVMH).

6

Le 1er juillet 2015, Bank of America Corporation (« **BoA** ») détenait 678.301 actions Norbert Dentressangle et avait cédé 677.864 *equity swaps* à règlement en espèce, portant sur autant d'actions Norbert Dentressangle et arrivant à échéance le 29 janvier 2016 (les « **Equity Swaps** ») (pièce n°11 : déclarations de BoA publiées par l'AMF). BoA est selon toute vraisemblance la contrepartie bancaire auprès de laquelle Elliott a conclu ses CFD. Cela résulte de la similitude entre les Equity Swaps cédés par BoA depuis le 17 juin 2015 et les CFD acquis par Elliott sur la même période : le nombre d'opérations réalisées chaque jour est très proche et parfois identique, leurs prix de référence sont très proches, et leur date d'échéance est identique.

Le 2 juillet 2015, Elliott a acheté 724.910 actions Norbert Dentressangle et cédé la totalité de ses CFD (pièce n°19 : déclaration d'Elliott publiée le 6 juillet 2015).

L'ensemble des opérations décrites ci-avant sont synthétisées sous la forme d'un tableau (pièce n°9 : synthèse des opérations réalisées par Elliott et BoA).[4]

### 1.3.    L'objectif poursuivi par Elliott est d'empêcher le retrait obligatoire annoncé par XPO

Lors de deux réunions d'investisseurs organisées par XPO le 1er juin 2015, des représentants d'Elliott ont posé de nombreuses questions relatives à l'impossibilité éventuelle pour XPO de mettre en œuvre, à l'issue de l'Offre, le retrait obligatoire annoncé, et aux conséquences financières qui en résulteraient pour XPO (pièce n°12 : attestation de Scott Malat). Dans la mesure où il n'existait à cette date aucune raison particulière d'anticiper un échec du retrait obligatoire, il est clair qu'Elliott avait d'ores et déjà l'intention de provoquer cet échec.

Vers la mi-juin 2015, un représentant d'Elliott a cherché à joindre la banque conseil de XPO. Le 19 juin 2015, cette dernière a retourné l'appel d'Elliott pour organiser une réunion. Mais le représentant d'Elliott a indiqué que réflexion faite, une réunion ne semblait pas nécessaire. Il a ajouté : « *nous déciderons au dernier moment mais a priori nous n'apporterons pas (...). Nous pensons que XPO doit payer plus (...). Nous verrons si nous discutons après la clôture* » (pièce n°13 : script de la conversation téléphonique entre la banque conseil de XPO et Elliott). Ces propos confirment qu'Elliott (i) contrôle les actions sous-jacentes, (ii) est enclin à ne pas les apporter à l'Offre et (iii) essayera d'en obtenir un avantage indu.

### 1.4.    XPO et XPO France vont déposer une plainte auprès de l'AMF

XPO et XPO France vont déposer une plainte auprès de l'AMF sur le fondement de l'article L.621-19 du code monétaire et financier. L'objectif de cette plainte est de faire en sorte que l'AMF soit informée des nombreuses violations de son règlement général par les Fonds. Elle pourra ainsi, si elle l'estime approprié, ouvrir une enquête qui pourrait aboutir au prononcé de sanctions sur le fondement de l'article L.621-15 du code monétaire et financier.

Rappelons que l'article L.621-20 du code monétaire et financier permet aux juridictions civiles appelées à faire application de dispositions entrant dans le champ de compétence de l'AMF à inviter cette dernière à déposer des observations. Il pourrait être opportun, dans la présente affaire, que le tribunal use de cette faculté.

---

[4] En outre, depuis le 20 mai 2015 au moins, Cheyne Capital Management (UK) LLP (« **Cheyne** ») a conclu pour le compte de fonds des CFD sur l'action Norbert Dentressangle à un cours de référence à plusieurs reprises supérieur à celui de l'Offre et sans date d'échéance. Cheyne n'a pas révélé la date d'acquisition de ses premiers CFD, mais elles sont vraisemblablement postérieures à l'annonce de l'Offre. Au 22 juin 2015, Cheyne détenait 143.150 CFD, soit une exposition économique portant sur environ 1,46% du capital de Norbert Dentressangle.

## 2.   **DISCUSSION**

L'opération mise en œuvre par Elliott (l'« **Opération** ») est illicite (2.1) et préjudiciable à XPO et XPO France (2.2).

