UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re Application of

XPO LOGISTICS, INC.

           Petitioner.

Case No. 15 MC 205

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF GEORGE T. RIGO IN SUPPORT OF THE *EX PARTE* APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 OF RESPONDENTS ELLIOTT CAPITAL ADVISORS, L.P., ELLIOTT MANAGEMENT CORPORATION, AND ELLIOTT ASSOCIATES, L.P.

I, George T. Rigo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and admitted to the Paris bar. I am a partner in the law firm of Orrick, Herrington & Sutcliffe (Europe) LLP.

2.      I am providing this declaration on behalf of certain Elliott entities, including Elliott Capital Advisors, L.P., Elliott Management Corporation, and Elliott Associates, L.P. (collectively, "Elliott") in connection with their *ex parte* application to this Court under 28 U.S.C. § 1782 for discovery in aid of foreign proceedings in the Paris Commercial Court.

3.      I advise certain Elliott entities in two foreign proceedings in the Paris Commercial Court filed by Orrick, Herrington & Sutcliffe (Europe) LLP. In one of those proceedings, Elliott Capital Advisors, L.P., Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Limited Partnership are defendants in an action filed on July 8, 2015 by plaintiffs XPO Logistics, Inc. and XPO Logistics France (collectively, "XPO") in the Paris Commercial Court (the "XPO French Action"). In the other proceeding, Elliott Capital Advisors, L.P., Elliott Associates, L.P., and Elliott International, L.P. are the plaintiffs in an action filed on July 16, 2015 against

defendants XPO Logistics France SAS and Norbert Dentressangle ("ND") in the Paris

Commercial Court (the "Elliott French Action").[1]

4.      This declaration provides the factual background of the Elliott French Action and

the relief sought thereunder, as well as of the XPO French Action.  There is an important need

for the discovery sought in Elliott's *ex parte* application to this Court under 28 U.S.C. § 1782 for

use in the Elliott French Action, in particular due to a July 23, 2015 hearing that the Paris

Commercial Court has scheduled in the Elliott French Action to rule on Elliott's request, in part,

for an extension of the freezing order currently in place preventing XPO from transferring any

assets of ND or dismantling ND before the French court makes a final determination on the

merits of that issue.

5.      Elliott requires the narrowly-tailored document and deposition discovery set forth

in its *ex parte* application to this Court regarding XPO's valuation of ND and its strategy and

rationale for the acquisition of ND, including its plans for post-acquisition integration and/or

asset transactions between ND and XPO.  This information bears directly on Elliott's allegations

that XPO intends to dismantle ND (without owning 100% of ND's shares) and integrate it into

XPO, a scheme which ignores the interests of ND and its minority shareholders but is clearly key

for XPO as it flows from each of its public declarations related to the operation.

6.      Insofar as the content of this Declaration is within my personal knowledge, it is

accurate and correct.  Insofar as it is not within my personal knowledge, it is true to the best of

my knowledge, information, and belief.

---

[1]  XPO Logistics, Inc. is not a defendant in the Elliott French Action.

## THE PARTIES

7.      Elliott is an internationally-renowned investment fund, part of whose assets are managed by Elliott Capital Advisors, L.P.  Founded by Paul Singer in 1977, Elliott is one of the oldest continuously-managed investment funds.  Elliott invests throughout the world in diverse targets; it also implements varied strategies including event-driven arbitrage, and actively manages its hedging positions. Although Elliott's strategy, like that of many other investment funds, is focused on seeking out high-yield investments, it pays particular attention to managing its risks, especially those relating to fluctuations on the share and bond markets, a practice on which it has built its reputation.  Elliott has offices in New York, London, Hong Kong and Tokyo. It employs nearly 320 people worldwide, half of whom work in portfolio management, trading and research.

8.      Elliott comprises the following two investment funds:  (1) Elliott Associates, L.P., based in the United States, which owns 100% of the Bermudan company, The Liverpool Limited Partnership; and (2) Elliott International, L.P., based in the Cayman Islands.

9.      The Elliott funds have over $26 billion in assets under management. Their investors include retirement funds, sovereign funds, endowment funds, funds of funds, individuals and families with high net equity, and employees of the company.

10.     One of the activities of Elliott Capital Advisors, L.P. is to advise and manage some of the Elliott funds' assets, including its recently-acquired shareholding in the French company, ND.

11.     ND is currently one of the world leaders in the logistics, transport and freight sectors operating in Europe, North America and Asia.  With a turnover of $4.7 billion in 2014 and 42,000 employees, ND, which is listed on the Euronext Paris and Euronext London, was created in 1979 and has gradually expanded as a result of numerous acquisitions, including the

3

purchase in July 2014 of the U.S. logistics and transport operator, Jacobson Companies. This development model explains why, today, over 64% of the group's turnover is generated outside France.

