# Exhibit 5

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## INFORMATION MEMORANDUM REGARDING THE SIMPLIFIED TENDER OFFER TARGETING THE SHARES OF



initiated by



**XPO Logistics France SAS**

presented by

# Morgan Stanley

---

**OFFER PRICE: 217.50 euros per Norbert Dentressangle SA share**
**OFFER PERIOD: 16 trading days**

---

AMF | AUTORITÉ DES MARCHÉS FINANCIERS

Pursuant to the provisions of Article L.621-8 of the French monetary and financial code and the article 231-26 of its General Regulations, the French Financial Markets Authority (*Autorité des marchés financiers*) ("**AMF**"), has as a result of its decision dated 23 June 2015 on the compliance of the Offer with its regulations delivered the visa n°15-290 on 23 June 2015 on this offer document. This document was prepared by XPO Logistics France and its signatories are liable for its content.

Pursuant to the provisions of the article L.621-8 I of the French monetary and financial code, the visa has been delivered after the AMF had verified "*whether the document is complete and understandable and whether the information presented is coherent*". The visa does not signify approval of the offer price or the merits of the transaction, and does not serve as authentication of the accounting and financial information provided.

---

**IMPORTANT NOTICE**

In the event that, upon the closing of the simplified tender offer, the number of shares not tendered in response to this offer by the minority shareholders represents less than 5% of the share capital or voting rights of Norbert Dentressangle SA, XPO Logistics France has the intention to implement, after the closing of such tender offer, pursuant to articles L. 433-4 III of the French Monetary and Financial Code and 237-14 *et seq.* of the AMF General Regulations, a mandatory squeeze-out procedure in exchange for compensation equal to 217.50 euros per Norbert Dentressangle SA share, it being specified that such squeeze-out procedure would be immediately followed by an application to Euronext for the delisting of Norbert Dentressangle SA shares.

---

This information memorandum approved by the AMF as well as other information relating in particular to the legal, financial and accounting characteristics of XPO Logistics France shall be made available to the public free of charge at the offices of **Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France)** ("**Morgan Stanley**"), as well as on the web sites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com), pursuant to article 231-27 2° of the AMF General Regulations. A press release will be issued pursuant to article 221-3 of the AMF General Regulations in order to inform the public of the manner in which these documents will be made available.

Pursuant to article 231-28 of the AMF General Regulations, information relating in particular to the legal, financial and accounting characteristics of XPO Logistics France and Norbert Dentressangle SA will be filed with the AMF and made available to the public no later than on the day preceding the opening of the simplified tender offer.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## TABLE OF CONTENTS

1.    PRESENTATION OF THE OFFER ...................................................................................... 4
1.1.    INTRODUCTION ............................................................................................................ 4
1.2.    CONTEXT OF AND RATIONALE FOR THE TRANSACTION .............................................. 4
1.2.1.    Background for transaction .................................................................................... 4
1.2.2.    Rationale for the Block Acquisition and the subsequent Offer ............................ 11
1.2.3.    Opinion of XPO Logistics, Inc.'s Board of Directors and sole shareholder approval of the Offeror ........ 12
1.3.    INTENTIONS OF THE OFFEROR FOR THE COMING TWELVE MONTHS ........................ 12
1.3.1.    Strategic rationale and future activity ................................................................ 12
1.3.2.    Intentions regarding employment and management ............................................ 13
1.3.3.    Dividend distribution policy ............................................................................... 13
1.3.4.    Synergies ............................................................................................................ 13
1.3.5.    Mandatory squeeze-out and removal from listing ............................................. 14
1.3.6.    Intentions regarding merger and integration ..................................................... 14
1.3.7.    Composition of the Supervisory Board ................................................................ 14
1.3.8.    Advantages for the Company, the Offeror and their shareholders ..................... 15
1.4.    AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS OUTCOME ........................................................................................................ 16
2.    CHARACTERISTICS OF THE OFFER ........................................................................ 16
2.1.    TERMS OF THE OFFER ................................................................................................ 16
2.2.    NUMBER AND NATURE OF THE SECURITIES TARGETED BY THE OFFER ...................... 17
2.3.    TENDER PROCEDURE FOR THE OFFER ........................................................................ 17
2.4.    INDICATIVE TIMETABLE OF THE OFFER ..................................................................... 18
2.5.    FINANCING OF THE OFFER ......................................................................................... 19
2.5.1.    Costs connected with the Offer ........................................................................... 19
2.5.2.    Financing sources of the Offer ............................................................................ 19
2.6.    RESTRICTIONS CONCERNING THE OFFER ABROAD ..................................................... 19
2.7.    TAX TREATMENT OF THE OFFER ................................................................................ 20
2.7.1.    Individual shareholders who are tax residents of France managing their private assets and not carrying out stock exchange transactions on an habitual basis ........................................................... 20
2.7.2.    Corporate shareholders residents of France for tax purposes and subject to corporate income tax under standard conditions ................................................................................................................ 22
2.7.3.    Shareholders who are not residents of France for tax purposes ......................... 23
2.7.4.    Shareholders subject to a different tax regime .................................................... 24
2.7.5.    Registration duties or financial transaction tax ................................................ 24
3.    OFFER VALUATION CRITERIA .................................................................................. 25
3.1.    ASSESSMENT OF THE OFFER PRICE FOR ND SHARES ................................................. 25
3.2.    FINANCIAL ELEMENTS ............................................................................................... 25
3.2.1.    Financial information .......................................................................................... 25
3.2.2.    Enterprise value to equity value bridge .............................................................. 26
3.2.3.    Number of shares retained .................................................................................. 26

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**3.3.**    **VALUATION OF THE OFFER** ........................................................................................... 27

3.3.1.  Reference to the acquisition by XPO of the majority block of ND shares (Block Acquisition) ................ 27

3.3.2.  Analysis of trading prices ........................................................................................... 27

3.3.3.  Equity research analysts' target prices ........................................................................ 29

3.3.4.  Analysis of trading multiples for comparable listed companies ................................. 29

3.3.5.  Analysis of precedent transactions multiples ............................................................. 31

3.3.6.  Analysis of premia paid in precedent French public transactions ("OPA") ................ 32

3.3.7.  Analysis of discounted cash flow ............................................................................... 32

3.3.8.  Summary of the valuation of the Offer per Company Share ...................................... 35

**4.**      **PERSONS ASSUMING RESPONSIBILITY FOR THE INFORMATION MEMORANDUM** ...... 36

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 1. PRESENTATION OF THE OFFER

## 1.1. Introduction

Pursuant to Title III of Book II, and in particular, articles 233-1 2° *et seq.* and 234-2 of the AMF General Regulations, XPO Logistics France SAS, a corporation incorporated under the laws of France having a share capital of 10,000 euros, whose registered office is located at 23 rue du Roule, 75001 Paris, France and registered under number 811 597 335 RCS Paris ("**XPO**" or the "**Offeror**"), a wholly owned subsidiary of XPO Logistics, Inc.[1], a company incorporated under the laws of the state of Delaware, whose registered office is at Five Greenwich Office Park, Greenwich, Connecticut 06831 (USA) and whose shares are traded on the New York Stock Exchange (NYSE: XPO) ("**XPO Logistics, Inc**" and, together with XPO, "**XPO Logistics**"), has irrevocably undertaken to the AMF to offer to all of the shareholders of Norbert Dentressangle SA, a French *société anonyme* having a share capital of 19,672,482 euros, whose registered office is located at 192, avenue Thiers, 69006 Lyon, France registered with the Commercial and companies registrar of Lyon under number 309 645 539 ("**ND**" or the "**Company**") and whose shares are traded on both Euronext Paris - Eurolist Compartment A (ISIN FR0000052870; ticker symbol: GND) and NYSE Euronext London - Official List, to purchase all their shares of ND at a price of 217.50 euros per share (the "**Offer**").

Pursuant to Article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offer shall be open for a period of 16 trading days.

The Offer follows the acquisition by XPO (i) on 8 June 2015, of 6,561,776 shares from various shareholders of ND by way of off-market block trades (the "**Block Acquisition**"), representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company and (ii) on 8 June 2015, of 110,000 Subscription Warrants (as defined hereafter) giving rise to the right to subscribe for 110,000 ND Shares. XPO holds at the Offer filing date, 6,561,776 ND shares, representing 66.71% of the share capital and 66.38% of the theoretical voting rights.

Pursuant to the terms of Article 231-13 of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015. Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings made by the Offeror.

The Offer targets all the shares not directly or indirectly held by the Offeror as at the date hereof.

## 1.2. Context of and rationale for the transaction

### 1.2.1. Background for transaction

#### (i) *Acquisition by the Offeror of a 66.71% interest in ND*

On 28 April 2015, XPO Logistics, Inc. entered into (i) a share purchase agreement (the "**Share Purchase Agreement**") with Dentressangle Initiatives, Messrs. Norbert Dentressangle and Pierre-

---

[1] XPO Logistics, Inc.'s largest stockholder is Jacobs Private Equity, LLC, which is controlled by Mr. Bradley Jacobs who owns approximately 17.015% of the common stock of XPO Logistics, Inc.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Henri Dentressangle and Mss. Evelyne Dentressangle and Marine Dentressangle (the "**Initial Sellers**"), (ii) a tender offer agreement (the "**Tender Offer Agreement**") with the Company and (iii) a letter with the members of the Management Board (the "**Incentive Letter**") setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of the Company.

Pursuant to the Share Purchase Agreement in relation to the Block Acquisition, XPO agreed to acquire from the Initial Sellers 6,561,776 shares, representing approximately 66.71% of the share capital of ND at a price of 217.50 euros per share. The purchase price takes into consideration the distribution of a dividend in the amount of 1.80 euros per share to the benefit of all ND shareholders prior to the closing of the Block Acquisition.

Further, pursuant to the Tender Offer Agreement and the Incentive Letter, XPO agreed to acquire, at a price of 157.95 euros per warrant, from certain members of the management board of the Company, the share subscription warrants issued to them by the Company, i.e., (i) 80,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant A**") and (ii) 30,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant B**" and, together with the Subscription Warrants A, the "**Subscription Warrants**"), provided the vesting conditions provided in the terms and conditions of such Subscription Warrants be cancelled and the exercise periods be opened in anticipation by the shareholders of the Company on the occasion of the shareholders' meeting of 21 May 2015.

Also on 28 April 2015, XPO Logistics, Inc. and the Company announced the Block Acquisition, and XPO Logistics, Inc. also announced that it would launch the acquisition process for all the remaining shares of ND at a price of 217.50 euros per share.

The Company's supervisory board in a meeting held on 27 April 2015, gave a preliminary favourable opinion as to the Block Acquisition and the Offer, and appointed Ledouble SAS, represented by Messrs. Olivier Cretté and Sébastien Sancho, as independent expert in charge of preparing a report regarding the financial terms of a tender offer, followed, as the case may be, by a mandatory squeeze-out.

On 19 May 2015, the Offeror was created by its sole shareholder, XPO Logistics, Inc., which substituted the Offeror in its rights and obligations under the Share Purchase Agreement and the Tender Offer Agreement.

On 16 May 2015, XPO Logistics, Inc. and the Initial Sellers agreed that all conditions precedent pertaining to governmental and antitrust approvals were satisfied and therefore that all conditions precedents under the Share Purchase Agreement were satisfied.

On 21 May 2015, the shareholders' meeting of the Company approved the payment of a dividend of 1.80 euros per share which was made on 2 June 2015 (record date occurring on 29 May 2015).

The Company initiated the employee information and consultation process with the employee committee at the ND group level immediately following the announcement of the signing of the Share Purchase Agreement. On 28 May 2015, the ND group's employee committee rendered an unfavourable opinion on the contemplated Offer.

The settlement-delivery of the Block Acquisition governed by the Share Purchase Agreement was completed off-market on 8 June 2015.

As a result of the Block Acquisition, the Offeror became the owner of 6,561,776 shares of ND, representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

On 8 June 2015, the Company's supervisory board, in view of the fairness opinion of the independent expert, recommended to shareholders to tender their shares to the Offer.

Further, on 8 June 2015, the Offeror acquired the Subscription Warrants at a price per warrant of 157.95 euros, corresponding to the price paid for the shares as part of the Block Acquisition minus the exercise price.

Finally, since the filing of the draft information memorandum up until 23 June 2015, the Offeror has acquired 189,525 shares of the Company, at the Offer price (i.e., 217.50 euros), pursuant to Article 231-38 IV of the AMF General Regulations.

### (ii)    *Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers*

The Share Purchase Agreement provides for an obligation for the Purchaser to ensure that the Company progressively ceases to use the Norbert Dentressangle trade name and brand, with the rebranding process to be fully completed in the 36 months following the Block Acquisition. Subject to certain conditions, penalties may be due in case of failure to observe these obligations.

The Share Purchase Agreement does not contain any price supplement provision to the benefit of the Initial Sellers in respect of the Block Acquisition.

Further, the Share Purchase Agreement provides for 3-year non-compete and non-solicitation obligations bearing upon the Initial Sellers. The Initial Sellers also undertook not to use the Norbert Dentressangle trade name and brand in a business similar to the Company's business for a period of 20 years.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**(iii)     Allocation of capital and voting rights of ND**

**(A)     ND's capital and voting rights allocation prior to the Block Acquisition**

The share capital of ND amounts, to the Offeror's knowledge, to 19,672,482 euros, divided into 9,836,241 ordinary shares with a nominal value of 2 euros each.

The following table presents, to the knowledge of the Offeror, the capital and theoretical voting rights of the Company immediately prior to the completion of the Block Acquisition on 31 May 2015.

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights* |
|---|---|---|---|---|
| Dentressangle Family | 240 482 | 2.44 | 480 944 | 2.96 |
| Dentressangle Initiatives (controlled by the Dentressangle family) | 6 321 294 | 64.27 | 12 366 694 | 76.26 |
| **Sub-total (Dentressangle family)** | 6 561 776 | 66.71 | 12 847 638 | 79.22 |
| Employees and public[2] | 3 230 018 | 32.84 | 3 325 298 | 20.50 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578**ated** | *0.24*** |
| *Including shares held under liquidity arrangement* | *5869* | *0.06* | *5 869*** | *0.04*** |
| **Total** | 9 836 241 | 100 | 16 217 383 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

Neither the Offeror nor any of the companies belonging to the Offeror group held, directly or indirectly, any ND shares prior to the Block Acquisition and in particular has not purchased any ND shares in the 12 months preceding the announcement of the Offer.

---

[2] Including 53 500 shares held by the Management Board

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**(B)    ND's capital and voting rights allocation following the Block Acquisition**

The following table presents, to the knowledge of the Offeror, as of the date hereof the capital and theoretical voting rights of the Company following the completion of the Block Acquisition.

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 561 776 | 66.71 | 6 561 776 | 66.38 |
| Employees and public | 3 230 018 | 32.84 | 3 279 575 | 33.17 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578\*\** | *0.39\*\** |
| *Including shares held under liquidity arrangement* | *5 869* | *0.06* | *5 869\*\** | *0.06\*\** |
| **Total** | 9 836 241 | 100 | 9 885 798 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

Apart from the Block Acquisition mentioned above and the acquisition of the Subscription Warrants mentioned below, neither the Offeror, nor any of the companies belonging to the Offeror group, held ND shares, whether directly or indirectly, prior to the Block Acquisition.

**(C)    ND's capital and voting rights allocation as of the date of the conformity decision**

The following table presents, to the knowledge of the Offeror, as of the date hereof the capital and theoretical voting rights of the Company as of 23 June 2015, taking into account the acquisitions of shares of the Company made by XPO (at the Offer price) since the filing of the draft information memorandum, pursuant to Article 231-38 IV of the AMF General Regulations.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 751 301 | 68.64 | 6 751 301 | 68.29 |
| *Including shares purchased since 11 June 2015* | *189 525* | *1.93* | *189 525* | *1.92* |
| Employees and public[3] | 3 084 940 | 31.36 | 3 134 497 | 31.71 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578\*\** | *0.39\*\** |
| *Including shares held under liquidity arrangement* | *5 869* | *0.06* | *5 869\*\** | *0.06\*\** |
| **Total** | 9 836 241 | 100 | 9 885 798 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

**(iv)   *Securities giving access to ND's share capital (Subscription Warrants)***

In addition, as of 8 June 2015, the outstanding Subscription Warrants giving access to the Company's share capital, were allocated as described in the table below:

| Category | Number granted by the Company | Total Shares (in case of exercise) |
|---|---|---|
| BSA A – Issue of July 2013 | 80 000 | 80 000 |
| BSA B – Issue of July 2013 | 30 000 | 30 000 |
| **Total** | 110 000 | 110 000 |

As mentioned above, on 8 June 2015, the Offeror acquired pursuant to the Tender Offer Agreement and the Incentive Letter, the Subscription Warrants from Messrs. Montjotin (50 000 Subscription Warrants), Bataillard (30 000 Subscription Warrants)[4], Wilson (15 000 Subscription Warrants) and

---

[3] 53 500 shares of which are held by members of the Management Board.

[4] It is noted that a portion of the Subscription Warrants held by Messrs. Montjotin and Bataillard were the subject of a contribution to a personal holding company and subject to an advanced gift on inheritance (*donation-partage*) to the benefit of their children respectively.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Gomez (15 000 Subscription Warrants) (members of the management board), at a price per warrant of 157.95 euros, corresponding to the price per share paid for thee Block Acquisition minus the exercise price of the Subscription Warrants. No price supplement clause was provided for in the context of these transfers.

As at the date hereof, XPO holds 100% of the Subscription Warrants. Apart from the foregoing, ND has issued no other securities giving access to its capital.

On the occasion of the mixed shareholders' meeting held on 21 May 2015, the shareholders of ND decided to amend the terms and conditions of the Subscription Warrants in order to (i) delete the presence and lock-up conditions provided therein and (ii) accelerate the exercise window as from 21 May 2015 (with the date of the end of the exercise period being maintained).

*(v)     Performance shares*

The Company has granted performance shares (*actions attribuées gratuitement*). As at 31 May 2015, the following performance shares are still under acquisition period and have not yet been issued and delivered to their beneficiaries:

| Category | Number granted by the Company | Total Shares (in case of delivery of shares) |
|---|---|---|
| Performance shares – Grant of May 2013 | 50 100 | 50 100 |
| Performance shares – Grant of May 2014 | 21 000 | 21 000 |
| Performance shares – Grant of October 2014 | 30 997 | 30 997 |
| **Total** | 102 097 | 102 097 |

Pursuant to the Incentive Letter, XPO Logistics, Inc. has proposed the following to the beneficiaries of performance shares, none of which have been delivered on the date of the Offer and which, as a result, are not targeted by the Offer:

For beneficiaries of performance shares granted in April 2013 and April 2014, which would be delivered in April 2016 and are subject to lockup obligation until April 2018, XPO Logistics, Inc. and the Offeror will propose such beneficiaries to cancel these performance shares in exchange for a cash bonus (considered as salary) for a gross amount of 217.50 euros per share, to be paid in two equal instalments 1.5 years and 3 years after the completion of the Block Acquisition (without any presence, service or performance conditions).

Based on the historical financial achievements in 2013 and 2014 and the 2015 budget, it may be considered that the performance conditions provided for in the April 2013 and April 2014 performance share plans will be met.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

For recipients of performance shares granted in October 2014 to the managers of Jacobson (the US subsidiary of the Company, the acquisition of which was completed on July 31 2014) whose acquisition and conservation periods both expire in October 2018, XPO Logistics, Inc. will offer in exchange for the waiver by the beneficiaries of their right to these shares, the establishment of a new plan based on the evolution of the share price of XPO Logistics, Inc. and whose performance targets would take into account integration within the XPO group. The timeframe of this new plan would be at least equal to that of the performance shares plan that it would replace. The value of grants under this new plan would in any event not be higher than the value of the replaced performance shares, taking into account, on the one hand, the price of the Offer to determine the value of the performance shares replaced and on the other hand, the market value of the XPO Logistics, Inc. shares underlying the instruments issued in exchange to determine the value of such instruments. In this way, the value of each performance share replaced would not be superior to 217.50 euros.

**(vi)    *Declarations of thresholds crossings***

Pursuant to articles 223-11 *et seq.* of the AMF General regulations and to articles 233-7 *et seq.* of the Commercial Code, the Offeror declared, by letters dated 11 June 2015 to the AMF and to ND, that it had, as a result of the Block Acquisition, crossed upward on 8 June 2015 all the legal thresholds between 0 and 2/3 thresholds of share capital and between 0 and 50% of voting rights of the Company following the execution of the Share Purchase Agreement relating to the Block Acquisition.

These declarations gave rise to a notice published by the AMF on 12 June 2015 under number 215C0813.

Conversely, members of the Dentressangle family and Dentressangle Initiatives have declared, by letters dated 11 June 2015 to the AMF and to ND, that they had, acting together in concert, as a result of the sale of their stake in ND via the Block Acquisition, crossed downwards all legal thresholds between 2/3 down to 0.

These declarations gave rise to a notice published by the AMF on 11 June 2015 under visa number 215C0803.

Given the shares acquired since the filing of the Offer, the Offeror has declared to the AMF and to ND, on 16 June 2015, that it had crossed upward on 11 June 2015 the 2/3 threshold of voting rights. These declarations gave rise to a notice published by the AMF on 16 June 2015 under visa number 215C0829.

**(vii)    *Commitment to participate in the Offer***

None.

**(viii)    *Regulatory approvals***

The Offer is not subject to any antitrust approval.

The Block Acquisition has been approved (or has not given rise to any objections) by the competition authorities in the United States, Germany and Russia. The respective clearances or terminations were granted on 11 May 2015 with respect to the United States (early termination) and Germany, and 20 May 2015 in respect of Russia.

## 1.2.2.   Rationale for the Block Acquisition and the subsequent Offer

XPO Logistics, Inc. is one of the largest and fastest-growing logistics companies in North America. It has successfully employed its strategy to grow organically as well as to acquire well performing

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

transportation and logistics businesses that bring value and are highly scalable. As a result, XPO Logistics, Inc.'s transportation segment has built industry-leading positions within North America in freight brokerage, intermodal, last mile, expedite and global freight forwarding. In addition, XPO Logistics, Inc.'s logistics segment has become the leading provider of highly engineered, technology-enabled contract logistics.

