# Exhibit 6

# SIMPLIFIED TENDER OFFER

## TARGETING THE SHARES OF



### INITIATED BY

## XPOLogistics

**XPO Logistics France SAS**

## RESPONSE MEMORANDUM PRESENTED BY NORBERT DENTRESSANGLE SA



Pursuant to Article L. 621-8 of the French Monetary and Financial Code and Article 231-26 of its General Regulations, the French Financial Markets Authority (the **"AMF"**) has affixed its visa nr 15-291 dated 23 June 2015 on this response memorandum. This response memorandum was prepared by Norbert Dentressangle SA and engages the responsibility of its signatories.

In accordance with the provisions of Article L. 621-8-1 I of the Monetary and Financial Code, the visa was granted after the AMF has verified "whether the document is complete and comprehensible and whether the information it contains is consistent". It does not imply approval of the suitability of the transaction or authentication of the accounting and financial information presented.

---

**Important Notice**

Pursuant to articles 261-1 *et seq* of the AMF General Regulations, the report of Ledouble SAS as independent expert is included in the present response memorandum

---

Copies of the response memorandum are available on the internet websites of Norbert Dentressangle SA (http://www.norbert-dentressangle.fr) and the AMF (www.amf-france.org) and may be obtained free of charges upon request to:

**Norbert Dentressangle SA**
192, avenue Thiers - 69006 Lyon Cedex 44

Pursuant to article 231-28 of the AMF General Regulations, information relating in particular to the legal, financial and accounting characteristics of Norbert Dentressangle SA will be filed with the AMF and made available to the public no later than on the day preceding the opening of the simplified tender offer.

A financial notice will be issued no later than the day preceding the opening of the simplified tender offer in order to inform the public of the manner in which these documents will be made available.

TABLE OF CONTENTS

I.      REMINDER OF THE CONDITIONS OF THE OFFER .................................................................................3

II.     CONTEXTE ET MOTIFS DE L'OPERATION ..........................................................................................4

        1.      Background for transaction .....................................................................................................4

        (i)     Acquisition by the Offeror of a 66.71% interest in ND .............................................................4

        (ii)    Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers ..................................5

        2.      ND's capital and voting rights allocation on 31 May 2015 .....................................................5

        (i)     Securities giving access to the company's capital (Subscription Warrants) ...............................6

        (ii)    Performance shares ...............................................................................................................7

        3.      ND's capital and voting rights allocation following the Block Acquisition on 8 June 2015 ...........7

        4.      ND's capital and voting rights allocation on the date of the clearance decision .....................8

        (i)     Declarations of thresholds and voting rights crossings .........................................................10

        (ii)    Commitment to participate in the offer ................................................................................10

        (iii)   Regulatory approvals .........................................................................................................10

        5.      Composition of the Supervisory Board ...............................................................................10

III.    OPINION OF NORBERT DENTRESSANGLE'S SUPERVISORY BOARD ................................................11

IV.     INTENTIONS OF NORBERT DENTRESSANGLE'S SUPERVISORY BOARD MEMBERS ...........................13

V.      INTENTIONS OF THE COMPANY WITH REGARD TO TREASURY SHARES ..........................................13

VI.     AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS ISSUE.............13

VII.    ELEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT IN THE EVENT OF A PUBLIC BID ...................13

        1.      Capital structure of the Company ........................................................................................14

        2.      Statutory voting and Share transfer restrictions or agreements clauses brought to the Company's knowledge under article L. 233-11 of the Code de commerce .........................................14

        3.      Direct or indirect stakes in the Company's capital the Company has knowledge of pursuant to articles L.233-7 and L.233-12 of the Code de Commerce ...............................................................15

        4.      List and description of the owners of any equity with special control rights associated with: ....15

        5.      Envisaged control mechanisms in the event of an employee shareholding system deprived of the control rights ......15

        6.      Shareholder agreements that could lead to Share transfer and voting rights restrictions the Company is aware of...........15

        7.      Applicable rules regarding the appointment or replacement of Supervisory Board members and the modification of the Company's articles of association..........................................................16

        8.      Powers of the Supervisory Board, in particular regarding the issue or the repurchasing of equities...............................16

        9.      Impact on the agreements entered into by the Company in the event of a change of control ............................................18

        10.     Agreements providing for the payment of indemnities for Norbert Dentressangle Supervisory Board members, or for employees, in the event of a resignation or a dismissal without actual and serious basis or if their employment is terminated due to a public bid..........................................................18

VIII.   REPORT OF THE INDEPENDENT EXPERT OF ART. 261-1 OF THE AMG GENERAL REGULATIONS................18

IX.     OPINION OF NORBERT DENTRESSANGLE'S GROUP COMMITTEE .....................................................89

X.      PRACTICAL ARRANGEMENTS UNDER WHICH THE INFORMATION CONCERNING THE COMPANY IS MADE AVAILABLE ..89

XI.     PERSONS ASSUMING RESPONSIBILITY FOR THE RESPONSE MEMORANDUM ......................................90

SCHEDULE I. REPORT OF THE CERTIFIED ACCOUNTANT TO THE GROUP COMMITTEE ........................91

## I.  REMINDER OF THE CONDITIONS OF THE OFFER

Pursuant to Title III of Book II, and in particular articles 233-1 2° and 234-2 *et seq* of the AMF General Regulations, XPO Logistics France SAS, a *société par actions simplifiée à associé unique* having a share capital of 10,000 euros, whose registered office is at 23 rue du Roule, 75001 Paris France, registered with the Commercial and companies register of Paris under number 811 597 335 ("**XPO**" or the "**Offeror**"),  a wholly owned subsidiary of XPO Logistics Inc., a company registered in the state of Delaware whose registered office is at Five Greenwich Office Park, Greenwich, Connecticut 06831 (USA) ("**XPO Logistics Inc.**") and, together with XPO, "**XPO Logistics**"), has irrevocably undertaken to the AMF to offer to all of the shareholders of Norbert Dentressangle, a *société anonyme* incorporated under French law having a share capital of 19,672,482 euros divided into 9,836,241 shares with a par value of 2 euros each, whose registered office is located at 192 avenue Theirs - 69006 Lyon, France, registered with the Commercial and companies registrar of Lyon under number 309 645 539  ("**ND**", "**Norbert Dentressangle**" or the "**Company**") and whose shares are traded on both Euronext Paris – Eurolist Compartment A (ISIN FR0000052870; ticker symbol: GND) and Euronext London – Official List to purchase all their shares of ND (the "**Shares**" or the "**Equities**") at a price of 217.50 euros.

In accordance with article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offer follows the acquisition by XPO (i) on 8 June 2015, of 6,561,776 shares from various shareholders of ND by way of off-market block trades (the "**Block Acquisition**") representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company and (ii) on 8 June 2015, of 110,000 Subscription Warrants (as defined hereafter) giving rise to the right to subscribe for 110,000 ND Shares.

XPO holds at the Offer filing date, 6,561,776 ND shares representing 66.71% of the share capital and 66.38% of the theoretical voting rights.

Pursuant to the terms of article 231-13 I of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015. Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings made by the Offeror.

The Offer targets all the shares not directly or indirectly held by the Offeror at the date hereof.

According to articles 237-14 to 237-16 of the AMF General Regulations, the Offeror will request the AMF within 3 months following closing of the Offer, to implement a mandatory squeeze-out process through the transfer of ND shares that it does not own and that would not be presented to the Offer (provided that they do not represent more than 5% of the capital or the voting rights of the Company) at the price of 217.50 euros per share.

## II.   CONTEXTE ET MOTIFS DE L'OPERATION

### 1.   Background for transaction

#### (i)   Acquisition by the Offeror of a 66.71% interest in ND

On 28 April 2015, XPO Logistics, Inc. entered into (i) a share purchase agreement (the "**Share Purchase Agreement**") with Dentressangle Initiatives, Messrs. Norbert Dentressangle and Pierre-Henri Dentressangle and Mss. Evelyne Dentressangle and Marine Dentressangle (the "**Initial Sellers**"), (ii) a tender offer agreement (the "**Tender Offer Agreement**") with the Company and (iii) a letter with the members of the Management Board (the "**Incentive Letter**") setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of the Company.

Pursuant to the Share Purchase Agreement, XPO agreed to acquire from the Initial Sellers 6,561,776 shares, representing about 66.71% of the share capital of ND at a price of 217.50 euros per share (the "**Block Acquisition**"). The purchase price takes into consideration the distribution of a dividend amounting 1.80 euros per share to all ND shareholders prior to the closing of the Block Acquisition.

Further, pursuant to the Tender Offer Agreement and the Incentive Letter, XPO agreed to acquire, at a price of 157.95 euros per warrant, from certain members of the management board of the Company, the share subscription warrants issued to them by the Company, i.e. (i) 80,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant A**") and (ii) 30,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant B**" and, together with the Subscription Warrants A, the "**Subscription Warrants**"), provided the vesting conditions provided in the terms and conditions of such Subscription Warrants be cancelled and the exercise periods be opened in anticipation by decision of the Company's shareholders on the occasion of the shareholders' meeting that was held on 21 May 2015.

Also on 28 April 2015, XPO Logistics, Inc. and the Company announced the Block Acquisition, and XPO Logistics, Inc. also announced that it would launch the acquisition process for all the remaining shares of ND at a price of 217.50 euros per share.

The Company's supervisory board in a meeting held on 27 April 2015, gave a preliminary favourable opinion as to the Block Acquisition and the Offer, and appointed Ledouble SAS, represented by Messrs. Olivier Cretté and Sébastien Sancho, as independent expert in charge of preparing a report regarding the financial terms of a tender offer possibly followed by a mandatory squeeze-out.

On 21 May 2015, the shareholders' meeting of the Company approved the payment of a dividend of 1.80 euros per share made on 2 June 2015 (detachment date on 29 May 2015).

The Company initiated the employee information and consultation process with the committee at Group level immediately following the announcement of the signing of the Share Purchase Agreement. On 28 May 2015, the Group's employee committee rendered an unfavourable opinion on the contemplated Offer.

The settlement and delivery related to the Block Acquisition provided for in the Share Purchase Agreement was made off-market on 8 June 2015.

As a result of the Block Acquisition, the Offeror became the owner of 6,561,776 shares of ND, representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company.

Further, on 8 June 2015, the Offeror acquired the Subscription Warrants at a price per warrant of 157.95 euros, corresponding to the price paid for the shares as part of the Block Acquisition minus the exercise price.

### (ii)   Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers

The Share Purchase Agreement provides for an obligation for the purchaser to ensure that the Company gradually ceases to use the Norbert Dentressangle trade name and brand, the rebranding and change of trade name needing to have been completed within 36 months after the Block Acquisition. Subject to certain conditions, penalties may be due in case of failure to comply with these obligations.

Further, the Share Purchase Agreement provides for 3-year non-compete and non-solicitation obligations bearing upon the Initial Sellers. The Initial Sellers also undertook not to use the Norbert Dentressangle trade name and brand in a business similar to the Company's business for a period of 20 years.

### 2.   ND's capital and voting rights allocation on 31 May 2015

The share capital of ND amounts to 19,672,482 euros, divided into 9,836,241 ordinary shares with a nominal value of 2 euros each.

The table hereafter represents the capital and voting rights prior to the completion of the Block Acquisition, on 31 May 2015.

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[1] |
|---|---|---|---|---|
| Dentressangle Family | 240,482 | 2.44 | 480,944 | 2.96 |
| Dentressangle Initiatives | 6,321,294 | 64.27 | 12,366,694 | 76.26 |
| Officers, employees and public[2] | 3,230,018 | 32.84 | 3,325,298 | 20.50 |
| Including shares held by Norbert Dentressangle SA | 38,578 | 0.39 | 38,578 | 0.24 |
| Including shares held under liquidity arrangement | 5,869 | 0.06 | 5,869 | 0.04 |
| Total | 9,836,241 | 100.00 | 16,217,383 | 100.00 |

**(i)   Securities giving access to the company's capital (Subscription Warrants)**

In addition, as of 8 June 2015, the existing Subscription Warrants giving access to the Company's share capital, were allocated as described in the table below:

| Category | Number granted by the Company | Total Shares (in case of exercise) |
|---|---|---|
| BSA A – Issue of July 2013 | 80,000 | 80,000 |
| BSA B – Issue of July 2013 | 30,000 | 30,000 |
| **Total** | **110,000** | **110,000** |

As mentioned above, on 8 June 2015, 2015 Offeror acquired pursuant to the Tender Offer Agreement and the Incentive Letter, the Subscription Warrants from Messrs. Montjotin (50,000 Subscription Warrants), Bataillard (30,000 Subscription Warrants)[3], Wilson (15,000 Subscription Warrants) and Gomez (15,000 Subscription Warrants) (members of the management board), at a price per warrant of 157.95 euros, this amount corresponding to the per-share price paid for the Block Acquisition minus the exercise price of the Subscription Warrants.

On the occasion of the mixed shareholders' meeting held on 21 May 2015, ND's shareholders had decided to amend the terms and conditions of the Subscription Warrants in order to (i) delete the presence and non-transferability conditions, (ii) anticipate the opening of the exercise

---

[1] In accordance with article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[2] Including 53,500 shares held by members of the Management Board.

[3] It is stated that part of the Subscription Warrants held by Mr. Bataillard and by Mr. Montjotin have been subject to contributions to patrimonial holdings belonging to them and to *inter vivos* distribution (*donation-partage*) to the benefit of their respective children.

period as from 21 May 2015 (with the date of the end of the exercise period provided for at the time of their issue being maintained).

It is also stated that, in accordance with the terms of the Tender Offer Agreement, the management board did not use the authorization to issue Subscription Warrants 2015 to the benefit of Messrs. Malcom Wilson and Luis Angel Gomez, that had been granted to it during the General Meeting held on 21st May 2015.

### (ii)  Performance shares

The following performance shares (*actions attribuées gratuitement*) have been granted by the Company. On 31 May 2015, the following performance shares are still under acquisition period and have not yet been issued, nor delivered to their beneficiaries.

| Category | Number granted by the Company |
|---|---|
| Performance Shares – Grant of May 2013 | 50,100 |
| Performance Shares – Grant of May 2014 | 21,000 |
| Performance Shares – Grant of October 2014 | 30,997 |
| **Total** | **102,097** |

### 3.  ND's capital and voting rights allocation following the Block Acquisition on 8 June 2015

The table below represents the capital and voting rights allocation after the completion of the Block Acquisition on 8 June 2015.

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[4] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6,561,776 | 66.71 | 6,561,776 | 66.38 |
| Officers, employees and public[5] | 3,230,018 | 32.84 | 3,279,575 | 33.17 |
| *Including shares held by Norbert Dentressangle SA* | 38,578 | 0.39 | 38,578 | 0.39 |
| *Including shares held under liquidity arrangement* | 5,869 | 0.06 | 5,869 | 0.06 |
| **Total** | 9,836,241 | 100.00 | 9,885,798 | 100.00 |

**4.   ND's capital and voting rights allocation on the date of the clearance decision**

The table below represents the capital and voting rights allocation on 23 June 2015, taking into consideration share purchases made by XPO since filing of the draft Response Memorandum.

---

[4] Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[5] Including 53,500 shares held by members of the Management Board.

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[6] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6,751,301 | 68.64 | 6,751,301 | 68.29 |
| *Including shares acquired since 11 June 2015* | 189,525 | 1.93 | 189,525 | 1.92 |
| Officers, employees and public[7] | 3,084,940 | 31.36 | 3,134,497 | 31.71 |
| *Including shares held by Norbert Dentressangle SA* | 38,578 | 0.39 | 38,578 | 0.39 |
| *Including shares held under liquidity arrangement* | 5,869 | 0.06 | 5,869 | 0.06 |
| **Total** | 9,836,241 | 100 | 9,885,798 | 100 |

In accordance with the Incentive Letter, XPO Logistics, Inc. offered the following to the beneficiaries of performance shares, being recalled that these performance shares have not yet been issued at the date of the Offer and are therefore not targeted by the Offer.

For beneficiaries of performance-based shares granted in April 2013 and April 2014, which would be delivered in April 2016 and are subject to lockup obligation until April 2018, XPO Logistics, Inc. and the Offeror will propose such beneficiaries to waive these performance-based shares in exchange for a cash bonus (considered as salary) for a gross amount of 217.50 euros per share, to be paid in two equal instalments 1.5 years and 3 years after the completion of the Block Acquisition (subject to no condition of presence, service or performance).

The historical 2013 and 2014 achievements, and the 2015 budget allow to consider that the performances conditions attached to the April 2013 and April 2014 plans will be met.

For beneficiaries of performance-based shares granted in October 2014 to managers of Jacobson (the US subsidiary of the Company acquired on 31 July 2014), and which would vest and be delivered in October 2018, XPO Logistics, Inc. will propose such beneficiaries to cancel these performance-based shares in exchange for the grant of a new plan based on the evolution of the share price of XPO Logistics, Inc. and whose performance targets would take into account integration within the XPO group. The timeframe of this new plan would be at least equal to that

---

[6] Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[7] Including 53,500 shares held by members of the Management Board.

of the performance shares plan that it would replace. The value of grants under this new plan would in any event not be higher than the value the replaced performance shares, by taking into account, on the one hand, the offer price in respect of bonus shares replaced, and secondly, the stock exchange value of the XPO Logistics, Inc. shares, underlying the instruments issued in exchange in order to determine their value.

### (i)   Declarations of thresholds and voting rights crossings

Pursuant to articles 223-11 et seq. of the AMF General Regulations and to articles 233-7 *et seq.* of the *Code de commerce*, the Offeror declared, by letters of today's date to the AMF and to ND, that it had, as a result of the Block Acquisition, crossed upwards on 8 June 2015 2015 all the legal and statutory thresholds comprised between zero and 2/3 of share capital and zero and 50 % of the voting rights of the Company following the execution of the Share Purchase Agreement relating to Block Acquisition.

Conversely, members of the Dentressangle family and Dentressangle Initiatives have declared, by letters of today's date to the AMF and to ND, that they had, acting together in concert, as a result of the Block Acquisition, crossed downwards on 8 June 2015 all legal and statutory thresholds from 2/3 down to zero.

### (ii)   Commitment to participate in the offer

None.

### (iii)   Regulatory approvals

The Offer is not subject to any antitrust approval.

The Block Acquisition has been approved (or holds no objections)  under the competition regimes of Germany and Russia.

The respective clearances or terminations have been granted on 11 May 2015 with respect to the US (early termination) and Germany, and 20 May 2015 in respect of Russia.

### 5.   Composition of the Supervisory Board

Concomitantly with the completion of the Block Acquisition in accordance with the Share Purchase Agreement, Messrs. Norbert Dentressangle, Pierre-Henri Dentressangle, Vincent Menez, Bruno Rousset, Jean Bernard Lafonta and Madame Evelyne Dentressangle resigned from their duties as members of ND's Supervisory Board with effect on 8 June 2015. Such resignations occurred after the supervisory board of ND recommended the Offer as mentioned above.

The supervisory board of the Company met on 8 June 2015 and has co-opted six new members (Messrs. Bradley Jacobs, Troy Cooper, John Hardig, Gordon Devens, Tavio Headley and XPO Logistics, Inc., with Mrs. Angela Kirkby as permanent representative). Mr. Bradley Jacobs has, in addition, been appointed Chairman of the supervisory board, and Mr. Gordon Devens has been appointed Vice-Chairman of the supervisory board.

These co-optations, which took effect on 8 June 2015, will be subject to ratification by the Company's shareholders in general meeting.

The supervisory board of the Company is now composed as follows:

- Mr. Bradley Jacobs, Chairman (also Chairman of XPO Logistics, Inc.),

- Mr. Gordon Devens, Vice-Chairman (employee of XPO),

- Ms. Clare Chatfield (independent member),

- Mr. Henri Lachmann (independent member),

- Mr. Jean-Luc Poumarède (independent member),

- Mr. Françoise-Marie Valentin (independent member),

- XPO Logistics, Inc., represented by Ms. Angela Kirkby,

- Mr. Troy Cooper (employee of XPO),

- Mr. John Hardig (employee of XPO),

- Mr. Tavio Headley (employee of XPO).

### III.    OPINION OF NORBERT DENTRESSANGLE'S SUPERVISORY BOARD

In accordance with the terms of article 231-19 of the AMF General Regulations, members of the Supervisory Board of the Company have met on 8 June 2015 upon convocation made in accordance with the Company's articles of association, in order to consider, before the reformation described under Section II.5, the draft Offer. Except for Mr. Bruno Rousset, all the members of the Board were present, including independent members. Discussions and the vote concerning the opinion of the Supervisory Board have been held under Mr. Norbert Dentressangle's presidency, as Chairman of the Supervisory Board, in accordance with article 22 of the Company's article of associations.

Before the meeting, the following information and documents have been brought to the knowledge of the members of the Supervisory Board:

- The draft information memorandum established by XPO Logistics France SAS, setting forth the characteristics of the draft Offer, most notably, the motives and intentions of the Offeror as well as the elements of appraisal of the price of the Offer established by Morgan Stanley as the Offer's presenting bank;

- The certificate by the independent expert (*Ledouble SAS*) concluding that the price offered, 217.50 euros per share of the Company, is fair with regard to the Company's minority Shareholders, including in the perspective of a mandatory squeeze-out process;

- The draft response memorandum established by the Company.

The Supervisory Board, in addition, has noted that the prior group committee information and consultation procedure on the undertakings contemplated in the context of the Offer has ended on 28 May 2015, the group committee having issued an unfavorable opinion.

The following opinion has been adopted unanimously by the members of the Supervisory Board, including its independent members:

*« After discussion, and after having seen the above-mentioned documents, the members of the Supervisory Board find that:*

- *The price offered to the Company's shareholders, 217.50 euros per share, represents a (34%(35% attached coupon) premium price compared to the market value at the closing of the stock exchange on 27th April 2015, amounting 162.10 euros, prior to the announcement of the main characteristics of the draft Offer.*

- *The offered price in the Offer is identical to the purchase price payable by XPO Logistics to the controlling shareholders of Norbert Dentressangle in order to acquire Norbert Dentressangle's equity block representing 66.71% of Norbert Dentressangle's capital;*

- *The independent expert has noted that the price of the Offer unlocks a premium with regard to all the evaluation criteria used and that this price is fair, from a financial point of view, for Norbert Dentressangle's shareholders in the perspective of a mandatory squeeze out process;*

- *XPO Logistics is one of the US leaders in the transportation and logistics sector in North America : its development, which has seen a substantial growth, has relied during the past few years on external growth operations. XPO Logistics enjoys solid positions in the transportation industry in the US, as well as in the highly technological and sophisticated contract logistics industry.*

- *XPO Logistics foresees that this acquisition will generate substantial opportunities for cross-selling within the new group. Norbert Dentressangle's current clients will be able to benefit from a single point of entry in order to be provided with a global scale assistance in the management of their supply-chain, and will have access to XPO Logistics France SAS' first class services in North America;*

- *XPO Logistics intends to make Norbert Dentressangle its European development platform. XPO will set up in Europe its freight optimization proprietary platform in order to improve the transporters' sourcing and the customer service. XPO also intends to realize substantial growth investments in its new European activities, in particular technological development ;*

- *Norbert Dentressangle and XPO Logistics have found no meaningful cost synergies, mainly due to the low business overlap in Europe and the complementarity of the respective US operations of Norbert Dentressangle and XPO Logistics. Most of the expected synergies come from the cross-selling opportunities. As a consequence, the alliance between the two companies should preserve the integrity of Norbert Dentressangle's current activities and level of employment.*

- *The Offer is driven by a strategy of continuing the Company's business and development. In this respect, XPO Logistics intends to continue practically the entirety of Norbert Dentressangle's management, at the benefit of which incentive programs will be set up. XPO Logistics will also maintain at its current level the number of full time employees in France, during a minimum period of 18 months after the completion of the acquisition. XPO Logistics considers that the integration between the two companies should not result in a substantial modification of the individual and collective status of Norbert Dentressangle's and its subsidiaries' employees.*

- *XPO Logistics intends to maintain Norbert Dentressangle's European decision centers in France, in Lyon for the registered office, Malakoff (Hauts-de-Seine) for the logistics business and Beausemblant (Drôme) for the transportation business, for a 5 years period starting from the block acquisition.*

- *If the minority shareholders do not own more than 5% of the Company's capital or the voting rights after the completion of the Offer, the Offeror will implement a mandatory squeeze-out process in return for which a compensation equivalent to the price of the Offer will be paid and, if the necessary conditions to implement the squeeze out are not met, does not intend to withdraw the Company's shares from the Parisian stock exchange during the 12 months following the Offer, but reserves the possibility to consider their withdrawal from the London stock exchange and will consider the best ways to integrate the Company within the new group, including through mergers or contributions.*

*In view of these elements, after discussion, the Supervisory Board including the independent members unanimously issues a favorable opinion to the draft Offer as presented and regards the Offer as complying with the best interests of the Company, its shareholders and its employees.*

*In view of the immediate liquidity opportunity represented by this offer, made at a very attractive price, even in the event of the implementation of a squeeze-out process, the Supervisory Board, including the independent members, unanimously advices the Company's shareholders to tender their shares to the Offer.*

*In this respect, members owning Norbert Dentressangle shares but whose shares are not included in the Block Acquisition, indicated intent to tender their shares to the Offer, except for those whose holding is compulsory under the articles of association.*

*In addition, the Supervisory Board decides that the 44,447 self-owned Company's shares will not be tendered to the Offer, in accordance with the terms of the Tender Offer Agreement.".*

## IV.   INTENTIONS OF NORBERT DENTRESSANGLE'S SUPERVISORY BOARD MEMBERS

The members of Norbert Dentressangle's Supervisory Board who are not parties to the Share Purchase Agreement indicated intent to tender the mentioned Shares to the Offer except for those whose holding is compulsory under the articles of association.

## V.   INTENTIONS OF THE COMPANY WITH REGARD TO TREASURY SHARES

In accordance with the Tender Offer Agreement, the Supervisory Board has decided to not tender to the Offer the 44,447 self-owned Shares.

## VI.   AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS ISSUE

Except for the Share Purchase Agreement and the Tender Offer Agreement, there is no agreement that could have a significant impact on the assessment of the Offer or its issue.

## VII.   ELEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT IN THE EVENT OF A PUBLIC BID

1. **Capital structure of the Company**

Norbert Dentressangle's capital, amounting 19,672,482 euros, is divided into 9,836,241 Shares having a nominal value of 2 euros each, fully paid-up and all pertaining to the same category.

