# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
In re Application of                                      :
                                                          :
XPO LOGISTICS, INC.                                       :       Case No. 15 MC 205
                                                          :
                    Petitioner.                           :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF GEORGE T. RIGO IN SUPPORT OF THE *EX PARTE*
APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28
U.S.C. § 1782 OF RESPONDENTS ELLIOTT CAPITAL ADVISORS, L.P., ELLIOTT
MANAGEMENT CORPORATION, AND ELLIOTT ASSOCIATES, L.P.**

I, George T. Rigo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746,

that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and admitted to

the Paris bar. I am a partner in the law firm of Orrick, Herrington & Sutcliffe (Europe) LLP.

2.      I am providing this declaration on behalf of certain Elliott entities, including

Elliott Capital Advisors, L.P., Elliott Management Corporation, and Elliott Associates, L.P.

(collectively, "Elliott") in connection with their *ex parte* application to this Court under 28

U.S.C. § 1782 for discovery in aid of foreign proceedings in the Paris Commercial Court.

3.      I advise certain Elliott entities in two foreign proceedings in the Paris Commercial

Court filed by Orrick, Herrington & Sutcliffe (Europe) LLP. In one of those proceedings, Elliott

Capital Advisors, L.P., Elliott Associates, L.P., Elliott International, L.P., and The Liverpool

Limited Partnership are defendants in an action filed on July 8, 2015 by plaintiffs XPO Logistics,

Inc. and XPO Logistics France (collectively, "XPO") in the Paris Commercial Court (the "XPO

French Action"). In the other proceeding, Elliott Capital Advisors, L.P., Elliott Associates, L.P.,

and Elliott International, L.P. are the plaintiffs in an action filed on July 16, 2015 against

defendants XPO Logistics France SAS and Norbert Dentressangle ("ND") in the Paris

Commercial Court (the "Elliott French Action").[1]

4.      This declaration provides the factual background of the Elliott French Action and

the relief sought thereunder, as well as of the XPO French Action. There is an important need

for the discovery sought in Elliott's *ex parte* application to this Court under 28 U.S.C. § 1782 for

use in the Elliott French Action, in particular due to a July 23, 2015 hearing that the Paris

Commercial Court has scheduled in the Elliott French Action to rule on Elliott's request, in part,

for an extension of the freezing order currently in place preventing XPO from transferring any

assets of ND or dismantling ND before the French court makes a final determination on the

merits of that issue.

5.      Elliott requires the narrowly-tailored document and deposition discovery set forth

in its *ex parte* application to this Court regarding XPO's valuation of ND and its strategy and

rationale for the acquisition of ND, including its plans for post-acquisition integration and/or

asset transactions between ND and XPO. This information bears directly on Elliott's allegations

that XPO intends to dismantle ND (without owning 100% of ND's shares) and integrate it into

XPO, a scheme which ignores the interests of ND and its minority shareholders but is clearly key

for XPO as it flows from each of its public declarations related to the operation.

6.      Insofar as the content of this Declaration is within my personal knowledge, it is

accurate and correct. Insofar as it is not within my personal knowledge, it is true to the best of

my knowledge, information, and belief.

---

[1]  XPO Logistics, Inc. is not a defendant in the Elliott French Action.

## THE PARTIES

7.      Elliott is an internationally-renowned investment fund, part of whose assets are managed by Elliott Capital Advisors, L.P.  Founded by Paul Singer in 1977, Elliott is one of the oldest continuously-managed investment funds.  Elliott invests throughout the world in diverse targets; it also implements varied strategies including event-driven arbitrage, and actively manages its hedging positions. Although Elliott's strategy, like that of many other investment funds, is focused on seeking out high-yield investments, it pays particular attention to managing its risks, especially those relating to fluctuations on the share and bond markets, a practice on which it has built its reputation.  Elliott has offices in New York, London, Hong Kong and Tokyo. It employs nearly 320 people worldwide, half of whom work in portfolio management, trading and research.

8.      Elliott comprises the following two investment funds:  (1) Elliott Associates, L.P., based in the United States, which owns 100% of the Bermudan company, The Liverpool Limited Partnership; and (2) Elliott International, L.P., based in the Cayman Islands.

9.      The Elliott funds have over $26 billion in assets under management. Their investors include retirement funds, sovereign funds, endowment funds, funds of funds, individuals and families with high net equity, and employees of the company.

10.      One of the activities of Elliott Capital Advisors, L.P. is to advise and manage some of the Elliott funds' assets, including its recently-acquired shareholding in the French company, ND.

11.      ND is currently one of the world leaders in the logistics, transport and freight sectors operating in Europe, North America and Asia.  With a turnover of $4.7 billion in 2014 and 42,000 employees, ND, which is listed on the Euronext Paris and Euronext London, was created in 1979 and has gradually expanded as a result of numerous acquisitions, including the

3

purchase in July 2014 of the U.S. logistics and transport operator, Jacobson Companies. This development model explains why, today, over 64% of the group's turnover is generated outside France.

12.     XPO Logistics Inc., a U.S. company listed on the New York Stock Exchange, is based in Greenwich, Connecticut, and is one of the leaders in the North American transport and logistics sector. In 2014, XPO had 10,000 employees and posted a turnover of $2.4 billion, generated primarily in the U.S. This has been achieved due to numerous acquisitions. In particular, in 2014, XPO attempted to purchase the U.S. logistics and transport operator Jacobson Companies, but the contract was ultimately won by ND instead. XPO has since shown an interest in ND.

13.     XPO Logistics France ("XPO France") is the wholly-owned French subsidiary of XPO. It was created in May 2015 in preparation for the purchase of a majority shareholding in ND.

**XPO'S ATTEMPTED TAKEOVER OF ND**

14.     On April 28, 2015, XPO announced its intention to attempt to acquire a 100% interest in ND. Specifically, XPO announced it had signed (1) a share purchase agreement for 66.71% of the share capital of ND at the price of €217.50 per share (increased by €1.80 per share in relation to a dividend that was paid out before the purchase was finalised); (2) a tender offer agreement for the remaining shares of ND at the price of €217.50 per share; and (3) an incentive letter with the members of ND's management board, setting forth the treatment of the existing ND management incentive instruments and the future incentive scheme to be granted to the management and employees of ND.

15.     In a press release, XPO stated that in the event that, upon the closing of the simplified tender offer, the number of shares not tendered by the shareholders represents less

4

than 5% of the share capital or voting rights of ND, XPO has the intention to implement a

mandatory squeeze-out procedure and the delisting of ND shares. [Exhibit 1.]  Under French

law, XPO must obtain at least 95% of the shares and voting rights of ND in order to engage in a

squeeze-out of any remaining shareholders and to meet the conditions needed for a mandatory

delisting of ND and its integration, especially for tax purposes, into XPO.

      16.     On April 29, 2015, the AMF[2] published a decision marking the start of the pre-

tender period, in particular making it mandatory for any investor to declare to the AMF, starting

on this date, any transaction involving the shares of ND -- as the target company -- if the

investor's shareholding increases to at least 1%, as per the requirements of article 231-46 of the

AMF General Regulation.

      17.     Believing that the share purchase price as announced by XPO did not reflect the

full value of ND, Elliott decided to invest in ND.  Starting on May 8, 2015, Elliott began,

directly or indirectly, via The Liverpool Limited Partnership, purchasing ND shares and CFDs[3]

for ND shares.

      18.     In line with applicable regulations, Elliott made the necessary declarations for

these purchases, as and when they occurred.

      19.     On May 18, 2015, Elliott submitted a declaration of intent to the AMF stating that

Elliott was planning to continue its purchases of ND shares and/or derivatives linked to ND

---

[2]  The AMF (Autorité des marchés financiers) is the French securities regulator.

[3]  A "CFD," or "Contract for Difference" is a flexible financial derivative linked to upward or
downward changes in the price of a share, index or any other asset, without actually owning
it.  These contracts have several advantages (i) financially, because they allow the investor to
receive the same benefits as though it were the direct owner of the shares in question but for
a purchase cost much lower than the actual purchase cost of the shares; and (ii) fiscally, by
allowing the investor to avoid certain taxes because it is not the owner of the underlying
asset.

shares, depending on market conditions. At the same time, and as required by article 9 of ND's articles of association, Elliott informed ND that it had passed the statutory 2% share ownership threshold. [Exhibit 2.]

20.     On May 19, 2015, XPO created XPO France, which would subrogate the former in its rights and obligations under the share purchase agreement and the tender offer agreement. On June 8, 2015, XPO France acquired 66.71% of the share capital of ND, as per the terms of the share purchase agreement. On June 11, 2015, XPO France issued a simplified tender offer targeting the remaining ND shares for the price of €217.50 per share. At the same time, and as stated in its letter of intent of May 18, 2015, Elliott increased its position in ND.

21.     On June 19, 2015, Elliott informed ND it had passed the 4% statutory share ownership threshold. [Exhibit 3.] On June 23, 2015, the AMF approved the simplified tender offer made by XPO France. On June 24, 2015, Elliott informed ND it had passed the 5% share ownership threshold. [Exhibit 4.] On June 25, 2015, the AMF said that the simplified tender offer would be open from June 26 to July 17, 2015.

22.     The AMF also granted a *visa* to the information memorandum filed by XPO France [Exhibit 5] and the response memorandum from ND [Exhibit 6] which were released at the same time. Notably, neither of these documents contained any information about what would happen to shareholders who did not wish to tender their ND shares to the offer, and instead, retain their investment in ND. The information memorandum stated that "Depending on the results of the Offer, the Offeror reserves the right to consider the best ways of integrating ND into XPO Logistics Inc. group. In this context, at some point of time in the future, the Offeror may decide to merge or transfer certain ND assets or branches with or to XPO Logistics group companies (including XPO) or vice versa." As explained in the response memorandum from ND, "if the necessary conditions to implement the squeeze out are not met, [...] [XPO France]

6

will consider the best ways to integrate the Company within the new group, including through mergers or contributions."

23.     Still believing that the price officially offered by XPO for the ND shares did not reflect the actual value of the company, Elliott continued purchasing financial instruments in ND. On June 26, 2015, Elliott informed ND it had passed the 6% statutory share ownership threshold. [Exhibit 7.] After informing the AMF on July 6, 2015 of the unwinding of all CFDs that had been signed and the purchase of the underlying ND shares, Elliott repeated to the AMF Elliott's intention to continue purchasing ND shares and/or derivatives linked to ND shares and that Elliott has no intention to tender the purchased shares to the offer and is not acting in concert with any other person. On this date, XPO France knew with certainty that it would not be able to engage in a squeeze-out of any remaining shareholders or meet the conditions needed for a mandatory delisting of ND and its integration, especially for tax purposes, into XPO.

## XPO'S FRENCH ACTION AGAINST ELLIOTT

24.     As noted above, XPO filed its action against Elliott on July 8, 2015. XPO's civil complaint in its French Action alleges that Elliott has violated (1) disclosure requirements under French law and (2) French tender offer law. It further alleges that Elliott's intent has been to disrupt the XPO offer by blocking the squeeze-out in order to obtain an undue advantage.

25.     XPO seeks in its French Action an order (1) compelling Elliott to transfer to Bank of America all of the ND shares that Elliott allegedly purchased from Bank of America and (2) prohibiting Elliott from repurchasing those shares from Bank of America. XPO also seeks purported damages.

26.     On July 8, 2015, the Commercial Court granted XPO an *ex parte* freezing order to preserve the status quo and barring Elliott from transferring its equity interest in ND to any third party other than XPO until the matter is further heard at the next hearing in the XPO French

Action on July 23, 2015. Notably, because Elliott intends to hold onto the shares, the Court's July 8 order is in line with Elliott's intentions. At the July 23, 2015 hearing, XPO will be seeking a continuation of the freezing order until the end of the proceedings on XPO's French Claim against Elliott, currently scheduled for a merits hearing on September 29, 2015.

27.     XPO's allegations in its French Action are without support. Elliott lawfully acquired its ND shares because it believes in their value and in the strong potential of ND in the long term. Elliott is not the only investor to have reached this conclusion, as other investors began to purchase ND's shares after XPO announced its attempt to acquire 100% of the company. Elliott properly and timely made all regulatory filings regarding its purchases required by French law. And it kept ND apprised of its purchases of ND shares and CFDs, sending ND and the AMF a series of notices that Elliott had acquired increasing percentages of ND's share capital. After an analysis of the tender offer for ND's shares, Elliott decided, as is its right under French law, not to tender its ND shares. The evidence Elliott will be presenting in XPO's French Action will show that Elliott has made the required disclosures and is compliant with French law.

**ELLIOTT'S FRENCH ACTION AGAINST XPO**

28.     As noted above, Elliott filed its French Action against XPO on July 16, 2015. Elliott's French Action alleges that XPO intends to dismantle ND for the sole purpose of integrating it into XPO, a scheme which ignores the interests of ND and its minority shareholders. [Exhibit 8.] Elliott's French Action further alleges XPO intends to proceed with its dismantling of ND and incorporation into XPO even without owning 100% of ND's shares, thus bypassing ND's minority shareholders.

29.     As stated in its information memorandum, XPO had a target of owning 95% of ND's shares by the end of the tender offer, which closed on July 17, 2015, in order to be able to proceed with the mandatory delisting of the company and its integration, especially for tax

8

purposes, into XPO. [Exhibit 5.] XPO announced this target from the outset, and XPO apparently did not expect that ND's minority shareholders would not tender their shares to the offer and would want to retain their stake in ND.

30. Given the size of Elliott's shareholding and intentions regarding the tender offer, XPO now knows it cannot achieve its 95% target. These facts, together with the extremely aggressive and unlawful conduct adopted by XPO against Elliott, provides Elliott with good cause to believe that XPO has already taken - or has imminent plans to take - action that is manifestly contrary to the corporate interests of ND and its minority shareholders in order to achieve its goal of fully or partially integrating ND into XPO by bypassing the fact that it does not own 100% of ND's shares. Given this risk, Elliott sent a letter to ND on July 15, 2015, sharing its concerns and asking ND to provide all information about the actions XPO was planning to take for integrating ND into XPO. [Exhibit 9.] However, insofar as (i) XPO currently owns more than 73.6% of the share capital of ND, (ii) ND's managers have a very close relationship with the XPO management; (iii) ND's management has a direct interest[4] in the offer; and (iv) XPO has already appointed the majority of the board members of ND, it is highly unlikely that any satisfactory response will be received to this letter.

31. Through its French Action, Elliott seeks the French court's appointment of an expert who will produce a report on whether the actions already taken or about to be taken by XPO to integrate ND within XPO are compatible with the interests of ND and its minority shareholders. Elliott also seeks relief from the French court prohibiting XPO and ND from

---

[4] One example of this direct interest is the incentive letter with the members of the management board, setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of ND.

9

continuing any actions or undertaking any new actions to integrate ND, pending the report from the court expert.

32.     On July 16, 2015, the President of the Paris Commercial Court granted, at Elliott's request, a freezing order barring XPO from carrying out any of its contemplated transactions with ND until such time as the transactions can be properly evaluated from the standpoint of protecting ND and its shareholders from being unduly deprived of value. The Court also ordered the next hearing on the matter to take place on July 23, 2015, at which time the requests for a court appointed expert and the extension of the freezing order will be heard.

## ELLIOTT'S DISCOVERY REQUESTS ON XPO IN AID OF THE FRENCH ACTIONS

33.     Elliott has filed this Section 1782 application in order to obtain information for use in its prosecution of the Elliott French Action, as well as in defense of the XPO French Action.

34.     XPO has already obtained an order from this Court permitting Section 1782 discovery of similar scope to what Elliott is seeking here.

35.     Elliott's Section 1782 application seeks the following information from XPO:

●     Document Request No. 1 directed to XPO seeks the following: "All documents related to the purpose of evaluating XPO's contemplated acquisition of ND (including, but not limited to, its rationale, valuation, synergies, post-acquisition integration, or strategy), without limit to XPO's internal memoranda, presentations, reports, research, and analyses with respect to the acquisition; external expert reports or analysis, including but without limit to structure memos, valuation reports, fairness opinions, market dynamics reports, or competitors reports; and any correspondence between XPO (or its affiliates and/or subsidiaries) and ND's (or its affiliates' and/or subsidiaries') management boards, supervisory boards, shareholders, and financial advisors."

10

● Document Request No. 2 directed to XPO seeks the following: "All documents related to the contemplated acquisition of ND presented to XPO's Board of Directors or its committees, including, but not limited to, memoranda, reports, presentations, and reports or presentations from financial advisors or market experts."

● Document Request No. 3 directed to XPO seeks the following: "All documents related to the financial implications of the contemplated ND acquisition, including but not limited to memoranda, reports, or analysis prepared by XPO or external financial advisors regarding the tax implications of the acquisition."

● Document Request No. 4 directed to XPO seeks the following: "All documents related to or filed pursuant to item 4(c) or 4(d) in the Hart-Scott-Rodino Act notification form or French Foreign investment notification and/or authorization."

● Document Request No. 5 directed to XPO seeks the following: "All documents (whether in draft or final form) related to any transactions, arrangements, or agreements between XPO and ND, with respect to topics, including but not limited to mergers, spin offs, transfers of business, companies or assets; providing products or services to customers of the other party; transfers of employees; use of the XPO trademark, trade name or brand name, including detailed terms and conditions for its use by ND, and any related party transactions."

● Document Request No. 6 directed to XPO seeks the following: "All documents, including any proposals, regarding any and all changes to the compensation of members of ND's management board and supervisory board after the acquisition, including, without limitation, details of any options, warrants, restricted stock, performance units, and other equity compensation (whether real or phantom) proposed to be provided to any

11

members of the management board and of the supervisory board of ND, and all written instruments with respect thereto (whether letters, term sheets, agreements or other)."

