# SIMPLIFIED TENDER OFFER

## TARGETING THE SHARES OF



### INITIATED BY

## XPOLogistics

**XPO Logistics France SAS**

## RESPONSE MEMORANDUM PRESENTED BY
## NORBERT DENTRESSANGLE SA



AM F | AUTORITÉ
DES MARCHÉS FINANCIERS

Pursuant to Article L. 621-8 of the French Monetary and Financial Code and Article 231-26 of its General Regulations, the French Financial Markets Authority (the "**AMF**") has affixed its visa nr 15-291 dated 23 June 2015 on this response memorandum. This response memorandum was prepared by Norbert Dentressangle SA and engages the responsibility of its signatories.

In accordance with the provisions of Article L. 621-8-1 I of the Monetary and Financial Code, the visa was granted after the AMF has verified "whether the document is complete and comprehensible and whether the information it contains is consistent". It does not imply approval of the suitability of the transaction or authentication of the accounting and financial information presented.

### Important Notice

Pursuant to articles 261-1 *et seq* of the AMF General Regulations, the report of Ledouble SAS as independent expert is included in the present response memorandum

Copies of the response memorandum are available on the internet websites of Norbert Dentressangle SA (http://www.norbert-dentressangle.fr) and the AMF (www.amf-france.org) and may be obtained free of charges upon request to:

**Norbert Dentressangle SA**
192, avenue Thiers - 69006 Lyon Cedex 44

Pursuant to article 231-28 of the AMF General Regulations, information relating in particular to the legal, financial and accounting characteristics of Norbert Dentressangle SA will be filed with the AMF and made available to the public no later than on the day preceding the opening of the simplified tender offer.

A financial notice will be issued no later than the day preceding the opening of the simplified tender offer in order to inform the public of the manner in which these documents will be made available.

TABLE OF CONTENTS

I.      REMINDER OF THE CONDITIONS OF THE OFFER ........................................................................................ 3

II.     CONTEXTE ET MOTIFS DE L'OPERATION .............................................................................................. 4

        1.      Background for transaction .......................................................................................................... 4

        (i)     Acquisition by the Offeror of a 66.71% interest in ND ........................................................... 4

        (ii)    Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers .................................. 5

        2.      ND's capital and voting rights allocation on 31 May 2015 ..................................................... 5

        (i)     Securities giving access to the company's capital (Subscription Warrants) ............................. 6

        (ii)    Performance shares ....................................................................................................................... 7

        3.      ND's capital and voting rights allocation following the Block Acquisition on 8 June 2015 ......... 7

        4.      ND's capital and voting rights allocation on the date of the clearance decision ....................... 8

        (i)     Declarations of thresholds and voting rights crossings .............................................................. 10

        (ii)    Commitment to participate in the offer ..................................................................................... 10

        (iii)   Regulatory approvals .................................................................................................................. 10

        5.      Composition of the Supervisory Board ....................................................................................... 10

III.    OPINION of NORBERT DENTRESSANGLE'S SUPERVISORY BOARD ................................................. 11

IV.     INTENTIONS of NORBERT DENTRESSANGLE'S SUPERVISORY BOARD members ............................. 13

V.      INTENTIONS OF THE COMPANY WITH REGARD TO TREASURY SHARES ............................................... 13

VI.     AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS ISSUE ............. 13

VII.    ELEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT IN THE EVENT OF A PUBLIC BID ...................... 13

        1.      Capital structure of the Company ............................................................................................. 14

        2.      Statutory voting and Share transfer restrictions or agreements clauses brought to the Company's knowledge under article L. 233-11 of the Code de commerce ........................................................... 14

        3.      Direct or indirect stakes in the Company's capital the Company has knowledge of pursuant to articles L.233-7 and L.233-12 of the Code de Commerce ............................................................................. 15

        4.      List and description of the owners of any equity with special control rights associated with: ............... 15

        5.      Envisaged control mechanisms in the event of an employee shareholding system deprived of the control rights ............ 15

        6.      Shareholder agreements that could lead to Share transfer and voting rights restrictions the Company is aware of .......... 15

        7.      Applicable rules regarding the appointment or replacement of Supervisory Board members and the modification of the Company's articles of association ......................................................................... 16

        8.      Powers of the Supervisory Board, in particular regarding the issue or the repurchasing of equities ................ 16

        9.      Impact on the agreements entered into by the Company in the event of a change of control ............ 18

        10.     Agreements providing for the payment of indemnities for Norbert Dentressangle Supervisory Board members, or for employees, in the event of a resignation or a dismissal without actual and serious basis or if their employment is terminated due to a public bid ...................................................................... 18

VIII.   REPORT OF THE INDEPENDENT EXPERT OF ART. 261-1 OF THE AMG GENERAL REGULATIONS .............. 18

IX.     OPINION OF NORBERT DENTRESSANGLE'S GROUP COMMITTEE ............................................................ 89

X.      PRACTICAL ARRANGEMENTS UNDER WHICH THE INFORMATION CONCERNING THE COMPANY IS MADE AVAILABLE .. 89

XI.     PERSONS ASSUMING RESPONSIBILITY FOR THE RESPONSE MEMORANDUM ........................................... 90

        SCHEDULE I. REPORT OF THE CERTIFIED ACCOUNTANT TO THE GROUP COMMITTEE .......................... 91

## I.     REMINDER OF THE CONDITIONS OF THE OFFER

Pursuant to Title III of Book II, and in particular articles 233-1 2° and 234-2 *et seq* of the AMF General Regulations, XPO Logistics France SAS, a *société par actions simplifiée à associé unique* having a share capital of 10,000 euros, whose registered office is at 23 rue du Roule, 75001 Paris France, registered with the Commercial and companies register of Paris under number 811 597 335 ("**XPO**" or the "**Offeror**"),  a wholly owned subsidiary of XPO Logistics Inc., a company registered in the state of Delaware whose registered office is at Five Greenwich Office Park, Greenwich, Connecticut 06831 (USA) ("**XPO Logistics Inc.**") and, together with XPO, "**XPO Logistics**"), has irrevocably undertaken to the AMF to offer to all of the shareholders of Norbert Dentressangle, a *société anonyme* incorporated under French law having a share capital of 19,672,482 euros divided into 9,836,241 shares with a par value of 2 euros each, whose registered office is located at 192 avenue Theirs - 69006 Lyon, France, registered with the Commercial and companies registrar of Lyon under number 309 645 539  ("**ND**", "**Norbert Dentressangle**" or the "**Company**") and whose shares are traded on both Euronext Paris – Eurolist Compartment A (ISIN FR0000052870; ticker symbol: GND) and Euronext London – Official List to purchase all their shares of ND (the "**Shares**" or the "**Equities**") at a price of 217.50 euros.

In accordance with article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offer follows the acquisition by XPO (i) on 8 June 2015, of 6,561,776 shares from various shareholders of ND by way of off-market block trades (the "**Block Acquisition**") representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company and (ii) on 8 June 2015, of 110,000 Subscription Warrants (as defined hereafter) giving rise to the right to subscribe for 110,000 ND Shares.

 XPO holds at the Offer filing date, 6,561,776 ND shares representing 66.71% of the share capital and 66.38% of the theoretical voting rights.

Pursuant to the terms of article 231-13 I of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015. Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings made by the Offeror.

The Offer targets all the shares not directly or indirectly held by the Offeror at the date hereof.

According to articles 237-14 to 237-16 of the AMF General Regulations, the Offeror will request the AMF within 3 months following closing of the Offer, to implement a mandatory squeeze-out process through the transfer of ND shares that it does not own and that would not be presented to the Offer (provided that they do not represent more than 5% of the capital or the voting rights of the Company) at the price of 217.50 euros per share.

II.     CONTEXTE ET MOTIFS DE L'OPERATION

    1.  **Background for transaction**

        (i)  **Acquisition by the Offeror of a 66.71% interest in ND**

On 28 April 2015, XPO Logistics, Inc. entered into (i) a share purchase agreement (the "**Share Purchase Agreement**") with Dentressangle Initiatives, Messrs. Norbert Dentressangle and Pierre-Henri Dentressangle and Mss. Evelyne Dentressangle and Marine Dentressangle (the "**Initial Sellers**"), (ii) a tender offer agreement (the "**Tender Offer Agreement**") with the Company and (iii) a letter with the members of the Management Board (the "**Incentive Letter**") setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of the Company.

Pursuant to the Share Purchase Agreement, XPO agreed to acquire from the Initial Sellers 6,561,776 shares, representing about 66.71% of the share capital of ND at a price of 217.50 euros per share (the "**Block Acquisition**"). The purchase price takes into consideration the distribution of a dividend amounting 1.80 euros per share to all ND shareholders prior to the closing of the Block Acquisition.

Further, pursuant to the Tender Offer Agreement and the Incentive Letter, XPO agreed to acquire, at a price of 157.95 euros per warrant, from certain members of the management board of the Company, the share subscription warrants issued to them by the Company, i.e. (i) 80,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant A**") and (ii) 30,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant B**" and, together with the Subscription Warrants A, the "**Subscription Warrants**"), provided the vesting conditions provided in the terms and conditions of such Subscription Warrants be cancelled and the exercise periods be opened in anticipation by decision of the Company's shareholders on the occasion of the shareholders' meeting that was held on 21 May 2015.

Also on 28 April 2015, XPO Logistics, Inc. and the Company announced the Block Acquisition, and XPO Logistics, Inc. also announced that it would launch the acquisition process for all the remaining shares of ND at a price of 217.50 euros per share.

The Company's supervisory board in a meeting held on 27 April 2015, gave a preliminary favourable opinion as to the Block Acquisition and the Offer, and appointed Ledouble SAS, represented by Messrs. Olivier Cretté and Sébastien Sancho, as independent expert in charge of preparing a report regarding the financial terms of a tender offer possibly followed by a mandatory squeeze-out.

On 21 May 2015, the shareholders' meeting of the Company approved the payment of a dividend of 1.80 euros per share made on 2 June 2015 (detachment date on 29 May 2015).

The Company initiated the employee information and consultation process with the committee at Group level immediately following the announcement of the signing of the Share Purchase Agreement. On 28 May 2015, the Group's employee committee rendered an unfavourable opinion on the contemplated Offer.

The settlement and delivery related to the Block Acquisition provided for in the Share Purchase Agreement was made off-market on 8 June 2015.

As a result of the Block Acquisition, the Offeror became the owner of 6,561,776 shares of ND, representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company.

Further, on 8 June 2015, the Offeror acquired the Subscription Warrants at a price per warrant of 157.95 euros, corresponding to the price paid for the shares as part of the Block Acquisition minus the exercise price.

> (ii)  **Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers**

The Share Purchase Agreement provides for an obligation for the purchaser to ensure that the Company gradually ceases to use the Norbert Dentressangle trade name and brand, the rebranding and change of trade name needing to have been completed within 36 months after the Block Acquisition. Subject to certain conditions, penalties may be due in case of failure to comply with these obligations.

Further, the Share Purchase Agreement provides for 3-year non-compete and non-solicitation obligations bearing upon the Initial Sellers. The Initial Sellers also undertook not to use the Norbert Dentressangle trade name and brand in a business similar to the Company's business for a period of 20 years.

> 2.  **ND's capital and voting rights allocation on 31 May 2015**

The share capital of ND amounts to 19,672,482 euros, divided into 9,836,241 ordinary shares with a nominal value of 2 euros each.

The table hereafter represents the capital and voting rights prior to the completion of the Block Acquisition, on 31 May 2015.

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[1] |
|---|---|---|---|---|
| Dentressangle Family | 240,482 | 2.44 | 480,944 | 2.96 |
| Dentressangle Initiatives | 6,321,294 | 64.27 | 12,366,694 | 76.26 |
| Officers, employees and public[2] | 3,230,018 | 32.84 | 3,325,298 | 20.50 |
| Including shares held by Norbert Dentressangle SA | 38,578 | 0.39 | 38,578 | 0.24 |
| Including shares held under liquidity arrangement | 5,869 | 0.06 | 5,869 | 0.04 |
| **Total** | 9,836,241 | 100.00 | 16,217,383 | 100.00 |

**(i)   Securities giving access to the company's capital (Subscription Warrants)**

In addition, as of 8 June 2015, the existing Subscription Warrants giving access to the Company's share capital, were allocated as described in the table below:

| Category | Number granted by the Company | Total Shares (in case of exercise) |
|---|---|---|
| BSA A – Issue of July 2013 | 80,000 | 80,000 |
| BSA B – Issue of July 2013 | 30,000 | 30,000 |
| **Total** | 110,000 | 110,000 |

As mentioned above, on 8 June 2015, 2015 Offeror acquired pursuant to the Tender Offer Agreement and the Incentive Letter, the Subscription Warrants from Messrs. Montjotin (50,000 Subscription Warrants), Bataillard (30,000 Subscription Warrants)[3], Wilson (15,000 Subscription Warrants) and Gomez (15,000 Subscription Warrants) (members of the management board), at a price per warrant of 157.95 euros, this amount corresponding to the per-share price paid for the Block Acquisition minus the exercise price of the Subscription Warrants.

