### 3.5.2   *Modalités de calcul des multiples d'EBITDA et d'EBITA par référence à la valeur d'entreprise (VE)*

Nous avons écarté les multiples :

- de chiffre d'affaires, car il ne nous apparaît pas pertinent de valoriser le Groupe sur le seul critère du volume d'activité sans tenir compte du critère de rentabilité d'exploitation ;

- de résultat net (PER), qui ne tiennent pas compte des écarts de structure financière et de taux d'imposition.

Les multiples d'EBITDA étant affectés par les différences de politique de financement des entrepôts et des parcs de véhicules (*asset light* vs *asset heavy*[85]), ceux-ci ne sont présentés ici qu'à titre d'information ; nous avons ainsi privilégié les multiples d'EBITA qui permettent de limiter l'incidence de ces différences[86].

Les multiples de l'échantillon pour 2015 et 2016 sont présentés ci-après :

| Multiples boursiers | | | | |
|---|---|---|---|---|
| Société | VE/EBITDA | | VE/EBITA | |
|  | 2015 | 2016 | 2015 | 2016 |
| C.H. Robinson | 12,0x | 11,1x | 12,8x | 12,0x |
| Landstar System | 10,1x | 9,2x | 11,4x | 10,3x |
| Con-Way | 4,9x | 4,4x | 8,9x | 7,8x |
| STEF | 6,2x | 5,9x | 12,1x | 11,4x |
| ID Logistics | 11,0x | 10,2x | 16,5x | 15,4x |
| Wincanton | 3,8x | 4,0x | 5,1x | 5,1x |
| **Médiane** | **8,2x** | **7,6x** | **11,7x** | **10,9x** |
| **Moyenne** | **8,0x** | **7,5x** | **11,1x** | **10,3x** |

Nous avons déterminé, à fin mai 2015, les multiples de chacune des sociétés comparables sur la base de (i) la capitalisation boursière moyenne 1 mois des entités, minorée de leur endettement net comptable sous déduction de la valeur nette comptable des intérêts minoritaires et (ii) des estimations d'agrégats issues du consensus d'analystes[87], après calendarisation éventuelle de ces prévisions.

Afin d'extérioriser le maximum de valeur, nous n'avons pas tenu compte d'une éventuelle décote de taille qui pourrait trouver à s'appliquer, au regard d'une sélection de comparables en moyenne plus importants que le Groupe (§ 3.5.1).

---

[85] Recours à la location simple.
[86] Détention en pleine propriété ou financement en crédit-bail.
[87] Par construction, l'EBITA consolidé intègre les loyers relatifs aux biens pris en location simple et les amortissements attachés aux biens détenus en pleine propriété ou financés en crédit-bail.
[88] Source : *Bloomberg*.

- 42 -

### 3.5.3   *Synthèse*

Avec l'application des multiples médians appliqués aux agrégats prévisionnels 2015 et 2016, et sous déduction de l'endettement net retenu pour la méthode analogique (§ 3.1.5.2), la valeur diluée du titre Norbert Dentressangle se situe dans une fourchette de valeurs comprises :

- en multiples d'EBITA, entre 146 € et 171 € ;
- en multiples d'EBITDA, entre 185 € et 199 €.

A titre d'information, la valeur non diluée du titre se situe dans une fourchette de valeurs comprises :

- sur la base des multiples d'EBITA, entre 148 € et 175 € ;
- sur la base des multiples d'EBITDA, entre 188 € et 203 €.

### 3.6   Valorisation analogique par les transactions comparables

Nous développons dans le présent chapitre la valorisation du titre Norbert Dentressangle par référence aux transactions récentes intervenues dans les secteurs d'activité du Groupe. Le caractère parcellaire des informations publiques sur les mouvements capitalistiques dans le secteur du transport ne permet pas de disposer de paramètres de référence fiables.

Afin d'extérioriser le maximum de valeur, nous n'avons pas tenu compte d'un éventuel retraitement des primes de contrôle qui pourrait trouver à s'appliquer à notre échantillon de transactions comparables.

Nous avons appliqué une méthode similaire à celle développée dans l'évaluation par les multiples boursiers (§ 3.5) en déterminant les multiples d'EBITDA et d'EBITA extériorisés par des transactions intervenues dans l'industrie du Transport et de la Logistique depuis 2011.

- 43 -

Les transactions retenues sont les suivantes :

| Multiples transactionnels | | | | |
|---|---|---|---|---|
| Date | Acquéreur | Cible | VE / EBITDA | VE / EBITA |
| juil.-14 | Norbert Dentressangle | Jacobson | 9,9x | 17,4x |
| juil.-14 | TransForce | Contrans Group | 6,9x | 11,6x |
| juil.-14 | Singapore Post Ltd | F.S. Mackenzie Ltd | 8,3x | 8,4x |
| mai-14 | Suomen Transval Group | Vindea Oy | nc | 12,0x |
| avr.-14 | Emerge Vest Ltd | NFT Distribution Ltd | 6,2x | 12,4x |
| janv.-14 | Knight Transportation | Barr-Nunn Transportation | nc | 7,5x |
| nov.-13 | Park Ohio | Henry Halstead | nc | 7,1x |
| nov.-13 | Heartland Express | Gordon Trucking (GTI) | nc | 16,4x |
| sept.-11 | Imperial Holding | Lehnkering | 6,1x | 9,6x |
| **Médiane** | | | **6,9x** | **11,6x** |
| **Moyenne** | | | **7,5x** | **11,4x** |

Avec l'application du multiple médian appliqué aux agrégats 2014 *pro forma*[98] du Groupe, et sous déduction de l'endettement net retenu pour les méthodes d'évaluation analogique (§ 3.1.5.2), la valeur diluée du titre Norbert Dentressangle se situe entre 133 € et 136 €.

| Comparables transactionnels | | |
|---|---|---|
| | xEBITDA | xEBITA |
| Multiple médian | 6,9x | 11,6x |
| Agrégat | 337 | 203 |
| Valeur d'entreprise (M€) | 2 326 | 2 350 |
| Endettement net (M€) | (991) | (991) |
| *Fonds propres (M€)* | *1 335* | *1 359* |
| Nombre d'actions dilué | 10 003 891 | 10 003 891 |
| Valeur par action | 133 € | 136 € |

A titre d'information, la valeur non diluée de l'action se situe entre 136 € et 138 €.

---

[98] Prise en compte de l'impact de Jacobson sur 12 mois.

- 44 -

3.7   Synthèse de la valorisation multicritères du titre Norbert Dentressangle

Le prix de l'Offre est équivalent au prix offert pour l'acquisition du Bloc de Contrôle.
Nos travaux mettent en avant l'existence d'une prime sur l'ensemble des autres
approches d'évaluation ; nous présentons ci-après la prime déterminée à partir de la
valeur centrale[*] du titre estimée selon ces différentes méthodes :



En raison du nombre restreint d'instruments dilutifs en proportion du capital social
de la Société, la détermination de la valeur du titre sur une base non diluée n'a pas
d'incidence significative sur le niveau des primes ainsi présentées.

[*] La valeur centrale présentée correspond pour l'approche :
- du cours de bourse, au cours moyen pondéré 1 mois ;
- des objectifs de cours, au cours cible médian ;
- DCF, à la valeur centrale issue de nos travaux ;
- des comparables boursiers et transactionnels, à la moyenne des fourchettes de valeurs obtenues.

- 45 -

## 4   ANALYSE DES ACCORDS CONCLUS DANS LE CADRE DE L'OFFRE

L'examen des accords conclus dans le cadre de l'Offre (§ 1.7) appelle de notre part les commentaires suivants ; il nous a été confirmé qu'aucun autre accord n'avait été ou ne serait conclu dans le cadre de l'Offre.

Au titre du Plan d'Intéressement :

- l'Initiateur s'engage à racheter les « BSA 2013 A » et « BSA 2013 B » sur la base du prix d'Offre minoré de leur prix d'exercice ; ces instruments, rendus exerçables et cessibles dès le 21 mai 2015 suite à une décision de l'assemblée générale des actionnaires à cette même date, sont actuellement fortement dans la monnaie, le cours de bourse de la Société s'étant ajusté rapidement après l'annonce de l'Opération du 28 avril 2015 aux alentours du prix d'Offre ;

- les actions de performance détenues par les *managers* européens seront annulées et compensées par le versement d'une somme de 217,50 € par action ; les réalisations historiques 2013 et 2014 et les dernières prévisions 2015 permettent de considérer que les conditions de performance des plans d'avril 2013 et d'avril 2014 attribués aux *managers* européens devraient être respectées ;

- les actions de performance détenues par les *managers* américains seront annulées et compensées par l'attribution d'instruments d'intéressement (*restricted stock units*) ayant pour sous-jacent l'action XPO Logistics, sur la base d'un rapport d'échange fondé sur des valeurs de marché, soit le prix d'Offre pour la Société et le cours de bourse pour XPO Logistics ; le plan mis en place par XPO Logistics aura une durée au moins égale à celle du plan de la Société[30] qu'il est amené à remplacer.

Les autres accords conclus dans le cadre de l'Offre n'appellent pas de commentaires de notre part.

Nous n'avons pas identifié, à l'examen de l'ensemble des accords conclus dans le cadre de l'Offre, d'élément de nature à porter atteinte à l'objectivité ou à l'équité du prix d'Offre de 217,50 € par action (coupon de 1,80 € détaché), ainsi qu'à l'égalité entre actionnaires.

---

[30] Plan d'octobre 2014.

## 5 OBSERVATIONS SUR LES ÉLÉMENTS DE VALORISATION DE L'ÉTABLISSEMENT PRÉSENTATEUR

Nous avons examiné la restitution des travaux d'évaluation du titre réalisés par Morgan Stanley.

Les méthodes d'évaluation que nous avons employées sont globalement comparables à celles auxquelles a eu recours l'établissement présentateur.

Il ressort de la comparaison de nos travaux de valorisation avec ceux effectués par Morgan Stanley les principaux points suivants.

### 5.1 Valorisation de l'action

#### 5.1.1 Nombre d'actions sur base diluée

Dans nos travaux, nous nous sommes appuyés sur le nombre d'actions et d'instruments donnant accès au capital au 31 mai 2015, l'établissement présentateur ayant retenu ces éléments en date du 31 décembre 2014.

| Nombre d'actions dilué | Ledouble | Morgan Stanley |
|---|---|---|
| Actions en circulation | 9 836 241 | 9 836 241 |
| Bons de souscription d'actions | 110 000 | 79 883 |
| Actions de performance | 102 097 | 111 463 |
| Actions propres | (44 447) | (38 578) |
| **Total** | **10 003 891** | **9 989 009** |

L'impact global[101] de l'exercice des 110.000 BSA au prix d'exercice de 59,55 € est pris en compte par l'établissement présentateur directement via le nombre d'actions, soit 79.883.

Dans le cadre de nos travaux, nous avons déduit le nombre total des actions d'autocontrôle en ce y compris les actions existantes au titre du contrat de liquidité[102].

Par ailleurs, nous avons présenté également, à titre d'information, les valeurs sur la base d'une structure de capital non diluée (§ 3.1.3).

---

[101] Celui-ci comprend l'entrée de trésorerie suite à l'exercice des BSA et l'impact dilutif lié aux actions nouvelles attribuées.
[102] DDR 2014, p.130, « Les actions propres, quelle que soit leur destination, sont imputées sur les capitaux propres ».

- 47 -

### 5.1.2  Endettement net

Morgan Stanley a retenu un endettement net de 1.054 M€ en valorisation intrinsèque et en valorisation analogique.

Nous raisonnons sur un endettement net de 1.162 M€ en valorisation intrinsèque et de 991 M€ en valorisation analogique (§ 3.1.5).

### 5.1.3  Valorisation intrinsèque

Les différences de mise en œuvre de l'approche DCF avec l'établissement présentateur portent essentiellement sur l'estimation du taux d'actualisation et de la valeur terminale. Pour déterminer celle-ci, l'établissement présentateur retient à titre principal un multiple de sortie ; nous avons capitalisé pour notre part le flux normatif sur un horizon infini à l'aide de la formule de Gordon Shapiro.

A titre d'information, la valeur terminale non actualisée que nous retenons correspond à un multiple implicite de sortie de 11,2x l'EBITA normatif, en ligne avec la moyenne 2015-2016 des multiples médians d'EBITA issus de notre échantillon de sociétés comparables (§ 3.5.2).

### 5.1.4  Valorisation analogique par les multiples boursiers

Notre panel de comparables boursiers englobe celui de Morgan Stanley à l'exception de Knight Transportation Inc. et de Heartland Express Inc. tout en intégrant Landstar System et C.H. Robinson.

- nous avons retenu dans notre échantillon les groupes américains Landstar et C.H. Robinson, qui se rapprochent du Groupe en termes d'activité, de croissance et de taux de marge ; privilégier les multiples d'EBITA nous permet de limiter l'incidence des politiques d'investissement (*asset light vs asset heavy*) ;

- nous avons écarté de notre sélection les transporteurs américains Knight Transportation Inc. et Heartland Express car les écarts de marge constatés entre ces sociétés et le Groupe ainsi que les autres sociétés de notre panel de comparables, traduisent des disparités en termes de modèle économique ; par ailleurs les retenir aurait conduit à surpondérer dans notre échantillon les sociétés implantées aux Etats-Unis[10].

---

[10] Après l'acquisition de Jacobson, Norbert Dentressangle réalise environ 15 % de son chiffre d'affaires aux Etats-Unis.

- 48 -

### 5.1.5 Valorisation analogique par les transactions comparables

Notre panel de transactions intègre des transactions postérieures à 2010 ; l'établissement présentateur se réfère également à des opérations antérieures.

### 5.2 Synthèse sur la valorisation du titre Norbert Dentressangle

La comparaison chiffrée de nos travaux avec ceux de l'établissement présentateur est présentée ci-après :

| Synthèse | Ledouble | | Morgan Stanley | |
|---|---|---|---|---|
| | Valeur centrale | Prime (%) | Valeur centrale | Prime (%) |
| **Acquisition du Bloc de Contrôle** | | | | |
| Prix du Bloc de Contrôle | 219 € | - | 219 € | - |
| **Cours de bourse** | | | | |
| Spot - 28 avril 2015 | 159 € | 37,8% | 159 € | 37,8% |
| Moyenne pondérée 1 mois | 155 € | 41,1% | 155 € | 41,1% |
| Moyenne pondérée 3 mois | 149 € | 47,3% | 149 € | 47,3% |
| Moyenne pondérée 6 mois | 135 € | 62,2% | 135 € | 62,2% |
| Moyenne pondérée 12 mois | 122 € | 79,4% | 122 € | 79,4% |
| **Objectifs de cours** | | | | |
| Cours cible | 174 € | 26,4% | 174 € | 26,4% |
| **Approche DCF** | | | | |
| DCF | 170 € | 28,6% | 192 € | 14,2% |
| **Multiples boursiers** | | | | |
| VE/EBITA - 2015 | 171 € | 27,9% | 170 € | 29,1% |
| VE/EBITA - 2016 | 146 € | 50,5% | 137 € | 59,9% |
| VE/EBITDA - 2015 | 199 € | 10,2% | 139 € | 58,1% |
| VE/EBITDA - 2016 | 185 € | 18,8% | 129 € | 69,4% |
| PER - 2015 | nc | nc | 202 € | 8,5% |
| PER - 2016 | nc | nc | 189 € | 16,0% |
| **Multiples transactionnels** | | | | |
| Transactions OPA en France | nc | nc | 195 € | 12,7% |
| Transactions comparables | 135 € | 62,9% | 138 € | 59,2% |

# 6  CONCLUSION

A l'issue de nos travaux de valorisation du titre Norbert Dentressangle, nous constatons que le prix d'Offre extériorise une prime sur l'ensemble des critères d'évaluation.

Les accords conclus dans le cadre de l'Offre sont sans incidence sur notre appréciation de l'équité du prix d'Offre.

Nous sommes d'avis que le prix proposé de 217,50 € (coupon de 1,80 € détaché) est équitable d'un point de vue financier pour les actionnaires de Norbert Dentressangle dans la perspective de mise en œuvre d'un retrait obligatoire.

Fait à Paris, le 10 juin 2015

LEDOUBLE SAS

Olivier CRETTE                              Sébastien SANCHO

- 50 -

## ANNEXES

- Programme de travail détaillé et rémunération de l'expert          Annexe 1

- Principales étapes de l'expertise          Annexe 2

- Liste de personnes rencontrées et/ou contactées par l'expert          Annexe 3

- Principales sources d'information exploitées          Annexe 4

- Composition de l'équipe Ledouble          Annexe 5

- Liste des expertises et analyses financières réalisées par Ledouble  Annexe 6

- Performances prévisionnelles des comparables boursiers          Annexe 7

- Présentation de l'activité des comparables          Annexe 8

<u>Annexe 1</u> : Programme de travail détaillé et rémunération de l'expert

**1. Travaux préliminaires et prise de connaissance**

- Revue de presse et recherches documentaires

- Analyse de l'Opération et de son cadre juridique

- Etude de l'évolution historique du titre de la Société et des objectifs de cours

- Entretiens avec les représentants de la Société et de l'Initiateur, de l'établissement présentateur, ainsi que leurs conseils respectifs

**2. Travaux de valorisation**

- Revue des résultats historiques, de la structure financière et des événements marquants de la Société

- Constitution d'un panel de comparables boursiers et transactionnels

- Requêtes documentaires

- Recherches d'informations sectorielles et financières dans les bases de données

- Evaluation multicritères du titre de la Société

**3. Rapport d'expertise indépendante**

- Réunions et entretiens téléphoniques

- Rédaction d'une lettre de mission

- Rédaction d'une proposition de lettre d'affirmation à l'attention des représentants de la Société et de l'Initiateur

- Rédaction du rapport

- Administration et supervision de la mission

**4. Rémunération**

Le montant global des honoraires aux termes de la lettre de mission de Ledouble en date du 7 mai 2015 s'établit entre 260.000 € et 280.000 € (hors taxes et débours), en fonction du temps passé.

