# Exhibit C

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*

# DRAFT INFORMATION MEMORANDUM REGARDING THE SIMPLIFIED TENDER OFFER TARGETING THE SHARES OF



**initiated by**



**XPO Logistics France SAS**

**presented by**

Morgan Stanley

---

**OFFER PRICE: 217.50 euros per Norbert Dentressangle SA share**
**OFFER PERIOD: 15 trading days**

---



This draft information memorandum has been prepared and filed with the *Autorité des marchés financiers* (the French Financial Markets Authority ("**AMF**")) on 11 June 2015 in accordance with Articles 231-13, 231-16 and 231-18 of the AMF General Regulations. This offer and the draft information memorandum are subject to review by the AMF.

---

**IMPORTANT NOTICE**

In the event that, upon the closing of the simplified tender offer, the number of shares not tendered in response to this offer by the minority shareholders represents less than 5% of the share capital or voting rights of Norbert Dentressangle SA, XPO Logistics France has the intention to implement, after the closing of such tender offer, pursuant to articles L. 433-4 III of the French Monetary and Financial Code and 237-14 *et seq.* of the AMF General Regulations, a mandatory squeeze-out procedure in exchange for compensation equal to 217.50 euros per Norbert Dentressangle SA share, it being specified that such squeeze-out procedure would be immediately followed by an application to Euronext for the delisting of Norbert Dentressangle SA shares.

---

Copies of the draft information memorandum are available on the websites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com) and may be obtained free of charge upon request to **Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France)** ("**Morgan Stanley**").

This draft information memorandum to be approved by the AMF as well as other information relating in particular to the legal, financial and accounting characteristics of XPO Logistics France shall be made available to the public free of charge at the offices of Morgan Stanley, as well as on the web sites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com), pursuant to article 231-27 2° of the AMF General Regulations. A press release will be issued pursuant to article 221-3 of the AMF General Regulations in order to inform the public of the manner in which these documents will be made available.

Pursuant to article 231-28 of the AMF General Regulations, information relating in particular to the legal, financial and accounting characteristics of XPO Logistics France and Norbert Dentressangle SA will be filed with the AMF and made available to the public no later than on the day preceding the opening of the simplified tender offer.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

## TABLE OF CONTENTS

1. PRESENTATION OF THE OFFER ........................................................................................... 4

1.1. INTRODUCTION ...................................................................................................................... 4

1.2. CONTEXT OF AND RATIONALE FOR THE TRANSACTION .................................................... 4

1.2.1. Background for transaction ............................................................................................... 4

1.2.2. Rationale for the Block Acquisition and the subsequent Offer ........................................ 10

1.2.3. Opinion of XPO Logistics, Inc.'s Board of Directors and sole shareholder approval of the Offeror ........ 11

1.3. INTENTIONS OF THE OFFEROR FOR THE COMING TWELVE MONTHS ................................ 11

1.3.1. Strategic rationale and future activity ............................................................................. 11

1.3.2. Intentions regarding employment and management ........................................................ 12

1.3.3. Dividend distribution policy ............................................................................................ 12

1.3.4. Synergies .......................................................................................................................... 12

1.3.5. Mandatory squeeze-out and removal from listing ........................................................... 13

1.3.6. Intentions regarding merger and integration .................................................................. 13

1.3.7. Composition of the Supervisory Board ............................................................................. 13

1.3.8. Advantages for the Company, the Offeror and their shareholders .................................. 14

1.4. AGREEMENTS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE ASSESSMENT OF THE OFFER OR ITS OUTCOME ........................................................................................................................... 15

2. CHARACTERISTICS OF THE OFFER ............................................................................... 15

2.1. TERMS OF THE OFFER ......................................................................................................... 15

2.2. NUMBER AND NATURE OF THE SECURITIES TARGETED BY THE OFFER ............................ 16

2.3. TENDER PROCEDURE FOR THE OFFER ................................................................................ 16

2.4. INDICATIVE TIMETABLE OF THE OFFER .............................................................................. 17

2.5. FINANCING OF THE OFFER ................................................................................................... 18

2.5.1. Costs connected with the Offer ........................................................................................ 18

2.5.2. Financing sources of the Offer ......................................................................................... 18

2.6. RESTRICTIONS CONCERNING THE OFFER ABROAD ............................................................ 18

2.7. TAX TREATMENT OF THE OFFER ......................................................................................... 19

2.7.1. Individual shareholders who are tax residents of France managing their private assets and not carrying out stock exchange transactions on an habitual basis ................................................................. 19

2.7.2. Corporate shareholders residents of France for tax purposes and subject to corporate income tax under standard conditions ...................................................................................................................... 21

2.7.3. Shareholders who are not residents of France for tax purposes ...................................... 22

2.7.4. Shareholders subject to a different tax regime ................................................................ 23

2.7.5. Registration duties or financial transaction tax .............................................................. 23

3. OFFER VALUATION CRITERIA ........................................................................................ 24

3.1. ASSESSMENT OF THE OFFER PRICE FOR ND SHARES ......................................................... 24

3.2. FINANCIAL ELEMENTS ......................................................................................................... 24

3.2.1. Financial information ....................................................................................................... 24

3.2.2. Enterprise value to equity value bridge ........................................................................... 25

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

3.2.3.   Number of shares retained ............................................................................................................ 25

**3.3.   VALUATION OF THE OFFER** ........................................................................................................... **25**

3.3.1.   Analysis of trading prices ........................................................................................................ 25

3.3.2.   Equity research analysts' target prices ................................................................................... 27

3.3.3.   Analysis of trading multiples for comparable listed companies ............................................ 27

3.3.4.   Analysis of precedent transactions multiples ........................................................................ 29

3.3.5.   Analysis of premia paid in precedent French public transactions ("OPA") ............................ 30

3.3.6.   Analysis of discounted cash flow ........................................................................................... 31

3.3.7.   Summary of the valuation of the Offer per Company Share .................................................. 33

**4.   PERSONS   ASSUMING   RESPONSIBILITY   FOR   THE   DRAFT   INFORMATION MEMORANDUM** .................................................................................................................................. **34**

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

# 1.   PRESENTATION OF THE OFFER

## 1.1.   Introduction

Pursuant to Title III of Book II, and in particular, articles 233-1 2° *et seq.* and 234-2 of the AMF General Regulations, XPO Logistics France SAS, a corporation incorporated under the laws of France having a share capital of 10,000 euros, whose registered office is located at 23 rue du Roule, 75001 Paris, France and registered under number 811 597 335 RCS Paris ("**XPO**" or the "**Offeror**"), a wholly owned subsidiary of XPO Logistics, Inc.[1], a company incorporated under the laws of the state of Delaware, whose registered office is at Five Greenwich Office Park, Greenwich, Connecticut 06831 (USA) and whose shares are traded on the New York Stock Exchange (NYSE: XPO) ("**XPO Logistics, Inc**" and, together with XPO, "**XPO Logistics**"), has irrevocably undertaken to the AMF to offer to all of the shareholders of Norbert Dentressangle SA, a French *société anonyme* having a share capital of 19,672,482 euros, whose registered office is located at 192, avenue Thiers, 69006 Lyon, France registered with the Commercial and companies registrar of Lyon under number 309 645 539 ("**ND**" or the "**Company**") and whose shares are traded on both Euronext Paris - Eurolist Compartment A (ISIN FR0000052870; ticker symbol: GND) and NYSE Euronext London - Official List, to purchase all their shares of ND at a price of 217.50 euros per share (the "**Offer**").

Pursuant to Article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offer shall be open for a period of 15 trading days, from [29] June to [17] July 2015 inclusive.

The Offer follows the acquisition by XPO (i) on 8 June 2015, of 6,561,776 shares from various shareholders of ND by way of off-market block trades (the "**Block Acquisition**"), representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company and (ii) on 8 June 2015, of 110,000 Subscription Warrants (as defined hereafter) giving rise to the right to subscribe for 110,000 ND Shares. XPO holds at the Offer filing date, 6,561,776 ND shares, representing 66.71% of the share capital and 66.38% of the theoretical voting rights.

Pursuant to the terms of Article 231-13 of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015. Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings made by the Offeror.

The Offer targets all the shares not directly or indirectly held by the Offeror as at the date hereof.

## 1.2.   Context of and rationale for the transaction

### 1.2.1.   Background for transaction

*(i)      Acquisition by the Offeror of a 66.71% interest in ND*

On 28 April 2015, XPO Logistics, Inc. entered into (i) a share purchase agreement (the "**Share**

---

[1] XPO Logistics, Inc.'s largest stockholder is Jacobs Private Equity, LLC, which is controlled by Mr. Bradley Jacobs who owns approximately 17.015% of the common stock of XPO Logistics, Inc.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

**Purchase Agreement**") with Dentressangle Initiatives, Messrs. Norbert Dentressangle and Pierre-Henri Dentressangle and Mss. Evelyne Dentressangle and Marine Dentressangle (the "**Initial Sellers**"), (ii) a tender offer agreement (the "**Tender Offer Agreement**") with the Company and (iii) a letter with the members of the Management Board (the "**Incentive Letter**") setting forth the treatment of the existing management incentive instruments and the future incentive scheme to be granted to the management and employees of the Company.

Pursuant to the Share Purchase Agreement in relation to the Block Acquisition, XPO agreed to acquire from the Initial Sellers 6,561,776 shares, representing approximately 66.71% of the share capital of ND at a price of 217.50 euros per share. The purchase price takes into consideration the distribution of a dividend in the amount of 1.80 euros per share to the benefit of all ND shareholders prior to the closing of the Block Acquisition.

