**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____ 5/22/2017
DATE FILED: _____

-----------------------------------------------------------------X

In re APPLICATION OF XPO LOGISTICS, INC.,

15-MC-205 (LGS)(SN)

Petitioner.

<u>OPINION & ORDER</u>

-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

Respondent Elliott Capital Advisors, L.P., Elliott Management Corporation, and Elliott Associates L.P. (collectively "Elliott") filed this motion pursuant to 28 U.S.C. § 1782 on October 27, 2015, seeking to compel production of certain documents by Petitioner, XPO Logistics, Inc. ("XPO"). On February 8, 2017, the Court lifted the stay that it had imposed on January 8, 2016.

On February 15, 2017, Elliott moved for additional § 1782 discovery from two wholly owned subsidiaries of Norbert Dentressangle, S.A. ("ND"), a California-based corporation named XPO GF America, Inc. ("XPO GF"), and a number of Iowa-based corporations ("Jacobson"). XPO GF was previously ND's principal American subsidiary, and ND had acquired 100% of Jacobson in 2014, while maintaining its separate incorporation. Both XPO GF and Jacobson have asserted in previous litigation in the Central District of California and the Southern District of Iowa that they would consent to the jurisdiction of this Court, so that all of the outstanding disputes could be adjudicated efficiently and consistently.

For the reasons set forth below, both Elliott's original motion and its motion pertaining to XPO GF and Jacobson are GRANTED in part and DENIED in part.

**I.    Underlying French Litigation**

The § 1782 motions at issue relate to litigation pending before the Paris Commercial Court. On April 28, 2015, XPO announced an agreement to acquire 66.71% of the shares of a

French corporation, Norbert Dentressangle ("ND"), and its intention to launch a tender offer for the remaining shares. XPO stated that if it reached the 95% controlling ownership threshold, it would exercise its right under French law to conduct a squeeze-out of the remaining shareholders. Following this announcement, Elliott began acquiring shares and contracts for difference ("CFDs") in ND. On June 8, 2015, XPO acquired 66.71% of the shares of ND and on June 11, 2015, XPO filed a tender offer for the remaining shares. Throughout this period, Elliott continued to acquire shares and CFDs in ND. On June 26, 2015, Elliott informed XPO that it had acquired the statutory threshold of 6% of shares in ND, and on July 6, 2015, Elliott announced that it intended to continue to acquire ND shares and would not tender its shares to XPO's bid.

On July 8, 2015, XPO filed a Summary Proceeding against Elliott in Paris Commercial Court, alleging that Elliott had illegally obtained its interest in ND with an improper motive. On the same day, the French court granted XPO's request for a provisional order barring Elliott from transferring any of its interest in ND to a third party other than XPO. On July 16, 2015, Elliott filed a Summary Proceeding against XPO and ND in Paris Commercial Court, alleging that XPO had wrongfully stripped assets from ND contrary to the interests of ND and its minority shareholders. Elliott also asked the French court to appoint an expert to collect documents from XPO to assess whether XPO's actions related to its attempt to acquire ND were consistent with the interests of ND and its minority shareholders. On the same day, the French court granted Elliott's request for a provisional order suspending all integration activities from XPO and ND until the court ruled on whether to appoint an expert.

On July 29, 2015, the Paris Commercial Court issued an order consolidating the two actions into a single proceeding (the "French Proceeding"), lifted both provisional orders and denied interim relief to either party.

On September 29, 2015, Elliott submitted its defenses and counterclaims and renewed its request for the appointment of an expert. In its counterclaims, Elliott seeks compensatory damages for (1) XPO's alleged misrepresentation of its tender offer materials relating to ND, on which Elliott relied to its detriment, and (2) XPO's alleged "gutting" of ND, contrary to the interests of ND and its shareholders. In regards to its first counterclaim, Elliott argued that it detrimentally relied on XPO's public claims that "its new majority stake . . . could potentially release some unrealized value for ND and its shareholders including its minority shareholders," that ND would be "the development platform for all the European activities of XPO Logistics, Inc.," and that it would continue to be led by then Chairman of the Executive Board Hervé Montjotin. See ECF No. 131-1, Statement in Defence and Counterclaim at ¶¶ 91–93. In regards to the second counterclaim, Elliott argues that XPO has tried to make up for the loss of its prospective gains when it was not able to acquire 95% of ND's shares by wrongfully divesting ND of assets and revenues in derogation of the rights of ND's minority shareholders. Specifically, Elliott alleges that XPO has provided ND with an inter-company loan at rates far above ND's previous cost of borrowing, in order to maximize XPO's cash flow (id. at ¶¶ 102–09); required ND to use XPO's trademark in exchange for royalties paid by ND to XPO (id. at ¶¶ 110–14); redirected web traffic from ND's American subsidiary, Jacobson Companies, to XPO's website (id. at ¶ 119) and announced on its website that XPO is the "official carrier of the Tour de France," even though ND had paid to renew its partnership with the Tour de France through 2018 (id. at ¶ 120).