### 2.1.   **L'Opération est illicite**

L'Opération qui vise, à l'insu du marché, à faire échec au retrait obligatoire annoncé par XPO afin d'en tirer un avantage indu (2.1.1), est illicite dans la mesure où elle constitue une entrave déloyale et occulte au libre jeu de l'Offre (2.1.2).

#### 2.1.1.   L'Opération vise, à l'insu du marché, à faire échec au retrait obligatoire annoncé par XPO afin d'en tirer un avantage indu

Le 6 juillet 2015 (pièce n°19), Elliott a déclaré avoir acquis 724.910 actions Norbert Dentressangle et cédé la totalité de ses CFD. Cette opération, comme les propos d'Elliott (cf. ci-avant, 1.3) et le faisceau d'indices exposé ci-après, démontrent que l'Opération vise, à l'insu du marché, à faire échec au retrait obligatoire annoncé par XPO afin d'en tirer un avantage indu.

(i)   Le calendrier et le contexte de l'Opération démontrent qu'Elliott n'a pas l'intention d'apporter à l'Offre :

–   Elliott a commencé à opérer sur le titre Norbert Dentressangle après l'annonce de l'Offre rendue obligatoire par la cession à XPO France du contrôle de Norbert Dentressangle, alors que rien n'indique qu'Elliott ait investi dans cette société auparavant ;
–   Les quantités concernées sont de nature à immobiliser plus de cinq pour cent du capital de Norbert Dentressangle pendant la période de l'Offre, ce qui, à la clôture, empêchera XPO France d'atteindre le seuil de 95% ;
–   Aucune offre concurrente n'est raisonnablement envisageable sur Norbert Dentressangle, dans la mesure où XPO France détient, aujourd'hui, les deux tiers de son capital, ce qui exclut tout relèvement du prix de l'Offre ;
–   Le prix moyen de référence des CFD acquis par Elliott est proche du prix de l'Offre, de sorte que les opérations litigieuses ne peuvent avoir pour objectif de profiter d'une différence de cours.

Certes, Elliott a prétendu avoir initialement acquis des CFD en imaginant pouvoir « *demander à XPO d'augmenter son prix en contrepartie de notre apport* » à l'Offre et n'avoir compris que tardivement que XPO était dans l'impossibilité de relever son Offre (pièce n°13 : script de la conversation téléphonique entre la banque conseil de XPO et Elliott). Mais cette explication n'est pas vraisemblable : Elliott est un connaisseur averti des marchés financiers et sait par conséquent depuis le début qu'il ne peut y avoir aucune offre concurrente ni aucune raison pour XPO d'augmenter son prix.

(ii)   Elliott et BoA ont tout fait pour dissimuler l'Opération au marché :

Dans ses déclarations d'intentions, Elliott s'est borné à indiquer qu'il envisageait de poursuive ses acquisitions, sans préciser ses intentions à l'égard de l'Offre (pièce n°10 : déclarations d'Elliott publiées par l'AMF). Certes, l'article 231-47 du règlement général de l'AMF n'oblige le déclarant à révéler ses intentions à l'égard de l'offre qu'à compter de son dépôt. Mais cette solution se justifie lorsqu'il existe une incertitude sur le dépôt ou les termes de l'offre, ce qui n'est pas le cas en l'espèce. Il s'avère d'ailleurs que la majorité des déclarations réalisées avant le dépôt de l'offre incluent les intentions du déclarant à l'égard de l'offre[5]. De surcroît, Elliott n'a jamais précisé ses intentions après

---

[5] Parmi les 21 déclarations d'intention en période de pré-offre entre 2011 et 2015, 14 (soit 66,7%) incluaient l'intention de la partie déclarante d'apporter ses actions ou non (par exemple, voir 215C0508, 214C0682, 214C2380, 212C1076, 212C0982, 212C0925).

le dépôt de l'Offre, aggravant cette violation alors même que sa participation s'est depuis lors accrue de plus de 2%.