12.     XPO Logistics Inc., a U.S. company listed on the New York Stock Exchange, is based in Greenwich, Connecticut, and is one of the leaders in the North American transport and logistics sector. In 2014, XPO had 10,000 employees and posted a turnover of $2.4 billion, generated primarily in the U.S. This has been achieved due to numerous acquisitions. In particular, in 2014, XPO attempted to purchase the U.S. logistics and transport operator Jacobson Companies, but the contract was ultimately won by ND instead. XPO has since shown an interest in ND.

13.     XPO Logistics France ("XPO France") is the wholly-owned French subsidiary of XPO. It was created in May 2015 in preparation for the purchase of a majority shareholding in ND.

## XPO'S ATTEMPTED TAKEOVER OF ND

14.     On April 28, 2015, XPO announced its intention to attempt to acquire a 100% interest in ND. Specifically, XPO announced it had signed (1) a share purchase agreement for 66.71% of the share capital of ND at the price of €217.50 per share (increased by €1.80 per share in relation to a dividend that was paid out before the purchase was finalised); (2) a tender offer agreement for the remaining shares of ND at the price of €217.50 per share; and (3) an incentive letter with the members of ND's management board, setting forth the treatment of the existing ND management incentive instruments and the future incentive scheme to be granted to the management and employees of ND.

15.     In a press release, XPO stated that in the event that, upon the closing of the simplified tender offer, the number of shares not tendered by the shareholders represents less

4

than 5% of the share capital or voting rights of ND, XPO has the intention to implement a

mandatory squeeze-out procedure and the delisting of ND shares.  [Exhibit 1.]  Under French

law, XPO must obtain at least 95% of the shares and voting rights of ND in order to engage in a

squeeze-out of any remaining shareholders and to meet the conditions needed for a mandatory

delisting of ND and its integration, especially for tax purposes, into XPO.

16.     On April 29, 2015, the AMF[2] published a decision marking the start of the pre-

tender period, in particular making it mandatory for any investor to declare to the AMF, starting

on this date, any transaction involving the shares of ND -- as the target company -- if the

investor's shareholding increases to at least 1%, as per the requirements of article 231-46 of the

AMF General Regulation.

17.     Believing that the share purchase price as announced by XPO did not reflect the

full value of ND, Elliott decided to invest in ND.  Starting on May 8, 2015, Elliott began,

directly or indirectly, via The Liverpool Limited Partnership, purchasing ND shares and CFDs[3]

for ND shares.

18.     In line with applicable regulations, Elliott made the necessary declarations for

these purchases, as and when they occurred.

19.     On May 18, 2015, Elliott submitted a declaration of intent to the AMF stating that

Elliott was planning to continue its purchases of ND shares and/or derivatives linked to ND

---

[2] The AMF (Autorité des marchés financiers) is the French securities regulator.

[3] A "CFD," or "Contract for Difference" is a flexible financial derivative linked to upward or
downward changes in the price of a share, index or any other asset, without actually owning
it.  These contracts have several advantages (i) financially, because they allow the investor to
receive the same benefits as though it were the direct owner of the shares in question but for
a purchase cost much lower than the actual purchase cost of the shares; and (ii) fiscally, by
allowing the investor to avoid certain taxes because it is not the owner of the underlying
asset.

shares, depending on market conditions.  At the same time, and as required by article 9 of ND's

articles of association, Elliott informed ND that it had passed the statutory 2% share ownership

threshold.  [Exhibit 2.]

20.     On May 19, 2015, XPO created XPO France, which would subrogate the former

in its rights and obligations under the share purchase agreement and the tender offer agreement.

On June 8, 2015, XPO France acquired 66.71% of the share capital of ND, as per the terms of

the share purchase agreement.  On June 11, 2015, XPO France issued a simplified tender offer

targeting the remaining ND shares for the price of €217.50 per share.  At the same time, and as

stated in its letter of intent of May 18, 2015, Elliott increased its position in ND.

21.     On June 19, 2015, Elliott informed ND it had passed the 4% statutory share

ownership threshold.  [Exhibit 3.]  On June 23, 2015, the AMF approved the simplified tender

offer made by XPO France.  On June 24, 2015, Elliott informed ND it had passed the 5% share

ownership threshold.  [Exhibit 4.]  On June 25, 2015, the AMF said that the simplified tender

offer would be open from June 26 to July 17, 2015.