The three businesses of ND (Logistics, Transportation, and Air & Sea) are intended to remain headquartered in France and will serve as the development platform for all of XPO Logistics, Inc.'s European activities. XPO Logistics expects this acquisition to enable it to offer the more than 15,000 current customers of XPO Logistics, Inc. leading transportation and logistics services in Europe. In addition, ND has built a loyal base of blue chip customers that includes multinational companies, some of which are not currently served by XPO Logistics, Inc. These customers have an opportunity to consolidate their supply chain relationships with the combined company, and will gain access to XPO Logistics, Inc.'s industry leading services in North America.

In addition, XPO Logistics expects to invest in the growth of the combined company through its proprietary technology platforms that provide industry-leading customer service and leverage our scale. XPO Logistics, together with ND, have a 2015 IT budget of approximately 225 million USD, which it believes is among the highest in the industry.

Finally, ND's culture, like XPO Logistics, Inc.'s, is strongly focused on operational excellence and world-class service.

### 1.2.3. Opinion of XPO Logistics, Inc.'s Board of Directors and sole shareholder approval of the Offeror

Following a detailed review of the terms and structure of the proposed transaction with its advisors during the Board meeting held on 26 April 2015, the Board of Directors of XPO Logistics, Inc. declared the transaction, including the Block Acquisition and the Offer advisable and in the best interest of XPO Logistics, Inc. and its stockholders. The Board further granted the necessary powers to its officers to take any and all actions necessary for the consummation of the transaction.

In addition, on 4 June 2015, XPO Logistics, Inc. as sole shareholder of the Offeror, authorised the latter to make the Block Acquisition and proceed to initiate the Offer.

### 1.3. Intentions of the Offeror for the coming twelve months

### 1.3.1. Strategic rationale and future activity

As explained above in paragraph 1.2.2, the Offeror considers that ND's three main businesses are aligned with the XPO Logistics, Inc.'s business portfolio. ND will serve as the development platform for all of XPO Logistics, Inc.'s European activities. ND will be able to provide services to XPO Logistics, Inc.'s more than 15,000 current customers which have commercial interests outside of North America. The Offeror expects the European headquarters to remain in France, where XPO Logistics intends to grow the European operations of the group. For a period of five (5) years after the closing date, the Offeror intends to maintain the headquarters and decision-making centre of ND's European logistics business in Paris and transportation business in the department of the Drôme.

**Regarding the logistics business**, XPO Logistics, Inc. will now be able to offer leading contract logistics services in Europe to their current customers. In addition, ND has built a loyal base of blue

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

chip customers that includes multinational companies, many of which are not currently served by XPO Logistics, Inc. ND's operations in North America are expected to grow along with XPO Logistics, Inc.'s domestic contract logistics business. As a whole, the transaction will combine approximately 11 million square metres of ND's operated warehouse space with XPO Logistics, Inc.'s 1.1 million square metres, making the combined company one of the world's largest contract logistics provider based on warehouse capacity.

**Regarding the transportation business**, XPO Logistics, Inc. will now be able to offer transportation services in Europe to its current customers. ND's blue chip multi-national customers will also have an opportunity to consolidate their supply chain relationships with the combined company, and will gain access to XPO Logistics, Inc.'s industry leading services in North America for freight brokerage, intermodal, last mile, expedite and global forwarding.

**Regarding the air & sea business**, the combination will increase XPO Logistics Inc.'s global freight forwarding operations to approximately 500 million USD in revenue. The combined company will utilise the added volume to purchase air and sea transportation more efficiently for its customers.

### 1.3.2. Intentions regarding employment and management

The Offeror believes that a key element of the success of ND is preserving and developing the talent and intellectual capital of ND's personnel. In this context, the Offeror does not have any plan to modify ND's current strategy regarding staffing.

Additionally, the Offeror intends to ensure continuity of the management of ND following the completion of the Offer and retain it in the future. The Offeror intends to implement a management incentive program.

The Offeror intends not to reduce the total number of full-time employees in France for a period of eighteen months from the date of the Block Acquisition (i.e. as of 8 June 2015).

The Offeror intends to maintain the European headquarters of the ND group companies in Lyon, and has undertaken in the Tender Offer Agreement to maintain for a period of 5 years after the date of the Block Acquisition, the headquarters and decision-making centre of the Company's European logistics business in Paris and the Company's transportation business in the department of the Drôme.

The Offeror does not anticipate that the combination of ND with the Offeror subsequent to the Offer will affect the individual and collective status of the employees of ND and its subsidiaries.

### 1.3.3. Dividend distribution policy

The distribution policy will be examined subsequently, in relation notably to the Company's results, its financial capacity for such distribution and its financing needs in view of its development plans.

### 1.3.4. Synergies

The combination of XPO Logistics, Inc. and ND is not expected to generate meaningful cost synergies, mainly due to the low business overlap in Europe and the complementarity of the respective US operations of ND and XPO Logistics, Inc. XPO Logistics has committed not to reduce the total number of full-time employees in France for a period of at least 18 months from closing and to maintain the European headquarters of ND in Lyon.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Revenues synergies are expected to be derived from company-wide cross-selling opportunities within the combined group which would benefit the respective clients of XPO Logistics, Inc. and ND of the services offered by the other party. Furthermore, XPO Logistics intends to invest in the growth of ND through technology so as to leverage the combined company's scale.

Finally, XPO Logistics will have a platform in Europe to continue to execute on its M&A strategy, with significant opportunities in the fragmented European market.

### 1.3.5.  Mandatory squeeze-out and removal from listing

According to Articles 237-14 to 237-16 of the AMF General Regulations, the Offeror will request the AMF within 3 months following closing of the Offer to implement a mandatory squeeze-out process through the transfer of ND shares that it does not own and that would not be presented to the Offer (provided that they do not represent more than 5% of the capital or the voting rights of the Company), at the price of 217.50 euros per share.

The Offeror also reserves the right, in the event that it comes to hold, directly or indirectly, at least 95% of share capital and voting rights of ND, and where a mandatory squeeze-out would not have been implemented under the conditions referred to above, to file with the AMF public buy-out offer followed by a mandatory squeeze-out of the shares not directly or indirectly held by it under the conditions of Articles 236-1 et seq. and 237-14 et seq. of the AMF General Regulations.

Apart from the foregoing, the Offeror does not have the intention, in the event where it would not be able to implement a squeeze-out following the Offer, to request the delisting of the ND shares from Euronext Paris - Eurolist Compartment A in the next 12 months. The Offeror reserves its right, however, to consider the opportunity to request the delisting of the ND shares from the Euronext London - Official List.

### 1.3.6.  Intentions regarding merger and integration

Depending on the results of the Offer, the Offeror reserves the right to consider the best ways of integrating ND into XPO Logistics Inc. group. In this context, at some point of time in the future, the Offeror may decide to merge or transfer certain ND assets or branches with or to XPO Logistics group companies (including XPO) or *vice versa.*

The conditions of these possible merger or contribution operations would be subject to local works council consultation in due course and to the extent required by law, and would be reviewed by the AMF, as the case may be, in accordance with applicable regulations.

It is intended that the ND group will be integrated under the XPO brand as soon as possible. For an initial period of 3 months, this license shall proceed on a free of charge basis following which XPO Logistics, Inc. and ND shall negotiate for the grant of a license by the former to the latter under a brand licensing agreement in line with market practices.

### 1.3.7.  Composition of the Supervisory Board

Concomitantly with the completion of the Block Acquisition in accordance with the Share Purchase Agreement, Norbert Dentressangle, Evelyne Dentressangle, Pierre-Henri Dentressangle, Vincent Ménez, Jean-Bernard Lafonta and Bruno Rousset resigned from their duties as supervisory board

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

members of ND on 8 June 2015. Such resignations occurred after the supervisory board of ND recommended the Offer as mentioned above.

The supervisory board of the Company met on 8 June 2015 and has co-opted six new supervisory board members (Mr. Bradley Jacobs, XPO Logistics, Inc., represented by Ms. Angela Kirkby, Mr. Troy Cooper, Mr. John Hardig, Mr. Gordon Devens and Mr. Tavio Headley). Mr. Bradley Jacobs has, in addition, been appointed Chairman of the supervisory board and Mr. Gordon Devens its Vice-Chairman.

These cooptations, which took effect on 8 June 2015, will be subject to ratification by the Company's shareholders in general meeting.

The supervisory board of the Company is now composed as follows:

– Mr. Bradley Jacobs, Chairman (also Chairman of XPO Logistics, Inc.),

– Mr. Gordon Devens, Vice-Chairman (employee of XPO),

– Ms. Clare Chatfield (independent member),

– Mr. Henri Lachmann (independent member),

– Mr. Jean-Luc Poumarède (independent member),

– Mr. François-Marie Valentin (independent member),

– XPO Logistics, Inc., represented by Ms. Angela Kirkby,

– Mr. Troy Cooper (employee of XPO),

– Mr. John Hardig (employee of XPO),

– Mr. Tavio Headley (employee of XPO).

### 1.3.8. Advantages for the Company, the Offeror and their shareholders

XPO Logistics, Inc. is a top ten global provider of cutting-edge supply chain solutions to the most successful companies in the world. The company provides high-value-added services for surface transportation, including freight brokerage, intermodal, last mile and expedite; highly engineered contract logistics; warehousing and distribution; and global forwarding by ground, air and sea. XPO Logistic's corporate headquarters is in Greenwich, Connecticut, USA, and its European headquarters is in Lyon, France.

XPO Logistics, including the business of ND following the Block Acquisition on 8 June 2015, serves more than 30,000 customers at 863 locations in 27 countries within a highly integrated network comprising approximately 52,350 employees.

With 201 locations and approximately 10 000 employees, XPO Logistics, Inc. was, prior to the combination with ND, one of the key players in the logistics sector in North America.

*(i)* *Interest of the transaction for the Company and its shareholders*

The Offeror proposes to ND shareholders who tender their shares to the Offer immediate liquidity of all of their shareholding at the same price as that offered to the Initial Sellers, i.e., 217.50 euros per share. This transaction will allow the shareholders who participated in the development of ND to monetise their shares at a 62.2% premium to the 6-month weighted average share price.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

***(ii)       Interest of the operation to the Offeror and its shareholders***

The Offeror believes that this acquisition fits into its strategy to acquire best-in-class logistics companies and become a single source provider of transportation and logistics services. The combined entity would be a dynamic, global player, with leadership positions in logistics and transportation. Customers would benefit from the combined entity's broad range of services, leading edge technology, deep access to transportation capacity, and commitment to customer service.

## 1.4.     Agreements that could have a significant impact on the assessment of the Offer or its outcome

Subject to the SPA in respect of the Block Acquisition as described above, the Offeror is not aware of any agreement and is not party to any agreement in connection with the Offer or that potentially could have a significant impact on the assessment of the Offer or its outcome.

## 2.     CHARACTERISTICS OF THE OFFER

## 2.1.     Terms of the Offer

Pursuant to the terms of Article 231-13 of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015.

The AMF published on 11 June 2015 a filing notice in relation to the Offer on its website (www.amf-france.org) under visa number 215C0799.

Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings taken by the Offeror.

Pursuant to Article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offeror irrevocably undertakes to acquire from the shareholders of ND, the shares of the Company which will be tendered to the Offer, at a price of 217.50 euros per share, during a 16 trading day period.

Pursuant to Article 231-16° of the AMF General Regulations, a press release in relation to the terms and conditions of the Offer has been issued on 11 June 2015 by the Offeror and made available on the Offeror's website (http://www.xpo.com). A copy of the draft information memorandum was made available on the websites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com) and may be obtained free of charge upon request to Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France).

On 23 June 2015, the AMF published a clearance decision (*décision de conformité*) for the Offer on its website (www.amf-france.org), following its verification of the compliance of this Offer with applicable laws and regulations. The clearance decision will entail approval (*visa*) by the AMF of the information memorandum.

The information memorandum as approved by the AMF, together with the document entitled "Other Information" relating, in particular, to the legal, financial and accounting characteristics of the Offeror shall be made available to the public free of charge, no later than the day before the opening of the Offer, at the offices of Morgan Stanley. These documents will also be made available on the websites of XPO Logistics France (http://www.xpo.com), ND (http://www.norbert-dentressangle.com/) and the AMF (www.amf-france.org).

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

A press release specifying the conditions under which these documents will be made available will be issued in accordance with Article 221-4 IV of the AMF General Regulations.

Prior to the opening of the Offer, the AMF will release a notice announcing the opening of the Offer and the timetable for the Offer, and Euronext Paris will release a notice announcing the terms and timetable of the Offer.

## 2.2.    Number and nature of the securities targeted by the Offer

The Offer covers all of the securities giving access to the share capital and voting rights of the Company, namely all of the 9,836,241 shares issued as of the filing of this Offer, excluding (i) the 6,561,776 shares acquired by the Offeror on 8 June 2015 as part of the Block Acquisition and the 189,525 shares acquired by XPO since the filing of the draft information memorandum pursuant to pursuant to Article 231-38 IV of the AMF General Regulations, and (ii) the 110,000 Subscription Warrants issued by the Company acquired by the Offeror on 8 June 2015, it being specified that the Supervisory Board of ND has committed itself not to tender the treasury shares to the Offer (44,447 shares as of 8 June 2015).

Therefore, the Offer covers a total maximum of 3,040,493 shares of the Company, representing 30.91% of the share capital of the Company.

It is specified that:

- the Offer does not aim at the shares underlying the 110,000 Subscription Warrants issued by the Company to the extent that the Offeror already owns these Subscription Warrants;

- as of 11 June 2015, the total number of performance shares is 102,097; these shares are under acquisition period (i.e. have not been delivered to their beneficiaries) as of such date, and will, after delivery, be subject to a lock-up for a period of two years as per their terms. The performance shares may therefore not be tendered to the Offer.

With the exception of the shares referred to above, to the Offeror's knowledge, there exists no equity security or any other financial instrument providing a right, either immediately or in the future, to the share capital or voting rights of the Company, other than the Company shares.

## 2.3.    Tender procedure for the Offer

The shares tendered to the Offer must be freely tradable and free of any lien, pledge, or other form of security or restriction of any kind whatsoever which may limit the free transfer of ownership. The Offeror reserves the right, in its sole discretion, to reject any Company shares which do not comply with this condition.

The Offer shall be open for a period of 16 trading days.

Company shares held in registered form must be converted and held in bearer form to be tendered to the Offer. Therefore, holders of shares held in an account managed by a financial intermediary in registered form who wish to tender Company shares in the Offer will have to ask for the conversion of these shares to hold them in bearer form as soon as possible. Holders of shares will therefore lose the benefits attached to the registered form for those shares so converted into bearer form.

Holders of Company shares held in an account managed by a financial intermediary (including traders, banks and financial institutions) and willing to tender their Company shares to the Offer must deliver an irrevocable transfer order in relation to their shares to their financial intermediary in accordance

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

with the standard forms provided by their financial intermediary no later than the last day on which the Offer is open and in a timely manner so as their order can be executed. Each financial intermediary shall transfer the Company shares for which it has received the order to tender to the Offer.

Shareholders of the Company who wish to tender their shares in the Offer may either:

− sell their shares on the market, in which case settlement and delivery of the transferred shares (including payment of the price thereof) will take place on the second trading day following the execution of the orders, and trading fees (including the brokerage fees and corresponding VAT) relating to such transactions will be borne entirely by the tendering shareholders; or

− sell their shares in the semi-centralised procedure coordinated by Euronext Paris, in which case settlement and delivery of the transferred shares (including payment of the price thereof) will take place following completion of the semi-centralization procedure after the closing of the offer. The Offeror will reimburse the trading fees (brokerage fees and corresponding VAT) incurred by the tendering shareholders of Company shares tendered in the semi-centralised procedure up to 0.2% of the purchase price (including tax) subject to a maximum amount of 100 euros per transaction; it being specified however that, if the Offer is declared null for any reason, the shareholders of the Company may not seek any reimbursement.

Only shareholders who decide to tender their shares under the semi-centralized procedure and whose shares are registered in an account on the day before the opening of the Offer may receive reimbursement of these trading fees from the Offeror.

The requests for reimbursement of the fees mentioned above will be accepted and processed by the financial intermediaries during a period of 25 business days from the last day on which the Offer is open. After the expiry of such period, Morgan Stanley, acting as buying market member, will no longer carry out the reimbursement of the fees mentioned above.

Except for the reimbursement by the Offeror of certain brokerage fees to the shareholders as described above, no commission will be paid by the Offeror to the financial intermediaries through which the shareholders tender their shares in the Offer.

## 2.4. Indicative timetable of the Offer

Prior to the opening of the Offer, the AMF and Euronext will issue notices announcing the opening date and the calendar of the Offer. For indicative purposes only, an Offer timetable is set out below:

| | |
|---|---|
| 11 June 2015 | Filing of the contemplated Offer with the AMF |
| 11 June 2015 | Filing of the draft information memorandum in response by the Company |
| 23 June 2015 | Statement of conformity of the Offer issued by the AMF |
| 24 June 2015 | Offeror's information memorandum and Company's information memorandum in response to be made available to the public |
| 25 June 2015 | Other information relating to the Offeror and other information relating to the Company to be made available to the public |
| 26 June 2015 | Opening of the Offer |

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| | |
|---|---|
| 17 July 2015 | Closing of the Offer |
| 23 July 2015 | Release of the results |
| 27 July 2015 | Indicative date of implementation of a mandatory squeeze-out (if requirements are met) |

## 2.5. Financing of the Offer

### 2.5.1. Costs connected with the Offer

Expenses incurred by the Offeror for the Offer (including fees of external financial, legal and accounting advisers and of any experts and other consultants, as well as communication and publication costs, but excluding those associated with the Block Acquisition) are estimated at approximately 2 million euros (excluding tax).

### 2.5.2. Financing sources of the Offer

The cost to be incurred by the Offeror for the acquisition of ND shares not held by it as of 23 June 2015 (on the basis of the share capital of the Company as at the date of filing of the Offer, assuming all the outstanding ND shares targeted by the Offer are tendered thereto and at the proposed Offer Price) amounts to a total of 661,307,227.50 euros.

Payments due by the Offeror in connection with the Offer will be made out of its own resources and shareholder loans. XPO Logistics, Inc. will finance the Offeror for the purpose of the Offer out of its own resources and where necessary, its existing credit lines.

## 2.6. Restrictions concerning the Offer abroad

The Offer is being made solely in France.

This information memorandum is not intended for distribution in countries other than France.

The Offer has not been subject to any registration or approval outside of France. Holders of ND shares outside France may not participate in the Offer unless the law and regulation to which they are subject permits them to do so without any further formality to be undertaken nor disclosure to be made on the part of the Offeror. Indeed, participation in the Offer and distribution of this information memorandum may be subject to restrictions outside France. The Offer is not addressed to persons subject to such restrictions, whether directly or indirectly, and is not subject to acceptance concerning orders from any country in which the Offer is subject to restrictions. Persons availing themselves of this information memorandum must comply with the restrictions in force in their country. Non-compliance with such restrictions may constitute infringement of laws and regulations in respect of exchange matters in any of these countries.

The Offeror accepts no responsibility in the event of infringement by any person of restrictions applicable to him/her.

This information memorandum and the other documents relating to the Offer do not constitute an offer to sell or a solicitation or an offer to purchase securities in any other country in which such an offer or solicitation is illegal. This Offer has not been the subject matter of any formality, registration or visa outside of France.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

This information memorandum does not constitute an extension of the Offer to the United States and the Offer is not proposed, directly or indirectly, in the United States, to persons in the United States, by means of postal services or by any communication means or by any commerce means (including but not limited to transmission by fax, telephone and email) of the United States or through the services of a stock exchange of the United States. As a consequence, no copy of this information memorandum, and no other related document or document relating to the Offer, may be sent by mail, communicated or published by an intermediary or any other person in the United States under any form whatsoever. No shareholder of the Company may contribute its shares to the Offer if it is not in a position to declare (i) that it did not receive in the United States a copy of the present information memorandum or any other document relating to the Offer, and that it did not send any such documents to the United States, (ii) that it did not use, directly or indirectly, postal services, telecommunication means or other commerce instruments or services of a stock exchange in the United States in connection with the Offer, (iii) that it was not on United States territory when it accepted the terms of the Offer or communicated its share transfer order and (iv) that it is neither an agent nor a representative acting on behalf of a person other than a person who communicated instructions outside of the United States. Authorised intermediaries shall not be allowed to accept share transfer orders which are not compliant with the above provisions (save for any authorization or opposite instruction by or on behalf of the Offeror at the Offeror's discretion). As regards interpretation of the above paragraph, United States shall mean the United States of America, its territories and possessions, or any of these States, and the District of Columbia.

## 2.7. Tax treatment of the Offer

In the current state of French legislation, the tax regime applicable to the shareholders of the Company who will participate to the Offer is described below.

The attention of such shareholders is drawn to the fact that this information constitutes a mere summary of the tax regime in force and is not meant to represent an exhaustive analysis of all tax effects likely to be applicable to them. They are thus invited to contact their usual tax advisor in order to become informed of the tax regime applicable to their own situation.

This summary is based on the French legal provisions in force as at the date of this offer document and are therefore likely to be affected by changes in French tax rules, which could have a retroactive effect or apply to the current year or fiscal year, and by their interpretation from the French tax administration.

Persons who are not tax residents of France must also comply with the tax legislation in force in their country of residence and, as the case may be, international tax treaties that have been entered into between France and said country.

### 2.7.1. Individual shareholders who are tax residents of France managing their private assets and not carrying out stock exchange transactions on an habitual basis

a)   Ordinary regime

i.   Personal income tax

Pursuant to Article 150-0 A and seq. and 200 A of the *Code général des impôts* ("**French Tax Code**"), net capital gains resulting from the sale of shares by individuals are generally taken into account for the determination of the income subject to the progressive income tax rate scale after application of an allowance for ownership duration provided for by Article 150-0 D of the French Tax Code equal to:

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

x)   50% of their amount where the shares have been held for at least two years but less than eight years, as at the date of the sale; and

y)   65% of their amount where the shares have been held for at least eight years, as at the date of the sale.

For the application of this allowance, the ownership duration is, except for particular cases, calculated from the date of subscription or purchase of the shares.

Individuals who have carry forward net capital losses or who have suffered a loss upon the sale of the shares of the Company within the framework of the Offer are invited to contact their usual tax advisor in order to determine if and how these losses may be used.

The contribution of the shares of the Company to the Offer is likely to put an end to any potential tax deferral of which the holders of these shares could have benefited with respect to prior transactions.