Immediately prior to the completion of the Block Acquisition Norbert Dentressangle's capital was allocated as described in Section II.1 above.
Following the Block Acquisition, as of the date hereof, the share capital and voting rights of Norbert Dentressangle are allocated as follows:

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[8] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6,751,301 | 68.64 | 6,751,301 | 68.29 |
| *Including shares acquired since 11 June 2015* | 189,525 | 1.93 | 189,525 | 1.92 |
| Officers, employees and public[9] | 3,084,940 | 31.36 | 3,134,497 | 31.71 |
| *Including shares held by Norbert Dentressangle SA* | 38,578 | 0.39 | 38,578 | 0.39 |
| *Including shares held under liquidity arrangement* | 5,869 | 0.06 | 5,869 | 0.06 |
| **Total** | 9,836,241 | 100 | 9,885,798 | 100 |

2. **Statutory voting and Share transfer restrictions or agreements clauses brought to the Company's knowledge under article L. 233-11 of the *Code de commerce***

No statutory restriction is applicable to the voting rights or Share transfer. Article 9 of the Company's articles of association provides that if the threshold of 2%, or any multiple of that number until the threshold of 50%, of the capital or voting rights is crossed in the upwards or downwards direction, every shareholder acting on their own or jointly, is obligated to inform the Company no later than on the fourth day of negotiation after the day of the crossing of each threshold, by registered letter with an acknowledgement of receipt.

---

[8] Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[9] Including 53,500 shares held by members of the Management Board.

Failure to comply with this obligation can lead to the Shares exceeding the undeclared fraction to be deprived of their voting rights in any shareholders meeting held until a two years delay after the regularization of the notification being recorded in the minutes of the General Meeting

This sanction can only be implemented upon a request registered in the minutes of the General Meeting by one or more shareholders owning more than 5% of the capital or the voting rights of the Company.

No agreement in force has been brought to the Company's knowledge under article L.233-11 of the *Code de commerce*.

3. **Direct or indirect stakes in the Company's capital the Company has knowledge of pursuant to articles L.233-7 and L.233-12 of the *Code de Commerce***

After the Block Acquisition, the Offeror owns 6,561,776 Shares representing as many voting rights, 66.71% of the capital and 66.38% of the voting rights (calculated on the basis of 9,836,241 Shares representing 9,885,798 voting rights, calculated in accordance with article 223-11 of the AMF General Regulations.)

To the knowledge of the Company, the following shareholder owns more than 2% of its capital or voting rights at the date hereof:

- Financière de l'Echiquier has declared on 30th March 2015 that it owned 483,055 Shares representing as many voting rights, 4.91% of the capital and 2,93% of the voting rights, on behalf of funds whose management its taking care of.

4. **List and description of the owners of any equity with special control rights associated with:**

Article 9 of the Company's articles of association provides for the granting of a double voting right for the holders of nominative and fully paid-up Shares when these shares are registered for at least four (4) years in the name of the same holder.

Any conversion into bearer shares or transfer of the ownership of the Shares leads to the deprivation of the double voting right unless the transfer is made to an entitled rightholder following a succession, a liquidation of a community of assets between spouses, a donation *inter vivos (donation-partage)* in favor of a spouse or a relative entitled to inherit, which does not interrupt the necessary double voting right acquisition delay.

5. **Envisaged control mechanisms in the event of an employee shareholding system deprived of the control rights**

The Company has no knowledge of any control mechanism in place in an employee shareholding system deprived of the control rights.

6. **Shareholder agreements that could lead to Share transfer and voting rights restrictions the Company is aware of**

The Company is not aware of any in place shareholder agreement that could lead to Share transfer or voting rights restrictions.

7.   **Applicable rules regarding the appointment or replacement of Supervisory Board members and the modification of the Company's articles of association**

Except for the obligation for any member of the Supervisory Board to hold more than hundred (100) shares of the Company, under articles 6 III and 19 of the Company's articles of association, no statutory clause provides for any terms other than the applicable law with regards to the appointment and replacement of the Supervisory Board members and the modification of the Company's articles of association.

8.   **Powers of the Supervisory Board, in particular regarding the issue or the repurchasing of equities**

Apart from the general powers provided for by the applicable law and the articles of association, the Company's Supervisory Board has the following powers:

| Date of the meeting which granted or modified the authorization | Content of the authorization | Final date of validity | Effective use of these authorizations | Maximum amount allowed |
|---|---|---|---|---|
| 21 May 2015 (10th resolution) | Issue of securities giving access to the capital with shareholders' pre-emptive subscription right being maintained | 20 July 2017 | · | Upper limit for increases in the capital: 20 000 000 E Upper limit for debt securities: 500 000 000 € |
| 21 May 2015 (11th resolution) | Issue of securities giving access to the capital without a shareholders' pre-emptive subscription right | 20 July 2017 | | Upper limit for increases in the capital: 20 000 000 € Upper limit for debt-securities: 500 000 000 € |
| 21 May 2015 (12th resolution) | Issue of securities giving right to debt securities  or to increase the capital as part of an offer described in section II of article L. 411-2 of the *Code monétaire et financier* | 20th July 2017 | | Upper limit for increases in the capital: 20 % of the capital a year. Upper limit for debt securities: 500 000 000 € |
| 21 May 2015 (13th resolution) | Authorization for the Management Board to fix the price in accordance with the terms decided by the General Meeting in the event of an issue without pre-emptive subscription right | 20th July 2017 | | 10 % of the capital |
| 21 May 2015 (14th resolution) | Increase in the number of securities to be issued in the event of an increase in the capital with or without pre-emptive subscription right | 20 July 2016 | | 15% of the initial issue |

| | | | | |
|---|---|---|---|---|
| 21 May 2015 (15th resolution) | Increase in the capital through incorporation of premiums, reserves, benefits or else. | 20 July 2016 | | Upper limit for increases in the capital: 20 000 000 € |
| 21 May 2015 (16th resolution) | Issue of ordinary shares, securities giving access to the capital, without shareholders' pre-emptive subscription right, in consideration for contributions in kind concerning equities or securities giving access to the capital. | 20 July 2016 | | 10% of the capital |
| 21 May 2012 (23rd resolution) 23 May 2013 (13th resolution) | Authorization to grant free-shares. | 38 months starting from 21 May 2014, or, failing that from the General Meeting deciding on the account closed on 31 December 2014. | Share granted by the Management Board (24/04/2013, then on the 23/04/2014 and on the 20/10/2014) subject to performance ad presence conditions | Upper limit for granting fixed at 2% of the capital |
| 21 May 2015 (17th resolution) | Increase in the capital reserved for employees under the terms of the *Code de commerce* and articles L.3332-18 *et seq* of the *Code du travail.* | | | 393 000 €. |
| 23 May 2013 (9th resolution) | Issue of 110 000 subscription warrants at the benefit of the named persons | | Issue of 110 000 subscription warrants (Decision by the Management Board on the 29/07/2013) and subscription by the beneficiaries. | 110 000 subscription warrants — Authorization fully used. |
| 21 May 2015 (9th resolution) | Cancellation of the shares acquired by the Company and corresponding decrease in the share capital. | 20 May 2017 | | 10% of the share capital |
| 21 May 2015 (18th resolution) | Issue of subscription warrants for new shares and / or existing shares at the benefit of the named persons, with elimination of the pre-emptive subscription right. | 30 September 2015 | | 20,000 subscription warrants |

9. **Impact on the agreements entered into by the Company in the event of a change of control**

Some agreements include a change of control provision that can lead to the termination of the said agreement, and will as a consequence be subject to a refinancing by the Offeror in the agreed delays provided for in the terms of each one of these agreements. This is, *inter alia*, the case for the following agreements:

-   Multi-currency Revolving Credit Facility entered into on 23rd December 2013 for a maximum amount of 400,000,000€;

-   Credit contract entered into on 1st August 2014 for a maximum amount of 250,000,000€;

-   Credit contract EURO PP entered into on 5th February 2013 for a maximum amount of 75,000,000€;

-   EURO PP Bonds for 75.000.000€ at 3.80 per cent issued by Norbert Dentressangle, due on 20th December 2019 pursuant to a 18th December 2013 prospectus;

-   EURO PP Bonds for 160.000.000€ at 4.00 per cent issued by Norbert Dentressangle, due on 20th December 2020 pursuant to a 18th December 2013 prospectus.

Some commercial agreements entered into by the Company and/or its subsidiaries include provisions granting the client or the counterparty the right to terminate the agreement in the event of a change of control.

To date, no co-contractor has made known to the Company its intent to terminate the agreement due to the change of control.

10. **Agreements providing for the payment of indemnities for Norbert Dentressangle Supervisory Board members, or for employees, in the event of a resignation or a dismissal without actual and serious basis or if their employment is terminated due to a public bid**

There is no agreement creating any obligations to pay compensations to managers or employees in the event of a resignation or of a dismissal without actual or serious basis, or in the event of a public bid targeting the Company's shares within the Company or its subsidiaries.

## VIII. REPORT OF THE INDEPENDENT EXPERT OF ART. 261-1 OF THE AMG GENERAL REGULATIONS

# Ledouble

# NORBERT DENTRESSANGLE

**Simplified Public Tender Offer
followed by a Squeeze-Out
initiated by XPO Logistics France SAS**

-=-

# FAIRNESS OPINION

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

With a view to the Simplified Public Tender Offer followed by a Squeeze-Out ("**the Offer**" or "**the Transaction**") initiated by XPO Logistics France SAS[10] ("**XPO**" or "**the Offeror**") concerning shares in Norbert Dentressangle SA ("**Norbert Dentressangle**", "**the Company**" or "**the Target**"), Ledouble SAS ("**Ledouble**") has been asked, in its capacity as independent appraiser as appointed by the Company's Supervisory Board on 27 April 2015, to give an opinion on the fairness of the Offer price of **€217.50** per share (ex-dividend of €1.80).

## Regulatory framework

The appointment of Ledouble falls within the framework of the requirements of Article 261.1 I 1°[11] and 2°[12] and II[13] of the AMF General Regulations and implementing instruction n° 2006-08, in turn also subject to the AMF's recommendations of 28 September 2006[14].

This fairness opinion is to be understood within the meaning of Article 262-1.I[15] of the AMF General Regulations.

## Independence

Ledouble is independent of the Company, the Offeror, the sponsoring bank for the Offer[16] and the legal[17] and financial[18] advisors of the parties (the legal advisors of the Company and the Offeror and the financial advisor of the Company are hereinafter referred to as "**the Advisors**"):

Ledouble does not have any legal or financial ties to the aforementioned parties;

---

[10] A wholly-owned subsidiary of XPO Logistics, Inc. (« **XPO Logistics** »), registered in Delaware, registered office Five Greenwich Office Park, Greenwich, Connecticut 06831 (United States), whose shares are traded on the New York Stock Exchange (NYSE : XPO).

[11] The Target shall be controlled by the Offeror within the meaning of Article L.233-3 of the French Commercial Code prior to the launch of the Transaction.

[12] Where there are agreements between the senior managers of the Target and the Offeror.

[13] With a view to the implementation of a squeeze-out.

[14] Recommendations amended on 19 October 2006 and 27 July 2010.

[15] Excerpt from Article 262-1.I of the AMF General Regulations: *"The independent appraiser prepares a report on the financial terms of the offer or transaction. Content requirements for the report are set out in an AMF instruction. In particular, the report contains the statement of independence..., a description of the verifications performed and a valuation of the company in question. The report's conclusion takes the form of a fairness opinion."*

[16] Morgan Stanley.

[17] Bredin Prat as legal advisor to the Company, and Wachtell, Lipton, Rosen & Katz and Darrois Villey Maillot Brochier as legal advisors to the Offeror.

[18] Rothschild and JP Morgan as financial advisors to the Company.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- There are no conflicts of interest within the meaning of Articles 261-4 of the AMF General Regulations and AMF instruction n° 2006-08 as mentioned above; for information only, **appendix 6** provides a list of the most recent independent appraisals and financial analysis performed by Ledouble, showing the sponsoring banks for the transactions concerned[19];

- We believe that the assignment for which we have been appointed does not require us to work repeatedly with the sponsoring bank and the Advisors[20].

In accordance with Article 261-4 of the AMF General Regulations, we certify that there are no known past, present or future ties with the persons concerned by the Offer and the Advisors that could compromise our independence or impair the objectivity of our assessment when carrying out the appraisal; we have therefore been able to perform our duties with full independence.

The skills of the team that performed the appraisal are mentioned in **appendix 5.**

**Procedures performed**

We carried out our procedures in accordance with the requirements of Articles 262-1 et seq. of the AMF General Regulations, implementing instruction n° 2006-08 of 25 July 2006 concerning independent appraisals and the AMF's recommendations of 28 September 2006[21]. The programme of work to be carried out and the amount of fees received within the framework of this assignment are stated in **appendix 1**. The timetable for our involvement is provided in **appendix 2.**

The documents used to support our work are listed in **appendix 4.**

The procedures performed consisted primarily of familiarising ourselves with the business activities and market conditions of the Company and its subsidiaries (the "**Group**") and, following diagnosis based on this information, carrying out a multi-criteria valuation of the Group, as well as analysis of the premium resulting from the Offer price of €217.50 per share (ex-dividend of €1.80) using different valuation criteria.

---

[19] This declaration of independence applies to everyone at Ledouble, profiles provided in **appendix 5**.

[18] Within the meaning of Article 261-4 I of the AMF General Regulations.

[21] AMF recommendation n°2006-15 "Independent appraisal within the framework of financial transactions"; document created on 28 September 2006, amended on 19 October 2006 and 27 July 2010.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

These procedures concerned in particular:

- briefings and meetings with the persons in charge of the Transaction within the Group, members of the Company's Management Board and Supervisory Board, as well as with the Boards and representatives of the Offeror and the sponsoring bank. A list of contacts is provided in **appendix 3**;

- analysis of the means by which the Offer will take place, on the basis of these interviews and draft offer documents (*"note d'information"*) from the Offeror and the offer document in response from the Target intended for the AMF;

- review of agreements signed within the framework of the Offer[22];

- review of financing arrangements for the Controlling Interest[23] and the Offer;

- use of public and regulated information concerning the Company and XPO Logistics;

- identification of the key events in the life of the Company over the last few years and the current year;

- use of recent market and sector research within the Group's field of business;

- analysis of reports by brokers covering Norbert Dentressangle and XPO Logistics;

- analysis of other information relating to the Group taken from our own databases, in particular analysts' reports and consensus forecasts, as well as investment multiples taken from a sample of companies deemed to be comparable as set out in **appendix 7** and **appendix 8**;

- factoring into our intrinsic[24] and analogical[25] valuation models forward-

---

[22] In particular the Share Purchase Agreement ("**SPA**") signed on 28 April 2015 concerning the sale to XPO of the shares held by Mr Norbert Dentressangle and his family, and the Tender Offer Agreement ("**TOA**") signed on 28 April 2015 between the Company and the Offeror.

[23] The term Controlling Interest is defined in section 1.7.1.

[24] Discounted cash flow (DCF).

[25] Application of investment multiples to business plan indicators.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

looking data taken from the business plan prepared by the Company's management, upon which we performed detailed and contradictory analysis, in collaboration with our contacts within the Group;

- analysis of the terms of transactions carried out by the Company prior to the Offer and the resulting valuation multiples;

- review of the work done by the sponsoring bank and comparison of its multi-criteria valuation with our own work.

**Assertions obtained and limitations of our assignment**

We obtained confirmation from the management team of the Target and representatives of the Offeror concerning the absence of:

- information that may affect the objectivity of the Offer price and substantially alter the value of the shares concerned by the Offer;

- any mechanisms that may be similar to an earnout payment that may not benefit minority shareholders and which may have been agreed at the time of the purchase of the Controlling Interest prior to the Offer.

We received confirmation that the documents listed in the offer documents intended for the AMF reflect all of the commitments made with regard to all shareholders in respect of the Offer.

In accordance with usual practice for independent appraisals, the purpose of our valuation work was not to validate the historic and forward-looking information used, for which we restricted ourselves to verifying the plausibility and consistency of this information. In this regard, we believed that all of the information provided to us within the framework of our assignment was reliable and transmitted in good faith, in particular budgets and forecasts.

This report is not intended as a recommendation of the Offer.

**Report structure**

We shall look at:

- the terms of the Offer (section 1);

- the Group's business activities and market conditions (section 2);

- our multi-criteria valuation of the Norbert Dentressangle shares (section 3);

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- our analysis of agreements signed within the framework of the Offer (section 4);

- our observations concerning valuation information from the sponsoring bank (section 5).

The conclusion constitutes the fairness opinion for shareholders concerned by the Offer (section 6).


**Method of presentation**

The amounts presented below may be expressed in:

- euros (€/currency);

- thousands of euros (€'000/currency);

- millions of euros (€m/currency);

- billions of euros (€bn/currency).


Cross-references between sections of the report are shown in brackets.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 1 ABOUT THE OFFER

## 1.1 Companies taking part in the Offer

### 1.1.1 Target

Norbert Dentressangle, whose shares are the object of the Offer, is a public limited liability company ("*société anonyme*") with share capital of €19,672,482 divided into 9,836,241 shares with a par value of €2, registered office 192 Avenue Thiers in Lyon (69006).

The Company, whose shares are listed on Euronext Paris (compartment A)[26] and Euronext London[27], is represented by Mr Hervé Montjotin, Chairman of the Management Board.

With over 42,000 employees and revenues of €4.7bn in 2014, generated primarily in France and the United Kingdom, the group - of which Norbert Dentressangle is the ultimate parent company (the "**Group**") - is a world market leader in logistics, transportation, freight brokerage and global forwarding services.

Since it was founded in 1979, the Group has expanded gradually partly via a number of acquisitions, including that of logistics and transportation operator Jacobson Companies ("**Jacobson**") in the United States in July 2014. It currently runs one of the largest transportation networks in Europe.

### 1.1.2 Offeror

XPO is a wholly-owned subsidiary of XPO Logistics, the parent company of the XPO Group[28], one of the leading US transportation and logistics companies in North America. Its expansion over the last few years has been founded on acquisitions.

With around 10,000 employees, the XPO Group generated revenues of USD 2.4bn in 2014, primarily in the United States, of which USD 2.1bn can be attributed to the Transportation operating segment[29].

---

[26] Under code FR0000052870.

[27] Stock code: GND.

[28] The "**XPO Group**" consists of XPO Logistics and its subsidiaries.

[29] The Logistics operating segment, which generated revenues of USD 0.2bn in 2014, was only created recently following the acquisition of New Breed in September 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**1.2    Aims of the Offer and intentions of the Offeror**

Thanks to the strategic fit between the services offered and geographical presence of the Group and the Offeror, the merger - which was made public on 28 April 2015 by XPO Group[30] and the Company[31] - should allow for commercial synergies in relation to a large portfolio of international clients.

However, the Offeror has not made any estimates concerning potential synergies from the merger.

**1.3    Breakdown of share capital and voting rights before the Offer**

*1.3.1    Number of shares and voting rights*

At 31 May 2015, following the prior transfers of shares described below (Section 1.7.3), the number of outstanding shares and the number of theoretical voting rights of Norbert Dentressangle broke down as follows:

**Share capital and voting rights**

| | Number of shares | % of share capital | Theoretical voting rights | % of voting rights |
|---|---|---|---|---|
| Dentressangle Initiatives | 6,321,294 | 64.27% | 12,366,694 | 76.26% |
| Pierre-Henri Dentressangle | 120,241 | 1.22% | 240,472 | 1.48% |
| Marine Dentressangle | 120,241 | 1.22% | 240,472 | 1.48% |
| **Dentressangle family** | **6,561,776** | **66.71%** | **12,847,638** | **79.22%** |
| Employees | 92,533 | 0.94% | 121,526 | 0.75% |
| Free float | 3,137,485 | 31.90% | 3,203,772 | 19.76% |
| Treasury stock #1 (a) | 38,578 | 0.39% | 38,578 | 0.24% |
| Treasury stock #2 (b) | 5,869 | 0.06% | 5,869 | 0.04% |
| **Total** | **9,836,241** | **100%** | **16,217,383** | **100%** |

*(a)     Allocated to covering stock options or bonus shares.*
*(b)     Under the liquidity agreement.*

---

[30]   XPO Logistics press release. [Online], http://investors.xpologistics.com/phoenix.zhtml?c=204615&p=irol-newsArticle_print&ID=2041131

[31]   Norbert Dentressangle press release. [Online],http://www.norbert-dentressangle.fr/Actualites-en-France/Acquisition-de-Norbert-Dentressangle-par-XPO-Logistics

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 1.3.2   *Instruments giving access to share capital*

Instruments giving access to share capital consisted of (i) stock warrants held by members of the Management Board and (ii) performance share plans awarded to European managers of Norbert Dentressangle and former US managers of Jacobson.

### 1.3.2.1   *Stock warrants ("Warrants")*

At 31 May 2015, the Company's 110,000 outstanding warrants, issued on 29 July 2013, comprised 80,000 "2013 A" warrants and 30,000 "2013 B" warrants and broke down as follows between the various beneficiaries, who are members of the Management Board[32]:

**Breakdown of 2013 warrants**

|  | A warrants | B warrants | Total |
|---|---|---|---|
| Mr. Hervé Montjotin and family | 30,000 | 20,000 | 50,000 |
| Mr. Patrick Bataillard and family | 20,000 | 10,000 | 30,000 |
| Mr. Malcom Wilson | 15,000 | - | 15,000 |
| Mr. Luis Angel Gomez | 15,000 | - | 15,000 |
| **Total** | **80,000** | **30,000** | **110,000** |

---

[32] Prior to the Transaction, a portion of the warrants held by Mr Bataillard and Mr Montjotin were transferred to holding companies belonging to them and assigned to their respective children.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The 19th resolution of the general shareholders' meeting of 21 May 2015 amended the terms and conditions of these warrants as defined at the time they were issued, resulting in:

- the lifting of the dual exercise condition: at the date of exercise, holders of warrants are no longer subject to the obligation (i) to hold the office of member of the Management Board within the Company and (ii) not to be involved, either as plaintiff or defendant, in an arbitration or judicial body with the Company or one of its subsidiaries;

- bringing forward the start of the exercise period for "2013 A" and "2013 B" warrants to 21 May 2015[33]; the date of the end of the exercise period as stated at the time the warrants were issued remains unchanged, i.e. 31 May 2019 and 31 May 2021 respectively;

- making them immediately transferable.

### 1.3.2.2   *Performance share plans*

At 31 May 2015, performance share plans in force broke down as follows:

**Performance shares**

| Plan | 31-Dec.-14 | Change | 31-May-15 |
|---|---|---|---|
| April 2013 | 52,300 | (2,200) | 50,100 |
| April 2014 | 21,500 | (500) | 21,000 |
| October 2014 | 37,663 | (6,666) | 30,997 |
| **Total** | **111,463** | **(9,366)** | **102,097** |

---

[33] At the time of issue, "2013 A" and "2013 B" warrants were supposed to be exercisable as of 1 June 2016 and 1 June 2019 respectively.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The April 2013[34] and April 2014[35] plans are the two tranches of a long-term incentive programme intended for European staff, introduced to accompany the achievement of the Group's 2013-15 three-year business plan:

- the April 2013 plan is targeted at around 200 managers and key employees of the Group, with the aim of awarding shares to each beneficiary at the end of a vesting period of three years (from 1 May 2013 to 30 April 2016), subject to achieving the target of an average ratio of Group EBITA[36] to revenues over the period from 2013 to 2015 of 3.25% or more;

- the April 2014 plan concerns around 40 people, with shares awarded at the end of a vesting period of two years (from 1 May 2014 to 30 April 2016), subject to achieving a Group EBITA target in 2015 of €213m or more. If this target is 80-100% achieved, the number of shares awarded is proportionally adjusted on a straight-line basis.

For beneficiaries resident in France, the vesting period is followed by a lock-up period of two years (from 1 May 2016 to 30 April 2018).
On the basis of the performances achieved in 2013 and 2014 and the latest forecasts for 2015, it can be considered that the performance conditions attached to the April 2013 and April 2014 plans should be respected.

Following the acquisition of Jacobson, the Company decided in October 2014[37] to extend the Incentive Programme to 12 US managers of Jacobson, with the awarding at the end of a period of four years, i.e. on 21 October 2018, subject to performance conditions, of a maximum of 3,333 bonus shares in the Company (1,333 under tranche A and 2,000 under tranche B):

- tranche A is subject to Jacobson's US operations achieving annual operating income of USD 84.7m or more over the period from 2015 to 2017;

- tranche B is subject to a dual performance condition, (i) firstly, achieving the tranche A performance condition for each year from 2015 to 2017 and (ii)

---

[34] Management Board decision of 24 April 2013.

[35] Management Board decision of 23 April 2014.

[36] Earnings before interest, taxes and amortisation.

[37] Management Board decision of 20 October 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

secondly, Jacobson's US operations achieving annual operating income of USD 92.2m of more in 2017. If this target is 90-100% achieved, the number of shares awarded is proportionally adjusted on a straight-line basis.

The awarding of performance shares in respect of the various plans is subject to the employee working for the Group at the date of award.

### 1.3.2.3  Specific treatment of dilutive instruments before the Offer

Under an agreement between XPO Logistics[38] and all members of the Management Board[39] ("**Profit-Sharing Plan**"), annexed to the TOA described below (Section 1.7.2), between now and the offer the aforementioned dilutive instruments are to be treated as follows:

- for warrants, XPO has agreed to purchase, within five working days following the change of control of the Company, and in any case before the Offer, all of the "2013 A" and "2013 B" warrants still outstanding, at a price of €157.95, equal to the Offer price of €217.50 (ex-dividend of €1.80) less the exercise price of €59.55; the vesting date for these warrants is 8 June 2015;

- for performance shares, the Company shall ask beneficiaries of the various plans to waive their right and in return shall grant (i) for European managers under the April 2013 and April 2014 plans, payment of a cash bonus of €217.50 per share[40] and (ii) for US managers under the October 2014 plan, the awarding of restricted stock units of which the underlying instruments are XPO Logistics' shares on the basis of an exchange based on a value of the Company's shares equivalent to the Offer price and a market value of the XPO Logistics shares according to its share price. The time frame for this new plan shall be at least equal to that of the Company plan it is due to replace[41].

---

[38] Represented by Mr Bradley S. Jacobs, in his capacity as Chairman and Chief Executive Officer.

[39] Mr Hervé Montjotin, Mr Patrick Bataillard, Mr Luis Angel Gomez, Mr Malcom Wilson and Mr Ludovic Oster.

[40] The sum will be paid within three years of the acquisition of the Controlling Interest, 50% of which will be within 18 months.

[41] October 2014 plan.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 1.4 Scope of the Offer

The Offer concerns a maximum of 3,230,018 shares corresponding to all shares making up the Company's share capital, i.e. 9,836,241 shares (Section 1.3.1), with the exception of (i) the 6,561,776 shares representative of the Controlling Interest (Section 1.7.1) to be purchased on 8 June 2015 by XPO and (ii) the 44,447[42] treasury shares (Section 1.3.1) not tendered to the Offer.

However, the Offer does not concern the 110,000 2013 warrants (Section 1.3.2.1) to be purchased by XPO prior to the Offer, or the 102,097 performance shares while they are still in their vesting period (Section 1.3.2.2).

## 1.5 Squeeze-out, intentions in terms of merging and integration

The terms of the squeeze-out and the intentions of the merging and integration of the Company are set out in Sections 1.3.5. and 1.3.6. of the draft offer document prepared by XPO. If the conditions required for a squeeze-out are not met, the Offeror:

- does not intend to delist the Company's shares in Paris[43] within the 12 months following the Offer, but reserves the right to consider delisting them in London[44];

- shall review the best way of integrating the Company into the new group, in particular by means of mergers or transfers of assets.