- Deposition Category No. 1 directed to XPO seeks the following: "Your knowledge of and communications concerning XPO's acquisition of its interest in ND with respect to its rationale and valuation, synergies, post-acquisition integration, and strategy. These would include knowledge of and communications concerning:

    a.    reports and presentations to XPO's Board of Directors or its committees (e.g., audit, strategic, or investments);

    b.    reports, including structure memos, valuation reports and fairness opinions from financial advisors, and reports from consultants on market dynamics and competitors;

    c.    any tax memoranda prepared for the purpose of evaluating the impact of the contemplated transaction;

    d.    any information relating to the financial aspects of the transaction.

- Deposition Category No. 2 directed to XPO seeks the following: "Your knowledge of and communications concerning any actual or contemplated transactions or arrangements between ND or its affiliates and/or subsidiaries, on the one hand, and XPO and its affiliates and/or subsidiaries, on the other hand, including:

    a.    mergers, spin offs, transfers of business, companies or assets;

    b.    providing products or services to customers of the other party;

    c.    transfers of employees;

    d.    any proposals regarding any and all changes to the compensation of members of ND's management board and supervisory board after the acquisition, including, without limitation, details of any options, warrants,

12

restricted stock, performance units, and other equity compensation (whether real or phantom) proposed to be provided to any members of the management board and of the supervisory board of ND, and all written instruments with respect thereto (whether letters, term sheets, agreements or other);

e.  use of the XPO trademark, trade name or brand name by ND; and

f.  any related party transactions.

•  Deposition Category No. 3 directed to XPO seeks the following:  Your knowledge of and communications concerning any actual or contemplated changes to the compensation of members of the management board of ND and of the supervisory board after the contemplated acquisition of ND, including, but not limited to, details of any options, warrants, restricted stock, and performance units and other equity compensation (whether real or phantom) proposed to be provided to any members of the management board and of the supervisory board of ND.

36.  Each of these requests is reasonable under the circumstances and likely to yield information highly relevant to the Elliott French Action, as well as the XPO French Action.  The above requests are narrowly tailored to obtain information regarding XPO's valuation of ND and its strategy and rationale for the acquisition of ND, including its plans for post-acquisition integration and/or asset transactions between ND and XPO.  This information bears directly on Elliott's allegations that XPO intends to dismantle ND (without owning 100% of ND's shares) and integrate it into XPO, a scheme which ignores the interests of ND and its minority shareholders while ND will still remain a listed company with a significant minority shareholding.

13

**FRENCH CIVIL PROCEDURE**

37.     Under the French Code of Civil Procedure, which applies to both French Actions, each party has the burden of providing evidence for the facts that it alleges. Notably, French legal practice does not require a party to a civil case to produce evidence contrary to its own interest. While a party may ask a French court to order the production of a document, under French law the party seeking discovery is required to identify the precise document that it is requesting, and it is not sufficient to request that the French court order a party to produce documents that concern a specific relevant subject matter.

38.     In this case, the central issues require disclosure of XPO's *internal* strategy and rationale for the acquisition of ND, including its plans for post-acquisition integration and/or asset transactions between ND and XPO, as well as XPO's *undisclosed* scheme to dismantle ND (without owning 100% of ND's shares) and integrate it into XPO, thus ignoring the interests of ND and its minority shareholders

39.     The documents set forth in Elliott's subpoenas are not precisely identified and their substance is not actually known, and discovery proceedings do not exist in France; accordingly, a French court would generally lack the ability to order production of the documents sought through Elliott's Section 1782 application. The Elliot French Action is against ND and XPO Logistics France SAS – not XPO Logistics, Inc. Additional constraints apply to documents located outside France, such as those in XPO Logistics, Inc.'s possession, which would make it difficult for a French court to order the production of any documents held in the United States in the timeframe applicable here.

40.     Moreover, French legal practice generally does not permit depositions in civil litigation.

14

41.     While the Paris Commercial Court could not order the production of the requested discovery, it is permitted to receive documents collected in the United States. Those documents would be available subject to all parties' ability to access them in the French Actions. Indeed, Elliott could present the evidence obtained through its Section 1782 application at the July 23, 2015 and/or during the requested expert proceedings, and/or at future hearings on the merits in the litigation.

42.     Neither French law nor the rules of the Paris Commercial Court forbid the use in the French Actions of the relevant information that Elliott seeks through its Section 1782 application.

43.     Accordingly, it is respectfully requested that this Court assist Elliott in obtaining the information requested in the proposed subpoenas attached to this Section 1782 application for use in the French Actions.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on July 20, 2015 at Paris, France.

George T. Rigo

Services    Careers    News    Careers    Investors    About Us    Contact    **Login**

NEWS/

# XPO LOGISTICS TO ACQUIRE NORBERT DENTRESSANGLE SA, A LEADING GLOBAL PROVIDER OF CONTRACT LOGISTICS; FREIGHT BROKERAGE AND TRANSPORTATION; AND GLOBAL FORWARDING SERVICES

**Category:**
Uncategorized

**Date:**
April 28, 2015

*XPO to become a top ten worldwide logistics company and leading European outsourced e-fulfillment provider*

*The acquisition will more than triple XPO's EBITDA run rate to approximately $545 million, and increase its revenue to approximately $8.5 billion, nearly achieving the company's 2017 targets two years ahead of plan*

*Complementary service offerings and geographies will enable widespread cross-selling to an established base of multinational companies*

*The transaction is valued at €3.24 billion ($3.53 billion USD) and is expected to close in the second quarter of 2015*

*Norbert Dentressangle's supervisory board has unanimously approved entry into a tender offer support agreement*

*Conference call scheduled for April 29, 2015 at 8:00 AM Eastern Time / 14:00 Central European Time*

**GREENWICH, Conn. USA and LYON, France - April 28, 2015 -** XPO Logistics, Inc. ("XPO Logistics" or "XPO") (NYSE: XPO) and Norbert Dentressangle SA ("Norbert Dentressangle") (Euronext: GND) today announced that they have entered into a definitive agreement for XPO Logistics to acquire a majority interest in Norbert Dentressangle and launch a tender offer for the remaining shares. Norbert Dentressangle is a leading global provider of contract logistics, including e-commerce fulfillment; freight brokerage and transportation; and global forwarding services.

Headquartered in Lyon, France, Norbert Dentressangle has 662 locations and approximately 42,350 employees, and serves a blue chip customer base that includes some of the world's largest companies. Norbert Dentressangle's transportation and logistics services complement XPO's offerings in contract logistics, freight brokerage and global forwarding. The company had €5.1 billion ($5.5 billion USD) in pro-forma trailing 12-month revenue for the year-ended December 31, 2014.

**Highlights of the Proposed Transaction**

- The market value of the transaction for Norbert Dentressangle shareholders is €2.17 billion, based on 9.9 million fully-diluted outstanding shares. The total transaction value is approximately €3.24 billion, including €1.08 billion of net debt. The board of directors of XPO and the supervisory board of Norbert Dentressangle have unanimously approved the transaction.

- XPO has entered into a binding agreement to purchase from Mr. Norbert Dentressangle and his family all of their shares in Norbert Dentressangle, representing 67% of the company's outstanding shares. The agreed price per share is €217.50, excluding €1.80 dividend per share to be paid prior to the close of the transaction. The transaction is subject only to receipt of antitrust clearances in the United States and Germany. Following receipt of such clearances, XPO will launch an all-cash simplified tender offer to acquire the remaining outstanding shares of Norbert Dentressangle. Shareholders of Norbert Dentressangle will receive €217.50 of cash for each ordinary share of Norbert Dentressangle, assuming the offer is launched after the payment of the dividend. If the tender

results in XPO holding more than 95% of Norbert Dentressangle's ordinary shares and voting rights, XPO intends to squeeze out minority shareholders and delist the shares. The proposed transactions are structured in accordance with the General Regulation of the French securities regulator, the *Autorité des marchés financiers,* and all applicable securities laws and regulations in the United States.

- The purchase price represents an aggregate consideration of 9.1 times consensus 2015 EBITDA of €357 million (approximately $388 million USD). The per-share cash price represents a premium of approximately 34 percent compared to the closing price of Norbert Dentressangle ordinary shares on April 27, 2015.

- The transaction is not conditioned on financing. Morgan Stanley has provided a financing commitment for up to $2.6 billion. XPO has over $1 billion in cash and an undrawn $415 million ABL revolver.

- Hervé Montjotin, chairman of the executive board and chief executive officer of Norbert Dentressangle, will serve as chief executive officer of XPO's European business and president of the parent company.

- XPO intends not to reduce the total number of full-time employees in France for a period of at least 18 months from closing. Additionally, XPO intends to maintain the European headquarters of Norbert Dentressangle in Lyon, and also intends to maintain the headquarters and center of decision of Norbert Dentressangle's European logistics business in France, as well as Norbert Dentressangle's transportation business in the department of Drôme.

Bradley Jacobs, chairman and chief executive officer of XPO Logistics, said, "This is a defining moment in the growth of XF Our planned acquisition of Norbert Dentressangle will catapult XPO to a top ten global logistics company. It will more than triple our EBITDA to $545 million and increase our revenue to about $8.5 billion upon completion of the tender offer, nearly achieving our 2017 financial targets two years ahead of plan. The acquisition of Norbert Dentressangle is a major leap forward, but we're still in the early innings of our long-term growth plan."

Jacobs continued, "In Norbert Dentressangle, we are acquiring a company that has been meticulously built over the last fc decades. I am extremely pleased that Norbert Dentressangle's executive leader, Hervé Montjotin, will serve as chief execut officer of our European business and president of the parent company. I look forward to working closely with Hervé as we execute XPO's global strategy."

Hervé Montjotin, chairman of the executive board and chief executive officer of Norbert Dentressangle, said, "By joining XF we will become part of an organization that shares the ambition that has guided us since the creation of Norbert Dentressangle 36 years ago: to become a global partner able to effectively support our customers in the management of t supply chains. As XPO's platform for growth in Europe, we can continue to pursue this goal on an even larger scale, to the benefit of our customers and employees. I am proud to lead this growth for XPO, together with the current management board."

## Compelling Rationale and Commercial Synergies

- Norbert Dentressangle offers services that strongly mirror XPO's portfolio: contract logistics, including e-fulfillment; freight brokerage; an asset-light palletized network; freight management; dedicated and owned truckload; and global freight forwarding. XPO intends to use the acquired operations as a platform to grow its business in Europe.

- XPO expects to realize substantial, company-wide cross-selling opportunities from the combination. For 36 years, Norbert Dentressangle has built a loyal base of blue chip customers that includes multinational companies, many of which are not currently served by XPO. These customers will have an opportunity to consolidate their supply chain relationships with XPO and benefit from a single source with a global footprint. Norbert Dentressangle serves customers in retail, food and beverage, manufacturing, chemicals, agriculture, e-commerce and high tech. The company's largest customer represents less than 4% of revenue.

- Norbert Dentressangle's Red Online service leads the €5 billion outsourced e-fulfillment market in Europe, with

€242 million revenue in 2014 and 31% organic growth. It serves both B2B and B2C customers in the United Kingdom, Spain and France. Norbert Dentressangle has leading capabilities in high-growth reverse logistics.

- XPO will gain global scale in freight brokerage and managed transportation, two of its core services, with the ability to employ technology and best practices. XPO intends to deploy its proprietary Freight Optimizer platform in Europe to facilitate best-in-class carrier sourcing and customer service. Norbert Dentressangle currently generates over €1 billion of freight brokerage revenue annually. Road transport in its primary markets of the United Kingdom, Spain and France is an estimated €95 billion opportunity.

- The transaction will give XPO access to Europe's largest fleet network through a mix of 7,700 owned trucks, 3,200 trucks contracted through owner-operators and access to an additional 12,000 independent carriers. XPO will gain lane density covering approximately 90% of the eurozone's GDP-producing regions. Norbert's transportation business includes €250 million of revenue from dedicated carriage.

- Asset intensity in Norbert Dentressangle's business is low, with annual net capex of approximately 2.5% of revenue on average.

- The transaction will create a top ten worldwide contract logistics company based on combined revenue and 129 million square feet of facility space. Most of the facilities are leased and dedicated to high-value-added warehousing operations, including cold chain and reverse logistics. Norbert Dentressangle's €2.6 billion contract logistics business has deep customer relationships as evidenced by a 97% customer renewal rate. Approximately 26% of contract logistics revenues are generated in the United States.

- The combination will increase XPO's global freight forwarding revenue to approximately $425 million annually and provide greater access to Euro-Asia trade lanes. XPO expects the added volume to improve its air and sea transportation buy rates for its customers.

- XPO intends to make substantial investments in the growth of its acquired European operations, in part through the application of technology. XPO expects its combined annual spend on technology to be approximately $225 million after closing.

- XPO has looked beyond North America to capitalize on three favorable dynamics: the timing of its investment in the eurozone as the economy begins to rebound from the trough; a strong U.S. dollar relative to the euro; and the acquisition opportunities presented by a fragmented European transportation and logistics industry where Norbert Dentressangle holds leadership positions.

- Substantially all of the management team of Norbert Dentressangle is expected to join XPO upon completion of the transaction.

- XPO's multinational operations will further enhance the company's position as an employer of choice that facilitates the worldwide sharing of best practices in support of operational excellence. The combination will create numerous opportunities for its employees to move within Europe and between North America and Europe.

- Following the closing, XPO will rebrand the acquired operations under the single global name XPO Logistics. The company expects to have combined scale of approximately 52,350 employees at 863 locations in 27 countries.

## Advisors

Morgan Stanley is serving as financial advisor to XPO Logistics, and Wachtell, Lipton, Rosen & Katz and Darrois Villey Maillot Brochier are acting as legal advisors. Rothschild and JP Morgan are serving as financial advisors to Norbert Dentressangle and Bredin Prat is acting as legal advisor.

## Conference Call

XPO Logistics will hold a conference call to discuss the proposed transaction on Wednesday, April 29, 2015, at 8:00 a.m. Eastern Time / 14:00 Central European Time. Participants can call toll-free (from U.S./Canada) 1-800-708-4539; internation

callers dial +1-847-619-6396. A live webcast of the conference will be available on the investor relations area of the company website, www.xpo.com/investors. The conference will be archived until May 29, 2015. To access the replay by phone, call free (from U.S./Canada) 1-888-843-7419; international callers dial +1-630-652-3042. Use participant passcode 39598058.

**About XPO Logistics, Inc.**

XPO Logistics, Inc. (NYSE: XPO) facilitates more than 37,000 deliveries a day as one of the fastest growing providers of transportation logistics services in North America. XPO is a leading provider of highly engineered, technology-enabled contract logistics, the second largest freight brokerage firm, the third largest provider of intermodal services, the largest provider of mile logistics for heavy goods, and the largest manager of expedited shipments. Additionally, the company has growing positions in managed transportation, global freight forwarding and less-than-truckload brokerage.

XPO, with headquarters in Greenwich, Conn., USA, has 201 locations and approximately 10,000 employees. Its two business segments - transportation and logistics - utilize relationships with ground, rail, sea and air carriers and other suppliers to se over 15,000 customers in the manufacturing, industrial, retail, technology, aerospace, commercial, life sciences and government sectors. The company has more than 4,900 independently owned trucks under contract to its drayage, exped and last mile subsidiaries, and has access to additional capacity through its relationships with over 30,000 other carriers. www.xpo.com

**About Norbert Dentressangle**

Norbert Dentressangle, with headquarters in Lyon, France, is a leading global provider of contract logistics, including e-commerce fulfillment; freight brokerage and transportation; and global forwarding services. The company had pro-forma 2 revenue of €5.1 billion. Norbert Dentressangle has approximately 42,350 employees and 662 locations in 24 countries. The company provides supply chain solutions to a diverse base of approximately 20,000 customers, including many of the wor largest companies. Norbert Dentressangle is traded under the code GND (Isin FR0000052870) on Euronext Paris (category and Euronext London. www.norbert-dentressangle.com.