On the occasion of the mixed shareholders' meeting held on 21 May 2015, ND's shareholders had decided to amend the terms and conditions of the Subscription Warrants in order to (i) delete the presence and non-transferability conditions, (ii) anticipate the opening of the exercise

---

[1] In accordance with article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[2] Including 53,500 shares held by members of the Management Board.

[3] It is stated that part of the Subscription Warrants held by Mr. Bataillard and by Mr. Montjotin have been subject to contributions to patrimonial holdings belonging to them and to *inter vivos* distribution (*donation-partage*) to the benefit of their respective children.

period as from 21 May 2015 (with the date of the end of the exercise period provided for at the time of their issue being maintained).

It is also stated that, in accordance with the terms of the Tender Offer Agreement, the management board did not use the authorization to issue Subscription Warrants 2015 to the benefit of Messrs. Malcom Wilson and Luis Angel Gomez, that had been granted to it during the General Meeting held on 21st May 2015.

(ii)   **Performance shares**

The following performance shares (*actions attribuées gratuitement*) have been granted by the Company. On 31 May 2015, the following performance shares are still under acquisition period and have not yet been issued, nor delivered to their beneficiaries.

| Category | Number granted by the Company |
|---|---|
| Performance Shares – Grant of May 2013 | 50,100 |
| Performance Shares – Grant of May 2014 | 21,000 |
| Performance Shares – Grant of October 2014 | 30,997 |
| **Total** | **102,097** |

3.   **ND's capital and voting rights allocation following the Block Acquisition on 8 June 2015**

The table below represents the capital and voting rights allocation after the completion of the Block Acquisition on 8 June 2015.

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[4] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6,561,776 | 66.71 | 6,561,776 | 66.38 |
| Officers, employees and public[5] | 3,230,018 | 32.84 | 3,279,575 | 33.17 |
| *Including shares held by Norbert Dentressangle SA* | 38,578 | 0.39 | 38,578 | 0.39 |
| *Including shares held under liquidity arrangement* | 5,869 | 0.06 | 5,869 | 0.06 |
| **Total** | 9,836,241 | 100.00 | 9,885,798 | 100.00 |

**4.   ND's capital and voting rights allocation on the date of the clearance decision**

The table below represents the capital and voting rights allocation on 23 June 2015, taking into consideration share purchases made by XPO since filing of the draft Response Memorandum.

---

[4] Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[5] Including 53,500 shares held by members of the Management Board.

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[6] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6,751,301 | 68.64 | 6,751,301 | 68.29 |
| *Including shares acquired since 11 June 2015* | 189,525 | 1.93 | 189,525 | 1.92 |
| Officers, employees and public[7] | 3,084,940 | 31.36 | 3,134,497 | 31.71 |
| *Including shares held by Norbert Dentressangle SA* | 38,578 | 0.39 | 38,578 | 0.39 |
| *Including shares held under liquidity arrangement* | 5,869 | 0.06 | 5,869 | 0.06 |
| Total | 9,836,241 | 100 | 9,885,798 | 100 |

In accordance with the Incentive Letter, XPO Logistics, Inc. offered the following to the beneficiaries of performance shares, being recalled that these performance shares have not yet been issued at the date of the Offer and are therefore not targeted by the Offer.

For beneficiaries of performance-based shares granted in April 2013 and April 2014, which would be delivered in April 2016 and are subject to lockup obligation until April 2018, XPO Logistics, Inc. and the Offeror will propose such beneficiaries to waive these performance-based shares in exchange for a cash bonus (considered as salary) for a gross amount of 217.50 euros per share, to be paid in two equal instalments 1.5 years and 3 years after the completion of the Block Acquisition (subject to no condition of presence, service or performance).

The historical 2013 and 2014 achievements, and the 2015 budget allow to consider that the performances conditions attached to the April 2013 and April 2014 plans will be met.

For beneficiaries of performance-based shares granted in October 2014 to managers of Jacobson (the US subsidiary of the Company acquired on 31 July 2014), and which would vest and be delivered in October 2018, XPO Logistics, Inc. will propose such beneficiaries to cancel these performance-based shares in exchange for the grant of a new plan based on the evolution of the share price of XPO Logistics, Inc. and whose performance targets would take into account integration within the XPO group. The timeframe of this new plan would be at least equal to that

---

[6] Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[7] Including 53,500 shares held by members of the Management Board.

of the performance shares plan that it would replace. The value of grants under this new plan would in any event not be higher than the value the replaced performance shares, by taking into account, on the one hand, the offer price in respect of bonus shares replaced, and secondly, the stock exchange value of the XPO Logistics, Inc. shares, underlying the instruments issued in exchange in order to determine their value.

### (i)   Declarations of thresholds and voting rights crossings

Pursuant to articles 223-11 et seq. of the AMF General Regulations and to articles 233-7 *et seq.* of the *Code de commerce*, the Offeror declared, by letters of today's date to the AMF and to ND, that it had, as a result of the Block Acquisition, crossed upwards on 8 June 2015 2015 all the legal and statutory thresholds comprised between zero and 2/3 of share capital and zero and 50 % of the voting rights of the Company following the execution of the Share Purchase Agreement relating to Block Acquisition.

Conversely, members of the Dentressangle family and Dentressangle Initiatives have declared, by letters of today's date to the AMF and to ND, that they had, acting together in concert, as a result of the Block Acquisition, crossed downwards on 8 June 2015 all legal and statutory thresholds from 2/3 down to zero.

### (ii)   Commitment to participate in the offer

None.

### (iii)   Regulatory approvals

The Offer is not subject to any antitrust approval.

The Block Acquisition has been approved (or holds no objections)  under the competition regimes of Germany and Russia.

The respective clearances or terminations have been granted on 11 May 2015 with respect to the US (early termination) and Germany, and 20 May 2015 in respect of Russia.

### 5.   Composition of the Supervisory Board

Concomitantly with the completion of the Block Acquisition in accordance with the Share Purchase Agreement, Messrs. Norbert Dentressangle, Pierre-Henri Dentressangle, Vincent Menez, Bruno Rousset, Jean Bernard Lafonta and Madame Evelyne Dentressangle resigned from their duties as members of ND's Supervisory Board with effect on 8 June 2015. Such resignations occurred after the supervisory board of ND recommended the Offer as mentioned above.

The supervisory board of the Company met on 8 June 2015 and has co-opted six new members (Messrs. Bradley Jacobs, Troy Cooper, John Hardig, Gordon Devens, Tavio Headley and XPO Logistics, Inc., with Mrs. Angela Kirkby as permanent representative). Mr. Bradley Jacobs has, in addition, been appointed Chairman of the supervisory board, and Mr. Gordon Devens has been appointed Vice-Chairman of the supervisory board.

These co-optations, which took effect on 8 June 2015, will be subject to ratification by the Company's shareholders in general meeting.

The supervisory board of the Company is now composed as follows:

- Mr. Bradley Jacobs, Chairman (also Chairman of XPO Logistics, Inc.),

- Mr. Gordon Devens, Vice-Chairman (employee of XPO),

- Ms. Clare Chatfield (independent member),

- Mr. Henri Lachmann (independent member),

- Mr. Jean-Luc Poumarède (independent member),

- Mr. Françoise-Marie Valentin (independent member),

- XPO Logistics, Inc., represented by Ms. Angela Kirkby,

- Mr. Troy Cooper (employee of XPO),

- Mr. John Hardig (employee of XPO),

- Mr. Tavio Headley (employee of XPO).


### III.   OPINION OF NORBERT DENTRESSANGLE'S SUPERVISORY BOARD

In accordance with the terms of article 231-19 of the AMF General Regulations, members of the Supervisory Board of the Company have met on 8 June 2015 upon convocation made in accordance with the Company's articles of association, in order to consider, before the reformation described under Section II.5, the draft Offer. Except for Mr. Bruno Rousset, all the members of the Board were present, including independent members. Discussions and the vote concerning the opinion of the Supervisory Board have been held under Mr. Norbert Dentressangle's presidency, as Chairman of the Supervisory Board, in accordance with article 22 of the Company's article of associations.

Before the meeting, the following information and documents have been brought to the knowledge of the members of the Supervisory Board:

- The draft information memorandum established by XPO Logistics France SAS, setting forth the characteristics of the draft Offer, most notably, the motives and intentions of the Offeror as well as the elements of appraisal of the price of the Offer established by Morgan Stanley as the Offer's presenting bank;

- The certificate by the independent expert (*Ledouble SAS*) concluding that the price offered, 217.50 euros per share of the Company, is fair with regard to the Company's minority Shareholders, including in the perspective of a mandatory squeeze-out process;

- The draft response memorandum established by the Company.


The Supervisory Board, in addition, has noted that the prior group committee information and consultation procedure on the undertakings contemplated in the context of the Offer has ended on 28 May 2015, the group committee having issued an unfavorable opinion.

The following opinion has been adopted unanimously by the members of the Supervisory Board, including its independent members:

*« After discussion, and after having seen the above-mentioned documents, the members of the Supervisory Board find that:*

- *The price offered to the Company's shareholders, 217.50 euros per share, represents a (34%(35% attached coupon) premium price compared to the market value at the closing of the stock exchange on 27th April 2015, amounting 162.10 euros, prior to the announcement of the main characteristics of the draft Offer.*

- *The offered price in the Offer is identical to the purchase price payable by XPO Logistics to the controlling shareholders of Norbert Dentressangle in order to acquire Norbert Dentressangle's equity block representing 66.71% of Norbert Dentressangle's capital;*

- *The independent expert has noted that the price of the Offer unlocks a premium with regard to all the evaluation criteria used and that this price is fair, from a financial point of view, for Norbert Dentressangle's shareholders in the perspective of a mandatory squeeze out process;*

- *XPO Logistics is one of the US leaders in the transportation and logistics sector in North America : its development, which has seen a substantial growth, has relied during the past few years on external growth operations. XPO Logistics enjoys solid positions in the transportation industry in the US, as well as in the highly technological and sophisticated contract logistics industry.*

- *XPO Logistics foresees that this acquisition will generate substantial opportunities for cross-selling within the new group. Norbert Dentressangle's current clients will be able to benefit from a single point of entry in order to be provided with a global scale assistance in the management of their supply-chain, and will have access to XPO Logistics France SAS' first class services in North America;*

- *XPO Logistics intends to make Norbert Dentressangle its European development platform. XPO will set up in Europe its freight optimization proprietary platform in order to improve the transporters' sourcing and the customer service. XPO also intends to realize substantial growth investments in its new European activities, in particular technological development ;*

- *Norbert Dentressangle and XPO Logistics have found no meaningful cost synergies, mainly due to the low business overlap in Europe and the complementarity of the respective US operations of Norbert Dentressangle and XPO Logistics. Most of the expected synergies come from the cross-selling opportunities. As a consequence, the alliance between the two companies should preserve the integrity of Norbert Dentressangle's current activities and level of employment.*

- *The Offer is driven by a strategy of continuing the Company's business and development. In this respect, XPO Logistics intends to continue practically the entirety of Norbert Dentressangle's management, at the benefit of which incentive programs will be set up. XPO Logistics will also maintain at its current level the number of full time employees in France, during a minimum period of 18 months after the completion of the acquisition. XPO Logistics considers that the integration between the two companies should not result in a substantial modification of the individual and collective status of Norbert Dentressangle's and its subsidiaries' employees.*

- *XPO Logistics intends to maintain Norbert Dentressangle's European decision centers in France, in Lyon for the registered office, Malakoff (Hauts-de-Seine) for the logistics business and Beausemblant (Drôme) for the transportation business, for a 5 years period starting from the block acquisition.*

- *If the minority shareholders do not own more than 5% of the Company's capital or the voting rights after the completion of the Offer, the Offeror will implement a mandatory squeeze-out process in return for which a compensation equivalent to the price of the Offer will be paid and, if the necessary conditions to implement the squeeze out are not met, does not intend to withdraw the Company's shares from the Parisian stock exchange during the 12 months following the Offer, but reserves the possibility to consider their withdrawal front the London stock exchange and will consider the best ways to integrate the Company within the new group, including through mergers or contributions.*

*In view of these elements, after discussion, the Supervisory Board including the independent members unanimously issues a favorable opinion to the draft Offer as presented and regards the Offer as complying with the best interests of the Company, its shareholders and its employees.*

*In view of the immediate liquidity opportunity represented by this offer, made at a very attractive price, even in the event of the implementation of a squeeze-out process, the Supervisory Board, including the independent members, unanimously advices the Company's shareholders to tender their shares to the Offer.*

*In this respect, members owning Norbert Dentressangle shares but whose shares are not included in the Block Acquisition, indicated intent to tender their shares to the Offer, except for those whose holding is compulsory under the articles of association.*

*In addition, the Supervisory Board decides that the 44,447 self-owned Company's shares will not be tendered to the Offer, in accordance with the terms of the Tender Offer Agreement.".*

## IV.   INTENTIONS OF NORBERT DENTRESSANGLE'S SUPERVISORY BOARD MEMBERS

The members of Norbert Dentressangle's Supervisory Board who are not parties to the Share Purchase Agreement indicated intent to tender the mentioned Shares to the Offer except for those whose holding is compulsory under the articles of association.

## V.   INTENTIONS OF THE COMPANY WITH REGARD TO TREASURY SHARES

In accordance with the Tender Offer Agreement, the Supervisory Board has decided to not tender to the Offer the 44,447 self-owned Shares.