- 52 -

**Annexe 2 : Principales étapes de l'expertise**

⇒ **Semaine du 27 avril au 3 mai 2015**

- Contacts préalables
- Désignation de l'expert indépendant par le Conseil de surveillance de la Société
- Exploitation des informations publiques disponibles sur le site de la Société
- Examen des informations de la *data room* mises à disposition de l'Initiateur dans le cadre de ses diligences
- Étude de la documentation juridique relative à l'Offre

⇒ **Semaine du 4 mai au 10 mai 2015**

- Proposition de lettre de mission
- Requêtes documentaires
- Contacts, réunions et entretiens avec l'établissement présentateur et les Conseils
- Analyse de l'évolution du cours de bourse de la Société
- Recherches d'informations sectorielles et financières dans les bases de données
- Constitution d'un panel de comparables boursiers et transactionnels

⇒ **Semaine du 11 mai au 17 mai 2015**

- Exploitation des informations recueillies comprenant le plan d'affaires et mise en œuvre d'une évaluation multicritères
- Requêtes documentaires complémentaires
- Examen de la documentation juridique relative aux opérations d'apports préalables à l'Offre et entretiens avec le commissaire aux apports
- Rédaction de la trame du rapport d'expertise indépendante

⇒ **Semaine du 18 mai au 24 mai 2015**

- Entretiens avec les représentants de la Société
- Exploitation des informations reçues au titre de nos demandes d'informations complémentaires
- Examen du rapport du commissaire aux apports
- Exploitation du projet de note d'information de l'Initiateur
- Entretiens avec les Conseils

⇒ **Semaine du 25 au 31 mai 2015**

- Entretiens avec les représentants de l'Initiateur
- Contacts et entretiens avec les représentants de la Société et les Conseils
- Demandes d'informations complémentaires
- Finalisation des travaux d'évaluation
- Rédaction du rapport d'expertise indépendante

⇒ **Semaine du 1ᵉʳ au 7 juin 2015**

- Propositions de lettres d'affirmation
- Exploitation du projet de note d'information en réponse de la Société
- Levée des points en suspens
- Transmission du projet de rapport d'expertise indépendante

⇒ **Semaine du 8 au 14 juin 2015**

- Présentation du projet de rapport d'expertise indépendante
- Délivrance de l'attestation d'équité en vue du Conseil de Surveillance de la Société et du dépôt de la note d'information en réponse auprès de l'AMF

**Annexe 3** : Liste des principales personnes rencontrées et/ou contactées par l'expert

### 1)   SOCIETE

| | |
|---|---|
| Jean-Luc Poumarède | Membre du Conseil de surveillance, Président de la Commission d'Audit |
| Vincent Menez | Membre du Conseil de surveillance, Membre de la Commission d'Audit |
| Patrick Bataillard | Membre du Directoire, Directeur Financier Groupe |
| Gaultier de la Rochebrochard | Directeur juridique Groupe |
| Cyril Trossat | Directeur de la consolidation |

### 2)   GROUPE XPO

| | |
|---|---|
| Gordon Devens | *Senior Vice President and General Counsel* |
| John Hardig | *Chief Financial Officer* |

### 3)   ETABLISSEMENT PRESENTATEUR

| | |
|---|---|
| Alban de La Sablière | *Managing Director* |
| Marie-Charlotte Etienne | *Executive Director* |
| Jean Dorcier | *Analyst* |

### 4)   CONSEILS

**Rothschild**

| | |
|---|---|
| Cyril de Mont-Marin | Associé gerant |
| Pierre-Henri Chappaz | *Managing Director* |
| Pierre Boscher | *Assistant Director* |
| Oussama Lemsyeh | *Analyst* |

**JP Morgan**

| | |
|---|---|
| Edouard Debost | *Managing Director* |
| Olivier Simon | *Executive Director* |
| Benoit Hourdain | *Associate* |

**Bredin Prat**

| | |
|---|---|
| Olivier Assant | Avocat à la Cour |
| Karine Angel | Avocat à la Cour |
| Bena Mara | Avocat à la Cour |

**Darroy Villey Maillot Brochier**

| | |
|---|---|
| Olivier Huygues Despointes | Avocat associé |

5)   *COMMISSAIRE AUX APPORTS*

| | |
|---|---|
| Sylvain Mary | Commissaire aux apports |

- 56 -

<u>Annexe 4 : Principales sources d'information exploitées</u>

**Documentation relative à l'Opération**
- Projet de note d'information relative à l'Offre visant les actions de la Société initiée par XPO présentée par Morgan Stanley
- Note d'information en réponse de la Société relative à l'Offre visant les actions de la Société initiée par XPO
- Communication publique de l'Offre en date du 28 avril 2015
- Procès-verbal du Conseil de surveillance du 27 avril 2015 rappelant l'accueil favorable fait au projet d'Offre par le Conseil de surveillance et autorisant le Président du Directoire à conclure le TOA
- SPA conclu le 28 avril 2015 entre M. Norbert Dentressangle, Mme Evelyne Dentressangle, M. Pierre Henri Dentressangle, Mme Marine Denstressangle et XPO Logistics.
- TOA conclu le 28 avril 2015 entre la Société et XPO Logistics.
- Plan d'Intéressement conclu entre XPO Logistics et l'ensemble des membres du Directoire et annexé au TOA
- Projet de traité d'apport du 15 mai 2015 entre M. Norbert Dentressangle, Mme Evelyne Dentressangle et DI SAS
- Projet de rapport d'évaluation initial de Morgan Stanley et mises à jour ultérieures

**Documentation juridique de la Société**
- Procès-verbaux du Directoire de 2013, 2014 et 2015
- Procès-verbaux du Conseil de Surveillance de 2013, 2014 et 2015
- Projet de texte des résolutions proposées aux Assemblées générales 2013, 2014 et 2015
- Nombre total d'actions et de droits de vote composant le capital social de la Société au 31 mai 2015
- Nombre de bons de souscription d'actions en circulation au 31 mai 2015
- Nombre d'actions de performance au 31 mai 2015

**Documentation comptable et financière de la Société**

- Documents de référence[104]

- Communiqué de presse présentant l'Opération[105]

- Présentation des résultats 2014[106]

- Tests d'*impairment* au 31 décembre 2014

- Présentation du budget 2015[107]

- Plan d'affaires 2015-2018

- Présentation des résultats au 31 mars 2015[108] et au 30 avril 2015

- Notes de brokers les plus récentes[109]


**Documentation de l'Initiateur**

- Documents de référence[110]

- Communiqué de presse présentant l'Opération[111]

- *Conference call* présentant l'Opération[112]

- Notes de brokers[113]


**Documentation sectorielle**

- Xerfi, « Le *freight forwarding* », août 2014.

- Xerfi, « Le transport routier de marchandises », février 2014

- Xerfi, « L'entreposage frigorifique et non frigorifique », février 2014

- Xerfi, "*Logistics Groups – World, Market Analysis – 2014-2019 Trends*", août 2014

---

[104] http://www.norbert-dentressangle.com/fr/Investisseurs.
[105] http://www.norbert-dentressangle.com/fr/Presse/Actualites.
[106] http://www.norbert-dentressangle.com/fr/Investisseurs/Informations-Financieres.
[107] « Book budget 2015 – Group Finance ».
[108] Document de la Société intitulé « Commission d'audit – le 19 mai 2015 ».
[109] ThomsonOne, notes communiquées par la Société et son conseil financier.
[110] http://investors.xpologistics.com/phoenix.zhtml?c=204615&p=irol-reportsannual.
[111] http://investors.xpologistics.com.
[112] http://investors.xpologistics.com/phoenix.zhtml?c=204615&p=irol-newsArticle&ID=2041131 ; "*XPO Logistics will hold a conference call to discuss the proposed transaction on Wednesday, April 29, 2015*".
[113] ThomsonOne.

- 58 -

**Bases de données**

- *Bloomberg*
- *ThomsonOne*
- *Infinancials*
- *Xerfi*

**Informations en ligne[114]**

- Revue de presse (Factiva, La Tribune, La Dépêche, Le Monde, Les Echos, *The Financial Times, Marketwatch.com*)
- Site d'information de la Société : http://www.norbert-dentressangle.com/fr/
- Site d'information de XPO Logistics : http://www.xpologistics.com/
- Site d'information de l'AMF : http://www.amf-france.org/
- Site d'information de la Banque de France : www.banque-france.fr.
- Damodaran, « *Transportation* », janvier 2015: http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/Betas.html
- KPMG, « Q3 2014 *Transportation and logistics M&A update* »: https://www.kpmg.com/NL/nl/IssuesAndInsights/ArticlesPublications/Documents/PDF/Transactions-Restructuring/MA-TL-Sector-update-Q3-2014.pdf.
- FMI, "*World Economic Outlook*", avril 2015: http://www.imf.org/external/pubs/ft/weo/2015/01/pdf/text.pdf

---

[114] Liens Web au 8 juin 2015.

<u>Annexe 5</u> : Composition de l'équipe Ledouble

Ledouble est un cabinet spécialisé dans l'expertise financière. A ce titre, il a réalisé de nombreuses missions d'expertise indépendante, notamment dans le cadre d'offres publiques. Les principales missions d'expertise et d'analyses financières indépendantes effectuées dans ce domaine de 2008 à 2015 figurent en annexe 6. Ledouble est membre fondateur de l'Association Professionnelle des Experts Indépendants (APEI), association professionnelle agréée par l'AMF en application de l'article 263-1 de son règlement général, de la Société Française des Évaluateurs (SFEV), et suit les règles déontologiques décrites sur son site Internet : http://www.ledouble.fr.

**Olivier CRETTÉ, Associé**
- Expert-comptable et commissaire aux comptes, EM Lyon, docteur en sciences de gestion
- Membre du Comité directeur de l'APEI
- Membre de la SFEV
- Membre de la Commission Evaluation de l'association des Directeurs Financiers et Contrôleurs de Gestion (DFCG)
- Membre de la Commission des Normes Professionnelles de la Compagnie Nationale des Commissaires aux Comptes (CNCC)
- Conduit régulièrement des missions d'expertise indépendante et d'évaluation
- Professeur associé au Conservatoire National des Arts et Metiers (CNAM), chargé de cours à l'Institut d'Administration des Entreprises (IAE) de Paris et à l'Université Paris IX – Dauphine

**Sébastien SANCHO, Associé**
- Expert-comptable et commissaire aux comptes, Master 225 « Finance d'entreprise et d'ingénierie financière » de l'Université Paris IX – Dauphine, MSTCF Paris IX – Dauphine, certifié « Islamic Qualification »
- Membre de la SFEV
- Membre de la Commission Evaluation de l'association nationale des Directeurs Financiers et de Contrôle de Gestion (DFCG)
- Conduit régulièrement des missions d'expertise indépendante et d'évaluation

**Romain DELAFONT, Responsable de mission**

- Master 225 « Finance d'entreprise et d'ingénierie financière » de l'Université Paris IX – Dauphine

- Diplôme Supérieur de Comptabilité et de Gestion

- Membre de la SFEV

- Intervient régulièrement dans des missions d'expertise indépendante et d'évaluation

**Edouard HAYOT, Analyste**

- Neoma Business School

- Intervient régulièrement dans des missions d'expertise indépendante et d'évaluation

**Dominique LEDOUBLE, en charge de la revue indépendante**

*Dominique Ledouble n'a pas pris part directement aux travaux diligentés dans le cadre de l'expertise indépendante ; il est intervenu au titre de contrôleur qualité interne au sein de Ledouble conformément à l'article 2 de l'instruction AMF 2006-08.*

- HEC, expert-comptable et commissaire aux comptes, docteur en droit

- Président de la Fédération Française des Experts en Evaluation (FFEE)

- Fondateur et Président d'honneur de l'APEI

- Membre de la SFEV

- Intervient régulièrement dans des missions d'expertise indépendante et d'évaluation

- Chargé de cours à Sciences-Po

**Annexe 6** : Liste des expertises et analyses financières réalisées par Ledouble

| Année | Société | Etablissement présentateur |
|---|---|---|
| 2015 | Euro Disney SCA | BNP Paribas |
| 2014 | Euro Disney SCA | [113] |
| 2014 | Siic de Paris | Natixis |
| 2014 | Bull | Rothschild |
| 2013 | Global Graphics | . |
| 2013 | Sam | Société Générale |
| 2013 | Etam | Natixis |
| 2013 | Tesfran | Oddo Corporate Finance |
| 2013 | Monceau Fleurs | Omega Capital Market |
| 2013 | Sical | Arkeon Finance |
| 2013 | Auto Escape | Portzampare |
| 2013 | Klemurs | Morgan Stanley |
| 2013 | Foncière Sépric | Crédit Agricole CIB |
| 2013 | Elixens | Banque Palatine |
| 2012 | Orchestra Kazibao | Arkeon Finance |
| 2012 | Leguide.com | Natixis |
| 2011 | Xiring | Oddo Corporate Finance |
| 2011 | Maurel et Prom Nigeria | . |
| 2011 | Eurosic | BNP Paribas, CM CIC Securities, CACIB, Natixis |
| 2011 | Metrologic | HSBC |
| 2011 | Merci Plus | Oddo Corporate Finance |
| 2010 | Stallergenes | Deutsche Bank |
| 2010 | Initiative et Finance | Rothschild |
| 2010 | Sperian Protection | BNP Paribas |
| 2010 | Sodifrance | Portzampare |
| 2010 | Radiall | Oddo Corporate Finance |
| 2009 | Foncière Développement Logement | Société Générale et Calyon |
| 2009 | L'Inventoriste | Dexia Securities France |
| 2009 | GiFi | Société Générale |
| 2009 | Homair Vacances | Arkeon Finance |
| 2008 | Keyrus | Calyon |
| 2008 | Réponse SA | Rothschild Transaction R |
| 2008 | SASA | Oddo Corporate Finance |
| 2008 | Sodexo | Lazard |
| 2008 | Alain Afflelou | Lazard |
| 2008 | Cedip | Oddo Corporate Finance |

---

[113] Augmentations de capital réservées (article 261-2 du règlement général de l'AMF).

- 62 -

<u>Annexe 7</u> : Performances prévisionnelles des comparables boursiers

| Comparables boursiers | | % croissance du CA | | | EBITDA (% CA) | | | EBITA (% CA) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Société | Référence annexe 8 | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 |
| C.H. Robinson | §8.1 | 6% | 7% | 6% | 6% | 6% | 6% | 6% | 6% | 6% |
| Landstar System | §8.2 | 6% | 7% | 8% | 8% | 8% | 8% | 7% | 7% | 8% |
| Con-Way | §8.3 | 2% | 6% | 5% | 9% | 10% | 10% | 5% | 6% | 6% |
| STEF | §8.4 | 3% | 3% | 3% | 7% | 7% | 8% | 4% | 4% | nc |
| ID Logistics | §8.5 | 8% | 8% | 6% | 7% | 7% | 7% | 5% | 5% | 5% |
| Wincanton | §8.6 | 1% | 2% | 2% | 6% | 6% | 6% | 5% | 4% | 6% |
| Médiane | | 4% | 7% | 6% | 7% | 7% | 8% | 5% | 5% | 6% |
| Moyenne | | 4% | 6% | 5% | 7% | 7% | 8% | 5% | 5% | 6% |

- 63 -

<u>Annexe 8</u> : Présentation de l'activité des comparables[116]

| 8.1 | C.H. Robinson |
|---|---|

Groupe américain spécialisé dans les services de transport et de logistique.

C.H. Robinson est structuré en trois divisions :

- la division « *Transportation* » regroupe des activités de transport (routier, international, fret) et de logistique ;
- la division « *Sourcing* » correspond à l'achat et la vente de denrées périssables ;
- l'activité « *Payment Services* », qui reste très marginale, tire ses revenus des avances de paiement octroyées à ses clients.

Le groupe exploite un réseau de près de 280 bureaux répartis en Amérique du Nord, en Europe, en Asie et en Amérique du Sud.





---

[116] Dans l'ordre de présentation de l'annexe 7.

- 64 -

| 8.2 | Landstar System |
|---|---|

Groupe américain spécialisé dans les services de transport et de logistique.

Landstar est structuré en deux divisions :

- la division « *Transportation / Logistics* » englobe les services de transport (essentiellement routier) et de logistique ;
- la division « *Insurance* » propose des services de gestion des risques à ses clients.

Le groupe opère essentiellement sur le marché nord-américain. Au 31 décembre 2014, il exploitait 8.953 semi-remorques dont 852 sous contrat de crédit-bail et 3.927 fournis par des indépendants.



- 65 -

| 8.3 | Con-Way |
|---|---|

Groupe américain spécialisé dans les services de transport et de logistique.

Con-Way est structuré en trois divisions :

- l'activité fret à travers sa filiale « *Con-way freight* » fournit des services régionaux et internationaux essentiellement en Amérique du Nord ;
- l'activité logistique à travers sa filiale « *Menlo Worldwide Logistic* » ; en 2014, le groupe exploitait 78 entrepôts en Amérique du Nord et 81 hors Amérique du Nord ;
- le transport routier ou « *Truckload* » avec une flotte de 7 800 semi-remorques et 2 600 tracteurs.