Further, pursuant to the Tender Offer Agreement and the Incentive Letter, XPO agreed to acquire, at a price of 157.95 euros per warrant, from certain members of the management board of the Company, the share subscription warrants issued to them by the Company, i.e., (i) 80,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant A**") and (ii) 30,000 subscription warrants with an exercise price of 59.55 euros ("**Subscription Warrant B**" and, together with the Subscription Warrants A, the "**Subscription Warrants**"), provided the vesting conditions provided in the terms and conditions of such Subscription Warrants be cancelled and the exercise periods be opened in anticipation by the shareholders of the Company on the occasion of the shareholders' meeting of 21 May 2015.

Also on 28 April 2015, XPO Logistics, Inc. and the Company announced the Block Acquisition, and XPO Logistics, Inc. also announced that it would launch the acquisition process for all the remaining shares of ND at a price of 217.50 euros per share.

The Company's supervisory board in a meeting held on 27 April 2015, gave a preliminary favourable opinion as to the Block Acquisition and the Offer, and appointed Ledouble SAS, represented by Messrs. Olivier Cretté and Sébastien Sancho, as independent expert in charge of preparing a report regarding the financial terms of a tender offer, followed, as the case may be, by a mandatory squeeze-out.

On 19 May 2015, the Offeror was created by its sole shareholder, XPO Logistics, Inc., which substituted the Offeror in its rights and obligations under the Share Purchase Agreement and the Tender Offer Agreement.

On 16 May 2015, XPO Logistics, Inc. and the Initial Sellers agreed that all conditions precedent pertaining to governmental and antitrust approvals were satisfied and therefore that all conditions precedents under the Share Purchase Agreement were satisfied.

On 21 May 2015, the shareholders' meeting of the Company approved the payment of a dividend of 1.80 euros per share which was made on 2 June 2015 (record date occurring on 29 May 2015).

The Company initiated the employee information and consultation process with the employee committee at the ND group level immediately following the announcement of the signing of the Share Purchase Agreement. On 28 May 2015, the ND group's employee committee rendered an unfavourable opinion on the contemplated Offer.

The settlement-delivery of the Block Acquisition governed by the Share Purchase Agreement was completed off-market on 8 June 2015.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

As a result of the Block Acquisition, the Offeror became the owner of 6,561,776 shares of ND, representing 66.71% of the share capital and 66.38% of the theoretical voting rights of the Company.

On 8 June 2015, the Company's supervisory board, in view of the fairness opinion of the independent expert, recommended to shareholders to tender their shares to the Offer.

Further, on 8 June 2015, the Offeror acquired the Subscription Warrants at a price per warrant of 157.95 euros, corresponding to the price paid for the shares as part of the Block Acquisition minus the exercise price.

### (ii)     *Provisions specific to the Share Purchase Agreement between the Offeror and the Initial Sellers*

The Share Purchase Agreement provides for an obligation for the Purchaser to ensure that the Company progressively ceases to use the Norbert Dentressangle trade name and brand, with the rebranding process to be fully completed in the 36 months following the Block Acquisition. Subject to certain conditions, penalties may be due in case of failure to observe these obligations.

The Share Purchase Agreement does not contain any price supplement provision to the benefit of the Initial Sellers in respect of the Block Acquisition.

Further, the Share Purchase Agreement provides for 3-year non-compete and non-solicitation obligations bearing upon the Initial Sellers. The Initial Sellers also undertook not to use the Norbert Dentressangle trade name and brand in a business similar to the Company's business for a period of 20 years.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

*(A)     ND's capital and voting rights allocation prior to the Block Acquisition*

The share capital of ND amounts, to the Offeror's knowledge, to 19,672,482 euros, divided into 9,836,241 ordinary shares with a nominal value of 2 euros each.

The following table presents, to the knowledge of the Offeror, the capital and theoretical voting rights of the Company immediately prior to the completion of the Block Acquisition on 31 May 2015.

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights* |
|---|---|---|---|---|
| Dentressangle Family | 240 482 | 2.44 | 480 944 | 2.96 |
| Dentressangle Initiatives (controlled by the Dentressangle family) | 6 321 294 | 64.27 | 12 366 694 | 76.26 |
| **Sub-total (Dentressangle family)** | 6 561 776 | 66.71 | 12 847 638 | 79.22 |
| Employees and public[2] | 3 230 018 | 32.84 | 3 325 298 | 20.50 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578\*\** | *0.24\*\** |
| *Including shares held under liquidity arrangement* | *5869* | *0.06* | *5 869\*\** | *[0.04]\*\** |
| **Total** | 9 836 241 | 100 | 16 217 383 | 100 |

* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

** Theoretical voting rights – voting rights attached to treasury shares being suspended.

Neither the Offeror nor any of the companies belonging to the Offeror group held, directly or indirectly, any ND shares prior to the Block Acquisition and in particular has not purchased any ND shares in the 12 months preceding the announcement of the Offer.

---

[2] Including 53 500 shares held by the Management Board

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

**(B)** **ND's capital and voting rights allocation following the Block Acquisition**

The following table presents, to the knowledge of the Offeror, as of the date hereof the capital and theoretical voting rights of the Company following the completion of the Block Acquisition.

| Shareholders | Number of shares | % Capital | Number of voting rights | % Voting rights |
|---|---|---|---|---|
| XPO Logistics France SAS | 6 561 776 | 66.71 | 6 561 776 | 66.38 |
| Employees and public | 3 230 018 | 32.84 | 3 279 575 | 33.17 |
| *Including treasury shares* | *38 578* | *0.39* | *38 578\*\** | *0.39\*\** |
| *Including shares held under liquidity arrangement* | *5 869* | *0.06* | *5 869\*\** | *0.06\*\** |
| **Total** | 9 836 241 | 100 | 9 885 798 | 100 |

\* Pursuant to article 223-11 of the AMF General Regulations, the total number of voting rights is computed on the basis of all the shares to which voting rights are attached, including shares deprived of voting rights.

\*\* Theoretical voting rights – voting rights attached to treasury shares being suspended.

Apart from the Block Acquisition mentioned above and the acquisition of the Subscription Warrants mentioned below, neither the Offeror, nor any of the companies belonging to the Offeror group, held ND shares, whether directly or indirectly, prior to the Block Acquisition.

**(iii)** **Securities giving access to ND's share capital (Subscription Warrants)**

In addition, as of 8 June 2015, the outstanding Subscription Warrants giving access to the Company's share capital, were allocated as described in the table below:

| Category | Number granted by the Company | Total Shares (in case of exercise) |
|---|---|---|
| BSA A – Issue of July 2013 | 80 000 | 80 000 |
| BSA B – Issue of July 2013 | 30 000 | 30 000 |
| **Total** | 110 000 | 110 000 |

As mentioned above, on 8 June 2015, the Offeror acquired pursuant to the Tender Offer Agreement and the Incentive Letter, the Subscription Warrants from Messrs. Montjotin (50 000 Subscription

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Warrants), Bataillard (30 000 Subscription Warrants)[3], Wilson (15 000 Subscription Warrants) and Gomez (15 000 Subscription Warrants) (members of the management board), at a price per warrant of 157.95 euros, corresponding to the price per share paid for thee Block Acquisition minus the exercise price of the Subscription Warrants.

As at the date hereof, XPO holds 100% of the Subscription Warrants. Apart from the foregoing, ND has issued no other securities giving access to its capital.

On the occasion of the mixed shareholders' meeting held on 21 May 2015, the shareholders of ND decided to amend the terms and conditions of the Subscription Warrants in order to (i) delete the presence and lock-up conditions provided therein and (ii) accelerate the exercise window as from 21 May 2015 (with the date of the end of the exercise period being maintained).

*(iv)*   *Performance shares*

The Company has granted performance shares (*actions attribuées gratuitement*). As at 31 May 2015, the following performance shares are still under acquisition period and have not yet been issued and delivered to their beneficiaries:

| Category | Number granted by the Company | Total Shares (in case of delivery of shares) |
|---|---|---|
| Performance shares – Grant of May 2013 | 50 100 | 50 100 |
| Performance shares – Grant of May 2014 | 21 000 | 21 000 |
| Performance shares – Grant of October 2014 | 30 997 | 30 997 |
| **Total** | 102 097 | 102 097 |

Pursuant to the Incentive Letter, XPO Logistics, Inc. has proposed the following to the beneficiaries of performance shares, none of which have been delivered on the date of the Offer and which, as a result, are not targeted by the Offer:

For beneficiaries of performance shares granted in April 2013 and April 2014, which would be delivered in April 2016 and are subject to lockup obligation until April 2018, XPO Logistics, Inc. and the Offeror will propose such beneficiaries to cancel these performance shares in exchange for a cash bonus (considered as salary) for a gross amount of 217.50 euros per share, to be paid in two equal instalments 1.5 years and 3 years after the completion of the Block Acquisition (without any presence, service or performance conditions).

---

[3] It is noted that a portion of the Subscription Warrants held by Messrs. Montjotin and Bataillard were the subject of a contribution to a personal holding company and subject to an advanced gift on inheritance (*donation-partage*) to the benefit of their children respectively.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Based on the historical financial achievements in 2013 and 2014 and the 2015 budget, it may be considered that the performance conditions provided for in the April 2013 and April 2014 performance share plans will be met.

For recipients of performance shares granted in October 2014 to the managers of Jacobson (the US subsidiary of the Company, the acquisition of which was completed on July 31 2014) whose acquisition and conservation periods both expire in October 2018, XPO Logistics, Inc. will offer in exchange for the waiver by the beneficiaries of their right to these shares, the establishment of a new plan based on the evolution of the share price of XPO Logistics, Inc. and whose performance targets would take into account integration within the XPO group. The timeframe of this new plan would be at least equal to that of the performance shares plan that it would replace. The value of grants under this new plan would in any event not be higher than the value of the replaced performance shares, taking into account, on the one hand, the price of the Offer to determine the value of the performance shares replaced and on the other hand, the market value of the XPO Logistics, Inc. shares underlying the instruments issued in exchange to determine the value of such instruments.