In addition to asserting its defenses and counterclaims, Elliott also petitioned the Paris Commercial Court for the appointment of an expert, pursuant to Article 146 of the French Code

of Civil Procedure.[1] Specifically, Elliott requested an expert to "report on the extent of the misconduct committed against the company and its minority shareholders, to identify those responsible and jointly responsible, and the extent of the damage caused as a result." Id. at ¶ 147.

On May 2, 2016, Elliott filed a separate *ut singuli* action, which is similar to a shareholder's derivative suit, against present and former ND executives in Paris Commercial Court. See ECF No. 97 (May 12, 2016 status report); ECF 132-12 (*ut singuli* complaint). On October 3, 2016, the ND executives did not oppose the consolidation of their case with the underlying XPO-Elliott dispute. ECF No. 104 (October 13, 2016 status report). In its complaint, Elliott made a similar request for the appointment of a court expert pursuant to Article 146 of the French Code of Civil Procedure. See ECF No. 132-12, *Ut Singuli* complaint at ¶¶ 111–17.

## II.   Procedural History in the U.S. District Court

On July 10, 2015, XPO filed an ex parte application for an order pursuant to 28 U.S.C. § 1782 to conduct expedited discovery for use in the French Summary Proceeding. On the same date, the Court granted XPO's request for expedited discovery of the following categories of documents:

(i)     All documents regarding transactions in any ND or XPO securities, or relating to XPO's tender offer, including any documents related to or reflecting such transactions;

(ii)    All documents concerning any communications or agreements with third parties regarding ND Securities' or XPO's tender offer;

(iii)   All documents concerning Elliott's plans or intentions with respect to XPO's tender offer for ND shares, including documents regarding Elliott's financing of its acquisition of ND securities, and all documents concerning valuations of ND securities;

---

[1] Article 146 provides: "A preparatory inquiry on a fact may be ordered only if the party who pleads it does not have sufficient material to prove it." Code of Civil Procedure (Yves-Antoine Tsegaye, trans.), available at www.legifrance.gouv.fr/content/download/1962/13735/.../Code_39.pdf. The powers of an expert are detailed in Articles 232 through 263 of the French Code of Civil Procedure.

(iv)    Documents sufficient to show Elliott's document retention policies. (ECF No. 5, Ex. 1-4).

On July 20, 2015, Elliott filed an ex parte motion for an order of judicial assistance pursuant to § 1782. (ECF No. 15, 16.)  On July 24, 2015, Elliott filed a separate ex parte motion seeking discovery from Morgan Stanley & Co. LLC ("Morgan Stanley") and KPMG LLP ("KPMG"), who served as XPO's investment banker and auditor, respectively. (ECF No. 28.) On the same day, the Honorable Ronnie Abrams, Part I, granted both of Elliott's § 1782 requests, and ordered the following discovery:

(i)    The deposition of an XPO representative with extensive knowledge of its plans for integrating ND into XPO;

(ii)    All documents related to the purpose of evaluating XPO's contemplated acquisition of ND, including internal memoranda, reports, analyses and presentations to XPO's committees and board;

(iii)    All documents related to the financial implications of the contemplated acquisition of ND;

(iv)    All documents related to or filed pursuant to items 4(c) and 4(d) of the Hart-Scott-Rodino Act notification form or French Foreign investment notification;

(v)    All documents related to actual or contemplated transactions or arrangements between ND and XPO;

(vi)    All documents related to changes in compensation of ND board members; and

(vii)    Production of witnesses for depositions by Morgan Stanley and KPMG. (ECF No. 19, Ex. 1, & 22.)

In response to the parties' ongoing disagreements regarding the timeliness of production and running of search terms, the Honorable Lorna G. Schofield, Part I, issued an order on August 7, 2015, directing XPO to proceed with email searches for five identified custodians, to provide Elliott with an affidavit from the individual at XPO with the greatest day-to-day involvement in the buy-out of ND, and to identify all other individuals who were involved in the transaction. She

further ordered that the parties agree to categories of documents to be produced in a rolling production by August 17, August 23, and September 3, 2015.