L'article 231-52 du règlement général de l'AMF oblige les prestataires de services d'investissement à déclarer leur participation dans une société visée par une offre publique un jour de bourse après que cette participation a augmenté de 1% du capital social de la société depuis l'ouverture de la période de pré offre. Cependant, BoA n'a déclaré ses opérations sur le titre Norbert Dentressangle (en titres et en dérivés) que plusieurs jours après avoir franchi le seuil de 5% du capital (pièce n°11 : déclarations de BoA publiées par l'AMF). En outre, elle l'a fait de manière incomplète : la déclaration d'intention de BoA est vague et ne fait aucune référence à Elliott ; BoA utilise le terme d'« Equity Swaps » là où Elliott se réfère à des « CFD » ; les prix de référence des Equity Swaps de BoA ne correspondent pas exactement à ceux des CFD d'Elliott ; BoA indique qu'elle se réserve la possibilité d'apporter à l'Offre alors qu'elle sait que cette décision est en pratique difficile tant que les CFD ne sont pas dénoués, puisqu'elle doit conserver sa couverture. Enfin, BoA a régularisé avec retard, le 2 juillet 2015, la déclaration de franchissement du seuil de 5% (pièce n°11 : déclarations de BoA publiées par l'AMF).

(iii)   Elliott cherche fréquemment à perturber le déroulement d'opérations de rapprochement entre sociétés pour tenter d'obtenir des conditions plus avantageuses que les autres actionnaires :

Lors de la garantie de cours déposée en 2006 par Eiffarie sur les titres APRR, des entités affiliées à Elliott ont acheté sur le marché des titres APRR et franchi le seuil de 5% avant la clôture de l'offre, empêchant ainsi Eiffarie de franchir le seuil de 95% du capital et des droits de vote. La Commission des sanctions de l'AMF a relevé dans une décision récente que leurs dirigeants avaient en effet acquis la conviction « *que si [le Fonds Elliott] arrivait à réunir un bloc de titres suffisant pour faire obstacle, dans l'immédiat, au projet d'Eiffarie [de procéder à un retrait obligatoire], il serait à même de réaliser une plus-value importante lors de la cession ultérieure de sa participation à cette dernière, motivée par la perspective de retrait de la cote et de l'intégration fiscale d'APRR, ou de la cession éventuelle à un tiers* ». La Commission des sanctions de l'AMF a infligé une sanction pécuniaire de 16 millions d'euros aux deux entités concernées pour manquement d'initié, ces dernières ayant continué à acquérir des titres sur le marché pendant la négociation du bloc avec Eiffarie (pièce n°14 : décision de la Commission des sanctions de l'AMF du 25 avril 2014 à l'égard des sociétés Elliott Advisors UK Ltd et Elliott Management Corporation).

Dans le contexte de l'offre de McKesson Corporation sur Celesio AG en 2013, Elliott a acquis une partie des obligations convertibles donnant accès au capital de Celesio puis a refusé de les apporter à l'offre, ce qui a provoqué son échec. Elliott est ensuite parvenu à céder ces obligations dans le cadre d'un accord séparé avec l'initiateur, à un prix dont les informations disponibles établissent qu'il a permis à Elliott de réaliser un profit substantiel (pièce n°15 : éléments relatifs à l'opération McKesson/Celesio).

Durant l'été 2013, postérieurement à l'annonce par Vodafone de son offre publique sur Kabel Deutschland pour 84,50€ par action, Elliott a acquis 10,9% du capital de la cible aux côtés d'un autre fonds qui en a acquis 3,41%. Vodafone a obtenu plus de 75% du capital de la cible dans le cadre de l'offre (ce qui démontre que le prix proposé était équitable). Elliott a ensuite engagé plusieurs contentieux, toujours pendants, pour tenter d'imposer à Vodafone le paiement d'un prix excédant 250€ par action (soit trois fois le prix de l'offre)(pièce n°16 : éléments relatifs à l'opération Vodafone/Kabel Deutschland).

Elliott tente actuellement de s'opposer à une opération de rapprochement entre Samsung (dont Elliott détient 7,1%) et Cheil Industries en contestant la parité de fusion proposée. Selon Samsung, la position d'Elliott serait fondée sur des documents biaisés. Le 1er juillet 2015, la juridiction compétente a rejeté la demande d'Elliott tendant à faire interdire la fusion envisagée (pièce n°17 : éléments relatifs à l'opération Samsung/Cheil Industries).