22.     The AMF also granted a *visa* to the information memorandum filed by XPO

France [Exhibit 5] and the response memorandum from ND [Exhibit 6] which were released at

the same time.  Notably, neither of these documents contained any information about what would

happen to shareholders who did not wish to tender their ND shares to the offer, and instead,

retain their investment in ND.  The information memorandum stated that "Depending on the

results of the Offer, the Offeror reserves the right to consider the best ways of integrating ND

into XPO Logistics Inc. group.  In this context, at some point of time in the future, the Offeror

may decide to merge or transfer certain ND assets or branches with or to XPO Logistics group

companies (including XPO) or vice versa."  As explained in the response memorandum from

ND, "if the necessary conditions to implement the squeeze out are not met, [...] [XPO France]

6

will consider the best ways to integrate the Company within the new group, including through mergers or contributions."

23.    Still believing that the price officially offered by XPO for the ND shares did not reflect the actual value of the company, Elliott continued purchasing financial instruments in ND.  On June 26, 2015, Elliott informed ND it had passed the 6% statutory share ownership threshold.  [Exhibit 7.]  After informing the AMF on July 6, 2015 of the unwinding of all CFDs that had been signed and the purchase of the underlying ND shares, Elliott repeated to the AMF Elliott's intention to continue purchasing ND shares and/or derivatives linked to ND shares and that Elliott has no intention to tender the purchased shares to the offer and is not acting in concert with any other person.  On this date, XPO France knew with certainty that it would not be able to engage in a squeeze-out of any remaining shareholders or meet the conditions needed for a mandatory delisting of ND and its integration, especially for tax purposes, into XPO.

## XPO'S FRENCH ACTION AGAINST ELLIOTT

24.    As noted above, XPO filed its action against Elliott on July 8, 2015.  XPO's civil complaint in its French Action alleges that Elliott has violated (1) disclosure requirements under French law and (2) French tender offer law.  It further alleges that Elliott's intent has been to disrupt the XPO offer by blocking the squeeze-out in order to obtain an undue advantage.

25.    XPO seeks in its French Action an order (1) compelling Elliott to transfer to Bank of America all of the ND shares that Elliott allegedly purchased from Bank of America and (2) prohibiting Elliott from repurchasing those shares from Bank of America.  XPO also seeks purported damages.

26.    On July 8, 2015, the Commercial Court granted XPO an *ex parte* freezing order to preserve the status quo and barring Elliott from transferring its equity interest in ND to any third party other than XPO until the matter is further heard at the next hearing in the XPO French

7

Action on July 23, 2015. Notably, because Elliott intends to hold onto the shares, the Court's

July 8 order is in line with Elliott's intentions. At the July 23, 2015 hearing, XPO will be seeking

a continuation of the freezing order until the end of the proceedings on XPO's French Claim

against Elliott, currently scheduled for a merits hearing on September 29, 2015.

27.     XPO's allegations in its French Action are without support.  Elliott lawfully

acquired its ND shares because it believes in their value and in the strong potential of ND in the

long term.  Elliott is not the only investor to have reached this conclusion, as other investors

began to purchase ND's shares after XPO announced its attempt to acquire 100% of the

company.  Elliott properly and timely made all regulatory filings regarding its purchases required

by French law.  And it kept ND apprised of its purchases of ND shares and CFDs, sending ND

and the AMF a series of notices that Elliott had acquired increasing percentages of ND's share

capital.  After an analysis of the tender offer for ND's shares, Elliott decided, as is its right under

French law, not to tender its ND shares.  The evidence Elliott will be presenting in XPO's French

Action will show that Elliott has made the required disclosures and is compliant with French law.

## ELLIOTT'S FRENCH ACTION AGAINST XPO

28.     As noted above, Elliott filed its French Action against XPO on July 16, 2015.

Elliott's French Action alleges that XPO intends to dismantle ND for the sole purpose of

integrating it into XPO, a scheme which ignores the interests of ND and its minority

shareholders.  [Exhibit 8.]  Elliott's French Action further alleges XPO intends to proceed with

its dismantling of ND and incorporation into XPO even without owning 100% of ND's shares,

thus bypassing ND's minority shareholders.

29.     As stated in its information memorandum, XPO had a target of owning 95% of

ND's shares by the end of the tender offer, which closed on July 17, 2015, in order to be able to

proceed with the mandatory delisting of the company and its integration, especially for tax

8

purposes, into XPO. [Exhibit 5.] XPO announced this target from the outset, and XPO apparently did not expect that ND's minority shareholders would not tender their shares to the offer and would want to retain their stake in ND.