## ii.   Social security contributions

Net capital gains resulting from the transfer of shares are, moreover, subject to social security contributions, without application of the allowance for ownership duration described above, at the global rate of 15.5% allocated as follows:

–   8.2% in respect of general social security contribution (*contribution sociale généralisée*);

–   0.5% in respect of social debt repayment contribution (*contribution au remboursement de la dette sociale*);

–   4.8% in respect of social levy and additional contribution to it; and

–   2% in respect of solidarity levy.

Apart from the general social security contribution, which is deductible up to 5.1 points from the total taxable income of the year during which it is paid, these social security contributions are not deductible from the taxable income.

## iii.   Other contributions

Article 223 sexies of the French Tax Code institutes for taxpayers liable to pay income tax an exceptional contribution on high incomes applicable when the reference income for tax purposes of the concerned taxpayer exceeds certain limits.

This contribution is calculated by applying a rate of:

–   3% for the portion of the reference income which is comprised between EUR250,000 and EUR500,000 for those taxpayers who are single, widowed, separated or divorced, and for the portion comprised between EUR500,000 and EUR1,000,000 for the taxpayers who are subject to joint taxation;

–   4% for the portion of the reference tax income exceeding EUR500,000 for those taxpayers who are single, widowed, separated or divorced, and for the portion exceeding EUR1,000,000 for the taxpayers who are subject to joint taxation.

The reference income for tax purposes of a tax household is defined pursuant to the provisions of 1° of IV of Article 1417 of the French Tax Code, without application of the quotient rules defined in Article 163-0 A of the French Tax Code. The reference income includes in particular the net capital gains

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

resulting from the transfer of shares realised by the concerned taxpayers, prior to the application of the allowance for ownership duration.

b) Specific regime applicable to shares registered in share savings plans (*plans d'épargne en actions*) ("SSP")

Persons who hold shares of the Company within a SSP may participate in the Offer.

Subject to certain conditions, the SSP allows (i) during the life-time of the SSP, an exemption of income and capital gains generated by the investment made within the SSP from income tax and social security contributions provided, in particular, that such income and capital gains are retained within the SSP, and; (ii) at the time of the closing of the SSP (if it occurs more than five (5) years after the opening date of the SSP, including in the case of a partial withdrawal occurring after five (5) years but before eight (8) years) or at the time of a partial withdrawal (if it occurs more than eight (8) years after the opening date of the SSP) an exemption of the net gain realised since the opening of the SSP from income tax, such net gain being in addition not taken into account for the calculation of the exceptional contribution on high incomes described in paragraph (iii) of (a) above, but remains subject to social security contribution described in paragraph (ii) of (a) above (provided, however, that the effective tax rate of these social security contribution may vary (between 0% and 15.5%) depending on the date of realization of the relevant gain).

Specific provisions, not described in the present note, are applicable in case of realization of capital losses, closing of the plan before the end of the fifth year following the opening of the SSP, or of exit from the SSP in the form of life annuity. The persons concerned are invited to contact their usual tax advisor.

## 2.7.2. Corporate shareholders residents of France for tax purposes and subject to corporate income tax under standard conditions

a) Ordinary regime

Capital gains resulting from the sale of shares are generally included in the taxable income of the legal entity which is subject to corporate income tax at the ordinary rate (currently 33.1/3%) increased by, if applicable, a social contribution amounting to 3.3% (Article 235 ter ZC of the French Tax Code) which is assessed tax on the amount of corporate income tax after deduction of an allowance that cannot exceed 763,000 euros per twelve-month period.

Corporate income tax payers realizing a turnover exceeding 250,000,000 euros are also subject to a temporary exceptional surcharge equal to 10.7% of the corporate income tax (determined before deduction of tax reductions or tax credits of all kinds (article 235 ter ZAA of the French Tax Code)).

However, companies with turnover (net of tax) that is below 7,630,000 euros and with a fully paid-up capital of which 75% has been continuously held during the relevant tax year by natural or by legal persons that comply with these conditions, benefit from a reduced corporate income tax rate of 15%, within the limit of a taxable income of 38,120 euros per twelve-month period. These companies are also exempt from the 3.3% social contribution and 10.7% exceptional surcharge mentioned above.

Capital losses incurred on the sale of shares are generally deductible from the taxable income of the legal entity.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Finally, it is specified that the contribution of the shares of the Company to the Offer may put an end to any potential tax deferral of which the holders of these shares could have benefited with respect to prior transactions.

### b) Specific regime applicable to long-term capital gains

Pursuant to Article 219 I-a quinquies of the French Tax Code, net capital gains realised upon the sale of shares qualifying as "*titres de participation*" within the meaning of this Article and which have been held for at least two (2) years as of the date of transfer are tax exempt, save for the recapture of an amount equal to 12 % of the gross capital gains realised.

For the purposes of Article 219 I-a quinquies of the French Tax Code, the term "*titres de participation*" means (a) shares qualifying as *titres de participation* for accounting purposes, (b) shares acquired pursuant to a public tender offer or public exchange offer in respect of the company which initiated such offer, as well as (c) shares that are eligible for the parent-subsidiary tax regime (as defined in Articles 145 and 216 of the French Tax Code) if these shares are registered as "*titres de participation*" in the accounts or in a specific subdivision of another account corresponding to their accounting qualification, except for shares in a predominant real estate company.

Persons likely to be affected are invited to contact their usual tax advisor to ensure that their shares qualify as "*titres de participation*" within the meaning of Article 219 I-a quinquies of the French Tax Code.

The use and carry-forward of long-term capital losses follow certain specific rules and taxpayers are encouraged to contact their usual tax advisor in this regard.

## 2.7.3. Shareholders who are not residents of France for tax purposes

Subject to the provisions of any applicable tax treaties capital gains resulting from the sale of shares by persons, that are either not resident of France within the meaning of Article 4 B of the French Tax Code or have their headquarter outside France (provided that the ownership of the shares not related to a fixed base or a permanent establishment subject to corporate income tax in France in the balance sheet of which the shares would be registered), are generally exempt from tax in France provided that (i) the rights held, directly or indirectly, by the transferor with his spouse, their ascendants or their descendants, in the profits of the company whose shares are transferred, have not, at any time during the five year-period preceding the sale, exceeded, together, 25 % of such profits (Articles 244 bis B and C of the French Tax Code) and (ii) the seller is not established in a non-cooperative jurisdiction within the meaning of article 238-0 A of the French Tax Code. In the latter case, regardless of the percentage of the rights held in the profits of the company whose shares are transferred, capital gains on such shares are subject to tax at the flat rate of 75 %, subject to the provisions of any applicable tax treaty. The list of non-cooperative states or jurisdictions is published by ministerial order and updated annually.

People who do not fulfil the conditions for benefiting from the tax exemption are invited to contact their usual tax advisor.

The shareholders of the Company who are not tax residents of France are invited to consider their particular tax situation with their tax usual advisor, in particular in order to take into account the tax regime applicable in their country of tax residence.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 2.7.4. Shareholders subject to a different tax regime

The holders of shares who are subject to a tax regime other than those described above and who participate to the Offer, in particular the taxpayers that carry out transactions on the stock exchange on an habitual basis or who have recorded their shares as professional assets, are invited to analyse their specific tax situation with their usual tax advisor.

### 2.7.5. Registration duties or financial transaction tax

ND being a company whose registered office is located in France and whose market capitalization exceeded one billion euros on 1 December 2014, the purchase of shares of ND by XPO will be subject to the tax on financial transactions referred to in article 235 ter ZD of the French Tax Code (currently at the rate of 0.2%) assessed on the transfer price; the tendering shareholders will not be subject to this financial transaction tax upon the sale of their ND shares in the context of the Offer.

In addition, in principle, no registration duty is due in France in connection with the sale of the shares of a company whose shares are traded on a financial instruments regulated market or on a multilateral trading system, unless the transfer may be evidenced by a written agreement. In this case, the transfer must be registered within one month as from its date, and its registration gives rise to the payment of a registration duty. However, when the transaction is subject to the tax on financial transactions mentioned above, such registration duty is not due (Article 726 II d) of the French Tax Code).

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**3.     OFFER VALUATION CRITERIA**

**3.1.   Assessment of the offer price for ND shares**

The price offered by the Offeror is €217.50 per share ex-dividend; due to the 1.80€ per share dividend to be paid before the completion of the Block Acquisition and the filing of the Offer, this analysis will take into account a theoretical offer price of €219.30 per ND share in cash, dividend attached. This offer price is equivalent to the price paid for the Block Acquisition.

The elements used to assess the price of the Offer have been prepared by Morgan Stanley, on behalf of the Offeror in accordance with usual valuation methods, based on publicly available information concerning ND and non-public information received in the course of due diligence and general business sector and competitors knowledge. The consideration proposed in the Offer has been assessed through a multi-criteria analysis based on the following methodologies:

  −     Price paid by XPO for the Block Acquisition

  −     Analysis of trading prices;

  −     Analysis of equity research analysts' valuation;

  −     Analysis of trading multiples for comparable listed companies;

  −     Analysis of precedent transactions multiples;

  −     Analysis of premia paid in precedent French public transactions ("OPA");

  −     Analysis of discounted future free cash flows.

Other methodologies were not considered as relevant for the purpose of valuing ND:

  −     Dividend discount model: This methodology is highly dependent on pay-out ratio, which is decided by the management/ supervisory board of the company. This decision could be totally independent from the company's financial performance and capacity to generate cash flow;

  −     Net asset book value ("NAV"): this methodology does not reflect the intrinsic value of intangible assets (market share, client relationship, brands, etc.) and the potential future performance of the company. For information purposes, the net asset book value is €67.78 per share as at December 31, 2014, based on a non-diluted number of shares of 9,797,663 (9,836,241 shares in issue less 38,578 treasury shares);

  −     Net adjusted book value: this methodology is generally used for evaluating diversified holding companies with assets undervalued at cost, as such it does not reflect the value of an operational company.

**3.2.   Financial elements**

**3.2.1. Financial information**

The historical data used for assessing the terms and conditions of the Offer are ND's historical financial accounts and, more particularly, the latest annual consolidated financial statements as of 31 December 2014.

The valuation work performed is based on the projected financial data communicated by ND during the due diligence performed from 17 April to 28 April 2015, which consists mainly of:

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

    −    ND's management budget for 2015E prepared in December 2014 and updated in April 2015 to reflect the current trading performance of the company ("updated management budget");

    −    ND's management business plan for years 2015E to 2018E prepared during summer 2014 ("business plan"). To the best of our knowledge, the business plan provided by ND's management at the time of due diligence remains reflective of ND's estimated future financial performance.

The projected financial data communicated by ND have been used for the purposes of the trading multiples analysis (section 3.3.3) and are in line with the forecasts published by research analysts.

### 3.2.2.  Enterprise value to equity value bridge

ND's enterprise value is assessed as equity value adjusted for the following items as per 2014 annual consolidated financial statements:

    −    Plus: Gross financial debt of €1,226.2 MM

    −    Less: Cash and short-term investments of €209.1 MM

    −    Plus: Post-tax pension provisions post-tax of €54.5 MM (i.e. €87.8 MM pension provisions adjusted at 38.0% French statutory income tax rate applicable for 2014 and 2015)

    −    Less: Other financial assets of €55.8 MM

    −    Less: Investment in associates of €2.1 MM

    −    Plus: Other debt-like provisions of €13.1 MM (i.e. €5.5 MM of restructuring provisions and a €7.6 MM provision for other expenses incurred but not recognised)

    −    Plus: Minority interest of €27.2 MM

Based on the above items the adjusted net debt value has been established at €1,054.0 MM.

### 3.2.3.  Number of shares retained

The number of shares retained is 9,989,009 shares, calculated as below:

    −    9,836,241 shares in issue as of 31 December 2014

    −    Less: 38,578 treasury shares

    −    Plus: 111,463 existing performance-based share units as of 31 December 2014, treated as dilutive instruments

    −    Plus: 79,883 dilutive impact related to 110,000 outstanding warrants, as per the treasury stock methodology and based on a €59.55 strike price per share and a €217.50 per share ex-dividend offer price, which have been acquired by the Offeror. It should be noted that under the treasury stock method, the dilutive impact of the warrants is a function of the  implied value  of ND's equity derived from the valuation method used, and as such has been adjusted accordingly in the following valuation analysis.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 3.3.    Valuation of the Offer

### 3.3.1.  Reference to the acquisition by XPO of the majority block of ND shares (Block Acquisition)

The price paid by XPO for the Block Acquisition is considered relevant given that it was established following negotiations between two independent parties for the control of ND.

The ex-dividend price offered of €217.50 per share for the Block Acquisition excludes a €1.80 dividend to be paid before the closing of the Block Acquisition, (therefore to the benefit of the initial shareholders), and therefore corresponds to a cum-dividend price of €219.30 per share. The price of the Offer is therefore equivalent to the price paid by XPO for a majority stake in ND.

### 3.3.2.  Analysis of trading prices

ND shares are listed on Euronext Paris and on Euronext London. Over the 6-month period ending 28 April 2015, cumulative trading volumes exchanged represented 22.9% of the free float (defined as the total number of shares excluding those held by the Dentressangle family and treasury shares).

For purposes of this analysis, the share prices were considered up to the day prior to the announcement of the acquisition of 66.71% of ND by XPO on 28 April 2015. The 66.71% cumulative stake is composed of shares held by Norbert Dentressangle Initiatives SA (64.27%), Mr. Pierre-Henri Dentressangle (1.22%), and Ms. Marine Dentressangle (1.22%). Since 29 April 2015, ND's share price has traded in line with XPO's offered price per share.

The table below shows the premium implied by the Offer Price as of 28 April 2015 and on average share price weighted by the exchanged volumes ("VWAP") over different periods.

| Premiums to Offer Price of €219.30 (cum-dividend) | | |
|---|---|---|
| Last Quoted Price (28 April 2015) | €159.10 | 37.8% |
| 1-Month VWAP | €155.41 | 41.1% |
| 2-Month VWAP | €154.78 | 41.7% |
| 3-Month VWAP | €148.87 | 47.3% |
| 6-Month VWAP | €135.19 | 62.2% |
| 9-Month VWAP | €125.83 | 74.3% |
| 12-Month VWAP | €122.27 | 79.4% |
| 12-Month High | €164.95 | 32.9% |
| 12-Month Low | €95.80 | 128.9% |

Source: Capital IQ

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The table below shows the average daily volume of shares exchanged as of April 28, 2015 over different periods.

| Average daily volume of shares exchanged (number of shares) | |
|---|---:|
| 1-month average | 8,910 |
| 2-month average | 7,310 |
| 3-month average | 6,400 |
| 6-month average | 5,870 |
| 9-month average | 6,070 |
| 12-month average | 5,890 |

Source: Capital IQ

The Offer Price (cum-dividend) represents a premium of 37.8% over the share price as of 28 April 2015 and 41.1% over the 1-month VWAP prior to the offer. It also represents a 32.9% premium over the 12-month high of the stock as of 28 April 2015 and a 128.9% premium over the 12-month low over the same period.



Source: Capital IQ

It is specified that the Offeror did not buy any Company shares on the market prior to the filing of the Offer.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.3.3. Equity research analysts' target prices

The table below summarises the target prices published by equity research analysts ND before the announcement of the offer.

| Contributor Name | Date | Recommendation | Target Price |
|---|---|---|---|
| Gilbert Dupont | 21-Apr-15 | Buy | 172.4 |
| Oddo Securities | 23-Apr-15 | Buy | 173.0 |
| Exane BNP Paribas | 23-Apr-15 | Neutral | 150.0 |
| Societe Generale Cross Asset Research | 23-Apr-15 | Hold | 174.0 |
| Berenberg | 14-Apr-15 | Buy | 178.0 |
| Edison Investment Research | 7-Apr-15 | No rating | 190.0 |
| **Mean** | | | **172.9** |
| **Median** | | | **173.5** |
| Offer price (cum-dividend) | | | 219.3 |
| **Premium to Median Target Price** | | | **26.4%** |

Source: Broker research reports

The Offer Price (cum-dividend) stands at a 26.4% premium to the median of the target prices published by the equity research analysts prior to the transaction announcement date of 28 April 2015.

### 3.3.4. Analysis of trading multiples for comparable listed companies

The valuation methodology using trading multiples consists of valuing a company based on valuation ratios observed on a sample of listed companies that have features comparable to ND, notably in terms of business mix and end markets.

Consideration was given to an extended group of global (predominantly US and European) logistics companies with strong activities either in Contract Logistics and/or in Transportation, similar to ND's core activities – excluded from this group were:

    —     companies which are predominantly international freight forwarders (despite having some contract logistics and transportation activities) such as DSV A/S and Kuehne + Nagel Inc.;

    —     companies which are mostly asset-light truck brokers (despite performing transportation services) – this includes Echo Global Logistics Inc., CH Robinson Worldwide Inc., Landstar System Inc. and Forward Air Corp.;

    —     Deutsche Post AG given that its Express and Mail divisions are key drivers of valuation, as well as Ryder System Inc. given it is still mostly a truck leasing business.

As a result, the sample consists of 6 core comparable companies in contracts logistics and/or transportation.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| Company | Headquarters | 2014 revenues[1] | Category | Description |
|---|---|---|---|---|
| Stef SA | France | 2,765 | Contract logistics and asset-based transportation | Transportation and freight management services for fresh and frozen goods in various sectors of the food industry |
| ID Logistics Group SA | France | 875 | Contract logistics | Supply chain, transport management, inventory management and optimization, and order picking and distribution services |
| Wincanton plc | UK | 1,522 | Contract logistics and asset-based transportation | Transport services, including road transport, rail transport, container transport, bulk tankers, and home delivery services, as well as warehousing |
| Con-way Inc. | US | 5,168 | Contract logistics and asset-based transportation | Transportation, logistics, and supply chain management services to various manufacturing, industrial, and retail customers |
| Knight Transportation Inc. | US | 824 | Asset-based transportation | Short-to-medium haul truckload carrier of general commodities primarily in the US |
| Heartland Express Inc. | US | 776 | Asset-based transportation | Short-to-medium haul truckload carrier of general commodities in the US and Canada |

[1] Calendarized 2014 revenues in Euros
Source: Capital IQ

Companies in the contracts logistics / transportation industry are customarily compared on the basis of their enterprise value ("EV") to operating income before depreciation and amortization (EV/EBITDA), their enterprise value to operating income before amortization (EV/EBITA) and their price to earnings per share (P/E) multiples.

In general, investors base investment decisions on future profitability and the companies selected are covered by financial analysts providing estimates of future financial performance. 2015E and 2016E are currently regarded as the most relevant periods. The selected comparable companies are covered by equity research analysts and consensus estimates for the relevant period are available. EBITA estimates have been extrapolated from consensus EBIT estimates, and historical amortization.

The following table presents the average multiples based on the closing market value on 28 April 2015 of the selected sample of comparable companies based on consensus EBITDA, EBITA and net income estimates calendarized to reflect a 31 December year end.

| Company | Geography | Mkt Values (USD MM) | | Net Fin. Debt / 2015E EBITDA | EV / EBITDA | | EV / EBITA | | P/E | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mkt Cap | EV | | 2015E | 2016E | 2015E | 2016E | 2015E | 2016E |
| Stef SA | France | 848 | 1,342 | 2.1x | 6.0x | 5.7x | 11.2x | 10.4x | 10.6x | 9.8x |
| ID Logistics Group SA | France | 592 | 665 | 0.8x | 8.9x | 8.2x | 13.0x | 11.9x | 21.5x | 18.4x |
| Wincanton plc | United Kingdom | 303 | 579 | 1.0x | 5.9x | 5.8x | 7.8x | 7.5x | 9.8x | 9.0x |
| Con-way Inc. | United States | 2,583 | 3,022 | 0.5x | 5.3x | 4.8x | 9.3x | 8.2x | 15.9x | 13.5x |
| Knight Transportation, Inc. | United States | 2,582 | 2,593 | 0.1x | 8.2x | 7.3x | 12.9x | 11.1x | 20.7x | 18.2x |
| Heartland Express, Inc. | United States | 1,882 | 1,830 | (0.2x) | 7.3x | 6.7x | 12.7x | 11.2x | 21.2x | 18.5x |
| Mean | | | | | 6.9x | 6.4x | 11.1x | 10.0x | 16.6x | 14.6x |
| Median | | | | | 6.7x | 6.2x | 11.9x | 10.7x | 18.3x | 15.9x |
| Min | | | | | 5.3x | 4.8x | 7.8x | 7.5x | 9.8x | 9.0x |
| Max | | | | | 8.9x | 8.2x | 13.0x | 11.9x | 21.5x | 18.5x |
| Implied Norbert Dentressangle share price based on median (in € per share) | | | | | 138.71 | 129.45 | 169.91 | 137.19 | 202.11 | 189.12 |
| Implied Offer Premium (cum-dividend) | | | | | 58.1% | 69.4% | 29.1% | 59.9% | 8.5% | 16.0% |

*Source: Capital IQ, Company Filings, Thomson Estimates*

The P/E multiple is impacted by the comparable companies' respective capital structures. As ND is more levered than its selected peers, applying such multiples to ND does not appear as relevant.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The Offer Price (cum-dividend) represents a 58.1% premium on the share price implied by the 2015E median comparable EV/EBITDA multiple, a 29.1% premium on the share price implied by the 2015E EV/EBITA multiple, and an 8.5% premium on the share price implied by the 2015E median comparable P/E multiple.

### 3.3.5. Analysis of precedent transactions multiples

The precedent transactions methodology consists in valuing a company based on valuation ratios observed on a sample of transactions that occurred in a sector comparable to that of ND.

The difficulty in this method lies in the choice of comparable transactions as:

- The quality and availability of the information vary significantly from one transaction to the next depending on the characteristics of the acquired companies (listed, privately held, subsidiaries of a Group) and on the level of confidentiality of the transaction;

- The acquired companies are never perfectly comparable because of differences in size, positioning, geographical presence, profitability and growth prospects; and

- The strategic interest of an acquisition varies and the price paid in consequence may include a control premium varying accordingly.