## 1.6 Financing of the Offer

XPO will finance the Transaction from its equity and by means of shareholder loans. XPO Logistics recently carried out a USD 1.26 billion capital increase[45] and a bond issue of about USD 2 billion [46].

---

[42] 38,578 shares allocated to covering stock options and bonus shares and 5,869 shares in respect of the liquidity agreement.

[43] Euronext Paris (compartment A).

[44] Euronext London.

[45] XPO Logistics press release, 1 June 2015. [Online], http://www.xpologistics.com/content/xpo-logistics-raises-126-billion-equity

[46] XPO Logistics Press release, 1 June 2015. [Online], http://www.xpologistics.com/content/xpo-logistics-announces-proposed-20-billion-us-dollar-equivalent-senior-notes-offering

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**1.7    Agreements signed within the framework of the Offer**

*1.7.1   SPA*

Under the memorandum of understanding signed on 28 April 2015 with Dentressangle Initiatives ("**DI SAS**")[47] and members of the Dentressangle family[48], XPO Logistics via its subsidiary XPO has made a commitment to purchase irrevocably all of the 6,561,776 shares in the Company ("the **Controlling Interest**") held directly or indirectly by the Dentressangle family, representing 66.71% of share capital and 79.22% of voting rights of the Company (Section 1.3.1).

Under the terms of the SPA, the planned purchase of the Controlling Interest at the price of €217.50 per share (ex-dividend of €1.80) should take place within five working days of obtaining approval from US and German competition authorities[49], but may not be before 2 June 2015, the payment date of the €1.80 dividend proposed at the general shareholders' meeting of 21 May 2015.

Agreement was obtained from US and German authorities on 11 May 2015. Agreement from the Russian authorities, which was not a condition precedent for the acquisition of the Controlling Interest, was obtained on 20 May 2015.

As of the date of purchase of the Controlling Interest, i.e. 8 June 2015, the SPA provides for:

- The obligation for the XPO Group to ensure that the Company gradually ceases to use the Norbert Dentressangle brand name no later than within a period of three years;

---

[47] Company wholly-owned by the Dentressangle family.

[48] Mr Norbert Dentressangle, Ms Evelyne Dentressangle, Mr Pierre-Henri Dentressangle and Ms Marine Dentressangle ("**the Assignors**");

[49] The deadline for obtaining these authorisations is 31 October 2015.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- a commitment by the Parties (i) for a period of three years, of non-competition, non-disparagement of the Company and non-solicitation of its staff and (ii) for a period of 20 years, not to use the Norbert Dentressangle brand name within the framework of a business activity similar to that of the Company.

### 1.7.2   TOA

Concomitantly with the SPA, the Company[50] and XPO Logistics[51] also signed on 28 April 2015 an agreement to determine the main characteristics of the Offer and the principles to be respected by the parties within this framework.

Under the TOA, the Simplified Public Tender Offer to be submitted by XPO following the purchase of the Controlling Interest (i) shall be entirely in cash for a price equivalent to that paid to purchase the Controlling Interest, i.e. €217.50 per share (ex-dividend of €1.80) and (ii) shall concern the remaining outstanding shares in the Company on the date of the Offer, with the exception of treasury shares, as well as performance shares for which the vesting and lock-up periods have ended[52].

The TOA also sets out the Offeror's intention not to cut the number of full-time jobs at the Company in France within the eighteen months following the acquisition of the Controlling Interest and its intention to keep the registered office for the Group's European operations in Lyon, and its current European decision-making centres for at least five years[53].

Furthermore, the Profit-Sharing Plan annexed to the TOA:

- specifies the means of treatment, prior to the Offer, of the "2013 A" warrants, "2013 B" warrants and performance share plans, details of which are given above (Section 1.3.2.3);

- plans for the Company to take out an unemployment insurance policy in favour of salaried members of the Management Board guaranteeing cover identical to that currently provided for the Chairman of the Management Board, Mr Hervé Montjotin;

---

[50] Represented by Mr Hervé Montjotin, in his capacity as Chairman of the Management Board.

[51] Represented by Mr Bradley S. Jacobs, in his capacity as Chairman and Chief Executive Officer.

[52] On the date of the Offer, no performance shares will meet these criteria.

[53] For logistics, the Malakoff centre (Hauts-de-Seine) and for transportation, the Beausemblant centre (Drôme).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- provides for the implementation by the Offeror of an incentive programme of a total of €18m, attributable to members of the Management Board of the Company and other managers in the form of bonus shares or phantom shares, depending on performances achieved.

### 1.7.3    Contributions to DI SAS

On 26 May 2015, the partners of DI SAS approved the contribution to the company by Mr Norbert Dentressangle and Mrs Evelyne Dentressangle of 257,474 and 688 shares respectively, representing a total of 258,162 shares. This contribution, which is technical in nature, resulted in the preparation of a contribution agreement and an expert appraiser's report dated 15 May 2014.

These contributions were in real value, in accordance with the value applied within the framework of the SPA, i.e. €219.30 per share (cum dividend of €1.80).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 2   THE GROUP'S BUSINESS ACTIVITIES AND MARKET CONDITIONS

Prior to our multi-criteria valuation of the Group and the Norbert Dentressangle shares, we endeavoured to establish a diagnosis on the basis of sector, market and financial information in order to identify the main strengths and weaknesses of the Group, as well as the opportunities and threats it faces in its market[54].

### 2.1   The Group's positioning in its sector

The Group is currently positioned as a world market leader in logistics, transportation, freight brokerage and global forwarding services. It has around 42,500 employees in 25 countries, with a strong footing for its operations in Europe.

The Group's operations are organised into three divisions, Transportation, Logistics and Air & Sea:

- **Transportation**: companies in the Transportation division operate a network of heavy goods vehicles and provide national and international road transportation services;

- **Logistics**: the Logistics business consists of stock management on behalf of clients from dedicated or multi-client warehouses; management covers primarily storage, packaging, distribution and bringing products to market;

- **Air & Sea**: companies in the global freight forwarding division provide services to organise the transportation of goods all over the world and take care of associated customs formalities.

In 2014, revenues by business line and region broke down as follows:





---

[54] Our analysis is summarised at the end of this section of the report in the form of a SWOT matrix (Section 2.4).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The Group's expansion is the result of organic growth and a policy of acquisitions. Over the last 10 years, the Group has made the following notable acquisitions:

- **in 2007**, it consolidated its position in the United Kingdom and almost doubled in size with a friendly takeover bid for UK transportation and logistics company Christian Salvesen, European market leader in temperature-controlled distribution;

- **in 2010**, it set up the Air & Sea division with the acquisition of US group Schneider National, with operations in both the United States and China;

- **in 2011**, it acquired UK group TDG, one of Europe's leading transportation, logistics and freight forwarding companies. At the end of the same year, it acquired Chinese freight forwarding company APC Beijing International;

- **in 2013**, it acquired the Air & Sea operations of Daher in France and Russia, as well as the logistics and transportation operations of Fiege in Spain, Italy and Portugal;

- **in 2014**, it extended its geographical presence in the US market with the strategic acquisition in the United States of Jacobson, the fifth-largest logistics and transportation company on the other side of the Atlantic.

As an international operator, the Group endeavours to be a local economic partner via its transportation agencies and logistics sites[55]. It offers a wide range of services to clients across all major business sectors:



## 2.2   Characteristics of the Transportation, Logistics and Air & Sea markets

Below we present the characteristics of the French and European markets, where the Group generates the majority of its revenues.

---

[55] 662 sites at 31 December 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 2.2.1 The Transportation market

Transportation of goods can be segmented according to (i) the means of transport used (road, rail, sea, air); (ii) whether transportation is domestic or cross-border, (iii) the type of services offered (domestic pallet distribution, full truck loads, partial loads or groups of loads), (iv) the means of packaging (transportation of goods in bulk or packed) or even (v) the type of product transported (hazardous materials, temperature-controlled goods).

In France and the United Kingdom, the Group's main markets, road transport is the main means of transporting goods and accounts for more than 80% of total freight traffic (excluding air)[56].

According to the European Union's official statistics office Eurostat, *"The rapid increase in global trade up to the onset of the global financial and economic crisis and the deepening integration of an enlarged EU, alongside a range of economic practices (including the concentration of production in fewer sites to reap economies of scale, delocalisation, and just-in-time deliveries), may explain the relatively fast growth of freight transport across the EU."*

However, transportation of goods was severely affected by the outbreak of the global economic and financial crisis, resulting in a period of consolidation[57] that allowed certain operators to access new outlets, benefit from economies of scale and strengthen their local coverage. Despite the phenomenon of consolidation observed over the last few years, the Transportation market remains particularly fragmented.

Over the long term, the French transportation market has outperformed the national economy[58]:

---

[56]Source: Eurostat. [Online], http://ec.europa.eu/eurostat/web/transport/data/main-tables.

[57] Source: Xerfi, "Road transportation of goods", February 2014: *"Capitalising on the opportunities on offer, transportation companies with sufficient financial resources increased the number of acquisitions in order to secure the scope of their activities or access new outlets."*

[58] Assessed on the basis of GDP.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Transportation costs are affected by regulatory changes and oil prices. Price revisions remain limited due to intra-sector and inter-sector competition and competition from other countries, which penalises many SMEs in the market. French operators also have to deal with less favourable taxation and wage legislation than their counterparts and competitors in the rest of Europe.

Gefco, Geodis, STEF and Transalliance are among the Group's main competitors in this market.

### 2.2.2   The Logistics market

The development and growing complexity of trade networks are forcing companies to outsource an increasing proportion of their logistics activities to external service providers.

Logistics operators are involved in different stages of the distribution process, at the upstream stage of shippers' activities (assembly, co-manufacturing, quality control, storage, packaging, order preparation) and downstream (organisation of transportation of goods, after-sales service, management of returns of goods).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Logistics services and the relationships formed between the service provider and the client company are qualified according to the degree of outsourcing, from straightforward subcontracting of transportation services ("1PL[59]") to complete outsourcing of the supply chain[60] ("5PL"). It is also useful to distinguish between the ambient temperature logistics market and the temperature-controlled logistics market[61].

The Logistics market, which is more concentrated[62] than the Transportation market, is segmented between services provided by generalist service providers (such as Geodis, Kuehne Nagel and Norbert Dentressangle, which dominate the market) and logistics specialists (such as FM Logistic and ID Logistics). Like Transportation, the Logistics industry is highly capital intensive - due to the cost of acquiring warehouses and equipment - which constitutes a barrier to entry.

Although Logistics activities are - in the same way as Transportation - dependent on economic conditions, the increased outsourcing of logistics services by shippers[63] limits the impact of an economic downturn[64].

Over the long term, the French logistics market has performed in line with the national economy[65]:

---

[59] First Party Logistics.

[60] Logistics value chain.

[61] Source: Xerfi, "Cold and non-cold storage", February 2014: the cold storage segment accounts for around 8% of the total market in France.

[62] Particularly in the temperature-controlled logistics segment, largely dominated in France by STEF.

[63] Within the European Union, the United Kingdom and France have the highest level of logistics outsourcing. Sector studies show an average outsourcing rate of 50% in Europe; in the United States, the rate is generally estimated at 30%.

[64] Companies looking for operating flexibility in a fragile economic climate is one of the reasons for outsourcing.

[65] Assessed on the basis of GDP.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Some sectors such as e-commerce also offer fast-growing outlets for operators that have been able to adapt their offering.

The market is also subject to consolidation: *"acquisitions are motivated primarily by the desire to integrate new activities, optimise regional coverage, offer new services and even enter new markets[66]"*. In a highly competitive market, operators find growth drivers by establishing their presence in other countries[67] and offering services upstream and downstream of the supply chain.

### 2.2.3   The Air & Sea market

For the service provider, freight forwarding consists of *"[reviewing] the best air, sea and land combinations and [mastering] administrative formalities, in particular customs formalities[68]"*. Due to its connections to the Logistics industry, freight forwarding is practiced by market leaders DHL, Kuehne Nagel and Geodis, integrated into activities across the entire logistics chain. Specialists such as Panalpina and SDV are also involved in this area.

Forwarders are particularly sensitive to international economic conditions and also subject to fierce intra-sector competition, mainly as a result of limited barriers to entry: freight forwarding requires little investment and is characterised by an essentially variable cost structure.

---

[66] Source: Xerfi, "Cold and non-cold storage", February 2014.

[67] Source: Xerfi, *"Logistics Groups – World, Market Analysis – 2014-2019 Trends"*, August 2014: *"To tap into growth opportunities, logistics groups will therefore position themselves in emerging economies to ensure that they benefit from this change in trade patterns. Such moves are typically orchestrated through joint ventures and mergers and acquisitions, leading to some industry consolidation".*

[68] Source: Xerfi, *"Freight forwarding"*, August 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The freight business is also sensitive to fluctuations in oil prices:



## 2.3 Historic analysis of the Group's performance

### 2.3.1 *Analysis of business activity and profitability*

The Group's business activity and profitability over the period from 2009 to 2014 are shown below:



Acquisitions - in particular those of TDG and Jacobson, finalised in 2011 and 2014 respectively - enabled the Group to achieve a total CAGR of 11.4% over the period from 2009-14.

In 2014, the year that Jacobson was integrated, the Logistics division was the Group's largest business, generating 50% of consolidated revenues.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Following efforts to cut costs in 2009 against the backdrop of severe deterioration in business activity[69], the Group managed to stabilise its EBITA margin. In 2011, the acquisition of TDG enabled the Group to achieve breakeven in the Air & Sea division. The Logistics business remains historically the most profitable.



### 2.3.2   *Balance sheet structure*

Below we show changes in the Group's simplified balance sheet since 2009:

---

[69] As a reminder, the Group's Transportation business was the hardest hit in 2009, with consolidated revenues down 14.8% on a reported basis.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



### 2.3.3  *Employment*

The strategic acquisitions carried out by the Group over the last few years have resulted in an increasing proportion of goodwill in the consolidated balance sheet.

Consolidated fixed assets consist mainly of rolling stock[70] used for the Transportation business, owned outright or via finance lease agreements[71]. Most of the warehouses operated by the Logistics business are rented.

Historically, the Group has ended its financial year with financing resources (negative WCR). The acquisition of Jacobson led to the recognition of a positive working capital requirement at 31 December 2014, which is nevertheless of immaterial relative to the Group's balance sheet structure.

---

[70] Tractors, trucks and trailers (specialist tankers).

[71] The Company also uses in its Transport activity operating leases for rolling stock; in accordance with generally accepted accounting principles these assets are not capitalized.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 2.3.4 Sources of funds

The Group's liabilities consist mainly of equity and debt. At 31 December 2014, the leverage ratio (consolidated net debt relative to consolidated EBITDA adjusted for Jacobson's pro forma EBITDA over the 12 months of 2014) was 3.0x.



The increased proportion of net debt at the end of the 2014 financial year was due to (i) the drawing of USD 431m used to finance the acquisition of Jacobson, and (ii) a currency effect resulting in an increase in the amount of debt.

The reduction in provisions at the end of the 2014 financial year, consisting chiefly of employee benefits, relates primarily to the actuarial reduction in the deficits of the two UK pension funds.

### 2.3.5 SWOT analysis

The matrix below summarises the Group's strengths and weaknesses, as well as the threats and opportunities it faces in its market:

| Strengths | Weaknesses |
| --- | --- |
| - Multi-specialist operator offering an integrated range of services covering the entire Transportation and Logistics value chain<br>- Direct operation of the largest fleet of heavy goods vehicles in Europe<br>- Management's ability to identify acquisition targets and integrated acquired operations | - Group revenues still generated predominantly in Europe<br>- Maturity of the Group's main geographical markets (France, UK) where a large number of companies have already outsourced their logistics activities<br>- Direct ownership of a large proportion of the vehicle fleet and limited use of |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| - Cash flow generation able to finance the Group's expansion<br>- Strategic position in the United States where the Group is now the fourth-largest logistics operator<br>- Market-leading positions in France, the United Kingdom and Spain | subcontracting, increasing the proportion of fixed costs borne by the Group<br>- Outsider position in the freight forwarding market |
|---|---|
| **Opportunities** | **Threats** |
| - Growth opportunities in the United States, characterised by a lower outsourcing rate than in Europe<br>- Development and improvement of operating margin for the Air & Sea division<br>- Strong momentum of the e-commerce business, accounting for around 10% of the Logistics division's revenues<br>- Shift towards a more asset light model in Transportation | - Risk of deterioration in economic conditions, particularly in France and the United Kingdom, which account for more than half of consolidated revenues<br>- Fragmented markets characterised by intense competition creating a risk of erosion in margins<br>- Unfavourable regulatory changes, particularly in terms of taxation and wage packages, which could reduce the Group's margins<br>- Exposure to currency risk, particularly in relation to the USD and GBP |

## 3   VALUATION OF THE NORBERT DENTRESSANGLE SHARES

In accordance with AMF recommendations, we have used a multi-criteria valuation approach. After identifying the main accounting, financial and tax characteristics of the Group (Section 3.1), we set out below the valuation methods we have decided not to use (Section 3.2) and then the valuation approaches we considered most relevant in order to assess the fairness of the price per share proposed within the framework of the Offer (Section 3.3 et seq.).

The date used as the benchmark for the Norbert Dentressangle share price is 28 April 2015, the last day of trading before the Transaction was announced.

The market data used for our multi-criteria valuation of the Norbert Dentressangle shares, such as investment multiples (Section 3.5) and discount rates from the business plan (Section 3.4.3), are to end-May 2015.

The Offer price of €217.50 is without the dividend coupon of €1.80. In order to ensure uniformity with the approach used by the sponsoring bank, we have not taken into account the impact of the dividend payment of 2 June 2015. The value of the Company's shares obtained by means of the different valuation approaches used is therefore presented cum dividend and compared to €219.30, i.e. the Offer price of €217.50 plus a dividend coupon of €1.80.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 3.1 Accounting, financial and tax characteristics

### 3.1.1 Accounting standards

The Group prepares its consolidated financial statements in accordance with International Financial Reporting Standards (IFRS), applicable to listed companies.

The consolidated financial statements for the last financial year ended 31 December 2014 have been certified without reservation by the Statutory Auditors.

### 3.1.2 Valuation date

Our multi-criteria valuation of the Norbert Dentressangle shares was dated 31 December 2014.

### 3.1.3 Number of shares

To calculate the per share value of the Norbert Dentressangle shares, we have assumed a number of **10,003,891 shares**, calculated on a fully diluted basis at the most recent date, i.e. 31 May 2015, which includes:

- the 9,836,241 outstanding shares;

- the 110,000 shares that may be issued if the 2013 warrants are exercised;

- the 102,097 performance shares;

- minus the 44,447 treasury shares.

| Diluted number of shares 31-May-15 | Number |
|---|---|
| Outstanding shares | 9,836,241 |
| Stock warrants | 110,000 |
| Performance shares | 102,097 |
| Treasury stock | (44,447) |
| **Total** | **10,003,891** |

For information purposes, we provide as our summary of each of the valuation methods used the per share value of the Company's shares before and after the impact of the theoretical dilution resulting from the exercising of stock warrants and the

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

awarding of performance shares. The dilutive impact of **2.1%**[72] calculated on the basis of the number of shares nevertheless remains marginal[73].

### 3.1.4   Tax losses

Norbert Dentressangle had tax loss carryforwards of around €169m at the end of 2014. In accordance with IAS 12, a deferred tax asset of €27.4m was recognised in the consolidated financial statements on a basis reduced to €84m.

In our valuation, we have taken account of the tax saving related to the deduction of all tax loss carryforwards from profits taken from the business plan (Section 3.4.2), after the effect of discounting.

### 3.1.5   Net debt

Our valuation is based on net debt as at 31 December 2014[74].

We have differentiated between net debt to be deducted from the enterprise value calculated using the intrinsic valuation method on the basis of discounted cash flow and analogical valuation methods to give the equity value.

---

[72] (110,000 + 102,097) / 10,003,891.

[73] At 31 May 2015, the number of undiluted number of shares was 9,791,794, i.e. 9,836,241 shares making up the share capital minus 44,447 treasury shares.

[74] In our work, we have not adjusted net debt as at 31 December 2014 for the cash impact relating to the change in the number of treasury shares between 31 December 2014 and 31 May 2015, which is immaterial.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.1.6   *Net debt in our intrinsic valuation*

We have assumed adjusted consolidated net debt of **€1,162m** for our intrinsic valuation, details of which are provided below:

**Net debt – DCF method**

| Type | €m |
|---|---|
| **Net debt** | **1,017** |
| Employee benefits provisions | 93.7 |
| Pension fund assets | (5.8) |
| Deferred tax assets on pension liabilities | (14.8) |
| **Pension liabilities** | **73.1** |
| **Minority interests (fair value)** | **36.7** |
| **Earnout payments** | **28.7** |
| Fair value of derivatives | 13.6 |
| Deferred tax assets on derivatives | (5.1) |
| **Derivatives** | **8.5** |
| Provisions for restructuring | 5.5 |
| Deferred tax assets on provisions for restructuring | (1.7) |
| Put on minority interests | 2.5 |
| Investments in associates | (1.6) |
| Interests in non-consolidated companies | (0.1) |
| **Other assets and liabilities** | **4.7** |
| **Exercise of warrants** | **(6.6)** |
| **Net debt – DCF method** | **1,162** |

This consists of reported net debt as at 31 December 2014 adjusted for:

- provisions relating to employee benefits, net of pension fund assets and associated deferred taxes recognised;

- the market value of minority interests determined on the basis of the estimated value of main subsidiary Salvesen Logistica by applying the median operating income multiple obtained from our sample of comparable listed companies (Section 3.5.2) and after a discount in respect of lower liquidity. As other non-controlling interests are immaterial, we have assimilated their net asset value into their market value;

- the Group's commitments relating to earnout payments on recent acquisitions;

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- the fair value of derivatives taken out by the Group to hedge its debt[75], net of associated deferred taxes recognised;

- other assets and liabilities including (i) provisions for restructuring net of estimated deferred taxes[76], (ii) the value of puts on non-controlling interests and (iii) the fair value of non-consolidated shares and interests in associates;

- cash and cash equivalents resulting from the exercise of 2013 warrants[77].

The tax saving related to tax loss carryforwards is also factored into our DCF model.

### 3.1.7  *Net debt in our analogical valuation*

To ensure uniformity with the net debt of comparable companies taken from our database, debt used in our analogical valuation approach consists of consolidated net debt as at 31 December 2014 plus the net asset value of minority interests and minus the impact of the exercise of stock warrants[78].

We have also adjusted debt for the estimated discounted value of the tax saving related to tax loss carryforwards according to how these are taken into account in the DCF approach. In order to obtain the maximum value for the Company's shares, we have not taken account of each comparable company's specific situation in terms of tax loss carryforwards.

Net debt in our analogical valuation is therefore estimated at **€991m**.

| Net debt – analogical method | |
|---|---|
| Type | €m |
| Net debt | 1,017 |
| Minority interests (NAV) | 27.2 |
| Discounted value of tax loss carryforwards | (47.0) |
| Exercise of warrants | (6.6) |
| Net debt – analogical method | 991 |

---

[75] Interest rate swaps.

[76] Based on a company tax rate of 30% (Section 3.4.2.2).

[77] I.e. 110,000 warrants at the exercise price of €59.55.

[78] Values shown on an undiluted basis in respect of the different valuation approaches do not take account of the impact of the exercising of warrants.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**3.2   Valuation methods not used**

Below we explain why we have not used the dividend discount model and net asset value as valuation methods.

### 3.2.1   *Dividend discount model (DDM)*

The dividend discount model is used to assess the yield value of minority interests. It gives a lower valuation than that obtained using the discounted cash flow (DCF) method.

### 3.2.2   *Net asset value*

The net asset value (NAV) method consists of correcting the net asset value of unrealised capital gains or losses currently identified as assets or liabilities.

The Company's fixed assets are allocated mainly to operations and at 31 December 2014 consisted primarily of:

-   goodwill[79]: as an intangible asset with an indefinite life, goodwill is tested for impairment at least once a year and any impairment losses are recognised accordingly;

-   customer relations[80]: these assets are depreciated on a straight-line basis[81] and specific contracts with an indefinite life are tested for impairment at least once a year;

-   real estate assets[82]: this corresponds chiefly to warehouses owned by the Company, allocated entirely to operations and which there are no plans to sell in the short term. In this regard, no material potential revaluations have been brought to our attention[83];

---

[79] Net asset value = €975.1m.

[80] Net asset value = €342.3m.

[81] Over a period of 11 to 20 years.

[82] Net asset value = €114.9m (land: €35.3m + buildings: €79.6m).

[83] The Company only performs property appraisals if planning to sell a property. When selling to a financial investor, the sale price shall be directly linked to the provisions of lease finance agreements that may subsequently be taken out by the new buyer.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- rolling stock[84]: this is depreciated over the estimated useful life of vehicles taking account of trade-in conditions granted by manufacturers[85]; in this respect, no material potential revaluation is expected.

On the basis of these factors, we did not envisage carrying out a revaluation of net asset value, which at 31 December 2014 stood at around €67.8 per share on an undiluted basis[86].

### 3.3   Reference to the share price

#### 3.3.1   Historic share price analysis

The Company's shares are listed on Euronext Paris (compartment A) and Euronext London. The chart below shows Norbert Dentressangle's share price performance since May 2013 relative to the CAC 40[87]:



The following events contributed to the main changes in the Norbert Dentressangle share price:

a) **16 July 2013**: announcement of the acquisition of Daher's freight forwarding business;

---

[84] Net asset value = €307.6m.

[85] At the end of the depreciation period, the net asset value of transportation equipment will correspond to the trade-in value.

[86] €664.1m (equity attributable to equity holders of the parent) / [9,836,241 shares making up share capital – 45,790 treasury shares (7,212 under the liquidity agreement and 38,578 allocated to covering stock options or bonus shares)].

[87] The CAC 40 was rebased on 20 May 2013.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

b) **9 September 2013**: announcement of the signing of a three-year logistics contract with ASOS representing revenues of around €117m;

c) **23 October 2013**: announcement of revenues for the first nine months of 2013, up 2% on a reported basis or 1.3% like-for-like and at constant exchange rates relative to the first nine months of 2012;

d) **19 December 2013**: announcement of a €235m bond issue by means of a private placement enabling the Group to diversify its sources of financing;

e) **30 January 2014**: announcement of 2013 revenues of €4bn, up 3.9% on a reported basis or 2.4% like-for-like and at constant exchange rates relative to 2012; Gilbert Dupont raises its target price from €99.4 to €108.6;

f) **26 February 2014**: announcement of 2013 profits in line with the strategic targets set by the Group; the following day, Société Générale raises its target price from €90 to €120;

g) **23 April 2014**: announcement of revenues for the first quarter of 2014, up 13.6% on a reported basis or 5.5% like-for-like and at constant exchange rates relative to the first quarter of 2013;

h) **31 July 2014**: announcement of the acquisition of US group Jacobson, a key player in the US Transportation and Logistics market;

i) **23 October 2014**: announcement of revenues for the first nine months of 2014, up 14.1% on a reported basis or 5.1% like-for-like and at constant exchange rates relative to the first nine months of 2013;

j) **29 January 2015**: announcement of 2014 full-year revenues of €4.7bn, up 15.8%;

k) **26 February 2015**: announcement of 2014 profits;

l) **28 April 2015**: announcement of the Transaction presenting a significant premium to the share price; the stock reacts to the announcement, adjusting itself immediately[88].