*Forward-Looking Statements*

*This press release includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and within the meaning of French stock exchange regulations, and Section 21E of the Securities Exchange Act of 1934, as amended, including the expected closing dates for the transactions, the expected impact of the acquisition and the related financing, including the expected impact on XPO Logistics' results of operations and EBITDA, the retention of the Nor Dentressangle management team, the expected ability to integrate operations and technology platforms and to cross-sell services, and the expected ability to retain Norbert Dentressangle's businesses and to grow XPO's and Norbert Dentressangl businesses. All statements other than statements of historical fact are, or may be deemed to be, forward-looking statements some cases, forward-looking statements can be identified by the use of forward-looking terms such as "anticipate," "estimate "believe," "continue," "could," "intend," "may," "plan," "potential," "predict," "should," "will," "expect," "objective," "projection," "foreca "goal," "guidance," "outlook," "effort," "target" or the negative of these terms or other comparable terms. However, the absence these words does not mean that the statements are not forward-looking. These forward-looking statements are based on ce assumptions and analyses made by us in light of our experience and our perception of historical trends, current conditions a expected future developments, as well as other factors we believe are appropriate in the circumstances.*

*These forward-looking statements are subject to known and unknown risks, uncertainties and assumptions that may cause actual results, levels of activity, performance or achievements to be materially different from any future results, levels of acti performance or achievements expressed or implied by such forward-looking statements. Factors that might cause or contribu to a material difference include those discussed in XPO's filings with the SEC and the following: economic conditions genera competition; XPO's ability to find suitable acquisition candidates and execute its acquisition strategy; the expected impact of Norbert Dentressangle acquisition, including the expected impact on XPO's results of operations; the ability to obtain the requisite regulatory approvals; XPO's ability to successfully complete the contemplated tender offer and the squeeze out of Norbert Dentressangle's publicly held shares; the ability to successfully integrate and realize anticipated synergies and cost savings with respect to Norbert Dentressangle and other acquired companies; XPO's ability to raise debt and equity capital; XPO's ability to attract and retain key employees to execute its growth strategy, including retention of Norbert Dentressangle*

*management team; litigation, including litigation related to alleged misclassification of independent contractors; the ability to develop and implement a suitable information technology system; the ability to maintain positive relationships with XPO's and Norbert Dentressangle's networks of third-party transportation providers; the ability to retain XPO's, Norbert Dentressangle's and other acquired companies' largest customers; rail and other network changes; weather and other service disruptions; and governmental regulation. All forward-looking statements set forth in this press release are qualified by these cautionary statements and there can be no assurance that the actual results or developments anticipated will be realized or, even if substantially realized, that they will have the expected consequences to, or effects on, XPO, Norbert Dentressangle or their respective businesses or operations. Forward-looking statements set forth in this document speak only as of the date hereof, and neither XPO nor Norbert Dentressangle undertakes any obligation to update forward-looking statements to reflect subsequent events or circumstances, changes in expectations or the occurrence of unanticipated events except to the exten: required by law.*

*In accordance with French law, the documentation relating to the simplified public offer targeting Norbert Dentressangle, wh if it is filed, will include the terms and conditions of the offer, will be subject to review by the AMF. The offer will only be open: once the AMF has granted its clearance. Information concerning Norbert Dentressangle contained in this press release has l elaborated based on publicly available sources.*

**Contacts:**

XPO Logistics, Inc.
Tavio Headley, +1-203-930-1602
tavio.headley@xpo.com

Norbert Dentressangle SA
Thierry Leduc, +33 4 72 83 66 00
thierry.leduc@norbert-dentressangle.com
Clémence Choutet, +33 4 72 83 66 00
clemence.choutet@norbert-dentressangle.com

Brunswick Group
Gemma Hart, +1-212-333-3810
Laurent Perpere, +33 1 53 96 83 83

DGM
Olivier Labesse, +33 1 40 70 11 89
ol@dgm-conseil.fr
Hugues Schmitt +33 1 40 70 11 89
h.schmitt@dgm-conseil.fr
Thomas de Climens +33 1 40 70 11 89
thomasdeclimens@dgm-conseil.fr

XPO to Acquire ND

Office Locator   Useful Links   Privacy Policy   Website Terms of Use   Business Terms   Forward-Looking Statements   Contact



© 2015 XPO Logistics, Inc. All rights reserved.





## XPO Logistics acquiert Norbert Dentressangle SA, leader en logistique, transport et freight-forwarding

*XPO intègre le top 10 mondial de la logistique et devient un leader européen dans la logistique E-commerce.*

*L'acquisition permettra à XPO de tripler son EBITDA annualisé en le portant à 545 millions de dollars, pour un chiffre d'affaires d'environ 8,5 milliards de dollars. XPO atteint quasiment les objectifs 2017 de son business plan avec deux ans d'avance.*

*La complémentarité des offres de services et des implantations géographiques permettra de générer des synergies commerciales auprès d'un large portefeuille de clients internationaux.*

*La transaction s'établit au total à 3,24 milliards d'euros (3,53 milliards de dollars), et sa réalisation est attendue au deuxième trimestre 2015.*

*Le Conseil de surveillance de Norbert Dentressangle SA a approuvé à l'unanimité le protocole d'accord relatif à l'offre publique d'achat.*

*Une conférence téléphonique à l'intention des investisseurs se tiendra le 29 avril 2015 à 14h00 heure française.*

**Greenwich, USA et Lyon, France, le 28 avril 2015,** XPO Logistics Inc. (« XPO Logistics » ou « XPO ») (NYSE : XPO), et Norbert Dentressangle SA (« Norbert Dentressangle ») (Euronext : GND) ont annoncé aujourd'hui avoir signé un accord définitif prévoyant l'acquisition par XPO Logistics de la majorité des actions Norbert Dentressangle SA et le lancement d'une offre publique d'achat sur le capital restant.

Norbert Dentressangle est un leader mondial de la logistique (notamment dans l'e-commerce), du transport, de l'affrètement, ainsi que du freight-forwarding. La société, dont le siège social se situe à Lyon, compte 662 sites et 42 350 collaborateurs. Ses clients, de tout premier rang, figurent parmi les plus grands groupes internationaux. Les activités de transport et affrètement, de logistique et de freight-forwarding de Norbert Dentressangle et de XPO sont très complémentaires. Au 31 décembre 2014, Norbert Dentressangle a réalisé un chiffre d'affaires annuel pro forma, de 5,1 milliards d'euros (5,5 milliards de dollars).

**Caractéristiques de la transaction**

- La valeur offerte aux actionnaires de Norbert Dentressangle la totalité des actions est de 2,17 milliards d'euros, sur une base pleinement diluée de 9,9 millions d'actions en circulation. La valeur totale de la transaction s'établit à environ 3,24 milliards d'euros, incluant une dette nette de 1,08 milliard d'euros. Le Directoire de XPO et le Conseil de Surveillance de Norbert Dentressangle ont unanimement approuvé la transaction.

- XPO s'est engagé irrévocablement à acquérir l'intégralité des titres détenus par M. Norbert Dentressangle et sa famille dans Norbert Dentressangle SA, représentant 67% des actions en circulation. Le prix d'offre par action a été fixé à 217,5 euros, coupon de 1,80 euros par action détaché. Après l'obtention des autorisations réglementaires usuelles, XPO lancera une offre publique d'achat simplifiée entièrement en numéraire visant le reste des actions de Norbert Dentressangle. Les

1

actionnaires de Norbert Dentressangle recevront 217,5 euros en numéraire pour chaque action ordinaire détenue, en supposant que l'offre soit lancée postérieurement au détachement du dividende. Si à l'issue de l'offre publique d'achat les actionnaires n'ayant pas apporté leurs titres à l'offre ne représentent pas plus de 5% du capital et des droits de vote de Norbert Dentressangle, XPO a l'intention de procéder à un retrait obligatoire et de retirer de la cote les actions de Norbert Dentressangle. Ces transactions sont structurées conformément à la réglementation de l'Autorité des marchés financiers et aux lois gouvernant les marchés financiers applicables aux Etats-Unis.

- La valeur totale de la transaction induite par le prix d'offre représente un multiple de 9.1 fois l'EBITDA 2015 de 357 millions d'euros tel qu'estimé par le consensus des analystes (environ 388 millions de dollars). Le prix d'achat par action représente une prime d'environ 34% (35% coupon attaché) par rapport au cours de clôture de Norbert Dentressangle au 27 avril 2015.

- La transaction n'est pas conditionnée à son financement. Un engagement de financement a été obtenu auprès de Morgan Stanley pour un montant maximum de 2,6 milliards de dollars (2,4 milliards d'euros). XPO dispose de liquidités disponibles d'un montant supérieur à 1 milliard de dollars et d'une ligne de crédit *ABL revolver* non tirée de 415 millions de dollars. La réalisation de la transaction n'est conditionnée qu'à l'obtention des autorisations des autorités en charge du contrôle des concentrations aux Etats-Unis et en Allemagne.

- Hervé Montjotin, Président du Directoire de Norbert Dentressangle deviendra CEO des activités européennes de XPO Logistics et « *President* » du Groupe.

- XPO entend maintenir à son niveau actuel le nombre d'employés à temps plein en France, sur une période minimum de 18 mois à compter de la clôture de l'acquisition. Les centres de décision européens de Norbert Dentressangle resteront situés en France, à Lyon pour le siège social, Malakoff (Hauts-de-Seine) pour la Logistique et Beausemblant (Drôme) pour le Transport.

Bradley Jacobs, Chairman et CEO de XPO Logistics a déclaré : « *Il s'agit d'un moment clé dans la croissance de XPO. L'acquisition prévue de Norbert Dentressangle va propulser XPO parmi les 10 premiers groupes de logistique dans le monde. Elle nous permettra de tripler notre EBITDA ajusté en le portant à 545 millions de dollars, et d'atteindre un chiffre d'affaires d'environ 8.5 milliards de dollars une fois l'offre publique finalisée, nous donnant ainsi près de deux ans d'avance sur les objectifs fixés dans notre business plan. L'acquisition de Norbert Dentressangle est un important bond en avant, mais nous sommes toujours dans les premières étapes de notre plan de croissance à long terme.*

*Acquérir Norbert Dentressangle, c'est acquérir une entreprise construite pierre par pierre pendant quatre décennies. Je me réjouis que le Président du Directoire de Norbert Dentressangle, Hervé Montjotin, ait accepté de prendre la tête de nos activités européennes et de devenir « President » de XPO Logistics. Je suis impatient de pouvoir travailler avec Hervé à la mise en œuvre de notre stratégie de déploiement international. »*

Hervé Montjotin, Président du Directoire de Norbert Dentressangle, a déclaré : « *En rejoignant XPO, nous nous inscrivons dans un projet de développement conforme à l'ambition qui nous a guidés depuis la création de Norbert Dentressangle il y a 36 ans : devenir un partenaire mondial capable d'accompagner nos clients dans la gestion globale de leur supply-chain, au plan local comme à l'échelle internationale et en soutien de leur propre développement. Fortes de leur bonne dynamique, les activités de Norbert Dentressangle deviennent la plateforme de croissance du nouveau Groupe XPO en Europe au bénéfice de*

2

*nos clients et de nos collaborateurs. C'est avec fierté que je continuerai à en assurer la responsabilité avec l'ensemble du Directoire de Norbert Dentressangle. »*

**Logique du rapprochement et synergies commerciales**

- Norbert Dentressangle propose une gamme de services similaires à celle de XPO : logistique contractuelle, notamment en e-commerce ; affrètement ; réseau de distribution à la palette ; pilotage et gestion de fret ; parc de véhicules poids lourds dédié et détenu en propre ; freight-forwarding à l'international. Norbert Dentressangle sera la plateforme de croissance de XPO en Europe.

- XPO prévoit que ce rapprochement générera d'importantes opportunités de ventes croisées à l'échelle du Groupe.

- En 36 ans, Norbert Dentressangle a construit un portefeuille de clients fidèles, parmi lesquelles figurent des entreprises internationales leaders dans leurs secteurs et qui ne sont pas encore, pour la plupart d'entre elles, clientes de XPO. Celles-ci auront la possibilité de renforcer leurs liens avec le nouveau Groupe XPO, bénéficiant d'un point d'entrée unique pour les accompagner à l'échelle mondiale dans la gestion de leur supply-chain. Dentressangle est notamment présent dans les secteurs suivants : grande distribution, industrie alimentaire, fabrication, chimie, agriculture, e-commerce et technologie. Son principal client représente moins de 4% des ventes.

- Avec un chiffre d'affaires de 242 millions d'euros et une croissance organique de 31%, l'offre *Red Online* de Norbert Dentressangle est leader sur le marché européen des services à destination de l'e-commerce, qui représente dans son ensemble 5 milliards d'euros. Elle s'adresse à la fois à des clients B2B et B2C au Royaume Uni, en Espagne et en France. Norbert Dentressangle dispose d'une expertise et de ressources reconnus en reverse logistics, un marché en forte croissance.

- Les services transport de XPO en affrètement et gestion de flottes, deux de ses activités-clés, atteindront une taille mondiale, s'appuyant sur des technologies et des expertises propres. XPO déploiera en Europe sa plateforme propriétaire d'optimisation du fret pour améliorer le sourçage des transporteurs et le service client. Norbert Dentressangle réalise actuellement plus d'1 milliard d'euros de chiffre d'affaires annuel en affrètement et pilotage de flux (asset-light transportation). Les marchés anglais, espagnol et français du transport routier représentent environ 95 milliards d'euros.

- L'opération donnera à XPO accès au plus grand réseau de transport en Europe, avec une flotte de 7 700 camions en propre et 3 200 camions affrétés, et l'accès à 12 000 transporteurs indépendants. XPO bénéficiera d'un maillage couvrant environ 90% des régions productrices en Europe. Les activités de transport de Norbert Dentressangle incluent 250 millions d'euros de chiffres d'affaire provenant du transport dédié.

- Les activités de Norbert Dentressangle ont un faible niveau d'intensité capitalistique, les investissements annuels se montant en moyenne à 2,5% du chiffre d'affaires.

- La transaction permettra la création d'un des dix premiers groupes mondiaux en logistique en termes de chiffre d'affaires et de surface d'entreposage, avec 12 millions de mètres carrés. La plupart des implantations font l'objet d'un crédit-bail et sont dédiées à des opérations d'entreposage à forte valeur ajoutée, parmi lesquelles la logistique de la chaîne du froid ou la *reverse logistic*. Générant 2,6 milliards d'euros de chiffre d'affaires, l'activité de logistique contractuelle de Norbert Dentressangle repose sur de solides relations clients, comme en témoigne son taux de renouvellement client de 97%. Environ 26% des ventes de logistique contractuelle sont réalisées aux Etats-Unis.

- L'alliance des deux entreprises permettra à XPO d'augmenter le chiffre d'affaires de ses activités de freight-forwarding à l'international de près de 425 millions de dollars par an et de développer les lignes Asie - Europe. XPO compte sur les volumes additionnels ainsi générés pour proposer une offre Air & Sea plus compétitive à ses clients.

- XPO envisage de réaliser d'importants investissements de croissance dans ses nouvelles activités européennes, notamment dans le développement technologique. XPO prévoit un montant total d'investissement dans les technologies d'environ 225 millions de dollars par an à l'échelle du nouveau Groupe.

- XPO se projette hors de l'Amérique du Nord afin de tirer parti d'un contexte porteur : un rebond de l'économie dans la zone Euro qui en fait un moment opportun ; un dollar fort par rapport à l'euro ; et des opportunités d'acquisitions sur le marché européen du transport et de la logistique, très fragmenté, sur lequel Norbert Dentressangle a bâti des positions de premier plan.

- L'ensemble de l'équipe de direction devrait rejoindre XPO après finalisation de la transaction.

- La dimension internationale acquise par les opérations de XPO renforceront l'attractivité du Groupe en tant qu'employeur de choix, animé par l'excellence opérationnelle et le partage du savoir-faire, et offriront à ses collaborateurs de nombreuses opportunités de mobilité en Europe et entre l'Europe et l'Amérique du Nord.

- Après la clôture de l'opération, l'ensemble des activités acquises rejoindra la marque XPO Logistics. Le nouveau Groupe réunira 52 350 collaborateurs et comptera 863 sites dans 27 pays.

**Conseils**

Morgan Stanley agit en qualité de conseil financier de XPO Logistics. Wachtell, Lipton, Rosen & Katz et Darrois Villey Maillot Brochier agissent en tant que conseil juridique de XPO Logistics.

Rothschild et JP Morgan sont les conseils financiers de Norbert Dentressangle et Bredin Prat agit en tant que conseil juridique.

**Conférence téléphonique**

XPO Logistics tiendra une conférence téléphonique pour présenter l'opération envisagée, mercredi 29 avril à 14h00 (heure de Paris). Les participants pourront se connecter au 1-800-708-4539 (numéro vert) depuis les Etats-Unis et le Canada et au +1-847-619-6396 pour les participants internationaux. Un webcast de la conférence sera également accessible en direct sur la page Relations Investisseurs de la société, www.xpologistics.com/investors.
Un replay vidéo sera disponible jusqu'au 29 mai 2015. Un replay audio sera également disponible au 1-888-843-7419 (numéro vert) depuis les États-Unis et le Canada et au +1-630-652-3042 pour les audiences internationales. Le code d'accès participant est le suivant : 39598058.

**À propos de XPO Logistics, Inc.**

Avec plus de 37 000 livraisons effectuées chaque jour, XPO Logistics, Inc. (NYSE: XPO) est l'un des acteurs de la logistique les plus actifs d'Amérique du Nord. XPO est un leader international de la logistique contractuelle de haute technologie, le deuxième opérateur de

4

courtage de fret, le troisième fournisseur de services intermodaux, le premier fournisseur de logistique sur le dernier kilomètre pour les marchandises lourdes et le premier opérateur d'envois accélérés. En outre, le Groupe connaît une forte croissance dans les activités de transports gérés, de freight-forwarding et de courtage de marchandises légères.

XPO, dont le siège est situé à Greenwich, Connecticut, USA, dispose de 201 agences et compte environ 10 000 salariés. Ses deux activités - le transport et la logistique – offrent des solutions multimodales associant des partenaires dans le transport routier, ferroviaire, maritime et aérien, pour servir plus de 15 000 clients opérant dans les secteurs du textile, de l'industrie, de la grande distribution, des technologies, de l'aéronautique, de la santé ou encore des services publics.

XPO Logistics s'appuie sur une flotte de plus de 4 900 camions affrétés pour déployer ses activités de camionnage et d'expédition-livraison sur le dernier kilomètre. Le Groupe dispose de capacités additionnelles grâce à plus de 30 000 autres transporteurs partenaires.

Pour plus d'informations : www.xpo.com

**A propos de Norbert Dentressangle**

Norbert Dentressangle est un acteur international de la Logistique, du Transport et de l'Air & Sea avec au 31 décembre 2014, un chiffre d'affaires pro forma de 5.1 Mds € dont 64% produits hors de France, 42 350 collaborateurs et une présence dans 24 pays. La société propose des solutions de gestion de la supply chain à environ 20 000 clients, parmi lesquels figurent certains des plus grands groupes mondiaux.
Norbert Dentressangle fait partie des indices CAC Small et CAC All Tradable.