## VI.   AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS ISSUE

Except for the Share Purchase Agreement and the Tender Offer Agreement, there is no agreement that could have a significant impact on the assessment of the Offer or its issue.

## VII.   ELEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT IN THE EVENT OF A PUBLIC BID

1. **Capital structure of the Company**

Norbert Dentressangle's capital, amounting 19,672,482 euros, is divided into 9,836,241 Shares having a nominal value of 2 euros each, fully paid-up and all pertaining to the same category.

Immediately prior to the completion of the Block Acquisition Norbert Dentressangle's capital was allocated as described in Section II.1 above.

Following the Block Acquisition, as of the date hereof, the share capital and voting rights of Norbert Dentressangle are allocated as follows:

| Shareholders | Number of shares | % Capital | Number of theoretical voting rights | % Voting rights[8] |
|---|---|---|---|---|
| XPO Logistics France SAS | 6,751,301 | 68.64 | 6,751,301 | 68.29 |
| *Including shares acquired since 11 June 2015* | 189,525 | 1.93 | 189,525 | 1.92 |
| Officers, employees and public[9] | 3,084,940 | 31.36 | 3,134,497 | 31.71 |
| *Including shares held by Norbert Dentressangle SA* | 38,578 | 0.39 | 38,578 | 0.39 |
| *Including shares held under liquidity arrangement* | 5,869 | 0.06 | 5,869 | 0.06 |
| **Total** | 9,836,241 | 100 | 9,885,798 | 100 |

2. **Statutory voting and Share transfer restrictions or agreements clauses brought to the Company's knowledge under article L. 233-11 of the *Code de commerce***

No statutory restriction is applicable to the voting rights or Share transfer. Article 9 of the Company's articles of association provides that if the threshold of 2%, or any multiple of that number until the threshold of 50%, of the capital or voting rights is crossed in the upwards or downwards direction, every shareholder acting on their own or jointly, is obligated to inform the Company no later than on the fourth day of negotiation after the day of the crossing of each threshold, by registered letter with an acknowledgement of receipt.

---

[8] Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

[9] Including 53,500 shares held by members of the Management Board.

Failure to comply with this obligation can lead to the Shares exceeding the undeclared fraction to be deprived of their voting rights in any shareholders meeting held until a two years delay after the regularization of the notification being recorded in the minutes of the General Meeting

This sanction can only be implemented upon a request registered in the minutes of the General Meeting by one or more shareholders owning more than 5% of the capital or the voting rights of the Company.

No agreement in force has been brought to the Company's knowledge under article L.233-11 of the *Code de commerce*.

### 3.   Direct or indirect stakes in the Company's capital the Company has knowledge of pursuant to articles L.233-7 and L.233-12 of the *Code de Commerce*

After the Block Acquisition, the Offeror owns 6,561,776 Shares representing as many voting rights, 66.71% of the capital and 66.38% of the voting rights (calculated on the basis of 9,836,241 Shares representing 9,885,798 voting rights, calculated in accordance with article 223-11 of the AMF General Regulations.)

To the knowledge of the Company, the following shareholder owns more than 2% of its capital or voting rights at the date hereof:

-   Financière de l'Echiquier has declared on 30th March 2015 that it owned 483,055 Shares representing as many voting rights, 4.91% of the capital and 2,93% of the voting rights, on behalf of funds whose management its taking care of.

### 4.   List and description of the owners of any equity with special control rights associated with:

Article 9 of the Company's articles of association provides for the granting of a double voting right for the holders of nominative and fully paid-up Shares when these shares are registered for at least four (4) years in the name of the same holder.

Any conversion into bearer shares or transfer of the ownership of the Shares leads to the deprivation of the double voting right unless the transfer is made to an entitled rightholder following a succession, a liquidation of a community of assets between spouses, a donation *inter vivos (donation-partage)* in favor of a spouse or a relative entitled to inherit, which does not interrupt the necessary double voting right acquisition delay.

### 5.   Envisaged control mechanisms in the event of an employee shareholding system deprived of the control rights

The Company has no knowledge of any control mechanism in place in an employee shareholding system deprived of the control rights.

### 6.   Shareholder agreements that could lead to Share transfer and voting rights restrictions the Company is aware of

The Company is not aware of any in place shareholder agreement that could lead to Share transfer or voting rights restrictions.

7. **Applicable rules regarding the appointment or replacement of Supervisory Board members and the modification of the Company's articles of association**

Except for the obligation for any member of the Supervisory Board to hold more than hundred (100) shares of the Company, under articles 6 III and 19 of the Company's articles of association, no statutory clause provides for any terms other than the applicable law with regards to the appointment and replacement of the Supervisory Board members and the modification of the Company's articles of association.

8. **Powers of the Supervisory Board, in particular regarding the issue or the repurchasing of equities**

Apart from the general powers provided for by the applicable law and the articles of association, the Company's Supervisory Board has the following powers:

| Date of the meeting which granted or modified the authorization | Content of the authorization | Final date of validity | Effective use of these authorizations | Maximum amount allowed |
|---|---|---|---|---|
| 21 May 2015 (10th resolution) | Issue of securities giving access to the capital with shareholders' pre-emptive subscription right being maintained | 20 July 2017 | . | Upper limit for increases in the capital: 20 000 000 E Upper limit for debt securities: 500 000 000 € |
| 21 May 2015 (11th resolution) | Issue of securities giving access to the capital without a shareholders' pre-emptive subscription right | 20 July 2017 | | Upper limit for increases in the capital: 20 000 000 € Upper limit for debt-securities: 500 000 000 € |
| 21 May 2015 (12th resolution) | Issue of securities giving right to debt securities or to increase the capital as part of an offer described in section II of article L. 411-2 of the *Code monétaire et financier* | 20th July 2017 | | Upper limit for increases in the capital: 20 % of the capital a year. Upper limit for debt securities: 500 000 000 € |
| 21 May 2015 (13th resolution) | Authorization for the Management Board to fix the price in accordance with the terms decided by the General Meeting in the event of an issue without pre-emptive subscription right | 20th July 2017 | | 10 % of the capital |
| 21 May 2015 (14th resolution) | Increase in the number of securities to be issued in the event of an increase in the capital with or without pre-emptive subscription right | 20 July 2016 | | 15% of the initial issue |

| 21 May 2015 (15th resolution) | Increase in the capital through incorporation of premiums, reserves, benefits or else. | 20 July 2016 | | Upper limit for increases in the capital: 20 000 000 € |
|---|---|---|---|---|
| 21 May 2015 (16th resolution) | Issue of ordinary shares, securities giving access to the capital, without shareholders' pre-emptive subscription right, in consideration for contributions in kind concerning equities or securities giving access to the capital. | 20 July 2016 | | 10% of the capital |
| 21 May 2012 (23rd resolution) 23 May 2013 (13th resolution) | Authorization to grant free-shares. | 38 months starting from 21 May 2014, or, failing that from the General Meeting deciding on the account closed on 31 December 2014. | Share granted by the Management Board (24/04/2013, then on the 23/04/2014 and on the 20/10/2014) subject to performance ad presence conditions | Upper limit for granting fixed at 2% of the capital |
| 21 May 2015 (17th resolution) | Increase in the capital reserved for employees under the terms of the *Code de commerce* and articles L.3332-18 *et seq* of the *Code du travail*. | | | 393 000 €. |
| 23 May 2013 (9th resolution) | Issue of 110 000 subscription warrants at the benefit of the named persons | | Issue of 110 000 subscription warrants (Decision by the Management Board on the 29/07/2013) and subscription by the beneficiaries. | 110 000 subscription warrants — Authorization fully used. |
| 21 May 2015 (9th resolution) | Cancellation of the shares acquired by the Company and corresponding decrease in the share capital. | 20 May 2017 | | 10% of the share capital |
| 21 May 2015 (18th resolution) | Issue of subscription warrants for new shares and / or existing shares at the benefit of the named persons, with elimination of the pre-emptive subscription right. | 30 September 2015 | | 20,000 subscription warrants |

9. **Impact on the agreements entered into by the Company in the event of a change of control**

Some agreements include a change of control provision that can lead to the termination of the said agreement, and will as a consequence be subject to a refinancing by the Offeror in the agreed delays provided for in the terms of each one of these agreements. This is, *inter alia*, the case for the following agreements:

- Multi-currency Revolving Credit Facility entered into on 23rd December 2013 for a maximum amount of 400,000,000€;

- Credit contract entered into on 1st August 2014 for a maximum amount of 250,000,000€;

- Credit contract EURO PP entered into on 5th February 2013 for a maximum amount of 75,000,000€;

- EURO PP Bonds for 75.000.000€ at 3.80 per cent issued by Norbert Dentressangle, due on 20th December 2019 pursuant to a 18th December 2013 prospectus;

- EURO PP Bonds for 160.000.000€ at 4.00 per cent issued by Norbert Dentressangle, due on 20th December 2020 pursuant to a 18th December 2013 prospectus.

Some commercial agreements entered into by the Company and/or its subsidiaries include provisions granting the client or the counterparty the right to terminate the agreement in the event of a change of control.

To date, no co-contractor has made known to the Company its intent to terminate the agreement due to the change of control.

10. **Agreements providing for the payment of indemnities for Norbert Dentressangle Supervisory Board members, or for employees, in the event of a resignation or a dismissal without actual and serious basis or if their employment is terminated due to a public bid**

There is no agreement creating any obligations to pay compensations to managers or employees in the event of a resignation or of a dismissal without actual or serious basis, or in the event of a public bid targeting the Company's shares within the Company or its subsidiaries.

## VIII. REPORT OF THE INDEPENDENT EXPERT OF ART. 261-1 OF THE AMG GENERAL REGULATIONS

# Ledouble

# NORBERT DENTRESSANGLE

**Simplified Public Tender Offer
followed by a Squeeze-Out
initiated by XPO Logistics France SAS**

-=-

# FAIRNESS OPINION

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

With a view to the Simplified Public Tender Offer followed by a Squeeze-Out ("**the Offer**" or "**the Transaction**") initiated by XPO Logistics France SAS[10] ("**XPO**" or "**the Offeror**") concerning shares in Norbert Dentressangle SA ("**Norbert Dentressangle**", "**the Company**" or "**the Target**"), Ledouble SAS ("**Ledouble**") has been asked, in its capacity as independent appraiser as appointed by the Company's Supervisory Board on 27 April 2015, to give an opinion on the fairness of the Offer price of **€217.50** per share (ex-dividend of €1.80).

## Regulatory framework

The appointment of Ledouble falls within the framework of the requirements of Article 261.1 I 1°[11] and 2°[12] and II[13] of the AMF General Regulations and implementing instruction n° 2006-08, in turn also subject to the AMF's recommendations of 28 September 2006[14].

This fairness opinion is to be understood within the meaning of Article 262-1.I[15] of the AMF General Regulations.

## Independence

Ledouble is independent of the Company, the Offeror, the sponsoring bank for the Offer[16] and the legal[17] and financial[18] advisors of the parties (the legal advisors of the Company and the Offeror and the financial advisor of the Company are hereinafter referred to as "**the Advisors**"):

Ledouble does not have any legal or financial ties to the aforementioned parties;

---

[10] A wholly-owned subsidiary of XPO Logistics, Inc. (« **XPO Logistics** »), registered in Delaware, registered office Five Greenwich Office Park, Greenwich, Connecticut 06831 (United States), whose shares are traded on the New York Stock Exchange (NYSE : XPO).

[11] The Target shall be controlled by the Offeror within the meaning of Article L.233-3 of the French Commercial Code prior to the launch of the Transaction.

[12] Where there are agreements between the senior managers of the Target and the Offeror.

[13] With a view to the implementation of a squeeze-out.

[14] Recommendations amended on 19 October 2006 and 27 July 2010.

[15] Excerpt from Article 262-1.I of the AMF General Regulations: *"The independent appraiser prepares a report on the financial terms of the offer or transaction. Content requirements for the report are set out in an AMF instruction. In particular, the report contains the statement of independence..., a description of the verifications performed and a valuation of the company in question. The report's conclusion takes the form of a fairness opinion."*

[16] Morgan Stanley.

[17] Bredin Prat as legal advisor to the Company, and Wachtell, Lipton, Rosen & Katz and Darrois Villey Maillot Brochier as legal advisors to the Offeror.

[18] Rothschild and JP Morgan as financial advisors to the Company.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- There are no conflicts of interest within the meaning of Articles 261-4 of the AMF General Regulations and AMF instruction n° 2006-08 as mentioned above; for information only, **appendix 6** provides a list of the most recent independent appraisals and financial analysis performed by Ledouble, showing the sponsoring banks for the transactions concerned[19];

- We believe that the assignment for which we have been appointed does not require us to work repeatedly with the sponsoring bank and the Advisors[20].

In accordance with Article 261-4 of the AMF General Regulations, we certify that there are no known past, present or future ties with the persons concerned by the Offer and the Advisors that could compromise our independence or impair the objectivity of our assessment when carrying out the appraisal; we have therefore been able to perform our duties with full independence.

The skills of the team that performed the appraisal are mentioned in **appendix 5**.