Con-Way est présent dans plus de 500 sites en Amérique du Nord ainsi que dans 20 autres pays répartis sur les 5 continents. Con-Way détient en propre 146 centres sur les 297 centres exploités.



| 8.4    STEF |
| --- |

Groupe français et acteur de premier ordre en Europe, STEF est le *leader* européen du transport et de la logistique de produits alimentaires frais et surgelés. Son activité est segmentée comme suit :

- le « Transport France » assure le transport routier de denrées périssables alimentaires (produits carnés, laitiers, boissons,...) et de produits pharmaceutiques et cosmétiques ;
- le pôle « International » regroupe les activités de transport et de logistique à l'étranger ;
- le pôle « Logistique » avec un patrimoine de 225 entrepôts et plateformes pour un volume global d'entreposage de 6.767.000 m³ ;
- le pôle « Maritime » assure le transport maritime de passagers et de fret entre le port de Marseille et les ports de Corse.
- les autres activités regroupent deux pôles d'expertise : Pôle Systèmes d'Information (informatique client, informatique gestion,...) et Pôle Immobilier (gérant le patrimoine immobilier du groupe).

Les principaux marchés clients du groupe sont l'agroalimentaire, la grande distribution, l'industrie pharmaceutique et cosmétique, les producteurs de fleurs.

Le groupe privilégie une politique de détention de ses actifs immobiliers.





| 8.5 | ID Logistics |
|---|---|

Groupe français « *Pure Player* » de la logistique contractuelle, ID Logistic est devenu l'un des *leaders* du secteur e-commerce en France et en Europe.

Le groupe a deux activités principales :

- la logistique, qui représente l'essentiel de son activité, consiste en l'entreposage, la préparation de commandes mais aussi en des solutions de *freight forwarding* et de transport avec sa filiale La Flèche ;
- la gestion de la *supply chain* (activité transversale) correspond au pilotage de la *supply chain*, la gestion des flux en amont et aval, et au suivi d'indicateurs.

Le groupe réalise la majeure partie de son chiffre d'affaires avec des enseignes de distribution (Carrefour, Auchan, Fnac) en France et en Europe. Il est aussi présent en Chine, au Brésil et en Indonésie. A fin 2014, le groupe exploitait 184 entrepôts dans le monde pour une surface de 3,6 millions de mètres carrés.





| 8.6 | Wincanton |
|---|---|

Groupe anglais spécialisé dans les services de logistique et de transport, Wincanton intervient essentiellement au Royaume-Uni à travers plus de 200 sites et exploite près de 13 millions de mètres carrés d'espace d'entreposage et près de 3.600 véhicules utilitaires.

L'activité du groupe se décompose en deux pôles :

- « the *contract logistics* » (85% du chiffre d'affaires en 2014) consistant en des offres de services tels que le transport routier, l'entreposage, et la livraison ;
- « the *specialist business* » consistant en des offres de transport en conteneurs, de fret et de maintenance (via notamment Pullman et Wincanton Records Management).

 

## IX.   AVIS DU COMITE DE GROUPE DE NORBERT DENTRESSANGLE

### *Réunion de Comité de groupe extraordinaire du 28 mai 2015*

*Les membres du comité de groupe Norbert Dentressangle réuni ce jour en réunion extraordinaire en vue de sa consultation au titre d'une Offre publique d'Achat portant sur la société Norbert Dentressangle SA, ont :*

- *Procédé à l'audition du rapport de l'expert mandaté le 4 mai 2015 dans le cadre de l'article L.2323-21 du Code de Travail ;*
- *Entendu les informations et explications apportées par la Direction de Norbert Dentressangle et par Gordon Devens, représentant de XPO Logistics, auteur de l'Offre ;*
- *Après en avoir débattu, décidé de rendre leur avis sur le projet d'Offre soumis à leur consultation.*

*A l'issue du vote, le comité de groupe Norbert Dentressangle à rendu l'avis suivant à la majorité de ses membres présents :*

*Compte tenu d'un montage financier permanent à ce jour non bouclé, de la logique de l'investisseur et de sa stratégie de faire monter l'action pour une revente à moyen terme.*

*Compte tenu d'un refus de réponse positive à l'ensemble des demandes d'engagement du Comité de Groupe.*

*Les membres du Comité de Groupe CFDT, CGT, FO, UNSA, FNCR rendent un avis défavorable au rachat de ND par XPO.*

*Compte tenu des incertitudes persistantes sur les perspectives détaillées découlant du rachat de ND par XPO logistique, les membres du Comité de groupe CFTC et les membres candidat Libre et CFE CGC ne peuvent rendre un avis.*

Le rapport de l'expert-comptable au comité de groupe se trouve en Annexe 1 de la présente note.

## X.   MODALITES DE MISE A DISPOSITION DES INFORMATIONS RELATIVES A LA SOCIETE

Les autres informations relatives aux caractéristiques, notamment juridiques, financières et comptables de la Société seront déposées auprès de l'AMF au plus tard la veille de l'ouverture de l'Offre. En application de l'article 231-28 du Règlement général, elles seront disponibles sur les sites Internet de Norbert Dentressangle (www.norbert-dentressangle.fr) et de l'AMF (www.amf-france.org), la veille de l'ouverture de l'Offre et pourront être obtenues sans frais auprès de Norbert Dentressangle Groupe - 192, avenue Thiers - 69006 Lyon Cedex 44.

**XI.**    PERSONNES QUI ASSUMENT LA RESPONSABILITE DE LA NOTE EN REPONSE

« *A ma connaissance, les données de la présente note en réponse sont conformes à la réalité et ne comportent pas d'omission de nature à en altérer la portée.* »

Monsieur Hervé Montjotin
Président du Directoire de Norbert Dentressangle

**ANNEXE I. RAPPORT DE L'EXPERT-COMPTABLE AU COMITE DE GROUPE**

**GROUPE
NORBERT
DENTRESSANGLE**

Rapport sur l'Offre Publique
d'Acquisition de XPO Logistics

**GROUPE NORBERT DENTRESSANGLE
192 AVENUE THIERS
69457 LYON CEDEX 6 FRANCE**

Mesdames, Messieurs,

Nous avons été désignés par les élus du Comité de Groupe de Norbert Dentressangle, en date du 4 mai 2015, pour les assister sur l'analyse de l'OPA réalisée par XPO Logistics sur Norbert Dentressangle SA dans le cadre de l'article L.2325-35.

Cette désignation a fait l'objet d'une lettre de mission passée avec le Comité de Groupe en date du 4 mai 2015 et d'un courrier à la Direction du Groupe Norbert Dentressangle en date du 5 mai 2015.

Nous renvoyons également, pour ces travaux, à notre note flash réalisée pour le comité de groupe sur le rachat de GND datée du 29 avril 2015 et à notre note de travail sur l'audition du repreneur XPO Logistics datée du 6 mai 2015.

Nous nous sommes appuyés pour la réalisation de cette note sur :

- De la documentation externe à l'entreprise (informations économiques, articles de presse, études statistiques...) ;
- De la documentation interne publique (rapports financiers).

Nous remercions les élus du Comité de Groppe pour la confiance renouvelée qu'ils nous témoignent.

Nous nous tenons à votre disposition pour vous apporter toutes explications complémentaires et approfondir les points que vous estimeriez nécessaires et vous prions de recevoir l'expression de notre meilleure considération.

Paris, le 27 mai 2015

Catherine Ferrière                              Grégory Djaouk
Expert comptable                                Carl Guinet
                                                Benjamin Pierre
                                                Martine Pindard



Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015

2

89/110

## PRÉAMBULE : RAPPELS SUR LE CADRE LÉGAL DE L'INFORMATION/CONSULTATION DU COMITÉ DE GROUPE (1/4)

- o Convocation de la première réunion d'information sur l'OPA :
  - Article L.2323-21 du Code du travail :
    - « Lors du dépôt d'une offre publique d'acquisition, l'employeur de l'entreprise sur laquelle porte l'offre et l'employeur qui est l'auteur de cette offre réunissent immédiatement leur comité d'entreprise respectif pour l'en informer. [...]
    - Au cours de la réunion du comité de l'entreprise qui fait l'objet de l'offre, l'employeur indique si l'offre a été sollicitée ou non. Le comité d'entreprise décide s'il souhaite procéder à l'audition de l'auteur de l'offre et désigner un expert-comptable dans les conditions prévues à l'article L.2325-35. Il peut également se prononcer sur le caractère amical ou hostile de l'offre. »
  - Article L.2323-23-1 du Code du travail :
    - « I. — A la demande de l'employeur auteur de l'offre, l'employeur de l'entreprise sur laquelle porte l'offre peut réunir son comité d'entreprise dans les deux jours ouvrables suivant l'annonce de cette offre. Les articles L. 2323-21 à L. 2323-23 s'appliquent. Les délais prévus à ces mêmes articles courent à compter de l'annonce de l'offre. [...] »
- o L'audition du repreneur :
  - Article L.2323-21-1 du Code du travail
    - L'audition de l'auteur de l'offre mentionnée au dernier alinéa de l'article L.2323-21 se tient dans un délai d'une semaine à compter du dépôt du projet d'offre publique d'acquisition.
    - Lors de son audition, l'auteur de l'offre peut se faire assister des personnes de son choix. Il présente au comité d'entreprise sa politique industrielle et financière, ses plans stratégiques pour la société concernée et les répercussions de la mise en œuvre de l'offre sur l'ensemble des intérêts, l'emploi, les sites d'activité et la localisation des centres de décision de cette société.
    - Le comité d'entreprise peut se faire assister de l'expert-comptable désigné en application du dernier alinéa du même article L.2323-21.



3

## PRÉAMBULE : RAPPELS SUR LE CADRE LÉGAL DE L'INFORMATION/CONSULTATION DU COMITÉ DE GROUPE (2/4)

- o Réunion de consultation et avis du comité :
  - Article L.2323-23 :
    - « I. — Préalablement à l'avis motivé rendu par le conseil d'administration ou le conseil de surveillance sur l'intérêt de l'offre et sur les conséquences de celle-ci pour la société visée, ses actionnaires et ses salariés, le comité de l'entreprise faisant l'objet de l'offre est réuni et consulté sur le projet d'offre. Au cours de cette réunion, il examine le rapport établi par l'expert-comptable en application de l'article L.2323-22-1 et peut demander la présence de l'auteur de l'offre.
    - Le comité d'entreprise émet son avis dans un délai d'un mois à compter du dépôt du projet d'offre publique d'acquisition. En l'absence d'avis dans ces délais, il est réputé avoir été consulté.
    - L'avis du comité d'entreprise ainsi que le rapport de l'expert-comptable sont reproduits dans la note en réponse établie par la société faisant l'objet de l'offre ou, s'il y a lieu, dans la note d'information commune établie par l'auteur de l'offre et la société faisant l'objet de l'offre. [...] »
- o Rapport de l'expert-comptable du comité :
  - Article L.2323-22-1 :
    - « L'expert-comptable désigné en application du dernier alinéa de l'article L.2323-21 établit un rapport qui évalue la politique industrielle et financière et les plans stratégiques que l'auteur de l'offre envisage d'appliquer à la société objet de l'offre, ainsi que les répercussions de leur mise en œuvre sur l'ensemble des intérêts, l'emploi, les sites d'activité et la localisation des centres de décision de cette dernière société. [...] »



4

*(texte vertical en marge gauche)* Groupe Herbert Derremaangle – Rapport sur l'OPA de BPD Logistic – 2015

## PRÉAMBULE : RAPPELS SUR LE CADRE LÉGAL DE L'INFORMATION/CONSULTATION DU COMITÉ DE GROUPE (3/4)

○ Suivi des engagements formulés par le repreneur :

- Article L.2323-26-1:

  ▪ *Si, à l'issue de l'offre publique, l'auteur de l'offre a acquis le contrôle de l'entreprise faisant l'objet de l'offre au sens des articles L. 233-1, L. 233-3 et L. 233-16 du code de commerce, il rend compte au comité d'entreprise de cette société, au cours du sixième, du douzième et du vingt-quatrième mois suivant la clôture de l'offre, de la manière dont il a mis en œuvre les déclarations d'intention et, le cas échéant, les engagements qu'il a pris auprès du comité d'entreprise, dans le cadre des auditions prévues aux articles L. 2323-21-1 et L. 2323-23 du présent code, en matière d'emploi, de maintien des sites d'activité et de localisation des centres de décision exprimés dans la note d'information mentionnée au IX de l'article L. 621-8 du code monétaire et financier. [...] »*



<div style="writing-mode: vertical">Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015</div>

5

## PRÉAMBULE : MODALITÉS DE RÉALISATION DE LA MISSION (4/4)

○ A la date de rédaction de ce rapport et en dépit de nos demandes, les informations ci-dessous restent manquantes :

- Conclusions du rapport de l'expert indépendant (M. Ledouble) sur le projet d'OPA : la Direction précise que ce document sera disponible seulement début juin ;

- Hypothèses chiffrées en matière de croissance externe par zone géographique et métier ainsi que le calendrier prévu ;

- Business plan détaillé à 3 ans de XPO Logistics faisant suite au rachat du Groupe Norbert Dentressangle : la Direction précise que cet élément sera construit avec le futur repreneur et sera disponible en mars 2016 ;

- Détail du montage financier finalement retenu (augmentation de capital et recours au marché des obligations) permettant le rachat du Groupe Norbert Dentressangle ;

- Organigramme actuel et cible du pilotage opérationnel et financier du groupe XPO Logistics, par pays et métier ;

- Organigramme juridique cible du groupe XPO Logistics, par pays et métier.

  ▪ La Direction précise qu'aucun organigramme cible juridique et opérationnel n'a encore été défini.

➔ Par ailleurs, nous avons reçu des éléments jusqu'au 26 mai 2015.

○ Ces informations factuelles sont indispensables pour comprendre le projet d'ensemble du repreneur. Nous ne pouvons que regretter cette situation qui rend notre analyse forcément partielle sur « *la politique industrielle et financière et les plans stratégiques que l'auteur de l'offre envisage d'appliquer à la société objet de l'offre, ainsi que les répercussions de leur mise en œuvre sur l'ensemble des intérêts, l'emploi, les sites d'activité et la localisation des centres de décision de cette dernière société.* » (Article L.2323-26-1 du Code du travail).



<div style="writing-mode: vertical">Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015</div>

6

## SOMMAIRE DU RAPPORT

| | | Pages |
|---|---|---|
| Points clés | | 8 |
| Rapport d'analyse | | 12 |
| 1. | Retour sur les principales modalités de l'acquisition et financement de l'opération | 13 |
| 2. | Quelques éléments sur le marché de la supply-chain en Europe et sur le repreneur | 17 |
| 3. | Approche croisée du groupe XPO Logistics et Norbert Dentressangle | 25 |
| 4. | Vision synthétique des risques et points de vigilance | 36 |
| Annexes | | 40 |

Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015



7

# POINTS CLÉS

Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015



8

Points clés

## POINTS CLÉS (1/3)

- L'annonce de l'opération de rachat du Groupe Norbert Dentressangle par XPO Logistics le 28 avril 2015 rompt avec un discours traditionnel de la présidence du Groupe Norbert Dentressangle, mettant encore en avant, jusqu'en mars 2015, les opportunités liées à l'actionnariat familial et la longue histoire du groupe :
    - Cf. interview du président du Directoire de ND du 23 mars 2015 dans le Parisien Economie :
        - A la question « *comment passe-t-on d'une TPE à un mastodonte, en gardant une dimension humaine* » , le président du Directoire répond : « *Malgré notre croissance continue depuis 35 ans, avec 67 % du capital détenu par la famille Dentressangle, notre entreprise a gardé son esprit familial* ».
        - Les clés du succès : « *c'est une histoire de continuité, de qualité d'exécution des opérations et de responsabilité individuelle* ».
        - La visibilité de la marque unique historique est mise en avant.
- La décision de vente par l'actionnaire familial répond, selon la communication officielle, à la question de la succession de Norbert Dentressangle pour assurer la pérennité et le développement long terme des activités du groupe...
- ...Néanmoins, cette question de succession se règle de façon « *soudaine et inattendue* » générant un choc pour l'ensemble des salariés dont les éventuelles conséquences ne doivent pas être sous-estimées
    - Ce sentiment est accentué par une visibilité limitée sur les perspectives : selon la Direction la stratégie européenne, le calendrier et les moyens alloués à la réalisation de cette stratégie et le Business Plan restent à élaborer.
- La solidité et la stabilité du Groupe Norbert Dentressangle renforcées par son type d'actionnariat tranchent avec le modèle de croissance effrénée de XPO Logistics, s'appuyant sur une logique fortement tournée vers le marché financier et la création de valeur pour l'actionnaire par la hausse du cours de bourse.

Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015



9

Points clés

## POINTS CLÉS (2/3)

- Ce modèle de XPO Logistics présente des risques non négligeables :
    - A date le financement permanent de l'opération d'acquisition n'est toujours pas trouvé et les modalités actuelles d'endettement déstabilisent fortement la structure financière du groupe XPO Logistics ;
    - Le projet de levée de fonds par augmentation de capital, initialement annoncé de 1 à 1,5 milliard de dollars, serait insuffisant pour garantir une structure financière équilibrée et permettre la réalisation d'autres opérations de croissance externe en Europe : objectif stratégique annoncé ;
    - Le coût de la dette initiale de XPO logistics (proche de 0% en 2014) est très au-dessus du standard actuel de Norbert Dentressangle (environ 3% en 2014) traduisant une prise de risque plus importante ;
    - Cette stratégie financière des actionnaires de XPO Logistics est portée par l'effervescence actuelle des opérations de fusion/acquisition aux Etats-Unis et en Europe, dans un marché financier qui abonde de liquidités ;
    - Empilement de sociétés/groupes non intégrés sans partage d'une vision commune. Ce risque est accentué par les différences culturelles des deux groupes.
- Cette marche importante franchie par XPO Logistics s'appuyant initialement sur une complémentarité géographique certaine (hormis aux Etats-Unis) vise à terme une concentration en Europe du secteur du transport et de la logistique avec un impact organisationnel et social important.

Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015



10

## POINTS CLÉS (3/3)

o   Au-delà des engagements annoncés (maintien de l'emploi et des centres de décision en France)...

- Selon le projet d'OPA simplifiée communiqué le 25 mai 2015, une entité XPO France SAS (de droit français) est en cours d'immatriculation pour mener l'opération d'acquisition. Bradley Jacobs en sera le président du conseil de Surveillance ;

- La Direction indique qu'il n'est pas prévu de changement sur la localisation et la présidence des holdings de détention des entités européennes (NDT, NDO et NDU). *«Les seules modifications envisagées pour ces entités concerneront potentiellement leur dénomination juridique. (Source mail de la Direction du 26 mai 2015)»*

o   ...dont la portée reste limitée, des incertitudes persistent :

- Quelles conséquences sur l'emploi à court terme des fonctions support notamment sur l'informatique et commerciales ?

- Quelle répartition entre emploi interne/externe ?

- Quelle répartition de l'emploi par pays ?

- Quelles conséquences sociales des restructurations de l'organigramme juridique envisagées ?

- Quelles exigences en terme de retour sur investissement pour les actionnaires ? Avec quelles conséquences sur les modes de pilotage de l'activité et sur la gestion des ressources humaines ?
  - Le projet d'OPA simplifiée précise que l'acquéreur prévoit la mise en place d'une politique de rémunération variable pour le management destinée à le fidéliser.

- Comment faire face à la croissance externe, à l'investissement métier et dans les ressources humaines, et à la nécessaire rentabilité à terme des capitaux engagés dans un secteur à faible marge ?
  - Le seul élément avancé est l'engagement d'un niveau d'investissement global en immobilisation d'exploitation de 2 à 2,5% du chiffre d'affaires (2,5%, point bas atteint en 2014 dans l'historique des investissements de ND depuis 2009). Notons également que la communication officielle met uniquement en avant l'investissement sur des moyens informatiques.

11



# RAPPORT D'ANALYSE

12

1-Retour sur les principales Modalités de l'acquisition et financement de l'opération

Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015

# 1-RETOUR SUR LES PRINCIPALES MODALITÉS DE L'ACQUISITION ET FINANCEMENT DE L'OPÉRATION



13

## RAPPELS DES PRINCIPALES MODALITÉS DE L'ACQUISITION

- Le prix d'achat est de 3,24 milliards d'euros, incluant une dette nette de 1,08 milliard d'euros :
  - Par action, cela représente 219,3 euros (coupon inclus) pour 9,9 millions d'actions soit 2,17 milliards d'euros ; la prime offerte aux actionnaires est d'environ 35% (référence : cours du 27 avril 2015).
  - Ce prix d'acquisition représente 9,1x EBITDA (sur une base 2015 estimée à 357 M€) du Groupe Norbert Dentressangle pour un cours moyen de février 2015 indiquant implicitement un multiple de 6,8 x EBITDA à fin 2014 (cf. p29 du document de référence 2014)
- Acquisition en deux phases :
  - Phase 1 : rachat des parts détenues par la famille Dentressangle (cela représente 1,4 milliard d'euros) ;
  - Phase 2 : offre publique d'achat (OPA) sur les actions cotées en bourse ;
  - L'objectif de la finalisation de l'opération est début juin 2015.
- Principales conditions suspensives et clauses connues à l'opération :
  - Aval des autorités de la concurrence américaine (à date cette autorisation a été donnée) et allemande ;
  - Suite à l'OPA, XPO Logistics doit détenir au moins 95% du capital de ND SA pour déclencher une obligation de vente pour les actionnaires restants ;
  - Non-concurrence dans un délai de 3 ans des actionnaires actuels.
- Financement de l'opération par XPO Logistics :
  - Financement à vocation temporaire obtenu jusqu'à 2,4 milliards d'euros auprès de la banque Morgan Stanley ;
    - Le taux qui commence à 4,25% augmente tous les 89 jours pour atteindre 7,00% un an après la clôture de l'acquisition (le taux moyen de la dette du Groupe Norbert Dentressangle est proche de 3% en 2014) ;
    - Le remboursement du montant de la dette doit se faire dans 5 ans, hors d'éventuels remboursements anticipés.
  - Liquidité à fin mars 2015 d'environ 1 milliard d'euros pour un endettement financier total d'environ 0,9 milliard d'euros ;
  - Ligne de crédit non tirée d'environ 0,4 milliard d'euros avec une garantie sur des actifs.

➔ La Direction de ND et le repreneur indiquent qu'il n'existe aucun risque sur la réalisation de l'opération au regard d'un financement déjà finalisé et aucun problème majeur d'entrave à la concurrence.

14

## UN FINANCEMENT DE L'OPÉRATION FINALISÉ, MAIS QUI DÉSTABILISERAIT LA STRUCTURE FINANCIÈRE DU GROUPE XPO (1/2)

_(sidebar, rotated)_ 1. Retour sur les principales Modalités de l'acquisition et financement de l'opération

| Données 2014 en M€* | XPO Logistics | ND | Futur Ensemble** |
|---|---|---|---|
| Capitaux propres consolidés (A) | 1 368 | 691 | 1 368 |
| Endettement financier total (B) | 491 | 1 212 | 3 731 |
| Endettement net (+1/Tresorerie nette(-) (C) | -42 | 1 017 | |
| ratio d'endettement (B)/(A) (limite 250%) | 36% | 175% | 273% |

*Conversion au cours du 31/12/2014, 1$=0,82638
**Estimation Tandem sur l'endettement total : prix achat + dette antérieure XPO

o Dans un premier temps, le poids important à court terme des intérêts et une maturité assez courte à 5 ans du prêt temporaire auprès de Morgan Stanley seraient préjudiciables pour les équilibres financiers du groupe :

- Notons également que le taux d'intérêt de la dette principale de XPO Logistics est déjà très élevé à 7,9% et pèse lourdement sur les comptes du groupe : 40 M€ pour une perte opérationnelle de -34 M€.

o Dans un second temps, en cas de financement par la dette de l'opération, le niveau d'endettement atteint par le nouvel ensemble amène à une structure financière très déséquilibrée au regard des capitaux propres actuels du groupe XPO et de la pression certaine qui sera mise sur la trésorerie générée par l'exploitation :

- Le ratio endettement financier total/capitaux propres consolidés dépasserait le seuil limite des 250 % marquant une prédominance anormale de la dette financière au regard des capitaux apportés par l'actionnaire ;

- Le ratio de leverage (Dette nette/EBITDA) serait pour le nouvel ensemble supérieur à 7 : ce ratio exprime en combien d'années le groupe est capable de rembourser sa dette au moyen de son EBITDA, soit ici 7 années :

  - Rappelons que le seuil limite accepté par les prêteurs du Groupe Norbert Dentressangle était de 3,5 ;

  - Le repreneur, lors de son audition (confirmé auprès des investisseurs), a indiqué un objectif sur ce ratio en dessous de 3, avec un niveau idéal jugé à 1.

_(sidebar, rotated)_ Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015



15

---

## UN FINANCEMENT DE L'OPÉRATION FINALISÉ, MAIS QUI DÉSTABILISERAIT LA STRUCTURE FINANCIÈRE DU GROUPE XPO (2/2)

_(sidebar, rotated)_ 1. Retour sur les principales Modalités de l'acquisition et financement de l'opération

o Le repreneur indique la volonté d'une levée de fonds, par augmentation de capital, rapide d'environ 1 à 1,5 milliard de dollars pour faire face à cette problématique d'endettement. Toutefois, cette levée de fonds serait insuffisante pour ramener l'endettement à des niveaux acceptables. La Direction annonce également le recours au marché obligataire pour lever des fonds.

→ Au final, à date, un financement long terme permettant une structure financière équilibrée reste à trouver.

_(sidebar, rotated)_ Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015



16

# 2-QUELQUES ÉLÉMENTS SUR LE MARCHÉ DE LA SUPPLY-CHAIN EN EUROPE ET PRÉSENTATION DU REPRENEUR



17

## TRANSPORT EUROPÉEN ET FRANÇAIS*

○ Sur le plan européen en 2013 (dernières données disponibles) :

   ▪ Après avoir reculé de 4,2% en 2012, le transport routier de marchandises européen progresse de 2,4% en 2013, tiré par l'activité internationale des pavillons (+6,2%) notamment celle des pays de l'Est (+9,7%).

   ▪ Le cabotage poursuit son augmentation (+18,0% en 2013 contre +10,5% en 2012) notamment en Allemagne. En France, sa part atteint 4,5% du transport national en 2013.

| Évolutions (en millions de t.km en %) | 2013/12 | 2014/13 |
|---|---|---|
| **Selon l'activité** | | |
| Compte d'autrui en France | -2,1% | -4,7% |
| Compte propre en France | 8,5% | 1,1% |
| **Selon le périmètre géographique** | | |
| National | -0,3% | -3,2% |
| International en France | 1,9% | -9,8% |
| **Selon la classe de distance en charge** | | |
| À moins de 150 km | 0,2% | -2,0% |
| À 150 km ou plus | -0,4% | -4,3% |
| **Selon la nature de marchandises** | | |
| Produits agricoles et agroalimentaires | -2,1% | 0,0% |
| Produits pétroliers | -8,6% | NC |
| Biens intermédiaires | -3,0% | -4,2% |
| Construction | -1,2% | -3,8% |
| Produits manufacturés | 4,1% | -4,0% |
| **Total** | **-0,7%** | **-3,6%** |

*Source gouvernementale-ministère du développement durable

○ Le transport en France :

   ▪ Sur 2014, les variations en volume et en chiffre d'affaires sont identiques, car les prix sont stables entre 2013 et 2014 ;

   ▪ Les données sectorielles font état d'un repli de 3,6% sur 2014 du transport routier de marchandises en France contre une quasi-stabilité entre 2012 et 2013 :

      ▪ On relève une croissance du transport pour compte propre (+1,1% après avoir progressé de 8,5% en 2013) qui traduit un moindre recours à l'externalisation.

   ▪ La longue distance pâtit davantage (-4,3%) que la courte distance (-2,0%) du ralentissement de l'activité en 2014 ;

   ▪ Nous identifions une stabilité de l'acheminement des produits agricoles et agroalimentaires qui contraste avec le repli des biens intermédiaires (-4,2% en 2014 après -3,0% en 2013).



18



Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015

2-Quelques éléments sur le marché de la Supply-Chain
en Europe et présentation du repreneur

## PRÉSENTATION DU REPRENEUR (1/2)

o  La stratégie de développement de XPO Logistics est mise en œuvre depuis septembre 2011 (reprise de Express 1 par Bradley Jacobs et ses équipes pour un investissement initial de 150 M$).

o  Particulièrement offensive et ambitieuse, elle vise à construire un acteur de taille mondiale et à créer de la valeur pour les actionnaires, dans un délai très rapide

   ▪  Mise en œuvre dans un secteur très fragmenté, de taille importante et présentant des perspectives de croissance (tendance à l'externalisation du transport et de la logistique vers des prestataires 3PL)

   ▪  Via de nombreuses et importantes acquisitions permettant la recomposition du secteur (« roll-up strategy »)

o  Selon G. Devens, senior Vice président de XPO Logistics, auditionné par le comité du groupe le 7 mai 2015 dans le cadre de l'OPA annoncée, l'édifice actuellement en cours de construction par l'équipe dirigeante de XPO dispose de « solides fondations »

o  La stratégie de XPO est conforme à celle déployée dans les entreprises précédemment fondées et dirigées par Bradley Jacobs aux USA

   ▪  Amerex Oil Associates (créée en 1979) : courtage pétrolier, 4,7 Mrds$ de CA annuel

   ▪  Hamilton Ressources (créée en 1984), société de trading de pétrole,  1 Mrd$ de CA

   ▪  United Waste Systems (créée en 1989), devenue n° 5 du traitement de déchet en Amérique du Nord. Introduite au NASDAQ en 1992, elle a été revendue 6 ans plus tard en août 1997 à USA Waste Services pour 2 milliards de $

   ▪  United Rentals (créée en1997), Location d'équipements industriels , 5,9Mrds$ de CA, 13.000 salariés.

     Bradley Jacobs en a été le dirigeant (CEO) pendant 6 ans, jusqu'à fin 2003, date à laquelle il a abandonné cette fonction pour devenir Président exécutif en charge de la stratégie, des ressources humaines et des opérations de fusions et acquisitions. Il a en parallèle annoncé son intention d'investir dans un nouveau secteur d'activité pour y déployer une stratégie de même type, et a créé à cette fin en décembre 2003, son propre fonds d'investissement (Jacobs Private Equity, LLC).



21

## PRÉSENTATION DU REPRENEUR (2/2)

Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015

2-Quelques éléments sur le marché de la Supply-Chain
en Europe et présentation du repreneur

   ▪  United Rentals (créée en1997), Location d'équipements industriels *(suite)*

     Bradley Jacobs a définitivement quitté US Rentals en août 2007, après l'annonce de la signature en juillet 2007 d'un accord de cession de US Rentals au fonds d'investissement Cerberus Capital Management pour un montant de 6,6 milliards de $ incluant la reprise d'une dette de 2,6 milliards de $.

     Le projet n'a finalement pu être mené à son terme : Cerberus a renoncé à l'acquisition en novembre 2007, dans un contexte de contraction de l'offre de crédit, pour non-obtention des financements. Le fonds a dû s'acquitter du versement d'une indemnité de 100 M$ à US Rentals

     Il est à noter que

      ▪  United Rentals a fait l'objet d'une enquête de la SEC (Stock Echange Commission) en 2004 portant sur certaines de ses pratiques comptables (relatives à la comptabilisation de certaines opérations de ventes d'équipements en leaseback). Elle a dû apporter des corrections à ses comptes pour les exercices 2002 et 2003, a destitué en août 2005 son directeur financier, et a accepté en 2008, le paiement d'une amende de plusieurs millions de $ pour mettre fin à l'enquête.



22

Groupe Norbert Dentressangle – Rapport sur l'OPA          2-Quelques éléments sur le marché de la Supply-Chain
de XPO Logistics – 2015                                         en Europe et présentation de repreneur

## LA STRATÉGIE TRÈS OFFENSIVE DE CROISSANCE EXTERNE DE XPO LOGISTICS (1/2)

o En 3,5 ans, le total des acquisitions réalisées (ou en cours de réalisation), atteint 5,2 milliards de $
  ▪ 1,5 milliard de $ de 2012 à 2014 ;
  ▪ 3,7 milliards de $ au premier semestre 2015

o Avec deux acquisitions majeures sur la période récente, qui marquent l'entrée de XPO sur le segment de la logistique contractuelle ainsi que le début de son expansion hors du continent européen
  ▪ New Breed (616 M$) en septembre 2014 : logistique contractuelle en Amérique du Nord
  ▪ Norbert Dentressangle (3,5 milliards $ , soit 3,2 milliards €) au 1er semestre 2015, qui est à ce jour, de très loin la plus grosse cible visée par le groupe XPO

o Depuis l'investissement initial de 150 M$ en septembre 2011 dans Express-1 (support d'investissement de Bradley Jacobs dans le secteur du transport, devenu XPO Logistics), il est à noter que 4 augmentations de capital successives ont été réalisées entre mars 2012 et septembre 2014. Elles ont permis de lever un total de 1,5 milliard de $
  ▪ Dont près de 700 M€ en septembre 2014, avec l'entrée au capital de 3 actionnaires institutionnels de référence : PSP Investments, GIC, et Ontario Teachers' Pension Plan







23

## LA STRATÉGIE TRÈS OFFENSIVE DE CROISSANCE EXTERNE DE XPO LOGISTICS (2/2)

### XPO Logistics - Acquisitions 2012-2015

| Société | Activité | Date d'acquisition | Prix d'achat (en M$) |
|---|---|---|---|
| **Acquisitions en 2012** | | | |
| Continental Freight Services | Courtage transport routier | mai-12 | 3,8 |
| Kelron | Courtage transport routier | août-12 | 8,0 |
| Turbo Logistics & BirDog Logistics | Courtage transport routier | oct-12 | 49,9 |
| **Acquisitions en 2013** | | | |
| East Coast Air Charter | Courtage affrètement aérien | févr-13 | 9,3 |
| Covered Logistics and Transportation | Courtage transport routier | févr-13 | 11,0 |
| Interide Logistics | Courtage transport routier | mai-13 | 3,7 |
| 3PD | Dernier kilomètre | août-13 | 364,3 |
| Optima Services solutions | Dernier kilomètre | nov-13 | 26,6 |
| NLM | Gestion de solutions de transport online | déc-13 | 87,0 |
| **Acquisitions en 2014** | | | |
| Pacer International | Transport multimodal | mars-14 | 331,5 |
| Atlantic Central Logistics | Dernier kilomètre | juil-14 | 36,2 |
| New Breed | Logistique | sept-14 | 615,9 |
| **Acquisitions depuis début 2015** | | | |
| UX Specialized Logistics | Dernier kilomètre | févr-15 | 58,9 |
| Norbert Dentressangle | Transport, logistique, freight forwarding | 1er sem. 15 | 3 530,0 |
| Bridge Terminal Transport | Transport multimodal | 1er sem. 15 | 100,0 |

24

# 3-APPROCHE CROISÉE DU GROUPE XPO LOGISTICS ET NORBERT DENTRESSANGLE

*andem*

25

## UNE STRATÉGIE SIMILAIRE POUR LES DEUX GROUPES, MAIS LE RYTHME, LA MÉTHODE ET LA FINALITÉ DIFFÈRENT





*Au taux de conversion du dollar au 31/12/14

o  ND, acteur historique, s'est engagé dans une stratégie de croissance externe accompagnée d'une internationalisation depuis plus de 10 ans. Cette stratégie :

- Correspond à la réponse des autres acteurs face à l'évolution du marché de la supply chain et s'inscrit pour ND prioritairement dans une logique métier ;

- S'est réalisée par une croissance rapide, mais avec un temps certain laissé à l'intégration : multiplication par 2,6 du chiffre d'affaires en 10 ans, mais avec une période de 3,5 ans en moyenne entre les plus grosses acquisitions (Christian Salvesen, TDG, Jacobson) ;

- S'est accompagnée d'un résultat opérationnel positif et en croissance quasi continue en valeur sur 10 ans.