*(v)   Declarations of thresholds crossings*

Pursuant to articles 223-11 *et seq.* of the AMF General regulations and to articles 233-7 *et seq.* of the Commercial Code, the Offeror declared, by letters dated 11 June 2015 to the AMF and to ND, that it had, as a result of the Block Acquisition, crossed upward on 8 June 2015 all the legal thresholds between 0 and 2/3 thresholds of share capital and between 0 and 50% of voting rights of the Company following the execution of the Share Purchase Agreement relating to the Block Acquisition.

These declarations gave rise to a notice published by the AMF on [●] 2015 under number [●].

Conversely, members of the Dentressangle family and Dentressangle Initiatives have declared, by letters dated 11 June 2015 to the AMF and to ND, that they had, acting together in concert, as a result of the sale of their stake in ND via the Block Acquisition, crossed downwards all legal thresholds between 2/3 down to 0.

These declarations gave rise to a notice published by the AMF on [●] 2015 under visa number [●].

*(vi)   Commitment to participate in the Offer*

None.

*(vii)   Regulatory approvals*

The Offer is not subject to any antitrust approval.

The Block Acquisition has been approved (or has not given rise to any objections) by the competition authorities in the United States, Germany and Russia. The respective clearances or terminations were granted on 11 May 2015 with respect to the United States (early termination) and Germany, and 20 May 2015 in respect of Russia.

## 1.2.2.   Rationale for the Block Acquisition and the subsequent Offer

XPO Logistics, Inc. is one of the largest and fastest-growing logistics companies in North America. It has successfully employed its strategy to grow organically as well as to acquire well performing transportation and logistics businesses that bring value and are highly scalable. As a result, XPO Logistics, Inc.'s transportation segment has built industry-leading positions within North America in freight brokerage, intermodal, last mile, expedite and global freight forwarding. In addition, XPO

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Logistics, Inc.'s logistics segment has become the leading provider of highly engineered, technology-enabled contract logistics.

The three businesses of ND (Logistics, Transportation, and Air & Sea) are intended to remain headquartered in France and will serve as the development platform for all of XPO Logistics, Inc.'s European activities. XPO Logistics expects this acquisition to enable it to offer the more than 15,000 current customers of XPO Logistics, Inc. leading transportation and logistics services in Europe. In addition, ND has built a loyal base of blue chip customers that includes multinational companies, some of which are not currently served by XPO Logistics, Inc. These customers have an opportunity to consolidate their supply chain relationships with the combined company, and will gain access to XPO Logistics, Inc.'s industry leading services in North America.

In addition, XPO Logistics expects to invest in the growth of the combined company through its proprietary technology platforms that provide industry-leading customer service and leverage our scale. XPO Logistics, together with ND, have a 2015 IT budget of approximately 225 million USD, which it believes is among the highest in the industry.

Finally, ND's culture, like XPO Logistics, Inc.'s, is strongly focused on operational excellence and world-class service.

### 1.2.3. Opinion of XPO Logistics, Inc.'s Board of Directors and sole shareholder approval of the Offeror

Following a detailed review of the terms and structure of the proposed transaction with its advisors during the Board meeting held on 26 April 2015, the Board of Directors of XPO Logistics, Inc. declared the transaction, including the Block Acquisition and the Offer advisable and in the best interest of XPO Logistics, Inc. and its stockholders. The Board further granted the necessary powers to its officers to take any and all actions necessary for the consummation of the transaction.

In addition, on 4 June 2015, XPO Logistics, Inc. as sole shareholder of the Offeror, authorised the latter to make the Block Acquisition and proceed to initiate the Offer.

### 1.3.   Intentions of the Offeror for the coming twelve months

### 1.3.1.  Strategic rationale and future activity

As explained above in paragraph 1.2.2, the Offeror considers that ND's three main businesses are aligned with the XPO Logistics, Inc.'s business portfolio. ND will serve as the development platform for all of XPO Logistics, Inc.'s European activities. ND will be able to provide services to XPO Logistics, Inc.'s more than 15,000 current customers which have commercial interests outside of North America. The Offeror expects the European headquarters to remain in France, where XPO Logistics intends to grow the European operations of the group. For a period of five (5) years after the closing date, the Offeror intends to maintain the headquarters and decision-making centre of ND's European logistics business in Paris and transportation business in the department of the Drôme.

**Regarding the logistics business**, XPO Logistics, Inc. will now be able to offer leading contract logistics services in Europe to their current customers. In addition, ND has built a loyal base of blue chip customers that includes multinational companies, many of which are not currently served by XPO Logistics, Inc. ND's operations in North America are expected to grow along with XPO Logistics,

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Inc.'s domestic contract logistics business. As a whole, the transaction will combine approximately 11 million square metres of ND's operated warehouse space with XPO Logistics, Inc.'s 1.1 million square metres, making the combined company one of the world's largest contract logistics provider based on warehouse capacity.

**Regarding the transportation business**, XPO Logistics, Inc. will now be able to offer transportation services in Europe to its current customers. ND's blue chip multi-national customers will also have an opportunity to consolidate their supply chain relationships with the combined company, and will gain access to XPO Logistics, Inc.'s industry leading services in North America for freight brokerage, intermodal, last mile, expedite and global forwarding.

**Regarding the air & sea business**, the combination will increase XPO Logistics Inc.'s global freight forwarding operations to approximately 500 million USD in revenue. The combined company will utilise the added volume to purchase air and sea transportation more efficiently for its customers.

## 1.3.2.  Intentions regarding employment and management

The Offeror believes that a key element of the success of ND is preserving and developing the talent and intellectual capital of ND's personnel. In this context, the Offeror does not have any plan to modify ND's current strategy regarding staffing.

Additionally, the Offeror intends to ensure continuity of the management of ND following the completion of the Offer and retain it in the future. The Offeror intends to implement a management incentive program.

The Offeror intends not to reduce the total number of full-time employees in France for a period of eighteen months from the date of the Block Acquisition (i.e. as of 8 June 2015).

The Offeror intends to maintain the European headquarters of the ND group companies in Lyon, and has undertaken in the Tender Offer Agreement to maintain for a period of 5 years after the date of the Block Acquisition, the headquarters and decision-making centre of the Company's European logistics business in Paris and the Company's transportation business in the department of the Drôme.

The Offeror does not anticipate that the combination of ND with the Offeror subsequent to the Offer will affect the individual and collective status of the employees of ND and its subsidiaries.

## 1.3.3.  Dividend distribution policy

The distribution policy will be examined subsequently, in relation notably to the Company's results, its financial capacity for such distribution and its financing needs in view of its development plans.

## 1.3.4.  Synergies

The combination of XPO Logistics, Inc. and ND is not expected to generate meaningful cost synergies, mainly due to the low business overlap in Europe and the complementarity of the respective US operations of ND and XPO Logistics, Inc. XPO Logistics has committed not to reduce the total number of full-time employees in France for a period of at least 18 months from closing and to maintain the European headquarters of ND in Lyon.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Revenues synergies are expected to be derived from company-wide cross-selling opportunities within the combined group which would benefit the respective clients of XPO Logistics, Inc. and ND of the services offered by the other party. Furthermore, XPO Logistics intends to invest in the growth of ND through technology so as to leverage the combined company's scale.

Finally, XPO Logistics will have a platform in Europe to continue to execute on its M&A strategy, with significant opportunities in the fragmented European market.

### 1.3.5. Mandatory squeeze-out and removal from listing

According to Articles 237-14 to 237-16 of the AMF General Regulations, the Offeror will request the AMF within 3 months following closing of the Offer to implement a mandatory squeeze-out process through the transfer of ND shares that it does not own and that would not be presented to the Offer (provided that they do not represent more than 5% of the capital or the voting rights of the Company), at the price of 217.50 euros per share.

The Offeror also reserves the right, in the event that it comes to hold, directly or indirectly, at least 95% of share capital and voting rights of ND, and where a mandatory squeeze-out would not have been implemented under the conditions referred to above, to file with the AMF public buy-out offer followed by a mandatory squeeze-out of the shares not directly or indirectly held by it under the conditions of Articles 236-1 et seq. and 237-14 et seq. of the AMF General Regulations.

Apart from the foregoing, the Offeror does not have the intention, in the event where it would not be able to implement a squeeze-out following the Offer, to request the delisting of the ND shares from Euronext Paris - Eurolist Compartment A in the next 12 months. The Offeror reserves its right, however, to consider the opportunity to request the delisting of the ND shares from the Euronext London - Official List.

### 1.3.6. Intentions regarding merger and integration

Depending on the results of the Offer, the Offeror reserves the right to consider the best ways of integrating ND into XPO Logistics Inc. group. In this context, at some point of time in the future, the Offeror may decide to merge or transfer certain ND assets or branches with or to XPO Logistics group companies (including XPO) or *vice versa*.

The conditions of these possible merger or contribution operations would be subject to local works council consultation in due course and to the extent required by law, and would be reviewed by the AMF, as the case may be, in accordance with applicable regulations.

It is intended that the ND group will be integrated under the XPO brand as soon as possible. For an initial period of 3 months, this license shall proceed on a free of charge basis following which XPO Logistics, Inc. and ND shall negotiate for the grant of a license by the former to the latter under a brand licensing agreement in line with market practices.

### 1.3.7. Composition of the Supervisory Board

Concomitantly with the completion of the Block Acquisition in accordance with the Share Purchase Agreement, Norbert Dentressangle, Evelyne Dentressangle, Pierre-Henri Dentressangle, Vincent Ménez, Jean-Bernard Lafonta and Bruno Rousset resigned from their duties as supervisory board

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

members of ND on 8 June 2015. Such resignations occurred after the supervisory board of ND recommended the Offer as mentioned above.