At a status conference held on September 14, 2015, Judge Schofield exempted from XPO's production to Elliott any documents or portions of documents that related to the following issues: (i) tax consolidation of XPO and ND; (ii) the financial implications of XPO not reaching 95% ownership of ND; (iii) XPO's public relations strategy related to the proposed acquisition of ND; (iv) post-integration compensation of ND's directors; and (v) inter-company indebtedness. ECF Nos. 60 & 63 at 34. Judge Schofield gave Elliott leave to renew its application for these documents at a later date, provided that Elliott could explain to the Court how this information supported its counterclaims or defenses in the French proceeding. Id.

On October 27, 2015, Elliott submitted a motion to renew its application to compel XPO to produce documents that Judge Schofield excluded in the September 14, 2015 Order. At this time, Judge Schofield referred this proceeding to me. XPO opposed Elliott's motion, and submitted a cross-motion seeking an order to compel production of numerous categories of documents, which XPO claimed represented deficiencies in Elliott's original productions.

On January 8, 2016, the Court granted Elliott limited discovery into "documents that concern the actual tax costs that [XPO] is seeking as damages in its claims against Elliott," thus addressing the first of the five categories originally excluded by Judge Schofield. ECF No. 76 at 3. As to the other four categories of documents, however, the Court stayed the discovery proceedings pending Elliott's application for appointment of an expert in the French proceeding, given the possibility that the expert, if appointed, would be able to acquire the same documents sought here. On June 22, 2016, Judge Schofield overruled Elliott's objections to the stay. ECF No. 99. On December 15, 2016, the Court of Appeals for the Second Circuit dismissed Elliott's

appeal for lack of jurisdiction, finding that the partial stay of discovery was not a final, appealable decision. <u>XPO Logistics, Inc. v. Elliott Capital Advisors, L.P.</u>, No. 16-2567, 2016 WL 7321049, at *1 (2d Cir. Dec. 15, 2016) (summary order).

On December 27, 2016, Elliott moved for the Court to lift the stay imposed on the grounds of developments in the French litigation and continuing delays in the Paris Commercial Court's ruling on the appointment of an expert. While the Court did not subscribe fully to Elliott's characterization of the issues, in light of the statutory purpose of 28 U.S.C. § 1782 to provide "efficient means of assistance to participants in international litigation," <u>Application of Malev Hungarian Airlines</u>, 964 F.2d 97, 100 (2d Cir. 1992), and the passage of over a year without action, the Court lifted the stay on February 8, 2017. ECF No. 120. Accordingly, the Court proceeds to consider Elliott's applications.[2]

## DISCUSSION

### I.  Legal Standard for 28 U.S.C. § 1782 Discovery

Pursuant to 28 U.S.C. § 1782, litigants in foreign proceedings are permitted to obtain discovery in the United States for the purpose of assisting in foreign litigation. Section 1782 authorizes "[t]he district court in which a person resides or is found [to] order him to give his testimony or statement or to produce documents or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person." 28 U.S.C. § 1782(a). The statute sets forth three requirements to qualify for § 1782 discovery: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery be for use in a proceeding before a foreign tribunal, and (3) the application be made by a foreign or international tribunal or any interested person."

---

[2] At oral argument on the motion to lift the stay on January 26, 2017, the parties stipulated that they were content to rely on the briefing they submitted on the 2015 motion to compel. ECF No. 118 at 13.

Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P., 789 F.3d 113, 117 (2d Cir. 2015) (quoting Brandi-Dohrn v. IKB Deutsche Industriebank AG, 673 F.3d 76, 80 (2d Cir. 1997)).

Once these requirements have been met, the district court should exercise its discretion under § 1782 "in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery, 121 F.3d 77, 79 (2d Cir. 1997) (quoting Malev Hungarian Airlines, 964 F.2d at 100–01 (internal quotation marks omitted)).

Provided that the statutory requirements above are met, Section 1782(a) gives district courts "broad authority . . . to impose reasonable limitations and conditions upon discovery." Euromepa S.A. v. Eserian, Inc., 51 F.3d 1095, 1102 (2d Cir. 1995). In determining how to exercise this discretion, the Supreme Court has instructed courts to consider: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for § 1782(a) aid generally is not as apparent; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is unduly intrusive or burdensome. Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264–65 (2004).

## II.     Application to Elliott's Original Motion

In this case, there is no doubt that the three statutory factors for the applicability of 28 U.S.C. § 1782 are met—XPO is subject to jurisdiction within the Southern District of New York,

the discovery is sought for a foreign proceeding before a French tribunal, and Elliott is an "interested person" in the litigation. Therefore, the appropriateness of granting discovery under the statute depends on the application of the discretionary factors outlined by the Supreme Court in <u>Intel</u>, 542 U.S. 241.