2.1.2.   L'Opération constitue une entrave déloyale et occulte au libre jeu de l'Offre

L'article 231-3 du règlement général de l'AMF, qui énonce les principes directeurs régissant les offres publiques d'acquisition, dispose :

> « *En vue d'un déroulement ordonné des opérations au mieux des intérêts des investisseurs et du marché, toutes les personnes concernées par une offre doivent respecter le libre jeu des offres et de leurs surenchères, d'égalité de traitement et d'information des détenteurs des titres des personnes concernées par l'offre, de transparence et d'intégrité du marché et de loyauté dans les transactions et la compétition.* »

La cour d'appel de Paris a précisé :

– que les principes directeurs des offres **s'appliquent à tout intervenant sur le marché du titre concerné** : le principe du libre jeu des offres et des surenchères, notamment, « *revêt une portée générale et intéresse aussi bien le comportement de l'initiateur de l'offre et de la société visée que celui des tiers* »[6] ;

– que la règlementation des offres publiques est d'ordre public et s'impose à tout opérateur qui intervient sur un marché financier français[7] ;

– que la déloyauté est caractérisée en cas d'« *entrave au libre jeu des offres et des surenchères par le recours à des manœuvres ou moyens détournés mis en œuvre dans des conditions illicites, occultes ou frauduleuses* »[8].

L'article 231-3 du règlement général de l'AMF s'applique donc non seulement aux Fonds, mais également à BoA. L'article 6 du Code civil interdisant de « *déroger, par des conventions particulières, aux lois qui intéressent l'ordre public* », la conclusion par les Fonds de contrats violant les dispositions d'ordre public régissant les offres publiques en France est un délit au sens de l'article 1382 du Code civil. Or l'Opération est manifestement contraire à l'article 231-3 du règlement général de l'AMF puisqu'elle constitue une entrave au libre jeu et au déroulement ordonné de l'Offre (i), mise en œuvre de manière déloyale (ii) et occulte (iii).

(i)     L'Opération entrave le libre jeu et le déroulement ordonné de l'Offre

D'une part, le libre jeu des offres implique que XPO ne soit pas privée de son droit à mettre en œuvre un retrait obligatoire s'il atteint le seuil de 95% du capital et des droits de vote de Norbert Dentressangle à l'issue de l'Offre. La privation de ce droit nuit non seulement à XPO mais aussi à l'intérêt général des investisseurs et du marché.

La Cour de cassation a en effet jugé que ce mécanisme visait à satisfaire des fins d'intérêt général[9] : il est destiné à éviter que le marché soit encombré par des valeurs très peu liquides et à faire de l'offre publique, procédé de concentration des sociétés cotées, une véritable alternative à la fusion. Il assure également à l'initiateur, afin de préserver l'attractivité des offres publiques, qu'il pourra prendre le contrôle à 100% de la cible, si les conditions offertes sont jugées satisfaisantes par la très grande majorité des actionnaires. Ces considérations ont été jugées suffisamment décisives pour que le législateur européen décide d'imposer le retrait obligatoire au sein de l'Union. Le considérant 24 de la directive 2004/25/CE prévoit ainsi que « *Les Etats membres devraient prendre les mesures nécessaires pour permettre à un offrant, qui a acquis un certain pourcentage du capital d'une société*

---

[6] CA Paris, 20 nov. 1991, CSEE c/ CBV : Bull. Joly Sociétés 1er janv. 1992, n° 1, p. 76.

[7] CA Paris, 13 janvier 1998, TECKNECOMP HOLDING INTERNATIONAL BV, RG n°97/15877.

[8] CA Paris, 17 juin 1999, Société générale et Paribas c/ CMF, BNP : Bull. Joly Bourse 1er sept. 1999, p. 485.

[9] Cass. com. 17 juillet 2001, 98-20188.

*assorti de droits de vote à la suite d'une offre publique d'acquisition, d'obliger les détenteurs restants à lui vendre leurs titres* ».

D'autre part, le libre jeu de l'Offre suppose que tous les actionnaires de la société visée soient libres d'apporter ou non leurs titres à l'Offre. Or en concluant les CFD, les Fonds empêchent BoA d'apporter à l'Offre les titres qu'elle a acquis pour se couvrir. Une partie des titres Norbert Dentressangle a ainsi été, de fait, rendue indisponible pour l'Offre pendant tout ou partie de sa durée, si bien que le taux d'apport à l'Offre ne reflétera pas l'attractivité réelle de cette dernière, mais plutôt le résultat du comportement des Fonds, qui est exclusivement dicté par le dessein d'obtenir un avantage indu.

(ii)     L'Opération est déloyale

L'entrave au libre jeu de l'Offre est de toute évidence réalisée par des moyens détournés : plutôt que d'acquérir les actions Norbert Dentressangle dès le départ, les Fonds ont conclu des CFD qui produisent, indirectement, le même effet. La manœuvre est d'autant plus déloyale qu'elle représente pour les Fonds – fût-ce temporairement – un avantage économique injustifié : le coût des CFD est en effet très inférieur au prix du sous-jacent puisqu'il correspond aux frais bancaires (commissions et intérêts) et à l'immobilisation du montant des appels de marge.