30. Given the size of Elliott's shareholding and intentions regarding the tender offer, XPO now knows it cannot achieve its 95% target. These facts, together with the extremely aggressive and unlawful conduct adopted by XPO against Elliott, provides Elliott with good cause to believe that XPO has already taken - or has imminent plans to take - action that is manifestly contrary to the corporate interests of ND and its minority shareholders in order to achieve its goal of fully or partially integrating ND into XPO by bypassing the fact that it does not own 100% of ND's shares. Given this risk, Elliott sent a letter to ND on July 15, 2015, sharing its concerns and asking ND to provide all information about the actions XPO was planning to take for integrating ND into XPO. [Exhibit 9.] However, insofar as (i) XPO currently owns more than 73.6% of the share capital of ND, (ii) ND's managers have a very close relationship with the XPO management; (iii) ND's management has a direct interest[4] in the offer; and (iv) XPO has already appointed the majority of the board members of ND, it is highly unlikely that any satisfactory response will be received to this letter.

31. Through its French Action, Elliott seeks the French court's appointment of an expert who will produce a report on whether the actions already taken or about to be taken by XPO to integrate ND within XPO are compatible with the interests of ND and its minority shareholders. Elliott also seeks relief from the French court prohibiting XPO and ND from

---

[4] One example of this direct interest is the incentive letter with the members of the management board, setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of ND.

continuing any actions or undertaking any new actions to integrate ND, pending the report from the court expert.

32.     On July 16, 2015, the President of the Paris Commercial Court granted, at Elliott's request, a freezing order barring XPO from carrying out any of its contemplated transactions with ND until such time as the transactions can be properly evaluated from the standpoint of protecting ND and its shareholders from being unduly deprived of value. The Court also ordered the next hearing on the matter to take place on July 23, 2015, at which time the requests for a court appointed expert and the extension of the freezing order will be heard.

## ELLIOTT'S DISCOVERY REQUESTS ON XPO IN AID OF THE FRENCH ACTIONS

33.     Elliott has filed this Section 1782 application in order to obtain information for use in its prosecution of the Elliott French Action, as well as in defense of the XPO French Action.

34.     XPO has already obtained an order from this Court permitting Section 1782 discovery of similar scope to what Elliott is seeking here.

35.     Elliott's Section 1782 application seeks the following information from XPO:

•     Document Request No. 1 directed to XPO seeks the following: "All documents related to the purpose of evaluating XPO's contemplated acquisition of ND (including, but not limited to, its rationale, valuation, synergies, post-acquisition integration, or strategy), without limit to XPO's internal memoranda, presentations, reports, research, and analyses with respect to the acquisition; external expert reports or analysis, including but without limit to structure memos, valuation reports, fairness opinions, market dynamics reports, or competitors reports; and any correspondence between XPO (or its affiliates and/or subsidiaries) and ND's (or its affiliates' and/or subsidiaries') management boards, supervisory boards, shareholders, and financial advisors."

• Document Request No. 2 directed to XPO seeks the following: "All documents related to the contemplated acquisition of ND presented to XPO's Board of Directors or its committees, including, but not limited to, memoranda, reports, presentations, and reports or presentations from financial advisors or market experts."

• Document Request No. 3 directed to XPO seeks the following: "All documents related to the financial implications of the contemplated ND acquisition, including but not limited to memoranda, reports, or analysis prepared by XPO or external financial advisors regarding the tax implications of the acquisition."

• Document Request No. 4 directed to XPO seeks the following: "All documents related to or filed pursuant to item 4(c) or 4(d) in the Hart-Scott-Rodino Act notification form or French Foreign investment notification and/or authorization."

• Document Request No. 5 directed to XPO seeks the following: "All documents (whether in draft or final form) related to any transactions, arrangements, or agreements between XPO and ND, with respect to topics, including but not limited to mergers, spin offs, transfers of business, companies or assets; providing products or services to customers of the other party; transfers of employees; use of the XPO trademark, trade name or brand name, including detailed terms and conditions for its use by ND, and any related party transactions."

• Document Request No. 6 directed to XPO seeks the following: "All documents, including any proposals, regarding any and all changes to the compensation of members of ND's management board and supervisory board after the acquisition, including, without limitation, details of any options, warrants, restricted stock, performance units, and other equity compensation (whether real or phantom) proposed to be provided to any

11

members of the management board and of the supervisory board of ND, and all written instruments with respect thereto (whether letters, term sheets, agreements or other)."