With respect to these difficulties, the retained sample is made up of 9 transactions presented in the table below:

| Date of Announcement | Acquiror | Target | Target Short Description | Enterprise Value ($ MM) | EV / LTM EBITDA |
|---|---|---|---|---|---|
| 29-Sep-2014 | Goldman Sachs, Rhones Capital | Neovia | Global automotive contract logistics business | 1,000 | 7.7 x |
| 31-Jul-2014 | Norbert Dentressangle | Jacobson Companies | US-based contract logistics business | 750 | 9.9 x |
| 29-Jul-2014 | XPO Logistics | New Breed | US-based contract logistics business | 615 | 8.0 x |
| 26-Jul-2012 | Universal Truckload Services | Linc Logistics | US-based contract logistics business | 335 | 6.5 x |
| 29-Nov-2010 | Norbert Dentressangle | TDG | UK-based contract logistics business | 313 | 6.1 x |
| 19-Jul-2010 | Genco Holdings I | ATC Technology Corporation | US-based reverse logistics business | 403 | 5.2 x |
| 04-Jul-2008 | Laxey Partners | TDG | UK-based contract logistics business | 436 | 5.9 x |
| 06-Apr-2008 | SNCF Participations | Geodis | European diversified transportation and contract logistics business | 2,431 | 7.2 x |
| 02-Oct-2007 | Norbert Dentressangle | Christian Salvesen | European diversified transportation and contract logistics business | 614 | 8.0 x |
| Minimum | | | | | 5.2 x |
| Maximum | | | | | 9.9 x |
| Median | | | | | 7.2 x |

Source: Press, Company information and releases

Applying the multiples of these comparable transactions to ND's 2014 EBITDA pro-forma the 12-month consolidation of Jacobson Companies leads to the below metrics:

31

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| Minimum EBITDA multiple from comparable precedent transactions (x) | 5.2 x |
|---|---|
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 70.4 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | 211.4% |
| | |
| Maximum EBITDA multiple from comparable precedent transactions | 9.9 x |
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 228.6 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | (4.1%) |
| | |
| Median EBITDA multiple from comparable precedent transactions | 7.2 x |
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 137.7 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | 59.2% |

The Offer Price (cum-dividend) represents a premium of 59.2% on the share price implied by the median Last Twelve Months ("LTM") EV/EBITDA of comparable transactions, a premium of 211.4% on the share price implied by the minimum LTM EV/EBITDA multiple, and a (4.1%) discount to the maximum LTM EV/EBITDA multiple of comparable transactions.

### 3.3.6. Analysis of premia paid in precedent French public transactions ("OPA")

The precedent premia paid methodology consists in applying to ND's share price the premia observed in a sample of precedent French public transactions (Offres Publiques d'Achat - "OPA") on target companies listed in France.

The retained sample includes transactions starting in 1998 with an equity value for 100% of the share capital in excess of €100 MM. Additionally, the sample only includes transactions after which the Offeror held a stake above 50% of the share capital. Based on the foregoing criteria, a total of 69 operations were retained.

Based on this sample, the observed median premium to the targets' 1-month average share prices is 24.3% based on Morgan Stanley data. Applying this premium to ND's 1-month average share price as of 28 April 2015 (€156.53 per share) yields a valuation of €194.57 per share.

For reference, the Offer Price (cum-dividend) represents a premium of 40.1% to ND's 1-month average share price as of 28 April 2015.

### 3.3.7. Analysis of discounted cash flow

Discounted cash flow ("DCF") analysis consists of a valuation of the enterprise value of ND through the discounting of future cash flow generation. This methodology is extremely sensitive to business plan assumptions.

The 31 December 2014 enterprise value was obtained by discounting future free cash flows at the Weighted Average Cost of Capital ("WACC") for the period from 2015E to 2019E. In addition a terminal value corresponding to a multiple of 2019E EBITDA was also discounted and added to the enterprise value.

The 2015E updated management budget was used as a basis for the 2015E Revenues, EBITDA, EBIT, and effective tax rate. The cash flow items were not included in the updated management budget (capital expenditures and change in working capital) and as such were sourced from the business plan instead. Additionally it should be noted that 2015E includes a €(39.3) MM one-off earn-out payment

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

linked to the acquisition of Jacobson Companies in 2014, as this was not recorded as a liability on the balance sheet.

For the years 2016E to 2018E, the business plan formed the basis for the forecast used in the discounted cash flow analysis. The main assumptions underlying the forecast are:

— Annual revenue growth rate of 3.7% to 3.8%;
— EBITDA and EBIT margins are kept constant throughout the forecast period at 6.9% and 4.0% of revenues respectively;
— Effective tax rate is kept constant throughout the forecast period at 33.4%;
— Capital expenditures as a percentage of revenues of 2.6%;
— Change in net working capital as a percentage of change in revenues of (0.3)%;

The financials for 2019E were based on extrapolation of the business plan, with similar revenue growth trajectory, consistent margins, as well as stable capex as a percentage of sales and stable change in net working capital as a percentage of change in revenues.

— Exit multiple approach: the terminal value calculation is based on the 2019E EBITDA and an exit multiple of 7.5x EBITDA i.e. above the median multiple of precedent comparable transactions of 7.2x, the average of core peers historic trading levels of 7.1x LTM EBITDA, and above ND's 5-year historic trading level of 5.7x LTM EBITDA.

The WACC is assessed as the weighted average of the equity (assessed through the Capital Asset Pricing Model "CAPM") and of the cost of the debt. ND's WACC stands at 6.5%, on the basis of current economic conditions, in particular reflecting the current low-rate environment:

— Market Risk Premium of 6.0% (Morgan Stanley standard global assumption);
— Risk free rate corresponding to the current yield of German government 30-year bonds of 1.6%;
— Beta of 1.24 based on Barra Global Predicted Beta database;
— Pre-tax cost of debt based on ND coupon of 2020 Euro PP bond of 4.0%;
— Effective tax rate of 33.4%;
— Net debt / total capitalization of 39.0%[5].

The tables below illustrate the sensitivity of the share price for a WACC range of 6.5% +/- 50 basis points as well as an exit multiple range of 7.5x EBITDA +/- 0.5x.

| Share Price Sensitivity Analysis €| | | | Implied Cum Dividend Offer Premium % | | | |
|---|---|---|---|---|---|---|---|
| | Exit Multiple | | | | Exit Multiple | | |
| | 7.0 x | 7.5 x | 8.0 x | | 7.0 x | 7.5 x | 8.0 x |
| WACC 6.0% | 182.7 | 198.3 | 213.9 | WACC 6.0% | 20.0% | 10.6% | 2.5% |
| 6.3% | 179.7 | 195.2 | 210.6 | 6.3% | 22.0% | 12.4% | 4.1% |
| 6.5% | 176.8 | 192.0 | 207.3 | 6.5% | 24.0% | 14.2% | 5.8% |
| 6.8% | 173.9 | 189.0 | 204.0 | 6.8% | 26.1% | 16.0% | 7.5% |
| 7.0% | 171.1 | 186.0 | 200.8 | 7.0% | 28.2% | 17.9% | 9.2% |

[5] Net debt over as of 31 December 2014 as per annual consolidated financial statements and market capitalization as of 28 April 2015 unaffected share price

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

In the central case, the terminal value represents 76.8% of the calculated enterprise value, which corresponds to an implied perpetual growth rate of 0.6%. Based on this analysis, the DCF value stands at €192.05 per share. As such, the Offer Price (cum-dividend) implies a premium of 14.2%.

For reference purposes, a valuation including a terminal value calculated from a Perpetual Growth Rate ("PGR") is presented in the tables below, which illustrate the sensitivity of the share price for a WACC of between 6.5% +/- 50 basis points and a PGR range of 0.5% +/- 50 basis points.

| Share Price Sensitivity Analysis € | | | | | | | Implied Cum Dividend Offer Premium % | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | PGR | | | | | | | PGR | | |
| | | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% | | | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% |
| WACC | 6.0% | 192.7 | 203.1 | 214.5 | 227.0 | 240.7 | WACC | 6.0% | 13.8% | 8.0% | 2.2% | (3.4%) | (8.9%) |
| | 6.3% | 180.9 | 190.4 | 200.8 | 212.1 | 224.5 | | 6.3% | 21.2% | 15.2% | 9.2% | 3.4% | (2.3%) |
| | 6.5% | 170.0 | 178.8 | 188.2 | 198.5 | 209.7 | | 6.5% | 29.0% | 22.7% | 16.5% | 10.5% | 4.6% |
| | 6.8% | 159.9 | 168.0 | 176.6 | 186.0 | 196.2 | | 6.8% | 37.1% | 30.6% | 24.2% | 17.9% | 11.8% |
| | 7.0% | 150.6 | 158.0 | 165.9 | 174.5 | 183.8 | | 7.0% | 45.7% | 38.8% | 32.2% | 25.7% | 19.3% |

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.3.8.  Summary of the valuation of the Offer per Company Share

| | | % Premium |
|---|---|---|
| **Block Acquisition** | | |
| Price paid for the Block Acquisition (cum dividend)[1] | €219.30 | 0.0% |
| **Trading Prices (VWAP)** | | |
| Last Quoted Price (28 April 2015) | €159.10 | 37.8% |
| 1-Month VWAP | €155.41 | 41.1% |
| 2-Month VWAP | €154.78 | 41.7% |
| 3-Month VWAP | €148.87 | 47.3% |
| 6-Month VWAP | €135.19 | 62.2% |
| 9-Month VWAP | €125.83 | 74.3% |
| 12-Month VWAP | €122.27 | 79.4% |
| 12-Month High | €164.95 | 32.9% |
| 12-Month Low | €95.80 | 128.9% |
| **Broker Target Prices** [2] | | |
| Median of broker target prices | €173.50 | 26.4% |
| **Comparable Companies** [2] | | |
| 2015E EV / EBITDA | €138.71 | 58.1% |
| 2016E EV / EBITDA | €129.45 | 69.4% |
| 2015E EV / EBITA | €169.91 | 29.1% |
| 2016E EV / EBITA | €137.19 | 59.9% |
| 2015E P / E [3] | €202.11 | 8.5% |
| 2016E P / E [3] | €189.12 | 16.0% |
| **Discounted Cash Flows** | | |
| 6.5% WACC / 7.5x Exit Multiple | €192.05 | 14.2% |
| **Precedent Transactions** [2] | | |
| French Public Transactions (OPA) - observed premium [4] | €194.57 | 12.7% |
| Precedent transactions (median AV / LTM EBITDA of 7.2x) | €137.72 | 59.2% |

[1] Corresponds to the €217.50 ex-dividend per share price paid for the Block Acquisition, which is equivalent to the Offer price
[2] Prices displayed are median of valuation ranges
[3] P/E multiples are impacted by the comparable companies' respective capital structures. As ND is more levered than its core peers, this methodology may not be relevant
[4] Median premium observed of 24.3% applied to ND 1-month average share price as of 28 April 2015 (€156.53 per share). For reference, the cum-dividend Offer Price represents a premium of 40.1% to ND's 1-month average share price as of 28 April 2015 (€156.53 per share)

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**4.    PERSONS ASSUMING RESPONSIBILITY FOR THE INFORMATION MEMORANDUM**

**OFFEROR**

*"As far as I am aware, the information in this information memorandum is true and there are no omissions liable to distort the content thereof."*

On 23 June 2015

**XPO Logistics France SAS**

Mr. John Hardig

**PRESENTING BANK**

*"Pursuant to article 231-18 of the AMF General Regulations, Morgan Stanley presenting bank for the Offer, certifies that, to its knowledge, the presentation of the Offer it has examined based on the information communicated to it by the Offeror and the elements of appraisal of the price are accurate and do not contain any omissions likely to alter their impact."*

On 23 June 2015

Morgan Stanley

# NOTE D'INFORMATION RELATIVE A L'OFFRE PUBLIQUE D'ACHAT SIMPLIFIEE
## VISANT LES ACTIONS DE LA SOCIETE



Initiée par



**XPO Logistics France SAS**

Présentée par





---

**PRIX DE L'OFFRE : 217,50 euros par action Norbert Dentressangle SA**
**DUREE DE L'OFFRE : 16 jours de négociation**

---

AMF | AUTORITE DES MARCHES FINANCIERS

En application de l'article L. 621-8 du code monétaire et financier et de l'article 231-26 de son règlement général, l'Autorité des marchés financiers (« AMF ») a, en application de la décision de conformité de l'offre publique du 11 juin 2015, apposé le visa n° 15-290 en date du 23 juin 2015 sur la présente note d'information. Cette note a été établie par la société XPO Logistics France et engage la responsabilité de ses signataires.

Le visa, conformément aux dispositions de l'article L. 621-8-1 I du code monétaire et financier, a été attribué après que l'Autorité des marchés financiers a vérifié *« si le document est complet et compréhensible, et si les informations qu'il contient sont cohérentes »*. Il n'implique ni approbation du prix ou de l'opportunité de l'opération, ni authentification des éléments comptables et financiers présentés.

---

**AVIS IMPORTANT**

Dans le cas où, à la clôture de la présente offre publique d'achat simplifiée, les actionnaires n'ayant pas apporté leurs titres à l'offre publique représenteraient moins de 5 % du capital et des droits de vote de Norbert Dentressangle SA, XPO Logistics France a l'intention de procéder, postérieurement à la clôture de cette offre publique, conformément aux articles L. 433-4 III du code monétaire et financier et 237-14 et suivants du règlement général de l'AMF, à une procédure de retrait obligatoire moyennant une indemnisation de 217,50 euros par action Norbert Dentressangle SA, étant précisé que cette procédure de retrait serait immédiatement suivie d'une demande à Euronext de radiation des actions Norbert Dentressangle SA.

---

La présente note d'information qui sera visée par l'AMF ainsi que les autres informations relatives aux caractéristiques, notamment juridiques, financières et comptables de XPO Logistics France seront mises gratuitement à disposition du public au siège de Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France) (« Morgan Stanley »), ainsi que sur les sites Internet de l'AMF (www.amf-france.org) et de XPO Logistics France (http://www.xpo.com), conformément à l'article 231-27 2° du règlement général de l'AMF. Un communiqué de presse sera diffusé conformément aux dispositions de l'article 221-3 du règlement général de l'AMF pour informer le public des modalités de mise à disposition de ces documents.

Conformément à l'article 231-28 du règlement général de l'AMF, les autres informations relatives aux caractéristiques, notamment juridiques, financières et comptables de XPO Logistics France et Norbert Dentressangle SA seront déposées auprès de l'AMF et mises à la disposition du public au plus tard la veille de l'ouverture de l'offre publique d'achat simplifiée.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

## TABLE DES MATIERES

**1.   PRESENTATION DE L'OFFRE** ................................................................................ **4**

**1.1.   INTRODUCTION** ............................................................................................. **4**

**1.2.   CONTEXTE ET MOTIFS DE L'OPERATION** ......................................................... **4**

1.2.1.   Contexte de l'opération ............................................................................. 4

1.2.2.   Motifs de l'Achat de Bloc et de l'Offre subséquente ................................... 12

1.2.3.   Avis du conseil d'administration d'XPO Logistics, Inc. et approbation par l'associé unique de l'Initiateur ................................................................................................................. 13

**1.3.   INTENTIONS DE L'INITIATEUR POUR LES DOUZE MOIS A VENIR** ....................... **13**

1.3.1.   Stratégie et activité future ......................................................................... 13

1.3.2.   Intentions en matière d'emploi .................................................................. 13

1.3.3.   Politique de distribution de dividendes ...................................................... 14

1.3.4.   Synergies .................................................................................................. 14

1.3.5.   Retrait obligatoire - Radiation de la cote ................................................... 14

1.3.6.   Intentions en matière de fusion et d'intégration ......................................... 15

1.3.7.   Composition du conseil de surveillance ...................................................... 15

1.3.8.   Avantages pour la Société, l'Initiateur et leurs actionnaires ....................... 16

**1.4.   ACCORDS POUVANT AVOIR UN EFFET SIGNIFICATIF SUR L'APPRECIATION DE L'OFFRE OU SON ISSUE.** **16**

**2.   CONDITIONS DE L'OFFRE** ................................................................................ **16**

**2.1.   TERMES DE L'OFFRE** ................................................................................... **16**

**2.2.   NOMBRE ET NATURE DES TITRES VISES PAR L'OFFRE** ..................................... **17**

**2.3.   PROCEDURE D'APPORT A L'OFFRE** ............................................................... **18**

**2.4.   CALENDRIER INDICATIF DE L'OFFRE** ............................................................ **19**

**2.5.   FINANCEMENT DE L'OFFRE** ......................................................................... **19**

2.5.1.   Frais liés à l'Offre .................................................................................... 19

2.5.2.   Modalités de financement de l'Offre .......................................................... 20

**2.6.   RESTRICTIONS CONCERNANT L'OFFRE A L'ETRANGER** ................................... **20**

**2.7.   TRAITEMENT FISCAL DE L'OFFRE** ................................................................ **21**

2.7.1.   Actionnaires personnes physiques résidents fiscaux de France, agissant dans le cadre de la gestion de leur patrimoine privé et ne réalisant pas des opérations de bourse à titre habituel ......... 21

2.7.2.   Actionnaires personnes morales résidents fiscaux de France et soumis à l'impôt sur les sociétés dans les conditions de droit commun ................................................................................................. 23

2.7.3.   Actionnaires non-résidents fiscaux de France ............................................. 24

2.7.4.   Actionnaires soumis à un régime d'imposition différent .............................. 24

2.7.5.   Droits d'enregistrement ou taxe sur les transactions financières .................. 24

**3.   CRITERES D'APPRECIATION DU PRIX DE L'OFFRE** ....................................... **25**

**3.1.   APPRECIATION DU PRIX DE L'OFFRE** ............................................................ **25**

**3.2.   ÉLEMENTS FINANCIERS** ............................................................................... **25**

3.2.1.   Données financières .................................................................................. 25

3.2.2.   Passage de la valeur d'entreprise à la valeur des fonds propres .................... 26

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

3.2.3. Nombre de titres ................................................................................................................ 26

**3.3.  VALORISATION DE L'OFFRE** .............................................................................................. 26

3.3.1.  Référence à l'acquisition du bloc d'actions majoritaire de ND par XPO (Achat de Bloc) ...................... 26

3.3.2.  Approche par les cours de bourse ......................................................................................... 27

3.3.3.  Approche par les objectifs de cours des analystes de recherche ............................................. 28

3.3.4.  Approche par les multiples des sociétés comparables cotées ................................................. 28

3.3.5.  Approche par les multiples de transactions comparables ....................................................... 30

3.3.6.  Approche par les primes payées lors des Offres Publiques d'Achat (« OPA ») précédentes .................. 31

3.3.7.  Approche par l'actualisation des flux de trésorerie disponibles futurs (« DCF ») ........................... 32

3.3.8.  Synthèse des éléments d'appréciation de l'Offre ................................................................. 34

**4.  PERSONNES RESPONSABLES DU CONTENU DE LA NOTE D'INFORMATION** .................. 35

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

## 1. PRESENTATION DE L'OFFRE

### 1.1. Introduction

En application du Titre III du Livre II, et plus particulièrement des articles 233-1 2° et suivants et 234-2 du règlement général de l'AMF, XPO Logistics France SAS, une société par actions simplifiée à associé unique de droit français ayant un capital social de 10 000 euros, dont le siège social est situé au 23 rue du Roule, 75001 Paris, France et immatriculée au Registre du commerce et des sociétés de Paris sous le numéro 811 597 335 (« **XPO** » ou l'« **Initiateur** »), elle-même filiale à 100 % de XPO Logistics, Inc.[1], une société immatriculée au Delaware, dont le siège social est à Five Greenwich Office Park, Greenwich, Connecticut 06831 (Etats-Unis) et dont les actions sont négociées sur le *New York Stock Exchange* (NYSE : XPO) (« **XPO Logistics, Inc.** » et, ensemble avec XPO, « **XPO Logistics** »), s'est engagée irrévocablement auprès de l'AMF à offrir aux actionnaires de Norbert Dentressangle SA, une société anonyme de droit français ayant un capital social de 19 672 482 euros, dont le siège social est situé au 192, avenue Thiers, 69006 Lyon, France, immatriculée au Registre du commerce et des sociétés de Lyon sous le numéro 309 645 539 (« **ND** » ou la « **Société** ») et dont les actions sont admises aux négociations sur Euronext Paris - Eurolist Compartiment A (ISIN FR0000052870 ; code mnémonique : GND) et sur la Liste Officielle d'Euronext London, d'acquérir la totalité de leurs actions ND, au prix unitaire de 217,50 euros (l'« **Offre** »).

Conformément à l'article 233-1 2° du règlement général de l'AMF, l'Offre prend la forme d'une offre publique d'achat simplifiée.

L'Offre sera ouverte pendant une période de 16 jours de négociation.

L'Offre fait suite à l'acquisition par XPO (i) le 8 juin 2015, de 6 561 776 actions de ND auprès de plusieurs actionnaires par voie de cession de blocs hors marché (l'« **Achat de Bloc** »), représentant 66,71 % du capital et 66,38 % des droits de vote théoriques de la Société et (ii) le 8 juin 2015, de 110 000 Bons de Souscriptions d'Actions (comme définis ci-après) donnant droit à souscrire 110 000 actions ND. XPO détenait à la date de dépôt de l'Offre, 6 561 776 actions ND, représentant 66,71 % du capital et 66,38 % des droits de vote théoriques.

Conformément aux dispositions de l'article 231-13 1 du règlement général de l'AMF, Morgan Stanley, agissant pour le compte de l'Initiateur, a déposé un projet de note d'information auprès de l'AMF le 11 juin 2015. Morgan Stanley, en tant qu'établissement présentateur, garantit la teneur et le caractère irrévocable des engagements pris par l'Initiateur.

L'Offre vise la totalité des actions non détenues directement ou indirectement par l'Initiateur à la date des présentes.

### 1.2. Contexte et motifs de l'opération

#### 1.2.1. Contexte de l'opération

##### *(i)   Acquisition par l'Initiateur d'une participation de 66,71 % dans ND*

Le 28 avril 2015, XPO Logistics, Inc. a conclu (i) un contrat de cession d'actions (le « **Contrat de Cession d'Actions** ») avec Dentressangle Initiatives, Messieurs Norbert Dentressangle et Pierre-Henri Dentressangle et Mesdames Evelyne Dentressangle et Marine Dentressangle (les « **Vendeurs Initiaux** »), (ii) un accord relatif à l'offre publique d'achat (« l'**Accord Relatif à l'Offre Publique**

---

[1] Le premier actionnaire de XPO Logistics, Inc. est Jacobs Private Equity, LLC, une société contrôlée par Monsieur Bradley Jacobs, Chairman de XPO Logistics, Inc., qui détient 17,015 % du capital de XPO Logistics, Inc.