---

[88] On 29 April 2014, the closing price was €216.9.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The table below summarises the premiums implied by the Offer price of €219.3 (cum dividend of €1.80) on the basis of the average volume-weighted daily share price before the date of the announcement:

**Share price analysis (€)**

| Reference date | 28-Apr.-15 | Premium |
|---|---|---|
| Spot price | 159.1 | 37.8% |
| 1-month weighted average | 155.4 | 41.1% |
| 3-month weighted average | 148.9 | 47.3% |
| 6-month weighted average | 135.2 | 62.2% |
| 12-month weighted average | 122.3 | 79.4% |
| **12-month high** | **164.4** | **33.4%** |
| **12-month low** | **95.8** | **128.9%** |

Over a reference period of one year, the share priced reached a low of €95.8 on 23 July 2014 and a high of €164.4 on 25 March 2015.

During the last 12 months preceding the announcement of the Offer and with a trading volume of shares in free float representing around 32% of share capital, the shares' turnover is estimated at around two years.

### 3.3.2   *Target price*

We have identified six equity research analysts who cover the Norbert Dentressangle shares on a regular basis. The table below summarises the premiums implied by the Offer price of €219.3 (cum dividend of €1.80) relative to the most recent target prices before the Transaction was announced:

**Summary of target prices (€)**

| Analyst | Date | Target rice | Premium |
|---|---|---|---|
| Berenberg | 14-Apr.-15 | 178.0 | 23.2% |
| Gilbert Dupont | 21-Apr.-15 | 172.4 | 27.2% |
| Oddo MidCap | 23-Apr.-15 | 173.0 | 26.8% |
| Exane | 23-Apr.-15 | 150.0 | 46.2% |
| Société Générale | 23-Apr.-15 | 174.0 | 26.0% |
| Edison | 27-Apr.-15 | 190.0 | 15.4% |
| **Median** | | **173.5** | **26.4%** |
| **Average** | | **172.9** | **26.8%** |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

We would note that all of the target prices set by analysts before the Transaction was announced were below the Offer price.

## 3.4   Intrinsic valuation using the discounted cash flow (DCF) method

We have tried to obtain an intrinsic value of the Norbert Dentressangle shares by discounting as of 31 December 2014 projected cash flows taken from the 2015-18 business plan presented to us by management, in order to infer an enterprise value and, deducting net debt, an equity value.

### 3.4.1   Principles of the DCF method

The DCF method is based on the estimated enterprise value of a company on the basis of available operating cash flow[89] generated by its operations, which are discounted at a rate corresponding to the rate of return expected by those providing capital resources for the company.

The calculation of residual value estimated beyond the explicit forecast period is based on estimated free cash flow and therefore takes account of assumed continuity of operations and a long-term growth estimate.

In order to obtain the market value of equity, the value of non-operating assets is added to the enterprise value of operating activities, if applicable, and net debt is deducted.

### 3.4.2   Business plan

#### 3.4.2.1   Management's 2015-18 business plan

The business plan, drawn up in summer 2014, covers the period from 2015 to 2018 (the "**explicit forecast period**"). We have adjusted the business plan, substituting it for the first year of forecasts with the 2015 budget[90] presented to the Supervisory Board on 25 February 2015, taking account of adjustments identified by management following the actual results achieved in 2015[91]. Management has confirmed that these results did not call into question the 2016-28 business plan forecasts.

---

[89] EBIT net of tax, adjusted for expenses calculated (depreciation charges) minus the change in the working capital requirement (WCR) and capex.

[90] The 2015 budget was prepared in December 2014.

[91] At 30 April 2015, actual results were ahead of target, mainly as a result of stronger than expected business volumes and the favourable effect on services provided in the United States and the United Kingdom of the development of dollar and sterling exchange rates.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The business plan, which looks at the Group's different business activities, is underpinned by the following assumptions for the period from 2015-18[92]:

- **Transportation:** organic growth of around 3.0% a year and EBITA margin of around 3.0%;

- **Logistics:** organic growth of around 4.5% a year and EBITA margin of around 5.0%;

- **Air & Sea:** organic growth of around 3.6% a year and EBITA margin of around 2.3%.

After elimination of intra-group flows, the business plan factors in average growth of around 3.8% a year over the explicit forecast period and EBITA margin of around 4.1%. The business plan therefore factors in improvement in profitability relative to the performances of recent years (Section 2.3.1), particularly following the integration of Jacobson.

### 3.4.2.2   Extrapolation and estimation of terminal value

We have extrapolated the 2015-2018 business plan over a transitional period of two additional years until 2020 in order to assess the Group's full maturity in its current scope and obtain a normative level of return on invested capital.

Extrapolation of the business plan over the transitional period from 2019-20 and determining the terminal value beyond 2020 were based on the following assumptions:
- a gradual reduction in revenue growth towards **2.0%** in terms of terminal value, in line with long-term inflation forecasts[93] for the main European countries in which the Group operates and the United States;

- EBITDA margin of around **6.9%** of consolidated revenues, based on management's forecasts for the explicit forecast period;

- a level of depreciation charges converging gradually towards an estimated investment level of **2.5%** of revenues in terms of terminal value;

- zero WCR change.

---

[92] Assumptions are presented on a pro forma basis taking account of the full-year impact of the consolidation of Jacobson.

[93] IMF, *"World Economic Outlook"*, April 2015.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Over the full forecast period from 2015-20 and on a normative basis, we have assumed a company tax rate of **30%**, estimated on the basis of the average tax rate[94] weighted by each country's contribution to consolidated revenues[95].

### 3.4.3   Discount rate

#### 3.4.3.1   Direct method or cost of capital

In the direct approach to calculating the discount rate, we considered that the Group's value was not impacted by its financial structure, as the tax saving realised on interest expenses is offset by implicit or explicit costs relating to use of debt.

The discount rate is therefore determined directly on the basis of the average enterprise value beta[96], estimated at **0.90** for the sample of comparable listed companies (section 3.5.1).

Other information used to determine the discount rate comprises (i) a risk-free rate of 1.1% corresponding to the 12-month average 10-year OAT yield[97] and (ii) a risk premium for the French market estimated at 7.9%[98];

The discount rate is therefore estimated at **8.2%**:

**Discount rate**

| Cost of capital | |
|---|---|
| Risk-free rate | 1.1% |
| Enterprise value beta | 0.90 |
| Risk premium | 7.9% |
| **Discount rate** | **8.2%** |

---

[94] Company tax rate by country, KPMG, [Online]  http://www.kpmg.com/global/en/services/tax/tax-tools-and-resources/pages/corporate-tax-rates-table.aspx.

[95] Taking account of the full-year impact of the consolidation of Jacobson, the Group generates the majority of its revenues in France, the United Kingdom, the United States and Spain.

[96] Only betas for comparable companies with a dividend yield presenting satisfactory correlation with the benchmark market yield have been used.

[97] Source: *www.banque-france.fr*.

[98] Based on an expected yield for the French market of 9%.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.4.3.2   Indirect method or weighted average cost of capital ("WACC")

For cross-checking purposes, we calculated the discount rate using the indirect weighted average cost of capital approach, which involves determining cost of equity and cost of debt in reference to:

- an average long-term Group gearing[99];

- relevered beta according to the aforementioned gearing;

- an average cost of debt before tax of 4.0%[100]; the impact of taxation on the effective cost of debt has been calculated on the basis of a normative tax rate of 30% for the Group (Section 3.4.2.2) and assuming that 25% of net financial expenses are non-deductible[101].

**Discount rate**

| WACC | |
|---|---|
| Risk-free rate | 1.1% |
| Levered beta | 1.43 |
| Risk premium | 7.9% |
| *Cost of equity* | *12.4%* |
| Cost of debt before tax | 4.0% |
| Normative tax rate | 30.0% |
| Reintegration of net financial expenses | 25.0% |
| *Net cost of debt* | *3.1%* |
| Discount rate | 8.4% |

The analysis conducted tends to show that the Group's value is not affected significantly by its financial structure. To simplify things and avoid prejudging changes in market interest rates, the Group's target financial structure and the market value of the Company's equity, we have favoured the direct approach.

### 3.4.4   Summary of DCF valuation

The tables below show our analysis of the sensitivity of the Group's enterprise value and equity value, as well as the value of the Norbert Dentressangle shares to cross changes in the discount rate and perpetual growth rate to calculate the terminal value:

---

[99] I.e. 76% (source: Bloomberg).

[100] As a reminder, the bond issues carried out by Norbert Dentressangle in December 2013 comprised two tranches paying coupons of 3.8% and 4.0% with respective maturities of six years and seven years.

[101] Pursuant to Article 212 bis of the French General Tax Code.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Enterprise Value sensitivity analysis (€m)**

| Normative growth | Discount rate | | | | |
|---|---|---|---|---|---|
| | 7.2% | 7.7% | 8.2% | 8.7% | 9.2% |
| 1.50% | 3,163 | 2,914 | 2,702 | 2,520 | 2,362 |
| 1.75% | 3,278 | 3,009 | 2,782 | 2,588 | 2,420 |
| 2.00% | 3,404 | 3,112 | **2,868** | 2,660 | 2,482 |
| 2.25% | 3,542 | 3,225 | 2,961 | 2,738 | 2,548 |
| 2.50% | 3,695 | 3,348 | 3,062 | 2,823 | 2,619 |

**Equity Value sensitivity analysis (M€)**

| Normative growth | Discount rate | | | | |
|---|---|---|---|---|---|
| | 7.2% | 7.7% | 8.2% | 8.7% | 9.2% |
| 1.50% | 2,001 | 1,752 | 1,540 | 1,358 | 1,199 |
| 1.75% | 2,115 | 1,846 | 1,619 | 1,425 | 1,257 |
| 2.00% | 2,241 | 1,950 | **1,705** | 1,498 | 1,319 |
| 2.25% | 2,380 | 2,062 | 1,799 | 1,576 | 1,385 |
| 2.50% | 2,533 | 2,186 | 1,900 | 1,660 | 1,457 |

**Per share value sensitivity analysis (€)**

| Normative growth | Discount rate | | | | |
|---|---|---|---|---|---|
| | 7.2% | 7.7% | 8.2% | 8.7% | 9.2% |
| 1.50% | €200 | €175 | €154 | €136 | €120 |
| 1,75% | €211 | €185 | €162 | €142 | €126 |
| 2,00% | €224 | €195 | **€170** | €150 | €132 |
| 2,25% | €238 | €206 | €180 | €158 | €138 |
| 2,50% | €253 | €218 | €190 | €166 | €146 |

The central value of the Norbert Dentressangle shares on a diluted basis comes out as €170 and falls within a range of values of between €142 and €206.

For information, the central value of the shares on an undiluted basis comes out as €173 and falls within a range of values of between €145 and €210.

## 3.5   Analogical valuation using peer comparisons

In this section, we shall look at the valuation of the Norbert Dentressangle shares in reference to EBITDA and EBITA multiples for a sample of comparable listed companies.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.5.1  Scope and composition of our sample

To our knowledge, there are no listed companies that are fully comparable to Norbert Dentressangle presenting strictly identical characteristics in terms of business activity, size, operating margin and regions in which they operate.

Taking into consideration the criteria of business sector, margin and growth prospects, we have put together a broad sample of listed companies operating in Norbert Dentressangle's three business lines of Transportation, Logistics and Freight Forwarding (Air & Sea) and presenting the following 1-month[102] market capitalisations:

**Comparable companies**

| Company | Country | 1 month (€m) |
|---|---|---|
| **Norbert Dentressangle** | **France** | **2,148** |
| C.H. Robinson | United States | 8,447 |
| Landstar System | United States | 2,520 |
| Con-Way | United States | 2,158 |
| STEF | France | 748 |
| ID Logistics | France | 579 |
| Wincanton | United Kingdom | 268 |
| **Average** | | **2,454** |

Information about the performances and profiles of these comparable companies is provided in **appendix 7** and **appendix 8**.

### 3.5.2  Means of calculating EBITDA and EBITA multiples in reference to enterprise value (EV)

We have not used the following multiples:

- revenues, as we do not consider it relevant to value the Group on the basis of the criterion of business volumes alone without taking account of operating profitability;

- net income (PER), which does not take account of differences in financial structure and tax rate.

---

[102] Source: *Bloomberg* (end-May 2015).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

As EBITDA multiples are affected by different financing policies for warehouses and vehicle fleets (asset light[103] vs. asset heavy[104])), these are presented only for information purposes. We favoured looking at EBITA multiples, which limit the impact of these differences[105].

The table below shows multiples for our sample for 2015 and 2016:

**Investment multiples**

| Company | EV/EBITDA | | EV/EBITA | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2015 | 2016 |
| C.H. Robinson | 12.0x | 11.1x | 12.8x | 12.0x |
| Landstar System | 10.1x | 9.2x | 11.4x | 10.3x |
| Con-Way | 4.9x | 4.4x | 8.9x | 7.8x |
| STEF | 6.2x | 5.9x | 12.1x | 11.4x |
| ID Logistics | 11.0x | 10.2x | 16.5x | 15.4x |
| Wincanton | 3.8x | 4.0x | 5.1x | 5.1x |
| **Median** | **8.2x** | **7.6x** | **11.7x** | **10.9x** |
| **Average** | **8.0x** | **7.5x** | **11.1x** | **10.3x** |

We determined multiples at end-May 2015 for each comparable company on the basis of (i) 1-month average market capitalisation, minus their net debt less the net value of minority interests and (ii) estimated aggregates taken from analysts' consensus forecasts[106], after any calenderisation of these forecasts.
In order to obtain the maximum value, we have not taken account of a possible size discount that could apply in view of a selection of comparable companies that are on average larger than the Group (Section 3.5.1.).

### 3.5.3   Summary

With the application of median multiples applied to forecast indicators for 2015 and 2016, and minus net debt used for the analogical method (Section 3.1.5.2), the diluted value of the Norbert Dentressangle shares falls within a range of:

- €146 to €171 (EBITA multiples);

- €185 to €199 (EBITDA multiples).

---

[103] Use of operating leases.

[104] Outright ownership or lease financing.

[105] Consolidated EBITA includes rents relating to goods owned on operating lease and depreciation relating to goods owned outright or under finance leases.

[106] Source: Bloomberg (end-May 2015).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

For information, the central value of the shares on an undiluted basis comes out as €156 and falls within a range of values of:

- €148 to €175 (EBITA multiples);
- €188 to €203 (EBITDA multiples).

### 3.6    Analogical valuation using comparable transactions

In this section, we shall look at the valuation of the Norbert Dentressangle shares in reference to recent transactions in the Group's business sectors. The fragmentary nature of public information about changes in shareholding structures within the transportation sector means that reliable reference parameters are not available.

In order to obtain the maximum value, we have not taken account of the possible restatement of control premiums that could apply to our sample of comparable transactions.

We have used a method similar to that developed in the peer comparison approach (Section 3.5), determining EBITDA and EBITA multiples for transactions that have taken place in the Transportation and Logistics industries since 2011.

The following transactions have been retained:

**Transaction multiples**

| Date | Acquirer | Target | EV/EBITDA | EV / EBITA |
|------|----------|--------|-----------|------------|
| Jul-14 | Norbert Dentressangle | Jacobson | 9.9x | 17.4x |
| Jul -14 | TransForce | Contrans Group | 6.9x | 11.6x |
| Jul -14 | Singapore Post Ltd | F.S. Mackenzie Ltd | 8.3x | 8.4x |
| May-14 | Suomen      Transval Group | Vindea Oy | n.a. | 12.0x |
| Apr.-14 | Emerge Vest Ltd | NFT Distribution Ltd | 6.2x | 12.4x |
| Jan.-14 | Knight Transportation | Barr-Nunn Transportation | n.a. | 7.5x |
| Nov.-13 | Park Ohio | Henry Halstead | n.a. | 7.1x |
| Nov.-13 | Heartland Express | Gordon      Trucking (GTI) | n.a. | 16.4x |
| Sep.-11 | Imperial Holding | Lehnkering | 6.1x | 9.6x |
| **Median** | | | **6.9x** | **11.6x** |
| **Average** | | | **7.5x** | **11.4x** |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

With the application of the median multiple applied to the Group's pro forma[107] 2014 aggregates, and minus net debt used for analogical valuation methods (Section 3.1.5.2), the diluted value of the Norbert Dentressangle shares is between €133 and €136.

**Comparable transactions**

| External transactions | xEBITDA | xEBITA |
|---|---|---|
| Median multiple | 6.9x | 11.6x |
| Aggregate amount | 337 | 203 |
| Enterprise value (€m) | 2,326 | 2,350 |
| Net debt (€m) | (991) | (991) |
| *Equity (M€)* | *1,335* | *1,359* |
| Diluted number of shares | 10,003,891 | 1,003,891 |
| **Per share value** | **€133** | **€136** |

For information, the undiluted per share value is between €136 and €138.

### 3.7   Summary of our multi-criteria valuation of the Norbert Dentressangle shares

The Offer price is equivalent to the price offered to acquire the Controlling Interest. Our work highlights the existence of a premium to all other valuation approaches. Below we set out the premium determined on the basis of the central value[108] of the shares estimated using these different methods:

---

[107] Taking account of the impact of Jacobson over 12 months.

[108] The central value shown corresponds to the following for each approach used:

- for the share price approach, to the 1-month weighted average share price;
- for the target price approach, to the median target price;
- for the DCF approach, to the central value obtained from our valuation work;
- for the peer comparison and comparable transaction approaches, to the average of the ranges of values obtained.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Due to the limited number of dilutive instruments as a proportion of the Company's share capital, determining the value of the shares on an undiluted basis does not have a material impact on the level of premiums thus presented.

## 4   ANALYSIS OF AGREEMENTS SIGNED WITHIN THE FRAMEWORK OF THE OFFER

We have the following comments to make concerning our review of the agreements signed within the framework of the Offer (Section 1.7). We have received confirmation that no other agreements have been or should be signed within the framework of the Offer.

In respect of the Profit-Sharing Plan:

- the Offeror agrees to purchase the "2013 A" and "2013 B" warrants on the basis of the Offer price minus their exercise price; these instruments, exercisable and transferable as of 21 May 2015 following a decision by the general shareholders' meeting on the same date, are currently strongly in the money as the share price adjusted itself rapidly to around the Offer price after the Transaction was announced on 28 April 2015;

- the performance shares held by European managers will be cancelled and compensated by means of a payment of €217.50 per share. On the basis of the performances achieved in 2013 and 2014 and the latest forecasts for 2015, it can

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

be considered that the performance conditions attached to the April 2013 and April 2014 plans awarded to European managers should be respected;

- the performance shares owned by US managers will be cancelled and compensated by the awarding of restricted stock units of which the underlying instruments are XPO Logistics' shares on the basis of an exchange ratio based on market values, i.e. the Offer price for the Company and the share price for XPO Logistics. The duration of the plan implemented by XPO Logistics will be at least equal to that of the Company plan109 that it is intended to replace.

We have no comments to make on the other agreements signed within the framework of the Offer.

On reviewing of all agreements signed within the framework of the Offer, we have not identified any elements that may affect the objectivity or fairness of the Offer price of €217.50 per share (ex-dividend of €1.80), as well as equality between shareholders.

---

[109] October 2014 plan.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 5  OBSERVATIONS CONCERNING VALUATION INFORMATION FROM THE SPONSORING BANK

We have reviewed the valuation work performed by Morgan Stanley.

The valuation methods we have used are generally comparable to those used by the sponsoring bank.

A comparison of our valuation work with that carried out by Morgan Stanley gives rise to the following main points.

## 5.1  Valuation of the shares

### 5.1.1  *Number of shares on a diluted basis*

In our work, we looked at the number of shares and instruments giving access to share capital at 31 May 2015, while the sponsoring bank looked at the same information as at 31 December 2014.

**Diluted number of shares**

|  | Ledouble | Morgan Stanley |
| --- | --- | --- |
| Outstanding shares | 9,836,241 | 9,836,241 |
| Stock warrants | 110,000 | 79,883 |
| Performance shares | 102,097 | 111,463 |
| Treasury stock | (44,447) | (38,578) |
| Total | 10,003,891 | 9,989,009 |

The overall impact[110] of the exercise of the 110,000 warrants at the exercise price of €59.55 was taken into account by the sponsoring bank directly by means of the number of shares, i.e. 79,883.

As part of our work, we deducted the total number of treasury shares including existing shares under the liquidity agreement[111].

In addition, for information purposes we have also shown values on the basis of an undiluted shareholding structure (Section 3.1.3).

---

[110] This includes the inflow of cash following the exercise of warrants and the dilutive impact relating to new shares awarded.

[111] 2014 annual report, p.130, "*Treasury shares, regardless of their destination, are deducted from equity*".

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 5.1.2   Net debt

Morgan Stanley assumed net debt of €1,054m in its intrinsic valuation and its analogical valuation.

We have based our reasoning on net debt of €1,162m in our intrinsic valuation and €991m in our analogical valuation (Section 3.1.5).

### 5.1.3   Intrinsic valuation

The differences in use of the DCF approach compared with the sponsoring bank relate primarily to the estimated discount rate and terminal value. To determine these estimates, the sponsoring bank principally used an exit multiple, while we translated normative cash flows into capital value over an infinite horizon using the Gordon-Shapiro formula.

For information, the undiscounted terminal value we have used corresponds to an implicit exit multiple of 11.2x normative EBITA, in line with the 2015-16 average median EBITA multiple obtained from our sample of comparable companies (Section 3.5.2);

### 5.1.4   Analogical valuation using peer comparisons

Our sample of comparable listed companies is the same as that used by Morgan Stanley with the exception of Knight Transportation Inc. and Heartland Express Inc., and also includes Landstar System and C.H. Robinson.

-   Our sample includes US groups Landstar and C.H. Robinson, which are similar to the Group in terms of business activity, growth and margins. By favouring EBITA multiples, we have been able to limit the impact of investment policies (asset light vs. asset heavy);

-   Our selection does not include US transportation companies Knight Transportation Inc. and Heartland Express as the differences in margin between these companies and the Group and other companies in our sample reflect disparities in terms of business model. Furthermore, including these companies would have led to the overweighting of companies based in the United States[112] in our sample.

---

[112] Following the acquisition of Jacobson, Norbert Dentressangle generates around 15% of its revenues in the United States.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 5.1.5   Analogical valuation using comparable transactions

Our sample of transactions includes transactions post-2010. The sponsoring bank also refers to prior transactions.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 5.1.6  Summary of our valuation of the Norbert Dentressangle shares

The table below shows a comparison in figures of our work with that performed by the sponsoring bank:

**Summary**

| | Ledouble | | Morgan Stanley | |
|---|---|---|---|---|
| | Central value | Prime (%) | Central value | Prime (%) |
| **Purchase of the Controlling Interest** | | | | |
| Price of the Controlling Interest | €219 | - | €219 | - |
| **Share price** | | | | |
| Spot price - 28 April 2015 | €159 | 37.8% | €159 | 37.8% |
| 1-month weighted average | €155 | 41.1% | €155 | 41.1% |
| 3-month weighted average | €149 | 47.3% | €149 | 47.3% |
| 6-month weighted average | €135 | 62.2% | €135 | 62.2% |
| 12-month weighted average | €122 | 79.4% | €122 | 79.4% |
| **Target prices** | | | | |
| Target price | €174 | 26.4% | €174 | 26.4% |
| **DCF approach** | | | | |
| DCF | €170 | 28.6% | €196 | 11.6% |
| **Investment multiples** | | | | |
| EV /EBITA – 2015 | €171 | 27.9% | €170 | 29.1% |
| EV /EBITA - 2016 | €146 | 50.5% | €137 | 59.9% |
| EV/EBITDA - 2015 | €199 | 10.2% | €139 | 58.1% |
| EV /EBITDA-2016 | €185 | 18.8% | €129 | 69.4% |
| PER - 2015 | n.a. | n.a. | €202 | 8.5% |
| PER - 2016 | n.a. | n.a. | €189 | 16.0% |
| **Transaction multiples** | | | | |
| Takeover bids in France | n.a. | n.a. | €195 | 12.7% |
| Comparable transactions | €135 | 62.9% | €138 | 59.2% |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 6   CONCLUSION

On the basis of our valuation of the Norbert Dentressangle shares, we can see that the Offer price presents a premium to all valuation criteria.

The agreements signed within the framework of the Offer do not have any impact on our assessment of the fairness of the Offer price.

It is our opinion that the proposed price of €217.50 (ex-divided of €1.80) is fair from a financial viewpoint for Norbert Dentressangle shareholders with a view to the implementation of a squeeze-out procedure.