Euronext Paris (catégorie A) / Euronext London, Code GND – Isin FR0000052870

Pour plus d'informations : www.norbert-dentressangle.com

**Déclarations prospectives**

*Ce communiqué de presse contient des déclarations prospectives au sens de la Section 27A du U.S. Securities Act de 1933, tel que modifié, et au sens de la règlementation boursière française et de la Section 21E du U.S. Securities Exchange Act de 1934, tel que modifié, notamment les dates de réalisation anticipées des transactions, l'impact anticipé de l'acquisition et du financement lié, y compris l'impact anticipé sur le résultat opérationnel et l'EBITDA de XPO Logistics, le maintien de l'équipe de direction de Norbert Dentressangle, la capacité projetée à intégrer les opérations et les plateformes technologiques et à réaliser des ventes croisées de services, et la capacité projetée à préserver l'activité de Norbert Dentressangle et faire croître l'activité de XPO et de Norbert Dentressangle. Toutes les déclarations autres que des déclarations se rapportant à des faits historiques sont, ou pourraient constituer, des déclarations prospectives. Dans certains cas, les déclarations prospectives peuvent être identifiées par l'utilisation de termes prospectifs tels que « anticiper », « estimer », « croire », « continuer », « pourrait », « avoir l'intention de », « prévoir », « potentiel », « prédire », « devrait », « sera », « s'attendre à », « objectif », « projection », « prévision », « but », « indication », « perspective », « s'efforcer », « viser », de leur forme négative ou d'autres termes similaires. Cependant, l'absence de ces termes ne signifie pas que les déclarations ne sont pas prospectives. Ces déclarations prospectives sont basées sur certaines hypothèses et analyses que nous avons formulées ou réalisées à la lumière de notre expérience et de notre perception des tendances historiques, de l'environnement actuel et des développements futurs anticipés, ainsi que d'autres facteurs que nous estimons adéquats compte tenu des circonstances.*

5

*Ces déclarations prospectives sont sujettes à des risques connus et inconnus, des incertitudes et des hypothèses qui peuvent avoir pour conséquence que les résultats, niveaux d'activité, performances ou réalisations réelles s'écartent significativement des résultats, niveaux d'activité, performances ou réalisations exprimés ou découlant de ces déclarations prospectives. Les facteurs susceptibles de causer ou de contribuer à un écart comprennent ceux évoqués dans les documents déposés par XPO auprès de la SEC et ce qui suit : les conditions économiques en général ; la situation concurrentielle ; la capacité de XPO d'identifier des opportunités d'acquisitions et d'exécuter sa stratégie d'acquisition ; les effets attendus de l'acquisition de Norbert Dentressangle, y compris celui sur le résultat des opérations de XPO ; la capacité à obtenir les autorisations réglementaires requises ; la capacité de XPO à achever avec succès l'offre publique et le retrait obligatoire envisagés sur les actions de Norbert Dentressangle ; la capacité à intégrer avec succès et à réaliser les synergies et économies en rapport tant avec Norbert Dentressangle qu'avec les autres entreprises acquises ; la capacité de XPO à lever de la dette et du capital ; la capacité de XPO à attirer et fidéliser des dirigeants et salariés à même d'exécuter sa stratégie de croissance, en ce compris la fidélisation de l'équipe de direction de Norbert Dentressangle ; des litiges, en ce compris celui relatif à d'éventuelles requalifications de sous-traitants indépendants ; la capacité à développer et mettre en œuvre un système d'information performant ; la capacité à maintenir des relations de qualité avec le réseau de transporteurs indépendants de XPO et de Norbert Dentressangle ; la capacité à retenir les principaux clients de XPO, Norbert Dentressangle et des autres entreprises acquises ; les changements affectant les réseaux ferroviaires et autres ; les conditions climatiques et les autres motifs d'interruption de services ; et l'environnement réglementaire. Toutes les déclarations prospectives figurant dans ce communiqué de presse sont formulées sous ces réserves et il ne peut être donnée aucune garantie que les résultats ou développements projetés seront réalisés ou, même s'ils sont réalisées en grande partie, qu'ils auront les conséquences ou effets attendus sur XPO, Norbert Dentressangle ou leurs activités ou opérations respectives. Les déclarations prospectives figurant dans ce document ne valent qu'à la date des présentes et ni XPO ni Norbert Dentressangle ne s'engage à mettre à jour ces déclarations prospectives pour tenir compte de nouveaux événements ou de nouvelles circonstances, d'évolutions dans les anticipations ou de la survenance d'événements imprévus sauf si la loi l'exige.*

*Conformément au droit français, la documentation relative à l'offre publique simplifiée visant la société Norbert Dentressangle qui, si elle est déposée, comportera les termes et conditions de l'offre, sera soumise à l'AMF. L'Offre ne pourra être ouverte qu'une fois déclarée conforme par l'AMF. Les informations concernant Norbert Dentressangle figurant dans ce communiqué de presse sont basées sur des sources publiques.*

**Contacts:**

| **XPO Logistics, Inc.** | **Norbert Dentressangle SA** |
|---|---|
| Tavio Headley, +1-203-930-1602 | Thierry Leduc, +33 4 72 83 66 00 |
| tavio.headley@xpo.com | thierry.leduc@norbert-dentressangle.com |
| | Clémence Choutet, +33 4 72 83 65 94 |
| | clemence.choutet@norbert-dentressangle.com |
| **Brunswick Group - New-York** | **DGM Conseil** |
| Gemma Hart, +1-212-333-3810 | Paris – Olivier Labesse, +33 1 40 70 11 89 |
| xpo@brunswickgroup.com | ol@dgm-conseil.fr |
| **Brunswick Group - Paris** | Hugues Schmitt +33 1 40 70 11 89 |
| Laurent Perpere, +33 1 53 96 83 83 | h.schmitt@dgm-conseil.fr |
| Aurélia de Lapeyrouse, +33 1 53 96 83 83 | Thomas de Climens +33 1 40 70 11 89 |
| xpoparis@brunswickgroup.com | thomasdeclimens@dgm-conseil.fr |



**Elliott Capital Advisors, L.P**
40 West 57th Street
New York, NY 10019
United States of America

Norbert Dentressangle
192 avenue Thiers
69006 Lyon
France

For the attention of Mr. Hervé
Montjotin, président du
directoire

New-York, May 18, 2015

**Certified letter with acknowledgment of receipt requested**

RE: Disclosure of crossing of threshold

Dear Sir:

     Pursuant to Section 9 of the by-laws of Norbert Dentressangle, we hereby inform you that, based on the number of shares disclosed by the company, i.e. 9,836,241. The Liverpool Limited Partnership, Elliott International, L.P. and Elliott Associates L.P., acting in concert, have crossed, on May 14, 2015, the threshold of 2% of the share capital of Norbert Dentressangle under the form (i) of shares held and (ii) *contracts for difference* (CFD) (assimilation pursuant to 4° bis of article L. 233-9 of the French *Code de commerce*) and that the underlying Norbert Dentressangle shares which are subject to these CFD amount to 234,635, as follows:

|  | Number of shares held | Number of CFDs held | Number of owned or underlying shares | % of share capital (based on 9,836,241 shares) |
|---|---|---|---|---|
| The Liverpool Limited Partnership et Elliott International, L.P. | 100 | - | 100 |  |
| Elliott International, L.P. et Elliott Associates, L.P. | - | 234,635 | 234,635 |  |
| **Total** |  |  | 234,735 | 2.38% |

Sincerely yours,
Elliott Capital Advisors, L.P

By: Elliot Greenberg
Its: Vice President

Elliott Capital Advisors, L.P
40 West 57th Street
New York, NY 10019
United States of America

Norbert Dentressangle
192 avenue Thiers
69006 Lyon
France

For the attention of Mr. Hervé
Montjotin, président du
directoire

New-York, June 19, 2015

**Certified letter with acknowledgment of receipt requested**

RE: Disclosure of crossing of threshold

Dear Sir:

Pursuant to Section 9 of the by-laws of Norbert Dentressangle, we hereby inform you that, based on the number of shares disclosed by the company, i.e. 9,836,241, The Liverpool Limited Partnership, Elliott International, L.P. and Elliott Associates L.P., acting in concert, have crossed, on June 17, 2015, the threshold of 4% of the share capital of Norbert Dentressangle under the form (i) of shares held and (ii) *contracts for difference* (CFD) (assimilation pursuant to 4° bis of article L. 233-9 of the French *Code de commerce*) and that the underlying Norbert Dentressangle shares which are subject to these CFD amount to 490,438, as follows:

| | Number of shares held | Number of CFDs held | Number of owned or underlying shares | % of share capital (based on 9,836,241 shares) |
|---|---|---|---|---|
| The Liverpool Limited Partnership et Elliott International, L.P. | 100 | - | 100 | |
| Elliott International, L.P. et Elliott Associates, L.P. | - | 490,438 | 490,438 | |
| **Total** | | | 490,538 | 4,99% |

Sincerely yours,
Elliott Capital Advisors, L.P

By: Joshua Nadell
Its: Vice President

**Elliott Capital Advisors, L.P**
**40 West 57th Street**
**New York, NY 10019**
**United States of America**

Norbert Dentressangle
192 avenue Thiers
69006 Lyon
France

For the attention of Mr. Hervé
Montjotin, président du
directoire

New-York, June 24, 2015

**Certified letter with acknowledgment of receipt requested**

RE: Notification of major holding

Dear Sir:

Pursuant to Article L. 233-7 I of the French Commercial Code, we hereby inform you that, based on the number of shares and voting rights disclosed by the company, i.e. 9,836,241 shares and 9,885,798 voting rights, The Liverpool Limited Partnership, Elliott International, L.P. and Elliott Associates L.P., managed by Elliott Capital Advisors, L.P (for itself and related general partners and investment managers) have crossed, on June 18, 2015, the threshold of 5% of the share capital and voting rights of Norbert Dentressangle under the form (i) of shares held and (ii) *contracts for difference* (CFD) (assimilation pursuant to 4° bis of Article L. 233-9 of the French *Code de commerce*) and that the underlying Norbert Dentressangle shares which are subject to these CFD amount to 530,438, as follows:

| | Number of shares held | Number of CFDs held | Number of owned or underlying shares | % of share capital (based on 9,836,241 shares) | % of voting rights (based on 9,885,798 voting rights) |
|---|---|---|---|---|---|
| The Liverpool Limited Partnership et Elliott International, L.P. | 100 | - | 100 | | |
| Elliott International, L.P. et Elliott Associates, L.P. | - | 530,438 | 530,438 | | |
| **Total** | | | 530,538 | 5.39% | 5,37% |

You will find attached to this letter a copy of the notification filed with the Autorité des marchés financiers pursuant to Article L. 233-7 II of the French Commercial Code.

Sincerely yours,

Elliott Capital Advisors, L.P

By: Elliot Greenberg
Its: Vice President

Encl.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# INFORMATION MEMORANDUM REGARDING THE SIMPLIFIED TENDER OFFER TARGETING THE SHARES OF



initiated by



**XPO Logistics France SAS**

presented by

## Morgan Stanley

---

**OFFER PRICE: 217.50 euros per Norbert Dentressangle SA share**
**OFFER PERIOD: 16 trading days**

---



Pursuant to the provisions of Article L.621-8 of the French monetary and financial code and the article 231-26 of its General Regulations, the French Financial Markets Authority (*Autorité des marchés financiers*) ("**AMF**"), has as a result of its decision dated 23 June 2015 on the compliance of the Offer with its regulations delivered the visa n°15-290 on 23 June 2015 on this offer document. This document was prepared by XPO Logistics France and its signatories are liable for its content.

Pursuant to the provisions of the article L.621-8 I of the French monetary and financial code, the visa has been delivered after the AMF had verified "*whether the document is complete and understandable and whether the information presented is coherent*". The visa does not signify approval of the offer price or the merits of the transaction, and does not serve as authentication of the accounting and financial information provided.

---

**IMPORTANT NOTICE**

In the event that, upon the closing of the simplified tender offer, the number of shares not tendered in response to this offer by the minority shareholders represents less than 5% of the share capital or voting rights of Norbert Dentressangle SA, XPO Logistics France has the intention to implement, after the closing of such tender offer, pursuant to articles L. 433-4 III of the French Monetary and Financial Code and 237-14 *et seq.* of the AMF General Regulations, a mandatory squeeze-out procedure in exchange for compensation equal to 217.50 euros per Norbert Dentressangle SA share, it being specified that such squeeze-out procedure would be immediately followed by an application to Euronext for the delisting of Norbert Dentressangle SA shares.

---

This information memorandum approved by the AMF as well as other information relating in particular to the legal, financial and accounting characteristics of XPO Logistics France shall be made available to the public free of charge at the offices of **Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France)** ("Morgan Stanley"), as well as on the web sites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com), pursuant to article 231-27 2° of the AMF General Regulations. A press release will be issued pursuant to article 221-3 of the AMF General Regulations in order to inform the public of the manner in which these documents will be made available.

Pursuant to article 231-28 of the AMF General Regulations, information relating in particular to the legal, financial and accounting characteristics of XPO Logistics France and Norbert Dentressangle SA will be filed with the AMF and made available to the public no later than on the day preceding the opening of the simplified tender offer.

970796.4

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## TABLE OF CONTENTS

1. PRESENTATION OF THE OFFER ........................................................................................ 4
1.1. INTRODUCTION ............................................................................................................. 4
1.2. CONTEXT OF AND RATIONALE FOR THE TRANSACTION ................................................. 4
1.2.1. Background for transaction ........................................................................................ 4
1.2.2. Rationale for the Block Acquisition and the subsequent Offer ................................ 11
1.2.3. Opinion of XPO Logistics, Inc.'s Board of Directors and sole shareholder approval of the Offeror ........ 12
1.3. INTENTIONS OF THE OFFEROR FOR THE COMING TWELVE MONTHS ............................. 12
1.3.1. Strategic rationale and future activity ..................................................................... 12
1.3.2. Intentions regarding employment and management .................................................. 13
1.3.3. Dividend distribution policy ..................................................................................... 13
1.3.4. Synergies .................................................................................................................. 13
1.3.5. Mandatory squeeze-out and removal from listing .................................................... 14
1.3.6. Intentions regarding merger and integration ........................................................... 14
1.3.7. Composition of the Supervisory Board ..................................................................... 14
1.3.8. Advantages for the Company, the Offeror and their shareholders ............................ 15
1.4. AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS OUTCOME ........ 16
2. CHARACTERISTICS OF THE OFFER ............................................................................. 16
2.1. TERMS OF THE OFFER .................................................................................................. 16
2.2. NUMBER AND NATURE OF THE SECURITIES TARGETED BY THE OFFER ......................... 17
2.3. TENDER PROCEDURE FOR THE OFFER .......................................................................... 17
2.4. INDICATIVE TIMETABLE OF THE OFFER ....................................................................... 18
2.5. FINANCING OF THE OFFER ........................................................................................... 19
2.5.1. Costs connected with the Offer ................................................................................ 19
2.5.2. Financing sources of the Offer ................................................................................. 19
2.6. RESTRICTIONS CONCERNING THE OFFER ABROAD ....................................................... 19
2.7. TAX TREATMENT OF THE OFFER .................................................................................. 20
2.7.1. Individual shareholders who are tax residents of France managing their private assets and not carrying out stock exchange transactions on an habitual basis ........ 20
2.7.2. Corporate shareholders residents of France for tax purposes and subject to corporate income tax under standard conditions ........ 22
2.7.3. Shareholders who are not residents of France for tax purposes ............................... 23
2.7.4. Shareholders subject to a different tax regime ......................................................... 24
2.7.5. Registration duties or financial transaction tax ....................................................... 24
3. OFFER VALUATION CRITERIA ..................................................................................... 25
3.1. ASSESSMENT OF THE OFFER PRICE FOR ND SHARES ................................................... 25
3.2. FINANCIAL ELEMENTS ................................................................................................ 25
3.2.1. Financial information ............................................................................................... 25
3.2.2. Enterprise value to equity value bridge ................................................................... 26
3.2.3. Number of shares retained ....................................................................................... 26

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**3.3.** **VALUATION OF THE OFFER** ....................................................................................... 27

3.3.1. Reference to the acquisition by XPO of the majority block of ND shares (Block Acquisition) ................ 27

3.3.2. Analysis of trading prices ............................................................................................ 27

3.3.3. Equity research analysts' target prices ....................................................................... 29

3.3.4. Analysis of trading multiples for comparable listed companies ................................. 29

3.3.5. Analysis of precedent transactions multiples .............................................................. 31

3.3.6. Analysis of premia paid in precedent French public transactions ("OPA") ................ 32

3.3.7. Analysis of discounted cash flow ................................................................................ 32

3.3.8. Summary of the valuation of the Offer per Company Share ......................................... 35

**4.** **PERSONS ASSUMING RESPONSIBILITY FOR THE INFORMATION MEMORANDUM** ...... 36

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 1.   PRESENTATION OF THE OFFER

## 1.1.   Introduction

Pursuant to Title III of Book II, and in particular, articles 233-1 2° *et seq.* and 234-2 of the AMF General Regulations, XPO Logistics France SAS, a corporation incorporated under the laws of France having a share capital of 10,000 euros, whose registered office is located at 23 rue du Roule, 75001 Paris, France and registered under number 811 597 335 RCS Paris ("**XPO**" or the "**Offeror**"), a wholly owned subsidiary of XPO Logistics, Inc.[1], a company incorporated under the laws of the state of Delaware, whose registered office is at Five Greenwich Office Park, Greenwich, Connecticut 06831 (USA) and whose shares are traded on the New York Stock Exchange (NYSE: XPO) ("**XPO Logistics, Inc**" and, together with XPO, "**XPO Logistics**"), has irrevocably undertaken to the AMF to offer to all of the shareholders of Norbert Dentressangle SA, a French *société anonyme* having a share capital of 19,672,482 euros, whose registered office is located at 192, avenue Thiers, 69006 Lyon, France registered with the Commercial and companies registrar of Lyon under number 309 645 539 ("**ND**" or the "**Company**") and whose shares are traded on both Euronext Paris - Eurolist Compartment A (ISIN FR0000052870; ticker symbol: GND) and NYSE Euronext London - Official List, to purchase all their shares of ND at a price of 217.50 euros per share (the "**Offer**").