**Procedures performed**

We carried out our procedures in accordance with the requirements of Articles 262-1 et seq. of the AMF General Regulations, implementing instruction n° 2006-08 of 25 July 2006 concerning independent appraisals and the AMF's recommendations of 28 September 2006[21]. The programme of work to be carried out and the amount of fees received within the framework of this assignment are stated in **appendix 1**. The timetable for our involvement is provided in **appendix 2**.

The documents used to support our work are listed in **appendix 4.**

The procedures performed consisted primarily of familiarising ourselves with the business activities and market conditions of the Company and its subsidiaries (the "**Group**") and, following diagnosis based on this information, carrying out a multi-criteria valuation of the Group, as well as analysis of the premium resulting from the Offer price of €217.50 per share (ex-dividend of €1.80) using different valuation criteria.

---

[19] This declaration of independence applies to everyone at Ledouble, profiles provided in **appendix 5**.

[18] Within the meaning of Article 261-4 I of the AMF General Regulations.

[21] AMF recommendation n°2006-15 "Independent appraisal within the framework of financial transactions"; document created on 28 September 2006, amended on 19 October 2006 and 27 July 2010.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

These procedures concerned in particular:

- briefings and meetings with the persons in charge of the Transaction within the Group, members of the Company's Management Board and Supervisory Board, as well as with the Boards and representatives of the Offeror and the sponsoring bank. A list of contacts is provided in **appendix 3**;

- analysis of the means by which the Offer will take place, on the basis of these interviews and draft offer documents ("*note d'information*") from the Offeror and the offer document in response from the Target intended for the AMF;

- review of agreements signed within the framework of the Offer[22];

- review of financing arrangements for the Controlling Interest[23] and the Offer;

- use of public and regulated information concerning the Company and XPO Logistics;

- identification of the key events in the life of the Company over the last few years and the current year;

- use of recent market and sector research within the Group's field of business;

- analysis of reports by brokers covering Norbert Dentressangle and XPO Logistics;

- analysis of other information relating to the Group taken from our own databases, in particular analysts' reports and consensus forecasts, as well as investment multiples taken from a sample of companies deemed to be comparable as set out in **appendix 7** and **appendix 8**;

- factoring into our intrinsic[24] and analogical[25] valuation models forward-

---

[22] In particular the Share Purchase Agreement ("**SPA**") signed on 28 April 2015 concerning the sale to XPO of the shares held by Mr Norbert Dentressangle and his family, and the Tender Offer Agreement ("**TOA**") signed on 28 April 2015 between the Company and the Offeror.

[23] The term Controlling Interest is defined in section 1.7.1.

[24] Discounted cash flow (DCF).

[25] Application of investment multiples to business plan indicators.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

looking data taken from the business plan prepared by the Company's management, upon which we performed detailed and contradictory analysis, in collaboration with our contacts within the Group;

-   analysis of the terms of transactions carried out by the Company prior to the Offer and the resulting valuation multiples;

-   review of the work done by the sponsoring bank and comparison of its multi-criteria valuation with our own work.

## Assertions obtained and limitations of our assignment

We obtained confirmation from the management team of the Target and representatives of the Offeror concerning the absence of:

-   information that may affect the objectivity of the Offer price and substantially alter the value of the shares concerned by the Offer;

-   any mechanisms that may be similar to an earnout payment that may not benefit minority shareholders and which may have been agreed at the time of the purchase of the Controlling Interest prior to the Offer.

We received confirmation that the documents listed in the offer documents intended for the AMF reflect all of the commitments made with regard to all shareholders in respect of the Offer.

In accordance with usual practice for independent appraisals, the purpose of our valuation work was not to validate the historic and forward-looking information used, for which we restricted ourselves to verifying the plausibility and consistency of this information. In this regard, we believed that all of the information provided to us within the framework of our assignment was reliable and transmitted in good faith, in particular budgets and forecasts.

This report is not intended as a recommendation of the Offer.

## Report structure

We shall look at:

-   the terms of the Offer (section 1);

-   the Group's business activities and market conditions (section 2);

-   our multi-criteria valuation of the Norbert Dentressangle shares (section 3);

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- our analysis of agreements signed within the framework of the Offer (section 4);

- our observations concerning valuation information from the sponsoring bank (section 5).

The conclusion constitutes the fairness opinion for shareholders concerned by the Offer (section 6).


**Method of presentation**

The amounts presented below may be expressed in:

- euros (€/currency);

- thousands of euros (€'000/currency);

- millions of euros (€m/currency);

- billions of euros (€bn/currency).


Cross-references between sections of the report are shown in brackets.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 1   ABOUT THE OFFER

## 1.1   Companies taking part in the Offer

### 1.1.1   Target

Norbert Dentressangle, whose shares are the object of the Offer, is a public limited liability company (*"société anonyme"*) with share capital of €19,672,482 divided into 9,836,241 shares with a par value of €2, registered office 192 Avenue Thiers in Lyon (69006).
The Company, whose shares are listed on Euronext Paris (compartment A)[26] and Euronext London[27], is represented by Mr Hervé Montjotin, Chairman of the Management Board.

With over 42,000 employees and revenues of €4.7bn in 2014, generated primarily in France and the United Kingdom, the group - of which Norbert Dentressangle is the ultimate parent company (the **"Group"**) - is a world market leader in logistics, transportation, freight brokerage and global forwarding services.

Since it was founded in 1979, the Group has expanded gradually partly via a number of acquisitions, including that of logistics and transportation operator Jacobson Companies (**"Jacobson"**) in the United States in July 2014. It currently runs one of the largest transportation networks in Europe.

### 1.1.2   Offeror

XPO is a wholly-owned subsidiary of XPO Logistics, the parent company of the XPO Group[28], one of the leading US transportation and logistics companies in North America. Its expansion over the last few years has been founded on acquisitions.

With around 10,000 employees, the XPO Group generated revenues of USD 2.4bn in 2014, primarily in the United States, of which USD 2.1bn can be attributed to the Transportation operating segment[29].

---

[26] Under code FR0000052870.

[27] Stock code: GND.

[28] The **"XPO Group"** consists of XPO Logistics and its subsidiaries.

[29] The Logistics operating segment, which generated revenues of USD 0.2bn in 2014, was only created recently following the acquisition of New Breed in September 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 1.2    Aims of the Offer and intentions of the Offeror

Thanks to the strategic fit between the services offered and geographical presence of the Group and the Offeror, the merger - which was made public on 28 April 2015 by XPO Group[30] and the Company[31] - should allow for commercial synergies in relation to a large portfolio of international clients.

However, the Offeror has not made any estimates concerning potential synergies from the merger.

## 1.3    Breakdown of share capital and voting rights before the Offer

### 1.3.1    *Number of shares and voting rights*

At 31 May 2015, following the prior transfers of shares described below (Section 1.7.3), the number of outstanding shares and the number of theoretical voting rights of Norbert Dentressangle broke down as follows:

**Share capital and voting rights**

| | Number of shares | % of share capital | Theoretical voting rights | % of voting rights |
|---|---|---|---|---|
| Dentressangle Initiatives | 6,321,294 | 64.27% | 12,366,694 | 76.26% |
| Pierre-Henri Dentressangle | 120,241 | 1.22% | 240,472 | 1.48% |
| Marine Dentressangle | 120,241 | 1.22% | 240,472 | 1.48% |
| **Dentressangle family** | **6,561,776** | **66.71%** | **12,847,638** | **79.22%** |
| Employees | 92,533 | 0.94% | 121,526 | 0.75% |
| Free float | 3,137,485 | 31.90% | 3,203,772 | 19.76% |
| Treasury stock #1 (a) | 38,578 | 0.39% | 38,578 | 0.24% |
| Treasury stock #2 (b) | 5,869 | 0.06% | 5,869 | 0.04% |
| **Total** | **9,836,241** | **100%** | **16,217,383** | **100%** |

*(a)      Allocated to covering stock options or bonus shares.*
*(b)      Under the liquidity agreement.*

---

[30]    XPO Logistics press release. [Online], http://investors.xpologistics.com/phoenix.zhtml?c=204615&p=irol-newsArticle_print&ID=2041131

[31]    Norbert Dentressangle press release. [Online],http://www.norbert-dentressangle.fr/Actualites-en-France/Acquisition-de-Norbert-Dentressangle-par-XPO-Logistics

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 1.3.2   *Instruments giving access to share capital*

Instruments giving access to share capital consisted of (i) stock warrants held by members of the Management Board and (ii) performance share plans awarded to European managers of Norbert Dentressangle and former US managers of Jacobson.

### 1.3.2.1   *Stock warrants ("Warrants")*

At 31 May 2015, the Company's 110,000 outstanding warrants, issued on 29 July 2013, comprised 80,000 "2013 A" warrants and 30,000 "2013 B" warrants and broke down as follows between the various beneficiaries, who are members of the Management Board[32]:

**Breakdown of 2013 warrants**

|  | A warrants | B warrants | Total |
|---|---|---|---|
| Mr. Hervé Montjotin and family | 30,000 | 20,000 | 50,000 |
| Mr. Patrick Bataillard and family | 20,000 | 10,000 | 30,000 |
| Mr. Malcom Wilson | 15,000 | - | 15,000 |
| Mr. Luis Angel Gomez | 15,000 | - | 15,000 |
| **Total** | **80,000** | **30,000** | **110,000** |

---

[32] Prior to the Transaction, a portion of the warrants held by Mr Bataillard and Mr Montjotin were transferred to holding companies belonging to them and assigned to their respective children.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The 19th resolution of the general shareholders' meeting of 21 May 2015 amended the terms and conditions of these warrants as defined at the time they were issued, resulting in:

- the lifting of the dual exercise condition: at the date of exercise, holders of warrants are no longer subject to the obligation (i) to hold the office of member of the Management Board within the Company and (ii) not to be involved, either as plaintiff or defendant, in an arbitration or judicial body with the Company or one of its subsidiaries;

- bringing forward the start of the exercise period for "2013 A" and "2013 B" warrants to 21 May 2015[33]; the date of the end of the exercise period as stated at the time the warrants were issued remains unchanged, i.e. 31 May 2019 and 31 May 2021 respectively;

- making them immediately transferable.


### 1.3.2.2   *Performance share plans*

At 31 May 2015, performance share plans in force broke down as follows:

**Performance shares**

| Plan | 31-Dec.-14 | Change | 31-May-15 |
|------|-----------|--------|-----------|
| April 2013 | 52,300 | (2,200) | 50,100 |
| April 2014 | 21,500 | (500) | 21,000 |
| October 2014 | 37,663 | (6,666) | 30,997 |
| **Total** | **111,463** | **(9,366)** | **102,097** |

---

[33] At the time of issue, "2013 A" and "2013 B" warrants were supposed to be exercisable as of 1 June 2016 and 1 June 2019 respectively.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The April 2013[34] and April 2014[35] plans are the two tranches of a long-term incentive programme intended for European staff, introduced to accompany the achievement of the Group's 2013-15 three-year business plan:

- the April 2013 plan is targeted at around 200 managers and key employees of the Group, with the aim of awarding shares to each beneficiary at the end of a vesting period of three years (from 1 May 2013 to 30 April 2016), subject to achieving the target of an average ratio of Group EBITA[36] to revenues over the period from 2013 to 2015 of 3.25% or more;

- the April 2014 plan concerns around 40 people, with shares awarded at the end of a vesting period of two years (from 1 May 2014 to 30 April 2016), subject to achieving a Group EBITA target in 2015 of €213m or more. If this target is 80-100% achieved, the number of shares awarded is proportionally adjusted on a straight-line basis.

For beneficiaries resident in France, the vesting period is followed by a lock-up period of two years (from 1 May 2016 to 30 April 2018).
On the basis of the performances achieved in 2013 and 2014 and the latest forecasts for 2015, it can be considered that the performance conditions attached to the April 2013 and April 2014 plans should be respected.

Following the acquisition of Jacobson, the Company decided in October 2014[37] to extend the Incentive Programme to 12 US managers of Jacobson, with the awarding at the end of a period of four years, i.e. on 21 October 2018, subject to performance conditions, of a maximum of 3,333 bonus shares in the Company (1,333 under tranche A and 2,000 under tranche B):

- tranche A is subject to Jacobson's US operations achieving annual operating income of USD 84.7m or more over the period from 2015 to 2017;

- tranche B is subject to a dual performance condition, (i) firstly, achieving the tranche A performance condition for each year from 2015 to 2017 and (ii)

---

[34] Management Board decision of 24 April 2013.

[35] Management Board decision of 23 April 2014.

[36] Earnings before interest, taxes and amortisation.

[37] Management Board decision of 20 October 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

secondly, Jacobson's US operations achieving annual operating income of USD 92.2m of more in 2017. If this target is 90-100% achieved, the number of shares awarded is proportionally adjusted on a straight-line basis.

The awarding of performance shares in respect of the various plans is subject to the employee working for the Group at the date of award.