XPO Logistics, acteur récent de la supply-chain (moins de 5 ans), est engagée dans la même stratégie que ND. Toutefois, cette stratégie :

- Est menée par une croissance effrénée sans base solide sur un métier historique : multiplication par 13,3 du chiffre d'affaires en 4 ans, amenant le groupe au niveau d'un acteur majeur aux Etats-Unis ;

- S'accompagne d'une logique financière prédominante, puisque la finalité est l'augmentation du cours de bourse afin, à moyen terme, de réaliser une forte plus-value à la revente pour ses actionnaires ;

- Se traduit pour l'instant par des pertes opérationnelles répétées.



26

3-Approche croisée du groupe XPO Logistics et Norbert Dentressangle

Groupe Norbert Dentressangle – Rapport sur l'OPA de XPO Logistics – 2015

## UNE PERFORMANCE DE L'ACTION NORBERT DENTRESSANGLE QUI S'INSCRIT DANS LA DURÉE

- Elle affiche des hausses successives de +8% en 2012 ; +60% en 2013 ; +30% en 2014 et +30% sur les 4 premiers mois de 2015
  - 159,1 € le 28/04/2015 avant annonce du rachat par XPO Logistics, contre 54 € fin 2011
- La capitalisation boursière a franchi le seuil de 1 Milliard d'€ en 2014, pour atteindre
  - 1,2 Milliard € fin décembre 2014
  - 1,6 Milliard € le 28/04/2015 avant l'annonce du rachat
  - 2,1 Milliards € début mai 2015 (soit 2,4 milliards de $), incluant la prime de contrôle offerte par XPO Logistics aux actionnaires de Norbert Dentressangle SA



Cours de l'action GND : Période 2003-2015 (en €)

27

## UNE ENVOLÉE DU COURS DE L'ACTION XPO LOGISTICS ET UNE CAPITALISATION BOURSIÈRE PROCHE DE 4 MILLIARDS $

- Malgré des pertes opérationnelles récurrentes, des anticipations très positives des investisseurs sur la valeur future de XPO Logistics
- Elles se reflètent dans la forte croissance du cours de l'action
  - Multipliée par plus de 4 depuis septembre 2011
  - Avec un cours proche de 50 $ début mai 2015
- La capitalisation boursière atteint 3,9 Milliards $ début mai 2015 (contre 0,6 mds$ en septembre 2013)



XPO Logistics : Capitalisation boursière (en millions de $)



Cours de l'action XPO Logistics : septembre 2011-mai 2015 (en $)

28

## UNE LÉGITIMITÉ MÉTIER POUR ND VS UNE LÉGITIMITÉ FINANCIÈRE POUR XPO ISSUE DE LA TYPOLOGIE DE L'ACTIONNARIAT

### Répartition du capital des deux groupes à fin 2014



- Investisseurs divers
- Fonds d'investissement > 5%
- Famille ou Managers*

*y compris 19,5% détenus par le fonds Jacobs Private Equity propriété du PDG Bradley Jacobs.

c  Le capital de Norbert Dentressangle est principalement détenu par un actionnaire familial historique (67% du capital à fin 2014) :

➔  La légitimité de ND s'appuie sur une marque patronymique et provient d'un savoir-faire métier construit sur la durée à partir du transport puis combiné à la logistique.

c  Le capital de XPO logistics est détenu majoritairement par des fonds d'investissement. Ce poids des fonds d'investissement devrait à nouveau augmenter suite à la nouvelle levée de fonds prévue.

  ▪  Notons que le PDG Bradley S. Jacobs détient indirectement 19,5% du capital par son fonds Jacobs Private Equity et 0,2% directement (soit près de 800 M€).

➔  L'ascension rapide du groupe XPO logistics repose sur la confiance apportée au milieu financier par l'expérience dans les fusions/acquisitions de son PDG/actionnaire.



29

---

## PRINCIPAUX ACTIONNAIRES DE XPO LOGISTICS (AVRIL 2015)

| Jacobs Private Equity, LLC 19,5% du capital | PSP Investment Board 14,4% du capital | Coral Blue Investment, LLD 10,3% du capital | FMR LLC 6,1% du capital | Ontario Teachers' Pension Plan Board 4,1% du capital |
|---|---|---|---|---|
| • JPE, a été créé par Bradley Jacobs en décembre 2003. Il a investi en septembre 2011, dans le rachat de Express-1 Expedited Solutions (devenu XPO Logistics).<br>A priori pas d'autres participations.<br>• Bradley Jacobs est depuis septembre 2011, Chairman of the Board et Chief Executive Officer (CEO) de XPO. Il détient en avril 2015 une participation totale (directe + indirecte via JPE LLC) de 19,7% dans XPO Logistics | • Public Sector Pension Investment Board est l'un des plus grands gestionnaires de fonds pour des caisses de retraite au Canada. Il investit des capitaux pour les régimes de pension de la fonction publique, des Forces canadiennes, de la Gendarmerie royale du Canada et de la Force de réserve.<br>93,7 milliards de dollars en actif sous gestion au 31 mars 2014<br><br>*graphique circulaire*<br><br>Sources :<br>✓ http://jpe.com/<br>✓ rapports annuels XPO Logistics<br>Source :<br>http://www.investpsp.ca/ | • Fonds d'investissement de GIC Private Limited, fonds souverain domicilié à Singapour. Créé en 1981, pour gérer les réserves de change de Singapour.<br>• Pas d'information disponible sur le montant des actifs gérés<br><br>Source :<br>http://www.gic.com.sg/ | • Fidelity Investments ou Fidelity Management and Research (FMR LLC) est une multinationale spécialisée dans la gestion d'actifs pour compte de tiers, l'un des leaders mondiaux en ce domaine.<br>• FMR est dirigée par Edward C. Johnson III, et sa fille, Abigail Johnson, siège au conseil d'administration. Son siège social est situé à Boston. Peter Lynch est un gestionnaire associé ayant la plus grande notoriété.<br>• 4 900 Mrds£ d'actifs sous gestion<br><br>Source :<br>https://www.fidelity.com/ | • Le régime de retraite des enseignants et enseignantes de l'Ontario, est le plus important régime s'adressant à une seule profession au Canada. Il gère les placements et administre des prestations de retraite pour le compte de ses participants (182 000 enseignants actifs et 129 000 enseignants retraités de la province de l'Ontario).<br>•Actifs sous gestion: 154,5 milliards de dollars canadiens au 31/12/2014<br><br>Source : https://www.otpp.com/ |

30

## PRINCIPAUX ACTIONNAIRES DE XPO LOGISTICS (AVRIL 2015)

| Principaux Actionnaires (Avril 2015) | % |
|---|---|
| Jacobs Private Equity, LLC | 19,5% |
| PSP Investment Board | 14,4% |
| Coral Blue Investment, LLD (GHC) | 10,3% |
| FMR LLC | 6,1% |
| The Vanguard Group, Inc | 4,6% |
| Orbis Investment Management, Ltd | 4,5% |
| Ontario Teachers' Pension Plan Board | 4,1% |
| BlackRock Fund Advisors | 3,4% |
| Peter S. Cannel & co, Inc. | 3,4% |
| Spruce House Investment Management, LLC | 3,1% |
| Morgan Stanley Investment Management, Inc | 2,8% |
| Autres | 23,8% |

- o Il est à noter qu'en avril 2015, le management de XPO Logistics, détient 21,1% du capital de XPO Logistics
  - Dont Bradley Jacobs 19,7% (directement, et indirectement au travers de Jacobs Private Equity, LLC)

31

## UNE CULTURE GROUPE DIFFÉRENTE À BIEN DES ÉGARDS

- o Groupe Norbert Dentressangle
  - Actionnariat historique familial s'inscrivant dans une vision long terme
  - Des valeurs promulguées en interne personnifiées par l'actionnaire Norbert Dentressangle

  - Equipe dirigeante à dominante métier

  - Culture européenne avec ancrage des centres de décision en France et une présence sur l'ensemble de l'hémisphère nord

  - Gestion opérationnelle décentralisée s'appuyant principalement sur la diffusion d'une logique entrepreneuriale des encadrants à de nombreux niveaux hiérarchiques

- o Groupe XPO Logistics
  - Actionnariat financier s'inscrivant dans une vision moyen voire court terme

  - Equipe dirigeante à dominante financière et juridique, spécialisée dans les fusions/acquisitions

  - Culture nord-américaine avec des centres de décision aux Etats-Unis et une présence uniquement nord-américaine

  - A priori, une gestion opérationnelle décentralisée s'appuyant plus amplement sur le déploiement d'un système d'information performant

32

104/110

# UNE NOUVELLE CULTURE A INTÉGRER POUR PLUS DE 42 000 SALARIÉS À TRAVERS LE MONDE



Effectif des deux groupes en 2014
(en nombre de salariés)*

o Le Groupe Norbert Dentressangle compte plus de 4 fois plus de salariés que XPO Logistics : 42 468 salariés dont 12 588 en France contre 10 000 salariés pour XPO Logistics.

o Le Groupe Norbert Dentressangle également dans une stratégie de croissance externe et d'internationalisation rapide devait déjà faire face au défi de la diffusion d'une culture groupe et d'un projet commun :

  • Rappelons que cette condition est essentielle pour concrétiser l'offre globale et mondiale promise au client.

o Dès lors, l'intégration de plus de 42 000 salariés sur un vaste territoire, marquant de fait une transformation sans précédent pour XPO Logistics, constitue un enjeu majeur.

# DES ARBITRAGES COMPLEXES POUR MENER DE FRONT UNE CROISSANCE EXTERNE ET L'INVESTISSEMENT INTERNE NÉCESSAIRE



o L'actif immobilisé du Groupe Norbert Dentressangle (GND) est :

  • En premier lieu, marqué par ses immobilisations corporelles 46% de l'actif immobilisé à fin 2014, dont près de la moitié concerne le parc de véhicule
  • En second lieu marqué par sa stratégie de croissance externe puisque les écarts d'acquisition représentent 38% de l'actif immobilisé.

o L'actif immobilisé du groupe XPO Logistics est marqué principalement par sa stratégie de croissance externe, 68% de l'actif immobilisé à fin 2014.

➔ Cette composition des actifs et ce choix opérationnel du parc propre imposent une politique d'investissement non négligeable dans le parc...

➔ Toutefois, cette nécessaire politique d'investissement imposée par ce choix opérationnel du parc propre est déjà difficilement compatible avec une croissance rapide

  • L'historique du ratio d'investissement présenté sur le graphique de droite montre une baisse tendancielle liée en partie aux choix de gestion entre parc loué/parc propre et part sous-traitance/part interne, mais également liée aux arbitrages entre croissance externe et investissement.

## UNE COMPLÉMENTARITÉ MÉTIER ET GÉOGRAPHIQUE CERTAINE, MAIS UNE ZONE DE RECOUVREMENT IMPORTANTE AUX ETATS-UNIS



35

# 4- VISION SYNTHÉTIQUE DES RISQUES ET POINTS DE VIGILANCE



36

4. Risques et points de vigilance

Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015

# STRATÉGIE ET POLITIQUE INDUSTRIELLE

| Thématique : Stratégie et politique industrielle | Risques identifiés | Réponses apportées par la Direction et le repreneur | Points de vigilance et questions en suspens identifiés par Tandem |
|---|---|---|---|
| • Croissance externe et internationalisation<br>• Développement rapide d'un acteur mondial reconnu<br>• Un projet d'entreprise au service d'un objectif financier à moyen voire court terme<br>• Volonté de faire de XPO un acteur mondial recouvrant sur l'ensemble des métiers de la supply-chain<br>• S'appuyer sur des investissements informatiques annoncés importants<br>• Volonté d'avoir un modèle s'appuyant sur des ressources humaines flexibles | • Eloignement de sociétés/groupes non intégrés sans partage d'une vision commune<br>• Choc culturel<br>• Crise de croissance<br>• Marché européen plus complexe dans une approche réglementaire<br>• Pilotage court-termiste axé sur la hausse du cours de bourse au détriment de la logique métier<br>• Inexpérience de l'équipe actuelle de XPO Logistics sur le marché de la supply-chain et sur le territoire européen<br>• Groupe XPO logistics et marque associée peu connus<br>• Investissements insuffisants pour assurer à la fois la croissance externe et interne | • Déploiement rapide de la nouvelle marque XPO en Europe<br>• Maintien du management de ND<br>• Maintien des centres décisions européens en France pendant 5ans<br>• Expérience passée du PDG/actionnaire dans ce type de développement<br>• Approche décentralisée par zone géographique | • Insuffisance des moyens mis en œuvre pour faire face à la croissance externe, à l'investissement net dans les ressources humaines et à la nécessaire rentabilité à terme des capitaux engagés.<br>• Quelles prévisions chiffrée à 3 ans détaillée par métier et zone géographiques sur les thématiques citées ci-dessus ?<br>• Quelle stabilité de l'actionnariat sur le moyen terme ?<br>• Quelles marges de manœuvres pour l'équipe dirigeante en Europe ?<br>• Quelle stabilité pour l'équipe dirigeant en Europe ? |



37

# ACTIVITÉ, RÉSULTATS ET STRUCTURE FINANCIÈRE

| Thématique : activité, résultats et structure financière | Risques identifiés | Réponses apportées par la Direction et le repreneur | Points de vigilance et questions en suspens identifiés par Tandem |
|---|---|---|---|
| • La croissance du chiffre d'affaires XPO est très rapide liée à sa politique offensive de croissance externe<br>• Le groupe XPO affiche une perte d'exploitation récurrente et une lourde charge financière due à son endettement<br>• A date, le projet de financement de l'opération par endettement déstabiliserait fortement la structure financière du futur ensemble<br>• Volonté d'avoir un groupe ayant un recours limité à des investissements industriels lourds | • Des résultats futurs insuffisants pour faire face aux exigences des institutions financières, des actionnaires et des nécessaires investissements<br>• Un endettement anormalement élevée dans la durée<br>• Équilibres financiers insuffisants pour faire face à des aléas fortement défavorables (dégradation des performances, difficultés d'intégration, retour sur investissement des acquisitions inférieur aux attentes, nouvelle dégradation importante de l'environnement économique...)<br>• Développement accru de la sous-traitance et de la flexibilité des ressources humaines | • Levée de fonds prévue de 1,5 milliard de dollars<br>• Objectif fixé d'un retour à un ratio de leverage inférieur à 3<br>• Contrainte de la politique d'investissement (entre 2 et 2,5% du chiffre d'affaires en capex net en tendance annuelle, cf. ratio p.34) | • Présentation d'un Business plan<br>• Quelles exigences en terme d'objectif de résultat ?<br>• Quelles exigences en terme de retour sur investissement pour les actionnaires ?<br>• Quelles synergies attendues à cour terme sur les fonctions supports et commerciales ?<br>• Quelles synergies attendues sur le moyen terme sur les ressources opérationnelles dans une logique de poursuite de la croissance externe en Europe ?<br>• La référence indiquée en terme d'effort d'investissement constitue un point bas dans l'historique de GND : ce niveau annoncé d'investissement sera-t-il suffisant ? Quelle répartition par activité, métier et zone géographique ? Quel niveau d'investissement opérationnel ? |



38

## ORGANISATION ET ASPECTS SOCIAUX



| Thématique : organisation et aspects sociaux | Risques identifiés | Réponses apportées par la Direction et le repreneur | Points de vigilance et questions en suspens identifiés par Tandem |
|---|---|---|---|
| • Modèle d'organisation décentralisée<br>• Privilégier une adaptation des organisations aux réalités des différents marchés<br>• Flexibilité accrue de la main d'œuvre<br>• Politique de rémunération axée sur une part variable importante | • Restructuration des différentes activités avec destruction d'emploi<br>• Développement accru de la sous-traitance et de la flexibilité des ressources humaines<br>• Incertitude sur les centres de décisions pour l'Europe<br>• Autonomie limitée des équipes de management<br>• Déploiement du Système d'information de XPO Logistics uniformisant le pilotage de l'activité<br>• Pilotage financier ne reflétant pas l'engagement des ressources humaines au projet d'entreprise<br>• Individualisation des objectifs au détriment de la performance globale et collective | • Un engagement de 18 mois sur le maintien de l'emploi en équivalent temps plein en France à partir de la clôture de l'acquisition<br>• Le maintien des centres de décision pour l'Europe pendant 5 ans sur les 3 sites français (Lyon, Beausemblant et Malakoff) à partir de la clôture de l'acquisition<br>• Simplification juridique de l'organigramme | • Un engagement à portée limitée sur l'emploi :<br>  ✓ Cet engagement n'est pas assorti de sanction<br>  ✓ Il n'implique pas le maintien des emplois par contrat et par poste<br>  ✓ Cette formulation vague ne distingue pas les différents types de contrat (CDI, CDD, intérim, franchisé…)<br>  ✓ Il n'empêche pas la mise en place de plans de restructuration<br>• Un engagement sur des centres de décision sans présentation d'une organisation juridique et opérationnelle cible<br>• Quelles conséquences sur l'emploi à court terme des fonctions support notamment sur l'informatique et commerciales<br>• Quelle répartition entre emploi interne/externe ?<br>• Quelle répartition de l'emploi par pays ? |