The supervisory board of the Company met on 8 June 2015 and has co-opted six new supervisory board members (Mr. Bradley Jacobs, XPO Logistics, Inc., represented by Ms. Angela Kirkby, Mr. Troy Cooper, Mr. John Hardig, Mr. Gordon Devens and Mr. Tavio Headley). Mr. Bradley Jacobs has, in addition, been appointed Chairman of the supervisory board and Mr. Gordon Devens its Vice-Chairman.

These cooptations, which took effect on 8 June 2015, will be subject to ratification by the Company's shareholders in general meeting.

The supervisory board of the Company is now composed as follows:

– Mr. Bradley Jacobs, Chairman (also Chairman of XPO Logistics, Inc.),

– Mr. Gordon Devens, Vice-Chairman (employee of XPO),

– Ms. Clare Chatfield (independent member),

– Mr. Henri Lachmann (independent member),

– Mr. Jean-Luc Poumarède (independent member),

– Mr. François-Marie Valentin (independent member),

– XPO Logistics, Inc., represented by Ms. Angela Kirkby,

– Mr. Troy Cooper (employee of XPO),

– Mr. John Hardig (employee of XPO),Mr. Tavio Headley (employee of XPO).

### 1.3.8. Advantages for the Company, the Offeror and their shareholders

XPO Logistics, Inc. is a top ten global provider of cutting-edge supply chain solutions to the most successful companies in the world. The company provides high-value-added services for surface transportation, including freight brokerage, intermodal, last mile and expedite; highly engineered contract logistics; warehousing and distribution; and global forwarding by ground, air and sea. XPO Logistic's corporate headquarters is in Greenwich, Connecticut, USA, and its European headquarters is in Lyon, France.

XPO Logistics, including the business of ND following the Block Acquisition on 8 June 2015, serves more than 30,000 customers at 863 locations in 27 countries within a highly integrated network comprising approximately 52,350 employees.

With 201 locations and approximately 10 000 employees, XPO Logistics, Inc. was, prior to the combination with ND, one of the key players in the logistics sector in North America.

*(i)        Interest of the transaction for the Company and its shareholders*

The Offeror proposes to ND shareholders who tender their shares to the Offer immediate liquidity of all of their shareholding at the same price as that offered to the Initial Sellers, i.e., 217.50 euros per share. This transaction will allow the shareholders who participated in the development of ND to monetise their shares at a 62.2% premium to the 6-month weighted average share price.

*(ii)        Interest of the operation to the Offeror and its shareholders*

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

The Offeror believes that this acquisition fits into its strategy to acquire best-in-class logistics companies and become a single source provider of transportation and logistics services. The combined entity would be a dynamic, global player, with leadership positions in logistics and transportation. Customers would benefit from the combined entity's broad range of services, leading edge technology, deep access to transportation capacity, and commitment to customer service.

## 1.4. Agreements that could have a significant impact on the assessment of the Offer or its outcome

Subject to the SPA in respect of the Block Acquisition as described above, the Offeror is not aware of any agreement and is not party to any agreement in connection with the Offer or that potentially could have a significant impact on the assessment of the Offer or its outcome.

## 2. CHARACTERISTICS OF THE OFFER

## 2.1. Terms of the Offer

Pursuant to the terms of Article 231-13 of the AMF General Regulations, Morgan Stanley, acting on behalf of the Offeror, filed a draft information memorandum with the AMF on 11 June 2015. The AMF will publish a filing notice in relation to the Offer on its website (www.amf-france.org).

Morgan Stanley, acting as presenting bank, guarantees the terms and the irrevocable character of the undertakings taken by the Offeror.

Pursuant to Article 233-1 2° of the AMF General Regulations, the Offer is made in the form of a simplified cash tender offer (*offre publique d'achat simplifiée*).

The Offeror irrevocably undertakes to acquire from the shareholders of ND, the shares of the Company which will be tendered to the Offer, at a price of 217.50 euros per share, during a 15 trading day period.

The Offeror reserves the right, from the filing of the draft information memorandum up until the opening of the Offer, to acquire shares of the Company on the market, within the limits of Article 231-38 IV of the AMF General Regulations.

**The Offer and this draft information memorandum remain subject to review by the AMF.**

Pursuant to Article 231-16° of the AMF General Regulations, a press release in relation to the terms and conditions of the Offer has been issued on 11 June 2015 by the Offeror and made available on the Offeror's website (http://www.xpo.com). This draft information memorandum has been made available on the websites of the AMF (www.amf-france.org) and XPO Logistics France (http://www.xpo.com) and may be obtained free of charge upon request to Morgan Stanley & Co. International PLC, 61 rue de Monceau, 75008 Paris (France).

The AMF will publish a clearance decision (*décision de conformité*) for the Offer on its website (www.amf-france.org), following its verification of the compliance of this Offer with applicable laws and regulations. The clearance decision will entail approval (*visa*) by the AMF of the draft information memorandum.

The draft information memorandum as approved by the AMF, together with the document entitled "Other Information" relating, in particular, to the legal, financial and accounting characteristics of the Offeror shall be made available to the public free of charge, no later than the day before the opening of

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

the Offer, at the offices of Morgan Stanley. These documents will also be made available on the websites of XPO (http://www.xpo.com), ND (http://www.norbert-dentressangle.com/) and the AMF (www.amf-france.org).

A press release specifying the conditions under which these documents will be made available will be issued in accordance with Article 221-4 IV of the AMF General Regulations.

Prior to the opening of the Offer, the AMF will release a notice announcing the opening of the Offer and the timetable for the Offer, and Euronext Paris will release a notice announcing the terms and timetable of the Offer.

## 2.2.  Number and nature of the securities targeted by the Offer

The Offer covers all of the securities giving access to the share capital and voting rights of the Company, namely all of the 9,836,241 shares issued as of the filing of this Offer, excluding (i) the 6,561,776 shares acquired by the Offeror on 8 June 2015 as part of the Block Acquisition and (ii) the 110,000 Subscription Warrants issued by the Company acquired by the Offeror on 8 June 2015, it being specified that the Supervisory Board of ND has committed itself not to tender the treasury shares to the Offer (44,447 shares as of 8 June 2015).

Therefore, the Offer covers a total maximum of 3,230,018 shares of the Company.

It is specified that:

-   the Offer does not aim at the shares underlying the 110,000 Subscription Warrants issued by the Company to the extent that the Offeror already owns these Subscription Warrants;

-   as of 11 June 2015, the total number of performance shares is 102,097; these shares are under acquisition period (i.e. have not been delivered to their beneficiaries) as of such date, and will, after delivery, be subject to a lock-up for a period of two years as per their terms. The performance shares may therefore not be tendered to the Offer.

With the exception of the shares referred to above, to the Offeror's knowledge, there exists no equity security or any other financial instrument providing a right, either immediately or in the future, to the share capital or voting rights of the Company, other than the Company shares.

## 2.3.  Tender procedure for the Offer

The shares tendered to the Offer must be freely tradable and free of any lien, pledge, or other form of security or restriction of any kind whatsoever which may limit the free transfer of ownership. The Offeror reserves the right, in its sole discretion, to reject any Company shares which do not comply with this condition.

The Offer shall be open for a period of 15 trading days.

Company shares held in registered form must be converted and held in bearer form to be tendered to the Offer. Therefore, holders of shares held in an account managed by a financial intermediary in registered form who wish to tender Company shares in the Offer will have to ask for the conversion of these shares to hold them in bearer form as soon as possible. Holders of shares will therefore lose the benefits attached to the registered form for those shares so converted into bearer form.

Holders of Company shares held in an account managed by a financial intermediary (including traders, banks and financial institutions) and willing to tender their Company shares to the Offer must deliver

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

an irrevocable transfer order in relation to their shares to their financial intermediary in accordance with the standard forms provided by their financial intermediary no later than the last day on which the Offer is open and in a timely manner so as their order can be executed. Each financial intermediary shall transfer the Company shares for which it has received the order to tender to the Offer.

Shareholders of the Company who wish to tender their shares in the Offer may either:

– sell their shares on the market, in which case settlement and delivery of the transferred shares (including payment of the price thereof) will take place [at the latest] on the second trading day following the execution of the orders, and trading fees (including the brokerage fees and corresponding VAT) relating to such transactions will be borne entirely by the tendering shareholders; or

– sell their shares in the semi-centralised procedure coordinated by Euronext Paris, in which case settlement and delivery of the transferred shares (including payment of the price thereof) will take place following completion of the semi-centralization procedure after the closing of the offer. The Offeror will reimburse the trading fees (brokerage fees and corresponding VAT) incurred by the tendering shareholders of Company shares tendered in the semi-centralised procedure up to 0.2% of the purchase price (including tax) subject to a maximum amount of 100 euros per transaction; it being specified however that, if the Offer is declared null for any reason, the shareholders of the Company may not seek any reimbursement.

Only shareholders who decide to tender their shares under the semi-centralized procedure and whose shares are registered in an account on the day before the opening of the Offer may receive reimbursement of these trading fees from the Offeror.

The requests for reimbursement of the fees mentioned above will be accepted and processed by the financial intermediaries during a period of 25 business days from the last day on which the Offer is open. After the expiry of such period, Morgan Stanley, acting as buying market member, will no longer carry out the reimbursement of the fees mentioned above.

Except for the reimbursement by the Offeror of certain brokerage fees to the shareholders as described above, no commission will be paid by the Offeror to the financial intermediaries through which the shareholders tender their shares in the Offer.