### A. Factor 1: Whether XPO is a Participant in the Underlying Proceeding

XPO, of course, is a participant in the French litigation at issue in this case. The import of <u>Intel</u>'s first factor, however, is not only whether the foreign tribunal has jurisdiction over the party targeted by the § 1782 application, but whether the discovery sought is within the foreign tribunal's jurisdictional reach, and therefore accessible absent resort to § 1782. <u>See</u>, <u>e.g.</u>, <u>In re Ex Parte Application of Porsche Automobil Holding SE</u>, No. 15-MC-417 (LAK), 2016 WL 702327, at *7 (S.D.N.Y. Feb. 18, 2016) ("[T]he relevant inquiry is whether the foreign tribunal has the ability to control the evidence sought and order production, not whether the tribunal has control over the party targeted by the Section 1782 application . . . .").

This factor weighs in XPO's favor, and, indeed, was the primary basis for the stay imposed in this case. The parties vehemently disagree as to the powers accorded to the court-appointed expert requested by Elliott. <u>Compare</u> ECF No. 140, Rigo Decl. at ¶ 7 ("[The] expert has no ability or subpoena power to compel XPO to produce documents. Rather, the expert is appointed to analyze the documents that are produced by the parties, and if no information on a particular topic is produced, the expert will have no documents on that topic to analyze and report to the French court on.") <u>with</u> ECF No. 142, Brochier Suppl. Decl. at ¶ 3 (purposes of appointing the expert "include obtaining the very categories of documents which Elliott also seeks in the US proceeding, and if XPO declines to provide such documents . . . then Elliott can move the French Court to exercise its power to compel production . . . .")

Neither party has adequately briefed the legal powers of the expert with reference to specific articles of the French Code of Civil Procedure, case law, or treatises. And the Court of Appeals has cautioned district courts against becoming mired in "speculative forays into legal territories unfamiliar to federal judges." Euromepa S.A, 51 F.3d at 1099–1100. Nevertheless, a cursory examination of the French Code of Civil Procedure suggests that the expert has at least some means of acquiring documents relevant to his or her mission. An expert, once appointed, "may request the parties or third parties to produce any documents and the judge may provide for the same in case of difficulty." Code de Procédure Civile [C.P.C.] [Civil Procedure Code] art. 243. Moreover, "[w]here a party holds evidence material, the judge may, upon the petition of the other party, order him to produce it, where necessary under a periodic penalty payment." Id. art. 11.

Indeed, were the expert to have no ability whatsoever to compel the production of documents (whether on his own power or by intervention of the court), Elliott's submission to the Paris Commercial Court would make little to no sense. The entire premise of Elliott's request for the appointment of an expert is that the evidence it had already obtained through U.S. discovery was insufficient to establish its counterclaims. See ECF No. 131-1, Statement in Defense and Counterclaim at ¶¶ 135–36 (noting that the information Elliott collected through discovery in the United States was insufficient); id. at ¶ 137 (alleging that XPO failed to provide virtually the same document categories sought in the present application); id. at ¶ 139 (requesting that an expert be appointed to address these alleged deficiencies); id. at ¶¶ 146–47 (noting that "the information in Elliott's possession is not enough to establish the extent of [XPO's] fraudulent activities" and stating "[f]or this reason, it is essential that the Court appoints an expert . . . to be able to report on the extent of the misconduct committed . . . ."). Therefore,

without making any definitive conclusions about French law, the Court finds that because Elliott's own submissions in the litigation in France presuppose the Paris Commercial Court's jurisdiction over the relevant documents, the first <u>Intel</u> factor weighs in favor of XPO.

**B.      Factor 2: Whether the Paris Commercial Court Would be Receptive to U.S. Federal Assistance under 28 U.S.C. § 1782**

The Court of Appeals has stated that district courts "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," including, for example, "a forum country's judicial, executive, or legislative declarations that specifically address the use of evidence gathered under foreign procedures." <u>Euromepa S.A.</u>, 51 F.3d at 1099–1100; <u>see</u> <u>Schmitz v. Bernstein Liebhard & Lifshitz, LLP.</u>, 376 F.3d 79, 84 (2d Cir. 2004) (German Ministry of Justice explicitly asked district judge to deny the discovery request); <u>In re Microsoft Corp.</u>, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) (European Commission explicitly opposed discovery request). Absent such authoritative proof, "courts have been instructed to tread lightly and heed only clear statements by foreign tribunals." <u>In re Application of OOO Promnefstroy</u>, No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009).

In this case, XPO has made no showing that the Paris Commercial Court or any French authority has actively opposed the assistance of U.S. discovery procedures, either in this case or in any other. Accordingly, the second <u>Intel</u> factor weighs in favor of Elliott.