En outre, il existe un écart inexpliqué entre le prix déclaré par Elliott pour l'acquisition de ses CFD – presque toujours inférieur ou égal au prix de l'Offre – et le prix déclaré par BoA pour la cession des mêmes instruments à Elliott et l'acquisition des titres sous-jacents, supérieur au prix de l'Offre. Le prix d'acquisition des CFD déclaré par Elliott pourrait donc avoir été calculé de manière à dissimuler le prix – plus élevé – réellement payé par BoA et d'autres intermédiaires d'Elliott pour acquérir les titres Norbert Dentressangle sur le marché. Elliott aurait ainsi évité par une manœuvre déloyale la spéculation – et le surcoût – que n'aurait pas manqué d'entraîner la déclaration d'acquisitions au-dessus du prix  de l'Offre.

La déloyauté résulte enfin de ce que les Fonds ont constitué leur position pendant la période de préoffre, durant laquelle XPO ne pouvait pas intervenir sur le titre Norbert Dentressangle (article 231-38, II du règlement général de l'AMF). Les Fonds ont ainsi, dans un premier temps, privé l'initiateur XPO de toute possibilité de contrecarrer leur stratégie en procédant lui-même à des acquisitions sur le marché.

(iii)     L'Opération est occulte

La dissimulation de leurs intentions par les Fonds et BoA a donné lieu à plusieurs manquements aux obligations d'information spécifiquement applicables en cas d'offre publique (cf. ci-avant, 2.1.1(ii)). Cette dissimulation est également contraire à plusieurs dispositions d'application générale.

D'une part, elle est contraire à l'article 223-6 du règlement général de l'AMF, qui oblige toute personne à porter à la connaissance du public toute « *opération financière susceptible d'avoir une incidence significative sur le cours d'un instrument financier [l'action Norbert Dentressangle] ou sur la situation et les droits des porteurs de cet instrument financier* ». La cour d'appel de Paris a jugé que la stratégie consistant à conclure des CFD en vue de prendre de manière occulte une participation au capital d'un émetteur constitue une « opération financière » au sens de cette disposition[10]. Tel est également le cas de l'Opération, qui aurait donc dû être portée à la connaissance du public par Elliott.

D'autre part, BoA sait vraisemblablement qu'elle participe à la mise en œuvre de la stratégie d'Elliott : outre la réglementation applicable qui l'oblige à connaître son client – ce qui étant donné le comportement passé d'Elliott laisse peu de doute quant à ses intentions réelles – BoA connaît (à la différence du marché) les caractéristiques des opérations réalisées par Elliott. Si cela est avéré, Elliott et BoA pourraient donc avoir conclu un accord – qu'il soit exprès ou tacite – en vue d'acquérir des

---

[10] CA Paris, 31 mai 2012, 2011/05307.

droits de vote Norbert Dentressangle pour mettre en œuvre une politique commune à l'égard de cette dernière, et être de concert au sens de l'article L.233-10 du code de commerce. En admettant qu'il contrôlait les actions sous-jacentes des CFD, le fonds Elliott a d'ailleurs reconnu qu'il agissait de concert avec BoA (pièce n°13 : script de la conversation téléphonique entre la banque conseil de XPO et Elliott). Si tel est vraiment le cas, BoA et Elliott auraient dû agréger leurs participations pour faire les déclarations prévues par les articles 231-46 et 231-47 du règlement général de l'AMF, et L.233-7 du code de commerce.

**En conclusion, l'Opération est contraire aux principes directeurs du droit des offres publiques puisque, menée de manière occulte et déloyale, elle a manifestement pour objectif de faire obstacle au retrait obligatoire et de contraindre XPO de négocier avec les Fonds les conditions de leur sortie au détriment de XPO et du marché (pièce n°18 : Consultation de Monsieur le Professeur Hervé Synvet).**

## 2.2. Les conséquences dommageables de l'Opération

XPO et XPO France, qui réservent tous leurs droits à l'égard de BoA, demandent au tribunal de céans de mettre fin à la situation illicite et de condamner Elliott et les Fonds à les indemniser.