• Deposition Category No. 1 directed to XPO seeks the following: "Your knowledge of and communications concerning XPO's acquisition of its interest in ND with respect to its rationale and valuation, synergies, post-acquisition integration, and strategy. These would include knowledge of and communications concerning:

a.      reports and presentations to XPO's Board of Directors or its committees (e.g., audit, strategic, or investments);

b.      reports, including structure memos, valuation reports and fairness opinions from financial advisors, and reports from consultants on market dynamics and competitors;

c.      any tax memoranda prepared for the purpose of evaluating the impact of the contemplated transaction;

d.      any information relating to the financial aspects of the transaction.

• Deposition Category No. 2 directed to XPO seeks the following: "Your knowledge of and communications concerning any actual or contemplated transactions or arrangements between ND or its affiliates and/or subsidiaries, on the one hand, and XPO and its affiliates and/or subsidiaries, on the other hand, including:

a.      mergers, spin offs, transfers of business, companies or assets;

b.      providing products or services to customers of the other party;

c.      transfers of employees;

d.      any proposals regarding any and all changes to the compensation of members of ND's management board and supervisory board after the acquisition, including, without limitation, details of any options, warrants,

12

restricted stock, performance units, and other equity compensation

(whether real or phantom) proposed to be provided to any members of the

management board and of the supervisory board of ND, and all written

instruments with respect thereto (whether letters, term sheets, agreements

or other);

  e.  use of the XPO trademark, trade name or brand name by ND; and

  f.  any related party transactions.

●  Deposition Category No. 3 directed to XPO seeks the following:  Your

knowledge of and communications concerning any actual or contemplated changes to the

compensation of members of the management board of ND and of the supervisory board

after the contemplated acquisition of ND, including, but not limited to, details of any

options, warrants, restricted stock, and performance units and other equity compensation

(whether real or phantom) proposed to be provided to any members of the management

board and of the supervisory board of ND.

  36.  Each of these requests is reasonable under the circumstances and likely to yield

information highly relevant to the Elliott French Action, as well as the XPO French Action.  The

above requests are narrowly tailored to obtain information regarding XPO's valuation of ND and

its strategy and rationale for the acquisition of ND, including its plans for post-acquisition

integration and/or asset transactions between ND and XPO.  This information bears directly on

Elliott's allegations that XPO intends to dismantle ND (without owning 100% of ND's shares)

and integrate it into XPO, a scheme which ignores the interests of ND and its minority

shareholders while ND will still remain a listed company with a significant minority

shareholding.

## FRENCH CIVIL PROCEDURE

37.     Under the French Code of Civil Procedure, which applies to both French Actions,

each party has the burden of providing evidence for the facts that it alleges. Notably, French

legal practice does not require a party to a civil case to produce evidence contrary to its own

interest.  While a party may ask a French court to order the production of a document, under

French law the party seeking discovery is required to identify the precise document that it is

requesting, and it is not sufficient to request that the French court order a party to produce

documents that concern a specific relevant subject matter.

38.     In this case, the central issues require disclosure of XPO's *internal* strategy and

rationale for the acquisition of ND, including its plans for post-acquisition integration and/or

asset transactions between ND and XPO, as well as XPO's *undisclosed* scheme to dismantle ND

(without owning 100% of ND's shares) and integrate it into XPO, thus ignoring the interests of

ND and its minority shareholders

39.     The documents set forth in Elliott's subpoenas are not precisely identified and

their substance is not actually known, and discovery proceedings do not exist in France;

accordingly, a French court would generally lack the ability to order production of the

documents sought through Elliott's Section 1782 application.  The Elliot French Action is

against ND and XPO Logistics France SAS – not XPO Logistics, Inc.  Additional constraints

apply to documents located outside France, such as those in XPO Logistics, Inc.'s possession,

which would make it difficult for a French court to order the production of any documents held

in the United States in the timeframe applicable here.

40.     Moreover, French legal practice generally does not permit depositions in civil

litigation.

41.    While the Paris Commercial Court could not order the production of the requested discovery, it is permitted to receive documents collected in the United States. Those documents would be available subject to all parties' ability to access them in the French Actions. Indeed, Elliott could present the evidence obtained through its Section 1782 application at the July 23, 2015 and/or during the requested expert proceedings, and/or at future hearings on the merits in the litigation.

42.    Neither French law nor the rules of the Paris Commercial Court forbid the use in the French Actions of the relevant information that Elliott seeks through its Section 1782 application.

43.    Accordingly, it is respectfully requested that this Court assist Elliott in obtaining the information requested in the proposed subpoenas attached to this Section 1782 application for use in the French Actions.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed on July 20, 2015 at Paris, France.

George T. Rigo