4

d'Achat ») avec la Société et (iii) un accord d'intéressement avec les membres du directoire (le « **Plan d'Intéressement** ») régissant le traitement des plans d'intéressement existants et le futur plan d'intéressement qui sera octroyé aux dirigeants et salariés de la Société.

En application du Contrat de Cession d'Actions relatif à l'Achat de Bloc, XPO s'est engagée à acquérir 6 561 776 actions auprès des Vendeurs Initiaux, représentant environ 66,71 % du capital social de ND, au prix de 217,50 euros par action. Le prix d'acquisition prend en compte la distribution d'un dividende d'un montant de 1,80 euros par action intervenue au profit de tous les actionnaires de ND avant la réalisation de l'Achat de Bloc.

De plus, en application de l'Accord Relatif à l'Offre Publique d'Achat et du Plan d'Intéressement, XPO s'est engagée à acquérir, auprès de certains membres du directoire de la Société, les bons de souscription d'actions émis à leur profit par la Société, à un prix de 157,95 euros par bon de souscription, à savoir, (i) 80 000 bons de souscription au prix d'exercice de 59,55 euros (les « BSA A ») et (ii) 30 000 bons de souscription au prix d'exercice de 59,55 euros (les « BSA B ») (les BSA A et BSA B étant désignés, les « **BSA** » ou les « **Bons de Souscription d'Actions** »), à la seule condition que les conditions de « vesting » prévues dans les termes et conditions de ces Bons de Souscription d'Actions soient supprimées et que les périodes d'exercice soient ouvertes par anticipation, par décision des actionnaires de la Société à l'occasion de l'assemblée générale qui s'est tenue le 21 mai 2015.

XPO Logistics, Inc. et la Société ont annoncé l'Achat de Bloc le 28 avril 2015. XPO Logistics, Inc. a également annoncé qu'elle lancerait le processus d'acquisition de toutes les actions restantes de ND au prix de 217,50 euros par action.

Le conseil de surveillance de la Société, qui s'est tenu le 27 avril 2015, a émis un avis préliminaire favorable sur l'Achat de Bloc et sur l'Offre et a désigné Ledouble SAS, représentée par Messieurs Olivier Cretté et Sébastien Sancho, en qualité d'expert indépendant en charge de la rédaction du rapport portant sur les modalités financières d'une offre publique éventuellement suivie d'un retrait obligatoire.

Le 19 mai 2015, l'Initiateur a été constitué par son actionnaire unique, XPO Logistics, Inc., lequel a substitué l'Initiateur dans ses droits et obligations au titre du Contrat de Cession d'Actions et de l'Accord Relatif à l'Offre Publique d'Achat.

Le 16 mai 2015, XPO Logistics, Inc. et les Vendeurs Initiaux ont constaté la réalisation des conditions suspensives portant sur les autorisations règlementaires et, en conséquence, que l'ensemble des conditions suspensives prévues dans le Contrat de Cession d'Actions avaient été remplies.

Le 21 mai 2015, l'assemblée générale de la Société a approuvé la distribution d'un dividende d'un montant de 1,80 euros par action qui a été versé le 2 juin 2015 (la date de détachement étant intervenue le 29 mai 2015).

La Société a engagé les procédures d'information et de consultation du comité d'entreprise au niveau du groupe ND immédiatement après l'annonce de la signature du Contrat de Cession d'Actions. Le 28 mai 2015, le comité d'entreprise du groupe ND a émis un avis défavorable sur le projet d'Offre envisagé.

Le règlement-livraison relatif à l'Achat de Bloc prévu par le Contrat de Cession d'Actions a été réalisé hors marché le 8 juin 2015.

A la suite de l'Achat de Bloc, l'Initiateur est devenu propriétaire de 6 561 776 actions ND, représentant 66,71 % du capital social et 66,38 % des droits de vote théoriques de la Société.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

Le 8 juin 2015, au vu du rapport de l'expert indépendant, le conseil de surveillance de la Société a recommandé aux actionnaires d'apporter leurs titres à l'Offre.

De plus, le 8 juin 2015, l'Initiateur a acquis les BSA au prix de 157,95 euros par bon de souscription, correspondant au prix d'acquisition des actions dans le cadre de l'Achat de Bloc moins le prix d'exercice.

Enfin, depuis le dépôt du projet de note d'information et jusqu'au 23 juin 2015, l'Initiateur a acquis 189 525 actions de la Société, au prix de l'Offre (soit 217,50 euros), conformément à l'article 231-38 IV du règlement général de l'AMF.

*(ii)     Clauses particulières du Contrat de Cession d'Actions entre l'Initiateur et les Vendeurs Initiaux*

Le Contrat de Cession d'Actions prévoit l'obligation pour l'acquéreur de s'assurer que la Société cesse progressivement d'utiliser le nom commercial et la marque Norbert Dentressangle, le changement de nom commercial et de marque devant être intégralement réalisé dans les 36 mois qui suivent l'Achat de Bloc. Sous réserve de certaines conditions, des pénalités pourraient être dues en cas de manquement à ces obligations.

Le Contrat de Cession d'Actions ne contient pas de stipulations relatives à un complément de prix au profit des Vendeurs Initiaux, s'agissant de l'Achat de Bloc.

De plus, le Contrat de Cession d'Actions prévoit une obligation de non-concurrence et de non-sollicitation de 3 ans pour les Vendeurs Initiaux. Les Vendeurs Initiaux se sont également engagés à ne pas utiliser le nom commercial et la marque Norbert Dentressangle pour toute activité similaire à celle de la Société pendant une durée de 20 ans.

*(iii)    Répartition du capital et des droits de vote de ND*

*(A)     Répartition du capital et des droits de vote de ND avant l'Achat de Bloc*

Le capital social de ND s'élève, à la connaissance de l'Initiateur, à 19 672 482 euros divisé en 9 836 241 actions ordinaires de 2 euros de valeur nominale.

Le tableau ci-après présente, à la connaissance de l'Initiateur, la répartition du capital et des droits de vote avant la réalisation de l'Achat de Bloc, à la date du 31 mai 2015.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

| Actionnaires | Nombre d'actions | % Capital | Nombre de droits de vote | % Droits de vote* |
|---|---|---|---|---|
| Famille Dentressangle | 240 482 | 2,44 | 480 944 | 2,96 |
| Dentressangle Initiatives (contrôlée par la famille Dentressangle) | 6 321 294 | 64,27 | 12 366 694 | 76,26 |
| Sous-total Famille Dentressangle | 6 561 776 | 66,71 | 12 847 638 | 79,22 |
| Salariés et public[2] | 3 230 018 | 32,84 | 3 325 298 | 20,50 |
| *Y compris les actions auto-détenues* | *38 578* | *0,39* | *38 578*** | *0,24*** |
| *Y compris les actions détenues dans le cadre d'un contrat de liquidité* | *5 869* | *0,06* | *5 869*** | *0,04*** |
| Total | 9 836 241 | 100 | 16 217 383 | 100 |

* Conformément à l'article 233-11 du règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions auxquelles sont rattachés des droits de vote, en ce compris les actions dépourvues de droits de vote.

** Droits de vote théoriques – les droits de vote attachés aux actions auto-détenues étant suspendus.

Ni l'Initiateur, ni l'une quelconque des sociétés appartenant au groupe de l'Initiateur ne détenait, directement ou indirectement, des actions ND avant l'Achat de Bloc et n'a acquis une quelconque action ND dans les 12 mois précédent l'annonce de l'Offre.

**(B)**     ***Répartition du capital et des droits de vote de ND à la suite de l'Achat de Bloc***

Le tableau ci-après présente, à la connaissance de l'Initiateur, la répartition du capital et des droits de vote à la suite de la réalisation de l'Achat de Bloc.

---

[2] Dont 53 500  actions détenues par les membres du directoire.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

| Actionnaires | Nombre d'actions | % Capital | Nombre de droits de vote | % Droits de vote |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 561 776 | 66,71 | 6 561 776 | 66,38 |
| Salariés et public[3] | 3 230 018 | 32,84 | 3 279 575 | 33,17 |
| *Y compris les actions auto-détenues* | *38 578* | *0,39* | *38 578\*\** | *0,39\*\** |
| *Y compris les actions détenues dans le cadre d'un contrat de liquidité* | *5 869* | *0,06* | *5 869\*\** | *0,06\*\** |
| Total | 9 836 241 | 100 | 9 885 798 | 100 |

\* Conformément à l'article 233-11 du règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions auxquelles sont rattachés des droits de vote, en ce compris les actions dépourvues de droits de vote.

\*\* Droits de vote théoriques – les droits de vote attachés aux actions auto-détenues étant suspendus.

A l'exception de l'Achat de Bloc mentionné ci-dessus et de l'acquisition de Bons de Souscription d'Actions mentionnée ci-dessous, ni l'Initiateur, ni l'une quelconque des sociétés appartenant au groupe de l'Initiateur ne détenait, directement ou indirectement, des actions ND avant l'Achat de Bloc.

*(C)      Répartition du capital et des droits de vote de ND à la date de la décision de conformité*

Le tableau ci-après présente, à la connaissance de l'Initiateur, la répartition du capital et des droits de vote de ND du 23 juin 2015, compte tenu des achats d'actions de la Société effectuées par XPO (au prix de l'Offre) depuis le dépôt du projet de note d'information, conformément à l'article 231-38 IV du règlement général de l'AMF.

---

[3] Dont 53 500 actions détenues par les membres du directoire.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

| Actionnaires | Nombre d'actions | % Capital | Nombre de droits de vote | % Droits de vote |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 751 301 | 68,64 | 6 751 301 | 68,29 |
| *Y compris les actions acquises depuis le 11 juin 2015* | *189 525* | *1,93* | *189 525* | *1,92* |
| Salariés et public[4] | 3 084 940 | 31,36 | 3 134 497 | 31,71 |
| *Y compris les actions auto-détenues* | *38 578* | *0,39* | *38 578\*\** | *0,39\*\** |
| *Y compris les actions détenues dans le cadre d'un contrat de liquidité* | *5 869* | *0,06* | *5 869\*\** | *0,06\*\** |
| **Total** | 9 836 241 | 100 | 9 885 798 | 100 |

\* Conformément à l'article 233-11 du règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions auxquelles sont rattachés des droits de vote, en ce compris les actions dépourvues de droits de vote.

\*\* Droits de vote théoriques – les droits de vote attachés aux actions auto-détenues étant suspendus.

**(iv)     *Titres donnant accès au capital de ND (Bons de Souscription d'Actions)***

En outre, au 8 juin 2015, les Bons de Souscription d'Actions existants donnant accès au capital de la Société, étaient répartis de la façon suivante :

---

[4] Dont 53 500 actions détenues par les membres du directoire.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

| Catégorie | Nombre alloué par la Société | Total des Actions (en cas d'exercice) |
|---|---|---|
| BSA A – Emission en juillet 2013 | 80 000 | 80 000 |
| BSA B – Emission en juillet 2013 | 30 000 | 30 000 |
| Total | 110 000 | 110 000 |

Comme il est indiqué ci-dessus, l'Initiateur a acquis le 8 juin 2015, conformément à l'Accord Relatif à l'Offre Publique d'Achat et au Plan d'Intéressement, les Bons de Souscription d'Actions appartenant à Messieurs Montjotin (50 000 BSA), Bataillard (30 000 BSA)[5], Wilson (15 000 BSA) et Gomez (15 000 BSA) (membres du directoire), à un prix de 157,95 euros par action, ce montant correspondant au prix par action payé pour l'Achat de Bloc moins le prix d'exercice des Bons de Souscription d'Actions. Aucune clause de complément de prix n'a été prévue dans le cadre de ces cessions.

A la date des présentes, XPO détient 100 % des BSA. ND n'a par ailleurs émis aucune autre valeur mobilière donnant accès à son capital.

Lors de l'assemblée générale mixte des actionnaires du 21 mai 2015, les actionnaires de ND ont décidé de modifier les termes et conditions des Bons de Souscription d'Actions afin de (i) supprimer les conditions de présence et d'incessibilité qui y étaient prévues et (ii) anticiper l'ouverture de la période d'exercice à compter du 21 mai 2015 (la date de fin d'exercice prévue lors de l'émission restant inchangée).

*(v)     Actions attribuées gratuitement*

La Société a procédé à des attributions gratuites d'actions. Au 31 mai 2015, les actions attribuées gratuitement suivantes sont toujours en période d'acquisition et n'ont donc pas encore été émises et livrées à leurs bénéficiaires :

---

[5] Il est précisé qu'une partie des BSA détenus par Monsieur Bataillard et par Monsieur Montjotin a fait l'objet d'apports à des holdings patrimoniales leur appartenant et de donations-partages au profit de leurs enfants respectifs.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

| Catégorie | Nombre alloué par la Société | Total des Actions (en cas de remise des actions) |
|---|---|---|
| Actions attribuées gratuitement – Attribution de mai 2013 | 50 100 | 50 100 |
| Actions attribuées gratuitement – Attribution de mai 2014 | 21 000 | 21 000 |
| Actions attribuées gratuitement – Attribution d'octobre 2014 | 30 997 | 30 997 |
| **Total** | 102 097 | 102 097 |

Conformément au Plan d'Intéressement, XPO Logistics, Inc. a proposé ce qui suit aux bénéficiaires d'actions gratuites, étant rappelé que ces actions gratuites n'ont pas été émises à la date de l'Offre et ne sont donc pas visées par l'Offre.

Pour les bénéficiaires d'actions gratuites attribuées en avril 2013 et en avril 2014, dont la livraison interviendrait en avril 2016 et qui font l'objet d'un engagement de conservation jusqu'en avril 2018, XPO Logistics, Inc. et l'Initiateur proposeront à ces bénéficiaires de renoncer à ces actions gratuites en échange d'un bonus en numéraire (traité comme du salaire) pour un montant brut de 217,50 euros par action, payable en deux versements équivalents qui interviendraient 1 an et demi et 3 ans après la réalisation de l'Achat de Bloc (sans aucune condition de présence, de service ou de performance).

Les réalisations historiques 2013 et 2014 et le budget 2015 permettent de considérer que les conditions de performances prévues dans les plans d'attribution d'avril 2013 et d'avril 2014 seront bien atteintes.

Pour les bénéficiaires d'actions gratuites attribuées en octobre 2014 aux managers de la société Jacobson (la filiale américaine de la Société, dont l'acquisition a été réalisée le 31 juillet 2014) dont les périodes d'acquisition et de conservation expirent toutes deux en octobre 2018, XPO Logistics, Inc. proposera, en contrepartie de la renonciation des bénéficiaires à ces actions gratuites, la mise en place d'un nouveau plan reposant sur l'évolution du cours de bourse XPO Logistics, Inc. et dont les objectifs de performance tiendraient compte de l'intégration au sein du groupe XPO. L'horizon de ce nouveau plan serait au moins égal à celui des actions gratuites qu'il remplacerait. La valeur des attributions au titre de ce nouveau plan ne serait en tout état de cause pas supérieure à la valeur des actions gratuites remplacées en prenant en compte, d'une part, le prix de l'Offre pour déterminer la valeur des actions gratuites remplacées, et d'autre part, la valeur en bourse des actions XPO Logistics, Inc. sous-jacentes aux instruments remis en échange pour déterminer la valeur de ces derniers. De la sorte, la contre-valeur de chaque action gratuite remplacée ne saurait être supérieure à 217,50 euros.

*(vi)    Déclarations de franchissement de seuils*

Conformément aux articles 223-11 et suivants du règlement général de l'AMF et aux articles L. 233-7 et suivants du code de commerce, l'Initiateur a déclaré à l'AMF et à ND, par courriers en date du 11 juin 2015, qu'il avait, à la suite de l'Achat de Bloc, franchi à la hausse, le 8 juin 2015, tous les seuils légaux compris entre zéro et 2/3 du capital social et entre zéro et 50 % des droits de vote de la Société suite à l'exécution du Contrat de Cession d'Actions relatif à l'Achat de Bloc.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

Ces déclarations ont donné lieu à un avis publié par l'AMF le 12 juin 2015 sous le visa 215C0813.

Réciproquement, les membres de la famille Dentressangle et Dentressangle Initiatives ont déclaré, par des courriers à l'AMF et à ND, en date du 11 juin 2015, qu'ils avaient, agissant ensemble de concert, suite à l'Achat de Bloc, franchi à la baisse tous les seuils légaux compris entre 2/3 jusqu'à zéro.

Ces déclarations ont donné lieu à un avis publié par l'AMF le 11 juin 2015 sous le visa 215C0803.

L'Initiateur a par ailleurs, compte tenu des actions acquises depuis le dépôt du projet d'Offre, déclaré à l'AMF et ND, le 16 juin 2015, qu'il avait franchi à la hausse, le 11 juin 2015, le seuil de 2/3 des droits de vote. Ces déclarations ont donné lieu à un avis publié par l'AMF le 16 juin 2015 sous le visa 215C0829.

*(vii)    Engagements d'apport à l'Offre*

Sans objet.

*(viii)   Autorisations réglementaires*

L'Offre n'est soumise à aucune condition au titre du contrôle des concentrations.

L'Achat de Bloc a été autorisé (ou n'a pas donné lieu à objection) par les autorités de la concurrence aux Etats-Unis d'Amérique, en Allemagne et en Russie. Les autorisations ont été octroyées respectivement le 11 mai 2015 pour les Etats-Unis d'Amérique (*early termination*) et l'Allemagne et le 20 mai 2015 pour la Russie.

### 1.2.2.   Motifs de l'Achat de Bloc et de l'Offre subséquente

XPO Logistics, Inc. est l'une des entreprises logistiques les plus importantes et bénéficiant d'une des plus fortes croissances en Amérique du Nord. Elle a déployé avec succès sa stratégie pour développer sa croissance organique et acquérir des activités de transport et de logistique performantes créatrices de valeur et évolutives. En conséquence de quoi, le segment transport de XPO Logistics, Inc. lui a conféré des positions de leader en Amérique du Nord dans le courtage de marchandises, le transport intermodal, la logistique de dernier kilomètre et l'expédition accélérée et globale de marchandises. En outre, XPO Logistics, Inc. est devenu le premier prestataire de logistique contractuelle, avec des solutions sophistiquées et à fort contenu technologique.

Les trois activités de ND (Logistique, Transport et Air & Mer) sont destinées à rester basées en France et seront la plateforme de développement pour toutes les activités européennes de XPO Logistics, Inc. XPO Logistics prévoit que cette acquisition lui permettra d'offrir aux 15 000 clients actuels de XPO Logistics, Inc. des services de premier rang en transport et en logistique en Europe. En outre, ND a constitué une base de clientèle fidèle qui comprend des sociétés multinationales, dont certaines ne sont actuellement pas desservies par XPO Logistics, Inc. Ces clients auront l'opportunité de consolider leurs relations au sein de la chaîne d'approvisionnement avec la nouvelle entité et accèderont ainsi aux services de XPO Logistics, Inc. en Amérique du Nord.

En outre, XPO Logistics prévoit d'investir dans la croissance de la nouvelle entité au travers de ses plateformes technologiques propriétaires qui permettent d'offrir une haute qualité de services. XPO Logistics (en ce compris ND) dispose d'un budget informatique 2015 d'environ 225 millions de dollars, qu'il considère comme étant parmi les plus élevés dans le secteur.

Enfin, la culture de ND, tout comme celle de XPO Logistics, Inc. est focalisée sur l'excellence opérationnelle et l'ambition de fournir des services d'un meilleur niveau mondial.

### 1.2.3. Avis du conseil d'administration d'XPO Logistics, Inc. et approbation par l'associé unique de l'Initiateur

Après un examen détaillé des conditions et des modalités de la transaction proposée lors de la réunion du conseil d'administration du 26 Avril 2015, le conseil d'administration de XPO Logistics, Inc. a approuvé la transaction, y compris l'Achat de Bloc et l'Offre, comme étant dans l'intérêt de XPO Logistics, Inc. et de ses actionnaires. Le conseil d'administration a, en outre, accordé les pouvoirs nécessaires à ses dirigeants pour prendre toute décision nécessaire à la réalisation de la transaction.

Le 4 Juin 2015, XPO Logistics, Inc. a, en sa qualité d'actionnaire unique de l'Initiateur, autorisé ce dernier à procéder à l'Achat de Bloc et au dépôt de l'Offre.

### 1.3. Intentions de l'Initiateur pour les douze mois à venir

#### 1.3.1. Stratégie et activité future

Comme expliqué ci-dessus au paragraphe 1.2.2, l'Initiateur estime que les trois principales branches d'activité de ND sont en cohérence avec son propre portefeuille d'activités. ND sera la plateforme de développement pour l'ensemble des activités européennes de XPO Logistics, Inc. ND sera en mesure d'offrir ses services à plus de 15 000 clients actuels de XPO Logistics, Inc. qui ont des intérêts commerciaux en-dehors d'Amérique du Nord. L'Initiateur prévoit que le siège européen restera en France, d'où il développera les activités européennes du groupe. Pour une période de 5 ans à compter de la date de clôture, l'Initiateur a l'intention de conserver le siège social et le centre de décision de la division logistique européenne de ND à Paris et celui de la division transport dans la Drôme.

**En ce qui concerne la branche d'activité Logistique**, XPO Logistics, Inc. sera désormais en mesure d'offrir des services logistiques en Europe à l'ensemble de ses clients actuels. En outre, ND a constitué une clientèle fidèle qui comprend des sociétés multinationales, dont un nombre important n'est actuellement pas desservi par XPO Logistics, Inc. Les activités nord-américaines de ND devraient croître dans le cadre de la croissance des activités logistiques américaines de XPO Logistics, Inc. Dans l'ensemble, la transaction combinerait ces 11 millions de $m^2$ de surface d'entreposage de ND avec les 1,1 millions de $m^2$ de surface d'entreposage de XPO Logistics, Inc., ce qui ferait de XPO un des premiers fournisseurs de services logistiques dans le monde en termes de capacité d'entreposage.

**En ce qui concerne la branche d'activité Transport**, XPO Logistics, Inc. sera désormais en mesure d'offrir à l'ensemble de ses clients actuels des services de transport en Europe. Les clients multinationaux de ND auront également l'occasion de consolider leur « supply chain » avec XPO Logistics, Inc. et auront accès à la qualité de service proposée par XPO Logistics, Inc. en Amérique du Nord pour le courtage de fret, l'intermodal, la logistique de dernier kilomètre, les expéditions rapides et le « forwarding global ».