Paris, 10 June 2015

LEDOUBLE SAS

Olivier CRETTÉ                               Sébastien SANCHO

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## APPENDICES

- Detailed programme of works and appraisal fees          Appendix 1

- Main appraisal stages          Appendix 2

- List of persons met and/or contacted by the appraiser          Appendix 3

- Main sources of information used          Appendix 4

- Members of the Ledouble team          Appendix 5

- List of appraisals and financial analysis performed by Ledouble          Appendix 6

- Projected performances of comparable listed companies          Appendix 7

- Presentation of comparable companies' business activity          Appendix 8

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Appendix 1: Detailed programme of works and appraisal fees**

### 1. Preliminary work and familiarisation

- Press review and documentary research
- Analysis of the Transaction and its legal framework
- Review of the Company's historic share price performance and target prices
- Interviews with representatives of the Company and the Offeror, the sponsoring bank, as well as the respective advisors

### 2. Valuation work

- Review of past results, financial structure and key events for the Company
- Putting together a sample of comparable listed companies and transactions
- Documentary requests
- Researching sector and financial information in databases
- Multi-criteria valuation of the Company's shares

### 3. Independent appraisal report

- Meetings and telephone interviews
- Writing engagement letter
- Writing a proposed letter of representation for the attention of representatives of the Company and the Offeror
- Writing the report
- Administration and supervision of the assignment

### 4. Compensation

The total amount of fees under the terms of Ledouble's engagement letter of 7 May 2015 comes to between €260,000 and €280,000 (excluding taxes and disbursements), depending on the amount of time spent.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Appendix 2: Main appraisal stages**

⇨ **Week of 27 April to 3 May 2015**

- Prior contacts
- Appointment of the independent appraiser by the Company's Supervisory Board
- Use of information available to the public on the Company's website
- Review of data room information made available by the Offeror within the framework of its diligence procedures
- Review of legal documents relating to the Offer

⇨ **Week of 4 May to 10 May 2015**

- Proposed engagement letter
- Documentary requests
- Briefings, meetings and interviews with the sponsoring bank and Advisors
- Analysis of the Company's share price performance
- Researching sector and financial information in databases
- Putting together a sample of comparable listed companies and transactions

⇨ **Week of 11 May to 17 May 2015**

- Use of information collected comprising the business plan and implementation of a multi-criteria valuation
- Additional documentary requests
- Review of legal documents relating to contribution transactions prior to the Offer and interviews with the expert appraiser
- Writing the outline of the independent appraisal report

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

⇨  **Week of 18 May to 24 May 2015**

- Interviews with representatives of the Company
- Use of information received in response to our requests for additional information
- Review of the Statutory Auditors' report
- Use of the Offeror's draft offer document
- Interviews with Advisors

⇨  **Week of 25 May to 31 May 2015**

- Interviews with representatives of the Offeror
- Briefings and interviews with representatives of the Company and the Advisors
- Requests for additional information
- Finalisation of valuation work
- Writing the independent appraisal report

⇨  **Week of 1 to 7 June 2015**

- Proposed letters of representation
- Use of the draft responding offer document from the Company
- Raising of matters pending
- Distribution of the draft independent appraisal report

⇨  **Week of 8 to 14 June 2015**

- Presentation of the draft independent appraisal report
- Delivery of the fairness opinion intended for the Company's Supervisory Board and submission of the responding offer document to the AMF

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Appendix 3: List of persons met and/or contacted by the appraiser**

*1)*   *COMPANY*

| | |
|---|---|
| Jean-Luc Poumarède | Supervisory Board member, Chairman of the Audit Committee |
| Vincent Menez | Supervisory Board member, Member of the Audit Committee |
| Patrick Bataillard | Management Board member, Chief Financial Officer |
| Gaultier de la Rochebrochard | Group General Counsel |
| Cyril Trossat | Consolidation Director |

*2)*   *XPO GROUP*

| | |
|---|---|
| Gordon Devens | Senior Vice President and General Counsel |
| John Hardig | Chief Financial Officer |

*3)*   *SPONSORING BANK*

| | |
|---|---|
| Alban de La Sablière | Managing Director |
| Marie-Charlotte Etienne | Executive Director |
| Jean Dorcier | Analyst |

*4)*   *ADVISORS*

**Rothschild**

| | |
|---|---|
| Cyril de Mont-Marin | Partner |
| Pierre-Henri Chappaz | Managing Director |
| Pierre Boscher | Assistant Director |
| Oussama Lemsyeh | Analyst |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**JP Morgan**

| | |
|---|---|
| Edouard Debost | Managing Director |
| Olivier Simon | Executive Director |
| Benoît Hourdain | Associate |

**Bredin Prat**

| | |
|---|---|
| Olivier Assant | Barrister |
| Karine Angel | Barrister |
| Béna Mara | Barrister |

**Darroy Villey Maillot Brochier**

| | |
|---|---|
| Olivier Huygues Despointes | Partner |

5)    *EXPERT APPRAISER*

| | |
|---|---|
| Sylvain Mary | Expert appraiser |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Appendix 4: Main sources of information used**


**Documents relating to the Transaction**

- Draft offer document relating to the Offer for the Company's shares initiated by XPO presented by Morgan Stanley

- Responding offer document from the Company relating to the Offer for the Company's shares initiated by XPO

- Public announcement of the Offer dated 28 April 2015

- Minutes from the Supervisory Board meeting of 27 April 2015 showing the favourable response to the Offer from the Supervisory Board and authorising the Chairman of the Management Board to sign the TOA

- SPA signed on 28 April 2015 between Mr Norbert Dentressangle, Ms Evelyne Dentressangle, Mr Pierre-Henri Dentressangle, Ms Marine Dentressangle and XPO Logistics

- TOA signed on 28 April 2015 between the Company and XPO Logistics

- Profit-Sharing Plan signed between XPO Logistics and all members of the Management Board and annexed to the TOA

- Draft contribution agreement of 15 May 2015 between Mr Norbert Dentressangle, Ms Evelyne Dentressangle and DI SAS

- Draft initial valuation report by Morgan Stanley and subsequent updates


**Company legal documentation**

- Minutes of Management Board meetings of 2013, 2014 and 2015

- Minutes of Supervisory Board meetings of 2013, 2014 and 2015

- Draft text of resolutions proposed to 2013, 2014 and 2015 general shareholders' meetings

- Total number of shares and voting rights making up the Company's share capital at 31 May 2015

- Number of outstanding stock warrants at 31 May 2015

- Number of performance shares at 31 May 2015

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Company accounting and financial documentation**

- Annual reports[113]

- Press release on the Transaction[114]

- 2014 results presentation[115]

- Impairment tests to 31 December 2014

- Presentation of 2015 budget[116]

- 2015-18 Business plan

- Presentation of results to 31 March 2015[117] and 30 April 2015

- Most recent broker reports[118]


**Offeror documentation**

- Annual reports[119]

- Press release on the Transaction[120]

- Conference call on the Transaction[121]

- Broker reports[122]


**Sector documentation**

- Xerfi, "Freight forwarding", August 2014.

- Xerfi, "Road transportation of goods", February 2014

- Xerfi, "Cold and non-cold storage", February 2014

---

[113] http://www.norbert-dentressangle.com/fr/Investisseurs.

[114] http://www.norbert-dentressangle.com/fr/Groupe/Actualites/Acquisition-de-Norbert-Dentressangle-par-XPO-Logistics.

[115] http://www.norbert-dentressangle.com/fr/Investisseurs/Informations-Financieres.

[116] "Book budget 2015 – Group Finance".

[117] Company document entitled "Audit Committee - 19 May 2015".

[118] *ThomsonOne*, reports provided by the Company and its financial advisor.

[119] http://investors.xpologistics.com/phoenix.zhtml?c=204615&p=irol-reportsannual.

[120] http://investors.xpologistics.com.

[121] http://investors.xpologistics.com/phoenix.zhtml?c=204615&p=irol-newsArticle&ID=2041131 ; *"XPO Logistics will hold a conference call to discuss the proposed transaction on Wednesday, April 29, 2015"*.

[122] *ThomsonOne*.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- Xerfi, "Logistics Groups – World, Market Analysis – 2014-2019 Trends", August 2014

## Databases

- *Bloomberg*
- *ThomsonOne*
- *Infinancials*
- *Xerfi*

## Online information[123]

- Press review (Factiva, La Tribune, La Dépêche, Le Monde, Les Echos, *The Financial Times, Marketwatch.com*)
- Company website: http://www.norbert-dentressangle.com/fr/
- XPO website: http://www.xpologistics.com/
- AMF website: http://www.amf-france.org/
- Banque de France website: www.banque-france.fr.
- Damodaran, "*Transportation*", January 2015: http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/Betas.html
- KPMG, "*Q3 2014 Transportation and logistics M&A update*": https://www.kpmg.com/NL/nl/IssuesAndInsights/ArticlesPublications/Documents/PDF/Transactions-Restructuring/MA-TL-Sector-update-Q3-2014.pdf.
- IMF, "*World Economic Outlook*", April 2015: http://www.imf.org/external/pubs/ft/weo/2015/01/pdf/text.pdf

---

[123] Web links as at 8 June 2015.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## Appendix 5: Members of the Ledouble team

Ledouble is a financial consulting firm specialising in independent appraisals. In this regard, it performs a number of independent appraisals primarily within the framework of public tender offers. The main independent appraisal and financial analysis assignments performed within this area from 2008 to 2015 are listed in **appendix 6**. Ledouble is a founder member of the Association Professionnelle des Experts Indépendants (APEI), a professional association accredited by the AMF in accordance with Article 263-1 of its General Regulations, and of the Société Française des Evaluateurs (SFEV), and follows the compliance rules described on its website: http://www.ledouble.fr.

### Olivier CRETTÉ, Partner

-   Chartered accountant and auditor, EM Lyon business school, Doctor of Management Science
-   Member of the Steering Committee of the APEI
-   Member of SFEV
-   Member of the Valuation Committee of the Association of Finance and Management Control Directors (DFCG)
-   Member of the Professional Standards Committee of the Compagnie Nationale des Commissaires aux Comptes (CNCC)
-   Regularly conducts independent appraisals and valuations
-   Associate professor at the Conservatoire National des Arts et Métiers (CNAM), lecturer at the 'Institut d'Administration des Entreprises (IAE) in Paris and Université Paris IX – Dauphine

### Sébastien SANCHO, Partner

-   Chartered accountant and auditor, Master's degree in "Corporate Finance and Financial Engineering" from Université Paris IX – Dauphine, MSTCF Paris IX – Dauphine, certified "Islamic Qualification"
-   Member of SFEV
-   Member of the Valuation Committee of the Association of Finance and Management Control Directors (DFCG)
-   Regularly conducts independent appraisals and valuations

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Romain DELAFONT, Senior manager**

- Master's degree in "Corporate Finance and Financial Engineering" from Université Paris IX – Dauphine
- Advanced diploma in accounting and management
- Member of SFEV
- Regularly involved in independent appraisals and valuations

**Edouard HAYOT, Analyst**

- Neoma Business School
- Regularly involved in independent appraisals and valuations

-=-

**Dominique LEDOUBLE, in charge of the independent review**

*Dominique Ledouble did not take part directly in the work carried out within the framework of the independent appraisal. He was involved in the capacity of internal quality controller within Ledouble in accordance with Article 2 of AMF instruction 2006-08.*

- HEC business school, chartered accountant and auditor, Doctor of law
- Chairman of the Fédération Française des Experts en Evaluation (FFEE)
- Founder and Honorary Chairman of the APEI
- Member of SFEV
- Regularly involved in independent appraisals and valuations
- Lecturer at Sciences-Po

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## Appendix 6: List of appraisals and financial analysis performed by Ledouble

| Year | Company | Sponsoring bank |
|------|---------|-----------------|
| 2015 | Euro Disney SCA | BNP Paribas |
| 2014 | Euro Disney SCA | [124] |
| 2014 | Siic de Paris | Natixis |
| 2014 | Bull | Rothschild |
| 2013 | Global Graphics | - |
| 2013 | Sam | Société Générale |
| 2013 | Etam | Natixis |
| 2013 | Tesfran | Oddo Corporate Finance |
| 2013 | Monceau Fleurs | Omega Capital Market |
| 2013 | Sical | Arkeon Finance |
| 2013 | Auto Escape | Portzamparc |
| 2013 | Klémurs | Morgan Stanley |
| 2013 | Foncière Sépric | Crédit Agricole CIB |
| 2013 | Elixens | Banque Palatine |
| 2012 | Orchestra Kazibao | Arkeon Finance |
| 2012 | Leguide.com | Natixis |
| 2011 | Xiring | Oddo Corporate Finance |
| 2011 | Maurel et Prom Nigéria | - |
| 2011 | Eurosic | BNP Paribas, CM-CIC Securities, CACIB, Natixis |
| 2011 | Metrologic | HSBC |
| 2011 | Merci Plus | Oddo Corporate Finance |
| 2010 | Stallergenes | Deutsche Bank |
| 2010 | Initiative et Finance | Rothschild |
| 2010 | Sperian Protection | BNP Paribas |
| 2010 | Sodifrance | Portzamparc |
| 2010 | Radiall | Oddo Corporate Finance |
| 2009 | Foncière Développement Logement | Société Générale et Calyon |
| 2009 | L'Inventoriste | Dexia Securities France |
| 2009 | GiFi | Société Générale |
| 2009 | Homair Vacances | Arkeon Finance |
| 2008 | Keyrus | Calyon |
| 2008 | Réponse SA | Rothschild Transaction R |
| 2008 | SASA | Oddo Corporate Finance |
| 2008 | Sodexo | Lazard |
| 2008 | Alain Afflelou | Lazard |
| 2008 | Cedip | Oddo Corporate Finance |

---

[124] Reserved capital increases (Article 261-2 of the AMF General Regulations).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Appendix 7: Projected performances of comparable listed companies**

**Comparable listed companies**

| Company | Refer ence appe ndix 8 | % revenue growth | | | EBITDA margin (%) | | | EBITA margin (%) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2015 | 2016 | 2017 | 2015 | 201 6 | 2017 | 2015 | 2016 | 2017 |
| C.H. Robinson | §8.1 | 6% | 7% | 6% | 6% | 6% | 6% | 6% | 6% | 6% |
| Landstar System | §8.2 | 6% | 7% | 8% | 8% | 8% | 8% | 7% | 7% | 8% |
| Con-Way | §8.3 | 2% | 6% | 5% | 9% | 10% | 10% | 5% | 6% | 6% |
| STEF | §8.4 | 3% | 3% | 3% | 7% | 7% | 8% | 4% | 4% | n.a. |
| ID Logisitics | §8.5 | 8% | 8% | 6% | 7% | 7% | 7% | 5% | 5% | 5% |
| Wincanton | §8.6 | 1% | 2% | 2% | 6% | 6% | 6% | 5% | 4% | 6% |
| **Average** | | **4%** | **7%** | **6%** | **7%** | **7%** | **8%** | **5%** | **5%** | **6%** |
| **Median** | | **4%** | **6%** | **5%** | **7%** | **7%** | **8%** | **5%** | **5%** | **6%** |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Appendix 8**: **Presentation of comparable companies' business activity**[125]

| 8.1 | C.H. Robinson |
|---|---|

US group specialising in transportation and logistics services.

C.H. Robinson consists of three divisions:

- the "Transportation" division comprises transportation activities (road, international, freight) and logistics activities;

- the "Sourcing" division corresponds to the buying and selling of perishable goods;

- the "Payment Services" division, which remains very marginal, generates revenues from payment advances given to its clients.

The group operates a network of around 280 offices across North America, Europe, Asia and South America.



---

125 In the order of presentation of **appendix 7**.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| 8.2 | Landstar System |
|---|---|

US group specialising in transportation and logistics services.

Landstar consists of two divisions:

- the "Transportation/Logistics" division encompasses transportation services (primarily road) and logistics services;

- the "Insurance" division offers risk management services to clients.

The group operates primarily in the North American market. At 31 December 2014, it operated 8,953 semi-trailers of which 852 were under leasing agreements and 3,927 were supplied by independent parties.



*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| 8.3 | Con-Way |
|---|---|

US group specialising in transportation and logistics services.

Con-Way consists of three divisions:

- freight operations via subsidiary "Con-Way Freight", which provides regional and international services mainly in North America;

- logistics operations via subsidiary "Menlo Worldwide Logistic"; in 2014, the group operated 78 warehouses in North America and 81 outside North America;

- road transportation or "Truckload" with a fleet of 7,800 semi-trailers and 2,600 tractors.

Con-Way is present at over 500 sites in North America and also in 20 other countries spanning all five continents. Con-Way directly owns 146 centres out of the 297 centres in operation.




*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| 8.4 | STEF |
|-----|------|

French group and a leading name in Europe, STEF is European market leader in transportation and logistics services for chilled and frozen food products. Its business activities are structured as follows:

- "Transportation France" looks after road transportation of perishable food products (meat, dairy, beverages etc.) and pharmaceutical and cosmetic products;

- the "International" division comprises transportation and logistics activities in other countries;

- the "Logistics" division has 225 warehouses and platforms representing a total storage volume of 6,767,000 m3;

- the "Maritime" division looks after transportation by sea of passengers and freight between the port of Marseille and ports in Corsica.

- other activities cover two areas of expertise: Information Systems (client computing, management computing etc.) and Real Estate (manager of the group's property assets).

The group's main client markets are food products, supermarkets and hypermarkets, pharmaceuticals and cosmetics, and flower producers.

The group favours a policy of owning its properties.





*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| 8.5 | ID Logistics |
|---|---|

A French pure-play operator in contract logistics, ID Logistics has established itself as one of the market leaders in e-commerce in France and Europe.

The group has two main business lines:

- logistics, which accounts for the majority of its business, consists of storage and order preparation as well as freight forwarding and transportation solutions with subsidiary La Flèche;

- supply chain management (cross-functional business) corresponds to control of the supply chain, upstream and downstream flow management, and monitoring of indicators.

The group generates the majority of its revenues with retailers (Carrefour, Auchan, Fnac) in France and Europe. It also has operations in China, Brazil and Indonesia. At the end of 2014, the group operated 184 warehouses around the world representing a total of 3.6 million square metres.



*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| 8.6 Wincanton |
|---|

A UK group specialising in logistics and transportation services, Wincanton operates primarily in the United Kingdom via over 200 sites and operates around 13 million square metres of storage space and around 3,600 utility vehicles.

The group has two main business lines:

- "contract logistics" (85% of revenues in 2014), consisting of services such as road transportation, storage and delivery;

- "specialist business" consisting of container transportation, freight and maintenance services (mainly via Pullman and Wincanton Records Management).



*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**IX.   OPINION OF NORBERT DENTRESSANGLE'S GROUP COMMITTEE**

### *Extraordinary meeting of the Group Committee on 28 May 2015*

*The members of the Group Committee of Norbert Dentressangle, extraordinarily meeting this day in view of its consultation with regard to the simplified tender offer targeting the company Norbert Dentressangle SA have :*

- *Heard the report of the expert appointed on 4 May 2015 pursuant to article L2323-21 of the Code du Travail (French Labour Code);*

- *Heard the information and explanations provided by the management of Norbert Dentressangle and Gordon Devens, representative of XPO Logistics, the offeror ;*

- *After discussion, decided to deliver their opinion with regard to the draft Offer submitted for their consultation.*

*After the vote, Norbert Dentressangle's Group Committee delivered the following opinion  by a majority of its present members :*

*In view of a permanent and, as of today, not completed financing package, the rationale of the investor and its strategy to get the stock to soar in order to re-sell it in the medium term.*

*In view of the refusal to give an affirmative answer to all commitment demands made by the Group Committee.*

*The members of the Group Committee CFDT, CGT, FO, UNSA, FNCR deliver an unfavourable opinion with regard to the takeover of ND by XPO.*

*In view of the persisting uncertainties with respect to the detailed perspectives resulting from the takeover of ND by XPO Logistics, CFTC, CFE, CGC members and the independent member are unable to deliver an opinion.*

The certified accountant's report to the group committee is included in Schedule 1 to this response memorandum.


**X.   PRACTICAL ARRANGEMENTS UNDER WHICH THE INFORMATION CONCERNING THE COMPANY IS MADE AVAILABLE**

Other information concerning the characteristics of the Company, including legal, financial and accounting characteristics, will be submitted to the AMF no later than the day before the opening of the Offer. Pursuant to article 231-28 of the AMF General Regulations, this information will be available on Norbert Dentressangle's (www.norbert-dentressangle.fr) and the AMF's (www.amf-france.org) websites, the day before the opening of the Offer, and will be available free of charge upon request to Norbert Dentressangle Groupe - 192, avenue Thiers - 69006 Lyon Cedex 44.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**XI.** **PERSONS ASSUMING RESPONSIBILITY FOR THE RESPONSE MEMORANDUM**

« *To my knowledge the elements contained in this response memorandum are accurate and do not contain any omissions likely to alter their impact.* »

Mister Hervé Montjotin
Chairman of the Management Board of Norbert Dentressangle

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

SCHEDULE I. REPORT OF THE CERTIFIED ACCOUNTANT TO THE GROUP COMMITTEE

# NORBERT
# DENTRESSANGLE
# GROUP

Rapport sur l'Offre Publique

d'Acquisition de XPO Logistics

**NORBERT DENTRESSANGLE GROUP**
**192 AVENUE THIERS**
**69457 LYON CEDEX 6 FRANCE**

Dear all,

We were appointed by the elected representatives of the Norbert Dentressangle Works Council on 4 May 2015 to help them to analyse the takeover bid from XPO Logistics for Norbert Dentressangle SA within the framework of Article L. 2325-35.

This appointment resulted in the preparation of a mission statement with the Group Works Council dated 4 May 2015 and a letter to the Norbert Dentressangle Group's Senior Management dated 5 May 2015.

In carrying out our work, we have also referred to our flash report prepared for the Works Council on the takeover of GND dated 29 April 2015 and our report on the hearing of buyer XPO Logistics dated 6 May 2015.

In preparing this report, we have relied on:
- Documentation from outside the company (economic information, press articles, statistical reports etc.);
- In-house information available to the public (financial reports).

We would like to thank the elected representatives of the Works Council for the trust they have placed in us.

Please feel free to contact us if you require any additional explanations or further detail about any points you consider necessary. Yours faithfully

Paris, 27 May 2015

Catherine Ferrière
Independent Auditor

Grégory Djaouk
Carl Guinet
Benjamin Pierre
Martine Pindard

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# INTRODUCTION: OVERVIEW OF THE LEGAL FRAMEWORK FOR INFORMING/CONSULTING WITH THE WORKS COUNCIL (1/4)

- **Calling of the first information meeting on the Offer:**
  - Article L. 2323-21 of the French Labour Code:
    - *"**When submitting a public takeover bid, the employer of the company for which the offer is being made and the employer making the offer must immediately call a meeting of their respective works councils in order to inform it of the offer.** [...]*
    - *During the works council meeting of the company for which the offer is being made, the employer states whether the offer was solicited or not. The works council decides whether it wants to proceed with hearing the party making the offer and appoint an independent auditor in accordance with Article L.2325-35. It may also give its opinion on the friendly or hostile nature of the offer."*
  - Article L. 2323-23-1 of the French Labour Code:
    - *"I. -- **At the request of the employer making the offer, the employer of the company for which the offer is being made can convene its works council within two working days of the offer being announced.** Articles L. 2323-21 to L. 2323-23 apply. The time frames for these articles begin on the date the offer is announced [...]"*

- **Hearing of the buyer:**
  - Article L. 2323-21-1 of the French Labour Code
    - *The hearing of the party making the offer as mentioned in the final paragraph of Article L. 2323-21 shall be held within one week of the public takeover bid being submitted.*
    - *During the hearing, the party making the offer can be assisted by persons of its choosing. It presents to the works council its business and financial policy, its strategic plans for the company concerned and the repercussions of the implementation of the offer on all interests, employment, operational sites and the location of the company's decision-making centres.*
    - *The works council can be assisted by the independent auditor appointed in accordance with the final paragraph of the same Article L. 2323-21.*

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## INTRODUCTION: OVERVIEW OF THE LEGAL FRAMEWORK FOR INFORMING/CONSULTING WITH THE WORKS COUNCIL (2/4)

- O  Consultation meeting and opinion of the works council:
  - ▪ Article L. 2323-23:
    - ▪ *"I. -- Before the board of directors or the supervisory board gives a reasoned opinion on the attractiveness of the offer and its consequences for the company being targeted, its shareholders and employees, **the works council of the company for which the offer is being made meets and is consulted on the proposed offer. During this meeting, it reviews the report prepared by the independent auditor in accordance with Article L. 2323-22-1 and may ask for the party making the offer to attend.***
    - ▪ *The works council gives its opinion within one month of the public takeover bid being submitted. If an opinion is not issued within this time frame, it is deemed to have been consulted.*
    - ▪ ***The works council's opinion and the independent auditor's report are reproduced in the responding report prepared by the company for which the offer is being made** or, if applicable, in the joint offer document prepared by the party making the offer and the company for which the offer is being made [...]"*

- O  Independent auditor's report:
  - ▪ Article L. 2323-22-1:
    - ▪ *"The independent auditor appointed in accordance with the final paragraph of Article L. 2323-21 prepares a **report evaluating the business and financial policy and strategic plans that the company making the offer intends to apply to the company for which the offer is being made, as well as repercussions of their implementation on all interests, employment, operational sites and the location of the company's decision-making centres. [...]"***

## INTRODUCTION: OVERVIEW OF THE LEGAL FRAMEWORK FOR INFORMING/CONSULTING WITH THE WORKS COUNCIL (3/4)

- O  Monitoring of commitments made by the buyer:
  - ▪ Article L. 2323-26-1:
    - ▪ *If at the close of the offer **the party making the offer** has acquired control of the company for which the offer is being made within the meaning of Articles L. 233-1, L. 233-3 and L. 233-16 of the French Commercial Code, it shall **report to the company's works council during the sixth, twelfth and twenty-fourth month after the close of the offer on how it has implemented the declarations of intent and, if applicable, the commitments it has made to the works council,** within the framework of the hearings set out in Articles L. 2323-21-1 and L. 2323-23 of the French Commercial Code, concerning employment, maintaining operating sites and the location of decision-making centres as expressed in the offer document mentioned in Article L. 621-8-IX of the French Monetary and Financial Code [...]"*

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## INTRODUCTION: MEANS OF CARRYING OUT THE ASSIGNMENT (4/4)

o **As of the date of writing this report and despite our requests, the following information is still missing:**

- Conclusions of the report by the independent appraiser (Mr Ledouble) concerning the proposed offer: Executive Management states that this document will be not be available until early June;
- Quantitative assumptions concerning acquisitions by region and business line as well as the projected timetable;
- Detailed 3-year business plan from XPO Logistics following the takeover of the Norbert Dentressangle Group: Executive Management states that this will be prepared with the future buyer and will be available in March 2016;
- Details of the financial package finally selected (increase in share capital and use of the bond market) allowing for the buyout of the Norbert Dentressangle Group;
- Current and target organisational chart for operating and financial control of the XPO Logistics group by country and business line;
- Target legal organisational chart for the XPO Logistics group by country and business line;
  - Executive Management states that no operating and legal target organisational chart has been defined as yet.

→Furthermore, we have received information up to 26 May 2015.

o **This factual information is essential in order to be able to understand the buyer's overall plan.** This situation is regrettable and means that our analysis is only partial concerning *"the business and financial policy and strategic plans that the company making the offer intends to apply to the company for which the offer is being made, as well as repercussions of their implementation on all interests, employment, operational sites and the location of the company's decision-making centres."* (Article L.2323-26-1 of the French Labour Code).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## CONTENTS OF THE REPORT

|  |  | Page |
|---|---|---|
| Key points |  | 8 |
| Analysis report |  | 12 |
| 1. | Review of the main terms of the acquisition of financing of the transaction | 13 |
| 2. | Information on the supply chain market in Europe and the buyer | 17 |
| 3. | Cross-approach to the XPO Logistics group and Norbert Dentressangle | 25 |
| 4. | Summary of risks and points to look out for | 36 |
| Appendices |  | 40 |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# KEY POINTS

## KEY POINTS (1/3)

- The announcement of the takeover of the Norbert Dentressangle Group by XPO Logistics on 28 April 2015 breaks with the traditional stance of the Norbert Dentressangle Group's chairman, who until March 2015 continued to focus on opportunities relating to the family-owned shareholding structure and the group's long history:
  - See interview with the Chairman of the Management Board of 23 March 2015 in *Le Parisien Economie*:
    - When asked *"How do you go from a very small enterprise to a mammoth while still keeping a human dimension?"*, the Chairman of the Management Board replied: "Despite our continuous growth over the last 35 years, with 67% of share capital owned by the Dentressangle family, our company has maintained its family spirit".
    - The keys to its success are *"a history of continuity, quality of execution in our operations and individual responsibility"*.
    - The visibility of the historic single brand name is emphasised.
- According to official communications, the family shareholders' decision to sell is in response to the issue of the succession of Norbert Dentressangle to ensure the durability and long-term development of the group's operations...
- ... However, the question of succession has been addressed in a "sudden and unexpected" way, creating a shock for all employees, the potential consequences of which should not be underestimated
  - This feeling is accentuated by limited visibility on the outlook: according to Executive Management, the company's European strategy, timetable and resources allocated to implementing this strategy and the business plan still need to be developed.
- The solidity and stability of the Norbert Dentressangle Group, reinforced by its form of shareholding structure, are in contrast to XPO Logistics' frantic growth model, based on a model focusing strongly on the financial market and creating value for shareholders by increasing the share price.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## KEY POINTS (2/3)

- The XPO Logistics model presents significant risks:
  - To date, permanent financing has still not been found for the acquisition and the current terms of debt severely destabilise the financial structure of the XPO Logistics group;
  - The proposed raising of funds by means of a capital increase, initially announced at $1-1.5 billion, would not be enough to guarantee a balanced financial structure and allow for further acquisitions in Europe: the strategic target announced;
  - XPO Logistics' initial cost of debt (around 8% in 2014) is much higher than the current standard level for Norbert Dentressangle (around 3% in 2014), reflecting greater risk-taking;
  - The financial strategy of XPO Logistics' shareholders is conveyed by the current boom in mergers and acquisitions in the United States and Europe in a financial market with abundant liquidity;
  - Stacking up of non-consolidated companies/groups with no shared vision. This risk is accentuated by the cultural differences between the two groups.
- This major step taken by XPO Logistics was based initially on the strategic fit in terms of geographical presence (excluding the United States), with the long-term aim of consolidation in the transportation and logistics sector in Europe and a significant impact in terms of organisation and employment.