Pursuant to Article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offer shall be open for a period of 16 trading days.

The Offer follows the acquisition by XPO (i) on 8 June 2015, of 6,561,776 shares from various shareholders of ND by way of off-market block trades (the "**Block Acquisition**"), representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company and (ii) on 8 June 2015, of 110,000 Subscription Warrants (as defined hereafter) giving rise to the right to subscribe for 110,000 ND Shares. XPO holds at the Offer filing date, 6,561,776 ND shares, representing 66.71% of the share capital and 66.38% of the theoretical voting rights.

Pursuant to the terms of Article 231-13 of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015. Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings made by the Offeror.

The Offer targets all the shares not directly or indirectly held by the Offeror as at the date hereof.

## 1.2.   Context of and rationale for the transaction

### 1.2.1.   Background for transaction

### *(i)      Acquisition by the Offeror of a 66.71% interest in ND*

On 28 April 2015, XPO Logistics, Inc. entered into (i) a share purchase agreement (the "**Share Purchase Agreement**") with Dentressangle Initiatives, Messrs. Norbert Dentressangle and Pierre-

---

[1] XPO Logistics, Inc.'s largest stockholder is Jacobs Private Equity, LLC, which is controlled by Mr. Bradley Jacobs who owns approximately 17.015% of the common stock of XPO Logistics, Inc.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Henri Dentressangle and Mss. Evelyne Dentressangle and Marine Dentressangle (the "**Initial Sellers**"), (ii) a tender offer agreement (the "**Tender Offer Agreement**") with the Company and (iii) a letter with the members of the Management Board (the "**Incentive Letter**") setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of the Company.

Pursuant to the Share Purchase Agreement in relation to the Block Acquisition, XPO agreed to acquire from the Initial Sellers 6,561,776 shares, representing approximately 66.71% of the share capital of ND at a price of 217.50 euros per share. The purchase price takes into consideration the distribution of a dividend in the amount of 1.80 euros per share to the benefit of all ND shareholders prior to the closing of the Block Acquisition.

Further, pursuant to the Tender Offer Agreement and the Incentive Letter, XPO agreed to acquire, at a price of 157.95 euros per warrant, from certain members of the management board of the Company, the share subscription warrants issued to them by the Company, i.e., (i) 80,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant A**") and (ii) 30,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant B**" and, together with the Subscription Warrants A, the "**Subscription Warrants**"), provided the vesting conditions provided in the terms and conditions of such Subscription Warrants be cancelled and the exercise periods be opened in anticipation by the shareholders of the Company on the occasion of the shareholders' meeting of 21 May 2015.

Also on 28 April 2015, XPO Logistics, Inc. and the Company announced the Block Acquisition, and XPO Logistics, Inc. also announced that it would launch the acquisition process for all the remaining shares of ND at a price of 217.50 euros per share.

The Company's supervisory board in a meeting held on 27 April 2015, gave a preliminary favourable opinion as to the Block Acquisition and the Offer, and appointed Ledouble SAS, represented by Messrs. Olivier Cretté and Sébastien Sancho, as independent expert in charge of preparing a report regarding the financial terms of a tender offer, followed, as the case may be, by a mandatory squeeze-out.

On 19 May 2015, the Offeror was created by its sole shareholder, XPO Logistics, Inc., which substituted the Offeror in its rights and obligations under the Share Purchase Agreement and the Tender Offer Agreement.

On 16 May 2015, XPO Logistics, Inc. and the Initial Sellers agreed that all conditions precedent pertaining to governmental and antitrust approvals were satisfied and therefore that all conditions precedents under the Share Purchase Agreement were satisfied.

On 21 May 2015, the shareholders' meeting of the Company approved the payment of a dividend of 1.80 euros per share which was made on 2 June 2015 (record date occurring on 29 May 2015).

The Company initiated the employee information and consultation process with the employee committee at the ND group level immediately following the announcement of the signing of the Share Purchase Agreement. On 28 May 2015, the ND group's employee committee rendered an unfavourable opinion on the contemplated Offer.

The settlement-delivery of the Block Acquisition governed by the Share Purchase Agreement was completed off-market on 8 June 2015.

As a result of the Block Acquisition, the Offeror became the owner of 6,561,776 shares of ND, representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

On 8 June 2015, the Company's supervisory board, in view of the fairness opinion of the independent expert, recommended to shareholders to tender their shares to the Offer.

Further, on 8 June 2015, the Offeror acquired the Subscription Warrants at a price per warrant of 157.95 euros, corresponding to the price paid for the shares as part of the Block Acquisition minus the exercise price.

Finally, since the filing of the draft information memorandum up until 23 June 2015, the Offeror has acquired 189,525 shares of the Company, at the Offer price (i.e., 217.50 euros), pursuant to Article 231-38 IV of the AMF General Regulations.

### (ii)    Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers

The Share Purchase Agreement provides for an obligation for the Purchaser to ensure that the Company progressively ceases to use the Norbert Dentressangle trade name and brand, with the rebranding process to be fully completed in the 36 months following the Block Acquisition. Subject to certain conditions, penalties may be due in case of failure to observe these obligations.

The Share Purchase Agreement does not contain any price supplement provision to the benefit of the Initial Sellers in respect of the Block Acquisition.

Further, the Share Purchase Agreement provides for 3-year non-compete and non-solicitation obligations bearing upon the Initial Sellers. The Initial Sellers also undertook not to use the Norbert Dentressangle trade name and brand in a business similar to the Company's business for a period of 20 years.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**(iii)**     ***Allocation of capital and voting rights of ND***
**(A)**     ***ND's capital and voting rights allocation prior to the Block Acquisition***

The share capital of ND amounts, to the Offeror's knowledge, to 19,672,482 euros, divided into 9,836,241 ordinary shares with a nominal value of 2 euros each.

The following table presents, to the knowledge of the Offeror, the capital and theoretical voting rights of the Company immediately prior to the completion of the Block Acquisition on 31 May 2015.

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights* |
|---|---|---|---|---|
| Dentressangle Family | 240 482 | 2.44 | 480 944 | 2.96 |
| Dentressangle Initiatives (controlled by the Dentressangle family) | 6 321 294 | 64.27 | 12 366 694 | 76.26 |
| **Sub-total (Dentressangle family)** | 6 561 776 | 66.71 | 12 847 638 | 79.22 |
| Employees and public[2] | 3 230 018 | 32.84 | 3 325 298 | 20.50 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578**| *0.24*** |
| *Including shares held under liquidity arrangement* | *5869* | *0.06* | *5 869**| *0.04*** |
| **Total** | 9 836 241 | 100 | 16 217 383 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

Neither the Offeror nor any of the companies belonging to the Offeror group held, directly or indirectly, any ND shares prior to the Block Acquisition and in particular has not purchased any ND shares in the 12 months preceding the announcement of the Offer.

---

[2] Including 53 500 shares held by the Management Board

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**(B)     ND's capital and voting rights allocation following the Block Acquisition**

The following table presents, to the knowledge of the Offeror, as of the date hereof the capital and theoretical voting rights of the Company following the completion of the Block Acquisition.

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 561 776 | 66.71 | 6 561 776 | 66.38 |
| Employees and public | 3 230 018 | 32.84 | 3 279 575 | 33.17 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578\*\** | *0.39\*\** |
| *Including shares held under liquidity arrangement* | *5 869* | *0.06* | *5 869\*\** | *0.06\*\** |
| **Total** | 9 836 241 | 100 | 9 885 798 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

Apart from the Block Acquisition mentioned above and the acquisition of the Subscription Warrants mentioned below, neither the Offeror, nor any of the companies belonging to the Offeror group, held ND shares, whether directly or indirectly, prior to the Block Acquisition.

**(C)     ND's capital and voting rights allocation as of the date of the conformity decision**

The following table presents, to the knowledge of the Offeror, as of the date hereof the capital and theoretical voting rights of the Company as of 23 June 2015, taking into account the acquisitions of shares of the Company made by XPO (at the Offer price) since the filing of the draft information memorandum, pursuant to Article 231-38 IV of the AMF General Regulations.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 751 301 | 68.64 | 6 751 301 | 68.29 |
| *Including shares purchased since 11 June 2015* | *189 525* | *1.93* | *189 525* | *1.92* |
| Employees and public[3] | 3 084 940 | 31.36 | 3 134 497 | 31.71 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578\*\** | *0.39\*\** |
| *Including shares held under liquidity arrangement* | *5 869* | *0.06* | *5 869\*\** | *0.06\*\** |
| **Total** | 9 836 241 | 100 | 9 885 798 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

***(iv)    Securities giving access to ND's share capital (Subscription Warrants)***

In addition, as of 8 June 2015, the outstanding Subscription Warrants giving access to the Company's share capital, were allocated as described in the table below:

| Category | Number granted by the Company | Total Shares (in case of exercise) |
|---|---|---|
| BSA A – Issue of July 2013 | 80 000 | 80 000 |
| BSA B – Issue of July 2013 | 30 000 | 30 000 |
| **Total** | 110 000 | 110 000 |

As mentioned above, on 8 June 2015, the Offeror acquired pursuant to the Tender Offer Agreement and the Incentive Letter, the Subscription Warrants from Messrs. Montjotin (50 000 Subscription Warrants), Bataillard (30 000 Subscription Warrants)[4], Wilson (15 000 Subscription Warrants) and

---

[3] 53 500 shares of which are held by members of the Management Board.

[4] It is noted that a portion of the Subscription Warrants held by Messrs. Montjotin and Bataillard were the subject of a contribution to a personal holding company and subject to an advanced gift on inheritance (*donation-partage*) to the benefit of their children respectively.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Gomez (15 000 Subscription Warrants) (members of the management board), at a price per warrant of 157.95 euros, corresponding to the price per share paid for thee Block Acquisition minus the exercise price of the Subscription Warrants. No price supplement clause was provided for in the context of these transfers.

As at the date hereof, XPO holds 100% of the Subscription Warrants. Apart from the foregoing, ND has issued no other securities giving access to its capital.

On the occasion of the mixed shareholders' meeting held on 21 May 2015, the shareholders of ND decided to amend the terms and conditions of the Subscription Warrants in order to (i) delete the presence and lock-up conditions provided therein and (ii) accelerate the exercise window as from 21 May 2015 (with the date of the end of the exercise period being maintained).

*(v)     Performance shares*

The Company has granted performance shares (*actions attribuées gratuitement*). As at 31 May 2015, the following performance shares are still under acquisition period and have not yet been issued and delivered to their beneficiaries:

| Category | Number granted by the Company | Total Shares (in case of delivery of shares) |
|---|---|---|
| Performance shares – Grant of May 2013 | 50 100 | 50 100 |
| Performance shares – Grant of May 2014 | 21 000 | 21 000 |
| Performance shares – Grant of October 2014 | 30 997 | 30 997 |
| **Total** | 102 097 | 102 097 |

Pursuant to the Incentive Letter, XPO Logistics, Inc. has proposed the following to the beneficiaries of performance shares, none of which have been delivered on the date of the Offer and which, as a result, are not targeted by the Offer:

For beneficiaries of performance shares granted in April 2013 and April 2014, which would be delivered in April 2016 and are subject to lockup obligation until April 2018, XPO Logistics, Inc. and the Offeror will propose such beneficiaries to cancel these performance shares in exchange for a cash bonus (considered as salary) for a gross amount of 217.50 euros per share, to be paid in two equal instalments 1.5 years and 3 years after the completion of the Block Acquisition (without any presence, service or performance conditions).

Based on the historical financial achievements in 2013 and 2014 and the 2015 budget, it may be considered that the performance conditions provided for in the April 2013 and April 2014 performance share plans will be met.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

For recipients of performance shares granted in October 2014 to the managers of Jacobson (the US subsidiary of the Company, the acquisition of which was completed on July 31 2014) whose acquisition and conservation periods both expire in October 2018, XPO Logistics, Inc. will offer in exchange for the waiver by the beneficiaries of their right to these shares, the establishment of a new plan based on the evolution of the share price of XPO Logistics, Inc. and whose performance targets would take into account integration within the XPO group. The timeframe of this new plan would be at least equal to that of the performance shares plan that it would replace. The value of grants under this new plan would in any event not be higher than the value of the replaced performance shares, taking into account, on the one hand, the price of the Offer to determine the value of the performance shares replaced and on the other hand, the market value of the XPO Logistics, Inc. shares underlying the instruments issued in exchange to determine the value of such instruments. In this way, the value of each performance share replaced would not be superior to 217.50 euros.

**(vi)   Declarations of thresholds crossings**

Pursuant to articles 223-11 *et seq.* of the AMF General regulations and to articles 233-7 *et seq.* of the Commercial Code, the Offeror declared, by letters dated 11 June 2015 to the AMF and to ND, that it had, as a result of the Block Acquisition, crossed upward on 8 June 2015 all the legal thresholds between 0 and 2/3 thresholds of share capital and between 0 and 50% of voting rights of the Company following the execution of the Share Purchase Agreement relating to the Block Acquisition.

These declarations gave rise to a notice published by the AMF on 12 June 2015 under number 215C0813.

Conversely, members of the Dentressangle family and Dentressangle Initiatives have declared, by letters dated 11 June 2015 to the AMF and to ND, that they had, acting together in concert, as a result of the sale of their stake in ND via the Block Acquisition, crossed downwards all legal thresholds between 2/3 down to 0.

These declarations gave rise to a notice published by the AMF on 11 June 2015 under visa number 215C0803.

Given the shares acquired since the filing of the Offer, the Offeror has declared to the AMF and to ND, on 16 June 2015, that it had crossed upward on 11 June 2015 the 2/3 threshold of voting rights. These declarations gave rise to a notice published by the AMF on 16 June 2015 under visa number 215C0829.

**(vii)   Commitment to participate in the Offer**

None.

**(viii)   Regulatory approvals**

The Offer is not subject to any antitrust approval.

The Block Acquisition has been approved (or has not given rise to any objections) by the competition authorities in the United States, Germany and Russia. The respective clearances or terminations were granted on 11 May 2015 with respect to the United States (early termination) and Germany, and 20 May 2015 in respect of Russia.

## 1.2.2.   Rationale for the Block Acquisition and the subsequent Offer

XPO Logistics, Inc. is one of the largest and fastest-growing logistics companies in North America. It has successfully employed its strategy to grow organically as well as to acquire well performing

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

transportation and logistics businesses that bring value and are highly scalable. As a result, XPO Logistics, Inc.'s transportation segment has built industry-leading positions within North America in freight brokerage, intermodal, last mile, expedite and global freight forwarding. In addition, XPO Logistics, Inc.'s logistics segment has become the leading provider of highly engineered, technology-enabled contract logistics.

The three businesses of ND (Logistics, Transportation, and Air & Sea) are intended to remain headquartered in France and will serve as the development platform for all of XPO Logistics, Inc.'s European activities. XPO Logistics expects this acquisition to enable it to offer the more than 15,000 current customers of XPO Logistics, Inc. leading transportation and logistics services in Europe. In addition, ND has built a loyal base of blue chip customers that includes multinational companies, some of which are not currently served by XPO Logistics, Inc. These customers have an opportunity to consolidate their supply chain relationships with the combined company, and will gain access to XPO Logistics, Inc.'s industry leading services in North America.

In addition, XPO Logistics expects to invest in the growth of the combined company through its proprietary technology platforms that provide industry-leading customer service and leverage our scale. XPO Logistics, together with ND, have a 2015 IT budget of approximately 225 million USD, which it believes is among the highest in the industry.

Finally, ND's culture, like XPO Logistics, Inc.'s, is strongly focused on operational excellence and world-class service.

### 1.2.3. Opinion of XPO Logistics, Inc.'s Board of Directors and sole shareholder approval of the Offeror

Following a detailed review of the terms and structure of the proposed transaction with its advisors during the Board meeting held on 26 April 2015, the Board of Directors of XPO Logistics, Inc. declared the transaction, including the Block Acquisition and the Offer advisable and in the best interest of XPO Logistics, Inc. and its stockholders. The Board further granted the necessary powers to its officers to take any and all actions necessary for the consummation of the transaction.

In addition, on 4 June 2015, XPO Logistics, Inc. as sole shareholder of the Offeror, authorised the latter to make the Block Acquisition and proceed to initiate the Offer.

### 1.3.    Intentions of the Offeror for the coming twelve months

### 1.3.1.  Strategic rationale and future activity

As explained above in paragraph 1.2.2, the Offeror considers that ND's three main businesses are aligned with the XPO Logistics, Inc.'s business portfolio. ND will serve as the development platform for all of XPO Logistics, Inc.'s European activities. ND will be able to provide services to XPO Logistics, Inc.'s more than 15,000 current customers which have commercial interests outside of North America. The Offeror expects the European headquarters to remain in France, where XPO Logistics intends to grow the European operations of the group. For a period of five (5) years after the closing date, the Offeror intends to maintain the headquarters and decision-making centre of ND's European logistics business in Paris and transportation business in the department of the Drôme.

**Regarding the logistics business**, XPO Logistics, Inc. will now be able to offer leading contract logistics services in Europe to their current customers. In addition, ND has built a loyal base of blue

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

chip customers that includes multinational companies, many of which are not currently served by XPO Logistics, Inc. ND's operations in North America are expected to grow along with XPO Logistics, Inc.'s domestic contract logistics business. As a whole, the transaction will combine approximately 11 million square metres of ND's operated warehouse space with XPO Logistics, Inc.'s 1.1 million square metres, making the combined company one of the world's largest contract logistics provider based on warehouse capacity.

**Regarding the transportation business**, XPO Logistics, Inc. will now be able to offer transportation services in Europe to its current customers. ND's blue chip multi-national customers will also have an opportunity to consolidate their supply chain relationships with the combined company, and will gain access to XPO Logistics, Inc.'s industry leading services in North America for freight brokerage, intermodal, last mile, expedite and global forwarding.