### 1.3.2.3   *Specific treatment of dilutive instruments before the Offer*

Under an agreement between XPO Logistics[38] and all members of the Management Board[39] ("**Profit-Sharing Plan**"), annexed to the TOA described below (Section 1.7.2), between now and the offer the aforementioned dilutive instruments are to be treated as follows:

- for warrants, XPO has agreed to purchase, within five working days following the change of control of the Company, and in any case before the Offer, all of the "2013 A" and "2013 B" warrants still outstanding, at a price of €157.95, equal to the Offer price of €217.50 (ex-dividend of €1.80) less the exercise price of €59.55; the vesting date for these warrants is 8 June 2015;

- for performance shares, the Company shall ask beneficiaries of the various plans to waive their right and in return shall grant (i) for European managers under the April 2013 and April 2014 plans, payment of a cash bonus of €217.50 per share[40] and (ii) for US managers under the October 2014 plan, the awarding of restricted stock units of which the underlying instruments are XPO Logistics' shares on the basis of an exchange based on a value of the Company's shares equivalent to the Offer price and a market value of the XPO Logistics shares according to its share price. The time frame for this new plan shall be at least equal to that of the Company plan it is due to replace[41].

---

[38] Represented by Mr Bradley S. Jacobs, in his capacity as Chairman and Chief Executive Officer.

[39] Mr Hervé Montjotin, Mr Patrick Bataillard, Mr Luis Angel Gomez, Mr Malcom Wilson and Mr Ludovic Oster.

[40] The sum will be paid within three years of the acquisition of the Controlling Interest, 50% of which will be within 18 months.

[41] October 2014 plan.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 1.4    Scope of the Offer

The Offer concerns a maximum of 3,230,018 shares corresponding to all shares making up the Company's share capital, i.e. 9,836,241 shares (Section 1.3.1), with the exception of (i) the 6,561,776 shares representative of the Controlling Interest (Section 1.7.1) to be purchased on 8 June 2015 by XPO and (ii) the 44,447[42] treasury shares (Section 1.3.1) not tendered to the Offer.

However, the Offer does not concern the 110,000 2013 warrants (Section 1.3.2.1) to be purchased by XPO prior to the Offer, or the 102,097 performance shares while they are still in their vesting period (Section 1.3.2.2).

### 1.5    Squeeze-out, intentions in terms of merging and integration

The terms of the squeeze-out and the intentions of the merging and integration of the Company are set out in Sections 1.3.5. and 1.3.6. of the draft offer document prepared by XPO. If the conditions required for a squeeze-out are not met, the Offeror:

- does not intend to delist the Company's shares in Paris[43] within the 12 months following the Offer, but reserves the right to consider delisting them in London[44];

- shall review the best way of integrating the Company into the new group, in particular by means of mergers or transfers of assets.

### 1.6    Financing of the Offer

XPO will finance the Transaction from its equity and by means of shareholder loans. XPO Logistics recently carried out a USD 1.26 billion capital increase[45] and a bond issue of about USD 2 billion [46].

---

[42] 38,578 shares allocated to covering stock options and bonus shares and 5,869 shares in respect of the liquidity agreement.

[43] Euronext Paris (compartment A).

[44] Euronext London.

[45] XPO Logistics press release, 1 June 2015. [Online], http://www.xpologistics.com/content/xpo-logistics-raises-126-billion-equity

[46] XPO Logistics Press release, 1 June 2015. [Online], http://www.xpologistics.com/content/xpo-logistics-announces-proposed-20-billion-us-dollar-equivalent-senior-notes-offering

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**1.7    Agreements signed within the framework of the Offer**

*1.7.1   SPA*

Under the memorandum of understanding signed on 28 April 2015 with Dentressangle Initiatives ("**DI SAS**")[47] and members of the Dentressangle family[48], XPO Logistics via its subsidiary XPO has made a commitment to purchase irrevocably all of the 6,561,776 shares in the Company ("the **Controlling Interest**") held directly or indirectly by the Dentressangle family, representing 66.71% of share capital and 79.22% of voting rights of the Company (Section 1.3.1).

Under the terms of the SPA, the planned purchase of the Controlling Interest at the price of €217.50 per share (ex-dividend of €1.80) should take place within five working days of obtaining approval from US and German competition authorities[49], but may not be before 2 June 2015, the payment date of the €1.80 dividend proposed at the general shareholders' meeting of 21 May 2015.

Agreement was obtained from US and German authorities on 11 May 2015. Agreement from the Russian authorities, which was not a condition precedent for the acquisition of the Controlling Interest, was obtained on 20 May 2015.

As of the date of purchase of the Controlling Interest, i.e. 8 June 2015, the SPA provides for:

-   The obligation for the XPO Group to ensure that the Company gradually ceases to use the Norbert Dentressangle brand name no later than within a period of three years;

---

[47] Company wholly-owned by the Dentressangle family.

[48] Mr Norbert Dentressangle, Ms Evelyne Dentressangle, Mr Pierre-Henri Dentressangle and Ms Marine Dentressangle ("**the Assignors**");

[49] The deadline for obtaining these authorisations is 31 October 2015.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- a commitment by the Parties (i) for a period of three years, of non-competition, non-disparagement of the Company and non-solicitation of its staff and (ii) for a period of 20 years, not to use the Norbert Dentressangle brand name within the framework of a business activity similar to that of the Company.

### 1.7.2   TOA

Concomitantly with the SPA, the Company[50] and XPO Logistics[51] also signed on 28 April 2015 an agreement to determine the main characteristics of the Offer and the principles to be respected by the parties within this framework.

Under the TOA, the Simplified Public Tender Offer to be submitted by XPO following the purchase of the Controlling Interest (i) shall be entirely in cash for a price equivalent to that paid to purchase the Controlling Interest, i.e. €217.50 per share (ex-dividend of €1.80) and (ii) shall concern the remaining outstanding shares in the Company on the date of the Offer, with the exception of treasury shares, as well as performance shares for which the vesting and lock-up periods have ended[52].

The TOA also sets out the Offeror's intention not to cut the number of full-time jobs at the Company in France within the eighteen months following the acquisition of the Controlling Interest and its intention to keep the registered office for the Group's European operations in Lyon, and its current European decision-making centres for at least five years[53].

Furthermore, the Profit-Sharing Plan annexed to the TOA:

- specifies the means of treatment, prior to the Offer, of the "2013 A" warrants, "2013 B" warrants and performance share plans, details of which are given above (Section 1.3.2.3);

- plans for the Company to take out an unemployment insurance policy in favour of salaried members of the Management Board guaranteeing cover identical to that currently provided for the Chairman of the Management Board, Mr Hervé Montjotin;

---

[50] Represented by Mr Hervé Montjotin, in his capacity as Chairman of the Management Board.

[51] Represented by Mr Bradley S. Jacobs, in his capacity as Chairman and Chief Executive Officer.

[52] On the date of the Offer, no performance shares will meet these criteria.

[53] For logistics, the Malakoff centre (Hauts-de-Seine) and for transportation, the Beausemblant centre (Drôme).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- provides for the implementation by the Offeror of an incentive programme of a total of €18m, attributable to members of the Management Board of the Company and other managers in the form of bonus shares or phantom shares, depending on performances achieved.

### 1.7.3   Contributions to DI SAS

On 26 May 2015, the partners of DI SAS approved the contribution to the company by Mr Norbert Dentressangle and Mrs Evelyne Dentressangle of 257,474 and 688 shares respectively, representing a total of 258,162 shares. This contribution, which is technical in nature, resulted in the preparation of a contribution agreement and an expert appraiser's report dated 15 May 2014.

These contributions were in real value, in accordance with the value applied within the framework of the SPA, i.e. €219.30 per share (cum dividend of €1.80).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 2  THE GROUP'S BUSINESS ACTIVITIES AND MARKET CONDITIONS

Prior to our multi-criteria valuation of the Group and the Norbert Dentressangle shares, we endeavoured to establish a diagnosis on the basis of sector, market and financial information in order to identify the main strengths and weaknesses of the Group, as well as the opportunities and threats it faces in its market[54].

### 2.1  The Group's positioning in its sector

The Group is currently positioned as a world market leader in logistics, transportation, freight brokerage and global forwarding services. It has around 42,500 employees in 25 countries, with a strong footing for its operations in Europe.

The Group's operations are organised into three divisions, Transportation, Logistics and Air & Sea:

- **Transportation**: companies in the Transportation division operate a network of heavy goods vehicles and provide national and international road transportation services;

- **Logistics**: the Logistics business consists of stock management on behalf of clients from dedicated or multi-client warehouses; management covers primarily storage, packaging, distribution and bringing products to market;

- **Air & Sea**: companies in the global freight forwarding division provide services to organise the transportation of goods all over the world and take care of associated customs formalities.

In 2014, revenues by business line and region broke down as follows:





---

[54] Our analysis is summarised at the end of this section of the report in the form of a SWOT matrix (Section 2.4).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The Group's expansion is the result of organic growth and a policy of acquisitions. Over the last 10 years, the Group has made the following notable acquisitions:

- **in 2007**, it consolidated its position in the United Kingdom and almost doubled in size with a friendly takeover bid for UK transportation and logistics company Christian Salvesen, European market leader in temperature-controlled distribution;

- **in 2010**, it set up the Air & Sea division with the acquisition of US group Schneider National, with operations in both the United States and China;

- **in 2011**, it acquired UK group TDG, one of Europe's leading transportation, logistics and freight forwarding companies. At the end of the same year, it acquired Chinese freight forwarding company APC Beijing International;

- **in 2013**, it acquired the Air & Sea operations of Daher in France and Russia, as well as the logistics and transportation operations of Fiege in Spain, Italy and Portugal;

- **in 2014**, it extended its geographical presence in the US market with the strategic acquisition in the United States of Jacobson, the fifth-largest logistics and transportation company on the other side of the Atlantic.

As an international operator, the Group endeavours to be a local economic partner via its transportation agencies and logistics sites[55]. It offers a wide range of services to clients across all major business sectors:



## 2.2   Characteristics of the Transportation, Logistics and Air & Sea markets

Below we present the characteristics of the French and European markets, where the Group generates the majority of its revenues.

---

[55] 662 sites at 31 December 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 2.2.1   The Transportation market

Transportation of goods can be segmented according to (i) the means of transport used (road, rail, sea, air); (ii) whether transportation is domestic or cross-border, (iii) the type of services offered (domestic pallet distribution, full truck loads, partial loads or groups of loads), (iv) the means of packaging (transportation of goods in bulk or packed) or even (v) the type of product transported (hazardous materials, temperature-controlled goods).

In France and the United Kingdom, the Group's main markets, road transport is the main means of transporting goods and accounts for more than 80% of total freight traffic (excluding air)[56].

According to the European Union's official statistics office Eurostat, *"The rapid increase in global trade up to the onset of the global financial and economic crisis and the deepening integration of an enlarged EU, alongside a range of economic practices (including the concentration of production in fewer sites to reap economies of scale, delocalisation, and just-in-time deliveries), may explain the relatively fast growth of freight transport across the EU."*

However, transportation of goods was severely affected by the outbreak of the global economic and financial crisis, resulting in a period of consolidation[57] that allowed certain operators to access new outlets, benefit from economies of scale and strengthen their local coverage. Despite the phenomenon of consolidation observed over the last few years, the Transportation market remains particularly fragmented.

Over the long term, the French transportation market has outperformed the national economy[58]:

---

[56]Source: Eurostat. [Online], http://ec.europa.eu/eurostat/web/transport/data/main-tables.

[57] Source: Xerfi, "Road transportation of goods", February 2014: *"Capitalising on the opportunities on offer, transportation companies with sufficient financial resources increased the number of acquisitions in order to secure the scope of their activities or access new outlets."*

[58] Assessed on the basis of GDP.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Transportation costs are affected by regulatory changes and oil prices. Price revisions remain limited due to intra-sector and inter-sector competition and competition from other countries, which penalises many SMEs in the market. French operators also have to deal with less favourable taxation and wage legislation than their counterparts and competitors in the rest of Europe.

Gefco, Geodis, STEF and Transalliance are among the Group's main competitors in this market.

### 2.2.2   The Logistics market

The development and growing complexity of trade networks are forcing companies to outsource an increasing proportion of their logistics activities to external service providers.

Logistics operators are involved in different stages of the distribution process, at the upstream stage of shippers' activities (assembly, co-manufacturing, quality control, storage, packaging, order preparation) and downstream (organisation of transportation of goods, after-sales service, management of returns of goods).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Logistics services and the relationships formed between the service provider and the client company are qualified according to the degree of outsourcing, from straightforward subcontracting of transportation services ("1PL[59]") to complete outsourcing of the supply chain[60] ("5PL"). It is also useful to distinguish between the ambient temperature logistics market and the temperature-controlled logistics market[61].

The Logistics market, which is more concentrated[62] than the Transportation market, is segmented between services provided by generalist service providers (such as Geodis, Kuehne Nagel and Norbert Dentressangle, which dominate the market) and logistics specialists (such as FM Logistic and ID Logistics). Like Transportation, the Logistics industry is highly capital intensive - due to the cost of acquiring warehouses and equipment - which constitutes a barrier to entry.

Although Logistics activities are - in the same way as Transportation - dependent on economic conditions, the increased outsourcing of logistics services by shippers[63] limits the impact of an economic downturn[64].

Over the long term, the French logistics market has performed in line with the national economy[65]:

---

[59] First Party Logistics.

[60] Logistics value chain.

[61] Source: Xerfi, "Cold and non-cold storage", February 2014: the cold storage segment accounts for around 8% of the total market in France.