39

# ANNEXES

40



## ORGANIGRAMME JURIDIQUE DE XPO LOGISTICS AU 1/05/2015



Annexe 9

Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015

*tandem*

41

## COMPOSITION DU CONSEIL D'ADMINISTRATION DE XPO LOGISTICS

Annexe 10

| Conseil d'administration de XPO Logistics (Board of Directors) - 7 membres en Mai 2015 | | |
|---|---|---|
| Bradley S. Jacobs (Président et directeur général) | Depuis sept. 2011 | Il est également fondateur et dirigeant de Jacobs Private Equity, LLC, principal actionnaire de XPO Logistics |
| G. Chris Andersen | Depuis sept. 2011 | Fondateur et associé de G.C. Andersen Partners, LLC. Spécialiste des fusions acquisitions, il a notamment été vice président de Paine Webber (gestion d'actifs entre 1990 et 1995), a eu des fonctions de direction pendant 15 ans à la Drexel Burnham Lambert Inc, banque d'affaires spécialisée dans de grosses opérations de fusions acquisitions (qui a fait faillite en 1990), membre du conseil d'administration de Terex Cop. depuis 1992 |
| Michael G. Jesselson | Depuis sept. 2011 | Président de Jesselson Capital Corporation depuis 1994. Il est membre du conseil d'administration de American Eagle Outfitters depuis 1997. |
| Adrian P. Kingshott | Depuis sept. 2011 | Directeur général de Adson LLC depuis 2006, et senior advisor à Headwaters Merchant Bank depuis 2013. Spécialiste de la finance d'entreprise et des fusions acquisitions, il a notamment exercé des fonctions à Goldman Sachs & Co (entre 1982 et 2002) |
| James J. Martell | Depuis 2006 | Ancien président de Express-1 Expedited Solutions (devenu XPO Logistics en 2011). A eu des fonctions de dirigeant dans diverses entreprises de transport et logistique (notamment SmartMail Services Inc, Uti Worldwide Inc, Burlington Air Express Canada) et occupé précédemment des fonctions de direction à Fedex et UPS. |
| Jason D. Papastavrou | Depuis sept. 2011 | Fondateur et directeur des investissements de ARIS Capital Management, LLC et cofondateur de Empiric Asset Management, LLC. Il a notamment dirigé le fonds d'investissements Hedge Funds (fonds spéculatif) du groupe Banc of America Capital Management. Il est également administrateur de United Rentals, Inc. |
| Oren G. Shaffer | Depuis sept. 2011 | Il a notamment été Vice président et directeur général de Qwest Communications International, Inc (devenu CenturyLink, Inc) entre 2002 et 2007. Précédemment, il a occupé des fonctions de Directeur des opérations de Sorrento Networks, Inc (entre 2000 et 2002), directeur financier de Ameritech Corporation Inc (entre 1994 et 2000). Il est membre du conseil d'administration de Terex Corporation depuis 2007 |

Groupe Norbert Dentressangle – Rapport sur l'OPA
de XPO Logistics – 2015

*tandem*

42

## PRINCIPAUX DIRIGEANTS DE XPO LOGISTICS

| Principaux dirigeants de XPO Logistics (Named Executive Officers) - Mai 2015 | | |
|---|---|---|
| Bradley S. Jacobs | Président et directeur général | Depuis sept. 2011 |
| Hervé Montjotin | Président et directeur général de XPO Logistics – Europe | Depuis mai 2015 (actuellement Président du directoire de Norbert Dentressangle) |
| John J. Hardig | Directeur financier | Depuis fév. 2012 (précédemment banquier d'investissement spécialisé dans le transport et la logistique) |
| Troy A. Cooper | Directeur des Opérations | Depuis mai 2014 (entré en septembre 2011 comme Vice président Finances. Précédemment à United Rentals et United Waste Systems, en charge de l'intégration des nombreuses entités achetées) |
| Gordon E. Devens | Senior Vice President, Directeur Juridique et Sécrétaire général | Depuis nov. 2011 (spécialiste des opérations de fusions et acquisitions) |
| Scott B. Malatz | Directeur de la Stratégie | Depuis juillet 2012 (entré à XPO Logistics en octobre 2011, il est en charge de l'analyse des opportunités d'acquisitions et l'organisation de la technologie. Précédemment analyste financier dans des banques d'affaires dont : Goldman Sachs Group dans le secteur des transports, UBS, JPMorgan Chase &Co. |

Annexe en

Groupe Norbert Dentressangle – Rapport 1 sur l'OPA
de XPO Logistics – 2015



43

Elliott Capital Advisors, L.P
40 West 57th Street
New York, NY 10019
United States of America

Norbert Dentressangle
192 avenue Thiers
69006 Lyon
France

For the attention of Mr. Hervé
Montjotin, président du
directoire

New-York, June 26, 2015

**Certified letter with acknowledgment of receipt requested**

<u>RE</u>: Disclosure of crossing of threshold

Dear Sir:

     Pursuant to Section 9 of the by-laws of Norbert Dentressangle, we hereby inform you that, based on the number of shares disclosed by the company, i.e. 9,836,241, The Liverpool Limited Partnership, Elliott International, L.P. and Elliott Associates L.P., acting in concert, have crossed, on June 24, 2015, the threshold of 6% of the share capital of Norbert Dentressangle under the form (i) of shares held and (ii) *contracts for difference* (CFD) (assimilation pursuant to 4° bis of article L. 233-9 of the French *Code de commerce*) and that the underlying Norbert Dentressangle shares which are subject to these CFD amount to 613,509, as follows:

| | Number of shares held | Number of CFDs held | Number of owned or underlying shares | % of share capital (based on 9,836,241 shares) |
|---|---|---|---|---|
| The Liverpool Limited Partnership et Elliott International, L.P. | 100 | - | 100 | |
| Elliott International, L.P. et Elliott Associates, L.P. | - | 613,509 | 613,509 | |
| Total | | | 613,609 | 6.24% |

Sincerely yours,

Elliott Capital Advisors, L.P

By: Elliot Greenberg
Its: Vice President

*À Monsieur le Président*

*du Tribunal de commerce de Paris*

---

**ASSIGNATION EN RÉFÉRÉ D'HEURE À HEURE**

**ARTICLES 145 ET 873 DU CODE DE PROCÉDURE CIVILE**

---

**L'AN DEUX MILLE QUINZE**

**ET LE**

**À LA DEMANDE DE :**

> **Elliott Capital Advisors L.P.**, un « *limited partnership* » du Delaware dont le siège social est situé c\o Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, États-Unis d'Amérique, dument représentée par son General Partner, la société Braxton Associates, Inc., société du Delaware dont le siège social est situé c\o Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, États-Unis d'Amérique, dument représentée par son vice-président, Monsieur Elliot Greenberg ;

> Ci-après désignée « **Elliott Capital Advisors** » ou le « **Demandeur** »,

**AGISSANT AU NOM ET POUR LE COMPTE DES DEUX ENTITÉS SUIVANTES :**

1. **Elliott Associates, L.P.**, un « *limited partnership* » du Delaware, dont le siège social est situé c\o Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, États-Unis d'Amérique ;

2. **Elliott International, L.P.**, un « *limited partnership* » des Îles Caïmans, dont le siège social est situé c/o Maples & Calder, P.O. Box 309, Ugland House, South Church Street, George Town, Îles Caïmans ;

> 1. et 2. ci-après désignés ensemble les « **Fonds Elliott** »

**Ayant pour avocat :**  **ORRICK, HERRINGTON & SUTCLIFFE (EUROPE) LLP**

**Agissant sous l'enseigne ORRICK RAMBAUD MARTEL**

**Par Maître Jean-Pierre MARTEL,**

Avocat au Barreau de Paris

31, avenue Pierre 1er de Serbie, 75782 Paris Cedex 16

Tél : 01 53 53 75 00 – Fax : 01 53 53 75 01 - Toque P 134

secretjpm@orrick.com

À l'adresse desquels le Demandeur élit domicile

**J'AI, HUISSIER DE JUSTICE SOUSSIGNÉ,**

En vertu d'une requête et d'une ordonnance rendue par Monsieur le Président du Tribunal de commerce de Paris en date du ___**juillet 2015**.

Copie de la requête et de l'ordonnance étant jointes à la copie du présent acte.

**DONNÉ ASSIGNATION À :**

1.  La société **XPO Logistics France SAS**, société par actions simplifiée, au capital de 10 000,00 €, ayant son siège social 23, rue du Roule, 75001 Paris, immatriculée au registre du commerce et des sociétés de Paris sous le numéro 811 597 335, représentée par son Président ;

Ci-après désignée « **XPO France** »

2.  La société **Norbert Dentressangle**, société anonyme à directoire et conseil de surveillance, au capital de 19 672 482,00 €, ayant son siège social 192, avenue Thiers, 69006 Lyon, immatriculée au registre du commerce et des sociétés de Lyon sous le numéro 309 645 539, représentée par le Président du Directoire ;

Ci-après désignée « N**orbert Dentressangle** »

**D'AVOIR À COMPARAÎTRE LE :**

_____ **2015 à     h    , devant Monsieur le Président du Tribunal de commerce de Paris, statuant en référé, au Tribunal de Commerce de Paris, 1 Quai de Corse, 75004 Paris**

*Il est rappelé aux destinataires de la présente assignation, conformément aux articles 56, 853 et 855 du Code de procédure civile :*

*Que les parties se défendent elles-mêmes ou ont la possibilité de se faire assister ou représenter par toute personne de leur choix ; que toutefois, le représentant, s'il n'est pas avocat, doit justifier d'un pouvoir spécial.*

*Qu'à défaut de comparaître ou se faire représenter, le défendeur s'expose à ce qu'une ordonnance soit rendue à son encontre sur la base des seuls éléments fournis par ses adversaires.*

*Les pièces sur lesquelles la demande est fondée sont indiquées en fin d'acte.*

**OBJET DE LA DEMANDE**

## I.    LES FAITS

### I.1.   PRÉSENTATION DES PARTIES

### A.   Elliott est un fonds d'investissement de renommée internationale dont Elliott Capital Advisors gère une partie des actifs

1.  Fondé par Monsieur Paul Singer en 1977, Elliott est l'un des plus anciens fonds d'investissement sous gestion continue.

2.  Elliott investit dans le monde entier via des placements diversifiés, et met en œuvre des stratégies variées, comme des arbitrages dits « event-driven » ou « événementiels », ou encore la gestion active de positions de couverture. Si la stratégie d'Elliott est naturellement tournée, comme de nombreux fonds d'investissement, vers la recherche de placements à rentabilité élevée, il porte une attention toute particulière à la gestion des risques, notamment ceux liés aux fluctuations du marché des actions et obligations, pratique sur laquelle il a notamment bâti sa réputation.

3.  Elliott dispose de bureaux à New York, Londres, Hong Kong et Tokyo. Il emploie près de 320 personnes dans le monde, dont la moitié exerce les activités de gestion de portefeuille, de *trading* et de recherche.

4.  Elliott est composé des deux fonds d'investissement suivants :

    -   **Elliott Associates, L.P.**, situé aux États-Unis, qui détient 100% du fonds bermudien The Liverpool Limited Partnership ;

    -   **Elliott International, L.P.**, basé aux Iles Caïmans.

5.  Les Fonds Elliott ont plus de 26 milliards de dollars d'actifs sous gestion. Leurs investisseurs comprennent des régimes de retraite, des fonds souverains, des fonds de dotations, des fondations, des fonds de fonds, des particuliers et des familles dotés de fonds propres nets élevés et des employés de l'entreprise.

6.  L'une des activités d'**Elliott Capital Advisors** consiste à conseiller et gérer une partie des actifs des Fonds Elliott, dont la récente participation prise par ces fonds dans la société française Norbert Dentressangle.

### B.   Norbert Dentressangle est une société française qui est aujourd'hui l'un des leaders mondiaux du transport et de la logistique

7.  Avec un chiffre d'affaires de 4,7 Mds € en 2014 et 42 000 collaborateurs, **Norbert Dentressangle**, société française cotée sur les marchés Euronext Paris et Euronext Londres, se positionne aujourd'hui comme un leader mondial de la logistique, du transport et de l'affrètement qui intervient sur trois continents : l'Europe, l'Amérique et l'Asie.

8.  Ce groupe, créé en 1979, s'est développé progressivement notamment grâce à de nombreuses opérations de croissance externe, dont l'acquisition en juillet 2014, aux États-Unis, de l'opérateur de logistique et de transport Jacobson Companies.

9.  Ce modèle de développement explique qu'aujourd'hui, plus de 64% du chiffre d'affaires du groupe est produit hors de France.

**C.** **XPO France est la filiale française du groupe américain de logistique et de transport, XPO Logistics**

10. XPO Logistics Inc. (« **XPO Logistics** »), société américaine cotée à la bourse de New York et située à Greenwich dans le Connecticut, se présente comme l'un des leaders du secteur du transport et de la logistique en Amérique du Nord.

11. En 2014, le groupe XPO employait 10 000 collaborateurs et affichait un chiffre d'affaires de 2,4 Mds USD réalisé principalement aux États-Unis.

12. Plusieurs opérations de croissance externe ont permis au groupe XPO de parvenir à ce résultat. Notamment, en 2014, le groupe XPO a tenté d'acquérir l'opérateur de logistique et de transport américain Jacobson Companies mais l'opération a été finalement remportée par Norbert Dentressangle (cf. *supra* **§ 8.**). Le groupe XPO s'est alors intéressé à Norbert Dentressangle (pièce n°1).

13. **XPO France** est la filiale française à 100% de XPO Logistics. Elle a été constituée en mai 2015 en vue de l'acquisition de la majorité du capital social de Norbert Dentressangle.

**I.2.** **À COMPTER D'AVRIL 2015, XPO LOGISTICS A MANIFESTÉ SON INTÉRÊT POUR ACQUÉRIR LA TOTALITÉ DES TITRES DE NORBERT DENTRESSANGLE À UN PRIX JUGÉ INTÉRESSANT PAR PLUSIEURS FONDS D'INVESTISSEMENTS, DONT LES FONDS ELLIOTT AGISSANT PAR ELLIOTT CAPITAL ADVISORS**

14. Le 28 avril 2015, XPO Logistics a annoncé avoir conclu (pièce n°2) :

   - un contrat de cession d'actions portant sur 66,71 % du capital social de Norbert Dentressangle au prix de 217,50 euros par action, auquel s'ajoutent 1,80 euros par action au titre de la distribution d'un dividende intervenue avant la réalisation de ladite acquisition ;

   - un accord relatif à une offre publique d'achat portant sur les actions restantes de Norbert Dentressangle au prix de 217,50 euros par action ;

   - un accord d'intéressement avec les membres du directoire régissant le traitement des plans d'intéressement existants et le futur plan d'intéressement octroyé aux dirigeants et salariés de Norbert Dentressangle.

   Aux termes de son communiqué de presse, XPO Logistics indiquait que « *si à l'issue de l'offre publique d'achat, les actionnaires n'ayant pas apporté leurs titres à l'offre ne représentent pas plus de 5% du capital et des droits de vote de Norbert Dentressangle, XPO a l'intention de procéder à un retrait obligatoire et de retirer de la cote les actions de Norbert Dentressangle* ».

15. Le 29 avril 2015, l'AMF a publié une décision marquant le début de la période de pré-offre, rendant notamment obligatoire pour tout investisseur la déclaration à l'AMF à compter de cette date de toute opération sur les titres de la société visée dès lors qu'il vient à accroître sa détention d'au moins 1%, conformément aux termes de l'article 231-46 du règlement général de l'AMF (« **RG AMF** ») (pièce n°3).

16. Jugeant notamment que le prix d'acquisition des titres annoncé par XPO Logistics ne valorisait pas pleinement Norbert Dentressangle, les Fonds Elliott ont décidé d'investir dans cette société.

Ainsi, à compter du 8 mai 2015, les Fonds Elliott ont acquis, directement ou indirectement via The Liverpool Limited Partnership, des actions et des CFD[1] portant sur autant d'actions de Norbert Dentressangle.

Conformément à la réglementation en vigueur, Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a procédé au fur et à mesure aux déclarations de l'ensemble de ces achats (pièce n°4).

17. Les Fonds Elliott ne sont pas les seules entités à avoir eu cette analyse du niveau du prix de l'offre proposé par XPO Logistics puisque d'autres fonds ont également commencé à investir dans Norbert Dentressangle à compter de l'annonce de ladite offre (pièce n°5).

18. Le 18 mai 2015, Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a publié auprès de l'AMF une déclaration d'intention aux termes de laquelle il indiquait que les Fonds Elliott envisageait « *de poursuivre leurs acquisitions d'actions Norbert Dentressangle et/ou d'instruments dérivés relatifs aux actions Norbert Dentressangle en fonction des conditions de marché* ».