## 2.4.    Indicative timetable of the Offer

Prior to the opening of the Offer, the AMF and Euronext will issue notices announcing the opening date and the calendar of the Offer. For indicative purposes only, an Offer timetable is set out below:

| | |
|---|---|
| [11 June] 2015 | Filing of the contemplated Offer with the AMF |
| [11 June] 2015 | Filing of the draft information memorandum in response by the Company |
| [23 June] 2015 | Statement of conformity of the Offer issued by the AMF |
| [24 June] 2015 | Offeror's information memorandum and Company's information memorandum in response to be made available to the public |
| [25 June] 2015 | Other information relating to the Offeror and other information relating to the Company to be made available to |

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

| | the public |
|---|---|
| [29 June] 2015 | Opening of the Offer |
| [17 July] 2015 | Closing of the Offer |
| [23 July] 2015 | Release of the results |
| [27 July] 2015 | Indicative date of implementation of a mandatory squeeze-out (if requirements are met) |

## 2.5.    Financing of the Offer

### 2.5.1.  Costs connected with the Offer

Expenses incurred by the Offeror for the Offer (including fees of external financial, legal and accounting advisers and of any experts and other consultants, as well as communication and publication costs, but excluding those associated with the Block Acquisition) are estimated at approximately 2 million euros (excluding tax).

### 2.5.2.  Financing sources of the Offer

The cost to be incurred by the Offeror for the acquisition of ND shares not held by it as of 11 June 2015 (on the basis of the share capital of the Company as at the date of filing of the Offer, assuming all the outstanding ND shares targeted by the Offer are tendered thereto and at the proposed Offer Price) amounts to a total of 704,064,000 euros.

Payments due by the Offeror in connection with the Offer will be made out of its own resources and shareholder loans. XPO Logistics, Inc. will finance the Offeror for the purpose of the Offer out of its own resources and where necessary, its existing credit lines.

## 2.6.    Restrictions concerning the Offer abroad

The Offer is being made solely in France.

This information memorandum is not intended for distribution in countries other than France.

The Offer has not been subject to any registration or approval outside of France. Holders of ND shares outside France may not participate in the Offer unless the law and regulation to which they are subject permits them to do so without any further formality to be undertaken nor disclosure to be made on the part of the Offeror. Indeed, participation in the Offer and distribution of this information memorandum may be subject to restrictions outside France. The Offer is not addressed to persons subject to such restrictions, whether directly or indirectly, and is not subject to acceptance concerning orders from any country in which the Offer is subject to restrictions. Persons availing themselves of this information memorandum must comply with the restrictions in force in their country. Non-compliance with such restrictions may constitute infringement of laws and regulations in respect of exchange matters in any of these countries.

The Offeror accepts no responsibility in the event of infringement by any person of restrictions applicable to him/her.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

This information memorandum and the other documents relating to the Offer do not constitute an offer to sell or a solicitation or an offer to purchase securities in any other country in which such an offer or solicitation is illegal. This Offer has not been the subject matter of any formality, registration or visa outside of France.

This information memorandum does not constitute an extension of the Offer to the United States and the Offer is not proposed, directly or indirectly, in the United States, to persons in the United States, by means of postal services or by any communication means or by any commerce means (including but not limited to transmission by fax, telephone and email) of the United States or through the services of a stock exchange of the United States. As a consequence, no copy of this information memorandum, and no other related document or document relating to the Offer, may be sent by mail, communicated or published by an intermediary or any other person in the United States under any form whatsoever. No shareholder of the Company may contribute its shares to the Offer if it is not in a position to declare (i) that it did not receive in the United States a copy of the present information memorandum or any other document relating to the Offer, and that it did not send any such documents to the United States, (ii) that it did not use, directly or indirectly, postal services, telecommunication means or other commerce instruments or services of a stock exchange in the United States in connection with the Offer, (iii) that it was not on United States territory when it accepted the terms of the Offer or communicated its share transfer order and (iv) that it is neither an agent nor a representative acting on behalf of a person other than a person who communicated instructions outside of the United States. Authorised intermediaries shall not be allowed to accept share transfer orders which are not compliant with the above provisions (save for any authorization or opposite instruction by or on behalf of the Offeror at the Offeror's discretion). As regards interpretation of the above paragraph, United States shall mean the United States of America, its territories and possessions, or any of these States, and the District of Columbia.

## 2.7.    Tax treatment of the Offer

In the current state of French legislation, the tax regime applicable to the shareholders of the Company who will participate to the Offer is described below.

The attention of such shareholders is drawn to the fact that this information constitutes a mere summary of the tax regime in force and is not meant to represent an exhaustive analysis of all tax effects likely to be applicable to them. They are thus invited to contact their usual tax advisor in order to become informed of the tax regime applicable to their own situation.

This summary is based on the French legal provisions in force as at the date of this offer document and are therefore likely to be affected by changes in French tax rules, which could have a retroactive effect or apply to the current year or fiscal year, and by their interpretation from the French tax administration.

Persons who are not tax residents of France must also comply with the tax legislation in force in their country of residence and, as the case may be, international tax treaties that have been entered into between France and said country.

### 2.7.1.    Individual shareholders who are tax residents of France managing their private assets and not carrying out stock exchange transactions on an habitual basis

a)      Ordinary regime

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

i.   Personal income tax

Pursuant to Article 150-0 A and seq. and 200 A of the *Code général des impôts* ("**French Tax Code**"), net capital gains resulting from the sale of shares by individuals are generally taken into account for the determination of the income subject to the progressive income tax rate scale after application of an allowance for ownership duration provided for by Article 150-0 D of the French Tax Code equal to:

x)   50% of their amount where the shares have been held for at least two years but less than eight years, as at the date of the sale; and

y)   65% of their amount where the shares have been held for at least eight years, as at the date of the sale.

For the application of this allowance, the ownership duration is, except for particular cases, calculated from the date of subscription or purchase of the shares.

Individuals who have carry forward net capital losses or who have suffered a loss upon the sale of the shares of the Company within the framework of the Offer are invited to contact their usual tax advisor in order to determine if and how these losses may be used.

The contribution of the shares of the Company to the Offer is likely to put an end to any potential tax deferral of which the holders of these shares could have benefited with respect to prior transactions.

ii.   Social security contributions

Net capital gains resulting from the transfer of shares are, moreover, subject to social security contributions, without application of the allowance for ownership duration described above, at the global rate of 15.5% allocated as follows:

−   8.2% in respect of general social security contribution (*contribution sociale généralisée*);

−   0.5% in respect of social debt repayment contribution (*contribution au remboursement de la dette sociale*);

−   4.8% in respect of social levy and additional contribution to it; and

−   2% in respect of solidarity levy.

Apart from the general social security contribution, which is deductible up to 5.1 points from the total taxable income of the year during which it is paid, these social security contributions are not deductible from the taxable income.

iii.   Other contributions

Article 223 sexies of the French Tax Code institutes for taxpayers liable to pay income tax an exceptional contribution on high incomes applicable when the reference income for tax purposes of the concerned taxpayer exceeds certain limits.

This contribution is calculated by applying a rate of:

−   3% for the portion of the reference income which is comprised between EUR250,000 and EUR500,000 for those taxpayers who are single, widowed, separated or divorced, and for the portion comprised between EUR500,000 and EUR1,000,000 for the taxpayers who are subject to joint taxation;

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

–    4% for the portion of the reference tax income exceeding EUR500,000 for those taxpayers who are single, widowed, separated or divorced, and for the portion exceeding EUR1,000,000 for the taxpayers who are subject to joint taxation.

The reference income for tax purposes of a tax household is defined pursuant to the provisions of 1° of IV of Article 1417 of the French Tax Code, without application of the quotient rules defined in Article 163-0 A of the French Tax Code. The reference income includes in particular the net capital gains resulting from the transfer of shares realised by the concerned taxpayers, prior to the application of the allowance for ownership duration.

b)    Specific regime applicable to shares registered in share savings plans (*plans d'épargne en actions*) ("SSP")

Persons who hold shares of the Company within a SSP may participate in the Offer.

Subject to certain conditions, the SSP allows (i) during the life-time of the SSP, an exemption of income and capital gains generated by the investment made within the SSP from income tax and social security contributions provided, in particular, that such income and capital gains are retained within the SSP, and; (ii) at the time of the closing of the SSP (if it occurs more than five (5) years after the opening date of the SSP, including in the case of a partial withdrawal occurring after five (5) years but before eight (8) years) or at the time of a partial withdrawal (if it occurs more than eight (8) years after the opening date of the SSP) an exemption of the net gain realised since the opening of the SSP from income tax, such net gain being in addition not taken into account for the calculation of the exceptional contribution on high incomes described in paragraph (iii) of (a) above, but remains subject to social security contribution described in paragraph (ii) of (a) above (provided, however, that the effective tax rate of these social security contribution may vary (between 0% and 15.5%) depending on the date of realization of the relevant gain).

Specific provisions, not described in the present note, are applicable in case of realization of capital losses, closing of the plan before the end of the fifth year following the opening of the SSP, or of exit from the SSP in the form of life annuity. The persons concerned are invited to contact their usual tax advisor.

## 2.7.2.  Corporate shareholders residents of France for tax purposes and subject to corporate income tax under standard conditions

a)    Ordinary regime

Capital gains resulting from the sale of shares are generally included in the taxable income of the legal entity which is subject to corporate income tax at the ordinary rate (currently 33.1/3%) increased by, if applicable, a social contribution amounting to 3.3% (Article 235 ter ZC of the French Tax Code) which is assessed tax on the amount of corporate income tax after deduction of an allowance that cannot exceed 763,000 euros per twelve-month period.

Corporate income tax payers realizing a turnover exceeding 250,000,000 euros are also subject to a temporary exceptional surcharge equal to 10.7% of the corporate income tax (determined before deduction of tax reductions or tax credits of all kinds (article 235 ter ZAA of the French Tax Code)).