**C.      Factor 3: Whether the Request is an Attempt to Circumvent Foreign Proof-Gathering Restrictions or Other Policies of France or the United States**

Under the third <u>Intel</u> factor, the Court may consider how Elliott fared or is faring before the Paris Commercial Court in its attempts to procure the information it is seeking under 28 U.S.C. § 1782. Courts have been loath to condone "blatant end-run[s] around 'foreign proof-gathering restrictions or other policies of a foreign country'" and therefore have refused to grant

§ 1782 applications that would "preempt or contradict" decisions made by foreign tribunals. Microsoft Corp., 428 F. Supp. 2d at 195 (citing Intel, 542 U.S. at 264)).

In this case, XPO argues that Elliott was already once rebuffed in its attempt to secure this discovery, when on July 29, 2015, the President of the Paris Commercial Court terminated Elliott's first action seeking appointment of an expert, as well as the provisional orders previously entered on behalf of both parties. ECF No. 135, Brochier Decl. at ¶ 9. Elliott counters that the July 29, 2015 denial was not an adjudication on the merits of its request to appoint an expert, but rather a denial of the request on an expedited basis. ECF No. 77, Elliott Recons. Mot., at 6. This is, indeed, consistent with the current posture of the case, in which Elliott's request for an expert seeking identical discovery has been pending for over a year.

Because XPO has not demonstrated that Elliott has been definitively rebuffed in seeking such discovery in France, the Court has no basis to conclude that Elliott is seeking to circumvent foreign proof-gathering restrictions. Accordingly, the third Intel factor weighs in favor of Elliott.

## D. Factor 4: Whether the Request is Unduly Intrusive or Burdensome

In assessing whether a discovery request is "unduly intrusive or burdensome," the court should "assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." Mees v. Buiter, 793 F.3d 291, 302 (2d Cir. 2015). "[W]hether a request is intrusive or burdensome should not be assessed based on the 'discovery scope' available in the foreign proceeding." Id. Rule 26(b)(1) provides that the scope of discovery is limited to "relevant" material that is "proportional to the needs of the case . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit," among other factors. In re Application of Elvis Presley Enterprises LLC, No. 15-MC-386 (DLC), 2016 WL 843380, at *5 (S.D.N.Y. Mar. 1, 2016). The Rule also requires courts to

limit discovery where "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other sources that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). The Court of Appeals has generally encouraged district courts to take a permissive approach and "reconcile whatever misgivings [they] may have about the impact of [their] participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief." Euromepa S.A., 51 F.3d at 1101. If the court, however, determines that a § 1782 application was "made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery were sought in bad faith in domestic litigation." Id. at 1101 n.6.

### 1. The Financial Implications of XPO Not Reaching 95% Ownership of ND

In its counterclaims, Elliott argues that XPO had a "back-up" plan in the event that it failed to reach 95% ownership of ND, which involved stripping ND of assets to place it in the same financial position as if XPO held full ownership of the entity. Therefore, Elliott seeks documents relating to the financial implications of XPO not reaching full ownership, including minutes and documents from XPO's integration committees and documents involving the integration of ND subsidiary Jacobson into XPO. Elliott anticipates that such documents would include discussions regarding the assessment of the "risks" associated with not being able to achieve the full financial benefits of the takeover, and of what the "Plan B" would look like. ECF No. 129, Elliott Mem. of Law at 17.

XPO counters that these documents would go only to XPO's motives, which are not an element of Elliott's claims. See ECF No. 135, Brochier Decl. at ¶ 17 (noting that "Elliott does not allege that XPO had an incentive to breach applicable laws (which would not be a valid cause of action), but rather that XPO actually breached applicable laws"). Elliott responds that "[e]vidence of XPO's reasons, purpose, or motive is directly relevant, under French law, to . . . Elliott's counterclaim and defenses . . . . XPO's inability to achieve the full benefits of integration provides the foundation for its improper strategy of stripping ND of its assets. Accordingly, [this] foundational evidence is directly relevant, under French law . . . ." ECF No. 140, Rigo Decl. at ¶ 8.

The Court reads these dueling declarations as standing for the proposition that while Elliott does not need to demonstrate that XPO acted with a certain mental state or motive for liability to attach, evidence regarding the financial implications of XPO's failing to reach 95% ownership of ND would make XPO more likely to commit the actions that Elliott alleges are unlawful. Therefore, such motive evidence has some relevance to Elliott's counterclaims, even though it does not go to a specific element of its cause of action.