### 2.2.1. La cessation de la situation illicite

XPO subirait un préjudice très important si les Fonds devaient atteindre leur objectif en conservant des actions Norbert Dentressangle acquises en violation des dispositions d'ordre public de la réglementation boursière. La réparation appropriée consiste à ordonner qu'il soit mis fin à la situation dommageable[11]. Dès lors, le tribunal ordonnera sous astreinte aux Fonds de restituer à BoA (ou toute autre banque contrepartie) les actions Norbert Dentressangle acquises auprès de cette dernière.

### 2.2.2. Le dommage subi par XPO et XPO France

La restitution des actions à BoA ne saurait réparer entièrement le préjudice subi par XPO et XPO France, qui est d'ores et déjà significatif. Elliott et des Fonds doivent indemniser les demanderesses de ce préjudice, dont le montant sera précisé ultérieurement.

---

[11] G. Viney – P. Jourdain, Les effets de la responsabilité, 3e éd., nos 34 et suiv.

**PAR CES MOTIFS**

*Vu les articles 6 et 1382 du Code civil,*
*Vu l'article L.433-4 du Code monétaire et financier,*
*Vu le livre II, titre III, du règlement général de l'AMF relatif aux offres publiques d'acquisitions, et notamment son article 231-3,*

Il est demandé au tribunal de commerce de Paris de :

1.  Enjoindre à Elliott Capital Advisors, L.P., The Liverpool Limited Partnership, Elliott International, L.P. et Elliott Associates, L.P. de transférer à Bank of America Corporation la totalité des actions Norbert Dentressangle qu'ils ont acquises auprès de cette dernière, dans un délai de trois jours à compter de la signification (à l'adresse visée en en-tête des présentes) d'une copie du jugement à intervenir, sous astreinte de 200.000 euros par jour de retard ;

2.  Interdire à (i) Elliott Capital Advisors, L.P., The Liverpool Limited Partnership, Elliott International, L.P. et Elliott Associates, L.P. et (ii) tout fonds ou entité géré ou contrôlé par eux ou qui leur est affilié, d'acquérir les actions Norbert Dentressangle transférées à Bank of America Corporation en application du 1. ci-avant, ou d'une quelconque manière d'entrer en possession directe, indirecte ou économique de ces actions ;

3.  Condamner *in solidum* Elliott Capital Advisors, L.P., The Liverpool Limited Partnership, Elliott International, L.P. et Elliott Associates, L.P. à verser 1€ à XPO et 1€ à XPO France (montants à parfaire) à titre de dommages et intérêts ;

4.  Condamner *in solidum* Elliott Capital Advisors, L.P., The Liverpool Limited Partnership, Elliott International, L.P. et Elliott Associates, L.P. à payer à chacune des sociétés XPO et XPO France 100.000 € au titre de l'article 700 du Code de procédure civile, et aux entiers dépens ;

5.  Ordonner l'exécution provisoire.

*Sous toutes réserves*

**Pièces communiquées**

| | |
|---|---|
| Pièce n°1 : | Communiqué de presse conjoint du 28 avril 2015 ; |
| Pièce n°2 : | Ouverture de la période de préoffre ; |
| Pièce n°3 : | Communiqué conjoint du 8 juin 2015 ; |
| Pièce n°4 : | Dépôt du projet d'Offre ; |
| Pièce n°5 : | Conformité de l'Offre ; |
| Pièce n°6 : | Note d'information de XPO ; |
| Pièce n°7 : | Note en réponse de Norbert Dentressangle ; |
| Pièce n°8 : | Calendrier de l'Offre ; |
| Pièce n°9 : | Synthèse des opérations réalisées par Elliott et BoA ; |
| Pièce n°10 : | Déclarations d'Elliott publiées par l'AMF ; |
| Pièce n°11 : | Déclarations de BoA publiées par l'AMF ; |
| Pièce n°12 : | Attestation de Scott Malat ; |
| Pièce n°13 : | Script de la conversation téléphonique entre la banque conseil de XPO et Elliott ; |
| Pièce n°14 : | Décision du 25 avril 2014 à l'égard des sociétés Elliott Advisors UK Ltd et Elliott Management Corporation ; |
| Pièce n°15 : | Eléments relatifs à l'opération McKesson/Celesio ; |
| Pièce n°16 : | Eléments relatifs à l'opération Vodafone/Kabel Deutschland ; |
| Pièce n°17 : | Eléments relatifs à l'opération Samsung/Cheil Industries ; |
| Pièce n°18 : | Consultation de Monsieur le Professeur Hervé Synvet ; |
| Pièce n°19 : | Déclaration d'Elliott publiée le 6 juillet 2015. |