**En ce qui concerne la branche d'activité Air & Mer**, le rapprochement va porter les opérations de « fret forwarding » global de XPO Logistics à environ 500 millions de dollars. XPO pourra ainsi acheter des prestations de transport aérien et maritime de façon plus efficace pour ses clients.

#### 1.3.2. Intentions en matière d'emploi

L'Initiateur estime qu'un élément clé de la réussite de ND tient à la préservation et au développement du talent et du capital intellectuel du personnel de ND. Dans ce contexte, l'Initiateur n'a pas l'intention de modifier la stratégie actuelle de ND en matière de ressources humaines.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

En outre, l'Initiateur a l'intention d'assurer la continuité du management de ND à la suite de la réalisation de l'Offre et de le fidéliser pour l'avenir. L'Initiateur a ainsi l'intention de mettre en œuvre un programme d'intéressement du management.

L'Initiateur a l'intention de ne pas réduire le nombre total d'employés à temps plein en France pour une période de 18 mois à compter de la date de l'Achat de Bloc (à savoir, à compter du 8 juin 2015).

L'Initiateur a l'intention de maintenir le siège européen des sociétés du groupe ND à Lyon, en France, et il s'est engagé aux termes de l'Accord Relatif à l'Offre Publique d'Achat à maintenir, pour une période de 5 ans courant à compter de la date de l'Achat de Bloc (à savoir, à compter du 8 juin 2015), le siège et le centre de décision des activités logistiques européennes de la Société à Paris et les activités transport de la Société dans le département de la Drôme.

L'Initiateur estime que le rapprochement de ND avec l'Initiateur à la suite de l'Offre ne devrait pas avoir d'incidence sur le statut individuel et collectif des employés de ND et de ses filiales.

### 1.3.3.   Politique de distribution de dividendes

La politique de distribution sera examinée ultérieurement, au regard notamment des résultats de la Société, sa capacité financière pour une telle distribution et ses besoins de financement au titre de ses plans de développement.

### 1.3.4.   Synergies

La consolidation de XPO Logistics, Inc. et de ND ne devrait pas générer des synergies de coûts significatives, notamment en raison du faible chevauchement des activités en Europe et de la complémentarité des activités américaines respectives de ND et de XPO Logistics, Inc. XPO Logistics s'est engagée à ne pas réduire le nombre total d'employés à temps plein en France pour une période d'au moins 18 mois à compter du *closing* et à maintenir le siège européen de ND à Lyon.

Les synergies de chiffre d'affaires devraient être tirées des opportunités de « ventes croisées » au sein du nouveau groupe afin de faire bénéficier les clients respectifs de XPO Logistics, Inc. et de ND des services offerts par l'autre partie. En outre, XPO Logistics a l'intention d'investir dans la croissance de ND par le biais de la technologie de manière à tirer parti de la taille du nouveau groupe.

Enfin, XPO Logistics disposera d'une plate-forme en Europe lui permettant de continuer à exécuter sa stratégie M&A, avec d'importantes opportunités sur un marché européen fragmenté.

### 1.3.5.   Retrait obligatoire - Radiation de la cote

Conformément aux articles 237-14 à 237-16 du règlement général de l'AMF, l'Initiateur demandera à l'AMF, dans un délai maximum de 3 mois à l'issue de la clôture de l'Offre, de mettre en œuvre une procédure de retrait obligatoire par le transfert des actions ND qui ne lui appartiennent pas et qui n'auraient pas été présentées à l'Offre (à condition qu'elles ne représentent pas plus de 5 % du capital ou des droits de vote de la Société), au prix de 217,5 euros par action.

L'Initiateur se réserve également la faculté, dans l'hypothèse où il viendrait à détenir ultérieurement, directement ou indirectement, au moins 95 % du capital et des droits de vote de ND, et où un retrait obligatoire n'aurait pas été mis en œuvre dans les conditions visées ci-avant, de déposer auprès de l'AMF un projet d'offre publique de retrait suivie d'une procédure de retrait obligatoire visant les actions qui ne seront pas détenues directement ou indirectement par lui, dans les conditions des articles 236-1 et suivants et 237-14 et suivants du règlement général de l'AMF.

Hormis ce qui précède, l'Initiateur n'a pas l'intention, dans l'hypothèse où un retrait obligatoire n'aurait pas été mis en œuvre à l'issue de la clôture de l'Offre, de demander la radiation des actions ND d'Euronext Paris - Eurolist Compartiment A dans les 12 prochains mois. L'Initiateur se réserve, toutefois, la faculté de demander la radiation des actions ND de la Liste Officielle d'Euronext Londres.

### 1.3.6.  Intentions en matière de fusion et d'intégration

En fonction des résultats de l'Offre, l'Initiateur se réserve le droit d'envisager les meilleures façons d'intégrer ND au sein du groupe XPO Logistics. Dans ce contexte, l'Initiateur se réserve la faculté de fusionner, à tout moment, certains actifs ou branches de ND avec des sociétés du groupe XPO Logistics (en ce compris l'Initiateur) ou de les transférer à des sociétés du groupe XPO Logistics ou *vice versa*.

Les conditions de ces éventuelles opérations de fusion ou d'apport seront soumises aux instances représentatives du personnel compétentes pour consultation, en temps voulu et dans la mesure exigée par la loi, et seront examinés par l'AMF, le cas échéant, conformément à la réglementation en vigueur.

Il est prévu que le groupe ND soit intégré sous la marque XPO dans les meilleurs délais. Pour une période initiale de 3 mois, cette licence de marque sera conférée à titre gratuit, après quoi XPO Logistics, Inc. et ND négocieront l'octroi par XPO Logistics, Inc à ND d'une licence de marque rémunérée en ligne avec les pratiques du marché.

### 1.3.7.  Composition du conseil de surveillance

Concomitamment à la réalisation de l'Achat de Bloc conformément au Contrat de Cession d'Actions, Monsieur Norbert Dentressangle, Madame Evelyne Dentressangle, Monsieur Pierre-Henri Dentressangle, Monsieur Vincent Ménez, Monsieur Jean-Bernard Lafonta et Monsieur Bruno Rousset ont démissionné de leurs fonctions de membres du conseil de surveillance de ND le 8 juin 2015. Ces démissions sont intervenues après que le conseil de surveillance de ND ait recommandé l'Offre comme mentionné ci-dessus.

Le conseil de surveillance de la Société, réuni le 8 juin 2015, a coopté six nouveaux membres du conseil de surveillance (Bradley Jacobs, XPO Logistics, Inc. représentée par Angela Kirby, Troy Cooper, John Hardig, Gordon Devens et Tavio Headley). Monsieur Bradley Jacobs a, en outre, été nommé président du conseil de surveillance et Monsieur Gordon Devens a été nommé vice-président du conseil de surveillance.

Ces cooptations, qui ont pris effet le 8 juin 2015, seront soumises à la ratification des actionnaires de la Société réunis en assemblée générale.

Le conseil de surveillance de la Société est désormais composé comme suit :

–  Bradley Jacobs, président (également président du conseil d'administration de XPO Logistics, Inc.),

–  Gordon Devens, vice-président (salarié de XPO),

–  Clare Chatfield (membre indépendant),

–  Henri Lachmann (membre indépendant),

–  Jean-Luc Poumarède (membre indépendant),

–  François-Marie Valentin (membre indépendant),

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

- XPO Logistics, Inc., représentée par Angela Kirby,

- Troy Cooper, (salarié de XPO),

- John Hardig (salarié de XPO),

- Tavio Headley (salarié de XPO).

### 1.3.8. Avantages pour la Société, l'Initiateur et leurs actionnaires

XPO Logistics, Inc. appartient au Top 10 mondial des prestataires de « supply chain », offrant des solutions à la pointe de l'innovation aux entreprises les plus performantes. XPO Logistics, Inc. propose des services à haute valeur ajoutée en transport - notamment affrètement, multimodal, logistique du dernier kilomètre et expéditions urgentes, solutions logistiques à fort contenu technologique, entreposage et distribution, ainsi que le « global forwarding » par voies terrestre, aérienne et maritime.

XPO Logistics, en ce compris les activités de ND à la suite de l'Achat de Bloc du 8 juin 2015, sert désormais plus de 30 000 clients et dispose de 863 agences dans 27 pays et d'un réseau hautement intégré qui compte environ 52 350 employés.

Avec 201 agences et environ 10 000 salariés, XPO Logistics, Inc. était, avant intégration de ND, l'un des acteurs de la logistique les plus actifs d'Amérique du Nord.

#### (i)     *Intérêt de l'opération pour la Société et ses actionnaires*

L'Initiateur propose aux actionnaires de ND qui apporteront leurs actions à l'Offre une liquidité immédiate pour la totalité de leur participation au même prix que celui offert aux Vendeurs Initiaux, à savoir 217,50 euros par action. Cette opération permettra aux actionnaires qui ont participé au développement de ND de bénéficier d'une liquidité pour leurs actions à un prix présentant une prime de 62,2 % par rapport au cours moyen de l'action pondéré sur 6 mois.

#### (ii)    *Intérêt de l'opération pour l'Initiateur et ses actionnaires*

L'Initiateur considère que cette acquisition s'intègre dans sa stratégie visant à acquérir des entreprises de logistique de premier plan et de devenir un fournisseur global de services de transport et de logistique. La nouvelle entité sera un acteur mondial dynamique, global, avec des positions de leader dans la logistique et le transport. Les clients bénéficieront de la large gamme de services offerte par la nouvelle entité, de sa technologie de pointe, de son accès facilité aux capacités de transport et à son engagement au service du client.

### 1.4.    Accords pouvant avoir un effet significatif sur l'appréciation de l'Offre ou son issue

Sous réserve des dispositions du Contrat de Cession d'Actions relatif à l'Achat de Bloc telles que décrites ci-dessus, l'Initiateur n'a connaissance d'aucun accord et n'est partie à aucun accord lié à l'Offre ou susceptible d'avoir un effet significatif sur l'appréciation de l'Offre ou sur son issue.

### 2.     CONDITIONS DE L'OFFRE

### 2.1.    Termes de l'Offre

En application de l'article 231-13 du règlement général de l'AMF, Morgan Stanley, agissant pour le compte de l'Initiateur, a déposé un projet de note d'information auprès de l'AMF le 11 juin 2015.

16

L'AMF a publié, le 11 juin 2015, un avis de dépôt concernant l'Offre sur son site Internet (www.amf-france.org) sous le visa 215C0799.

Morgan Stanley, agissant en tant qu'établissement présentateur, garantit la teneur et le caractère irrévocable des engagements pris par l'Initiateur.

Conformément à l'article 233-1 2° du règlement général de l'AMF, l'Offre prend la forme d'une offre publique d'achat simplifiée.

L'Initiateur s'engage irrévocablement à acquérir auprès des actionnaires de ND les actions de la Société qui seront apportées à l'Offre, au prix de 217,50 euros par action, pendant une période de 16 jours de négociation.

Conformément à l'article 231-16° du règlement général de l'AMF, un communiqué de presse concernant les conditions de l'Offre a été publié le 11 juin 2015 par l'Initiateur et rendu public sur le site Internet de l'Initiateur (http: // www.xpo.com). Le projet de note d'information a été rendu public sur les sites Internet de l'AMF (www.amf-france.org) et XPO Logistics France (http://www.xpo.com) et peut être obtenu gratuitement sur simple demande auprès de Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France).

Le 23 juin 2015, l'AMF a déclaré l'Offre conforme après s'être assurée de sa conformité aux dispositions légales et règlementaires qui lui sont applicables et a publié sur son site (www.amf-france.org) une déclaration de conformité motivée. Cette déclaration de conformité emporte visa de la présente note d'information.

La note d'information ayant ainsi reçu le visa de l'AMF, conjointement avec le document intitulé « Autres Informations » relatif aux caractéristiques juridiques, financières et comptables de l'Initiateur, seront tenus gratuitement à la disposition du public, au plus tard la veille de l'ouverture de l'Offre, au siège de Morgan Stanley. Ces documents seront aussi rendus publics sur les sites Internet de XPO (http://www.xpo.com), de ND (http://www.norbert-dentressangle.com/) et de l'AMF (www.amf-france.org).

Un communiqué de presse sera publié afin de préciser les conditions dans lesquelles ces documents seront rendus publics conformément à l'article 221-4 IV du règlement général de l'AMF.

Préalablement à l'ouverture de l'Offre, l'AMF publiera un avis d'ouverture et de calendrier de l'Offre, et Euronext Paris publiera un avis rappelant la teneur de l'Offre et précisant le calendrier et les modalités de sa réalisation.

## 2.2.   Nombre et nature des Titres visés par l'Offre

L'Offre porte sur l'ensemble des valeurs mobilières donnant accès au capital et des droits de vote de la Société, à savoir les 9 836 241 actions émises à la date de dépôt de la présente Offre, à l'exclusion (i) des 6 561 776 actions acquises par l'Initiateur le 8 juin 2015 dans le cadre de l'Achat de Bloc et des 189 525 actions acquises par XPO depuis le dépôt du projet d'Offre conformément à l'article 231-38 IV du règlement général de l'AMF et (ii) des 110 000 Bons de Souscription d'Actions acquis par l'Initiateur le 8 juin 2015, étant précisé que ND s'est elle-même engagée à ne pas apporter à l'Offre les actions auto-détenues (44 447 actions en date du 8 juin 2015).

En conséquence, l'Offre porte sur un maximum de 3 040 493 actions de la Société, représentant 30,91 % du capital de la Société.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

Il est précisé que :

- l'Offre ne vise pas les actions sous-jacentes aux 110 000 Bons de Souscription d'Actions émis par la Société dans la mesure où l'Initiateur a déjà acquis ces BSA ;

- au 11 juin 2015, le nombre total des actions attribuées gratuitement est de 102 097 ; ces actions sont en période d'acquisition (c'est-à-dire qu'elles n'ont pas été livrées à leurs bénéficiaires) à cette date et seront, après leur livraison, indisponibles pour une période de 2 ans conformément à leurs termes et conditions. Les actions attribuées gratuitement ne peuvent donc pas être apportées à l'Offre.

A la connaissance de l'Initiateur, il n'existe actuellement aucun titre de participation ou d'instrument financier donnant accès, immédiatement ou à terme, au capital social ou aux droits de vote de la Société, à l'exception des titres et droits mentionnés ci-dessus.

### 2.3. Procédure d'apport à l'Offre

Les Actions apportées à l'Offre devront être librement négociables et libres de tout privilège, gage, nantissement, ou toute autre sûreté ou restriction de quelque nature que ce soit restreignant le libre transfert de leur propriété. L'Initiateur se réserve le droit d'écarter toutes les Actions apportées qui ne répondraient pas à cette condition.

L'Offre sera ouverte pendant une période de 16 jours de bourse.

Les actions de la Société détenues sous forme nominative doivent être converties et détenues au porteur pour pouvoir être apportées à l'Offre. Par conséquent, les actionnaires détenant leurs actions sous forme nominative et qui souhaitent les apporter à l'Offre devront demander la conversion de ces actions au porteur dans les meilleurs délais. Les actionnaires perdront donc les avantages attachés à la forme nominative pour les actions qui seront alors converties au porteur.

Les actionnaires de la Société dont les actions sont inscrites sur un compte géré par un intermédiaire financier (ce qui inclut les traders, les banques et les institutions financières) et qui souhaitent apporter leurs actions de la Société à l'Offre devront délivrer un ordre de virement irrévocable de leurs actions à leur intermédiaire financier, conformément aux formulaires standards fournis par leur intermédiaire financier au plus tard le dernier jour d'ouverture de l'Offre et en temps opportun afin que leur ordre puisse être exécuté. Chaque intermédiaire financier devra transférer les actions de la Société qu'il a reçu l'ordre d'apporter à l'Offre.

Conformément à la loi, Morgan Stanley, en sa qualité de membre de marché acheteur et d'intermédiaire agissant pour le compte de l'Initiateur, se portera acquéreur des actions de la Société apportées à l'Offre.

Les actionnaires de la Société qui souhaitent apporter leurs actions à l'Offre peuvent :

- soit vendre leurs actions sur le marché, auquel cas le règlement et le transfert des actions cédées (y compris le paiement du prix) auront lieu le deuxième jour de bourse suivant l'exécution des ordres, et les frais de négociation (y compris les frais de courtage et la TVA correspondante) relatifs à ces transactions seront entièrement supportés par les actionnaires vendeurs ;

- soit vendre leurs actions dans le cadre de la procédure semi-centralisée coordonnée par Euronext Paris, auquel cas le règlement et le transfert des actions cédées (y compris le paiement du prix) auront lieu après l'achèvement des opérations de semi-centralisation après la clôture de l'Offre. L'Initiateur remboursera les frais de négociation (frais de courtage et TVA

18

correspondante) encourus par les actionnaires apportant leurs actions à la procédure semi-centralisée, et ce jusqu'à 0,2 % du prix d'achat (TTC) sous réserve d'un montant maximal de 100 euros TTC par transaction ; étant précisé toutefois que, si l'Offre est déclarée nulle pour une raison quelconque, les actionnaires de la Société ne pourront demander aucun remboursement.

Seuls les actionnaires apportant leurs actions à la procédure semi-centralisée dont les actions sont inscrites dans un compte à la veille de l'ouverture de l'Offre pourront être remboursés de ces frais de négociation par l'Initiateur.

Les demandes de remboursement des frais mentionnés ci-dessus seront acceptées et traitées par les intermédiaires financiers pendant une période de 25 jours ouvrables à partir du dernier jour d'ouverture de l'Offre. Après l'expiration de ce délai, Morgan Stanley, en sa qualité de membre de marché acheteur, cessera de rembourser les frais mentionnés ci-dessus.

A l'exception du remboursement par l'Initiateur aux actionnaires de certains frais de courtage tels que décrits ci-dessus, aucune commission ne sera payée par l'Initiateur aux intermédiaires financiers à travers lesquels les actionnaires apporteront leurs actions à l'Offre.

### 2.4. Calendrier indicatif de l'Offre

Préalablement à l'ouverture de l'Offre, l'AMF et Euronext publieront des avis annonçant la date d'ouverture et le calendrier de l'Offre. À titre purement indicatif, un calendrier de l'Offre figure ci-après :

| | |
|---|---|
| 11 juin 2015 | Dépôt du projet d'Offre auprès de l'AMF |
| 11 juin 2015 | Dépôt du projet de note en réponse de la Société |
| 23 juin 2015 | Déclaration de conformité de l'Offre par l'AMF |
| 24 juin 2015 | Mise à disposition du public de la note d'information de l'Initiateur et de la note en réponse de la Société |
| 25 juin 2015 | Mise à disposition du public des autres informations de l'Initiateur et des autres informations de la Société |
| 26 juin 2015 | Ouverture de l'Offre |
| 17 juillet 2015 | Clôture de l'Offre |
| 23 juillet 2015 | Publication de l'avis de résultat |
| 27 juillet 2015 | Date indicative de mise en œuvre du retrait obligatoire (si les conditions sont réunies) |

### 2.5. Financement de l'Offre

### 2.5.1. Frais liés à l'Offre

Les frais engagés par l'Initiateur dans le cadre de l'Offre, (incluant en particulier les frais liés aux conseils financiers, juridiques et comptables et de toute autre expert ou consultant ainsi que les coûts de publicité et de communication, mais excluant les frais liés à l'Achat de Bloc) sont estimés à 2 millions d'euros environ (hors taxes).

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

**2.5.2.   Modalités de financement de l'Offre**

Le prix d'acquisition par l'Initiateur des actions ND en circulation et non détenues par l'Initiateur au 23 juin 2015 (sur la base du capital social de la Société à la date de dépôt du projet d'Offre, en prenant pour hypothèse que toutes les actions de ND visées par l'Offre seraient apportées à celle-ci et sur la base du Prix de l'Offre) s'élèverait à un total de 661 307 227,50 euros.

Le financement des sommes dues par l'Initiateur dans le cadre de l'Offre sera réalisé sur ses fonds propres et au moyen de prêts d'actionnaires. XPO Logistics, Inc. financera l'Initiateur dans le cadre de l'Offre au moyen de ses fonds propres et, le cas échéant, de ses lignes bancaires existantes.

**2.6.   Restrictions concernant l'Offre à l'étranger**

L'Offre est faite exclusivement en France.

La présente note d'information n'est pas destinée à être distribuée dans des pays autres que la France.

L'Offre n'a fait l'objet d'aucun enregistrement ni d'aucun visa en dehors de la France. Les actionnaires de ND en dehors de France ne peuvent participer à l'Offre, à moins que la loi et la réglementation qui leur sont applicables ne le leur permettent sans qu'aucune autre formalité ou publicité ne soit requise de la part de l'Initiateur. En effet, la participation à l'Offre et la distribution de la présente note d'information peuvent faire l'objet de restrictions en dehors de France. L'Offre ne s'adresse pas aux personnes faisant l'objet de telles restrictions, directement ou indirectement, et n'est pas susceptible d'acceptation s'agissant d'ordres émanant de pays au sein desquels l'Offre fait l'objet de restrictions. Les personnes en possession de la présente note d'information doivent se conformer aux restrictions en vigueur au sein de leur pays. Le non-respect de ces restrictions peut constituer une violation des lois et règlements applicables aux places de marché des pays en question.

L'Initiateur rejette toute responsabilité dans l'hypothèse de la violation par toute personne de restrictions qui lui sont applicables.

La présente note d'information ainsi que les autres documents relatifs à l'Offre ne constituent ni une offre de vente, ni une sollicitation, ni une offre d'achat de titres dans un pays au sein duquel l'Offre serait illégale. L'Offre n'a fait l'objet d'aucune formalité, enregistrement ou visa en dehors de France.