## KEY POINTS (3/3)

- In addition to the commitments announced (maintaining jobs and decision-making centres in France)...
  - According to the proposed simplified public tender offer announced on 25 May 2015, an entity named XPO France SAS (subject to French law) is in the process of being registered in order to lead the acquisition. Bradley Jacobs will be Chairman of the company's Supervisory Board;
  - Executive Management states that there are no plans to change the location and chairmanship of the holding companies owning European entities (NDT, NDO and NDLI). "The only changes planned for these entities will concern potentially their legal name. (Source: e-mail from Executive Management of 26 May 2015)"
- ... the scope of which remains limited, there are still uncertainties:
  - What are the consequences for jobs in the short term for support functions, particularly in IT and sales roles?
  - What will be the breakdown between in-house/external jobs?
  - What will be the breakdown of jobs between each country?
  - What are the consequences for employees of the planned legal restructuring?
  - What is expected in terms of return on investment for shareholders? What are the consequences for how operations are managed and human resources management?
    - The proposed simplified public tender offer states that the buyer intends to implement a policy of paying bonuses to management with the intention of fostering loyalty.
  - How will they address acquisitions, business investment and investment in human resources, as well as the need for a return on capital employed in a sector with low margins?
    - The only information put forward is the commitment of an overall level of investment in operating assets of 2-2.5% of revenues (2.5%, the lowest level of investment reached in 2014 in ND's history since 2009). We would also note that official communications focus only on investment in IT resources.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**ANALYSIS REPORT**

# 1-REVIEW OF THE MAIN TERMS OF THE ACQUISITION OF FINANCING OF THE TRANSACTION

## MAIN TERMS OF THE ACQUISITION

o  The acquisition price is €3.24 billion, including net debt of €1.08 billion:
  - This represents €219.3 per share (cum dividend) for 9.9 million shares, or €2.17 billion; the premium offered to shareholders is around 35% (benchmark: share price of 27 April 2015).
  - This acquisition price represents 9.1x EBITDA (on the basis of a 2015 estimate of €357m) for the Norbert Dentressangle Group for the average share price in February 2015 implying a multiple of 6.8x EBITDA at end-2014 (see p29 of the 2014 annual report).
o  Acquisition in two phases:
  - Phase 1: buyout of shares owned by the Dentressangle family (representing €1.4 billion);
  - Phase 2: public tender offer for shares listed on the stock market;
  - The aim is to finalise the transaction in early June 2015.
o  Main conditions precedent and clauses known:
  - Approval from competition authorities in the United States (to date this authorisation has been given) and Germany;
  - After the offer, XPO Logistics must own at least 95% of ND SA's share capital in order to force remaining shareholders to sell their shares;
  - Non-compete clause for a period of 3 years for current shareholders.
o  Financing of the transaction by XPO Logistics:
  - Temporary financing of up to €2.4 billion obtained from Morgan Stanley;
    - The rate of interest starts at 4.25% and increases every 89 days to a level of 7.00% after the close of the acquisition (the average interest rate for the Norbert Dentressangle Group's debt was around 3% in 2014);
    - Debt must be repaid within 5 years, excluding any early repayments.
  - Liquidity at end-March 2015 of around €1 billion with total debt of around €0.9 billion;
  - Undrawn credit facility of around €0.4 billion secured against assets.
→ND's Executive Management and the buyer state that there is no risk concerning the transaction going ahead with regard to financing already being finalised and no major problems concerning hampering competition.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## FINANCING OF THE TRANSACTION FINALISED BUT WHICH WOULD DESTABILISE THE XPO GROUP'S FINANCIAL STRUCTURE (1/2)

| 2014 figures in €m* | XPO Logistics | ND | Future Entity** |
|---|---|---|---|
| Consolidated equity (A) | 1,368 | 691 | 1,368 |
| Total debt (B) | 491 | 1,212 | 3,731 |
| Net debt (+) / Net cash (-) (C) | -42 | 1,017 | |
| Debt ratio (B)/(A) (limit 250%) | 36% | 175% | 273% |

\* Converted at exchange rate of 31/12/2014 $1 = 0.82638
\*\* Tandem estimate of total debt: acquisition price + XPO's prior debt

- Firstly, the significant weighting in the short term of interest and the fairly short maturity (5 years) of the temporary loan from Morgan Stanley would be damaging to the group's financial structure:
    - We would also note that the interest rate for XPO Logistics' principal debt is already very high at 7.9% and would have a significant impact on the group's financial statements: €40m for an operating loss of -€34m.
- Secondly, if the acquisition is financed by debt, the level of debt for the new entity would result in a highly unbalanced financial structure in the light of the XPO group's current equity and pressure would be placed on cash flow from operations:
    - The ratio of total debt to consolidated equity would exceed the threshold of 250%, indicating an unusually predominant level of debt in the light of the capital provided by the shareholder;
    - The leverage ratio (net debt/EBITDA) for the new entity would be higher than 7: this ratio reflects how many years the group is able to repay its debt by means of its EBITDA, i.e. 7 years in this case:
        - Remember that the maximum level accepted by the Norbert Dentressangle Group's lenders was 3.5;
        - During its hearing, the buyer (confirmed with investors) indicated a target ratio of less than 3, with an ideal level of 1.

## FINANCING OF THE TRANSACTION FINALISED BUT WHICH WOULD DESTABILISE THE XPO GROUP'S FINANCIAL STRUCTURE (2/2)

- The buyer expresses a desire to raise funds by means of a rapid capital increase of around $1-1.5 billion to address the problem of debt. However, this fund raising would not be enough to bring debt down to an acceptable level. Executive Management has also announced that it will use the bond market to raise funds.

→ To date, long-term financing allowing for a balanced financial structure is still to be found.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 2-INFORMATION ON THE SUPPLY CHAIN MARKET IN EUROPE AND THE BUYER

## TRANSPORTATION IN EUROPE AND FRANCE*

○  In Europe in 2013 (last available data):
- Following a decline of 4.2% in 2012, road transportation of goods in Europe grew by 2.4% in 2013, driven by operators' international activity (+6.2%), particularly in Eastern Europe (+9.7%).
- Cabotage saw further growth (+18.0% in 2013 vs. +10.5% in 2012), particularly in Germany.

In France, it accounted for 4.5% of national transportation in 2013.

○  Transportation in France:
- In 2014, changes in volumes and revenues were identical as prices remained stable between 2013 and 2014;
- Sector data show a decline of 3.6% in 2014 for road transportation of goods in France compared with near stability between 2012 and 2013:
  - Growth was seen in proprietary transportation (+1.1% following an increase of 8.5% in 2013), reflecting lesser use of outsourcing.
- Long-distance transportation (-4.3%) was harder hit than short-distance (-2.0%) by the slowdown in activity in 2014;
- Stability can be seen in the transportation of agricultural and food products, contrasting with the decline in intermediate goods (-4.2% in 2014 following -3.0% in 2013).

| Change (in millions of t.km; %) | 2013/12 | 2014/13 |
|---|---|---|
| *By activity* | | |
| Third party in France | -2.1% | -4.7% |
| Proprietary in France | 8.5% | 1.1% |
| *By geographical scope* | | |
| National | -0.3% | -3.2% |
| International in France | 1.9% | -9.6% |
| *By distance category* | | |
| Less than 150km | 0.2% | -2.0% |
| 150km or more | -0.4% | -4.3% |
| *By type of goods* | | |
| Agricultural and food products | -2.1% | 0.0% |
| Petroleum products | -8.6% | NM |
| Intermediate goods | -3.0% | -4.2% |
| Construction | -1.2% | -3.8% |
| Manufactured products | 4.1% | -4.0% |
| **Total** | **-0.2%** | **-3.6%** |

*Government source - Ministry of sustainable development

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# SYNOPSIS OF CHANGES IN TRANSPORTATION OF GOODS AND STRATEGIC RESPONSES BY OPERATORS



*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# SYNOPSIS OF CHANGES IN TRANSPORTATION OF GOODS AND STRATEGIC RESPONSES BY OPERATORS



*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## ABOUT THE BUYER (1/2)

○ XPO Logistics adopted its expansion strategy in September 2011 (takeover of Express 1 by Bradley Jacobs and its teams for an initial investment of $150m).

○ This is a particularly aggressive and ambitious strategy with the aim of building up an international operator and creating value for shareholders within a very short time frame
  ▪ Adopted in a large and highly fragmented sector presenting prospects for growth (trend towards outsourcing transportation and logistics services to 3PL service providers)
  ▪ Via a number of major acquisitions leading to reconfiguration of the sector ("roll-up strategy")

○ According to G. Devens, Senior Vice-President of XPO Logistics, heard by the group's works council on 7 May 2015 within the framework of the announced offer, the edifice currently being built by XPO's management team benefits from "solid foundations"

○ XPO's strategy is in keeping with that of the companies founded previously and managed by Bradley Jacobs in the US
  ▪ **Amerex Oil Associates (founded in 1979): oil brokerage**; annual revenues of $4.7bn
  ▪ **Hamilton Resources (founded in 1984), oil trading company**; revenues of $1bn
  ▪ **United Waste Systems (founded in 1989), now No. 5 in waste treatment in North America.** After floating on the Nasdaq in 1992, the company was resold 6 years later in August 1997 to USA Waste Services for $2bn
  ▪ **United Rentals (founded in 1997), Industrial equipment hire**; revenues of $5.9bn, 13,000 employees

Bradley Jacobs was CEO of the company for 6 years until the end of 2003, when he stood down to become Executive Chairman in charge of strategy, human resources and mergers and acquisitions. At the same time, he announced his intention to invest in a new business sector in order to roll out a similar strategy and to this end founded his own investment fund in December 2003 (Jacobs Private Equity, LLC).

## ABOUT THE BUYER (2/2)

  ▪ **United Rentals (founded in 1997), Industrial equipment hire** *(cont'd)*

Bradley Jacobs left US Rentals definitively in August 2007 following the announcement of the signing in July 2007 of an agreement to sell US Rentals to US investment fund Cerberus Capital Management for $6.6bn including taking on debt of $2.6bn.

The plan was not seen through. Cerberus pulled out of the acquisition in November 2007 against the backdrop of contraction in the credit market due to not obtaining financing. The fund had to pay compensation of $100m to US Rentals

It should be noted that

  ▪ United Rentals was the object of an investigation by the SEC (Stock Exchange Commission) in 2004 concerning some of its accounting practices (relating to the recognition of certain sale-leaseback transactions). It had to correct its accounts for the 2002 and 2003 financial years and in August 2005 got rid of its Chief Financial Officer. In 2008, it agreed to pay a fine of several million dollars to bring the investigation to an end.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# XPO LOGISTICS' HIGHLY AGGRESSIVE ACQUISITION STRATEGY (1/2)

- o In 3.5 years, acquisitions carried out (or in progress) represent a total of $5.2bn
  - $1.5bn from 2012 to 2014;
  - $3.7bn in the first half of 2015
- o With two major acquisitions recently marking XPO's entry into the contract logistics sector, as well as the start of its expansion outside Europe
  - New Breed ($616m) in September 2014: contract logistics in North America
  - Norbert Dentressangle ($3.5bn/€3.2bn) in the first half of 2015, which is to date by far the largest company targeted by the XPO group
- o Since the initial investment of $150m in September 2011 in Express-1 (Bradley Jacobs' investment vehicle in the transportation sector, now XPO Logistics), 4 successive capital increases took place between March 2012 and September 2014, raising a total of $1.5bn
  - Including around $700m in September 2014 with investment by 3 major institutional shareholders: PSP Investments, GIC and Ontario Teachers' Pension Plan

**XPO Logistics - Acquisitions 2012-2015 (in $m)**



**XPO Logistics - Capital increases** (Amount in $ billion, net of issue costs)



**Capital increases by XPO Logistics**

| Date | Share issues | No. of shares (in thousands) | Net amount (in $m)* |
|------|-------------|------------------------------|---------------------|
| Mar-12 | Public offering | 9,200 | 137 |
| Aug-13 | Public offering | 11,148 | 239 |
| Feb-14 | Public offering | 17,250 | 414 |
| Sep-14 | Institutional investors (PSP, GIC, OTPP) | 22,831 | 683 |
| **Total** | | **60,429** | **1,474** |

* Minus issue costs

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## XPO LOGISTICS' HIGHLY AGGRESSIVE ACQUISITION STRATEGY (2/2)

**XPO Logistics - Acquisitions 2012-2015**

| Company | Business | Acquisition date | Purchase price ($m) |
|---|---|---|---|
| **Acquisitions in 2012** | | | |
| Continental Freight Services | Road transportation brokerage | May-12 | 3.8 |
| Kelron | Road transportation brokerage | Aug-12 | 8.0 |
| Turbo Logistics & BirDog Logistics | Road transportation brokerage | Oct-12 | 49.9 |
| **Acquisitions in 2013** | | | |
| East Coast Air Charter | Air freight brokerage | Feb-13 | 9.3 |
| Covered Logistics and Transportation | Road transportation brokerage | Feb-13 | 11.0 |
| Interide Logistics | Road transportation brokerage | May-13 | 3.7 |
| 3PD | Last mile logistics | Aug-13 | 364.3 |
| Optima Services Solutions | Last mile logistics | Nov-13 | 26.6 |
| NLM | Online transportation solutions management | Dec-13 | 87.0 |
| **Acquisitions in 2014** | | | |
| Pacer International | Multimodal transportation | Mar-14 | 331.5 |
| Atlantic Central Logistics | Last mile logistics | Jul-14 | 36.2 |
| New Breed | Logistics | Sep-14 | 615.9 |
| **Acquisitions since the start of 2015** | | | |
| UX Specialized Logistics | Last mile logistics | Feb-15 | 58.9 |
| Norbert Dentressangle | Transportation, logistics, freight forwarding | 1st half 15 | 3,530.0 |
| Bridge Terminal Transport | Multimodal transportation | 1st half 15 | 100.0 |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 3-CROSS-APPROACH TO THE XPO LOGISTICS GROUP AND NORBERT DENTRESSANGLE

## SIMILAR STRATEGY FOR BOTH GROUPS BUT DIFFERENT PACE, METHOD AND END GOAL

**Revenues for the two groups (€m*)**          **Operating income for the two groups (€m*)**



\* At the dollar exchange rate of 31/12/14

○ ND, a long-standing operator, has pursued an acquisition strategy coupled with international expansion for more than 10 years. This strategy:
  ▪ Corresponds to the response of other operators to changes in the supply chain market and for ND is primarily based on a business-led logic;
  ▪ Has been achieved by means of rapid growth but with a certain amount of time given to integration: 2.6x increase in revenues in 10 years but with an average of 3.5 years between the biggest acquisitions (Christian Salvesen, TDG, Jacobson);
  ▪ Accompanied by positive operating income and almost continuous growth for 10 years.
○ XPO Logistics, a recent operator in supply chain logistics (less than 5 years), has adopted the same strategy as ND. However, this strategy:
  ▪ Is conducted by means of unbridled growth with no solid basis in an historic business line: 13.3x increase in revenues in 4 years, bringing the group to the level of a key player in the United States;
  ▪ Accompanied by a predominantly financial focus, as the end goal is to increase the share price in order to realise a significant capital gain on resale for shareholders in the medium term;
  ▪ Is reflected for the time being by repeated operating losses.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# NORBERT DENTRESSANGLE'S SHARE PRICE PERFORMANCE WITH A LONG-TERM VIEW

- O  Successive increases of +8% in 2012; +60% in 2013; +30% in 2014 and +30% over the first 4 months of 2015
    - ▪  $159.1 on 28/04/2015 before the takeover by XPO Logistics was announced vs. €54 at end-2011

- O  Market capitalisation exceeded the €1bn threshold in 2014, reaching
    - ▪  €1.2 billion at-end December 2014
    - ▪  €1.6 billion on 28/04/2015 before the takeover was announced
    - ▪  €2.1 billion at the start of May 2015 ($2.4 billion), including the control premium offered by XPO Logistics to Norbert Dentressangle SA shareholders

### GND share price: 2003-2015 (in €)



Announcement of XPO Logistics takeover bid
29 Apr 15

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## SURGE IN THE XPO LOGISTICS SHARE PRICE AND MARKET CAPITALISATION CLOSE TO $4 BILLION

○ Despite recurring operating losses, investors have very positive expectations concerning XPO Logistics' future value
○ These expectations are reflected by the sharp rise in the share price
  ▪ Increase of more than 4x since September 2011
    ▪ Share price close to $50 at the start of May 2015
○ Market capitalisation of $3.9 billion at the start of May 2015 (vs. $0.6bn in September 2013)

**XPO Logistics - Market capitalisation ($ million)**



**XPO Logistics share price: September 2011-May 2015 ($)**



Announcement of ND takeover

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# BUSINESS LEGITIMACY FOR ND VS. LEGITIMATE FINANCIAL POSITION FOR XPO AS A RESULT OF THE TYPE OF SHAREHOLDING STRUCTURE

**Shareholding structure of the two groups at end-2014**



o   Norbert Dentressangle's share capital is owned primarily by a long-standing family shareholder (67% of share capital at end-2014):

→ ND's legitimacy is based on a family trademark and stems from the expertise built up over time starting with transportation and then coupled with logistics.

o   The majority of XPO Logistics' share capital is owned by investment funds. The weighting of investment funds is likely to increase further following the planned new round of fund raising.

■   Note that CEO Bradley S. Jacobs owns 19.5% of share capital indirectly via his fund Jacobs Private Equity and 0.2% directly (i.e. around €800m).

→The XPO Logistics group's rapid rise is based confidence instilled in the financial community by the CEO/shareholder's experience in mergers and acquisitions.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## XPO LOGISTICS' MAIN SHAREHOLDERS (APRIL 2015)

| Jacobs Private Equity, LLC 19.5% of share capital | PSP Investment Board 14.4% of share capital | Coral Blue Investment, LLD 10.3% of share capital | FMR LLC 6.1% of share capital | Ontario Teachers' Pension Plan Board 4.1% of share capital |
|---|---|---|---|---|
| • JPE was created by Bradley Jacobs in December 2003. In September 2011, it invested in the buyout of Express-1 Expedited Solutions (now XPO Logistics). No other investments. <br><br> • Bradley Jacobs has been Chairman of the Board and Chief Executive Officer (CEO) of XPO since September 2011. In April 2015, he held a total stake (direct + indirect via JPE LLC) of 19.7% in XPO Logistics | Public Sector Pension Investment Board is one of the largest pension fund managers in Canada. It invests capital for pension schemes for the public sector, the Canadian armed forces, the Royal Canadian Mounted Police and the Reserve Force. <br><br> $93.7bn in assets under management at 31 March 2014 <br><br>  <br><br> Breakdown of assets At 31 March 2014 Foreign equities Real return assets Canadian equities Nominal fixed income securities Private placements | • Investment fund of GIC Private Limited, sovereign fund domiciled in Singapore, Created in 1981 to manage Singapore currency reserves. <br><br> • No information available about the amount of assets under management | • Fidelity Investments or Fidelity Management and Research (FMR LLC) is a multinational specialising in asset management for third parties, one of the world market leaders in its field. <br><br> • FMR is managed by Edward C. Johnson III and his daughter Abigail Johnson, who has a seat on the board of directors. Its head office is in Boston. Peter Lynch is its best known fund manager. <br><br> • £4,900bn in assets under management | • The pension scheme for teachers in Ontario is the largest scheme targeted at a single profession in Canada. It manages investments and administrates pension services on behalf of its participants (182,000 active teachers and 129,000 retired teachers from the province of Ontario). <br><br> • Assets under management: CAD 154.5 billion as at 31/12/2014 |
| Sources: http://jpe.com / XPO Logistics annual reports | Source: http://www.investpsp.ca/ | Source: http://www.gic.com.sg/ | Source: https://www.fidelity.com/ | Source: https://www.otto.com/ |

## XPO LOGISTICS' MAIN SHAREHOLDERS (APRIL 2015)

| Main Shareholders (April 2015) | % |
|---|---|
| Jacobs Private Equity, LLC | 19.5% |
| PSP Investment Board | 14.4% |
| Coral Blue Investment, LLD (GIC) | 10.3% |
| FMR LLC | 6.1% |
| The Vanguard Group, Inc | 4.6% |
| Orbis Investment Management, Ltd | 4.5% |
| Ontario Teachers' Pension Plan Board | 4.1% |
| BlackRock Fund Advisors | 3.4% |
| Peter B. Cannel & Co, Inc. | 3.4% |
| Spruce House Investment Management, LLC | 3.1% |
| Morgan Stanley Investment Management, Inc | 2.8% |
| Other | 23.8% |

- o Note that in April 2015, XPO Logistics' management owned 21.1% of XPO Logistics' share capital
  - Of which Bradley Jacobs 19.7% (directly and indirectly via Jacobs Private Equity, LLC)

## A DIFFERENT GROUP CULTURE IN MANY RESPECTS

- o Norbert Dentressangle Group
- Historic family shareholding structure with a long-term view
- Values disseminated internally personified by shareholder Norbert Dentressangle
- Management team with a predominantly industry background

- European culture with foothold of decision-making centres in France and presence across the entire northern hemisphere
- Decentralised operational management based primarily on an entrepreneurial approach by managers at a number of hierarchical levels

- o XPO Logistics Group
- Financial investors with a medium or even short-term view

- Management team with a predominantly financial and legal background, specialising in mergers and acquisitions
- North American culture with decision-making centres in the United States and present only in North America
- Decentralised operational management in theory based to a larger extent on the roll-out of an effective IT system

## A NEW CULTURE FOR MORE THAN 42,000 EMPLOYEES WORLDWIDE



**Two groups' employees in 2014
(number of employees)***

O/w France

*Source: 2014 annual report (slight discrepancy with data from the "effectif groupel212.xls" file provided by HR)

- O The Norbert Dentressangle Group has more than 4x as many employees as XPO Logistics: 42,468 employees including 12,588 in France vs. 10,000 for XPO Logistics.
- O The Norbert Dentressangle Group also has a strategy of acquisitions and rapid international expansion and has already had to face the challenge of disseminating a group culture and a shared project:
  - Remember that this is essential in order to make concrete the comprehensive international offering promised to customers.
- O The integration of more than 42,000 employees across a large area, marking an unprecedented transformation for XPO Logistics, therefore constitutes a major challenge.

## COMPLEX TRADE-OFFS IN ORDER TO LEAD ACQUISITIONS AND THE NECESSARY INTERNAL INVESTMENT FROM THE FRONT



**Breakdown of the two groups' fixed assets at end-2014**

■ Property, plant and equipment **
■ Intangible assets *
■ Goodwill

GND fixed assets   XPO fixed assets

* Mainly client relations
** Of which 46% relates to trucks for GND, i.e. €553m
(near zero for XPO Logistics)

**GND capex ratio**

→Purchases of property, plant and equipment/revenues

We do not have details of these figures for XPO, but this ratio must be lower given the weighting of property, plant and equipment.

- o The fixed assets of the Norbert Dentressangle Group (GND) are:
  - ▪ Firstly, characterised by property, plant and equipment making up 46% of fixed assets at end-2014, around half of which relates to the vehicle fleet
  - ▪ Secondly, characterised by its acquisition strategy as goodwill accounts for 38% of fixed assets.
- o The XPO Logistics group's fixed assets are characterised primarily by its acquisition strategy, 68% of fixed assets at end-2014.

→ This asset structure and choice of operation for the directly owned fleet requires a policy of heavy investment in the fleet…

→ However, this policy of investment made necessary by the choice of operation for the directly owned fleet is already difficult to reconcile with rapid growth

- ▪ Past capex ratios shown on the right-hand chart show a downtrend relating partly to the choice of management between leasing/directly owning the fleet and outsourcing/internal, but also relating to trade-offs between acquisitions and capex.