**Regarding the air & sea business**, the combination will increase XPO Logistics Inc.'s global freight forwarding operations to approximately 500 million USD in revenue. The combined company will utilise the added volume to purchase air and sea transportation more efficiently for its customers.

### 1.3.2.  Intentions regarding employment and management

The Offeror believes that a key element of the success of ND is preserving and developing the talent and intellectual capital of ND's personnel. In this context, the Offeror does not have any plan to modify ND's current strategy regarding staffing.

Additionally, the Offeror intends to ensure continuity of the management of ND following the completion of the Offer and retain it in the future. The Offeror intends to implement a management incentive program.

The Offeror intends not to reduce the total number of full-time employees in France for a period of eighteen months from the date of the Block Acquisition (i.e. as of 8 June 2015).

The Offeror intends to maintain the European headquarters of the ND group companies in Lyon, and has undertaken in the Tender Offer Agreement to maintain for a period of 5 years after the date of the Block Acquisition, the headquarters and decision-making centre of the Company's European logistics business in Paris and the Company's transportation business in the department of the Drôme.

The Offeror does not anticipate that the combination of ND with the Offeror subsequent to the Offer will affect the individual and collective status of the employees of ND and its subsidiaries.

### 1.3.3.  Dividend distribution policy

The distribution policy will be examined subsequently, in relation notably to the Company's results, its financial capacity for such distribution and its financing needs in view of its development plans.

### 1.3.4.  Synergies

The combination of XPO Logistics, Inc. and ND is not expected to generate meaningful cost synergies, mainly due to the low business overlap in Europe and the complementarity of the respective US operations of ND and XPO Logistics, Inc. XPO Logistics has committed not to reduce the total number of full-time employees in France for a period of at least 18 months from closing and to maintain the European headquarters of ND in Lyon.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Revenues synergies are expected to be derived from company-wide cross-selling opportunities within the combined group which would benefit the respective clients of XPO Logistics, Inc. and ND of the services offered by the other party. Furthermore, XPO Logistics intends to invest in the growth of ND through technology so as to leverage the combined company's scale.

Finally, XPO Logistics will have a platform in Europe to continue to execute on its M&A strategy, with significant opportunities in the fragmented European market.

### 1.3.5.  Mandatory squeeze-out and removal from listing

According to Articles 237-14 to 237-16 of the AMF General Regulations, the Offeror will request the AMF within 3 months following closing of the Offer to implement a mandatory squeeze-out process through the transfer of ND shares that it does not own and that would not be presented to the Offer (provided that they do not represent more than 5% of the capital or the voting rights of the Company), at the price of 217.50 euros per share.

The Offeror also reserves the right, in the event that it comes to hold, directly or indirectly, at least 95% of share capital and voting rights of ND, and where a mandatory squeeze-out would not have been implemented under the conditions referred to above, to file with the AMF public buy-out offer followed by a mandatory squeeze-out of the shares not directly or indirectly held by it under the conditions of Articles 236-1 et seq. and 237-14 et seq. of the AMF General Regulations.

Apart from the foregoing, the Offeror does not have the intention, in the event where it would not be able to implement a squeeze-out following the Offer, to request the delisting of the ND shares from Euronext Paris - Eurolist Compartment A in the next 12 months. The Offeror reserves its right, however, to consider the opportunity to request the delisting of the ND shares from the Euronext London - Official List.

### 1.3.6.  Intentions regarding merger and integration

Depending on the results of the Offer, the Offeror reserves the right to consider the best ways of integrating ND into XPO Logistics Inc. group. In this context, at some point of time in the future, the Offeror may decide to merge or transfer certain ND assets or branches with or to XPO Logistics group companies (including XPO) or *vice versa.*

The conditions of these possible merger or contribution operations would be subject to local works council consultation in due course and to the extent required by law, and would be reviewed by the AMF, as the case may be, in accordance with applicable regulations.

It is intended that the ND group will be integrated under the XPO brand as soon as possible. For an initial period of 3 months, this license shall proceed on a free of charge basis following which XPO Logistics, Inc. and ND shall negotiate for the grant of a license by the former to the latter under a brand licensing agreement in line with market practices.

### 1.3.7.  Composition of the Supervisory Board

Concomitantly with the completion of the Block Acquisition in accordance with the Share Purchase Agreement, Norbert Dentressangle, Evelyne Dentressangle, Pierre-Henri Dentressangle, Vincent Ménez, Jean-Bernard Lafonta and Bruno Rousset resigned from their duties as supervisory board

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

members of ND on 8 June 2015. Such resignations occurred after the supervisory board of ND recommended the Offer as mentioned above.

The supervisory board of the Company met on 8 June 2015 and has co-opted six new supervisory board members (Mr. Bradley Jacobs, XPO Logistics, Inc., represented by Ms. Angela Kirkby, Mr. Troy Cooper, Mr. John Hardig, Mr. Gordon Devens and Mr. Tavio Headley). Mr. Bradley Jacobs has, in addition, been appointed Chairman of the supervisory board and Mr. Gordon Devens its Vice-Chairman.

These cooptations, which took effect on 8 June 2015, will be subject to ratification by the Company's shareholders in general meeting.

The supervisory board of the Company is now composed as follows:

–   Mr. Bradley Jacobs, Chairman (also Chairman of XPO Logistics, Inc.),
–   Mr. Gordon Devens, Vice-Chairman (employee of XPO),
–   Ms. Clare Chatfield (independent member),
–   Mr. Henri Lachmann (independent member),
–   Mr. Jean-Luc Poumarède (independent member),
–   Mr. François-Marie Valentin (independent member),
–   XPO Logistics, Inc., represented by Ms. Angela Kirkby,
–   Mr. Troy Cooper (employee of XPO),
–   Mr. John Hardig (employee of XPO),
–   Mr. Tavio Headley (employee of XPO).

### 1.3.8.  Advantages for the Company, the Offeror and their shareholders

XPO Logistics, Inc. is a top ten global provider of cutting-edge supply chain solutions to the most successful companies in the world. The company provides high-value-added services for surface transportation, including freight brokerage, intermodal, last mile and expedite; highly engineered contract logistics; warehousing and distribution; and global forwarding by ground, air and sea. XPO Logistic's corporate headquarters is in Greenwich, Connecticut, USA, and its European headquarters is in Lyon, France.

XPO Logistics, including the business of ND following the Block Acquisition on 8 June 2015, serves more than 30,000 customers at 863 locations in 27 countries within a highly integrated network comprising approximately 52,350 employees.

With 201 locations and approximately 10 000 employees, XPO Logistics, Inc. was, prior to the combination with ND, one of the key players in the logistics sector in North America.

### (i)       Interest of the transaction for the Company and its shareholders

The Offeror proposes to ND shareholders who tender their shares to the Offer immediate liquidity of all of their shareholding at the same price as that offered to the Initial Sellers, i.e., 217.50 euros per share. This transaction will allow the shareholders who participated in the development of ND to monetise their shares at a 62.2% premium to the 6-month weighted average share price.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**(ii)        Interest of the operation to the Offeror and its shareholders**

The Offeror believes that this acquisition fits into its strategy to acquire best-in-class logistics companies and become a single source provider of transportation and logistics services. The combined entity would be a dynamic, global player, with leadership positions in logistics and transportation. Customers would benefit from the combined entity's broad range of services, leading edge technology, deep access to transportation capacity, and commitment to customer service.

## 1.4.   Agreements that could have a significant impact on the assessment of the Offer or its outcome

Subject to the SPA in respect of the Block Acquisition as described above, the Offeror is not aware of any agreement and is not party to any agreement in connection with the Offer or that potentially could have a significant impact on the assessment of the Offer or its outcome.

## 2.      CHARACTERISTICS OF THE OFFER

## 2.1.   Terms of the Offer

Pursuant to the terms of Article 231-13 of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015.

The AMF published on 11 June 2015 a filing notice in relation to the Offer on its website (www.amf-france.org) under visa number 215C0799.

Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings taken by the Offeror.

Pursuant to Article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offeror irrevocably undertakes to acquire from the shareholders of ND, the shares of the Company which will be tendered to the Offer, at a price of 217.50 euros per share, during a 16 trading day period.

Pursuant to Article 231-16° of the AMF General Regulations, a press release in relation to the terms and conditions of the Offer has been issued on 11 June 2015 by the Offeror and made available on the Offeror's website (http://www.xpo.com). A copy of the draft information memorandum was made available on the websites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com) and may be obtained free of charge upon request to Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France).

On 23 June 2015, the AMF published a clearance decision (*décision de conformité*) for the Offer on its website (www.amf-france.org), following its verification of the compliance of this Offer with applicable laws and regulations. The clearance decision will entail approval (*visa*) by the AMF of the information memorandum.

The information memorandum as approved by the AMF, together with the document entitled "Other Information" relating, in particular, to the legal, financial and accounting characteristics of the Offeror shall be made available to the public free of charge, no later than the day before the opening of the Offer, at the offices of Morgan Stanley. These documents will also be made available on the websites of XPO Logistics France (http://www.xpo.com), ND (http://www.norbert-dentressangle.com/) and the AMF (www.amf-france.org).

16

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

A press release specifying the conditions under which these documents will be made available will be issued in accordance with Article 221-4 IV of the AMF General Regulations.

Prior to the opening of the Offer, the AMF will release a notice announcing the opening of the Offer and the timetable for the Offer, and Euronext Paris will release a notice announcing the terms and timetable of the Offer.

## 2.2.    Number and nature of the securities targeted by the Offer

The Offer covers all of the securities giving access to the share capital and voting rights of the Company, namely all of the 9,836,241 shares issued as of the filing of this Offer, excluding (i) the 6,561,776 shares acquired by the Offeror on 8 June 2015 as part of the Block Acquisition and the 189,525 shares acquired by XPO since the filing of the draft information memorandum pursuant to pursuant to Article 231-38 IV of the AMF General Regulations, and (ii) the 110,000 Subscription Warrants issued by the Company acquired by the Offeror on 8 June 2015, it being specified that the Supervisory Board of ND has committed itself not to tender the treasury shares to the Offer (44,447 shares as of 8 June 2015).

Therefore, the Offer covers a total maximum of 3,040,493 shares of the Company, representing 30.91% of the share capital of the Company.

It is specified that:

-    the Offer does not aim at the shares underlying the 110,000 Subscription Warrants issued by the Company to the extent that the Offeror already owns these Subscription Warrants;

-    as of 11 June 2015, the total number of performance shares is 102,097; these shares are under acquisition period (i.e. have not been delivered to their beneficiaries) as of such date, and will, after delivery, be subject to a lock-up for a period of two years as per their terms. The performance shares may therefore not be tendered to the Offer.

With the exception of the shares referred to above, to the Offeror's knowledge, there exists no equity security or any other financial instrument providing a right, either immediately or in the future, to the share capital or voting rights of the Company, other than the Company shares.

## 2.3.    Tender procedure for the Offer

The shares tendered to the Offer must be freely tradable and free of any lien, pledge, or other form of security or restriction of any kind whatsoever which may limit the free transfer of ownership. The Offeror reserves the right, in its sole discretion, to reject any Company shares which do not comply with this condition.

The Offer shall be open for a period of 16 trading days.

Company shares held in registered form must be converted and held in bearer form to be tendered to the Offer. Therefore, holders of shares held in an account managed by a financial intermediary in registered form who wish to tender Company shares in the Offer will have to ask for the conversion of these shares to hold them in bearer form as soon as possible. Holders of shares will therefore lose the benefits attached to the registered form for those shares so converted into bearer form.

Holders of Company shares held in an account managed by a financial intermediary (including traders, banks and financial institutions) and willing to tender their Company shares to the Offer must deliver an irrevocable transfer order in relation to their shares to their financial intermediary in accordance

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

with the standard forms provided by their financial intermediary no later than the last day on which the Offer is open and in a timely manner so as their order can be executed. Each financial intermediary shall transfer the Company shares for which it has received the order to tender to the Offer.

Shareholders of the Company who wish to tender their shares in the Offer may either:

– sell their shares on the market, in which case settlement and delivery of the transferred shares (including payment of the price thereof) will take place on the second trading day following the execution of the orders, and trading fees (including the brokerage fees and corresponding VAT) relating to such transactions will be borne entirely by the tendering shareholders; or

– sell their shares in the semi-centralised procedure coordinated by Euronext Paris, in which case settlement and delivery of the transferred shares (including payment of the price thereof) will take place following completion of the semi-centralization procedure after the closing of the offer. The Offeror will reimburse the trading fees (brokerage fees and corresponding VAT) incurred by the tendering shareholders of Company shares tendered in the semi-centralised procedure up to 0.2% of the purchase price (including tax) subject to a maximum amount of 100 euros per transaction; it being specified however that, if the Offer is declared null for any reason, the shareholders of the Company may not seek any reimbursement.

Only shareholders who decide to tender their shares under the semi-centralized procedure and whose shares are registered in an account on the day before the opening of the Offer may receive reimbursement of these trading fees from the Offeror.

The requests for reimbursement of the fees mentioned above will be accepted and processed by the financial intermediaries during a period of 25 business days from the last day on which the Offer is open. After the expiry of such period, Morgan Stanley, acting as buying market member, will no longer carry out the reimbursement of the fees mentioned above.

Except for the reimbursement by the Offeror of certain brokerage fees to the shareholders as described above, no commission will be paid by the Offeror to the financial intermediaries through which the shareholders tender their shares in the Offer.

## 2.4.   Indicative timetable of the Offer

Prior to the opening of the Offer, the AMF and Euronext will issue notices announcing the opening date and the calendar of the Offer. For indicative purposes only, an Offer timetable is set out below:

| | |
|---|---|
| 11 June 2015 | Filing of the contemplated Offer with the AMF |
| 11 June 2015 | Filing of the draft information memorandum in response by the Company |
| 23 June 2015 | Statement of conformity of the Offer issued by the AMF |
| 24 June 2015 | Offeror's information memorandum and Company's information memorandum in response to be made available to the public |
| 25 June 2015 | Other information relating to the Offeror and other information relating to the Company to be made available to the public |
| 26 June 2015 | Opening of the Offer |

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| 17 July 2015 | Closing of the Offer |
| 23 July 2015 | Release of the results |
| 27 July 2015 | Indicative date of implementation of a mandatory squeeze-out (if requirements are met) |

## 2.5.    Financing of the Offer

### 2.5.1.    Costs connected with the Offer

Expenses incurred by the Offeror for the Offer (including fees of external financial, legal and accounting advisers and of any experts and other consultants, as well as communication and publication costs, but excluding those associated with the Block Acquisition) are estimated at approximately 2 million euros (excluding tax).

### 2.5.2.    Financing sources of the Offer

The cost to be incurred by the Offeror for the acquisition of ND shares not held by it as of 23 June 2015 (on the basis of the share capital of the Company as at the date of filing of the Offer, assuming all the outstanding ND shares targeted by the Offer are tendered thereto and at the proposed Offer Price) amounts to a total of 661,307,227.50 euros.

Payments due by the Offeror in connection with the Offer will be made out of its own resources and shareholder loans. XPO Logistics, Inc. will finance the Offeror for the purpose of the Offer out of its own resources and where necessary, its existing credit lines.

## 2.6.    Restrictions concerning the Offer abroad

The Offer is being made solely in France.

This information memorandum is not intended for distribution in countries other than France.

The Offer has not been subject to any registration or approval outside of France. Holders of ND shares outside France may not participate in the Offer unless the law and regulation to which they are subject permits them to do so without any further formality to be undertaken nor disclosure to be made on the part of the Offeror. Indeed, participation in the Offer and distribution of this information memorandum may be subject to restrictions outside France. The Offer is not addressed to persons subject to such restrictions, whether directly or indirectly, and is not subject to acceptance concerning orders from any country in which the Offer is subject to restrictions. Persons availing themselves of this information memorandum must comply with the restrictions in force in their country. Non-compliance with such restrictions may constitute infringement of laws and regulations in respect of exchange matters in any of these countries.

The Offeror accepts no responsibility in the event of infringement by any person of restrictions applicable to him/her.

This information memorandum and the other documents relating to the Offer do not constitute an offer to sell or a solicitation or an offer to purchase securities in any other country in which such an offer or solicitation is illegal. This Offer has not been the subject matter of any formality, registration or visa outside of France.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

This information memorandum does not constitute an extension of the Offer to the United States and the Offer is not proposed, directly or indirectly, in the United States, to persons in the United States, by means of postal services or by any communication means or by any commerce means (including but not limited to transmission by fax, telephone and email) of the United States or through the services of a stock exchange of the United States. As a consequence, no copy of this information memorandum, and no other related document or document relating to the Offer, may be sent by mail, communicated or published by an intermediary or any other person in the United States under any form whatsoever. No shareholder of the Company may contribute its shares to the Offer if it is not in a position to declare (i) that it did not receive in the United States a copy of the present information memorandum or any other document relating to the Offer, and that it did not send any such documents to the United States, (ii) that it did not use, directly or indirectly, postal services, telecommunication means or other commerce instruments or services of a stock exchange in the United States in connection with the Offer, (iii) that it was not on United States territory when it accepted the terms of the Offer or communicated its share transfer order and (iv) that it is neither an agent nor a representative acting on behalf of a person other than a person who communicated instructions outside of the United States. Authorised intermediaries shall not be allowed to accept share transfer orders which are not compliant with the above provisions (save for any authorization or opposite instruction by or on behalf of the Offeror at the Offeror's discretion). As regards interpretation of the above paragraph, United States shall mean the United States of America, its territories and possessions, or any of these States, and the District of Columbia.

## 2.7. Tax treatment of the Offer

In the current state of French legislation, the tax regime applicable to the shareholders of the Company who will participate to the Offer is described below.