[62] Particularly in the temperature-controlled logistics segment, largely dominated in France by STEF.

[63] Within the European Union, the United Kingdom and France have the highest level of logistics outsourcing. Sector studies show an average outsourcing rate of 50% in Europe; in the United States, the rate is generally estimated at 30%.

[64] Companies looking for operating flexibility in a fragile economic climate is one of the reasons for outsourcing.

[65] Assessed on the basis of GDP.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Some sectors such as e-commerce also offer fast-growing outlets for operators that have been able to adapt their offering.

The market is also subject to consolidation: *"acquisitions are motivated primarily by the desire to integrate new activities, optimise regional coverage, offer new services and even enter new markets[66]"*. In a highly competitive market, operators find growth drivers by establishing their presence in other countries[67] and offering services upstream and downstream of the supply chain.

### 2.2.3   The Air & Sea market

For the service provider, freight forwarding consists of *"[reviewing] the best air, sea and land combinations and [mastering] administrative formalities, in particular customs formalities[68]"*. Due to its connections to the Logistics industry, freight forwarding is practiced by market leaders DHL, Kuehne Nagel and Geodis, integrated into activities across the entire logistics chain. Specialists such as Panalpina and SDV are also involved in this area.

Forwarders are particularly sensitive to international economic conditions and also subject to fierce intra-sector competition, mainly as a result of limited barriers to entry: freight forwarding requires little investment and is characterised by an essentially variable cost structure.

---

[66] Source: Xerfi, "Cold and non-cold storage", February 2014.

[67] Source: Xerfi, *"Logistics Groups – World, Market Analysis – 2014-2019 Trends"*, August 2014: *"To tap into growth opportunities, logistics groups will therefore position themselves in emerging economies to ensure that they benefit from this change in trade patterns. Such moves are typically orchestrated through joint ventures and mergers and acquisitions, leading to some industry consolidation".*

[68] Source: Xerfi, *"Freight forwarding"*, August 2014.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The freight business is also sensitive to fluctuations in oil prices:



## 2.3 Historic analysis of the Group's performance

### 2.3.1 *Analysis of business activity and profitability*

The Group's business activity and profitability over the period from 2009 to 2014 are shown below:



Acquisitions - in particular those of TDG and Jacobson, finalised in 2011 and 2014 respectively - enabled the Group to achieve a total CAGR of 11.4% over the period from 2009-14.

In 2014, the year that Jacobson was integrated, the Logistics division was the Group's largest business, generating 50% of consolidated revenues.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Following efforts to cut costs in 2009 against the backdrop of severe deterioration in business activity[69], the Group managed to stabilise its EBITA margin. In 2011, the acquisition of TDG enabled the Group to achieve breakeven in the Air & Sea division. The Logistics business remains historically the most profitable.



### 2.3.2 Balance sheet structure

Below we show changes in the Group's simplified balance sheet since 2009:

---

[69] As a reminder, the Group's Transportation business was the hardest hit in 2009, with consolidated revenues down 14.8% on a reported basis.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



### 2.3.3   *Employment*

The strategic acquisitions carried out by the Group over the last few years have resulted in an increasing proportion of goodwill in the consolidated balance sheet.

Consolidated fixed assets consist mainly of rolling stock[70] used for the Transportation business, owned outright or via finance lease agreements[71]. Most of the warehouses operated by the Logistics business are rented.

Historically, the Group has ended its financial year with financing resources (negative WCR). The acquisition of Jacobson led to the recognition of a positive working capital requirement at 31 December 2014, which is nevertheless of immaterial relative to the Group's balance sheet structure.

---

[70] Tractors, trucks and trailers (specialist tankers).

[71] The Company also uses in its Transport activity operating leases for rolling stock; in accordance with generally accepted accounting principles these assets are not capitalized.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 2.3.4   Sources of funds

The Group's liabilities consist mainly of equity and debt. At 31 December 2014, the leverage ratio (consolidated net debt relative to consolidated EBITDA adjusted for Jacobson's pro forma EBITDA over the 12 months of 2014) was 3.0x.



The increased proportion of net debt at the end of the 2014 financial year was due to (i) the drawing of USD 431m used to finance the acquisition of Jacobson, and (ii) a currency effect resulting in an increase in the amount of debt.

The reduction in provisions at the end of the 2014 financial year, consisting chiefly of employee benefits, relates primarily to the actuarial reduction in the deficits of the two UK pension funds.

### 2.3.5   SWOT analysis

The matrix below summarises the Group's strengths and weaknesses, as well as the threats and opportunities it faces in its market:

| Strengths | Weaknesses |
|---|---|
| - Multi-specialist operator offering an integrated range of services covering the entire Transportation and Logistics value chain<br>- Direct operation of the largest fleet of heavy goods vehicles in Europe<br>- Management's ability to identify acquisition targets and integrated acquired operations | - Group revenues still generated predominantly in Europe<br>- Maturity of the Group's main geographical markets (France, UK) where a large number of companies have already outsourced their logistics activities<br>- Direct ownership of a large proportion of the vehicle fleet and limited use of |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

| | |
|---|---|
| - Cash flow generation able to finance the Group's expansion<br>- Strategic position in the United States where the Group is now the fourth-largest logistics operator<br>- Market-leading positions in France, the United Kingdom and Spain | subcontracting, increasing the proportion of fixed costs borne by the Group<br>- Outsider position in the freight forwarding market |
| **Opportunities** | **Threats** |
| - Growth opportunities in the United States, characterised by a lower outsourcing rate than in Europe<br>- Development and improvement of operating margin for the Air & Sea division<br>- Strong momentum of the e-commerce business, accounting for around 10% of the Logistics division's revenues<br>- Shift towards a more asset light model in Transportation | - Risk of deterioration in economic conditions, particularly in France and the United Kingdom, which account for more than half of consolidated revenues<br>- Fragmented markets characterised by intense competition creating a risk of erosion in margins<br>- Unfavourable regulatory changes, particularly in terms of taxation and wage packages, which could reduce the Group's margins<br>- Exposure to currency risk, particularly in relation to the USD and GBP |

## 3  VALUATION OF THE NORBERT DENTRESSANGLE SHARES

In accordance with AMF recommendations, we have used a multi-criteria valuation approach. After identifying the main accounting, financial and tax characteristics of the Group (Section 3.1), we set out below the valuation methods we have decided not to use (Section 3.2) and then the valuation approaches we considered most relevant in order to assess the fairness of the price per share proposed within the framework of the Offer (Section 3.3 et seq.).

The date used as the benchmark for the Norbert Dentressangle share price is 28 April 2015, the last day of trading before the Transaction was announced.

The market data used for our multi-criteria valuation of the Norbert Dentressangle shares, such as investment multiples (Section 3.5) and discount rates from the business plan (Section 3.4.3), are to end-May 2015.

The Offer price of €217.50 is without the dividend coupon of €1.80. In order to ensure uniformity with the approach used by the sponsoring bank, we have not taken into account the impact of the dividend payment of 2 June 2015. The value of the Company's shares obtained by means of the different valuation approaches used is therefore presented cum dividend and compared to €219.30, i.e. the Offer price of €217.50 plus a dividend coupon of €1.80.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

## 3.1    Accounting, financial and tax characteristics

### 3.1.1    Accounting standards

The Group prepares its consolidated financial statements in accordance with International Financial Reporting Standards (IFRS), applicable to listed companies.

The consolidated financial statements for the last financial year ended 31 December 2014 have been certified without reservation by the Statutory Auditors.

### 3.1.2    Valuation date

Our multi-criteria valuation of the Norbert Dentressangle shares was dated 31 December 2014.

### 3.1.3    Number of shares

To calculate the per share value of the Norbert Dentressangle shares, we have assumed a number of **10,003,891 shares**, calculated on a fully diluted basis at the most recent date, i.e. 31 May 2015, which includes:

- the 9,836,241 outstanding shares;

- the 110,000 shares that may be issued if the 2013 warrants are exercised;

- the 102,097 performance shares;

- minus the 44,447 treasury shares.

| Diluted number of shares 31-May-15 | Number |
|---|---|
| Outstanding shares | 9,836,241 |
| Stock warrants | 110,000 |
| Performance shares | 102,097 |
| Treasury stock | (44,447) |
| **Total** | **10,003,891** |

For information purposes, we provide as our summary of each of the valuation methods used the per share value of the Company's shares before and after the impact of the theoretical dilution resulting from the exercising of stock warrants and the

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

awarding of performance shares. The dilutive impact of **2.1%**[72] calculated on the basis of the number of shares nevertheless remains marginal[73].

### 3.1.4   Tax losses

Norbert Dentressangle had tax loss carryforwards of around €169m at the end of 2014. In accordance with IAS 12, a deferred tax asset of €27.4m was recognised in the consolidated financial statements on a basis reduced to €84m.

In our valuation, we have taken account of the tax saving related to the deduction of all tax loss carryforwards from profits taken from the business plan (Section 3.4.2), after the effect of discounting.

### 3.1.5   Net debt

Our valuation is based on net debt as at 31 December 2014[74].

We have differentiated between net debt to be deducted from the enterprise value calculated using the intrinsic valuation method on the basis of discounted cash flow and analogical valuation methods to give the equity value.

---

[72] (110,000 + 102,097) / 10,003,891.

[73] At 31 May 2015, the number of undiluted number of shares was 9,791,794, i.e. 9,836,241 shares making up the share capital minus 44,447 treasury shares.

[74] In our work, we have not adjusted net debt as at 31 December 2014 for the cash impact relating to the change in the number of treasury shares between 31 December 2014 and 31 May 2015, which is immaterial.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.1.6   *Net debt in our intrinsic valuation*

We have assumed adjusted consolidated net debt of **€1,162m** for our intrinsic valuation, details of which are provided below:

| Net debt – DCF method | |
|---|---|
| Type | €m |
| **Net debt** | **1,017** |
| Employee benefits provisions | 93.7 |
| Pension fund assets | (5.8) |
| Deferred tax assets on pension liabilities | (14.8) |
| **Pension liabilities** | **73.1** |
| **Minority interests (fair value)** | **36.7** |
| **Earnout payments** | **28.7** |
| Fair value of derivatives | 13.6 |
| Deferred tax assets on derivatives | (5.1) |
| **Derivatives** | **8.5** |
| Provisions for restructuring | 5.5 |
| Deferred tax assets on provisions for restructuring | (1.7) |
| Put on minority interests | 2.5 |
| Investments in associates | (1.6) |
| Interests in non-consolidated companies | (0.1) |
| **Other assets and liabilities** | **4.7** |
| **Exercise of warrants** | **(6.6)** |
| **Net debt – DCF method** | **1,162** |

This consists of reported net debt as at 31 December 2014 adjusted for:

- provisions relating to employee benefits, net of pension fund assets and associated deferred taxes recognised;

- the market value of minority interests determined on the basis of the estimated value of main subsidiary Salvesen Logistica by applying the median operating income multiple obtained from our sample of comparable listed companies (Section 3.5.2) and after a discount in respect of lower liquidity. As other non-controlling interests are immaterial, we have assimilated their net asset value into their market value;

- the Group's commitments relating to earnout payments on recent acquisitions;

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- the fair value of derivatives taken out by the Group to hedge its debt[75], net of associated deferred taxes recognised;

- other assets and liabilities including (i) provisions for restructuring net of estimated deferred taxes[76], (ii) the value of puts on non-controlling interests and (iii) the fair value of non-consolidated shares and interests in associates;

- cash and cash equivalents resulting from the exercise of 2013 warrants[77].

The tax saving related to tax loss carryforwards is also factored into our DCF model.

### 3.1.7   Net debt in our analogical valuation

To ensure uniformity with the net debt of comparable companies taken from our database, debt used in our analogical valuation approach consists of consolidated net debt as at 31 December 2014 plus the net asset value of minority interests and minus the impact of the exercise of stock warrants[78].

We have also adjusted debt for the estimated discounted value of the tax saving related to tax loss carryforwards according to how these are taken into account in the DCF approach. In order to obtain the maximum value for the Company's shares, we have not taken account of each comparable company's specific situation in terms of tax loss carryforwards.

Net debt in our analogical valuation is therefore estimated at **€991m**.

| Net debt – analogical method | |
| --- | --- |
| Type | €m |
| Net debt | 1,017 |
| Minority interests (NAV) | 27.2 |
| Discounted value of tax loss carryforwards | (47.0) |
| Exercise of warrants | (6.6) |
| Net debt – analogical method | 991 |

---

[75] Interest rate swaps.

[76] Based on a company tax rate of 30% (Section 3.4.2.2).

[77] I.e. 110,000 warrants at the exercise price of €59.55.

[78] Values shown on an undiluted basis in respect of the different valuation approaches do not take account of the impact of the exercising of warrants.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**3.2    Valuation methods not used**

Below we explain why we have not used the dividend discount model and net asset value as valuation methods.

### 3.2.1    Dividend discount model (DDM)

The dividend discount model is used to assess the yield value of minority interests. It gives a lower valuation than that obtained using the discounted cash flow (DCF) method.

### 3.2.2    Net asset value

The net asset value (NAV) method consists of correcting the net asset value of unrealised capital gains or losses currently identified as assets or liabilities.