Parallèlement, et conformément à l'article 9 des statuts de Norbert Dentressangle (pièce n°6), Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a déclaré à la société avoir franchi le seuil statutaire de 2% du capital (pièce n°7).

19. Le 19 mai 2015, XPO Logistics a constitué XPO France afin de le substituer dans ses droits et obligations au titre du contrat de cession d'actions et de l'accord relatif à une offre publique d'achat.

20. Le 2 juin 2015, un dividende de 1,80 euros par action a été versé aux actionnaires de Norbert Dentressangle.

21. Le 8 juin 2015, XPO France a acquis 66,71% du capital social de Norbert Dentressangle conformément aux termes du contrat de cession d'actions.

**I.3.  EN JUIN 2015, XPO FRANCE A DÉPOSÉ UNE OFFRE PUBLIQUE D'ACHAT SIMPLIFIÉE PORTANT SUR LES ACTIONS DE NORBERT DENTRESSANGLE, TANDIS QUE LES FONDS ELLIOTT ONT POURSUIVI LEURS ACQUISITIONS D'INSTRUMENTS FINANCIERS CONFORMÉMENT À LEUR DÉCLARATION D'INTENTION**

22. Le 11 juin 2015, XPO France a déposé un projet d'offre publique d'achat simplifiée visant le solde des actions de Norbert Dentressangle au prix de 217,50 € par action (pièce n°8).

23. Parallèlement, et comme annoncé dans sa déclaration d'intention du 18 mai 2015, les Fonds Elliott ont renforcé leurs positions dans Norbert Dentressangle (pièce n°4). Ainsi :

  - le 19 juin 2015, Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a déclaré à la société avoir franchi le seuil statutaire de 4% du capital (pièce n°7) ;

  - le 24 juin 2015, Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a déclaré à l'AMF avoir franchi le seuil de 5% du capital (pièce n°9).

---

[1]  « *Contract for difference* » : il d'agit d'un instrument financier dérivé flexible qui permet de réaliser des profits indexés sur la variation à la hausse comme à la baisse du cours d'une action, d'un indice, ou de tout autre actif sans en détenir le droit de propriété. Ces contrats présentent de nombreux avantages (i) financiers, puisqu'ils permettent à l'investisseur de se placer dans la même situation économique que s'il était propriétaire directement des titres concernés mais pour un coût d'acquisition très inférieur au coût réel d'acquisition desdits titres, et (ii) fiscaux, en permettant à l'investisseur d'être exonéré de certaines taxes puisqu'il n'est pas propriétaire de l'actif sous-jacent.

*24.*   Le 25 juin 2015, l'AMF a publié sa décision du 23 juin 2015 aux termes de laquelle elle a déclaré conforme l'offre publique d'achat simplifiée déposée par XPO France (pièce n°10), et a indiqué que l'offre serait ouverte du 26 juin au 17 juillet 2015 (pièce n°11).

*25.*   La note d'information de XPO France (pièce n°12) et la note en réponse de Norbert Dentressangle (pièce n°13) ont été simultanément diffusées.

**<u>Étrangement, aucune information n'est délivrée dans ces documents quant au sort des actionnaires qui souhaiteraient ne pas apporter leurs titres à l'offre et maintenir leur investissement au sein de Norbert Dentressangle.</u>**

En revanche, il est clairement indiqué dans la note d'information qu'« *en fonction des résultats de l'Offre, l'Initiateur se réserve le droit d'envisager les meilleures façons d'intégrer ND au sein du groupe XPO Logistics. Dans ce contexte, <u>l'Initiateur se réserve la faculté **de fusionner, à tout moment, certains actifs ou branches de ND avec des sociétés du groupe XPO Logistics** (en ce compris l'Initiateur) **ou de les transférer à des sociétés du groupe XPO Logistics ou vice versa***</u> » (pièce n°12).

En d'autres termes, et comme cela est clairement explicité dans la note en réponse de Norbert Dentressangle, « ***si les conditions à la mise en œuvre du retrait obligatoire ne sont [pas] réunies, (…) [XPO France] réfléchira aux meilleurs moyens d'intégrer la Société dans le nouveau groupe, notamment via la réalisation d'opérations de fusion ou d'apports*** » (pièce n°13).

Ainsi, en dépit du fait que plusieurs nouveaux actionnaires sont entrés au capital de Norbert Dentressangle durant la période de pré-offre puis d'offre, sans forcément avoir l'intention d'apporter leurs titres à l'offre, rien n'a été prévu dans l'offre déposée par XPO France quant au sort qui leur serait réservé postérieurement à la clôture de l'offre ; pire encore, XPO a uniquement réfléchi aux moyens de contourner leur présence s'ils venaient à représenter plus de 5 % du capital de Norbert Dentressangle à la clôture de l'offre, l'empêchant ainsi de réaliser directement l'intégration recherchée.

*26.*   Toujours persuadés que le prix désormais officiellement offert par XPO France pour les actions Norbert Dentressangle ne reflétait pas la valeur réelle de la société, les Fonds Elliott ont poursuivi leurs acquisitions d'instruments financiers dans la société. Ainsi :

-   le 26 juin 2015, Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a déclaré à la société avoir franchi le seuil statutaire de 6% du capital (pièce n°7) ;

-   après avoir déclaré à l'AMF le 7 juillet 2015 le débouclement de l'ensemble des CFDs contractés et l'acquisition des actions Norbert Dentressangle sous-jacentes (pièce n°9), Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, a réitéré auprès de l'AMF « *son intention de poursuivre les acquisitions d'actions NORBERT DENTRESSANGLE et/ou d'instruments dérivés relatifs aux actions NORBERT DENTRESSANGLE et, en conséquence, n'a pas l'intention d'apporter les actions acquises à l'offre. Elliott International, L.P. et Elliott Associates, L.P., n'agissent de concert avec aucune autre personne* » (pièce n°4).

*27.*   **À compter de cette date, XPO France a acquis la certitude qu'elle ne parviendrait pas à réunir les conditions nécessaires au retrait obligatoire de la cote des actions Norbert Dentressangle.**

**I.4. LE 9 JUILLET 2015, ELLIOTT CAPITAL ADVISORS A EU LA SURPRISE D'APPRENDRE QU'UNE ORDONNANCE AVAIT ÉTÉ RENDUE À SON ENCONTRE À LA REQUÊTE DE XPO LOGISTICS ET XPO FRANCE LUI INTERDISANT DE CÉDER SES TITRES À QUI QUE CE SOIT AUTRE QUE CES DERNIÈRES**

28.  Alors qu'il poursuivait les acquisitions de titres Norbert Dentressangle au nom et pour le compte des Fonds Elliott, Elliott Capital Advisors a eu la surprise de découvrir, par un article publié par le site internet Wansquare sous le titre : « *Norbert Dentressangle : les titres acquis par Elliott bloqués en justice* », qu'une ordonnance aurait été rendue sur requête à son encontre « *décidant que les titres ND acquis par Elliott ne devraient être cédés à XPO, l'initiateur de l'OPA* », dans la mesure où les Fonds Elliott auraient illégalement acquis leur participation dans Norbert Dentressangle (!) (pièce n°14).

29.  Sans avoir le temps de contester les termes de cette ordonnance – l'audience prévue à cet effet se tiendra le 23 juillet prochain (pièce n°15) –, XPO Logistics et XPO France ont poursuivi leur action extrêmement agressive à l'encontre d'Elliott Capital Advisors en lançant une procédure de « discovery » aux États-Unis sur la seule base de l'ordonnance non contradictoire ainsi obtenue.

30.  Elliott Capital Advisors et les Fonds Elliott condamnent fermement ce comportement déloyal et sont persuadés que le Président du Tribunal de commerce de Paris reviendra sur les termes de l'ordonnance qu'il a rendue une fois qu'il aura eu connaissance de la réalité du contexte parfaitement légal et légitime dans lequel les Fonds Elliott ont acquis les titres Norbert Dentressangle.

**I.5. DANS CE CONTEXTE, ELLIOTT CAPITAL ADVISORS ET LES FONDS ELLIOTT ONT TOUTES LES RAISONS DE CRAINDRE QUE DES OPÉRATIONS CONTRAIRES À L'INTÉRÊT DE LA SOCIÉTÉ ET DE SES ACTIONNAIRES MINORITAIRES SOIENT MIS EN ŒUVRE PAR XPO FRANCE POUR CONTOURNER LEURS DROITS**

31.  Comme cela ressort de la note d'information, XPO France souhaite atteindre le seuil de 95 % du capital de Norbert Dentressangle à l'issue de l'offre publique qui sera clôturée le 17 juillet prochain afin de pouvoir procéder au retrait obligatoire de la société de la cote et à son intégration notamment fiscale au sein du groupe. Cet objectif est affiché depuis le début du processus d'acquisition et il ne fait aucun doute que XPO France n'a jamais vraiment envisagé la possibilité que des actionnaires minoritaires n'apportent pas leurs titres à l'offre et souhaite poursuivre l'aventure au sein de Norbert Dentressangle (cf. *supra* **§ 24.**).

32.  Compte tenu du niveau de la participation des Fonds Elliott et de leur d'intentions vis-à-vis de l'offre, XPO France sait qu'elle ne parviendra pas à atteindre le niveau de 95% recherché.

33.  Ces faits, doublés de l'attitude extrêmement agressive et illégitime adoptée par XPO France et XPO Logistics à l'encontre d'Elliott Capital Advisors et des Fonds Elliott, font légitimement craindre à ces derniers que XPO France ait déjà mis en œuvre – ou qu'elle entende mettre en œuvre de façon imminente – des opérations manifestement contraires à l'intérêt social de Norbert Dentressangle et de ses actionnaires minoritaires pour pouvoir parvenir à son objectif d'intégration totale ou partielle de la société française au sein du groupe américain en contournant la difficulté liée au fait qu'elle ne détient pas 100% des titres de la société.

34.  Compte tenu de ce risque, Elliott Capital Advisors a adressé le 15 juillet 2015 une lettre à Norbert Dentressangle afin de lui faire part de ses inquiétudes et lui demander en conséquence de lui transmettre toutes les informations sur les opérations envisagées avec le groupe XPO pour « *intégrer ND au sein du groupe XPO Logistics* » (pièce n°16).

35.  Cependant, dans la mesure où (i) XPO France détient aujourd'hui plus de 73,6% du capital de Norbert Dentressangle, (ii) il existe des relations très étroites entre la direction de Norbert Dentressangle et celle du groupe XPO (notamment, le Président du conseil de surveillance de la société occupe également le poste de *Chairman of the Board* de XPO Logistics, et 6 des 10 membres du conseil de surveillance de la société sont des salariés ou affiliés de XPO Logistics), et (iii) le management de Norbert Dentressangle est directement intéressé à l'offre (cf. *supra* **§ 13.**), il est fort à craindre qu'aucune réponse satisfaisante ne sera apportée à cette lettre.

36.  Face à l'urgence de la situation, XPO France s'étant réservé « *la faculté de **fusionner, à tout moment [à compter de l'issue de l'offre qui interviendra le 17 juillet prochain]**, certains actifs ou branches de ND avec des sociétés du groupe XPO Logistics (en ce compris l'Initiateur) **ou de les transférer à** des sociétés du groupe XPO Logistics ou vice versa* », Elliott Capital Advisors sollicite du juge des référés :

- qu'il désigne sur le fondement de l'article 145 du Code de procédure civile un expert judiciaire chargé d'établir un rapport sur la conformité à l'intérêt de la société et de ses actionnaires autres que XPO France (ou toute autre société du groupe XPO) des opérations d'ores et déjà mises en œuvre ou sur le point de l'être par XPO France au sein de Norbert Dentressangle et/ou de ses filiales pour procéder à l'intégration de la société au sein du groupe XPO ;

- qu'il interdise à XPO France et Norbert Dentressangle, sur le fondement de l'article 873 du Code de procédure civile, de poursuivre la réalisation de toutes opérations ou de procéder à toute nouvelle opération d'intégration dans l'attente de l'établissement du rapport de l'expert judiciaire ainsi désigné.


## II.  **DISCUSSION**

37.  À titre liminaire, il est rappelé que l'article 56 alinéa 3 du Code de procédure civile prévoit que :

> « ***Sauf justification d'un motif légitime tenant à l'urgence*** *ou à la matière considérée, en particulier lorsqu'elle intéresse l'ordre public, l'assignation précise également les diligences entreprises en vue de parvenir à une résolution amiable du litige* ».

En l'espèce, et compte tenu de l'urgence dont il est justifié et du comportement extrêmement agressif de XPO France, Elliott Capital Advisors n'a pas pu accomplir de diligences complémentaires en vue de parvenir à une résolution amiable du litige autre que celles décrites ci-dessus (cf. *supra* **I.**).

38.  Ceci étant précisé, l'article 145 du Code de procédure civile dispose que :

> « *S'il existe un motif légitime de conserver ou d'établir avant tout procès la preuve de faits dont pourrait dépendre la solution d'un litige, les mesures d'instruction légalement admissibles peuvent être ordonnées à la demande de tout intéressé, sur requête ou en référé* »

En l'espèce, la volonté non dissimulée de XPO France de procéder à des opérations de démantèlement de Norbert Dentressangle dans le seul but de l'intégrer au sein du groupe XPO, sans tenir compte de l'intérêt de la société et de ses actionnaires minoritaires, justifie qu'un expert judiciaire soit nommé avant tout procès **(II-1.)**.

*39.* En outre, l'article 873 du Code de procédure civile donne pouvoir au juge des référés de prescrire, même en présence d'une contestation sérieuse, les mesures conservatoires qui s'imposent pour prévenir un dommage imminent ou faire cesser un trouble manifestement illicite.

La poursuite de la réalisation des opérations en cours (et/ou la mise en œuvre de nouvelles opérations) visant à intégrer Norbert Dentressangle dans le groupe XPO dans le seul intérêt de XPO France et de sa maison mère et au détriment de l'intérêt de la société et des actionnaires minoritaires constitue un trouble manifestement illicite (et/ou un dommage imminent) qu'Elliott Capital Advisors est légitime à faire cesser (et/ou à prévenir) **(II-2.)**.

**II.1.** <u>MONSIEUR LE PRÉSIDENT DU TRIBUNAL DE COMMERCE DE PARIS NOMMERA TEL EXPERT QUI LUI PLAIRA SUR LE FONDEMENT DE L'ARTICLE 145 DU CODE DE PROCÉDURE CIVILE</u>

**A.** <u>Elliott Capital Advisors est recevable et légitime à solliciter la désignation d'un expert judiciaire</u>

*40.* Compte tenu de ce qui précède, il ne fait aucun doute qu'Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, est recevable et légitime à solliciter la désignation d'un expert judiciaire sur le fondement de l'article 145 du Code de procédure civile. En effet :

*41.* D'une part, aucun procès n'est à ce jour engagé entre d'une part, Elliott Capital Advisors agissant au nom et pour le compte des Fonds Elliott, et d'autre part, XPO France et Norbert Dentressangle.

Certes, XPO Logistics et XPO France ont assigné à bref délai Elliott Capital Advisors et les Fonds Elliott devant le Tribunal de commerce de Paris. Cependant, les deux procédures en cause, outre le fait qu'elles n'impliquent pas les mêmes parties, ne portent absolument pas sur le même objet : alors que XPO Logistics et XPO France sollicitent en substance dans la première procédure que le Tribunal de commerce de Paris enjoigne Elliott Capital Advisors et les Fonds Elliot à « *transférer à Bank of America Corporation la totalité des actions Norbert Dentressangle qu'ils ont acquises auprès de cette dernière* », Elliott Capital Advisors sollicite par la présente procédure la désignation d'un expert aux fins d'établir un rapport sur les opérations en cours ou à venir mises œuvre par XPO France (ou tout autre société du groupe XPO) aux fins d'intégrer Norbert Dentressangle au sein du groupe XPO, et de tirer par la suite toutes les conséquences des conclusions de ce rapport à l'égard de XPO France, notamment compte tenu de l'absence de respect de l'intérêt de la société et de ses actionnaires minoritaires.

Ces deux litiges n'ont donc aucun lien. Or il est de jurisprudence constance « *qu'une mesure d'instruction (…) sollicitée dans l'éventualité de litiges distincts du procès déjà engagé entre les parties* »[2] est recevable sur le fondement de l'article 145 du Code de procédure civile.

*42.* D'autre part, il existe à l'évidence un motif légitime pour le Demandeur de faire désigner un expert judiciaire avant tout procès.

En effet, et comme cela a d'ores et déjà été démontré, il ne fait aucun doute que XPO France a mis en œuvre, ou entend mettre en œuvre dès que l'offre sera close, au sein de Norbert Dentressangle, une série d'opérations, incluant la possibilité ***de fusionner, à tout moment, certains actifs ou branches de ND*** *avec des sociétés du groupe XPO Logistics (en ce compris l'Initiateur) ou de les transférer à des sociétés du groupe XPO Logistics ou vice versa* », **aux fins d'« *intégrer ND au sein du groupe XPO Logistics* »** (pièce n°12), et ce dans le seul intérêt du groupe XPO, l'intérêt de la société et de ses actionnaires autres que XPO France n'étant à cet égard même pas mentionné dans la note d'information. L'imminence de ces opérations est confirmée par les déclarations publiques faites auprès de la place financière au lendemain de l'annonce de l'offre, en particulier en ce qui concerne le souhait de trouver dans tous les cas un moyen d'intégrer l'ensemble des activités logistiques de Norbert Dentressangle très rapidement au sein du groupe XPO (pièce n°1).