However, companies with turnover (net of tax) that is below 7,630,000 euros and with a fully paid-up capital of which 75% has been continuously held during the relevant tax year by natural or by legal persons that comply with these conditions, benefit from a reduced corporate income tax rate of 15%,

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

within the limit of a taxable income of 38,120 euros per twelve-month period. These companies are also exempt from the 3.3% social contribution and 10.7% exceptional surcharge mentioned above.

Capital losses incurred on the sale of shares are generally deductible from the taxable income of the legal entity.

Finally, it is specified that the contribution of the shares of the Company to the Offer may put an end to any potential tax deferral of which the holders of these shares could have benefited with respect to prior transactions.

> b) Specific regime applicable to long-term capital gains

Pursuant to Article 219 I-a quinquies of the French Tax Code, net capital gains realised upon the sale of shares qualifying as "*titres de participation*" within the meaning of this Article and which have been held for at least two (2) years as of the date of transfer are tax exempt, save for the recapture of an amount equal to 12 % of the gross capital gains realised.

For the purposes of Article 219 I-a quinquies of the French Tax Code, the term "*titres de participation*" means (a) shares qualifying as *titres de participation* for accounting purposes, (b) shares acquired pursuant to a public tender offer or public exchange offer in respect of the company which initiated such offer, as well as (c) shares that are eligible for the parent-subsidiary tax regime (as defined in Articles 145 and 216 of the French Tax Code) if these shares are registered as "*titres de participation*" in the accounts or in a specific subdivision of another account corresponding to their accounting qualification, except for shares in a predominant real estate company.

Persons likely to be affected are invited to contact their usual tax advisor to ensure that their shares qualify as "*titres de participation*" within the meaning of Article 219 I-a quinquies of the French Tax Code.

The  use and carry-forward of long-term capital losses follow certain specific rules and taxpayers are encouraged to contact their usual tax advisor in this regard.

### 2.7.3. Shareholders who are not residents of France for tax purposes

Subject to the provisions of any applicable tax treaties capital gains resulting from the sale of shares by persons, that are either not resident of France within the meaning of Article 4 B of the French Tax Code or have their headquarter outside France (provided that the ownership of the shares not related to a fixed base or a permanent establishment subject to corporate income tax in France in the balance sheet of which the shares would be registered), are generally exempt from tax in France provided that (i) the rights held, directly or indirectly, by the transferor with his spouse, their ascendants or their descendants, in the profits of the company whose shares are transferred, have not, at any time during the five year-period preceding the sale, exceeded, together, 25 % of such profits (Articles 244 bis B and C of the French Tax Code) and (ii) the seller is not established in a non-cooperative jurisdiction within the meaning of article 238-0 A of the French Tax Code. In the latter case, regardless of the percentage of the rights held in the profits of the company whose shares are transferred, capital gains on such shares are subject to tax at the flat rate of 75 %, subject to the provisions of any applicable tax treaty. The list of non-cooperative states or jurisdictions is published by ministerial order and updated annually.

People who do not fulfil the conditions for benefiting from the tax exemption are invited to contact their usual tax advisor.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

The shareholders of the Company who are not tax residents of France are invited to consider their particular tax situation with their tax usual advisor, in particular in order to take into account the tax regime applicable in their country of tax residence.

### 2.7.4.  Shareholders subject to a different tax regime

The holders of shares who are subject to a tax regime other than those described above and who participate to the Offer, in particular the taxpayers that carry out transactions on the stock exchange on an habitual basis or who have recorded their shares as professional assets, are invited to analyse their specific tax situation with their usual tax advisor.

### 2.7.5.  Registration duties or financial transaction tax

ND being a company whose registered office is located in France and whose market capitalization exceeded one billion euros on 1 December 2014, the purchase of shares of ND by XPO will be subject to the tax on financial transactions referred to in article 235 ter ZD of the French Tax Code (currently at the rate of 0.2%) assessed on the transfer price; the tendering shareholders will not be subject to this financial transaction tax upon the sale of their ND shares in the context of the Offer.

In addition, in principle, no registration duty is due in France in connection with the sale of the shares of a company whose shares are traded on a financial instruments regulated market or on a multilateral trading system, unless the transfer may be evidenced by a written agreement. In this case, the transfer must be registered within one month as from its date, and its registration gives rise to the payment of a registration duty. However, when the transaction is subject to the tax on financial transactions mentioned above, such registration duty is not due (Article 726 II d) of the French Tax Code).

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

**3.    OFFER VALUATION CRITERIA**

## 3.1.    Assessment of the offer price for ND shares

The price offered by the Offeror is €217.50 per share ex-dividend; due to the 1.80€ per share dividend to be paid before the completion of the Block Acquisition and the filing of the Offer, this analysis will take into account a theoretical offer price of €219.30 per ND share in cash, dividend attached. This offer price is equivalent to the price paid for the Block Acquisition.

The elements used to assess the price of the Offer have been prepared by Morgan Stanley, on behalf of the Offeror in accordance with usual valuation methods, based on publicly available information concerning ND and non-public information received in the course of due diligence and general business sector and competitors knowledge. The consideration proposed in the Offer has been assessed through a multi-criteria analysis based on the following methodologies:

- Price paid by XPO for the Block Acquisition
- Analysis of trading prices;
- Analysis of equity research analysts' valuation;
- Analysis of trading multiples for comparable listed companies;
- Analysis of precedent transactions multiples;
- Analysis of premia paid in precedent French public transactions ("OPA");
- Analysis of discounted future free cash flows.

Other methodologies were not considered as relevant for the purpose of valuing ND:

- Dividend discount model: This methodology is highly dependent on pay-out ratio, which is decided by the management/ supervisory board of the company. This decision could be totally independent from the company's financial performance and capacity to generate cash flow;
- Net asset book value: this methodology does not reflect the intrinsic value of intangible assets (market share, client relationship, brands, etc.) and the potential future performance of the company;
- Net adjusted book value: this methodology is generally used for evaluating diversified holding companies with assets undervalued at cost, as such it does not reflect the value of an operational company.

## 3.2.    Financial elements

### 3.2.1.    Financial information

The historical data used for assessing the terms and conditions of the Offer are ND's historical financial accounts and, more particularly, the latest annual consolidated financial statements as of 31 December 2014.

The valuation work performed is based on the projected financial data communicated by ND during the due diligence performed from 17 April to 28 April 2015, which consists mainly of:

- ND's management budget for 2015E prepared in December 2014 and updated in April 2015 to reflect the current trading performance of the company ("updated management budget");

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

− ND's management business plan for years 2015E to 2018E prepared during summer 2014 ("business plan"). To the best of our knowledge, the business plan provided by ND's management at the time of due diligence remains reflective of ND's estimated future financial performance.

The projected financial data communicated by ND have been used for the purposes of the trading multiples analysis (section 3.3.3) and are in line with the forecasts published by research analysts.

## 3.2.2. Enterprise value to equity value bridge

ND's enterprise value is assessed as equity value adjusted for the following items as per 2014 annual consolidated financial statements:

− Plus: Gross financial debt of €1,226.2 MM

− Less: Cash and short-term investments of €209.1 MM

− Plus: Post-tax pension provisions post-tax of €54.5 MM (i.e. €87.8 MM pension provisions adjusted at 38.0% French statutory income tax rate applicable for 2014 and 2015)

− Less: Other financial assets of €55.8 MM

− Less: Investment in associates of €2.1 MM

− Plus: Other debt-like provisions of €13.1 MM (i.e. €5.5 MM of restructuring provisions and a €7.6 MM provision for other expenses incurred but not recognised)

− Plus: Minority interest of €27.2 MM

Based on the above items the adjusted net debt value has been established at €1,054.0 MM.

## 3.2.3. Number of shares retained

The number of shares retained is 9,989,009 shares, calculated as below:

− 9,836,241 shares in issue as of 31 December 2014

− Less: 38,578 treasury shares

− Plus: 111,463 existing performance-based share units as of 31 December 2014, treated as dilutive instruments

− Plus: 79,883 dilutive impact related to 110,000 outstanding warrants, as per the treasury stock methodology and based on a €59.55 strike price per share and a €217.50 per share ex-dividend offer price, which have been acquired by the Offeror. It should be noted that under the treasury stock method, the dilutive impact of the warrants is a function of the  implied value  of ND's equity derived from the valuation method used, and as such has been adjusted accordingly in the following valuation analysis.

## 3.3.  Valuation of the Offer

## 3.3.1.  Analysis of trading prices

ND shares are listed on Euronext Paris and on Euronext London. Over the 6-month period ending 28 April 2015, cumulative trading volumes exchanged represented 22.9% of the free float (defined as the total number of shares excluding those held by the Dentressangle family and treasury shares).

For purposes of this analysis, the share prices were considered up to the day prior to the announcement of the acquisition of 66.71% of ND by XPO on 28 April 2015. The 66.71% cumulative stake is

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

composed of shares held by Norbert Dentressangle Initiatives SA (64.27%), Mr. Pierre-Henri Dentressangle (1.22%), and Ms. Marine Dentressangle (1.22%). Since 29 April 2015, ND's share price has traded in line with XPO's offered price per share.