Nevertheless, the Court's analysis under Rule 26 and 28 U.S.C. § 1782 does not stop at relevance. In considering this motion, the Court must take notice of the posture of the judicial proceedings before the Paris Commercial Court. The genesis of this dispute is XPO's initial claim that Elliott engaged in a concealed transaction that was illegal under French law targeted at impeding XPO's acquisition of 100% of ND, with the goal of "greenmailing" XPO into paying some sum of money related to the value destroyed by Elliott's blocking of the consolidation. Evidently, the documentation sought in this category would provide Elliott with, inter alia, XPO's own assessments for the amount of value lost due to Elliott's strategy.

The Court expresses no opinion on the merits of either party's allegations in the French proceeding or of the French law underlying them, and notes only that the Paris Commercial Court has made no definitive findings favorable to other side. In light of the possibility that the French court may find Elliott's conduct to be illegal, the Court finds that it would be imprudent and unduly intrusive to order XPO to produce documents that are reasonably likely to further such conduct. Ordering the production of such documents during the pendency of XPO's claims would not promote the "twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." <u>Schmitz</u>, 376 F.3d at 84 (internal quotation marks omitted). Instead, such an order would run the risk of provoking unforeseen consequences and entangling the Court in the merits of a foreign proceeding. Given the interplay between XPO's claims and Elliott's counterclaims, such discovery, if warranted, should be sought through any expert who may be appointed in France for this purpose.

To be clear, the Court does not base this ruling on any "exhaustion" or "quasi-exhaustion" requirement, because the Court of Appeals has repeatedly found that categorically forcing litigants to seek discovery first in the foreign tribunal "finds no support in the plain language of the statute and runs counter to its express purposes." <u>Metallgesellschaft AG</u>, 121 F.3d 77, 79 (2d Cir. 1997). Rather, in the unique situation presented here in which documents with some relevance to a counterclaim may also further allegedly unlawful conduct in an unadjudicated claim before a foreign tribunal, the Court finds that it is well within its discretion to deny the relief requested.[3] Accordingly, the fourth <u>Intel</u> factor weights in favor of XPO as to

---

[3] This finding of intrusiveness ties in to the second <u>Intel</u> factor instructing courts to consider "the character of the proceedings underway abroad." <u>Intel</u>, 542 U.S. at 264.

this category of documents because the request is unduly intrusive, and Elliott's application is DENIED.

### 2. XPO's Public Relations Strategy Related to Proposed Acquisition of ND

In relation to its misinformation counterclaim, Elliott alleges that it detrimentally relied on various public claims made by XPO regarding its intentions for ND. Therefore, Elliott seeks documents related to XPO's public relations strategy relating to the ND transaction in order to shed light onto the veracity of XPO's public representations. XPO argues that Judge Schofield already deemed such documents to be irrelevant.

The Court finds that information concerning XPO's public relations strategy is relevant to Elliott's counterclaim that the statements that it made during and immediately after its acquisition of the majority of ND's shares were materially misleading. Because Judge Schofield's ruling on September 14, 2015, predated the filing of Elliott's counterclaims in France on September 29, 2015, she could not possibly have considered the relevance to such counterclaims. Accordingly, the fourth <u>Intel</u> factor weighs in favor of Elliott as to this category of documents, and Elliott's application is GRANTED. XPO should produce documents relating to its public relations strategy dating back to a reasonable period before April 28, 2015, when XPO announced its acquisition of the majority share of ND, and the closing of the tender offer on July 17, 2015.

### 3. Post-Integration Compensation of ND's Directors

In relation to its asset-stripping counterclaim, Elliott also seeks documents concerning the post-integration compensation of ND's current and former managerial employees, postulating that XPO overcompensated ND's senior management as an incentive to act to the detriment of ND. Alternatively, Elliott posits that XPO may have imposed restrictions on ND's management

creating conflicts of interest that make ND's management unable to represent the interests of ND and minority shareholders, and speculates that XPO may have internal documents reflecting discussion and analysis of overcompensating ND management such that they would acquiesce to asset-stripping ND. ECF No. 129, Elliott's Mem. of Law at 20; ECF No. 138, Elliott's Reply Mem. of Law At 9. XPO responds that ND is a publicly listed company, and that compensation information for key officers and directors is readily available to the general public. ECF No. 134, XPO's Opp'n Mem. of Law at 19.

The Court finds that Elliott's allegations of overcompensation of ND board members (stemming from one paragraph in their counterclaim dealing only with former Chairman of the Board Hervé Montjotin) are speculative and of minimal, if any, relevance to its counterclaims. Elliott has presented no plausible evidence of any such overcompensation or restrictions. Moreover, providing Elliott with proprietary personnel information beyond that which is already publicly available would be highly intrusive given the nature of the dispute and is not proportional to the needs of the case. Accordingly, the fourth <u>Intel</u> factor weighs in favor of XPO as to this category, and Elliott's application is DENIED.