Cette note d'information ne constitue pas une extension de l'Offre aux États-Unis et l'Offre n'est pas proposée, directement ou indirectement, aux États-Unis, aux personnes résidant aux États-Unis, par les moyens des services postaux ou par tout moyen de communication ou de commerce (incluant de manière non limitative la transmission par fax, téléphone et par courrier électronique) aux États-Unis, ou par l'intermédiaire des services d'une bourse de valeurs des États-Unis. En conséquence, aucun exemplaire de la présente note d'information, aucun autre document lié à la présente note d'information ni aucun document relatif à l'Offre ne peut être envoyé par la poste, communiqué ou publié par un intermédiaire ou n'importe quelle autre personne aux États-Unis sous quelque forme que ce soit. Aucun actionnaire de la Société ne peut apporter ses actions à l'Offre, s'il n'est pas en mesure de déclarer : (i) qu'il n'a pas reçu aux États-Unis une copie de la présente note d'information, ou de quelque autre document lié à l'Offre, et qu'il n'a pas envoyé de tels documents vers les États-Unis, (ii) qu'il n'a pas utilisé, directement ou indirectement les services postaux, les moyens de télécommunication ou d'autres instruments de commerce ou encore les services d'une bourse de valeurs aux États-Unis en lien avec l'Offre, (iii) qu'il n'était pas aux États-Unis lorsqu'il a accepté les termes de l'Offre ou communiqué l'ordre de transfert de ses actions et (iv) qu'il n'est ni mandataire ni représentant agissant pour le compte d'une autre personne qui lui aurait communiqué des instructions en dehors des États-Unis. Les intermédiaires habilités n'auront pas le droit d'accepter d'ordre de transfert d'actions qui ne respecteraient pas les dispositions précitées (à moins d'une autorisation ou

20

d'un ordre contraire de la part de l'Initiateur, ou fait en son nom, et laissé à sa discrétion). En ce qui concerne l'interprétation du paragraphe ci-dessus, les États-Unis correspondent aux États-Unis d'Amérique, ses territoires et possessions, tous ses États, ainsi que le district de Columbia.

## 2.7.    Traitement fiscal de l'Offre

En l'état actuel de la législation française, les développements suivants décrivent les conséquences fiscales susceptibles de s'appliquer aux actionnaires de la Société qui participeront à l'Offre.

L'attention de ces derniers est toutefois appelée sur le fait que ces informations ne constituent qu'un simple résumé du régime fiscal en vigueur et qu'elles n'ont pas vocation à constituer une analyse exhaustive de l'ensemble des effets fiscaux susceptibles de s'appliquer à eux. Ils sont donc invités à prendre contact avec leur conseiller fiscal habituel afin de s'informer du régime fiscal applicable à leur situation particulière.

Ce résumé est fondé sur les dispositions légales françaises en vigueur à la date de la présente note d'information et est donc susceptible d'être affecté par d'éventuelles modifications des règles fiscales françaises, qui pourraient être assorties d'un effet rétroactif ou s'appliquer à l'année ou à l'exercice en cours et de leur interprétation par l'administration fiscale française.

Les personnes n'ayant pas leur résidence fiscale en France doivent se conformer à la législation fiscale en vigueur dans leur Etat de résidence et, le cas échéant, aux stipulations de la convention fiscale signée entre la France et cet Etat.

### 2.7.1.   Actionnaires personnes physiques résidents fiscaux de France, agissant dans le cadre de la gestion de leur patrimoine privé et ne réalisant pas des opérations de bourse à titre habituel

#### *(i)      Régime de droit commun*

##### (a) Impôt sur le revenu des personnes physiques

Conformément aux dispositions des articles 150-0 A et suivants et 200 A du code général des impôts (« **CGI** »), les gains nets de cessions des valeurs mobilières réalisées par les personnes physiques sont, sauf exception, pris en compte pour la détermination du revenu net global soumis au barème progressif de l'impôt sur le revenu après application d'un abattement pour durée de détention prévu à l'article 150-0 D égal à :

x)    50 % de leur montant lorsque les actions sont détenues depuis au moins 2 ans et moins de 8 ans, à la date de la cession ;

y)    65 % de leur montant lorsque les actions sont détenues depuis au moins 8 ans, à la date de la cession.

Pour l'application de cet abattement, la durée de détention est, sauf cas particuliers, décomptée à partir de la date de souscription ou d'acquisition des actions.

Les personnes disposant de moins-values nettes reportables ou réalisant une moins-value lors de la cession des actions de la Société dans le cadre de l'Offre sont invitées à se rapprocher de leur conseiller fiscal habituel pour étudier les conditions d'utilisation de ces moins-values.

L'apport des actions de la Société à l'Offre est susceptible d'avoir pour effet de mettre fin à un éventuel sursis ou report d'imposition dont auraient pu bénéficier les titulaires de ces actions dans le cadre d'opérations antérieures.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

(b) Prélèvements sociaux

Les gains nets de cession de valeurs mobilières sont, en outre, soumis aux contributions sociales, avant application de l'abattement pour durée de détention énoncé ci-avant, au taux global de 15,5 % réparties comme suit :

- 8,2 % au titre de la contribution sociale généralisée (« CSG »),

- 0,5 % au titre de la contribution pour le remboursement de la dette sociale (« CRDS »),

- 4,8 % au titre du prélèvement social et de sa contribution additionnelle, et

- 2 % au titre du prélèvement de solidarité.

Hormis la CSG, déductible à hauteur de 5,1 points du revenu global imposable l'année de son paiement, ces contributions sociales ne sont pas déductibles du revenu imposable.

(c) Autres contributions

L'article 223 sexies du CGI institue à la charge des contribuables passibles de l'impôt sur le revenu une contribution exceptionnelle sur les hauts revenus applicable lorsque le revenu fiscal de référence du contribuable concerné excède certaines limites.

Cette contribution est calculée en appliquant un taux de :

- 3 % à la fraction du revenu fiscal de référence comprise entre 250 000 et 500 000 euros pour les contribuables célibataires, veufs, séparés ou divorcés et à la fraction du revenu fiscal de référence comprise entre 500 000 et 1 000 000 euros pour les contribuables soumis à imposition commune ;

- 4 % à la fraction du revenu fiscal de référence supérieure à 500 000 euros pour les contribuables célibataires, veufs, séparés ou divorcés et à la fraction du revenu fiscal de référence supérieure à 1 000 000 euros pour les contribuables soumis à imposition commune.

Le revenu fiscal de référence du foyer fiscal dont il est fait mention ci-dessus, est défini conformément aux dispositions du 1° du IV de l'article 1417 du CGI, sans qu'il soit fait application des règles de quotient définies à l'article 163-0 A du CGI. Le revenu fiscal de référence visé comprend notamment les gains nets de cession de valeurs mobilières réalisés par les contribuables concernés, avant application de l'abattement pour durée de détention.

*(ii)    Cas des actions détenues dans le cadre d'un plan d'épargne en actions (« PEA »)*

Les personnes qui détiennent des actions de la Société dans le cadre d'un PEA pourront participer à l'Offre.

Le PEA ouvre droit, sous certaines conditions, (i) pendant la durée du PEA, à une exonération d'impôt sur le revenu et de prélèvements sociaux à raison des produits et des plus-values générés par les placements effectués dans le cadre du PEA, sous réserve notamment que ces produits et plus-values demeurent investis dans le PEA et (ii) au moment de la clôture du PEA (si elle intervient plus de 5 ans après la date d'ouverture du PEA, y compris du fait d'un retrait partiel intervenant après 5 ans et avant 8 ans) ou lors d'un retrait partiel (s'il intervient plus de 8 ans après la date d'ouverture du PEA), à une exonération d'impôt sur le revenu à raison du gain net réalisé depuis l'ouverture du plan, ledit gain net n'étant de surcroît pas pris en compte pour le calcul de la contribution exceptionnelle sur les hauts revenus décrite au paragraphe (iii) du (a) ci-avant mais restant néanmoins soumis aux prélèvements sociaux décrits au paragraphe (ii) du (a) ci-avant (étant toutefois précisé que le taux effectif de ces prélèvements sociaux est susceptible de varier (entre 0 % et 15,5 %) selon la date à laquelle ce gain a été acquis ou constaté).

Des dispositions particulières, non-décrites dans la présente note d'information, sont applicables en cas de réalisation de moins-values, de clôture du plan avant l'expiration de la cinquième année qui suit l'ouverture du PEA, ou en cas de sortie du PEA sous forme de rente viagère. Les personnes concernées sont invitées à se rapprocher de leur conseiller fiscal habituel.

### 2.7.2. Actionnaires personnes morales résidents fiscaux de France et soumis à l'impôt sur les sociétés dans les conditions de droit commun

#### (i)    *Régime de droit commun*

Les plus-values réalisées à l'occasion de la cession d'actions sont en principe comprises dans le résultat soumis à l'impôt sur les sociétés au taux de droit commun (actuellement 33,1/3 %) majoré, le cas échéant, de la contribution sociale de 3,3 % (article 235 ter ZC du CGI), qui s'applique au montant de l'impôt sur les sociétés diminué d'un abattement qui ne peut excéder 763 000 euros par période de 12 mois.

Les redevables de l'impôt sur les sociétés réalisant un chiffre d'affaires supérieur à 250 000 000 euros sont en outre assujettis à une contribution exceptionnelle égale à 10,7 % de l'impôt sur les sociétés dû (déterminé avant imputation des réductions, crédits d'impôts et des créances fiscales de toute nature (article 235 ter ZAA du CGI)).

Cependant, les sociétés dont le chiffre d'affaires (hors taxes) est inférieur à 7 630 000 euros, et dont le capital social, entièrement libéré, a été détenu de façon continue à hauteur d'au moins 75 % pendant l'exercice fiscal en question par des personnes physiques ou par des sociétés remplissant elles-mêmes ces conditions, bénéficient d'un taux réduit d'impôt sur les sociétés de 15 %, dans la limite d'un bénéfice imposable de 38 120 euros pour une période de 12 mois. Ces sociétés sont également exonérées des contributions additionnelles de 3,3 % et 10,7 %.

Les moins-values réalisées lors de la cession d'actions viennent, en principe, en déduction des résultats imposables à l'impôt sur les sociétés de la personne morale.

Il est enfin précisé que l'apport des actions de la Société à l'Offre est susceptible d'avoir pour effet de mettre fin à un éventuel report ou sursis d'imposition dont auraient pu bénéficier les titulaires de ces actions dans le cadre d'opérations antérieures.

#### (ii)    *Régime spécial des plus-values à long terme (plus-values de cession des titres de participation)*

Conformément aux dispositions de l'article 219 I-a quinquies du CGI, les plus-values nettes réalisées à l'occasion de la cession de « titres de participation » détenus depuis au moins 2 ans sont exonérées d'impôt sur les sociétés, sous réserve de la réintégration, dans les résultats imposables à l'impôt sur les sociétés, d'une quote-part de frais et charges égale à 12 % du montant brut des plus-values ainsi réalisées.

Constituent des titres de participation au sens de l'article 219 I-a quinquies du CGI (a) les actions revêtant ce caractère sur le plan comptable, (b) les actions acquises en exécution d'une offre publique d'achat ou d'échange par l'entreprise qui en est l'initiatrice, ainsi que (c) les titres ouvrant droit au régime fiscal des sociétés mères (tel que défini aux articles 145 et 216 du CGI) si ces titres sont inscrits en comptabilité au compte de titres de participation ou à une subdivision spéciale d'un autre compte du bilan correspondant à leur qualification comptable, à l'exception des titres de sociétés à prépondérance immobilière.

23

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

Les personnes susceptibles d'être concernées sont invitées à se rapprocher de leur conseiller fiscal habituel afin de s'assurer que les actions qu'ils détiennent constituent des titres de participation au sens de l'article 219 I-a quinquies du CGI.

Les conditions d'utilisation et de report des moins-values à long terme obéissent à des règles spécifiques et les contribuables sont invités à se rapprocher de leur conseiller fiscal habituel.

### 2.7.3. Actionnaires non-résidents fiscaux de France

Sous réserve des dispositions des conventions fiscales internationales éventuellement applicables, les plus-values réalisées à l'occasion de la cession d'actions par les personnes qui ne sont pas fiscalement domiciliées en France au sens de l'article 4 B du CGI, ou dont le siège social est situé hors de France (sans que la propriété de ces actions soit rattachable à une base fixe ou à un établissement stable soumis à l'impôt en France à l'actif duquel seraient inscrites ces actions), sont généralement exonérées d'impôt en France, sous réserve (i) que les droits dans les bénéfices sociaux de la société détenus, directement ou indirectement, par le cédant, avec son conjoint, leurs ascendants et leurs descendants, n'aient, à aucun moment au cours des 5 années qui précèdent la cession, dépassé ensemble 25 % de ces bénéfices (articles 244 bis B et C du CGI) et (ii) que le cédant ne soit pas domicilié, établi ou constitué dans un Etat ou territoire non coopératif au sens de l'article 238-0 A du CGI. Dans ce dernier cas, quel que soit le pourcentage de droits détenus dans les bénéfices de la société, les plus-values sur les actions de cette société qui sont cédés sont imposées au taux forfaitaire de 75 %, sous réserve des dispositions des conventions fiscales internationales éventuellement applicables. La liste des Etats ou territoires non coopératifs est publiée par arrêté ministériel et mise à jour annuellement.

Les personnes qui ne rempliraient pas les conditions pour bénéficier de l'exonération sont invitées à se rapprocher de leur conseiller fiscal habituel.

Les porteurs d'actions de la Société non-résidents fiscaux de France sont toutefois invités à étudier leur situation fiscale particulière avec leur conseiller fiscal habituel afin notamment de prendre en considération le régime d'imposition applicable dans leur pays de résidence fiscale.

### 2.7.4. Actionnaires soumis à un régime d'imposition différent

Les actionnaires soumis à un régime d'imposition autre que ceux visés ci-dessus et qui participent à l'Offre, notamment les contribuables dont les opérations portant sur des valeurs mobilières dépassent la simple gestion de portefeuille ou qui ont inscrit ces actions à l'actif de leur bilan commercial sont invités à étudier leur situation fiscale particulière avec leur conseiller fiscal habituel.

### 2.7.5. Droits d'enregistrement ou taxe sur les transactions financières

ND étant une société dont le siège social est situé en France et dont la capitalisation boursière excédait un milliard d'euros au 1er décembre 2014, l'acquisition par XPO des actions de la Société sera soumise à la taxe sur les transactions financières prévue à l'article 235 ter ZD du CGI (dont le taux est actuellement fixé à 0,2 %) assise sur le prix de cession ; les actionnaires de la Société ne seront pas soumis à cette taxe à raison de la cession de leurs actions de la Société dans le cadre de l'Offre.

En principe, aucun droit d'enregistrement n'est dû en France à raison de la cession d'actions d'une société dont les titres sont négociés sur un marché réglementé d'instruments financiers ou sur un système multilatéral de négociation, à moins que cette cession ne soit constatée par un acte. Dans ce dernier cas, la cession des actions doit faire l'objet d'un enregistrement dans le mois de sa date et cet enregistrement donne lieu au paiement d'un droit. Néanmoins, lorsque la cession est soumise à la taxe sur les transactions financières mentionnée ci-dessus, ce droit d'enregistrement n'est pas dû (article 726 II d) du CGI).

24

**3.   CRITERES D'APPRECIATION DU PRIX DE L'OFFRE**

**3.1.   Appréciation du prix de l'Offre**

Le prix offert par l'Initiateur est de 217,50€ en numéraire par action, après détachement du dividende de 1,80€ par action déboursé avant la réalisation de l'Achat de Bloc et le dépôt de la présente note d'information. L'appréciation du prix de l'Offre est basée sur un prix théorique de 219,30€ par action payable en numéraire, dividende attaché. Le prix de l'Offre est équivalent au prix offert pour l'Achat de Bloc.

Les éléments d'appréciation du Prix de l'Offre ont été établis par Morgan Stanley, pour l'Initiateur au moyen des méthodes de valorisation usuelles, sur la base d'informations publiques concernant ND, son secteur d'activité et ses concurrents, ainsi que d'informations non-publiques reçues au cours de la phase de due diligence. Le Prix de l'Offre a été apprécié selon une approche multicritères reposant sur les méthodes suivantes :

- Référence à l'acquisition du bloc d'actions majoritaire de ND par XPO (Achat de Bloc) ;
- Approche par les cours de bourse ;
- Approche par les objectifs de cours des analystes de recherche ;
- Approche par les multiples des sociétés comparables cotées ;
- Approche par les multiples de transactions comparables ;
- Approche par les primes payées lors des Offres Publiques d'Achat précédentes ;
- Approche par l'actualisation des flux de trésorerie futurs (« DCF »).

Les autres méthodes de valorisation ont été écartées pour l'évaluation de ND :

- Approche par l'actualisation des dividendes futurs : cette méthodologie est fortement liée au taux de distribution, qui dépend de la stratégie financière fixée par la direction / le conseil de surveillance. Cette décision interne peut ainsi être totalement décorrélée de la capacité de la société à générer des flux de trésorerie pour l'actionnaire ;
- Approche par l'Actif Net Comptable (« ANC ») : cette méthode ne permet pas d'appréhender la valeur réelle des actifs incorporels (parts de marché, relation-client, marques, etc.) et le potentiel de performance future de l'entreprise. A titre indicatif, l'ANC ressort à 67.78€ par action au 31 décembre 2014, sur une base non diluée de 9 797 663 actions (9 836 241 actions émises, moins 38 578 actions propres de la Société) ;
- Approche par l'Actif Net Réévalué : cette méthode est généralement utilisée dans le cas de holdings diversifiés ou de sociétés détentrices d'actifs diversifiés, et ne reflète pas la valeur d'une société opérationnelle.

**3.2.   Éléments financiers**

**3.2.1.   Données financières**

Les données historiques utilisées pour évaluer les termes et conditions de l'Offre sont issues des comptes consolidés de ND, en particulier pour l'exercice financier se clôturant le 31 décembre 2014.

Les données financières projetées utilisées pour évaluer les termes et conditions de l'Offre sont issues de projections financières communiquées par la direction de ND lors de la due diligence ayant eu lieu du 17 au 28 avril 2015, soit principalement :

- Budget de la direction de ND pour 2015E, préparé en décembre 2014 et mis à jour en avril 2015 prenant en compte la performance financière récente de l'entreprise (« Budget révisé »)

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

– Plan d'affaires de la direction de ND pour les années 2015E à 2018E préparé au courant de l'été 2014 (« Plan d'affaires »). Selon nos informations, le plan d'affaires, fourni par la direction de ND au moment de la due diligence demeure représentatif de la performance financière future de la société.

Les projections financières communiquées par la direction de ND ont été retenues dans le cadre de l'approche par les multiples des sociétés comparables cotées (section 3.3.3) et sont en ligne avec les projections publiées par les analystes de recherche.

### 3.2.2.   Passage de la valeur d'entreprise à la valeur des fonds propres

La valeur d'entreprise de ND est déterminée comme étant la valeur de ses fonds propres ajustée selon les éléments suivants provenant des comptes consolidés pour l'exercice financier se clôturant le 31 décembre 2014 :

– Plus : Passifs financiers de 1,226.2m€

– Moins : Trésorerie et équivalents de trésorerie de 209.1m€

– Plus : Provisions pour indemnités de fin de carrière nette des surplus et nette d'impôts de 54.5m€ (87.8m€ de provisions ajustées pour un taux d'imposition statutaire de 38.0 % applicable en France en 2014 et 2015)

– Moins : Autres actifs financiers non courants de 55.8m€

– Moins : Participations dans les entreprises associées de 2.1m€

– Plus : Autres provisions de 13.1m€ (5.5m€ relatifs à des provisions de restructurations, et 7.6m€ de provisions pour sinistres encourus mais non encore déclarés)

– Plus: Participations ne donnant pas le contrôle de 27.2m€.

Sur la base des éléments ci-dessus, la dette nette après ajustements a été établie à 1,054.0m€.

### 3.2.3.   Nombre de titres

Le calcul du prix de l'Offre repose sur un nombre de 9 989 009 titres, établi comme suit :

– Nombre d'actions émises de 9 836 241 au 31 décembre 2014

– Moins : 38 578 actions propres de la société

– Plus : 111 463 actions de performance en date du 31 décembre 2014, traitées comme des instruments dilutifs

– Plus : impact dilutif de 79 883 lié aux 110 000 bons de souscription d'action, suivant la méthode du rachat d'actions sur la base d'un prix d'exercice de 59.55€ par action et un prix offert de 217.50€ par action (dividende détaché), qui ont été acquis par l'Initiateur. Il est à noter que selon la méthode de rachat d'actions, l'impact dilutif des bons de souscription est une fonction de la valeur implicite des fonds propres de ND établi selon la méthode de valorisation retenue et a donc été ajustée en conséquence dans l'évaluation financière ci-jointe.

### 3.3.   Valorisation de l'offre

### 3.3.1.   Référence à l'acquisition du bloc d'actions majoritaire de ND par XPO (Achat de Bloc)

Le prix payé par XPO pour l'Achat de Bloc est considéré comme un point de référence pertinent, car déterminé à l'issue d'une négociation entre personnes indépendantes pour la cession du contrôle de la Société.

Le prix offert pour l'Achat de Bloc de 217.50€ par action exclut le dividende de 1,80€ par action détaché avant la réalisation de l'Achat de Bloc (et qui a donc bénéficié aux Vendeurs Initiaux) et

correspond donc à un prix dividende attaché de 219.30€ par action. Le prix de l'Offre est donc équivalent au prix payé par XPO pour l'acquisition de ce bloc d'actions majoritaire.

### 3.3.2.   Approche par les cours de bourse

L'action de ND est cotée sur les marchés Euronext de Paris et Euronext de Londres. Sur la période de 6 mois se terminant le 28 avril 2015, le volume cumulatif échangé représentait 22.9 % du capital flottant (défini comme étant le nombre total d'actions émises excluant celles détenues par la famille Dentressangle ainsi que les actions propres de la société).

Pour les besoins de cette analyse, les cours des actions jusqu'au jour précédant l'annonce de la transaction (acquisition de 66.71 % de ND par XPO le 28 avril 2015) ont été retenus. Le bloc d'actions de 66.71 % est composé des actions détenues par Norbert Dentressangle Initiatives SA (64.27 %), Monsieur Pierre-Henri Dentressangle (1.22 %) ainsi que Madame Marine Dentressangle (1.22 %). Depuis le 29 avril 2015, le cours de l'action de ND a évolué en ligne avec l'Offre de XPO.