# STRATEGIC FIT BETWEEN BUSINESS LINES AND REGIONS BUT SIGNIFICANT OVERLAP IN THE UNITED STATES

| | France | United States | United Kingdom | Spain | Other - European Union | Other - International |
|---|---|---|---|---|---|---|
| Contract logistics | NORBERT DENTRESSANGLE | XPO / NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | XPO / NORBERT DENTRESSANGLE |
| Last mile logistics | NORBERT DENTRESSANGLE / Only with businesses | XPO | NORBERT DENTRESSANGLE / Only with businesses | NORBERT DENTRESSANGLE / Only with businesses | | |
| Road transportation - dedicated fleet | NORBERT DENTRESSANGLE | XPO / NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE |
| Road transportation - freight and flow management | NORBERT DENTRESSANGLE | XPO / NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | |
| Multimodal transportation | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | | NORBERT DENTRESSANGLE | | |
| Freight forwarding | NORBERT DENTRESSANGLE | XPO / NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE | NORBERT DENTRESSANGLE |

# 4- SUMMARY OF RISKS AND POINTS TO LOOK OUT FOR

## STRATEGY AND BUSINESS POLICY

| Theme: Strategy and business policy | Risks identified | Responses by Executive Management and the buyer | Points to look out for and pending matters identified by Tandem |
|---|---|---|---|
| • Acquisitions and international expansion<br><br>• Rapid development of a well-known global operator<br><br>• Corporate project serving a medium or even short-term financial target<br><br>• Desire to make XPO a well-known global operator across all supply chain activities<br><br>• Rely on heavy investment in IT<br><br>• Desire to have a model based on flexible human resources | • Stacking up of non-consolidated companies/groups with no shared vision<br><br>• Culture shock<br><br>• Crisis of confidence<br><br>• More complex European market in terms of regulatory approach<br><br>• Short-termist management based on increasing the share price to the detriment of business issues<br><br>• Inexperience of XPO Logistics' current management team in the supply chain market and in Europe<br><br>• XPO Logistics Group and associated brand name not well known<br><br>• Insufficient investment to ensure both acquisition growth and organic growth | • Rapid roll-out of the new XPO brand in Europe<br><br>• Keeping ND's management team<br><br>• Keeping European decision-making centres in France for 5 years<br><br>• Past experience of CEO/shareholder in this type of development<br><br>• Decentralised approach by region | • Insufficient resources implemented to cope with acquisitions, business investment and investment in human resources, as well as the need for a return on capital employed.<br><br>• What are the 3-year detailed forecasts for each business line and region concerning the themes mentioned above?<br><br>• How stable is the shareholding structure over the medium term?<br><br>• What leeway does the management team have in Europe?<br><br>• How stable is the management team in Europe? |

# BUSINESS ACTIVITY, PROFITS AND FINANCIAL STRUCTURE

| Theme: business activity, profits and financial structure | Risks identified | Responses by Executive Management and the buyer | Points to look out for and pending matters identified by Tandem |
|---|---|---|---|
| • XPO's revenue growth is very rapid due to its aggressive acquisition policy<br><br>• The XPO group presents a recurring operating loss and heavy financial expenses due to its debt<br><br>• At present, the plan to finance the transaction by debt would severely destabilise the financial structure of the future entity<br><br>• Desire to have a group that makes limited use of heavy capex | • Future profits not enough to meet the demands of financial institutions, shareholders and required investment<br><br>• Unusually high debt over the long term<br><br>• Financial balances not enough to cope with very unfavourable ups and downs (deterioration in performance, difficulties with integration, lower than expected return on investment from acquisitions, further severe deterioration in economic conditions etc.)<br><br>• Increasing growth of outsourcing and flexibility of human resources | • Planned fund raising of $1.5 billion<br><br>• Target of return to a leverage ratio of less than 3<br><br>• Continuity of investment policy (capex of 2-2.5% of revenues a year, see radio p.34) | • Presentation of a business plan<br><br>• What is expected in terms of profit targets?<br><br>• What is expected in terms of return on investment for shareholders?<br><br>• What synergies are expected in the short term in support and sales functions?<br><br>• What synergies are expected in the medium term in operating resources with a view to further acquisitions in Europe?<br><br>• The reference given in terms of investment effort constitutes a low in the history of GND: will the announced level of investment be enough? What is the breakdown by activity, business line and region? What is the level of operating investment? |

## ORGANISATION AND EMPLOYMENT ISSUES

| Theme: organisation and employment issues | Risks identified | Responses by Executive Management and the buyer | Points to look out for and pending matters identified by Tandem |
|---|---|---|---|
| <ul><li>Decentralised organisational model</li><li>Favouring adapting organisational structure to realities of the different markets</li><li>Greater workforce flexibility</li><li>Compensation policy with a large bonus component</li></ul> | <ul><li>Restructuring of different activities with loss of jobs</li><li>Increasing growth of outsourcing and flexibility of human resources</li><li>Uncertainty about decision-making centres for Europe</li><li>Limited autonomy of management teams</li><li>Roll-out of XPO Logistics' IT system creating uniform control of activities</li><li>Financial control not reflecting the commitment of human resources to the corporate plan</li><li>Individual targets to the detriment of overall performance</li></ul> | <ul><li>18-month commitment to preserve full-time equivalent jobs in France after the acquisition is finalised:</li><li>Keeping decision-making centres for Europe for 5 years at the 3 sites in France (Lyon, Beausemblant and Malakoff) after the acquisition is finalised.</li><li>Legal simplification of the organisational structure</li></ul> | <ul><li>Commitment of limited scope with regard to employment:<ul><li>✓ This commitment is not accompanied by sanctions</li><li>✓ It does not imply preserving jobs by contract and by position</li><li>✓ This vague formulation does not distinguish between different types of contract (permanent, temporary, interim, franchise etc.)</li><li>✓ It does not affect the Implementation of restructuring plans</li></ul></li><li>Commitment concerning decision-making centres with no target legal and operating organisational structure</li><li>What are the consequences for jobs in the short term for support functions, particularly in IT and sales roles?</li><li>What will be the breakdown between in-house/external jobs?</li><li>What will be the breakdown of jobs between each country?</li></ul> |

# APPENDICES

# XPO LOGISTICS LEGAL ORGANISATIONAL STRUCTURE AS AT 1/05/2015



## MEMBERS OF XPO LOGISTICS' BOARD OF DIRECTORS

| XPO Logistics Board of Directors - 7 members in May 2015 | | |
|---|---|---|
| Bradley S. Jacobs (Chairman and Chief Executive Officer) | Since Sept. 2011 | He is also founder and manager of Jacobs Private Equity, LLC, XPO Logistics' main shareholder |
| G. Chris Andersen | Since Sept. 2011 | Founder and partner of G.C. Andersen Partners, LLC. A specialist in mergers and acquisitions, he has been Vice President of Paine Webber (asset management between 1990 and 1995) and held senior management roles for 15 years at Drexel Burnham Lambert Inc, an investment bank specialising in large merger and acquisition transactions (which collapsed in 1990), member of the board of directors of Terex Corp. since 1992 |
| Michael G. Jesselson | Since Sept. 2011 | President of Jesselson Capital Corporation since 1994. Member of the Board of Directors of American Eagle Outfitters since 1997. |
| Adrian P. Kingshott | Since Sept. 2011 | Chief Executive Officer of Adson LLC since 2006 and Senior Advisor to Headwaters Merchant Bank since 2013. A specialist in corporate finance and mergers and acquisitions, he previously worked at Goldman Sachs & Co (between 1982 and 2002) |
| James J. Martell | Since 2006 | Former Chairman of Express-1 Expedited Solutions (became XPO Logistics in 2011). Has held executive management roles at various transportation and logistics companies (in particular SmartMail Services Inc, Uti Worldwide Inc, Burlington Air Express Canada) and previously held executive management positions at Fedex and UPS. |
| Jason D. Papastavrou | Since Sept. 2011 | Founder and Chief Investment Officer at ARIS Capital Management, LLC and co-founder of Empiric Asset Management, LLC. He headed up the Hedge Funds Investment fund (speculative fund) of the Banc of America Capital Management group. He is also a director of United Rentals, Inc. |
| Oren G. Shaffer | Since Sept. 2011 | He was Vice Chairman and Chief Financial Officer of Qwest Communications International, Inc (now CenturyLink, Inc) between 2002 and 2007. Prior to this he was Chief Operating Officer of Sorrento Networks, Inc (between 2000 and 2002) and Chief Financial Officer of Ameritech Corporation Inc (between 1994 and 2000). He has been a member of the Board of Directors of Terex Corporation since 2007. |

## MAIN NAMED EXECUTIVE OFFICERS OF XPO LOGISTICS

| Main named executive officers of XPO Logistics - May 2015 | | |
|---|---|---|
| Bradley S. Jacobs | Chairman and Chief Executive Officer | Since Sept. 2011 |
| Hervé Montjotin | Chairman and Chief Executive Officer of XPO Logistics - Europe | Since May 2015 (currently Chairman of the Management Board of Norbert Dentressangle) |
| John J. Hardig | Chief Financial Officer | Since Feb. 2012 (previously investment banker specialising in transportation and logistics) |
| Troy A. Cooper | Chief Operating Officer | Since May 2014 (joined in September 2011 as Vice President - Finance. Previously at United Rentals and United Waste Systems, in charge of integrating a number of entities acquired) |
| Gordon E. Devens | Secretary, Senior Vice President and General Counsel | Since Nov. 2011 (specialist in mergers and acquisitions) |
| Scott B. Malatt | Chief Strategy Officer | Since July 2012 (joined XPO Logistics in October 2011, in charge of analysing acquisition opportunities and organising technology. Previously financial analysts at investment banks including: Goldman Sachs Group in the transportation sector, UBS, JPMorgan Chase & Co. |

# OFFRE PUBLIQUE D'ACHAT SIMPLIFIEE

### VISANT LES ACTIONS DE





### INITIEE PAR

# XPOLogistics

### XPO Logistics France SAS

## NOTE EN REPONSE ETABLIE PAR
## NORBERT DENTRESSANGLE SA



En application de l'article L. 621-8 du code monétaire et financier et de l'article 231-26 de son règlement général, l'Autorité des marchés financiers (l'« AMF ») a apposé le visa n° 15-291 en date du 23 juin 2015 sur la présente note en réponse. Cette note en réponse a été établie par la société Norbert Dentressangle SA et engage la responsabilité de ses signataires.

Le visa, conformément aux dispositions de l'article L. 621-8-1 I du code monétaire et financier, a été attribué après que l'AMF ait vérifié « si le document est complet et compréhensible et si les informations qu'il contient sont cohérentes ». Il n'implique ni approbation de l'opportunité de l'opération, ni authentification des éléments comptables et financiers présentés.

---

## Avis Important

En application des articles 261-1 et suivants du Règlement général de l'AMF, le rapport de Ledouble SAS, agissant en qualité d'expert indépendant, est inclus dans la présente note en réponse.

---

La présente note en réponse est disponible sur les sites internet de Norbert Dentressangle SA (http://www.norbert-dentressangle.fr) et de l'AMF (www.amf-france.org) et peut être obtenue sans frais auprès de :

### Norbert Dentressangle SA
192, avenue Thiers - 69006 Lyon Cedex 44

Conformément à l'article 231-28 du Règlement général de l'AMF, les informations relatives aux caractéristiques notamment juridiques, financières et comptables de Norbert Dentressangle SA seront déposées auprès de l'AMF et mises à disposition du public, au plus tard la veille de l'ouverture de l'offre publique.

Un avis financier sera publié, au plus tard la veille de l'ouverture de l'offre publique pour informer le public des modalités de mise à disposition de ces documents.

## TABLE DES MATIERES

I. RAPPEL DES CONDITIONS DE L'OFFRE ...................................................................................... 3

II. CONTEXTE ET MOTIFS DE L'OPÉRATION ................................................................................... 4

    1.     *Contexte de l'opération* ........................................................................................................ 4

        *(i) Acquisition par l'Initiateur d'une participation de 66,71% au capital de ND* ............... 4

        *(ii) Clauses particulières du Contrat de Cession d'Actions entre l'Initiateur et les Vendeurs Initiaux* ............ 5

    2.     *Répartition du capital et des droits de vote de ND au 31 mai 2015* ................................. 5

        *(i) Titres donnant accès au capital de la Société (bons de souscription d'achats)* ............. 6

        *(ii) Actions attribuées gratuitement* ................................................................................... 6

    3.     *Répartition du capital et des droits de vote de ND à la suite de l'Achat de Bloc le 8 juin 2015* ......... 7

    4.     *Répartition du capital et des droits de vote de ND à la date de la décision de conformité* ............... 7

        *(i) Déclarations de franchissements de seuils et des droits de vote* ..................................... 9

        *(ii) Engagements d'apport à l'Offre* .................................................................................... 9

        *(iii) Autorisations réglementaires* ...................................................................................... 9

    5.     *Composition du Conseil de surveillance* ............................................................................ 9

III. AVIS MOTIVÉ DU CONSEIL DE SURVEILLANCE DE NORBERT DENTRESSANGLE ....................... 10

IV. INTENTIONS DES MEMBRES DU CONSEIL DE SURVEILLANCE DE NORBERT DENTRESSANGLE ...... 12

V. INTENTIONS DE LA SOCIÉTÉ RELATIVE AUX ACTIONS D'AUTOCONTRÔLE .................................. 12

VI. ACCORDS SUSCEPTIBLES D'AVOIR UNE INCIDENCE SUR L'APPRÉCIATION OU L'ISSUE DE L'OFFRE ...... 12

VII. ELÉMENTS SUSCEPTIBLES D'AVOIR UNE INCIDENCE EN CAS D'OFFRE PUBLIQUE ........................ 12

    1.     *Structure du capital de la Société* ...................................................................................... 12

    2.     *Restrictions statutaires à l'exercice du droit de vote et au transfert d'Actions ou clauses des conventions portées à la connaissance de la Société en application de l'article L. 233-11 du Code de commerce* ............... 13

    3.     *Participations directes et indirectes dans le capital de la Société dont elle a connaissance en vertu des articles L. 233-7 et L. 233-12 du Code de commerce* ............... 14

    4.     *Liste des détenteurs de tout titre comportant des droits de contrôle spéciaux et description de ceux-ci* ............... 14

    5.     *Mécanismes de contrôle prévus dans un éventuel système d'actionnariat du personnel quand les droits de contrôle ne sont pas exercés par ce dernier* ............... 14

    6.     *Accords entre actionnaires dont la Société a connaissance et qui peuvent entraîner des restrictions au transfert d'Actions et à l'exercice des droits de vote* ............... 14

    7.     *Règles applicables à la nomination et au remplacement des membres du Conseil de surveillance et à la modification des statuts de la Société* ............... 14

    8.     *Pouvoirs du Conseil de surveillance, en particulier en matière d'émission ou de rachat de titres* ............... 15

    9.     *Impact d'un changement de contrôle sur les accords conclus par la Société* ............... 17

    10.   *Accords prévoyant des indemnités pour les membres du Conseil de surveillance de Norbert Dentressangle ou les salariés, s'ils démissionnent ou sont licenciés sans cause réelle et sérieuse ou si leur emploi prend fin en raison d'une offre publique* 17

VIII. RAPPORT DE L'EXPERT INDÉPENDANT DE L'ART. 261-1 DU RÈGLEMENT GÉNÉRAL DE L'AMF ............... 18

IX. AVIS DU COMITÉ DE GROUPE DE NORBERT DENTRESSANGLE ...................................................... 87

X. MODALITÉS DE MISE À DISPOSITION DES INFORMATIONS RELATIVES À LA SOCIÉTÉ ..................... 87

XI. PERSONNES QUI ASSUMENT LA RESPONSABILITÉ DE LA NOTE EN RÉPONSE ................................. 88

ANNEXE I. RAPPORT DE L'EXPERT-COMPTABLE AU COMITÉ DE GROUPE ............................................ 89

## I.   RAPPEL DES CONDITIONS DE L'OFFRE

En application du Titre III du Livre II et plus particulièrement des articles 233-1 2° et 234-2 et suivants du Règlement général de l'AMF, XPO Logistics France SAS, une société par actions simplifiée à associé unique ayant un capital social de 10.000 euros, dont le siège social est situé 23 rue du Roule, 75001 Paris France et immatriculée au Registre du commerce et des sociétés de Paris sous le numéro 811 597 335 (« **XPO** » ou l' « **Initiateur** »), elle-même filiale à 100% de la société XPO Logistics Inc., une société immatriculée au Delaware, dont le siège social est à Five Greenwich Office Park, Greenwich, Connecticut 06831 (Etats-Unis) (« **XPO Logistics, Inc.** » et, ensemble avec XPO, « **XPO Logistics** »), s'est engagée irrévocablement auprès de l'AMF à offrir aux actionnaires de la société Norbert Dentressangle, une société anonyme de droit français ayant un capital social de 19.672.482 euros divisé en 9.836.241 actions d'une valeur nominale de 2 euros chacune dont le siège social est situé au 192 avenue Thiers - 69006 Lyon, immatriculée au registre du commerce et des sociétés de Lyon sous le numéro 309 645 539 (« **ND** », « **Norbert Dentressangle** » ou la « **Société** »), et dont les actions sont admises aux négociations sur marché Euronext Paris – Eurolist Compartiment A (ISIN FR0000052870 ; code mnémonique : « GND ») et sur la Liste Officielle d'Euronext Londres, d'acquérir la totalité de leurs actions ND (les « **Actions** » ou les « **Titres** »), au prix unitaire de 217,50 euros.

Conformément à l'article 233-1 2° du règlement général de l'AMF, l'offre prend la forme d'une offre publique d'achat simplifiée.

L'Offre fait suite à l'acquisition par XPO (i) le 8 juin 2015, de 6.561.776 actions de ND auprès de plusieurs actionnaires par voie de cession de blocs hors marché (l' « **Achat de Bloc** »), représentant 66,71 % du capital et 66,38 % des droits de vote théoriques de la Société et (ii) le 8 juin 2015, de 110.000 bons de souscriptions (comme définis ci-après) donnant droit à souscrire à 110.000 actions ND.

XPO détient à la date de dépôt de l'Offre, 6.561.776 actions ND, représentant 66,71% du capital et 66,38 % des droits de vote théoriques.

Conformément aux dispositions de l'article 231-13 I du règlement général de l'AMF, Morgan Stanley, agissant pour le compte de l'Initiateur, a déposé un projet de note d'information auprès de l'AMF le 11 juin 2015. Morgan Stanley, en tant qu'établissement présentateur, garantit la teneur et le caractère irrévocable des engagements pris par l'Initiateur.

L'Offre vise la totalité des actions non détenues directement ou indirectement par l'Initiateur à la date des présentes.

Conformément aux articles 237-14 à 237-16 du règlement général de l'AMF, l'Initiateur demandera à l'AMF, dans un délai maximum de 3 mois à l'issue de la clôture de l'Offre, de mettre en œuvre une procédure de retrait obligatoire par le transfert des actions ND qui ne lui appartiennent pas et qui n'auraient pas été présentées à l'Offre (à condition qu'elles ne représentent pas plus de 5 % du capital ou des droits de vote de la Société), au prix de 217,50 euros par action.

## II.   CONTEXTE ET MOTIFS DE L'OPERATION

### 1.   Contexte de l'opération

#### (i)   Acquisition par l'Initiateur d'une participation de 66,71% au capital de ND

Le 28 avril 2015, XPO Logistics, Inc. a conclu (i) un contrat de cession d'actions (le « **Contrat de Cession d'Actions** ») avec Dentressangle Initiatives, Messieurs Norbert Dentressangle et Pierre-Henri Dentressangle et Mesdames Evelyne Dentressangle et Marine Dentressangle (les « **Vendeurs Initiaux** »), (ii) un accord relatif à l'offre publique d'achat (« **l'Accord Relatif à l'Offre Publique d'Achat** ») avec la Société et (iii) un accord d'intéressement avec les membres du Directoire (le « **Plan d'Intéressement** ») régissant le traitement des plans d'intéressement existants et le futur plan d'intéressement qui sera octroyé aux dirigeants et salariés de la Société.

En application du Contrat de Cession d'Actions, XPO s'est engagée à acquérir 6.561.776 actions auprès des Vendeurs Initiaux, représentant environ 66,71 % du capital social de ND, au prix de 217,50 euros par action (« **l'Achat de Bloc** »). Le prix d'acquisition prend en compte la distribution d'un dividende d'un montant de 1,80 euros par action intervenue au profit de tous les actionnaires de ND avant la réalisation de l'Achat de Bloc.

De plus, en application de l'Accord Relatif à l'Offre Publique d'Achat et du Plan d'Intéressement, XPO s'est engagée à acquérir, auprès de certains membres du directoire de la Société, les bons de souscription d'actions émis à leur profit par la Société, à un prix de 157,95 euros par bon de souscription, à savoir, (i) 80.000 bons de souscription au prix d'exercice de 59,55 euros (les « **BSA A** ») et (ii) 30.000 bons de souscription au prix d'exercice de 59,55 euros (les « **BSA B** ») (les BSA A et BSA B étant désignés, les « **BSA** » ou les « **Bons de Souscription d'Actions** »), à la seule condition que les conditions de « vesting » prévues dans les termes et conditions de ces Bons de Souscription d'Actions soient supprimées et que les périodes d'exercice soient ouvertes par anticipation, par décision des actionnaires de la Société lors de l'assemblée générale qui s'est tenue le 21 Mai 2015.

XPO Logistics, Inc. et la Société ont annoncé l'Achat de Bloc le 28 avril 2015. XPO Logistics, Inc. a également annoncé qu'elle lancerait le processus d'acquisition de toutes les actions restantes de ND au prix de 217,50 euros par action.

Le conseil de surveillance de la Société, qui s'est tenu le 27 avril 2015, a émis un avis préliminaire favorable sur l'Achat de Bloc et sur l'Offre et a désigné Ledouble SAS, représenté par Messieurs Olivier Cretté et Sébastien Sancho, en qualité d'expert indépendant en charge de la rédaction du rapport portant sur les modalités financières d'une offre publique éventuellement suivie d'un retrait obligatoire.

Le 21 mai 2015, l'assemblée générale de la Société a approuvé la distribution d'un dividende d'un montant de 1,80 euros par action qui a été versé le 2 juin 2015 (la date de détachement étant intervenue le 29 mai 2015).

La Société a engagé les procédures d'information et de consultation du comité d'entreprise au niveau du groupe ND immédiatement après l'annonce de la signature du Contrat de Cession d'Actions. Le 28 mai 2015, le comité d'entreprise du groupe ND a émis un avis défavorable sur le projet d'Offre envisagé.

Le règlement livraison relatif à l'Achat de Bloc prévu par le Contrat de Cession d'Actions a été réalisé hors marché le 8 juin 2015.

A la suite de l'Achat de Bloc, l'Initiateur est devenu propriétaire de 6.561.776 actions ND, représentant 66,71 % du capital social et 66,38 % des droits de vote théoriques de la Société.

De plus, le 8 juin 2015, l'Initiateur a acquis les BSA au prix de 157,95 euros par bon de souscription, correspondant au prix d'acquisition des actions dans le cadre de l'Achat de Bloc moins le prix d'exercice.

> (ii) **Clauses particulières du Contrat de Cession d'Actions entre l'Initiateur et les Vendeurs Initiaux**

Le Contrat de Cession d'Actions prévoit l'obligation pour l'acquéreur de s'assurer que la Société cesse progressivement d'utiliser le nom commercial et la marque Norbert Dentressangle, le changement de nom commercial et de marque devant être intégralement réalisé dans les 36 mois qui suivent l'Achat de Bloc. Sous réserve de certaines conditions, des pénalités pourraient être dues en cas de manquement à ces obligations.

De plus, le Contrat de Cession d'Actions prévoit une obligation de non-concurrence et de non-sollicitation de 3 ans pour les Vendeurs Initiaux. Les Vendeurs Initiaux se sont également engagés à ne pas utiliser le nom commercial et la marque Norbert Dentressangle pour toute activité similaire à celle de la Société pendant une durée de 20 ans.

> 2. **Répartition du capital et des droits de vote de ND au 31 mai 2015**

Le capital social de ND s'élève à 19.672.482 euros divisé en 9.836.241 actions ordinaires de 2 euros de valeur nominale.

Le tableau ci-après présente la répartition du capital et des droits de vote avant la réalisation de l'Achat de Bloc, au 31 mai 2015.

| Actionnaires | Nombre d'actions | % du capital | Nombre théorique de droits de vote | % Droits de vote[1] |
|---|---|---|---|---|
| Famille Dentressangle | 240.482 | 2,44 | 480.944 | 2,96 |
| Dentressangle Initiatives | 6.321.294 | 64,27 | 12.366.694 | 76,26 |
| Salariés et public[2] | 3.230.018 | 32,84 | 3.325.298 | 20,50 |
| Actions détenues par Norbert Dentressangle SA | 38.578 | 0,39 | 38.578 | 0,24 |
| Actions détenues au titre du contrat de liquidité | 5.869 | 0,06 | 5.869 | 0,04 |
| **Total** | 9.836.241 | 100,00 | 16.217.383 | 100,00 |

---

[1] Conformément à l'article 223-11 du Règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions à droits de vote sont attachés, y compris les actions privées de droit de vote.

[2] Incluant 53.500 actions détenues par les membres du directoire.

### (i) Titres donnant accès au capital de la Société (bons de souscription d'achats)

En outre, à la date du 8 juin 2015, les Bons de Souscription d'Actions existants donnant accès au capital de la Société, étaient répartis de la façon suivante :

| Catégorie | Nombre de Bons de Souscription d'Actions alloué par la Société | Total des Actions (en cas d'exercice) |
|---|---|---|
| BSA A – Emission en juillet 2013 | 80 000 | 80 000 |
| BSA B – Emission en juillet 2013 | 30 000 | 30 000 |
| **Total** | 110 000 | 110 000 |

Comme il est indiqué ci-dessus, l'Initiateur a acquis le 8 juin 2015, conformément à l'Accord Relatif à l'Offre Publique d'Achat et au Plan d'Intéressement, les Bons de Souscription d'Actions appartenant à Messieurs Montjotin (50.000 BSA), Bataillard (30.000 BSA)[3], Wilson (15.000 BSA) et Gomez (15.000 BSA) (membres du directoire), à un prix de 157,95 euros par Bon de Souscription d'Action, ce montant correspondant au prix par action payé pour l'Achat du Bloc moins le prix d'exercice par Bon de Souscription d'Action.

Lors de l'assemblée générale mixte des actionnaires du 21 mai 2015, les actionnaires de ND ont modifié les termes et conditions des BSA 2013 afin de (i) supprimer les conditions de présence et d'incessibilité qui y étaient prévues, et (ii) anticiper l'ouverture de la période d'exercice à compter du 21 mai 2015 (la date de fin d'exercice prévue lors de l'émission restant inchangée).
Il est par ailleurs indiqué que, conformément aux termes de l'Accord Relatif à l'Offre Publique d'Achat, le Directoire n'a pas fait usage de l'autorisation d'émettre des BSA 2015 au profit de Messieurs Malcom Wilson et Luis Angel Gomez qui avait été votée lors de l'assemblée générale du 21 mai 2015.

### (ii) Actions attribuées gratuitement

La Société a procédé à des attributions gratuites d'actions. Au 31 mai 2015, les actions attribuées gratuitement suivantes sont toujours en période d'acquisition et n'ont donc pas encore été émises ni livrées à leurs bénéficiaires :

---

[3] Il est précisé qu'une partie des BSA détenus par Monsieur Bataillard et par Monsieur Montjotin a fait l'objet d'apports à des holdings patrimoniales leur appartenant et de donations-partages au profit de leurs enfants respectifs.

| Catégorie | Nombre d'Actions alloué par la Société |
|---|---|
| Actions attribuées gratuitement – Attribution de mai 2013 | 50.100 |
| Actions attribuées gratuitement – Attribution de mai 2014 | 21.000 |
| Actions attribuées gratuitement – Attribution d'octobre 2014 | 30.997 |
| **Total** | **102.097** |

**3. Répartition du capital et des droits de vote de ND à la suite de l'Achat de Bloc le 8 juin 2015**

Le tableau ci-après présente la répartition du capital et des droits de vote à la suite de la réalisation de l'Achat de Bloc le 8 juin 2015.

| Actionnaires | Nombre d'actions | % du capital | Nombre de droits de vote théoriques | % Droits de vote[4] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6.561.776 | 66,71 | 6.561.776 | 66,38 |
| Salariés et public[5] | 3.230.018 | 32,84 | 3.279.575 | 33,17 |
| Actions détenues par Norbert Dentressangle SA | 38.578 | 0,39 | 38.578 | 0,39 |
| Actions détenues au titre du contrat de liquidité | 5.869 | 0,06 | 5.869 | 0,06 |
| **Total** | 9.836.241 | 100,00 | 9.885.798 | 100,00 |

**4. Répartition du capital et des droits de vote de ND à la date de la décision de conformité**

Le tableau ci-après présente la répartition du capital et des droits de vote au 23 juin 2015, compte tenu des achats d'actions de la Société effectuées par XPO depuis le dépôt du projet de note en réponse.