The attention of such shareholders is drawn to the fact that this information constitutes a mere summary of the tax regime in force and is not meant to represent an exhaustive analysis of all tax effects likely to be applicable to them. They are thus invited to contact their usual tax advisor in order to become informed of the tax regime applicable to their own situation.

This summary is based on the French legal provisions in force as at the date of this offer document and are therefore likely to be affected by changes in French tax rules, which could have a retroactive effect or apply to the current year or fiscal year, and by their interpretation from the French tax administration.

Persons who are not tax residents of France must also comply with the tax legislation in force in their country of residence and, as the case may be, international tax treaties that have been entered into between France and said country.

### 2.7.1. Individual shareholders who are tax residents of France managing their private assets and not carrying out stock exchange transactions on an habitual basis

a) Ordinary regime

i. Personal income tax

Pursuant to Article 150-0 A and seq. and 200 A of the *Code général des impôts* ("**French Tax Code**"), net capital gains resulting from the sale of shares by individuals are generally taken into account for the determination of the income subject to the progressive income tax rate scale after application of an allowance for ownership duration provided for by Article 150-0 D of the French Tax Code equal to:

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

x)  50% of their amount where the shares have been held for at least two years but less than eight years, as at the date of the sale; and

y)  65% of their amount where the shares have been held for at least eight years, as at the date of the sale.

For the application of this allowance, the ownership duration is, except for particular cases, calculated from the date of subscription or purchase of the shares.

Individuals who have carry forward net capital losses or who have suffered a loss upon the sale of the shares of the Company within the framework of the Offer are invited to contact their usual tax advisor in order to determine if and how these losses may be used.

The contribution of the shares of the Company to the Offer is likely to put an end to any potential tax deferral of which the holders of these shares could have benefited with respect to prior transactions.

## ii.  Social security contributions

Net capital gains resulting from the transfer of shares are, moreover, subject to social security contributions, without application of the allowance for ownership duration described above, at the global rate of 15.5% allocated as follows:

- 8.2% in respect of general social security contribution (*contribution sociale généralisée*);

- 0.5% in respect of social debt repayment contribution (*contribution au remboursement de la dette sociale*);

- 4.8% in respect of social levy and additional contribution to it; and

- 2% in respect of solidarity levy.

Apart from the general social security contribution, which is deductible up to 5.1 points from the total taxable income of the year during which it is paid, these social security contributions are not deductible from the taxable income.

## iii.  Other contributions

Article 223 sexies of the French Tax Code institutes for taxpayers liable to pay income tax an exceptional contribution on high incomes applicable when the reference income for tax purposes of the concerned taxpayer exceeds certain limits.

This contribution is calculated by applying a rate of:

- 3% for the portion of the reference income which is comprised between EUR250,000 and EUR500,000 for those taxpayers who are single, widowed, separated or divorced, and for the portion comprised between EUR500,000 and EUR1,000,000 for the taxpayers who are subject to joint taxation;

- 4% for the portion of the reference tax income exceeding EUR500,000 for those taxpayers who are single, widowed, separated or divorced, and for the portion exceeding EUR1,000,000 for the taxpayers who are subject to joint taxation.

The reference income for tax purposes of a tax household is defined pursuant to the provisions of 1° of IV of Article 1417 of the French Tax Code, without application of the quotient rules defined in Article 163-0 A of the French Tax Code. The reference income includes in particular the net capital gains

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

resulting from the transfer of shares realised by the concerned taxpayers, prior to the application of the allowance for ownership duration.

b)   Specific regime applicable to shares registered in share savings plans (*plans d'épargne en actions*) ("SSP")

Persons who hold shares of the Company within a SSP may participate in the Offer.

Subject to certain conditions, the SSP allows (i) during the life-time of the SSP, an exemption of income and capital gains generated by the investment made within the SSP from income tax and social security contributions provided, in particular, that such income and capital gains are retained within the SSP, and; (ii) at the time of the closing of the SSP (if it occurs more than five (5) years after the opening date of the SSP, including in the case of a partial withdrawal occurring after five (5) years but before eight (8) years) or at the time of a partial withdrawal (if it occurs more than eight (8) years after the opening date of the SSP) an exemption of the net gain realised since the opening of the SSP from income tax, such net gain being in addition not taken into account for the calculation of the exceptional contribution on high incomes described in paragraph (iii) of (a) above, but remains subject to social security contribution described in paragraph (ii) of (a) above (provided, however, that the effective tax rate of these social security contribution may vary (between 0% and 15.5%) depending on the date of realization of the relevant gain).

Specific provisions, not described in the present note, are applicable in case of realization of capital losses, closing of the plan before the end of the fifth year following the opening of the SSP, or of exit from the SSP in the form of life annuity. The persons concerned are invited to contact their usual tax advisor.

## 2.7.2. Corporate shareholders residents of France for tax purposes and subject to corporate income tax under standard conditions

a)   Ordinary regime

Capital gains resulting from the sale of shares are generally included in the taxable income of the legal entity which is subject to corporate income tax at the ordinary rate (currently 33.1/3%) increased by, if applicable, a social contribution amounting to 3.3% (Article 235 ter ZC of the French Tax Code) which is assessed tax on the amount of corporate income tax after deduction of an allowance that cannot exceed 763,000 euros per twelve-month period.

Corporate income tax payers realizing a turnover exceeding 250,000,000 euros are also subject to a temporary exceptional surcharge equal to 10.7% of the corporate income tax (determined before deduction of tax reductions or tax credits of all kinds (article 235 ter ZAA of the French Tax Code)).

However, companies with turnover (net of tax) that is below 7,630,000 euros and with a fully paid-up capital of which 75% has been continuously held during the relevant tax year by natural or by legal persons that comply with these conditions, benefit from a reduced corporate income tax rate of 15%, within the limit of a taxable income of 38,120 euros per twelve-month period. These companies are also exempt from the 3.3% social contribution and 10.7% exceptional surcharge mentioned above.

Capital losses incurred on the sale of shares are generally deductible from the taxable income of the legal entity.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Finally, it is specified that the contribution of the shares of the Company to the Offer may put an end to any potential tax deferral of which the holders of these shares could have benefited with respect to prior transactions.

### b)   Specific regime applicable to long-term capital gains

Pursuant to Article 219 I-a quinquies of the French Tax Code, net capital gains realised upon the sale of shares qualifying as "*titres de participation*" within the meaning of this Article and which have been held for at least two (2) years as of the date of transfer are tax exempt, save for the recapture of an amount equal to 12 % of the gross capital gains realised.

For the purposes of Article 219 I-a quinquies of the French Tax Code, the term "*titres de participation*" means (a) shares qualifying as *titres de participation* for accounting purposes, (b) shares acquired pursuant to a public tender offer or public exchange offer in respect of the company which initiated such offer, as well as (c) shares that are eligible for the parent-subsidiary tax regime (as defined in Articles 145 and 216 of the French Tax Code) if these shares are registered as "*titres de participation*" in the accounts or in a specific subdivision of another account corresponding to their accounting qualification, except for shares in a predominant real estate company.

Persons likely to be affected are invited to contact their usual tax advisor to ensure that their shares qualify as "*titres de participation*" within the meaning of Article 219 I-a quinquies of the French Tax Code.

The use and carry-forward of long-term capital losses follow certain specific rules and taxpayers are encouraged to contact their usual tax advisor in this regard.

### 2.7.3.  Shareholders who are not residents of France for tax purposes

Subject to the provisions of any applicable tax treaties capital gains resulting from the sale of shares by persons, that are either not resident of France within the meaning of Article 4 B of the French Tax Code or have their headquarter outside France (provided that the ownership of the shares not related to a fixed base or a permanent establishment subject to corporate income tax in France in the balance sheet of which the shares would be registered), are generally exempt from tax in France provided that (i) the rights held, directly or indirectly, by the transferor with his spouse, their ascendants or their descendants, in the profits of the company whose shares are transferred, have not, at any time during the five year-period preceding the sale, exceeded, together, 25 % of such profits (Articles 244 bis B and C of the French Tax Code) and (ii) the seller is not established in a non-cooperative jurisdiction within the meaning of article 238-0 A of the French Tax Code. In the latter case, regardless of the percentage of the rights held in the profits of the company whose shares are transferred, capital gains on such shares are subject to tax at the flat rate of 75 %, subject to the provisions of any applicable tax treaty. The list of non-cooperative states or jurisdictions is published by ministerial order and updated annually.

People who do not fulfil the conditions for benefiting from the tax exemption are invited to contact their usual tax advisor.

The shareholders of the Company who are not tax residents of France are invited to consider their particular tax situation with their tax usual advisor, in particular in order to take into account the tax regime applicable in their country of tax residence.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 2.7.4.  Shareholders subject to a different tax regime

The holders of shares who are subject to a tax regime other than those described above and who participate to the Offer, in particular the taxpayers that carry out transactions on the stock exchange on an habitual basis or who have recorded their shares as professional assets, are invited to analyse their specific tax situation with their usual tax advisor.

### 2.7.5.  Registration duties or financial transaction tax

ND being a company whose registered office is located in France and whose market capitalization exceeded one billion euros on 1 December 2014, the purchase of shares of ND by XPO will be subject to the tax on financial transactions referred to in article 235 ter ZD of the French Tax Code (currently at the rate of 0.2%) assessed on the transfer price; the tendering shareholders will not be subject to this financial transaction tax upon the sale of their ND shares in the context of the Offer.

In addition, in principle, no registration duty is due in France in connection with the sale of the shares of a company whose shares are traded on a financial instruments regulated market or on a multilateral trading system, unless the transfer may be evidenced by a written agreement. In this case, the transfer must be registered within one month as from its date, and its registration gives rise to the payment of a registration duty. However, when the transaction is subject to the tax on financial transactions mentioned above, such registration duty is not due (Article 726 II d) of the French Tax Code).

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

3.    OFFER VALUATION CRITERIA

### 3.1.   Assessment of the offer price for ND shares

The price offered by the Offeror is €217.50 per share ex-dividend; due to the 1.80€ per share dividend to be paid before the completion of the Block Acquisition and the filing of the Offer, this analysis will take into account a theoretical offer price of €219.30 per ND share in cash, dividend attached. This offer price is equivalent to the price paid for the Block Acquisition.

The elements used to assess the price of the Offer have been prepared by Morgan Stanley, on behalf of the Offeror in accordance with usual valuation methods, based on publicly available information concerning ND and non-public information received in the course of due diligence and general business sector and competitors knowledge. The consideration proposed in the Offer has been assessed through a multi-criteria analysis based on the following methodologies:

–    Price paid by XPO for the Block Acquisition

–    Analysis of trading prices;

–    Analysis of equity research analysts' valuation;

–    Analysis of trading multiples for comparable listed companies;

–    Analysis of precedent transactions multiples;

–    Analysis of premia paid in precedent French public transactions ("OPA");

–    Analysis of discounted future free cash flows.

Other methodologies were not considered as relevant for the purpose of valuing ND:

–    Dividend discount model: This methodology is highly dependent on pay-out ratio, which is decided by the management/ supervisory board of the company. This decision could be totally independent from the company's financial performance and capacity to generate cash flow;

–    Net asset book value ("NAV"): this methodology does not reflect the intrinsic value of intangible assets (market share, client relationship, brands, etc.) and the potential future performance of the company. For information purposes, the net asset book value is €67.78 per share as at December 31, 2014, based on a non-diluted number of shares of 9,797,663 (9,836,241 shares in issue less 38,578 treasury shares);

–    Net adjusted book value: this methodology is generally used for evaluating diversified holding companies with assets undervalued at cost, as such it does not reflect the value of an operational company.

### 3.2.   Financial elements

### 3.2.1.   Financial information

The historical data used for assessing the terms and conditions of the Offer are ND's historical financial accounts and, more particularly, the latest annual consolidated financial statements as of 31 December 2014.

The valuation work performed is based on the projected financial data communicated by ND during the due diligence performed from 17 April to 28 April 2015, which consists mainly of:

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- ND's management budget for 2015E prepared in December 2014 and updated in April 2015 to reflect the current trading performance of the company ("updated management budget");

- ND's management business plan for years 2015E to 2018E prepared during summer 2014 ("business plan"). To the best of our knowledge, the business plan provided by ND's management at the time of due diligence remains reflective of ND's estimated future financial performance.

The projected financial data communicated by ND have been used for the purposes of the trading multiples analysis (section 3.3.3) and are in line with the forecasts published by research analysts.

### 3.2.2.  Enterprise value to equity value bridge

ND's enterprise value is assessed as equity value adjusted for the following items as per 2014 annual consolidated financial statements:

- Plus: Gross financial debt of €1,226.2 MM

- Less: Cash and short-term investments of €209.1 MM

- Plus: Post-tax pension provisions post-tax of €54.5 MM (i.e. €87.8 MM pension provisions adjusted at 38.0% French statutory income tax rate applicable for 2014 and 2015)

- Less: Other financial assets of €55.8 MM

- Less: Investment in associates of €2.1 MM

- Plus: Other debt-like provisions of €13.1 MM (i.e. €5.5 MM of restructuring provisions and a €7.6 MM provision for other expenses incurred but not recognised)

- Plus: Minority interest of €27.2 MM

Based on the above items the adjusted net debt value has been established at €1,054.0 MM.

### 3.2.3.  Number of shares retained

The number of shares retained is 9,989,009 shares, calculated as below:

- 9,836,241 shares in issue as of 31 December 2014

- Less: 38,578 treasury shares

- Plus: 111,463 existing performance-based share units as of 31 December 2014, treated as dilutive instruments

- Plus: 79,883 dilutive impact related to 110,000 outstanding warrants, as per the treasury stock methodology and based on a €59.55 strike price per share and a €217.50 per share ex-dividend offer price, which have been acquired by the Offeror. It should be noted that under the treasury stock method, the dilutive impact of the warrants is a function of the  implied value  of ND's equity derived from the valuation method used, and as such has been adjusted accordingly in the following valuation analysis.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 3.3.  Valuation of the Offer

### 3.3.1.  Reference to the acquisition by XPO of the majority block of ND shares (Block Acquisition)

The price paid by XPO for the Block Acquisition is considered relevant given that it was established following negotiations between two independent parties for the control of ND.

The ex-dividend price offered of €217.50 per share for the Block Acquisition excludes a €1.80 dividend to be paid before the closing of the Block Acquisition, (therefore to the benefit of the initial shareholders), and therefore corresponds to a cum-dividend price of €219.30 per share. The price of the Offer is therefore equivalent to the price paid by XPO for a majority stake in ND.

### 3.3.2.  Analysis of trading prices

ND shares are listed on Euronext Paris and on Euronext London. Over the 6-month period ending 28 April 2015, cumulative trading volumes exchanged represented 22.9% of the free float (defined as the total number of shares excluding those held by the Dentressangle family and treasury shares).

For purposes of this analysis, the share prices were considered up to the day prior to the announcement of the acquisition of 66.71% of ND by XPO on 28 April 2015. The 66.71% cumulative stake is composed of shares held by Norbert Dentressangle Initiatives SA (64.27%), Mr. Pierre-Henri Dentressangle (1.22%), and Ms. Marine Dentressangle (1.22%). Since 29 April 2015, ND's share price has traded in line with XPO's offered price per share.

The table below shows the premium implied by the Offer Price as of 28 April 2015 and on average share price weighted by the exchanged volumes ("VWAP") over different periods.

| Premiums to Offer Price of €219.30 (cum-dividend) | | |
|---|---|---|
| Last Quoted Price (28 April 2015) | €159.10 | 37.8% |
| 1-Month VWAP | €155.41 | 41.1% |
| 2-Month VWAP | €154.78 | 41.7% |
| 3-Month VWAP | €148.87 | 47.3% |
| 6-Month VWAP | €135.19 | 62.2% |
| 9-Month VWAP | €125.83 | 74.3% |
| 12-Month VWAP | €122.27 | 79.4% |
| 12-Month High | €164.95 | 32.9% |
| 12-Month Low | €95.80 | 128.9% |

Source: Capital IQ

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The table below shows the average daily volume of shares exchanged as of April 28, 2015 over different periods.

| Average daily volume of shares exchanged (number of shares) | |
| --- | --- |
| 1-month average | 8,910 |
| 2-month average | 7,310 |
| 3-month average | 6,400 |
| 6-month average | 5,870 |
| 9-month average | 6,070 |
| 12-month average | 5,890 |

Source: Capital IQ

The Offer Price (cum-dividend) represents a premium of 37.8% over the share price as of 28 April 2015 and 41.1% over the 1-month VWAP prior to the offer. It also represents a 32.9% premium over the 12-month high of the stock as of 28 April 2015 and a 128.9% premium over the 12-month low over the same period.



Source: Capital IQ

It is specified that the Offeror did not buy any Company shares on the market prior to the filing of the Offer.

28

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.3.3. Equity research analysts' target prices

The table below summarises the target prices published by equity research analysts ND before the announcement of the offer.

| Contributor Name | Date | Recommendation | Target Price |
|---|---|---|---|
| Gilbert Dupont | 21-Apr-15 | Buy | 172.4 |
| Oddo Securities | 23-Apr-15 | Buy | 173.0 |
| Exane BNP Paribas | 23-Apr-15 | Neutral | 150.0 |
| Societe Generale Cross Asset Research | 23-Apr-15 | Hold | 174.0 |
| Berenberg | 14-Apr-15 | Buy | 178.0 |
| Edison Investment Research | 7-Apr-15 | No rating | 190.0 |
| **Mean** | | | **172.9** |
| **Median** | | | **173.5** |
| Offer price (cum-dividend) | | | 219.3 |
| **Premium to Median Target Price** | | | **26.4%** |

Source: Broker research reports

The Offer Price (cum-dividend) stands at a 26.4% premium to the median of the target prices published by the equity research analysts prior to the transaction announcement date of 28 April 2015.