The Company's fixed assets are allocated mainly to operations and at 31 December 2014 consisted primarily of:

- goodwill[79]: as an intangible asset with an indefinite life, goodwill is tested for impairment at least once a year and any impairment losses are recognised accordingly;

- customer relations[80]: these assets are depreciated on a straight-line basis[81] and specific contracts with an indefinite life are tested for impairment at least once a year;

- real estate assets[82]: this corresponds chiefly to warehouses owned by the Company, allocated entirely to operations and which there are no plans to sell in the short term. In this regard, no material potential revaluations have been brought to our attention[83];

---

[79] Net asset value = €975.1m.

[80] Net asset value = €342.3m.

[81] Over a period of 11 to 20 years.

[82] Net asset value = €114.9m (land: €35.3m + buildings: €79.6m).

[83] The Company only performs property appraisals if planning to sell a property. When selling to a financial investor, the sale price shall be directly linked to the provisions of lease finance agreements that may subsequently be taken out by the new buyer.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

- rolling stock[84]: this is depreciated over the estimated useful life of vehicles taking account of trade-in conditions granted by manufacturers[85]; in this respect, no material potential revaluation is expected.

On the basis of these factors, we did not envisage carrying out a revaluation of net asset value, which at 31 December 2014 stood at around €67.8 per share on an undiluted basis[86].

### 3.3    Reference to the share price

#### 3.3.1    Historic share price analysis

The Company's shares are listed on Euronext Paris (compartment A) and Euronext London. The chart below shows Norbert Dentressangle's share price performance since May 2013 relative to the CAC 40[87]:



The following events contributed to the main changes in the Norbert Dentressangle share price:

   a) **16 July 2013**: announcement of the acquisition of Daher's freight forwarding business;

---

[84] Net asset value = €307.6m.

[85] At the end of the depreciation period, the net asset value of transportation equipment will correspond to the trade-in value.

[86] €664.1m (equity attributable to equity holders of the parent) / [9,836,241 shares making up share capital − 45,790 treasury shares (7,212 under the liquidity agreement and 38,578 allocated to covering stock options or bonus shares)].

[87] The CAC 40 was rebased on 20 May 2013.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

b)  **9 September 2013**: announcement of the signing of a three-year logistics contract with ASOS representing revenues of around €117m;

c)  **23 October 2013**: announcement of revenues for the first nine months of 2013, up 2% on a reported basis or 1.3% like-for-like and at constant exchange rates relative to the first nine months of 2012;

d)  **19 December 2013**: announcement of a €235m bond issue by means of a private placement enabling the Group to diversify its sources of financing;

e)  **30 January 2014**: announcement of 2013 revenues of €4bn, up 3.9% on a reported basis or 2.4% like-for-like and at constant exchange rates relative to 2012; Gilbert Dupont raises its target price from €99.4 to €108.6;

f)  **26 February 2014**: announcement of 2013 profits in line with the strategic targets set by the Group; the following day, Société Générale raises its target price from €90 to €120;

g)  **23 April 2014**: announcement of revenues for the first quarter of 2014, up 13.6% on a reported basis or 5.5% like-for-like and at constant exchange rates relative to the first quarter of 2013;

h)  **31 July 2014**: announcement of the acquisition of US group Jacobson, a key player in the US Transportation and Logistics market;

i)  **23 October 2014**: announcement of revenues for the first nine months of 2014, up 14.1% on a reported basis or 5.1% like-for-like and at constant exchange rates relative to the first nine months of 2013;

j)  **29 January 2015**: announcement of 2014 full-year revenues of €4.7bn, up 15.8%;

k)  **26 February 2015**: announcement of 2014 profits;

l)  **28 April 2015**: announcement of the Transaction presenting a significant premium to the share price; the stock reacts to the announcement, adjusting itself immediately[88].

---

[88] On 29 April 2014, the closing price was €216.9.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The table below summarises the premiums implied by the Offer price of €219.3 (cum dividend of €1.80) on the basis of the average volume-weighted daily share price before the date of the announcement:

**Share price analysis (€)**

| Reference date | 28-Apr.-15 | Premium |
|---|---|---|
| Spot price | 159.1 | 37.8% |
| 1-month weighted average | 155.4 | 41.1% |
| 3-month weighted average | 148.9 | 47.3% |
| 6-month weighted average | 135.2 | 62.2% |
| 12-month weighted average | 122.3 | 79.4% |
| **12-month high** | **164.4** | **33.4%** |
| **12-month low** | **95.8** | **128.9%** |

Over a reference period of one year, the share priced reached a low of €95.8 on 23 July 2014 and a high of €164.4 on 25 March 2015.

During the last 12 months preceding the announcement of the Offer and with a trading volume of shares in free float representing around 32% of share capital, the shares' turnover is estimated at around two years.

### 3.3.2   Target price

We have identified six equity research analysts who cover the Norbert Dentressangle shares on a regular basis. The table below summarises the premiums implied by the Offer price of €219.3 (cum dividend of €1.80) relative to the most recent target prices before the Transaction was announced:

**Summary of target prices (€)**

| Analyst | Date | Target rice | Premium |
|---|---|---|---|
| Berenberg | 14-Apr.-15 | 178.0 | 23.2% |
| Gilbert Dupont | 21-Apr.-15 | 172.4 | 27.2% |
| Oddo MidCap | 23-Apr.-15 | 173.0 | 26.8% |
| Exane | 23-Apr.-15 | 150.0 | 46.2% |
| Société Générale | 23-Apr.-15 | 174.0 | 26.0% |
| Edison | 27-Apr.-15 | 190.0 | 15.4% |
| **Median** | | **173.5** | **26.4%** |
| **Average** | | **172.9** | **26.8%** |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

We would note that all of the target prices set by analysts before the Transaction was announced were below the Offer price.

## 3.4    Intrinsic valuation using the discounted cash flow (DCF) method

We have tried to obtain an intrinsic value of the Norbert Dentressangle shares by discounting as of 31 December 2014 projected cash flows taken from the 2015-18 business plan presented to us by management, in order to infer an enterprise value and, deducting net debt, an equity value.

### 3.4.1    *Principles of the DCF method*

The DCF method is based on the estimated enterprise value of a company on the basis of available operating cash flow[89] generated by its operations, which are discounted at a rate corresponding to the rate of return expected by those providing capital resources for the company.

The calculation of residual value estimated beyond the explicit forecast period is based on estimated free cash flow and therefore takes account of assumed continuity of operations and a long-term growth estimate.

In order to obtain the market value of equity, the value of non-operating assets is added to the enterprise value of operating activities, if applicable, and net debt is deducted.

### 3.4.2    *Business plan*

#### 3.4.2.1    *Management's 2015-18 business plan*

The business plan, drawn up in summer 2014, covers the period from 2015 to 2018 (the "**explicit forecast period**"). We have adjusted the business plan, substituting it for the first year of forecasts with the 2015 budget[90] presented to the Supervisory Board on 25 February 2015, taking account of adjustments identified by management following the actual results achieved in 2015[91]. Management has confirmed that these results did not call into question the 2016-28 business plan forecasts.

---

[89] EBIT net of tax, adjusted for expenses calculated (depreciation charges) minus the change in the working capital requirement (WCR) and capex.

[90] The 2015 budget was prepared in December 2014.

[91] At 30 April 2015, actual results were ahead of target, mainly as a result of stronger than expected business volumes and the favourable effect on services provided in the United States and the United Kingdom of the development of dollar and sterling exchange rates.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

The business plan, which looks at the Group's different business activities, is underpinned by the following assumptions for the period from 2015-18[92]:

- **Transportation:** organic growth of around 3.0% a year and EBITA margin of around 3.0%;

- **Logistics:** organic growth of around 4.5% a year and EBITA margin of around 5.0%;

- **Air & Sea:** organic growth of around 3.6% a year and EBITA margin of around 2.3%.

After elimination of intra-group flows, the business plan factors in average growth of around 3.8% a year over the explicit forecast period and EBITA margin of around 4.1%. The business plan therefore factors in improvement in profitability relative to the performances of recent years (Section 2.3.1), particularly following the integration of Jacobson.

### 3.4.2.2   *Extrapolation and estimation of terminal value*

We have extrapolated the 2015-2018 business plan over a transitional period of two additional years until 2020 in order to assess the Group's full maturity in its current scope and obtain a normative level of return on invested capital.

Extrapolation of the business plan over the transitional period from 2019-20 and determining the terminal value beyond 2020 were based on the following assumptions:
- a gradual reduction in revenue growth towards **2.0%** in terms of terminal value, in line with long-term inflation forecasts[93] for the main European countries in which the Group operates and the United States;

- EBITDA margin of around **6.9%** of consolidated revenues, based on management's forecasts for the explicit forecast period;

- a level of depreciation charges converging gradually towards an estimated investment level of **2.5%** of revenues in terms of terminal value;

- zero WCR change.

---

[92] Assumptions are presented on a pro forma basis taking account of the full-year impact of the consolidation of Jacobson.

[93] IMF, *"World Economic Outlook"*, April 2015.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

Over the full forecast period from 2015-20 and on a normative basis, we have assumed a company tax rate of **30%**, estimated on the basis of the average tax rate[94] weighted by each country's contribution to consolidated revenues[95].

### 3.4.3   Discount rate

#### 3.4.3.1   Direct method or cost of capital

In the direct approach to calculating the discount rate, we considered that the Group's value was not impacted by its financial structure, as the tax saving realised on interest expenses is offset by implicit or explicit costs relating to use of debt.
The discount rate is therefore determined directly on the basis of the average enterprise value beta[96], estimated at **0.90** for the sample of comparable listed companies (section 3.5.1).

Other information used to determine the discount rate comprises (i) a risk-free rate of 1.1% corresponding to the 12-month average 10-year OAT yield[97] and (ii) a risk premium for the French market estimated at 7.9%[98];

The discount rate is therefore estimated at **8.2%**:

| Discount rate | |
|---|---|
| Cost of capital | |
| Risk-free rate | 1.1% |
| Enterprise value beta | 0.90 |
| Risk premium | 7.9% |
| **Discount rate** | **8.2%** |

---

[94] Company tax rate by country, KPMG, [Online]  http://www.kpmg.com/global/en/services/tax/tax-tools-and-resources/pages/corporate-tax-rates-table.aspx.

[95] Taking account of the full-year impact of the consolidation of Jacobson, the Group generates the majority of its revenues in France, the United Kingdom, the United States and Spain.

[96] Only betas for comparable companies with a dividend yield presenting satisfactory correlation with the benchmark market yield have been used.

[97] Source: *www.banque-france.fr*.

[98] Based on an expected yield for the French market of 9%.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.4.3.2   Indirect method or weighted average cost of capital ("WACC")

For cross-checking purposes, we calculated the discount rate using the indirect weighted average cost of capital approach, which involves determining cost of equity and cost of debt in reference to:

- an average long-term Group gearing[99];

- relevered beta according to the aforementioned gearing;

- an average cost of debt before tax of 4.0%[100]; the impact of taxation on the effective cost of debt has been calculated on the basis of a normative tax rate of 30% for the Group (Section 3.4.2.2) and assuming that 25% of net financial expenses are non-deductible[101].

**Discount rate**

| WACC | |
|---|---|
| Risk-free rate | 1.1% |
| Levered beta | 1.43 |
| Risk premium | 7.9% |
| *Cost of equity* | *12.4%* |
| Cost of debt before tax | 4.0% |
| Normative tax rate | 30.0% |
| Reintegration of net financial expenses | 25.0% |
| *Net cost of debt* | *3.1%* |
| Discount rate | 8.4% |

The analysis conducted tends to show that the Group's value is not affected significantly by its financial structure. To simplify things and avoid prejudging changes in market interest rates, the Group's target financial structure and the market value of the Company's equity, we have favoured the direct approach.

### 3.4.4   Summary of DCF valuation

The tables below show our analysis of the sensitivity of the Group's enterprise value and equity value, as well as the value of the Norbert Dentressangle shares to cross changes in the discount rate and perpetual growth rate to calculate the terminal value:

---

[99] I.e. 76% (source: Bloomberg).

[100] As a reminder, the bond issues carried out by Norbert Dentressangle in December 2013 comprised two tranches paying coupons of 3.8% and 4.0% with respective maturities of six years and seven years.