---

[2]  Cf. notamment, Cass. Com. 16 avril 1991, Bull. civ. IV, n°144.

Certes, la note d'information diffusée par XPO France contient un certain nombre d'engagements du groupe relatifs à la conservation du siège social ou le maintien du nombre d'employés en France. Mais ces engagements, uniquement pris en France, doivent être relativisés au regard de l'importance du marché français au sein de Norbert Dentressangle qui représentait seulement 36% de son chiffre d'affaires en 2014. Ainsi, rien n'empêche XPO France de procéder au démantèlement du reste des activités de Norbert Dentressangle et de les intégrer par petits morceaux au sein du groupe XPO sans que les Fonds Elliott ne puissent avoir accès à la moindre information à cet égard.

En procédant ainsi, XPO France parviendrait à intégrer Norbert Dentressangle au sein du groupe XPO, sans pour autant détenir 100% des titres de la société, laissant ainsi les quelques minoritaires actionnaires d'une société ayant perdu plus de 60% de sa valeur.

Les déclarations et intentions du groupe XPO semblent d'ailleurs confirmer cette volonté de s'affranchir des règles protectrices des minoritaires : à titre d'exemple, le groupe XPO semble déjà vouloir utiliser toutes les dérogations pour éviter d'avoir à révéler aux actionnaires le contenu et les conditions des conventions réglementées qu'il s'apprête à signer avec Norbert Dentressangle en prétendant qu'elles seront conclues à des conditions normales de marché et ne seront donc pas susceptibles de faire l'objet d'un vote en assemblée générale (pièce n°12).

Elliott Capital Advisors, agissant au nom et pour le compte des Fonds Elliott, se réserve la possibilité de tirer toutes les conséquences d'un tel comportement contraire à l'intérêt de Norbert Dentressangle et de ses actionnaires autres que XPO France (ou tout autre société du groupe XPO), notamment via une action indemnitaire au fond, voire d'une action pénale.

La désignation d'un expert chargé d'établir un rapport sur les différentes opérations mises en œuvre ou envisagées permettra à Elliott Capital Advisors de mesurer, avant tout procès, l'ampleur des fautes commises par XPO France à son préjudice.

Le « *motif légitime de conserver ou d'établir avant tout procès la preuve de faits dont pourrait dépendre la solution d'un litige* » est donc parfaitement caractérisé.

**B.   La mission de l'expert consistera à établir un rapport sur les opérations mises en œuvre ou envisagées au sein de Norbert Dentressangle en vue de l'intégrer totalement ou partiellement au sein du groupe XPO**

*43.*   Compte tenu de ce qui précède, la mission de l'expert judicaire désigné par le Président du Tribunal de commerce de Paris consistera à :

- Interroger XPO France et Norbert Dentressangle sur l'existence d'opérations mises en œuvre aux fins de procéder à l'intégration, totale ou partielle, de Norbert Dentressangle au sein du groupe XPO et lister ces opérations ;

- Interroger XPO France et Norbert Dentressangle sur l'existence de projets d'opérations envisagés aux fins de procéder à l'intégration, totale ou partielle, de Norbert Dentressangle au sein du groupe XPO et lister ces projets ;

- Se faire remettre par XPO France et Norbert Dentressangle tout document de quelque nature que ce soit (notamment mais non exclusivement, les correspondances, memoranda, notes, études, analyses, contrats…), finalisé ou en projet, sur quelque support que ce soit (notamment mais non exclusivement, papier, électronique…), relatif à ces opérations ou projets d'opérations, qu'il jugera utile pour réunir les éléments permettant d'apprécier la conformité de ces opérations ou projets d'opérations à l'intérêt social de Norbert Dentressangle et de ses actionnaires autres que XPO France (ou tout autre société du groupe XPO) ;

- Dresser un rapport des mesures d'expertise ainsi mises en œuvre et des avis auxquelles l'expert judiciaire parvient à la lumière des documents ainsi collectés.

**II.2. MONSIEUR LE PRÉSIDENT DU TRIBUNAL DE COMMERCE DE PARIS INTERDIRA SUR LE FONDEMENT DE L'ARTICLE 873 DU CODE DE PROCÉDURE CIVILE À NORBERT DENTRESSANGLE ET XPO FRANCE DE POURSUIVRE LA MISE EN ŒUVRE OU DE METTRE EN ŒUVRE TOUTES OPÉRATIONS EN VUE DE L'INTÉGRATION DE NORBERT DENTRESSANGLE AU SEIN DU GROUPE XPO JUSQU'À L'ÉTABLISSEMENT DU RAPPORT DE L'EXPERT**

*44.*   Les mesures d'expertise sollicitées sur le fondement de l'article 145 du Code de procédure civile doivent permettre à Elliott Capital Advisors de mesurer l'ampleur des fautes commises par XPO France à son préjudice et de tirer toutes les conséquences de ces fautes en empêchant notamment que des opérations soient réalisées dans le seul intérêt du groupe XPO et au détriment de l'intérêt de Norbert Dentressangle et de ses actionnaires minoritaires.

*45.*   De telles mesures n'auront plus aucun intérêt si XPO France pouvait parachever parallèlement à l'expertise, et en tout état de cause avant que l'expert ait dressé son rapport, son plan visant à déposséder Norbert Dentressangle de ses principaux actifs pour les intégrer au sein du groupe XPO dans le seul intérêt de ce dernier. Une fois les opérations de démantèlement achevées, il sera impossible à Elliott Capital Advisors de revenir en arrière.

*46.*   **Il est donc impératif qu'en application des dispositions de l'article 873 du Code de procédure civile, Monsieur le Président du Tribunal de commerce de Paris fasse cesser le <u>trouble manifestement illicite</u> constitué par la poursuite des opérations en cours en vue de l'intégration totale ou partielle de Norbert Dentressangle au sein du groupe XPO, et prévienne le <u>dommage imminent</u> que la mise en œuvre des opérations futures causera au Demandeur.**

   **Monsieur le Président du Tribunal de commerce de Paris ordonnera par conséquent la suspension de toutes opérations en cours et interdira la mise œuvre de toutes opérations futures en vue de l'intégration totale ou partielle de Norbert Dentressangle au sein du groupe XPO, et ce jusqu'à (à tout le moins) ce que l'expert judiciaire désigné par le Président du Tribunal de commerce de Paris ait établi son rapport sur les opérations concernées.**

<div align="center">

\*      \*

\*

</div>

**PAR CES MOTIFS**

*Vu les articles 145 et 873 du Code de procédure civile ;*
*Vu ce qui précède et les pièces communiquées par le Demandeur ;*

**Elliott Capital Advisors L.P., agissant au nom et pour le compte d'Elliott Associates, L.P., et Elliott International, L.P., demande à Monsieur le Président du Tribunal de commerce de Paris, statuant en référé, de :**

1. **Dire et juger** Elliott Capital Advisors L.P., agissant au nom et pour le compte des d'Elliott Associates, L.P., et Elliott International, L.P., recevable et bien fondé en ses demandes, ce faisant :

2.

- **Désigner** l'expert judiciaire qui lui plaira avec pour mission de :

  - Interroger la société XPO Logistics France SAS et la société Norbert Dentressangle sur l'existence d'opérations mises en œuvre aux fins de procéder à l'intégration, totale ou partielle, de la société Norbert Dentressangle au sein du groupe XPO et lister ces opérations,

  - Interroger la société XPO Logistics France SAS et la société Norbert Dentressangle sur l'existence de projets d'opérations envisagés aux fins de procéder à l'intégration, totale ou partielle, de la société Norbert Dentressangle au sein du groupe XPO et lister ces projets,

  - Se faire remettre par la société XPO Logistics France SAS et la société Norbert Dentressangle tout document de quelque nature que ce soit (notamment mais non exclusivement, les correspondances, memoranda, notes, études, analyses, contrats…), finalisé ou en projet, sur quelque support que ce soit (notamment mais non exclusivement, papier, électronique…), relatif à ces opérations ou projets d'opérations, qu'il jugera utile pour réunir tous les éléments permettant d'apprécier la conformité de ces opérations ou projets d'opérations à l'intérêt social de la société Norbert Dentressangle et de ses actionnaires autres que la société XPO Logistics France SAS (ou tout autre société du groupe XPO),

  - Dresser un rapport des mesures d'expertise ainsi mises en œuvre et des avis auxquelles l'expert judiciaire parvient à la lumière des documents ainsi collectés ;

- **Dire et juger** que la société XPO Logistics France SAS devra faire l'avance des frais d'expertise ;

3. **Ordonner** la suspension de toutes les opérations en cours relatives à l'intégration totale ou partielle de la société Norbert Dentressangle au sein du groupe XPO et **interdire** la mise en œuvre de toutes opérations futures en vue de l'intégration totale ou partielle de la société Norbert Dentressangle au sein du groupe XPO, jusqu'à ce que l'expert judiciaire ait établi son rapport sur les opérations concernées ;

4. **Condamner** la société XPO Logistics France SAS à verser à Elliott Capital Advisors la somme de 200 000 euros au titre de l'article 700 du Code de procédure civile ainsi qu'aux entiers dépens ;

5. **Dire** que la présente ordonnance sera exécutoire sur minute.

<u>**PIÈCES JOINTES À L'ASSIGNATION**</u>

**Pièce n°1 :**   Transcript des discussions intervenues entre le groupe XPO et le management de Norbert Dentressangle le 29 avril 2015 pour présenter l'opération à la place financière

**Pièce n°2 :**   Communiqué de presse conjoint du groupe XPO et de Norbert Dentressangle du 28 avril 2015

**Pièce n°3 :**   Décision n°215C0544 de l'AMF du 29 avril 2015 constatant l'ouverture de la période de pré-offre

**Pièce n°4 :**   Déclarations des achats et des ventes des Fonds Elliott auprès de l'AMF à compter du 15 mai 2015

**Pièce n°5 :**   Déclarations des achats et des ventes d'autres fonds que les Fonds Elliott auprès de l'AMF à compter du 19 mai 2015 et article de presse publié sur le site du Dealreporter le 16 juin 2015

**Pièce n°6 :**   Statuts de Norbert Dentressangle

**Pièce n°7 :**   Déclarations des Fonds Elliott de franchissement de seuils statutaires auprès de Norbert Dentressangle

**Pièce n°8 :**   Décision n°215C0799 de l'AMF du 11 juin 2015 constatant le dépôt d'un projet d'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle

**Pièce n°9 :**   Déclarations des Fonds Elliott de franchissement de seuils auprès de l'AMF

**Pièce n°10 :**   Décision n°215C0877 de l'AMF du 23 juin 2015 déclarant conforme l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle

**Pièce n°11 :**   Décision n°215C0896 de l'AMF du 25 juin 2015 fixant le calendrier de l'offre publique d'achat simplifiée visant les actions de Norbert Dentressangle

**Pièce n°12 :**   Note d'information de l'initiateur diffusée le 23 juin 2015

**Pièce n°13 :**   Note en réponse de la société visée par l'offre diffusée le 23 juin 2015

**Pièce n°14 :**   Article de presse publié sur le site de Wansquare le 9 juillet 2015

**Pièce n°15 :**   Ordonnance du 8 juillet 2015 du Président du Tribunal de commerce de Paris et copie des actes de procédure initiés par le groupe XPO

**Pièce n°16 :**   Lettre adressée le 15 juillet 2015 par Elliott Capital Advisor à Norbert Dentressangle



Elliott Capital Advisors L.P.
C/o Elliott Management Corporation
40 West 57th Street
5th Floor
New York, NY 10019
United States

15 juillet 2015

A:   Hervé Montjotin
     Président du directoire de
     Norbert Dentressangle SA
     192 avenue Thiers
     69006 Lyon

A:   Bradley S. Jacobs
     Président du conseil de surveillance de
     Norbert Dentressangle SA
     192 avenue Thiers
     69006 Lyon

Messieurs,

Je vous écris en ma qualité de représentant d'Elliott Capital Advisors L.P., qui agit pour le compte de The Livepool Limited Partnership, L.P., Elliott International L.P. et Elliott Associates, L.P., ("Elliott").  Comme vous le savez, Elliott est actionnaire de Norbert Dentressangle SA ("**Norbert Dentressangle**" ou la "**Société**").  Nous souhaiterions, par la présente, réitérer notre attachement à la Société et vous faire part de certaines inquiétudes. Vous voudrez bien en conséquence transmettre une copie de cette lettre à chacun des membres du directoire et du conseil de surveillance de la Société.

La prise de participation d'Elliott dans Norbert Dentressangle a été motivée par la valeur (non encore réalisée) de la Société et son fort potentiel sur le long terme. C'est pourquoi nous avons indiqué que, sur la base des conditions actuelles de marché, nous n'avons pas l'intention d'apporter nos actions de la Société à l'offre publique lancée par XPO Logistics France SAS.  Cette position a été adoptée après une analyse poussée des documents finaux relatifs à l'offre en considération de ce que nous estimons être à ce jour le meilleur intérêt de la Société, et d'Elliott.  Nous ne souhaitons donc pas dévier de cette position, qui est en outre partagée par tous les autres actionnaires minoritaires qui n'apporteraient pas leur participation dans la Société à XPO Logistics France SAS.

Dans la mesure où, ayant pris la décision de ne pas apporter à l'offre, nous avons l'intention de demeurer actionnaires de la Société, soyez assurés que nous prêterons une grande attention à toutes ses activités, ainsi qu'à toutes les opérations et relations intragroupes qui pourraient être mises en place, notamment avec XPO Logistics, Inc. (qui est la société mère de XPO Logistics France SAS) ou ses filiales.  Nous ne doutons pas que vous aurez à cœur de vous acquitter au mieux de vos obligations et notamment de protéger les droits des actionnaires minoritaires, et que vous privilégierez en toutes circonstances l'intérêt de la Société à toutes autres considérations.

Ceci constitue pour tous les membres des organes sociaux une obligation essentielle dont la loi sanctionne l'irrespect même pénalement dans certaines circonstances, outre une obligation éthique reprise dans le code de gouvernement d'entreprise des sociétés cotées publié par l'AFEP-MEDEF, plus particulièrement au regard des relations très étroites qui existent entre la direction de Norbert Dentressangle et celle de XPO Logistics, Inc.(notamment du fait que le Président du conseil de surveillance de la Société occupe également le poste de *Chairman of the Board* de XPO Logistics, Inc).

Nous craignons en effet que ces relations conduisent les dirigeants de Norbert Dentressangle à considérer d'autres intérêts que ceux de la Société, en particulier ceux de XPO Logistics.  Dans ce contexte, nous invitons les membres indépendants du conseil de surveillance de la Société à faire preuve d'une vigilance renforcée et à prêter une attention particulière à toute opération entre sociétés liées, afin de s'assurer que les intérêts de la Société soient effectivement préservés.

Nous serons nous-mêmes particulièrement attentifs à la mise en œuvre des intentions qui ont été publiées par XPO Logistics dans la note d'information relative à l'offre publique. XPO Logistics y indique en effet se réserver la faculté de fusionner, à tout moment, certains actifs ou branches de la Société avec des sociétés du groupe XPO Logistics, de les transférer à des sociétés du groupe XPO Logistics (ou vice-versa), ou de conclure des contrats de licence portant sur certains droits de propriété intellectuelle, et notamment consentir une licence de la marque XPO à Norbert Dentressangle.  Bien que le détail de ces opérations n'ait pas été porté à la connaissance du public, il apparaît clairement qu'elles ne pourront pas être réalisées dans le seul intérêt de XPO Logistics au détriment de tout autre avantage, y compris stratégique, pour la Société, notamment dans la mesure où Norbert Dentressangle n'aurait sans doute jamais conclu de telles opérations si elle était demeurée une entité autonome.  La réalisation de telles opérations dans ce but avec des sociétés liées serait en effet de nature à porter une atteinte irréversible à la valeur et à la stratégie de Norbert Dentressangle, alors même que la Société demeurera cotée et que nous et bien d'autres en demeureront actionnaires minoritaires.

Nous souhaitons donc obtenir les informations nécessaires sur ces "actifs" et "branches d'activité" ainsi que sur le financement du groupe XPO Logistics lié à l'offre et à ses suites (y compris le refinancement de la Société), ainsi que sur le calendrier de réalisation de ces opérations et du contrat de licence, et savoir si les négociations entre Norbert Dentressangle et XPO Logistics ont commencé et à quelle date et si des accords ont déjà été conclus.  Nous pensons qu'il serait opportun que nous nous réunissions avec la direction de Norbert Dentressangle, y compris les membres indépendants de son conseil de surveillance, dès que possible afin que nous puissions comprendre les raisons qui pourraient la conduire à décider la conclusion de telles opérations et les conséquences qu'elles emporteraient.

Nous ne doutons pas, évidemment, que les membres du conseil de surveillance de la Société qui ne seraient pas indépendants de XPO Logistics s'abstiendront de prendre part à de telles décisions, afin notamment d'éviter tout conflit d'intérêts et de respecter tant les contraintes légales que les meilleurs principes de bonne gouvernance afin que les décisions de la Société soient prises indépendamment de toutes considérations des intérêts propres de XPO Logistics ou du management de cette dernière.  Nous sommes également convaincus que chacun des membres du directoire et du conseil de surveillance respectera en tous

2

points leurs obligations de loyauté envers la Société et ses actionnaires, en faisant toujours prévaloir l'intérêt de la Société et en protégeant les intérêts de tous les actionnaires, en particulier ceux des minoritaires.

Nous vous prions d'agréer, chers Messieurs, nos salutations distinguées.

Elliott Capital Advisors L.P.

3