The table below shows the premium implied by the Offer Price as of 28 April 2015 and on average share price weighted by the exchanged volumes ("VWAP") over different periods.

| Premiums to Offer Price of €219.30 (cum-dividend) | | |
|---|---|---|
| Last Quoted Price (28 April 2015) | €159.10 | 37.8% |
| 1-Month VWAP | €155.41 | 41.1% |
| 2-Month VWAP | €154.78 | 41.7% |
| 3-Month VWAP | €148.87 | 47.3% |
| 6-Month VWAP | €135.19 | 62.2% |
| 9-Month VWAP | €125.83 | 74.3% |
| 12-Month VWAP | €122.27 | 79.4% |
| 12-Month High | €164.95 | 32.9% |
| 12-Month Low | €95.80 | 128.9% |

Source: Capital IQ

The table below shows the average daily volume of shares exchanged as of April 28, 2015 over different periods.

| Average daily volume of shares exchanged (number of shares) | |
|---|---|
| 1-month average | 8,910 |
| 2-month average | 7,310 |
| 3-month average | 6,400 |
| 6-month average | 5,870 |
| 9-month average | 6,070 |
| 12-month average | 5,890 |

Source: Capital IQ

The Offer Price (cum-dividend) represents a premium of 37.8% over the share price as of 28 April 2015 and 41.1% over the 1-month VWAP prior to the offer. It also represents a 32.9% premium over the 12-month high of the stock as of 28 April 2015 and a 128.9% premium over the 12-month low over the same period.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*



Source: Capital IQ

It is specified that the Offeror did not buy any Company shares on the market prior to the filing of the Offer.

### 3.3.2.   Equity research analysts' target prices

The table below summarises the target prices published by equity research analysts ND before the announcement of the offer.

| Contributor Name | Date | Recommendation | Target Price |
|---|---|---|---|
| Gilbert Dupont | 21-Apr-15 | Buy | 172.4 |
| Oddo Securities | 23-Apr-15 | Buy | 173.0 |
| Exane BNP Paribas | 23-Apr-15 | Neutral | 150.0 |
| Societe Generale Cross Asset Research | 23-Apr-15 | Hold | 174.0 |
| Berenberg | 14-Apr-15 | Buy | 178.0 |
| Edison Investment Research | 7-Apr-15 | No rating | 190.0 |
| **Mean** | | | **172.9** |
| **Median** | | | **173.5** |
| Offer price (cum-dividend) | | | 219.3 |
| **Premium to Median Target Price** | | | **26.4%** |

Source: Broker research reports

The Offer Price (cum-dividend) stands at a 26.4% premium to the median of the target prices published by the equity research analysts prior to the transaction announcement date of 28 April 2015.

### 3.3.3.   Analysis of trading multiples for comparable listed companies

The valuation methodology using trading multiples consists of valuing a company based on valuation ratios observed on a sample of listed companies that have features comparable to ND, notably in terms of business mix and end markets.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Consideration was given to an extended group of global (predominantly US and European) logistics companies with strong activities either in Contract Logistics and/or in Transportation, similar to ND's core activities – excluded from this group were:

- − companies which are predominantly international freight forwarders (despite having some contract logistics and transportation activities) such as DSV A/S and Kuehne + Nagel Inc.;

- − companies which are mostly asset-light truck brokers (despite performing transportation services) – this includes Echo Global Logistics Inc., CH Robinson Worldwide Inc., Landstar System Inc. and Forward Air Corp.;

- − Deutsche Post AG given that its Express and Mail divisions are key drivers of valuation, as well as Ryder System Inc. given it is still mostly a truck leasing business.

As a result, the sample consists of 6 core comparable companies in contracts logistics and/or transportation.

| Company | Headquarters | 2014 revenues[1] | Category | Description |
|---|---|---|---|---|
| Stef SA | France | 2,765 | Contract logistics and asset-based transportation | Transportation and freight management services for fresh and frozen goods in various sectors of the food industry |
| ID Logistics Group SA | France | 875 | Contract logistics | Supply chain, transport management, inventory management and optimization, and order picking and distribution services |
| Wincanton plc | UK | 1,522 | Contract logistics and asset-based transportation | Transport services, including road transport, rail transport, container transport, bulk tankers, and home delivery services, as well as warehousing |
| Con-way Inc. | US | 5,168 | Contract logistics and asset-based transportation | Transportation, logistics, and supply chain management services to various manufacturing, industrial, and retail customers |
| Knight Transportation Inc. | US | 824 | Asset-based transportation | Short-to-medium haul truckload carrier of general commodities primarily in the US |
| Heartland Express Inc. | US | 776 | Asset-based transportation | Short-to-medium haul truckload carrier of general commodities in the US and Canada |

[1] Calendarized 2014 revenues in Euros
Source: Capital IQ

Companies in the contracts logistics / transportation industry are customarily compared on the basis of their enterprise value ("EV") to operating income before depreciation and amortization (EV/EBITDA), their enterprise value to operating income before amortization (EV/EBITA) and their price to earnings per share (P/E) multiples.

In general, investors base investment decisions on future profitability and the companies selected are covered by financial analysts providing estimates of future financial performance. 2015E and 2016E are currently regarded as the most relevant periods. The selected comparable companies are covered by equity research analysts and consensus estimates for the relevant period are available. EBITA estimates have been extrapolated from consensus EBIT estimates, and historical amortization.

The following table presents the average multiples based on the closing market value on 28 April 2015 of the selected sample of comparable companies based on consensus EBITDA, EBITA and net income estimates calendarized to reflect a 31 December year end.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

| Company | Geography | Mkt Values (USD MM) | | Net Fin. Debt / 2015E EBITDA | EV / EBITDA | | EV / EBITA | | P/E | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mkt Cap | EV | | 2015E | 2016E | 2015E | 2016E | 2015E | 2016E |
| Stef SA | France | 848 | 1,342 | 2.1x | 6.0x | 5.7x | 11.2x | 10.4x | 10.6x | 9.8x |
| ID Logistics Group SA | France | 592 | 665 | 0.8x | 8.9x | 8.2x | 13.0x | 11.9x | 21.5x | 18.4x |
| Wincanton plc | United Kingdom | 303 | 579 | 1.0x | 5.9x | 5.8x | 7.8x | 7.5x | 9.8x | 9.0x |
| Con-w ay Inc. | United States | 2,583 | 3,022 | 0.5x | 5.3x | 4.8x | 9.3x | 8.2x | 15.9x | 13.5x |
| Knight Transportation Inc. | United States | 2,582 | 2,593 | 0.1x | 8.2x | 7.3x | 12.9x | 11.1x | 20.7x | 18.2x |
| Heartland Express, Inc. | United States | 1,882 | 1,830 | (0.2x) | 7.3x | 6.7x | 12.7x | 11.2x | 21.2x | 18.5x |
| **Mean** | | | | | **6.9x** | **6.4x** | **11.1x** | **10.0x** | **16.6x** | **14.6x** |
| **Median** | | | | | **6.7x** | **6.2x** | **11.9x** | **10.7x** | **18.3x** | **15.9x** |
| **Min** | | | | | **5.3x** | **4.8x** | **7.8x** | **7.5x** | **9.8x** | **9.0x** |
| **Max** | | | | | **8.9x** | **8.2x** | **13.0x** | **11.9x** | **21.5x** | **18.5x** |
| Implied Norbert Dentressangle share price based on median (in € per share) | | | | | 138.71 | 129.45 | 169.91 | 137.19 | 202.11 | 189.12 |
| **Implied Offer Premium (cum-dividend)** | | | | | **58.1%** | **69.4%** | **29.1%** | **59.9%** | **8.5%** | **16.0%** |

*Source: Capital IQ, Company Filings, Thomson Estimates*

The P/E multiple is impacted by the comparable companies' respective capital structures. As ND is more levered than its selected peers, applying such multiples to ND does not appear as relevant.

The Offer Price (cum-dividend) represents a 58.1% premium on the share price implied by the 2015E median comparable EV/EBITDA multiple, a 29.1% premium on the share price implied by the 2015E EV/EBITA multiple, and an 8.5% premium on the share price implied by the 2015E median comparable P/E multiple.

### 3.3.4.  Analysis of precedent transactions multiples

The precedent transactions methodology consists in valuing a company based on valuation ratios observed on a sample of transactions that occurred in a sector comparable to that of ND.

The difficulty in this method lies in the choice of comparable transactions as:

- The quality and availability of the information vary significantly from one transaction to the next depending on the characteristics of the acquired companies (listed, privately held, subsidiaries of a Group) and on the level of confidentiality of the transaction;

- The acquired companies are never perfectly comparable because of differences in size, positioning, geographical presence, profitability and growth prospects; and

- The strategic interest of an acquisition varies and the price paid in consequence may include a control premium varying accordingly.

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

With respect to these difficulties, the retained sample is made up of 9 transactions presented in the table below:

| Date of Announcement | Acquiror | Target | Target Short Description | Enterprise Value ($ MM) | EV / LTM EBITDA |
|---|---|---|---|---|---|
| 29-Sep-2014 | Goldman Sachs, Rhones Capital | Neovia | Global automotive contract logistics business | 1,000 | 7.7 x |
| 31-Jul-2014 | Norbert Dentressangle | Jacobson Companies | US-based contract logistics business | 750 | 9.9 x |
| 29-Jul-2014 | XPO Logistics | New Breed | US-based contract logistics business | 615 | 8.0 x |
| 26-Jul-2012 | Universal Truckload Services | Linc Logistics | US-based contract logistics business | 335 | 6.5 x |
| 29-Nov-2010 | Norbert Dentressangle | TDG | UK-based contract logistics business | 313 | 6.1 x |
| 19-Jul-2010 | Genco Holdings I | ATC Technology Corporation | US-based reverse logistics business | 403 | 5.2 x |
| 04-Jul-2008 | Laxey Partners | TDG | UK-based contract logistics business | 436 | 5.9 x |
| 06-Apr-2008 | SNCF Participations | Geodis | European diversified transportation and contract logistics business | 2,431 | 7.2 x |
| 02-Oct-2007 | Norbert Dentressangle | Christian Salvesen | European diversified transportation and contract logistics business | 614 | 8.0 x |
| **Minimum** | | | | | **5.2 x** |
| **Maximum** | | | | | **9.9 x** |
| **Median** | | | | | **7.2 x** |

**Source:** Press, Company information and releases

Applying the multiples of these comparable transactions to ND's 2014 EBITDA pro-forma the 12-month consolidation of Jacobson Companies leads to the below metrics:

| **Minimum EBITDA multiple from comparable precedent transactions (x)** | **5.2 x** |
|---|---|
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 70.4 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | 211.4% |

| **Maximum EBITDA multiple from comparable precedent transactions** | **9.9 x** |
|---|---|
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 228.6 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | (4.1%) |

| **Median EBITDA multiple from comparable precedent transactions** | **7.2 x** |
|---|---|
| Norbert Dentressangle 2014 EBITDA, Pro Forma 12-month consolidation of Jacobson (€ MM) | 337.1 |
| Implied Share Price (€) | 137.7 |
| Implied Cum Dividend Offer Premium / (Discount) (%) | 59.2% |

The Offer Price (cum-dividend) represents a premium of 59.2% on the share price implied by the median Last Twelve Months ("LTM") EV/EBITDA of comparable transactions, a premium of 211.4% on the share price implied by the minimum LTM EV/EBITDA multiple, and a (4.1%) discount to the maximum LTM EV/EBITDA multiple of comparable transactions.