### 4. Inter-Company Indebtedness

Elliott's counterclaim alleges that one of the ways in which XPO allegedly misappropriated ND's assets is by lending ND money through an intercompany loan at an unusually high rate in questionable circumstances, contrary to ND's interests. <u>See</u> ECF No. 131-1, Statement in Defence and Counterclaim at ¶ 109. This loan was allegedly taken out for 657 million euros with an annual interest rate of 5.625%, when ND was able to access credit at 3% per annum previously. <u>Id.</u> at ¶ 107. XPO argues that Elliott already has the opinion of an

independent expert appointed by ND's board who opined that the intercompany loan was appropriate. XPO's Opp'n Mem. of Law at 19.

The Court finds that the information sought by Elliott in regards to the intercompany loan executed in or around June 2015 is highly relevant to its asset-stripping counterclaim and is proportional to the needs of the case. Even though XPO commissioned an independent expert, as required by French law, to certify the fairness of this loan, Elliott challenges this expert's conclusions and has presented plausible evidence to support an inference that the terms of the loan may have been unduly favorable to XPO.

Accordingly, the fourth Intel factor weighs in favor of Elliott as to this category, and Elliott's application is GRANTED in part. XPO must produce all non-privileged documents pertaining to the June 2015 intercompany loan. Because Elliott has not alleged or briefed the relevance of any other types of "intercompany indebtedness," XPO's obligation are limited to this loan only, not any other indebtedness that may exist between it and ND or its subsidiaries.

## III.    Application to Elliott's Motion as to XPO GF and Jacobson

As is the case for XPO itself, there is no doubt that the three statutory factors for the applicability of 28 U.S.C. § 1782 are met as to XPO GF and Jacobson. XPO GF and Jacobson have consented to jurisdiction in the Southern District of New York, the discovery is sought for a foreign proceeding before a French tribunal, and Elliott is an "interested person" in the litigation. Therefore, the appropriateness of granting discovery under the statute depends on the application of the Intel factors considered above.

To shorten this discussion, the Court notes that XPO has made no arguments regarding the first three Intel factors, either before this Court or the district courts in California and Iowa,

and these three discretionary factors weigh in Elliott's favor.[4] See ECF No. 132, Elliott Letter at 3 (noting that XPO had stated in open court in California that they were relying solely on the fourth Intel factor). Therefore, the Court shall pass directly to considering the fourth Intel factor concerning burdensomeness and intrusiveness, as informed by "the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." Mees, 793 F.3d at 302.

In considering the substance of Elliott's request, the Court takes note of the potential relevance of the discovery materials sought as to both Elliott's September 29, 2015 counterclaims and defenses against XPO, and Elliott's May 2, 2016 *ut singuli* complaint against ND executives.

As a preliminary matter, XPO argues that Elliott's discovery demands as to XPO GF and Jacobson are duplicative of Elliott's initial subpoenas served upon XPO, which called not only for documents in the possession of XPO, but also for those of XPO's "current and former subsidiaries, affiliates . . . and any predecessors or successors of the foregoing." ECF No. 18-1. Therefore, XPO contends that these requests were ultimately limited as part of a negotiated agreement with Elliott and that XPO has already provided Elliott with multiple documents that are responsive to its new requests. ECF No. 137, XPO Opp. Letter at 4–5. On August 11, 2015, XPO objected to the initial subpoena's inclusion of XPO's "affiliates" and "subsidiaries," and Elliott did not respond to that objection or move to compel. Id. at 6; ECF No. 53-1 (XPO Responses and Objections). XPO characterizes Elliott's efforts to "reopen" a previously negotiated discovery protocol, which only left open the possibility of additional searches if

---

[4] The Court has already found that the second and third Intel factors weigh in favor of Elliott in its initial application, and the first factor also weighs in favor of Elliott as to XPO GF and Jacobson, because unlike XPO, they are not participants in the French litigation, and it would not appear that the Paris Commercial Court would have jurisdiction to compel production of documents in their possession. See Porsche Automobil Holding SE, 2016 WL 702327, at *7.

Elliott identified a "material substantive deficiency," <u>see</u> ECF No. 53-2, as improper and cumulative, particularly because Elliott delayed for a significant period of time before lodging its new requests.

Elliott counters that the protocol negotiated with XPO in 2015 concerned discovery from XPO alone, and thus cannot serve as a basis for restricting any discovery from separate corporate entities such as XPO GF and Jacobson. ECF No. 141, Elliott Reply Letter at 4. Moreover, Elliott denies any allegations that its delay in seeking documents from XPO GF and Jacobson smacks of bad faith because it alleges that XPO has taken actions to unlawfully integrate these subsidiaries in the past 18 months since the closing, information that would not have been available in 2015. <u>Id.</u> at 5.