Le tableau ci-dessous présente la prime induite par le Prix de l'Offre sur le cours de clôture du 28 avril 2015, ainsi que sur les cours moyens pondérés des volumes échangés (« CMPVE ») sur différentes périodes jusqu'à cette date.

| Prime induite par le Prix d'Offre de 219,30€ (dividende attaché) | | |
|---|---|---|
| Cours de clôture du 28 avril 2015 | €159.10 | 37.8% |
| CMPVE 1 mois | €155.41 | 41.1% |
| CMPVE 2 mois | €154.78 | 41.7% |
| CMPVE 3 mois | €148.87 | 47.3% |
| CMPVE 6 mois | €135.19 | 62.2% |
| CMPVE 9 mois | €125.83 | 74.3% |
| CMPVE 12 mois | €122.27 | 79.4% |
| Cours le plus haut - 12 derniers mois | €164.95 | 32.9% |
| Cours le plus bas - 12 derniers mois | €95.80 | 128.9% |

Source: Capital IQ

Le tableau ci-dessous présente les volumes journaliers moyens échangés en date du 28 avril 2015 sur différentes périodes jusqu'à cette date.

| Volumes journaliers moyens échangés (en actions) | |
|---|---|
| Moyenne 1-mois | 8,910 |
| Moyenne 2-mois | 7,310 |
| Moyenne 3-mois | 6,400 |
| Moyenne 6-mois | 5,870 |
| Moyenne 9-mois | 6,070 |
| Moyenne 12-mois | 5,890 |

Source: Capital IQ

Le Prix de l'Offre (dividende attaché) induit une prime de 37.8 % sur le cours du 28 avril 2015 et 41.1 % sur le CMPVE du mois précédent. Il induit également d'une prime de 32.9 % sur le cours le plus haut des 12 derniers mois à compter du 28 avril 2015, et une prime de 128.9 % sur le cours le plus bas sur la même période.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*



Source: Capital IQ

Il est à noter que l'Initiateur n'a pas acheté de titres de ND sur les marchés jusqu'au dépôt du projet d'Offre.

### 3.3.3. Approche par les objectifs de cours des analystes de recherche

Le tableau ci-dessous présente les objectifs de cours des analystes de recherche couvrant ND avant la date de l'annonce de l'Offre.

| Analyste | Date | Recommandation | Objectif de cours |
|---|---|---|---|
| Gilbert Dupont | 21-avr.-15 | Acheter | 172.4 |
| Oddo Securities | 23-avr.-15 | Acheter | 173.0 |
| Exane BNP Paribas | 23-avr.-15 | Neutre | 150.0 |
| Société Générale Cross Asset Research | 23-avr.-15 | Conserver | 174.0 |
| Berenberg | 14-avr.-15 | Acheter | 178.0 |
| Edison Investment Research | 07-avr.-15 | Pas de recommandation | 190.0 |
| Moyenne | | | 172.9 |
| Médiane | | | 173.5 |
| Prix d'Offre (dividende attaché) | | | 219.3 |
| Prime sur la médiane des objectifs de cours | | | 26.4% |

Source: Rapports des analystes de recherche

Le Prix de l'Offre (dividende attaché) représente une prime de 26.4 % sur la médiane des objectifs de cours publiés par les analystes avant l'annonce de la transaction en date du 28 avril 2015.

### 3.3.4. Approche par les multiples des sociétés comparables cotées

La méthode d'évaluation par les multiples boursiers consiste à appliquer aux agrégats financiers de ND les multiples de valorisation observés sur un échantillon de sociétés cotées comparables, notamment en termes de secteur d'activité et marchés desservis.

Un échantillon élargi d'entreprises de logistiques internationales (principalement américaines et européennes) avec une forte activité en logistique contractuelle et / ou en transport, soit un profil

28

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

similaire aux activités principales de ND a été considéré. Les sociétés cotées suivantes ont été exclues de l'échantillon :

- – Les entreprises opérant principalement en tant que transitaire (en dépit d'un certain niveau d'activité en logistique de contrat et transport), telles que DSV A/S et Kuehne + Nagel Inc. ;

- – Les entreprises agissant principalement en tant que courtiers de services de transports (en dépit d'un certain niveau d'activité en transport), telles que Echo Global Logistics Inc., CH Robinson Worldwide Inc., Landstar System Inc. et Forward Air Corp. ;

- – Deutsche Post AG en raison de l'importance de ses divisions express et courrier et de leur impact sur sa valorisation, ainsi que Ryder Systems Inc. dont l'activité principale est la location de camions.

L'échantillon résultant de cette analyse est composé de 6 sociétés comparables en logistique contractuelle et / ou en transport.

| Entreprise | Siège social | Chiffre d'affaires 2014[1] | Catégorie | Description |
|---|---|---|---|---|
| Staf SA | France | 2,765 | Logistique contractuelle et transport | Transport et gestion du fret pour les produits frais et surgelés pour l'industrie de l'alimentation |
| ID Logistics Group SA | France | 875 | Logistique contractuelle | Chaîne d'approvisionnement, gestion du transport, gestion et optimisation de l'inventaire, préparation et distribution des commandes |
| Wincanton plc | Royaume-Uni | 1,522 | Logistique contractuelle et transport | Transport incluant transport routier, ferroviaire, maritime, vrac et service de livraison à domicile, ainsi qu'entreposage |
| Con-way Inc. | États-Unis | 5,168 | Logistique contractuelle et transport | Transport, logistique et gestion de la chaîne d'approvisionnement pour clients du secteur manufacturier, industriel et de détail |
| Knight Transportation Inc. | États-Unis | 824 | Transport | Transport général de commodités par camions sur distances courtes et moyennes, principalement aux États-Unis |
| Heartland Express Inc. | États-Unis | 776 | Transport | Transport général de commodités par camions sur distances courtes et moyennes, principalement aux États-Unis et au Canada |

[1] Chiffre d'affaires 2014 calendarisés en Euros
Source: Capital IQ

Les multiples habituellement utilisés pour valoriser les sociétés du secteur de la logistique contractuelle et / ou du transport sont le multiple d'excédent brut d'exploitation (Valeur d'Entreprise (« VE ») / EBITDA), le multiple d'excédent brut d'exploitation après dépréciation (VE / EBITA) et le multiple de cours de bourse/bénéfice par action (« PER »).

De manière générale, les investisseurs fondent leurs décisions d'investissement sur les bénéfices futurs et les sociétés cotées sont suivies par des analystes de recherche qui fournissent des projections financières. 2015E et 2016E sont actuellement considérées comme étant les périodes les plus pertinentes. Les sociétés comparables retenues sont suivies par des analystes de recherche et un consensus des estimations pour les périodes pertinentes sont disponibles. Les estimations d'EBITA ont été extrapolées à partir du consensus des estimations d'EBIT rehaussées des chiffres d'amortissement historiques.

Le tableau ci-dessous présente les moyennes des multiples retenus sur la base d'une valeur de marché à la clôture du 28 avril 2015 pour l'échantillon sélectionné de sociétés comparables et sur la base du consensus des estimations d'EBITDA, d'EBITA et de résultat net calendarisés pour refléter une clôture d'exercice financier au 31 décembre.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

| Entreprise | Géographie | Valeurs Marché (USD MM) | | Dette fin. nette / EBITDA 2015E | VE / EBITDA | | VE / EBITA | | PER | |
| | | Capit. boursière | VE | | 2015E | 2016E | 2015E | 2016E | 2015E | 2016E |
|---|---|---|---|---|---|---|---|---|---|---|
| Staf SA | France | 846 | 1,342 | 2.1x | 6.0x | 5.7x | 11.2x | 10.4x | 10.6x | 9.8x |
| ID Logistics Group SA | France | 592 | 665 | 0.8x | 8.9x | 8.2x | 13.0x | 11.9x | 21.5x | 18.4x |
| Wincanton plc | Royaume-Uni | 303 | 579 | 1.0x | 5.9x | 5.8x | 7.8x | 7.5x | 9.8x | 9.0x |
| Con-way Inc. | États-Unis | 2,583 | 3,022 | 0.5x | 5.3x | 4.8x | 9.3x | 8.2x | 15.9x | 13.5x |
| Knight Transportation Inc. | États-Unis | 2,582 | 2,593 | 0.1x | 8.2x | 7.3x | 12.9x | 11.1x | 20.7x | 18.2x |
| Heartland Express, Inc. | États-Unis | 1,882 | 1,830 | (0.2x) | 7.3x | 6.7x | 12.7x | 11.2x | 21.2x | 18.5x |
| Moyenne | | | | | 6.8x | 6.4x | 11.1x | 10.0x | 16.6x | 14.6x |
| Médiane | | | | | 6.7x | 6.2x | 11.9x | 10.7x | 18.3x | 15.9x |
| Minimum | | | | | 5.3x | 4.8x | 7.8x | 7.5x | 9.8x | 9.0x |
| Maximum | | | | | 8.9x | 8.2x | 13.0x | 11.9x | 21.5x | 18.5x |
| Valeur par action de ND induite par l'application des médianes de multiples | | | | | 138.71 | 129.45 | 169.91 | 137.19 | 202.11 | 189.12 |
| Prime induite sur le Prix d'Offre (dividende attaché) | | | | | 58.1% | 69.4% | 29.1% | 59.9% | 8.5% | 16.0% |

*Source: Capital IQ, Publications des sociétés, estimations Thomson*

Le PER est affecté par les structures financières respectives des sociétés comparables. ND étant largement plus endettée que les autres sociétés de l'échantillon, une valorisation de ND sur la base du PER de ces sociétés ne semble pas pertinente.

Le Prix de l'Offre (dividende attaché) fait ressortir une prime de 58.1 % par rapport à la valeur par action induite par l'application de la médiane du multiple VE/EBITDA de 2015E, une prime de 29.1 % par rapport à la valeur induite par l'application de la médiane du multiple VE/EBITA de 2015E et une prime de 8.5 % sur la valeur induite par la médiane du multiple PER de 2015E.

### 3.3.5. Approche par les multiples de transactions comparables

La méthode des multiples de transactions consiste à appliquer aux agrégats financiers de ND les multiples de valorisation observés sur un échantillon de transactions intervenues dans le même secteur d'activité.

La difficulté de cette méthode réside dans le choix des transactions retenues comme références de valorisation alors que :

- La qualité et la fiabilité de l'information varient fortement d'une transaction à l'autre en fonction du statut des sociétés rachetées (cotées, privées, filiales d'un groupe) et du niveau de confidentialité de la transaction ;

- Les sociétés acquises ne sont jamais parfaitement comparables à l'objet de l'évaluation du fait de leur taille, de leur positionnement, de leur présence géographique, de leur rentabilité, de leurs perspectives de croissance ; et

- L'intérêt stratégique d'une acquisition varie et le prix payé en conséquence peut inclure une prime de contrôle plus ou moins élevée.

Sous réserve de ces conditions, l'échantillon retenu est constitué de 9 transactions présentées dans le tableau ci-dessous :

| Date de l'annonce | Acquéreur | Cible | Target Short Description | Valeur d'entrep. ($ MM) | VE/ EBITDA (12 dern. mois) |
|---|---|---|---|---|---|
| 29-sept.-14 | Goldman Sachs, Rhones Capital | Neovia | Logistique contractuelle globale pour l'industrie automobile | 1,000 | 7.7 x |
| 31-jul.-14 | Norbert Dentressangle | Jacobson Companies | Logistique contractuelle, basé aux É-U | 750 | 9.9 x |
| 29-jul.-14 | XPO Logistics | New Breed | Logistique contractuelle, basé aux É-U | 615 | 8.0 x |
| 26-jul.-12 | Universal Truckload Services | Linc Logistics | Logistique contractuelle, basé aux É-U | 335 | 6.5 x |
| 29-nov.-10 | Norbert Dentressangle | TDG | Logistique contractuelle, basé au Royaume-Uni | 313 | 6.1 x |
| 19-jul.-10 | Genco Holdings I | ATC Technology Corporation | Logistique contractuelle, basé aux É-U | 403 | 5.2 x |
| 04-jul.-08 | Laxey Partners | TDG | Logistique contractuelle, basé au Royaume-Uni | 436 | 5.9 x |
| 08-avr.-08 | SNCF Participations | Geodis | Divers services de transport et logistique contractuelle en Europe | 2,431 | 7.2 x |
| 02-oct.-07 | Norbert Dentressangle | Christian Salvesen | Divers services de transport et logistique contractuelle en Europe | 614 | 8.0 x |
| **Minimum** | | | | | **5.2 x** |
| **Maximum** | | | | | **9.9 x** |
| **Médiane** | | | | | **7.2 x** |

Source: Presse, Publications des sociétés

L'application des multiples de transactions comparables à l'EBITDA 2014 pro-forma (incluant 12 mois de consolidation des activités de Jacobson Companies) de ND donne les paramètres suivants :

| Multiple minimum de VE/EBITDA de transactions comparables (x) | 5.2 x |
|---|---|
| EBITDA 2014 de Norbert Dentressangle, pro forma consolidé pour 12 mois de Jacobson (€ MM) | 337.1 |
| Valeur par action induite (€) | 70.4 |
| Prime induite par le Prix d'Offre (dividende attaché) / (Décote) (%) | 211.4% |
| **Maximum EBITDA multiple from comparable precedent transactions** | **9.9 x** |
| EBITDA 2014 de Norbert Dentressangle, pro forma consolidé pour 12 mois de Jacobson (€ MM) | 337.1 |
| Valeur par action induite (€) | 228.6 |
| Prime induite par le Prix d'Offre (dividende attaché) / (Décote) (%) | (4.1%) |
| **Median EBITDA multiple from comparable precedent transactions** | **7.2 x** |
| EBITDA 2014 de Norbert Dentressangle, pro forma consolidé pour 12 mois de Jacobson (€ MM) | 337.1 |
| Valeur par action induite (€) | 137.7 |
| Prime induite par le Prix d'Offre (dividende attaché) / (Décote) (%) | 59.2% |

Le Prix de l'Offre (dividende attaché) fait ressortir une prime de 59.2 % par rapport à la valeur par action induite par l'application des multiples médians de VE/EBITDA (12 derniers mois) de transactions comparables, une prime de 211.4 % en appliquant le multiple minimum de VE/EBITDA (12 derniers mois) et une décote de (4.1) % en appliquant le multiple maximum de VE/EBITDA (12 derniers mois).

### 3.3.6. Approche par les primes payées lors des Offres Publiques d'Achat (« OPA ») précédentes

L'approche par les primes payées consiste à appliquer au cours de l'action ND les primes observées sur un échantillon d'OPA précédentes sur des sociétés cibles cotées en France.

L'échantillon de transactions retenu inclut uniquement les transactions depuis 1998 avec une valeur des fonds propres pour 100 % des actions en excès de 100m€. De plus, seules les transactions à la suite desquelles l'Initiateur détenait plus de 50 % des actions de l'entreprise cible ont été retenues. Sur la base de ces critères, un total de 69 transactions ont été retenues.

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

La médiane des primes observées sur la moyenne 1-mois des cours des actions cibles ressort à 24.3 % sur la base d'informations Morgan Stanley. L'application de cette prime sur la moyenne 1-mois du cours de l'action de ND en date du 28 avril 2015 (156.53€ par action) fait ressortir une valeur de 194.57€ par action.

Il est à noter que le prix de l'Offre (dividende attaché) représente une prime de 40.1 % sur la moyenne 1-mois du cours de l'action de ND en date du 28 avril 2015.

### 3.3.7.  Approche par l'actualisation des flux de trésorerie disponibles futurs (« DCF »)

Cette méthode consiste à déterminer la valeur de l'actif économique de ND par actualisation des flux de trésorerie disponibles prévisionnels. Cette méthode est extrêmement sensible aux hypothèses retenues dans les projections.

La valeur d'entreprise au 31 décembre 2014 a été obtenue par l'actualisation des flux de trésorerie disponibles futurs au coût moyen pondéré du capital (« CMPC ») pour la période de 2015E à 2019E, ainsi qu'une valeur terminale correspondant à un multiple de l'EBITDA 2019E actualisée.

Le Budget révisé pour 2015E préparé par la direction de ND a servi de base pour le chiffre d'affaires, l'EBITDA, l'EBIT et le taux d'imposition effectif retenus pour 2015E. Les flux de trésorerie (investissements et variations du besoin en fonds de roulement) ne sont pas inclus dans le Budget révisé et ont donc été fondés sur le plan d'affaires. De plus il est à noter que 2015E inclus une charge non-récurrente de (39.3)m€ pour un versement complémentaire conditionnel en lien avec l'acquisition de Jacobson Companies en 2014, ce montant n'étant pas reflété comme un passif au bilan.

Pour les années 2016E à 2018E, le plan d'affaires a servi de base pour les prévisions utilisées dans le DCF. Les principales hypothèses sont les suivantes :

- Croissance annuelle du chiffre d'affaires variant de 3.7 % à 3.8 % ;
- Marges d'EBITDA et d'EBIT constantes sur l'ensemble de la période prévisionnelle à 6.9 % et 4.0 % des revenus, respectivement ;
- Taux d'imposition effectif constant sur l'ensemble de la période prévisionnelle à 33.4 % ;
- Investissements représentant 2.6 % du chiffre d'affaires ;
- Variation du besoin en fonds de roulement représentant (0.3) % de la variation du chiffre d'affaires ;

Les prévisions pour 2019E sont fondées sur une extrapolation du plan d'affaires, avec une croissance du chiffre d'affaires en ligne avec les années précédentes et des marges constantes. Le rapport des investissements sur le chiffre d'affaires ainsi que la variation du besoin en fonds de roulement sont également en ligne avec les années précédentes.

- Valeur terminale basée sur un multiple de sortie : établie sur la base de l'EBITDA 2019E et sur un multiple de 7.5x l'EBITDA, soit un multiple supérieur à la médiane des transactions comparables de 7.2x, la moyenne historique des multiples boursiers de VE / EBITDA des 12 derniers mois flottants des sociétés comparables de 7.1x, et également supérieur aux multiples historiques moyens de ND de 5.7x sur les 5 dernières années.

Le CMPC est calculé comme la moyenne pondérée du coût des fonds propres (estimé à partir du Modèle d'Équilibre des Actifs Financiers, « MEDAF ») et du coût de la dette. Le CMPC de ND retenu est de 6.5 %, en lien avec les conditions économique actuelles, et plus particulièrement un environnement de faible taux d'intérêts :

- Prime de marché de 6.0 % (hypothèse globale standard Morgan Stanley) ;
- Taux sans risque correspondant aux taux de rendement obligataire actuel des emprunts publics allemands à 30 ans de 1.6 % ;

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

- Beta de 1.24 basé sur la base de données Barra Global Predicted Beta ;
- Coût de la dette avant impôts basé sur le coupon des obligations 2020 Euro PP de ND de 4.0 % ;
- Taux d'imposition effectif de 33.4 % ;
- Dette nette / capitalisation totale de 39.0 %[6].

Les tables ci-dessous illustrent la sensibilité du cours par action pour un CMPC compris entre 6.5 % +/- 50 points de base ainsi qu'un multiple de valeur terminale de 7.5x l'EBITDA +/- 0.5x.

| Sensibilité du cours de l'action € | | Valeur terminale - multiple | | | | Prime induite sur le Prix d'Offre[1] % | | Valeur terminale - multiple | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 7.0 x | 7.5 x | 8.0 x | | | | 7.0 x | 7.5 x | 8.0 x |
| CMPC | 6.0% | 182.7 | 198.3 | 213.9 | | CMPC | 6.0% | 20.0% | 10.6% | 2.5% |
| | 6.3% | 179.7 | 195.2 | 210.6 | | | 6.3% | 22.0% | 12.4% | 4.1% |
| | 6.5% | 176.8 | 192.0 | 207.3 | | | 6.5% | 24.0% | 14.2% | 5.8% |
| | 6.8% | 173.9 | 189.0 | 204.0 | | | 6.8% | 26.1% | 16.0% | 7.5% |
| | 7.0% | 171.1 | 186.0 | 200.8 | | | 7.0% | 28.2% | 17.9% | 9.2% |

[1] Prix d'Offre avec dividende attaché

Dans le cas central, la valeur terminale représente 76.8 % de la valeur d'entreprise calculée, et correspond à un taux de croissance à l'infini implicite de 0.6 %. Sur la base de cette analyse, la valeur par action selon la méthode DCF est de 192.05€. Le Prix de l'Offre (dividende attaché) induit une prime de 14.2 % par rapport à cette valeur.

A titre indicatif, une valorisation sur la base d'une valeur terminale calculée à partir d'un taux de croissance à l'infini des flux de trésorerie est présentée dans les tables ci-dessous. Ces tables illustrent la sensibilité du cours par action pour un CMPC compris entre 6.5 % +/- 50 points de base ainsi qu'un taux de croissance à l'infini compris entre 0.5% +/- 50 points de base.

| Sensibilité du cours de l'action € | | Valeur terminale - croissance infinie | | | | | Prime induite sur le Prix d'Offre[1] % | | Valeur terminale - croissance infinie | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% | | | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% |
| CMPC | 6.0% | 192.7 | 203.1 | 214.5 | 227.0 | 240.7 | | CMPC | 6.0% | 13.8% | 8.0% | 2.2% | (3.4%) | (8.9%) |
| | 6.3% | 180.9 | 190.4 | 200.8 | 212.1 | 224.5 | | | 6.3% | 21.2% | 15.2% | 9.2% | 3.4% | (2.3%) |
| | 6.5% | 170.0 | 178.8 | 188.2 | 198.5 | 209.7 | | | 6.5% | 29.0% | 22.7% | 16.5% | 10.5% | 4.6% |
| | 6.8% | 159.9 | 168.0 | 176.6 | 186.0 | 196.2 | | | 6.8% | 37.1% | 30.6% | 24.2% | 17.9% | 11.8% |
| | 7.0% | 150.6 | 158.0 | 165.9 | 174.5 | 183.8 | | | 7.0% | 45.7% | 38.8% | 32.2% | 25.7% | 19.3% |

[1] Prix d'Offre avec dividende attaché

---

[6] Dette nette en date du 31 décembre 2014 (selon les états financiers consolidés) sur la capitalisation (selon le prix du marché non affecté en date du 28 avril 2015).

*Note d'information relative à l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle SA*

**4.     PERSONNES RESPONSABLES DU CONTENU DE LA NOTE D'INFORMATION**

**Initiateur**

*« À ma connaissance, les données de la présente note d'information sont conformes à la réalité et ne comportent pas d'omission de nature à en altérer la portée. »*

Le 23 juin 2015

**XPO Logistics France SAS**

Monsieur John Hardig

**Établissement présentateur**

*« Conformément à l'article 231-18 du règlement général de l'AMF, Morgan Stanley, établissement présentateur de l'Offre, atteste qu'à sa connaissance, la présentation de l'Offre qu'il a examinée sur la base des informations communiquées par l'Initiateur, et les éléments d'appréciation du prix proposé, sont conformes à la réalité et ne comportent pas d'omission de nature à en altérer la portée ».*

Le 23 juin 2015

**Morgan Stanley**