---

[4] Conformément à l'article 223-11 du Règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions à droits de vote sont attachés, y compris les actions privées de droit de vote.

[5] Incluant 53.500 actions détenues par les membres du directoire.

| Actionnaires | Nombre d'actions | % du capital | Nombre de droits de vote théoriques | % Droits de vote[6] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6.751.301 | 68,64 | 6.751.301 | 68,29 |
| Y compris les actions acquises depuis le 11 juin 2015 | 189.525 | 1,93 | 189.525 | 1,92 |
| Salariés et public[7] | 3.084.940 | 31,36 | 3.134.497 | 31,71 |
| Y compris les actions détenues par Norbert Dentressangle SA | 38.578 | 0,39 | 38.578 | 0,39 |
| Y compris les actions détenues au titre du contrat de liquidité | 5.869 | 0,06 | 5.869 | 0,06 |
| Total | 9.836.241 | 100 | 9.885.798 | 100 |

Conformément au Plan d'Intéressement, XPO Logistics, Inc. a proposé ce qui suit aux bénéficiaires d'actions gratuites, étant rappelé que ces actions gratuites n'ont pas été émises à la date de l'Offre et ne sont donc pas visées par l'Offre.

Pour les bénéficiaires d'actions gratuites attribuées en avril 2013 et en avril 2014, dont la livraison interviendrait en avril 2016 qui font l'objet d'un engagement de conservation jusqu'en avril 2018, XPO Logistics, Inc. et l'Initiateur proposeront à ces bénéficiaires de renoncer à ces actions gratuites en échange d'un bonus en numéraire (traité comme du salaire) pour un montant brut de 217,50 euros par action, payable en deux versements équivalents qui interviendraient 1 an et demi et 3 ans après la réalisation de l'Achat de Bloc (sans aucune condition de présence, de service ou de performance).

Les réalisations historiques 2013 et 2014 et le budget 2015 permettent de considérer que les conditions de performances attachées aux plans d'attribution d'avril 2013 et d'avril 2014 seront bien atteintes.

Pour les bénéficiaires d'actions gratuites attribuées en octobre 2014 aux managers de la société Jacobson (la filiale américaine de la Société, dont l'acquisition a été réalisée le 31 juillet 2014) dont les périodes d'acquisition et de conservation expirent toutes deux en octobre 2018, XPO Logistics, Inc. proposera, en contrepartie de la renonciation des bénéficiaires à ces actions gratuites, la mise en place d'un nouveau plan reposant sur l'évolution du cours de bourse XPO Logistics, Inc. et dont les objectifs de performance tiendraient compte de l'intégration au sein du groupe XPO. L'horizon de ce nouveau plan serait au moins égal à celui des actions gratuites qu'il remplacerait. La valeur des attributions au titre de ce nouveau plan ne serait en tout état de cause pas supérieure à la valeur des actions gratuites remplacées en prenant en compte, d'une part, le

---

[6] Conformément à l'article 223-11 du Règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions à droits de vote sont attachés, y compris les actions privées de droit de vote.

[7] Incluant 53.500 actions détenues par les membres du directoire.

prix de l'Offre pour déterminer la valeur des actions gratuites remplacées, et d'autre part, la valeur en bourse des actions XPO Logistics, Inc. sous-jacentes aux instruments remis en échange pour déterminer la valeur de ces derniers.

### (i)   Déclarations de franchissements de seuils et des droits de vote

Conformément aux articles 223-11 et suivants du règlement général de l'AMF et aux articles L. 233-7 et suivants du code de commerce, l'Initiateur a déclaré à l'AMF et à ND, par courriers en date de ce jour, qu'il avait, à la suite de l'Achat de Bloc, franchi à la hausse, le 8 juin 2015, tous les seuils légaux et statutaires compris entre zéro et $^2/_3$ du capital social et entre zéro et 50% des droits de vote de la Société suite à l'exécution du Contrat de Cession d'Actions relatif à l'Achat de Bloc.

Réciproquement, les membres de la famille Dentressangle et Dentressangle Initiatives ont déclaré, par des courriers à l'AMF et à ND, en date de ce jour, qu'ils avaient, agissant ensemble de concert, suite à l'Achat de Bloc, franchi à la baisse, le 8 juin 2015, tous les seuils légaux et statutaires compris entre $^2/_3$ jusqu'à zéro.

### (ii)   Engagements d'apport à l'Offre

Sans objet.

### (iii)   Autorisations réglementaires

L'Offre n'est soumise à aucune condition au titre du contrôle des concentrations.

L'Achat de Bloc a été autorisé (ou n'a pas donné lieu à objection) par les autorités de la concurrence aux Etats Unis d'Amérique, en Allemagne et en Russie.

Les autorisations ont été octroyées respectivement le 11 mai 2015 pour les Etats-Unis d'Amérique (*early termination*) et l'Allemagne et le 20 mai 2015 pour la Russie.

### 5.   Composition du Conseil de surveillance

Concomitamment à la réalisation de l'Achat de Bloc conformément au Contrat de Cession d'Actions, Messieurs Norbert Dentressangle, Pierre-Henri Dentressangle, Vincent Menez, Bruno Rousset, Jean-Bernard Lafonta et Madame Evelyne Dentressangle ont démissionné de leurs fonctions de membres du conseil de surveillance de ND avec effet au 8 juin 2015. Ces démissions sont intervenues après que le conseil de surveillance de ND ait recommandé l'Offre comme mentionné ci-dessus.

Le conseil de surveillance de la Société, réuni le 8 juin 2015, a coopté six nouveaux membres (Messieurs Bradley Jacobs, Troy Cooper, John Hardig, Gordon Devens, Tavio Headley et XPO Logistics, Inc., ayant pour représentant permanent Madame Angela Kirkby). Monsieur Bradley Jacobs a, en outre, été nommé président du conseil de surveillance, et Monsieur Gordon Devens a été nommé vice-président du conseil de surveillance.

Ces cooptations, qui ont pris effet le 8 juin 2015, seront soumises à la ratification de l'assemblée générale des actionnaires de la Société.

Le conseil de surveillance de la Société est désormais composé comme suit:

-   Bradley Jacobs, président (également président du conseil d'administration de XPO Logistics, Inc.),

-   Gordon Devens, vice-président (salarié de XPO),

-   Clare Chatfield (membre indépendant),

-   Henri Lachmann (membre indépendant),

-   Jean-Luc Poumarède (membre indépendant),

-   François-Marie Valentin (membre indépendant),

-   XPO Logistics, Inc., représentée par Angela Kirby,

-   Troy Cooper (salarié de XPO),

-   John Hardig (salarié de XPO),

-   Tavio Headley (salarié de XPO).


### III.   AVIS MOTIVE DU CONSEIL DE SURVEILLANCE DE NORBERT DENTRESSANGLE

Conformément aux dispositions de l'article 231-19 du Règlement général de l'AMF, les membres du Conseil de surveillance de la Société se sont réunis le 8 juin 2015, sur convocation faite conformément aux statuts de la Société, afin d'examiner, préalablement à la recomposition visée à la section II.5, le projet d'Offre. A l'exception de Monsieur Bruno Rousset, l'ensemble des membres du Conseil étaient présents, y compris les membres indépendants. Les débats et le vote sur l'avis motivé du Conseil de surveillance se sont tenus sous la présidence de Monsieur Norbert Dentressangle, en qualité de Président du Conseil de surveillance, conformément à l'article 22 des statuts de Norbert Dentressangle.

Préalablement à la réunion, les membres du Conseil de surveillance ont eu connaissance :

-   Le projet de note d'information établi par XPO Logistics France SAS contenant les caractéristiques du projet d'Offre, notamment les motifs et intentions de l'initiateur ainsi que les éléments d'appréciation du prix de l'Offre établis par Morgan Stanley en sa qualité de banque présentatrice de l'Offre ;

-   L'attestation de l'expert indépendant (Ledouble SAS), qui conclut au caractère équitable, pour les actionnaires minoritaires de la Société, du prix offert de 217,50 euros par action de la Société, notamment dans la perspective d'un retrait obligatoire ;

-   Le projet de note en réponse établi par la Société.

Le Conseil de Surveillance a par ailleurs pris acte que la procédure d'information-consultation préalable du comité de groupe sur les opérations envisagées dans le cadre de l'Offre s'est achevée le 28 mai 2015, le comité de groupe ayant émis un avis défavorable.

L'avis motivé suivant a été adopté à l'unanimité des membres du Conseil de surveillance, y compris ses membres indépendants :

« *Après en avoir débattu, et au vu des documents susvisés, les membres du Conseil de surveillance constatent que :*

- *le prix proposé de 217,50 euros par action offert aux actionnaires de la Société représente une prime de 34% (35% coupon attaché)% par rapport au cours de bourse de clôture du 27 avril 2015 qui s'élevait à 162,10 euros, avant l'annonce des principales caractéristiques du projet d'Offre ;*

- *le prix offert dans le cadre de l'Offre est identique au prix devant être payé par XPO Logistics France SAS pour acquérir les blocs de titres Norbert Dentressangle, représentant au total 66,71 % du capital de Norbert Dentressangle, auprès des actionnaires de contrôle de Norbert Dentressangle ;*

- *l'expert indépendant a relevé que le prix d'Offre extériorise une prime sur l'ensemble des critères d'évaluation retenus et que ce prix est équitable, d'un point de vue financier, pour les actionnaires de Norbert Dentressangle dans la perspective de mise en œuvre d'un retrait obligatoire ;*

- *XPO Logistics est un des leaders américains du secteur du transport et de la logistique en Amérique du Nord ; son développement, qui a connu une très forte croissance, s'est notamment appuyé au cours des dernières années sur des opérations de croissance externe. XPO Logistics dispose ainsi de positions solides dans le domaine du transport aux Etats-Unis, ainsi que dans celui de la logistique contractuelle sophistiquée et à fort contenu technologique.*

- *XPO Logistics prévoit que ce rapprochement générera d'importantes opportunités de ventes croisées à l'échelle du nouveau groupe. Les clients actuels de Norbert Dentressangle pourront ainsi bénéficier d'un point d'entrée unique pour les accompagner à l'échelle mondiale dans la gestion de leur supply-chain et auront accès aux services de premier plan que XPO Logistics France SAS peut offrir en Amérique du Nord ;*

- *XPO Logistics entend faire de Norbert Dentressangle sa plateforme de développement européenne. XPO Logistics déploiera en Europe sa plateforme propriétaire d'optimisation du fret pour améliorer le sourçage des transporteurs et le service client. De plus, XPO Logistics envisage de réaliser d'importants investissements de croissance dans ses nouvelles activités européennes, notamment dans le développement technologique ;*

- *Norbert Dentressangle et XPO Logistics n'ont pas identifié ni quantifié d'importantes synergies en raison de l'absence de recoupement de leurs activités en Europe et de la complémentarité de leurs activités en Amérique du Nord. L'essentiel des synergies attendues proviennent des opportunités de ventes croisées. Par conséquent, le rapprochement de ces deux sociétés devrait préserver l'intégrité des activités et du niveau d'emploi actuels de Norbert Dentressangle ;*

- *L'Offre s'inscrit dans une logique de poursuite de l'activité et du développement de la Société. A cet égard, XPO Logistics entend reprendre la quasi-totalité du management de Norbert Dentressangle, pour lequel il mettra en place des programmes d'intéressement. De plus, XPO Logistics entend maintenir à son niveau actuel le nombre d'employés à temps plein en France, sur une période minimum de 18 mois à compter de la clôture de l'acquisition. XPO Logistics estime que le rapprochement des deux sociétés ne devrait pas se traduire par une modification significative du statut individuel et collectif des employés de Norbert Dentressangle et de ses filiales ;*

- *XPO Logistics entend maintenir les centres de décision européens de Norbert Dentressangle en France, à Lyon pour le siège social, Malakoff (Hauts-de-Seine) pour la Logistique et Beausemblant (Drôme) pour le Transport, ce pendant une durée de 5 ans à compter de l'acquisition de bloc ;*

- *dans l'hypothèse où les actionnaires minoritaires ne détiendraient pas plus de 5 % du capital ou des droits de vote de la Société à l'issue de l'Offre, l'Initiateur procédera à un retrait obligatoire, moyennant une indemnité égale au prix de l'Offre, et, si les conditions à la mise en œuvre du retrait obligatoire ne sont réunies, n'envisage pas de retirer de la cote parisienne les actions de la Société dans les douze mois suivant l'Offre, mais s'autorise la possibilité d'étudier leur retrait de la cote londonienne et réfléchira aux meilleurs moyens d'intégrer la Société dans le nouveau groupe, notamment via la réalisation d'opérations de fusion ou d'apports.*

*Au vu de ces éléments, après en avoir délibéré, le Conseil de surveillance, statuant à l'unanimité de ses membres, en ce compris les membres indépendants, décide d'émettre un avis favorable sur le projet d'Offre tel qu'il lui a été présenté, et considère que l'Offre est conforme aux intérêts de la Société, de ses actionnaires et de ses salariés.*

*Compte tenu de l'opportunité de liquidité immédiate que cette offre représente, à un prix particulièrement attractif, y compris dans la perspective d'un éventuel retrait obligatoire, le Conseil de surveillance, à l'unanimité, en ce compris les membres indépendants, recommande aux actionnaires de la Société d'apporter leurs actions à l'Offre.*

*A cet égard, les membres qui détiennent des actions Norbert Dentressangle (autres que les cédants du bloc de contrôle) indiquent qu'ils ont l'intention de les apporter à l'Offre à l'exception de celles dont la détention est imposée par les statuts.*

*En outre, le Conseil de surveillance décide que les 44.447 actions autodétenues par la Société ne seront pas apportées à l'Offre conformément aux termes du Tender Offer Agreement. ».*

### IV.   INTENTIONS DES MEMBRES DU CONSEIL DE SURVEILLANCE DE NORBERT DENTRESSANGLE

Les membres du Conseil de surveillance de Norbert Dentressangle qui ne sont pas parties au Contrat de Cession ont indiqué leur intention d'apporter à l'Offre lesdites Actions à l'exception de celles dont la détention est imposée par les statuts.

### V.   INTENTIONS DE LA SOCIETE RELATIVE AUX ACTIONS D'AUTOCONTROLE

Conformément au *Tender Offer Agreement*, le Conseil de surveillance a décidé de ne pas apporter à l'Offre les 44.447 Actions auto-détenues par la Société.

### VI.   ACCORDS SUSCEPTIBLES D'AVOIR UNE INCIDENCE SUR L'APPRECIATION OU L'ISSUE DE L'OFFRE

A l'exception du Contrat de Cession de Bloc et du Tender Offer Agreement, il n'existe aucun accord susceptible d'avoir une incidence sur l'appréciation ou l'issue de l'Offre.

### VII.   ELEMENTS SUSCEPTIBLES D'AVOIR UNE INCIDENCE EN CAS D'OFFRE PUBLIQUE

1.   **Structure du capital de la Société**

Le capital social de Norbert Dentressangle, d'un montant de 19.672.482 euros, est divisé en 9.836.241 Actions, d'une valeur nominale de 2 euros chacune, entièrement libérées et toutes de même catégorie.

Le capital de Norbert Dentressangle était réparti, immédiatement avant la cession du Bloc de Contrôle, tel qu'indiqué à la Section II.1 ci-dessus.

A la suite de la cession du Bloc de Contrôle et à la date du présent document, le capital et les droits de vote de Norbert Dentressangle sont répartis comme suit :

| Actionnaires | Nombre d'actions | % du capital | Nombre de droits de vote théoriques | % Droits de vote[8] |
|---|---|---|---|---|
| XPO Logistics | 6.751.301 | 68,64 | 6.751.301 | 68,29 |
| Y compris les actions acquises depuis le 11 juin 2015 | 189.525 | 1,93 | 189.525 | 1,92 |
| Salariés et public[9] | 3.084.940 | 31,36 | 3.134.497 | 31,71 |
| Y compris les actions détenues par Norbert Dentressangle SA | 38.578 | 0,39 | 38.578 | 0,39 |
| Y compris les actions détenues au titre du contrat de liquidité | 5.869 | 0,06 | 5.869 | 0,06 |
| Total | 9.836.241 | 100 | 9.885.798 | 100 |

**2. Restrictions statutaires à l'exercice du droit de vote et au transfert d'Actions ou clauses des conventions portées à la connaissance de la Société en application de l'article L. 233-11 du Code de commerce**

Aucune restriction statutaire n'est applicable à l'exercice des droits de vote et aux transferts d'Actions. L'article 9 des statuts de la Société prévoit cependant qu'en cas de franchissement à la hausse ou à la baisse du seuil de 2% du capital ou des droits de vote ou un multiple de ce pourcentage et jusqu'au seuil de 50%, tout actionnaire, agissant seul ou de concert, est tenu d'en informer la Société au plus tard le quatrième jour de négociation suivant le jour du franchissement de chacun des seuils par lettre recommandée avec accusé de réception.

Le non respect de cette obligation peut être sanctionné de la privation du droit de vote pour les Actions excédant la fraction non déclarée pour toute assemblée d'actionnaires qui se tiendra jusqu'à l'expiration d'un délai de deux ans suivant la date de régularisation de la notification.

---

[8] Conformément à l'article 223-11 du Règlement général de l'AMF, le nombre total de droits de vote est calculé sur la base de toutes les actions à droits de vote sont attachés, y compris les actions privées de droit de vote.

[9] Incluant 53.500 actions détenues par les membres du directoire.

Cette sanction ne peut être exercée qu'à la demande, consignée dans le procès-verbal de l'assemblée générale, d'un ou plusieurs actionnaires détenant 5% du capital ou des droits de vote de la société.

Aucune convention en vigueur n'a été portée à la connaissance de la Société en application de l'article L. 233-11 du Code de commerce.

### 3. Participations directes et indirectes dans le capital de la Société dont elle a connaissance en vertu des articles L. 233-7 et L. 233-12 du Code de commerce

Postérieurement à la cession du Bloc de Contrôle, l'Initiateur détient 6.561.776 Actions représentant autant de droits de vote, soit 66,71% du capital et 66,38 % des droits de vote (sur la base d'un capital composé de 9.836.241 Actions représentant 9.885.798 droits de vote, calculés conformément à l'article 223-11 du Règlement général de l'AMF).

A la connaissance de la Société, les actionnaires suivants détiennent plus de 2% de son capital ou de ses droits de vote à la date de la présente note en réponse :

- Financière de l'Echiquier a déclaré, le 30 mars 2015, détenir pour le compte des fonds dont elle assure la gestion, 483.055 Actions représentant autant de droits de vote, soit 4,91% du capital et 2,93% des droits de vote.

### 4. Liste des détenteurs de tout titre comportant des droits de contrôle spéciaux et description de ceux-ci

L'article 9 des statuts de la Société prévoit l'octroi d'un droit de vote double aux titulaires d'Actions nominatives entièrement libérées lorsque celles-ci sont inscrites depuis quatre (4) ans au moins au nom du même actionnaire.

Toute conversion en actions au porteur, ou transfert de propriété des Actions entraîne la perte du droit de vote double, sauf transmission à un ayant droit par suite de succession, liquidation de communauté de biens entre époux ou donation entre vifs au profit d'un conjoint ou d'un parent au degré successible, laquelle n'interrompt pas le délai nécessaire à l'acquisition du droit de vote double.

### 5. Mécanismes de contrôle prévus dans un éventuel système d'actionnariat du personnel quand les droits de contrôle ne sont pas exercés par ce dernier

La Société n'a connaissance d'aucun mécanisme de contrôle en vigueur à ce jour prévu dans un système d'actionnariat du personnel dont les droits de contrôle ne seraient pas exercés par ce dernier.

### 6. Accords entre actionnaires dont la Société a connaissance et qui peuvent entraîner des restrictions au transfert d'Actions et à l'exercice des droits de vote

La Société n'a connaissance d'aucun accord entre actionnaires en vigueur à ce jour pouvant entraîner des restrictions au transfert d'Actions et à l'exercice des droits de vote.

### 7. Règles applicables à la nomination et au remplacement des membres du Conseil de surveillance et à la modification des statuts de la Société

A l'exception de l'obligation pour le membre du Conseil de surveillance d'être propriétaire d'au moins cent (100) actions de la Société imposée par les articles 6 III et 19 de ses statuts, aucune clause statutaire ne prévoit de dispositions différentes de celles prévues par la loi en ce qui concerne la nomination et le remplacement des membres ou la modification des statuts.

8. **Pouvoirs du Conseil de surveillance, en particulier en matière d'émission ou de rachat de titres**

En dehors des pouvoirs généraux prévus par la loi et les statuts, le Conseil de surveillance de la Société dispose des délégations suivantes :

| Date de l'Assemblée ayant octroyé ou modifié l'autorisation | Contenu de l'autorisation | Date limite de validité | Utilisation effective de ces autorisations | Montant maximal autorisé |
|---|---|---|---|---|
| 21 mai 2015 (10e résolution) | Émission de valeurs mobilières donnant accès au capital avec maintien du droit préférentiel de souscription des actionnaires | 20 juillet 2017 | | Plafond nominal de l'augmentation de capital : 20 000 000 E Plafond de valeur mobilière représentative de créances : 500 000 000 € |
| 21 mai 2015 (11e résolution) | Émission de valeurs mobilières donnant accès au capital sans droit préférentiel de souscription des actionnaires | 20 juillet 2017 | | Plafond nominal de l'augmentation de capital : 20 000 000 € Plafond de valeur mobilière représentative de créances : 500 000 000 € |
| 21 mai 2015 (12e résolution) | Émission de valeurs mobilières donnant droit à des titres de créance ou d'augmenter le capital dans le cadre d'une offre visée au II de l'article L.411-2 du Code monétaire et financier | 20 juillet 2017 | | Plafond nominal de l'augmentation de capital : 20 % du capital social par an. Plafond de valeur mobilière représentative de créances : 500 000 000 € |
| 21 mai 2015 (13e résolution) | Autorisation donnée au Directoire pour, en cas d'émission sans droit préférentiel de souscription, fixer le prix selon les modalités fixées par l'Assemblée Générale | 20 juillet 2017 | | 10 % du capital social |
| 21 mai 2015 (14e résolution) | Augmentation du nombre de titres à émettre en cas d'augmentation de capital avec ou sans droit préférentiel de souscription | 20 juillet 2017 | | 15% de l'émission initiale |
| 21 mai 2015 (15e résolution) | Augmentation du capital social par incorporation de primes, réserves, bénéfices ou autres | 20 juillet 2017 | | Plafond nominal de l'augmentation de capital : 20 000 000 € |
| 21 mai 2015 (16e résolution) | Émission d'actions ordinaires, de valeurs mobilières donnant accès au capital, sans droit préférentiel de souscription des actionnaires, en rémunération d'apports en nature portant sur des titres de capital ou des valeurs mobilières donnant accès au capital | 20 juillet 2017 | | 10% du capital |
| 21 mai 2012 (23e résolution) | Autorisation pour attribuer des actions gratuites | 38 mois à compter du 21 | Attributions d'actions par le | Plafond d'attribution fixé à 2% du capital social |

| Date de l'Assemblée ayant octroyé ou modifié l'autorisation | Contenu de l'autorisation | Date limite de validité | Utilisation effective de ces autorisations | Montant maximal autorisé |
|---|---|---|---|---|
| 23 mai 2013 (13e résolution) | | mai 2014 ou à défaut de l'Assemblée Générale statuant sur les comptes de l'exercice 2014 | Directoire (24/04/2013, puis le 23/04/2014 et le 20/10/2014) sous condition de performance et de présence | |
| 21 mai 2015 (17e résolution) | Augmentations de capital réservées aux salariés dans le cadre des dispositions du Code de commerce et des articles L.3332-18 et suivants du Code du travail | 20 juillet 2017 | | 393 000 € |
| 23 mai 2013 (9e résolution) | Émission de 110 000 BSA au profit des personnes dénommées | | Émission de 110 000 BSA (décision du Directoire du 29/07/2013) et souscription par les bénéficiaires | 110 000 BSA — Autorisation entièrement utilisée |
| 21 mai 2015 (9e résolution) | Annulation des actions acquises par la Société et réduction du capital social à due concurrence | 20 mai 2017 | | 10% du capital social |
| 21 mai 2015 (18e résolution) | Émission de bons de souscription d'actions nouvelles et/ou existantes au profit de personnes dénommées, avec suppression du droit préférentiel de souscription | 30 septembre 2015 | | 20.000 BSA |

16/110

9. **Impact d'un changement de contrôle sur les accords conclus par la Société**

Certains contrats comportent une clause de changement de contrôle pouvant entraîner la résiliation dudit accord, et feront en conséquence l'objet d'un refinancement par l'Initiateur dans les délais contractuels prévus par chacune de ces conventions en cas de changement de contrôle. Il s'agit notamment des contrats suivants :

- Convention de Crédit Renouvelable Multidevises en date du 23 décembre 2013 pour un montant maximal de 400.000.000€, qui offre aux créanciers un droit de remboursement anticipé en cas de changement de contrôle;

- Convention de Crédit en date du 1er août 2014 pour un montant maximal de 250.000.000€ ;

- Convention de Crédit EURO PP en date du 5 février 2013 pour un montant maximal de 75.000.000€ ;

- Obligations EURO PP pour 75.000.000€ à 3.80 pour cent émises par Norbert Dentressangle, dues le 20 décembre 2019 en vertu d'un prospectus en date du 18 décembre 2013;

- Obligations EURO PP pour 160.000.000€ à 4.00 pour cent émises par Norbert Dentressangle, dues le 20 décembre 2020 en vertu d'un prospectus en date du 18 décembre 2013.

Un certain nombre de contrats commerciaux signés par la Société et/ou ses filiales, qui intègrent des clauses offrant au client ou au partenaire la possibilité de résilier le contrat en cas de changement de contrôle.

A la date de la présente note en réponse, aucun des cocontractants n'a informé la Société de sa volonté de résilier le contrat du fait du changement de contrôle.

10. **Accords prévoyant des indemnités pour les membres du Conseil de surveillance de Norbert Dentressangle ou les salariés, s'ils démissionnent ou sont licenciés sans cause réelle et sérieuse ou si leur emploi prend fin en raison d'une offre publique**

Il n'existe au sein de la Société ou de ses filiales aucun accord portant engagement de verser des indemnités de départ au profit de dirigeants ou de salariés, en cas de démission ou de licenciement sans cause réelle et sérieuse, ou encore en cas d'offre publique visant les titres de la Société.

VIII. Rapport de l'expert independant de l'art. 261-1 du Reglement General de l'AMF

# Ledouble

## NORBERT DENTRESSANGLE

Offre Publique d'Achat Simplifiée

suivie d'un Retrait Obligatoire

initiée par XPO Logistics France SAS

## ATTESTATION D'EQUITE