### 3.3.4. Analysis of trading multiples for comparable listed companies

The valuation methodology using trading multiples consists of valuing a company based on valuation ratios observed on a sample of listed companies that have features comparable to ND, notably in terms of business mix and end markets.

Consideration was given to an extended group of global (predominantly US and European) logistics companies with strong activities either in Contract Logistics and/or in Transportation, similar to ND's core activities – excluded from this group were:

    –    companies which are predominantly international freight forwarders (despite having some contract logistics and transportation activities) such as DSV A/S and Kuehne + Nagel Inc.;

    –    companies which are mostly asset-light truck brokers (despite performing transportation services) – this includes Echo Global Logistics Inc., CH Robinson Worldwide Inc., Landstar System Inc. and Forward Air Corp.;

    –    Deutsche Post AG given that its Express and Mail divisions are key drivers of valuation, as well as Ryder System Inc. given it is still mostly a truck leasing business.

As a result, the sample consists of 6 core comparable companies in contracts logistics and/or transportation.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| Company | Headquarters | 2014 revenues[1] | Category | Description |
|---|---|---|---|---|
| Stef SA | France | 2,765 | Contract logistics and asset-based transportation | Transportation and freight management services for fresh and frozen goods in various sectors of the food industry |
| ID Logistics Group SA | France | 875 | Contract logistics | Supply chain, transport management, inventory management and optimization, and order picking and distribution services |
| Wincanton plc | UK | 1,522 | Contract logistics and asset-based transportation | Transport services, including road transport, rail transport, container transport, bulk tankers, and home delivery services, as well as warehousing |
| Con-way Inc. | US | 5,168 | Contract logistics and asset-based transportation | Transportation, logistics, and supply chain management services to various manufacturing, industrial, and retail customers |
| Knight Transportation Inc. | US | 824 | Asset-based transportation | Short-to-medium haul truckload carrier of general commodities primarily in the US |
| Heartland Express Inc. | US | 776 | Asset-based transportation | Short-to-medium haul truckload carrier of general commodities in the US and Canada |

[1] Calendarized 2014 revenues in Euros
Source: Capital IQ

Companies in the contracts logistics / transportation industry are customarily compared on the basis of their enterprise value ("EV") to operating income before depreciation and amortization (EV/EBITDA), their enterprise value to operating income before amortization (EV/EBITA) and their price to earnings per share (P/E) multiples.

In general, investors base investment decisions on future profitability and the companies selected are covered by financial analysts providing estimates of future financial performance. 2015E and 2016E are currently regarded as the most relevant periods. The selected comparable companies are covered by equity research analysts and consensus estimates for the relevant period are available. EBITA estimates have been extrapolated from consensus EBIT estimates, and historical amortization.

The following table presents the average multiples based on the closing market value on 28 April 2015 of the selected sample of comparable companies based on consensus EBITDA, EBITA and net income estimates calendarized to reflect a 31 December year end.

| Company | Geography | Mkt Values (USD MM) | | Net Fin. Debt / 2015E EBITDA | EV / EBITDA | | EV / EBITA | | P/E | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mkt Cap | EV | | 2015E | 2016E | 2015E | 2016E | 2015E | 2016E |
| Stef SA | France | 848 | 1,342 | 2.1x | 6.0x | 5.7x | 11.2x | 10.4x | 10.6x | 9.8x |
| ID Logistics Group SA | France | 592 | 665 | 0.8x | 8.9x | 8.2x | 13.0x | 11.9x | 21.5x | 18.4x |
| Wincanton plc | United Kingdom | 303 | 579 | 1.0x | 5.9x | 5.8x | 7.8x | 7.5x | 9.8x | 9.0x |
| Con-way Inc. | United States | 2,583 | 3,022 | 0.5x | 5.3x | 4.8x | 9.3x | 8.2x | 15.9x | 13.5x |
| Knight Transportation, Inc. | United States | 2,582 | 2,593 | 0.1x | 8.2x | 7.3x | 12.9x | 11.1x | 20.7x | 18.2x |
| Heartland Express, Inc. | United States | 1,882 | 1,830 | (0.2x) | 7.3x | 6.7x | 12.7x | 11.2x | 21.2x | 18.5x |
| **Mean** | | | | | **6.9x** | **6.4x** | **11.1x** | **10.0x** | **16.6x** | **14.6x** |
| **Median** | | | | | **6.7x** | **6.2x** | **11.9x** | **10.7x** | **18.3x** | **15.9x** |
| **Min** | | | | | **5.3x** | **4.8x** | **7.8x** | **7.5x** | **9.8x** | **9.0x** |
| **Max** | | | | | **8.9x** | **8.2x** | **13.0x** | **11.9x** | **21.5x** | **18.5x** |
| Implied Norbert Dentressangle share price based on median (in € per share) | | | | | 138.71 | 129.45 | 169.91 | 137.19 | 202.11 | 189.12 |
| **Implied Offer Premium (cum-dividend)** | | | | | **58.1%** | **69.4%** | **29.1%** | **59.9%** | **8.5%** | **16.0%** |

*Source: Capital IQ, Company Filings, Thomson Estimates*

The P/E multiple is impacted by the comparable companies' respective capital structures. As ND is more levered than its selected peers, applying such multiples to ND does not appear as relevant.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The Offer Price (cum-dividend) represents a 58.1% premium on the share price implied by the 2015E median comparable EV/EBITDA multiple, a 29.1% premium on the share price implied by the 2015E EV/EBITA multiple, and an 8.5% premium on the share price implied by the 2015E median comparable P/E multiple.

### 3.3.5. Analysis of precedent transactions multiples

The precedent transactions methodology consists in valuing a company based on valuation ratios observed on a sample of transactions that occurred in a sector comparable to that of ND.

The difficulty in this method lies in the choice of comparable transactions as:

- The quality and availability of the information vary significantly from one transaction to the next depending on the characteristics of the acquired companies (listed, privately held, subsidiaries of a Group) and on the level of confidentiality of the transaction;

- The acquired companies are never perfectly comparable because of differences in size, positioning, geographical presence, profitability and growth prospects; and

- The strategic interest of an acquisition varies and the price paid in consequence may include a control premium varying accordingly.

With respect to these difficulties, the retained sample is made up of 9 transactions presented in the table below:

| Date of Announcement | Acquiror | Target | Target Short Description | Enterprise Value ($ MM) | EV / LTM EBITDA |
|---|---|---|---|---|---|
| 29-Sep-2014 | Goldman Sachs, Rhones Capital | Neovia | Global automotive contract logistics business | 1,000 | 7.7 x |
| 31-Jul-2014 | Norbert Dentressangle | Jacobson Companies | US-based contract logistics business | 750 | 9.9 x |
| 29-Jul-2014 | XPO Logistics | New Breed | US-based contract logistics business | 615 | 8.0 x |
| 26-Jul-2012 | Universal Truckload Services | Linc Logistics | US-based contract logistics business | 335 | 6.5 x |
| 29-Nov-2010 | Norbert Dentressangle | TDG | UK-based contract logistics business | 313 | 6.1 x |
| 19-Jul-2010 | Genco Holdings I | ATC Technology Corporation | US-based reverse logistics business | 403 | 5.2 x |
| 04-Jul-2008 | Laxey Partners | TDG | UK-based contract logistics business | 436 | 5.9 x |
| 06-Apr-2008 | SNCF Participations | Geodis | European diversified transportation and contract logistics business | 2,431 | 7.2 x |
| 02-Oct-2007 | Norbert Dentressangle | Christian Salvesen | European diversified transportation and contract logistics business | 614 | 8.0 x |
| Minimum | | | | | 5.2 x |
| Maximum | | | | | 9.9 x |
| Median | | | | | 7.2 x |

**Source:** Press, Company information and releases

Applying the multiples of these comparable transactions to ND's 2014 EBITDA pro-forma the 12-month consolidation of Jacobson Companies leads to the below metrics:

31

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| Minimum EBITDA multiple from comparable precedent transactions (x) | 5.2 x |
|---|---|
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 70.4 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | 211.4% |
| | |
| Maximum EBITDA multiple from comparable precedent transactions | 9.9 x |
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 228.6 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | (4.1%) |
| | |
| Median EBITDA multiple from comparable precedent transactions | 7.2 x |
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 137.7 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | 59.2% |

The Offer Price (cum-dividend) represents a premium of 59.2% on the share price implied by the median Last Twelve Months ("LTM") EV/EBITDA of comparable transactions, a premium of 211.4% on the share price implied by the minimum LTM EV/EBITDA multiple, and a (4.1%) discount to the maximum LTM EV/EBITDA multiple of comparable transactions.

### 3.3.6. Analysis of premia paid in precedent French public transactions ("OPA")

The precedent premia paid methodology consists in applying to ND's share price the premia observed in a sample of precedent French public transactions (Offres Publiques d'Achat - "OPA") on target companies listed in France.

The retained sample includes transactions starting in 1998 with an equity value for 100% of the share capital in excess of €100 MM. Additionally, the sample only includes transactions after which the Offeror held a stake above 50% of the share capital. Based on the foregoing criteria, a total of 69 operations were retained.

Based on this sample, the observed median premium to the targets' 1-month average share prices is 24.3% based on Morgan Stanley data. Applying this premium to ND's 1-month average share price as of 28 April 2015 (€156.53 per share) yields a valuation of €194.57 per share.

For reference, the Offer Price (cum-dividend) represents a premium of 40.1% to ND's 1-month average share price as of 28 April 2015.

### 3.3.7. Analysis of discounted cash flow

Discounted cash flow ("DCF") analysis consists of a valuation of the enterprise value of ND through the discounting of future cash flow generation. This methodology is extremely sensitive to business plan assumptions.

The 31 December 2014 enterprise value was obtained by discounting future free cash flows at the Weighted Average Cost of Capital ("WACC") for the period from 2015E to 2019E. In addition a terminal value corresponding to a multiple of 2019E EBITDA was also discounted and added to the enterprise value.

The 2015E updated management budget was used as a basis for the 2015E Revenues, EBITDA, EBIT, and effective tax rate. The cash flow items were not included in the updated management budget (capital expenditures and change in working capital) and as such were sourced from the business plan instead. Additionally it should be noted that 2015E includes a €(39.3) MM one-off earn-out payment

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

linked to the acquisition of Jacobson Companies in 2014, as this was not recorded as a liability on the balance sheet.

For the years 2016E to 2018E, the business plan formed the basis for the forecast used in the discounted cash flow analysis. The main assumptions underlying the forecast are:

- Annual revenue growth rate of 3.7% to 3.8%;
- EBITDA and EBIT margins are kept constant throughout the forecast period at 6.9% and 4.0% of revenues respectively;
- Effective tax rate is kept constant throughout the forecast period at 33.4%;
- Capital expenditures as a percentage of revenues of 2.6%;
- Change in net working capital as a percentage of change in revenues of (0.3)%;

The financials for 2019E were based on extrapolation of the business plan, with similar revenue growth trajectory, consistent margins, as well as stable capex as a percentage of sales and stable change in net working capital as a percentage of change in revenues.

- Exit multiple approach: the terminal value calculation is based on the 2019E EBITDA and an exit multiple of 7.5x EBITDA i.e. above the median multiple of precedent comparable transactions of 7.2x, the average of core peers historic trading levels of 7.1x LTM EBITDA, and above ND's 5-year historic trading level of 5.7x LTM EBITDA.

The WACC is assessed as the weighted average of the equity (assessed through the Capital Asset Pricing Model "CAPM") and of the cost of the debt. ND's WACC stands at 6.5%, on the basis of current economic conditions, in particular reflecting the current low-rate environment:

- Market Risk Premium of 6.0% (Morgan Stanley standard global assumption);
- Risk free rate corresponding to the current yield of German government 30-year bonds of 1.6%;
- Beta of 1.24 based on Barra Global Predicted Beta database;
- Pre-tax cost of debt based on ND coupon of 2020 Euro PP bond of 4.0%;
- Effective tax rate of 33.4%;
- Net debt / total capitalization of 39.0%[5].

The tables below illustrate the sensitivity of the share price for a WACC range of 6.5% +/- 50 basis points as well as an exit multiple range of 7.5x EBITDA +/- 0.5x.

| Share Price Sensitivity Analysis € | | | | Implied Cum Dividend Offer Premium % | | | |
|---|---|---|---|---|---|---|---|
| | | Exit Multiple | | | | Exit Multiple | |
| | 7.0 x | 7.5 x | 8.0 x | | 7.0 x | 7.5 x | 8.0 x |
| 6.0% | 182.7 | 198.3 | 213.9 | 6.0% | 20.0% | 10.6% | 2.5% |
| 6.3% | 179.7 | 195.2 | 210.6 | 6.3% | 22.0% | 12.4% | 4.1% |
| 6.5% | 176.8 | 192.0 | 207.3 | 6.5% | 24.0% | 14.2% | 5.8% |
| 6.8% | 173.9 | 189.0 | 204.0 | 6.8% | 26.1% | 16.0% | 7.5% |
| 7.0% | 171.1 | 186.0 | 200.8 | 7.0% | 28.2% | 17.9% | 9.2% |

(WACC labels on the vertical axis for both tables)

---

[5] Net debt over as of 31 December 2014 as per annual consolidated financial statements and market capitalization as of 28 April 2015 unaffected share price

33

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

In the central case, the terminal value represents 76.8% of the calculated enterprise value, which corresponds to an implied perpetual growth rate of 0.6%. Based on this analysis, the DCF value stands at €192.05 per share. As such, the Offer Price (cum-dividend) implies a premium of 14.2%.

For reference purposes, a valuation including a terminal value calculated from a Perpetual Growth Rate ("PGR") is presented in the tables below, which illustrate the sensitivity of the share price for a WACC of between 6.5% +/- 50 basis points and a PGR range of 0.5% +/- 50 basis points.

**Share Price Sensitivity Analysis**
€

| | | PGR | | | | |
|---|---|---|---|---|---|---|
| | | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% |
| WACC | 6.0% | 192.7 | 203.1 | 214.5 | 227.0 | 240.7 |
| | 6.3% | 180.9 | 190.4 | 200.8 | 212.1 | 224.5 |
| | 6.5% | 170.0 | 178.8 | 188.2 | 198.5 | 209.7 |
| | 6.8% | 159.9 | 168.0 | 176.6 | 186.0 | 196.2 |
| | 7.0% | 150.6 | 158.0 | 165.9 | 174.5 | 183.8 |

**Implied Cum Dividend Offer Premium**
%

| | | PGR | | | | |
|---|---|---|---|---|---|---|
| | | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% |
| WACC | 6.0% | 13.8% | 8.0% | 2.2% | (3.4%) | (8.9%) |
| | 6.3% | 21.2% | 15.2% | 9.2% | 3.4% | (2.3%) |
| | 6.5% | 29.0% | 22.7% | 16.5% | 10.5% | 4.6% |
| | 6.8% | 37.1% | 30.6% | 24.2% | 17.9% | 11.8% |
| | 7.0% | 45.7% | 38.8% | 32.2% | 25.7% | 19.3% |

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.3.8. Summary of the valuation of the Offer per Company Share

| | | % Premium |
|---|---|---|
| **Block Acquisition** | | |
| Price paid for the Block Acquisition (cum dividend)[1] | €219.30 | 0.0% |
| **Trading Prices (VWAP)** | | |
| Last Quoted Price (28 April 2015) | €159.10 | 37.8% |
| 1-Month VWAP | €155.41 | 41.1% |
| 2-Month VWAP | €154.78 | 41.7% |
| 3-Month VWAP | €148.87 | 47.3% |
| 6-Month VWAP | €135.19 | 62.2% |
| 9-Month VWAP | €125.83 | 74.3% |
| 12-Month VWAP | €122.27 | 79.4% |
| 12-Month High | €164.95 | 32.9% |
| 12-Month Low | €95.80 | 128.9% |
| **Broker Target Prices** [2] | | |
| Median of broker target prices | €173.50 | 26.4% |
| **Comparable Companies** [2] | | |
| 2015E EV / EBITDA | €138.71 | 58.1% |
| 2016E EV / EBITDA | €129.45 | 69.4% |
| 2015E EV / EBITA | €169.91 | 29.1% |
| 2016E EV / EBITA | €137.19 | 59.9% |
| 2015E P / E [3] | €202.11 | 8.5% |
| 2016E P / E [3] | €189.12 | 16.0% |
| **Discounted Cash Flows** | | |
| 6.5% WACC / 7.5x Exit Multiple | €192.05 | 14.2% |
| **Precedent Transactions** [2] | | |
| French Public Transactions (OPA) - observed premium [4] | €194.57 | 12.7% |
| Precedent transactions (median AV / LTM EBITDA of 7.2x) | €137.72 | 59.2% |

[1] Corresponds to the €217.50 ex-dividend per share price paid for the Block Acquisition, which is equivalent to the Offer price
[2] Prices displayed are median of valuation ranges
[3] P/E multiples are impacted by the comparable companies' respective capital structures. As ND is more levered than its core peers, this methodology may not be relevant
[4] Median premium observed of 24.3% applied to ND 1-month average share price as of 28 April 2015 (€156.53 per share). For reference, the cum-dividend Offer Price represents a premium of 40.1% to ND's 1-month average share price as of 28 April 2015 (€156.53 per share)

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**4.   PERSONS ASSUMING RESPONSIBILITY FOR THE INFORMATION MEMORANDUM**

**OFFEROR**

*"As far as I am aware, the information in this information memorandum is true and there are no omissions liable to distort the content thereof."*

On 23 June 2015

**XPO Logistics France SAS**

Mr. John Hardig

**PRESENTING BANK**

*"Pursuant to article 231-18 of the AMF General Regulations, Morgan Stanley presenting bank for the Offer, certifies that, to its knowledge, the presentation of the Offer it has examined based on the information communicated to it by the Offeror and the elements of appraisal of the price are accurate and do not contain any omissions likely to alter their impact."*

On 23 June 2015

Morgan Stanley