[101] Pursuant to Article 212 bis of the French General Tax Code.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

**Enterprise Value sensitivity analysis (€m)**

| Normative | | | Discount rate | | |
|---|---|---|---|---|---|
| growth | 7.2% | 7.7% | 8.2% | 8.7% | 9.2% |
| 1.50% | 3,163 | 2,914 | 2,702 | 2,520 | 2,362 |
| 1.75% | 3,278 | 3,009 | 2,782 | 2,588 | 2,420 |
| 2.00% | 3,404 | 3,112 | **2,868** | 2,660 | 2,482 |
| 2.25% | 3,542 | 3,225 | 2,961 | 2,738 | 2,548 |
| 2.50% | 3,695 | 3,348 | 3,062 | 2,823 | 2,619 |

**Equity Value sensitivity analysis (M€)**

| Normative | | | Discount rate | | |
|---|---|---|---|---|---|
| growth | 7.2% | 7.7% | 8.2% | 8.7% | 9.2% |
| 1.50% | 2,001 | 1,752 | 1,540 | 1,358 | 1,199 |
| 1.75% | 2,115 | 1,846 | 1,619 | 1,425 | 1,257 |
| 2.00% | 2,241 | 1,950 | **1,705** | 1,498 | 1,319 |
| 2.25% | 2,380 | 2,062 | 1,799 | 1,576 | 1,385 |
| 2.50% | 2,533 | 2,186 | 1,900 | 1,660 | 1,457 |

**Per share value sensitivity analysis (€)**

| Normative | | | Discount rate | | |
|---|---|---|---|---|---|
| growth | 7.2% | 7.7% | 8.2% | 8.7% | 9.2% |
| 1.50% | €200 | €175 | €154 | €136 | €120 |
| 1,75% | €211 | €185 | €162 | €142 | €126 |
| 2,00% | €224 | €195 | **€170** | €150 | €132 |
| 2,25% | €238 | €206 | €180 | €158 | €138 |
| 2,50% | €253 | €218 | €190 | €166 | €146 |

The central value of the Norbert Dentressangle shares on a diluted basis comes out as **€170** and falls within a range of values of between **€142** and **€206**.

For information, the central value of the shares on an undiluted basis comes out as **€173** and falls within a range of values of between **€145** and **€210**.

### 3.5   Analogical valuation using peer comparisons

In this section, we shall look at the valuation of the Norbert Dentressangle shares in reference to EBITDA and EBITA multiples for a sample of comparable listed companies.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 3.5.1 Scope and composition of our sample

To our knowledge, there are no listed companies that are fully comparable to Norbert Dentressangle presenting strictly identical characteristics in terms of business activity, size, operating margin and regions in which they operate.

Taking into consideration the criteria of business sector, margin and growth prospects, we have put together a broad sample of listed companies operating in Norbert Dentressangle's three business lines of Transportation, Logistics and Freight Forwarding (Air & Sea) and presenting the following 1-month[102] market capitalisations:

**Comparable companies**

| Company | Country | 1 month (€m) |
|---|---|---|
| **Norbert Dentressangle** | **France** | **2,148** |
| C.H. Robinson | United States | 8,447 |
| Landstar System | United States | 2,520 |
| Con-Way | United States | 2,158 |
| STEF | France | 748 |
| ID Logistics | France | 579 |
| Wincanton | United Kingdom | 268 |
| **Average** | | **2,454** |

Information about the performances and profiles of these comparable companies is provided in **appendix 7** and **appendix 8**.

### 3.5.2 Means of calculating EBITDA and EBITA multiples in reference to enterprise value (EV)

We have not used the following multiples:

- revenues, as we do not consider it relevant to value the Group on the basis of the criterion of business volumes alone without taking account of operating profitability;

- net income (PER), which does not take account of differences in financial structure and tax rate.

---

[102] Source: *Bloomberg* (end-May 2015).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

As EBITDA multiples are affected by different financing policies for warehouses and vehicle fleets (asset light[103] vs. asset heavy[104])), these are presented only for information purposes. We favoured looking at EBITA multiples, which limit the impact of these differences[105].

The table below shows multiples for our sample for 2015 and 2016:

**Investment multiples**

| Company | EV/EBITDA | | EV/EBITA | |
|---|---|---|---|---|
| | 2015 | 2016 | 2015 | 2016 |
| C.H. Robinson | 12.0x | 11.1x | 12.8x | 12.0x |
| Landstar System | 10.1x | 9.2x | 11.4x | 10.3x |
| Con-Way | 4.9x | 4.4x | 8.9x | 7.8x |
| STEF | 6.2x | 5.9x | 12.1x | 11.4x |
| ID Logistics | 11.0x | 10.2x | 16.5x | 15.4x |
| Wincanton | 3.8x | 4.0x | 5.1x | 5.1x |
| **Median** | **8.2x** | **7.6x** | **11.7x** | **10.9x** |
| **Average** | **8.0x** | **7.5x** | **11.1x** | **10.3x** |

We determined multiples at end-May 2015 for each comparable company on the basis of (i) 1-month average market capitalisation, minus their net debt less the net value of minority interests and (ii) estimated aggregates taken from analysts' consensus forecasts[106], after any calenderisation of these forecasts.
In order to obtain the maximum value, we have not taken account of a possible size discount that could apply in view of a selection of comparable companies that are on average larger than the Group (Section 3.5.1.).

### 3.5.3   Summary

With the application of median multiples applied to forecast indicators for 2015 and 2016, and minus net debt used for the analogical method (Section 3.1.5.2), the diluted value of the Norbert Dentressangle shares falls within a range of:

- €146 to €171 (EBITA multiples);
- €185 to €199 (EBITDA multiples).

---

[103] Use of operating leases.

[104] Outright ownership or lease financing.

[105] Consolidated EBITA includes rents relating to goods owned on operating lease and depreciation relating to goods owned outright or under finance leases.

[106] Source: Bloomberg (end-May 2015).

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

For information, the central value of the shares on an undiluted basis comes out as €156 and falls within a range of values of:

- €148 to €175 (EBITA multiples);
- €188 to €203 (EBITDA multiples).

## 3.6    Analogical valuation using comparable transactions

In this section, we shall look at the valuation of the Norbert Dentressangle shares in reference to recent transactions in the Group's business sectors. The fragmentary nature of public information about changes in shareholding structures within the transportation sector means that reliable reference parameters are not available.

In order to obtain the maximum value, we have not taken account of the possible restatement of control premiums that could apply to our sample of comparable transactions.

We have used a method similar to that developed in the peer comparison approach (Section 3.5), determining EBITDA and EBITA multiples for transactions that have taken place in the Transportation and Logistics industries since 2011.

The following transactions have been retained:

**Transaction multiples**

| Date | Acquirer | Target | EV/EBITDA | EV / EBITA |
|---|---|---|---|---|
| Jul-14 | Norbert Dentressangle | Jacobson | 9.9x | 17.4x |
| Jul -14 | TransForce | Contrans Group | 6.9x | 11.6x |
| Jul -14 | Singapore Post Ltd | F.S. Mackenzie Ltd | 8.3x | 8.4x |
| May-14 | Suomen        Transval Group | Vindea Oy | n.a. | 12.0x |
| Apr.-14 | Emerge Vest Ltd | NFT Distribution Ltd | 6.2x | 12.4x |
| Jan.-14 | Knight Transportation | Barr-Nunn Transportation | n.a. | 7.5x |
| Nov.-13 | Park Ohio | Henry Halstead | n.a. | 7.1x |
| Nov.-13 | Heartland Express | Gordon        Trucking (GTI) | n.a. | 16.4x |
| Sep.-11 | Imperial Holding | Lehnkering | 6.1x | 9.6x |
| **Median** | | | **6.9x** | **11.6x** |
| **Average** | | | **7.5x** | **11.4x** |

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

With the application of the median multiple applied to the Group's pro forma[107] 2014 aggregates, and minus net debt used for analogical valuation methods (Section 3.1.5.2), the diluted value of the Norbert Dentressangle shares is between €133 and €136.

**Comparable transactions**

| External transactions | xEBITDA | xEBITA |
|---|---|---|
| Median multiple | 6.9x | 11.6x |
| Aggregate amount | 337 | 203 |
| Enterprise value (€m) | 2,326 | 2,350 |
| Net debt (€m) | (991) | (991) |
| *Equity (M€)* | *1,335* | *1,359* |
| Diluted number of shares | 10,003,891 | 1,003,891 |
| **Per share value** | **€133** | **€136** |

For information, the undiluted per share value is between €136 and €138.

## 3.7   Summary of our multi-criteria valuation of the Norbert Dentressangle shares

The Offer price is equivalent to the price offered to acquire the Controlling Interest. Our work highlights the existence of a premium to all other valuation approaches. Below we set out the premium determined on the basis of the central value[108] of the shares estimated using these different methods:

---

[107] Taking account of the impact of Jacobson over 12 months.

[108] The central value shown corresponds to the following for each approach used:

- for the share price approach, to the 1-month weighted average share price;
- for the target price approach, to the median target price;
- for the DCF approach, to the central value obtained from our valuation work;
- for the peer comparison and comparable transaction approaches, to the average of the ranges of values obtained.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*



Due to the limited number of dilutive instruments as a proportion of the Company's share capital, determining the value of the shares on an undiluted basis does not have a material impact on the level of premiums thus presented.

## 4   ANALYSIS OF AGREEMENTS SIGNED WITHIN THE FRAMEWORK OF THE OFFER

We have the following comments to make concerning our review of the agreements signed within the framework of the Offer (Section 1.7). We have received confirmation that no other agreements have been or should be signed within the framework of the Offer.

In respect of the Profit-Sharing Plan:

- the Offeror agrees to purchase the "2013 A" and "2013 B" warrants on the basis of the Offer price minus their exercise price; these instruments, exercisable and transferable as of 21 May 2015 following a decision by the general shareholders' meeting on the same date, are currently strongly in the money as the share price adjusted itself rapidly to around the Offer price after the Transaction was announced on 28 April 2015;

- the performance shares held by European managers will be cancelled and compensated by means of a payment of €217.50 per share. On the basis of the performances achieved in 2013 and 2014 and the latest forecasts for 2015, it can

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

be considered that the performance conditions attached to the April 2013 and April 2014 plans awarded to European managers should be respected;

- the performance shares owned by US managers will be cancelled and compensated by the awarding of restricted stock units of which the underlying instruments are XPO Logistics' shares on the basis of an exchange ratio based on market values, i.e. the Offer price for the Company and the share price for XPO Logistics. The duration of the plan implemented by XPO Logistics will be at least equal to that of the Company plan109 that it is intended to replace.

We have no comments to make on the other agreements signed within the framework of the Offer.

On reviewing of all agreements signed within the framework of the Offer, we have not identified any elements that may affect the objectivity or fairness of the Offer price of €217.50 per share (ex-dividend of €1.80), as well as equality between shareholders.

---

[109] October 2014 plan.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# 5  OBSERVATIONS CONCERNING VALUATION INFORMATION FROM THE SPONSORING BANK

We have reviewed the valuation work performed by Morgan Stanley.

The valuation methods we have used are generally comparable to those used by the sponsoring bank.

A comparison of our valuation work with that carried out by Morgan Stanley gives rise to the following main points.

## 5.1   Valuation of the shares

### 5.1.1   Number of shares on a diluted basis

In our work, we looked at the number of shares and instruments giving access to share capital at 31 May 2015, while the sponsoring bank looked at the same information as at 31 December 2014.

**Diluted number of shares**

|  | Ledouble | Morgan Stanley |
|---|---|---|
| Outstanding shares | 9,836,241 | 9,836,241 |
| Stock warrants | 110,000 | 79,883 |
| Performance shares | 102,097 | 111,463 |
| Treasury stock | (44,447) | (38,578) |
| Total | 10,003,891 | 9,989,009 |

The overall impact[110] of the exercise of the 110,000 warrants at the exercise price of €59.55 was taken into account by the sponsoring bank directly by means of the number of shares, i.e. 79,883.

As part of our work, we deducted the total number of treasury shares including existing shares under the liquidity agreement[111].

In addition, for information purposes we have also shown values on the basis of an undiluted shareholding structure (Section 3.1.3).

---

[110] This includes the inflow of cash following the exercise of warrants and the dilutive impact relating to new shares awarded.

[111] 2014 annual report, p.130, *"Treasury shares, regardless of their destination, are deducted from equity"*.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 5.1.2   Net debt

Morgan Stanley assumed net debt of €1,054m in its intrinsic valuation and its analogical valuation.

We have based our reasoning on net debt of €1,162m in our intrinsic valuation and €991m in our analogical valuation (Section 3.1.5).

### 5.1.3   Intrinsic valuation

The differences in use of the DCF approach compared with the sponsoring bank relate primarily to the estimated discount rate and terminal value. To determine these estimates, the sponsoring bank principally used an exit multiple, while we translated normative cash flows into capital value over an infinite horizon using the Gordon-Shapiro formula.

For information, the undiscounted terminal value we have used corresponds to an implicit exit multiple of 11.2x normative EBITA, in line with the 2015-16 average median EBITA multiple obtained from our sample of comparable companies (Section 3.5.2);

### 5.1.4   Analogical valuation using peer comparisons

Our sample of comparable listed companies is the same as that used by Morgan Stanley with the exception of Knight Transportation Inc. and Heartland Express Inc., and also includes Landstar System and C.H. Robinson.

- Our sample includes US groups Landstar and C.H. Robinson, which are similar to the Group in terms of business activity, growth and margins. By favouring EBITA multiples, we have been able to limit the impact of investment policies (asset light vs. asset heavy);

- Our selection does not include US transportation companies Knight Transportation Inc. and Heartland Express as the differences in margin between these companies and the Group and other companies in our sample reflect disparities in terms of business model. Furthermore, including these companies would have led to the overweighting of companies based in the United States[112] in our sample.

---

[112] Following the acquisition of Jacobson, Norbert Dentressangle generates around 15% of its revenues in the United States.

*Unofficial translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

### 5.1.5  Analogical valuation using comparable transactions

Our sample of transactions includes transactions post-2010. The sponsoring bank also refers to prior transactions.