### 3.3.5.   Analysis of premia paid in precedent French public transactions ("OPA")

The precedent premia paid methodology consists in applying to ND's share price the premia observed in a sample of precedent French public transactions (Offres Publiques d'Achat - "OPA").

The retained sample includes transactions starting in 1998 with an equity value for 100% of the share capital in excess of €100 MM. Additionally, the sample only includes transactions after which the

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

Offeror held a stake above 50% of the share capital. Based on this sample, the observed median premium to the targets' 1-month average share prices is 24.3%. Applying this premium to ND's 1-month average share price as of 28 April 2015 (€156.53 per share) yields a valuation of €194.57 per share.

For reference, the Offer Price (cum-dividend) represents a premium of 40.1% to ND's 1-month average share price as of 28 April 2015.

### 3.3.6.   Analysis of discounted cash flow

Discounted cash flow ("DCF") analysis consists of a valuation of the enterprise value of ND through the discounting of future cash flow generation. This methodology is extremely sensitive to business plan assumptions.

The 31 December 2014 enterprise value was obtained by discounting future free cash flows at the Weighted Average Cost of Capital ("WACC") for the period from 2015E to 2019E. In addition a terminal value corresponding to a multiple of 2019E EBITDA was also discounted and added to the enterprise value.

The 2015E updated management budget was used as a basis for the 2015E Revenues, EBITDA, EBIT, and effective tax rate. The cash flow items were not included in the updated management budget (capital expenditures and change in working capital) and as such were sourced from the business plan instead. Additionally it should be noted that 2015E includes a €(39.3) MM one-off earn-out payment linked to the acquisition of Jacobson Companies in 2014, as this was not recorded as a liability on the balance sheet.

For the years 2016E to 2018E, the business plan formed the basis for the forecast used in the discounted cash flow analysis. The main assumptions underlying the forecast are:

−   Annual revenue growth rate of 3.7% to 3.8%;
−   EBITDA and EBIT margins are kept constant throughout the forecast period at 6.9% and 4.0% of revenues respectively;
−   Effective tax rate is kept constant throughout the forecast period at 33.4%;
−   Capital expenditures as a percentage of revenues of 2.6%;
−   Change in net working capital as a percentage of change in revenues of (0.3)%;

The financials for 2019E were based on extrapolation of the business plan, with similar revenue growth trajectory, consistent margins, as well as stable capex as a percentage of sales and stable change in net working capital as a percentage of change in revenues.

−   Exit multiple approach: the terminal value calculation is based on the 2019E EBITDA and an exit multiple of 7.5x EBITDA i.e. above the median multiple of precedent comparable transactions of 7.2x, the average of core peers historic trading levels of 7.1x LTM EBITDA, and above ND's 5-year historic trading level of 5.7x LTM EBITDA.

The WACC is assessed as the weighted average of the equity (assessed through the Capital Asset Pricing Model "CAPM") and of the cost of the debt. ND's WACC stands at 6.5%, on the basis of current economic conditions, in particular reflecting the current low-rate environment:

−   Market Risk Premium of 6.0% (Morgan Stanley standard global assumption);
−   Risk free rate corresponding to the current yield  of German government 30-year bonds of 1.6%;

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

−   Beta of 1.24 based on Barra Global Predicted Beta database;

−   Pre-tax cost of debt based on ND coupon of 2020 Euro PP bond of 4.0%;

−   Effective tax rate of 33.4%;

−   Net debt / total capitalization of 39.0%[4].

The tables below illustrate the sensitivity of the share price for a WACC range of 6.5% +/- 50 basis points as well as an exit multiple range of 7.5x EBITDA +/- 0.5x.

| Share Price Sensitivity Analysis €  | | | | | Implied Cum Dividend Offer Premium % | | | |
|---|---|---|---|---|---|---|---|---|
| | | Exit Multiple | | | | | Exit Multiple | |
| | | 7.0 x | 7.5 x | 8.0 x | | | 7.0 x | 7.5 x | 8.0 x |
| WACC | 6.0% | 182.7 | 198.3 | 213.9 | WACC | 6.0% | 20.0% | 10.6% | 2.5% |
| | 6.3% | 179.7 | 195.2 | 210.6 | | 6.3% | 22.0% | 12.4% | 4.1% |
| | 6.5% | 176.8 | 192.0 | 207.3 | | 6.5% | 24.0% | 14.2% | 5.8% |
| | 6.8% | 173.9 | 189.0 | 204.0 | | 6.8% | 26.1% | 16.0% | 7.5% |
| | 7.0% | 171.1 | 186.0 | 200.8 | | 7.0% | 28.2% | 17.9% | 9.2% |

In the central case, the terminal value represents 76.8% of the calculated enterprise value, which corresponds to an implied perpetual growth rate of 0.6%. Based on this analysis, the DCF value stands at €192.05 per share. As such, the Offer Price (cum-dividend) implies a premium of 14.2%.

For reference purposes, a valuation including a terminal value calculated from a Perpetual Growth Rate ("PGR") is presented in the tables below, which illustrate the sensitivity of the share price for a WACC of 6.5% and a PGR range of 0.5% to 1.0%.

| Share Price Sensitivity Analysis €  | | | | | Implied Cum Dividend Offer Premium % | | | |
|---|---|---|---|---|---|---|---|---|
| | | PGR | | | | | PGR | |
| | | 0.50% | 0.75% | 1.00% | | | 0.50% | 0.75% | 1.00% |
| WACC | 6.5% | 188.2 | 198.5 | 209.7 | WACC | 6.5% | 16.5% | 10.5% | 4.6% |

---

[4] Net debt over as of 31 December 2014 as per annual consolidated financial statements and market capitalization as of 28 April 2015 unaffected share price

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

### 3.3.7.  Summary of the valuation of the Offer per Company Share

| | | %Premium |
|---|---|---|
| **Block Acquisition** | | |
| Price paid for the Block Acquisition (cum dividend) | €219.30 | 0.0% |
| **Trading Prices (VWAP)** | | |
| Last Quoted Price (28 April 2015) | €159.10 | 37.8% |
| 1-Month VWAP | €155.41 | 41.1% |
| 2-Month VWAP | €154.78 | 41.7% |
| 3-Month VWAP | €148.87 | 47.3% |
| 6-Month VWAP | €135.19 | 62.2% |
| 9-Month VWAP | €125.83 | 74.3% |
| 12-Month VWAP | €122.27 | 79.4% |
| 12-Month High | €164.95 | 32.9% |
| 12-Month Low | €95.80 | 128.9% |
| **Broker Target Prices [1]** | | |
| Median of broker target prices | €173.50 | 26.4% |
| **Comparable Companies [1]** | | |
| 2015E EV / EBITDA | €138.71 | 58.1% |
| 2016E EV / EBITDA | €129.45 | 69.4% |
| 2015E EV / EBITA | €169.91 | 29.1% |
| 2016E EV / EBITA | €137.19 | 59.9% |
| 2015E P / E [2] | €202.11 | 8.5% |
| 2016E P / E [2] | €189.12 | 16.0% |
| **Discounted Cash Flows** | | |
| 6.5% WACC / 7.5x Exit Multiple | €192.05 | 14.2% |
| **Precedent Transactions [1]** | | |
| French Public Transactions (OPA) - observed premium [3] | €194.57 | 12.7% |
| Precedent transactions (median AV / LTM EBITDA of 7.2x) | €137.72 | 59.2% |

[1] Prices displayed are median of valuation ranges
[2] P/E multiples are impacted by the comparable companies' respective capital structures. As ND is more levered than its core peers, this methodology may not be relevant
[3] Median premium observed of 24.3% applied to ND 1-month average share price as of 28 April 2015 (€156.53 per share). For reference, the cum-dividend Offer Price represents a premium of 40.1% to ND's 1-month average share price as of 28 April 2015 (€156.53 per share)

*Translation for information purposes only.*
*In case of discrepancy between the French and the English version, the French version shall prevail.*
*The Offer and this draft information memorandum remains subject to the review of the AMF*

**4.**     **PERSONS ASSUMING RESPONSIBILITY FOR THE DRAFT INFORMATION MEMORANDUM**

**OFFEROR**

"*As far as I am aware, the information in this draft information memorandum is true and there are no omissions liable to distort the content thereof.*"


On [●] 2015


**XPO Logistics France SAS**

Mr. John Hardig


**PRESENTING BANK**

"*Pursuant to article 231-18 of the AMF General Regulations, Morgan Stanley presenting bank for the Offer, certifies that, to its knowledge, the presentation of the Offer it has examined based on the information communicated to it by the Offeror and the elements of appraisal of the price are accurate and do not contain any omissions likely to alter their impact.*"


On [●] 2015


Morgan Stanley