The Court does not fully accept either party's characterization of the issues. On the one hand, though they are wholly-owned subsidiaries, XPO GF and Jacobson are separate entities. Notwithstanding Elliott's failure to respond to XPO's objections to the inclusion of subsidiaries in Elliott's initial subpoenas, it is not clear from the face of the emails memorializing the parties' 2015 discussions that their discovery protocol was categorically meant to apply to XPO's subsidiaries. Therefore, the Court shall not interpret the 2015 discovery protocol as a binding stipulation estopping Elliott from pursuing *any* further discovery into XPO's subsidiaries. At the same time, the Court need not blind itself to the fact that significant negotiations between the parties occurred, and such negotiations included formal objections by XPO to the inclusion of its subsidiaries that were not timely opposed by Elliott. These negotiations provide some support for limiting discovery to prevent it from becoming "unreasonably cumulative or duplicative" for XPO or because Elliott "had ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(2)(C). Given that the fourth <u>Intel</u> factor's concern with

burdensomeness and intrusiveness is discretionary, the Court shall consider the history of the

discovery dispute between the parties in establishing the proper scope of discovery.

Turning to Elliott's requests and considering the relevance and proportionality standards

of Federal Rule of Civil Procedure 26(b), the Court orders the following:

1) Elliott's omnibus request for "all documents and communications" concerning XPO's integration of XPO GF/Jacobson is overbroad, insufficiently specific and duplicative of the other requests for production and is therefore DENIED.

2) Elliott's request for "all documents and communications" concerning actions undertaken by XPO to transfer assets from XPO GF/Jacobson, whether directly or through ND, is GRANTED as to "ongoing" and "previous" transactions, but DENIED as to "contemplated" transactions (whether "contemplated" is defined as referring to future transactions or past transactions that were never consummated). Elliott's interests as a minority shareholder of ND cannot possibly be harmed by a transaction that has not been carried out, and thus such the production of such documents would be not be relevant to their claims and would be unduly intrusive into the corporate decisionmaking of the relevant entities.

3) Elliott's request for "all documents and communications" about the rebranding of XPO GF/Jacobson's assets as GPO's, including costs, licensing fees, and uses of each other's trademarks is GRANTED.

4) Elliott's request for "all documents and communications" about the methods by which XPO has allocated XPO GF/Jacobson's "actual or prospective customers," including the redirection of prospective customers to XPO, the allocation of existing customers between the two subsidiaries, ND, and XPO, and data from marketing channels is overbroad and unduly intrudes into the companies' internal governance and therefore is GRANTED in part and DENIED in part. XPO GF and Jacobson shall produce "all documents and communications" directly relating to any business plans to redirect XPO GF and Jacobson customers to XPO, but shall not be required to produce proprietary statistics or other information about the allocation of customers or data from marketing channels.

5) Elliott's request for "all documents and communications" about "any decisions of XPO, ND, or their affiliates that affect the finances of XPO GF or Jacobson, including transfers of funds," is overbroad, insufficiently specific and duplicative of the other requests for production, particularly Request #2, and is therefore DENIED.

6) Elliott's request for information for "all documents and communications" concerning the "service agreement between ["XPO Logistics Europe"] and XPO Logistics, Inc." as described in Section 4.1.1(d) of the December 31, 2015 Annual Financial Report of

"XPO Logistics Europe" is DENIED, because Elliott has not adequately explained the relevance of this document to its counterclaims or the *ut singuli* complaint.

7) Elliott's request for XPO GF and Jacobson's 2014, 2015, and 2016 financial statements is DENIED because it is overbroad and would allow Elliott to access proprietary company information that is not proportionate to its counterclaims or *ut singuli* complaint. Instead, the targeted discovery into tangible and intangible asset transfers in Request #2, the rebranding of assets in Request #3, and business plans to redirect customers in Request #4 are sufficient and proportionate for Elliott's needs.

8) Elliott's request for documents sufficient to show XPO GF and Jacobson's organizational relationship with its corporate parents, subsidiaries, and affiliates (including ND and XPO) as of January 1, 2015, and January 1, 2016, is GRANTED.

## CONCLUSION

Elliott's application for discovery pursuant to 28 U.S.C. § 1782 is GRANTED in part and DENIED in part. XPO, XPO GF, and Jacobson shall produce responsive, non-privileged documents as described in this Opinion and Order by Monday, June 5, 2017.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      May 22, 2017
            New York, New York